**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 21-cr-00229-RBJ
UNITED STATES OF AMERICA

      Plaintiff,

v.

1.  DAVITA INC.,
2.  KENT THIRY,

      Defendants

---

INDICTMENT

---

The Grand Jury charges that:

<u>COUNT 1</u>
Conspiracy in Restraint of Trade to Allocate Employees
(Violation of 15 U.S.C. § 1)

At times relevant to this Count:

1.      Defendant DAVITA INC., formerly DAVITA HEALTHCARE PARTNERS INC., ("DAVITA") was a company organized and existing under the laws of Delaware with its principal place of business in Denver, Colorado.  DAVITA was also sometimes referred to as "The Village" or "DVA."  DAVITA owned and operated outpatient medical care facilities across the United States.  DAVITA employed individuals to operate its business at its headquarters location and at other locations across the United States.

2.      Defendant KENT THIRY served as the Chief Executive Officer ("CEO") of DAVITA and the Chairman or Co-Chairman of the board of directors of DAVITA.  THIRY was also sometimes referred to as "KT."

3.      Surgical Care Affiliates, LLC was a company organized and existing under the laws of Delaware with its principal places of business in Birmingham, Alabama and

Deerfield, Illinois.  SCAI Holdings, LLC was a company organized and existing under the laws of Delaware, and was the successor entity to Surgical Care Affiliates, Inc. Collectively, these entities did business as Surgical Care Affiliates ("SCA").  SCA owned and operated outpatient medical care facilities across the United States and employed individuals to operate its business at its headquarters locations and at other locations across the United States.

4.      Individual 1 served as the CEO of SCA.

5.      Individual 2 was a senior-level executive of DAVITA.

6.      DAVITA and SCA were competitors in the recruitment and retention of senior-level employees.

7.      Various companies and individuals, not made defendants in this Count, participated as co-conspirators in the offenses charged herein and performed acts and made statements in furtherance thereof.

8.      Whenever in this Count reference is made to any act, deed, or transaction of any company, the allegation means that the company engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

9.      Beginning at least as early as February 2012 and continuing until at least as late as July 2017, the exact dates being unknown to the Grand Jury, in part in the District of Colorado and elsewhere, DAVITA and THIRY entered into and engaged in a conspiracy with SCA to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees.  The

conspiracy engaged in by DAVITA, THIRY, and their co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

10.    The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among DAVITA, THIRY, and their co-conspirators, the substantial terms of which were that DAVITA and SCA would allocate senior-level employees by not soliciting each other's senior-level employees across the United States.

## MEANS AND METHODS OF THE CONSPIRACY

11.    For the purpose of forming and participating in the charged conspiracy, DAVITA, THIRY, and their co-conspirators, among other things, did the following:

(a) participated in meetings, conversations, and communications with co-conspirators to discuss the solicitation of senior-level employees of DAVITA and SCA, including specific senior-level employees of DAVITA and SCA—for example, on or about October 20, 2014, THIRY emailed Individual 1 that "Someone called me to suggest they reach out to your senior biz dev guy for our corresponding spot. I explained I do not do proactive recruiting into your ranks.";

(b) agreed during those meetings, conversations, and communications not to solicit each other's senior-level employees;

(c) instructed certain executives, employees, and recruiters not to solicit senior-level employees of each other's companies—for example, on or about December 12, 2015, SCA's human resources executive emailed a

recruiter stating that "note that [Company A, another competitor of SCA] and Davita are off limits to SCA.";

(d) monitored compliance with the agreement not to solicit employees by requiring senior-level employees of DAVITA and SCA who applied to the other company to notify their current employer that they were seeking other employment in order for their applications to be considered—for example, on or about October 16, 2015, Individual 1 emailed SCA's human resources executive:  "Putting two companies in italics ([Company A] and DaVita) — we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking.";

(e) informed senior-level employees of DAVITA and SCA who were candidates for employment at the other company that they were required to provide such notice to their current employer—for example, on or about April 26, 2016, SCA's human resources executive emailed a candidate from DAVITA who was based in Dallas, Texas, that she could not recruit from DAVITA "unless candidates have been given explicit permission by their employers that they can be considered for employment with us.";

(f) alerted co-conspirators about instances of recruitment of employees of DAVITA and SCA and took steps to remedy violations of the agreement—for example, on or about June 13, 2016, an employee of SCA relayed a recruitment noting that "I thought there was a gentlemen's agreement between us and DaVita re: poaching talent."  An executive for SCA replied

"There is.  Do you mind if I share with [Individual 1], who has most recently addressed with Kent."  Individual 1 relayed the instance of recruitment to THIRY who replied "Will check it out."  On or about July 10, 2016, THIRY forwarded the communication from Individual 1 to Individual 2, commenting: "Pls put in our next agenda"; and

(g) refrained from soliciting each other's senior-level employees—for example, on or about April 7, 2017, Individual 1 was contacted by a consultant regarding his interest in a candidate employed by DAVITA, and Individual 1 responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave DaVita – that's the relationship that we have with DaVita."  The consultant responded, "… I'm glad you arrived at that agreement with KT."

<u>TRADE AND COMMERCE</u>

12.    The business activities of DAVITA, THIRY, and their co-conspirators that are the subject of this Count were within the flow of, and substantially affected, interstate trade and commerce.  For example:

(a) DAVITA and SCA employed senior-level employees in various states across the United States; and

(b) the conspiracy would restrict the interstate movement of senior-level employees between DAVITA and SCA.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

<u>COUNT 2</u>
Conspiracy in Restraint of Trade to Allocate Employees
(Violation of 15 U.S.C. § 1)

At times relevant to this Count:

13.     Paragraphs 1, 2, 7, and 8 are realleged and incorporated herein.

14.     Company B was a company organized and existing under the laws of Delaware with its principal place of business in San Francisco, California.  Company B was a healthcare company that operated across the United States and employed individuals to operate its business at its headquarters location.

15.     Individual 3 served as the CEO of Company B.

16.     DAVITA and Company B were competitors in the recruitment and retention of employees.

17.     Beginning at least as early as April 2017 and continuing until at least as late as June 2019, the exact dates being unknown to the Grand Jury, in part in the District of Colorado and elsewhere, DAVITA and THIRY entered into and engaged in a conspiracy with Company B to suppress competition between them for the services of employees by agreeing that Company B would not solicit DAVITA's employees.  The conspiracy engaged in by DAVITA, THIRY, and their co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

18.     The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among DAVITA, THIRY, and their co-conspirators, the substantial terms of which were that DAVITA and Company B would allocate employees by Company B's not soliciting DAVITA's employees.

<u>MEANS AND METHODS OF THE CONSPIRACY</u>

19.    For the purpose of forming and participating in the charged conspiracy, DAVITA, THIRY, and their co-conspirators, among other things, did the following:

(a) participated in meetings, conversations, and communications with co-conspirators to discuss the solicitation of employees of DAVITA by Company B;

(b) agreed during those meetings, conversations, and communications that Company B would not solicit DAVITA employees—for example, on or about April 16, 2017, Individual 3 emailed THIRY that "You also have my commitment we discussed that I'm going to make sure everyone on my team knows to steer clear of anyone at DVA and that I'll come back to you and talk before ever get anywhere near a point that could contemplate someone else.";

(c) reassured each other of compliance with the agreement that Company B would not solicit employees of DAVITA—for example, on or about February 22, 2018, Individual 3 emailed THIRY: "I took our conversations last year to heart around how it felt to you/DVA when [DAVITA employee] left—our relationship matters far more to me than any potential addition to our team.  Although there have been 4 people that have reached out over the past year to probe about opportunities, I have not pursued those conversations (always being clear that it was about not having a clear need which was accurate to some extent).";

7

(d) monitored compliance with the agreement that Company B would not solicit employees from DAVITA by requiring employees of DAVITA who reached out to Company B to notify DAVITA that they were seeking other employment in order to be considered by Company B;

(e) informed employees of DAVITA who were candidates for employment at Company B that they were required to provide such notice to DAVITA—for example, on or about February 22, 2018, Individual 3 emailed THIRY about a current DAVITA employee: "We do happen to have openings in her area and they could be a good fit.  However, I told her that given my relationship with the Village, I would only discuss with her if she told her manager explicitly that she would like to talk to me about a role and that I would talk to you about it before I would discuss with her (I framed it in a positive way about me making sure I'm doing the right thing as someone who cares about the Village and an investor in Village as well)."; and

(f) refrained from soliciting DAVITA employees—for example, on or about July 20, 2017, Individual 3 texted a former DAVITA employee: "Also please let me know if you think of any great folks (nobody currently at DaVita) that would be worth talking to."  And on or about April 20, 2017, Individual 3 texted a former colleague for recommendations for customer service employees and, referring to a DAVITA-owned pharmacy company, stated "But nobody at Rx today. Promised Kent!"

<u>TRADE AND COMMERCE</u>

20.     The business activities of DAVITA, THIRY, and their co-conspirators that are the subject of this Count were within the flow of, and substantially affected, interstate trade and commerce.  For example:

      (a) DAVITA and Company B employed employees in various states across the United States; and

      (b) the conspiracy would restrict the interstate movement of employees between DAVITA and Company B.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

A TRUE BILL

<u>Ink signature on file in Clerk's Office</u>
FOREPERSON

s/Richard A. Powers
RICHARD A. POWERS
Acting Assistant Attorney General

MARVIN N. PRICE, JR.
Director of Criminal Enforcement

s/Megan S. Lewis
MEGAN S. LEWIS
Assistant Chief
DC Bar No. 500720
Telephone: 202-598-8145
Fax: 202-514-9082
Email: megan.lewis@usdoj.gov

s/James J. Fredricks
JAMES J. FREDRICKS
Chief, Washington Criminal II Section


Antitrust Division
U.S. Department of Justice

s/William J. Vigen
WILLIAM J. VIGEN
Trial Attorney
DC Bar No. 997316
Telephone: 202-353-2411
Fax: 202-514-9082
Email: william.vigen@usdoj.gov

ANTHONY W. MARIANO
Trial Attorney
MA Bar No. 688559
Telephone: 202-598-2737
Fax: 202-514-9082
Email: anthony.mariano@usdoj.gov

Antitrust Division
U.S. Department of Justice
Washington Criminal II Section
450 5th Street NW
Washington, DC 20001