**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 21-cr-00229-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. DAVITA INC.,
2. KENT THIRY,

      Defendants.

---

## UNITED STATES' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS

The Indictment charges that DaVita Inc. and its former CEO Kent Thiry entered two long-running conspiracies with rival companies to suppress competition for employees. In both conspiracies, Defendants and their co-conspirators agreed not to solicit employees and enforced the agreements, including by instructing recruiters and others not to reach out to covered employees and, if such employees applied on their own, forcing them to demonstrate that they were not solicited and to disclose their application to their current employer to be considered. That is a per se unlawful market allocation and a crime under Section 1 of the Sherman Act, 15 U.S.C. § 1.

Yet Defendants make a baseless plea for a special dispensation from this per se rule because the victims of their conspiracies are employees and the perpetrators employers. But as long construed by the courts, Section 1's per se rule categorically condemns market-allocation agreements, including nonsolicitation agreements, and that rule applies when competitors allocate employees, who are suppliers of their own labor, just as it does when they allocate other

1

input suppliers or when they allocate customers. Defendants' demand that the per se rule be rejustified for this market and the supposed business excuses they offer reveal a profound misunderstanding of the per se rule's nature and rationale. Precedent makes plain that the per se rule establishes one uniform rule applicable to all industries alike and forecloses business excuses. Indeed, the excuses here echo the excuses rejected by courts when offered by conspirators allocating customers, and thus the supposed justifications actually show how allocation agreements among competitors are fundamentally alike.

The judicial decisions construing Section 1 demonstrate that the Indictment states a per se offense, and they likewise provided fair notice under the Due Process Clause. If Defendants or Amici want an exemption from the per se rule for conspiracies among employers, their recourse lies with Congress, not the courts, which follow existing antitrust principles and precedent.

## THE CHARGED CONSPIRACIES

Count 1 charges Defendants DaVita Inc. and its former CEO, Kent Thiry, with committing a per se violation of the Sherman Act by conspiring with SCA, a competing employer, "to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees. . . . the substantial terms of which were that DAVITA and SCA would allocate senior-level employees by not soliciting each other's senior level employees across the United States." Indictment ¶¶ 6, 9-10. Count 2 charges a substantially similar conspiracy among Defendants and Company B, another competing employer, to prevent Company B from soliciting any of DaVita's employees. *Id.* ¶¶ 16-18.

Defendants and their co-conspirators enforced the nonsolicitation agreements by, among other things, instructing executives, recruiters, and others not to solicit covered employees. For

example, "on or about December 12, 2015, SCA's human resources executive emailed a recruiter stating that 'note that . . . Davita [is] off limits to SCA." Indictment ¶ 11(c). And on or about April 20, 2017, the CEO of Company B "texted a former colleague for recommendations for customer service employees and, referring to a DAVITA-owned pharmacy company, stated 'But nobody at Rx today. Promised Kent!'" *Id.* ¶¶ 15, 19(f). The conspirators also forced employees who applied to the other company to notify their current employer before the employment application would even "be considered" by the conspiring company. *See* Indictment ¶¶ 11(d) & 19(d). In this way, Defendants and their co-conspirators "monitored compliance with the" nonsolicitation agreements. *Id.*

## LEGAL STANDARD

"An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quotations omitted). The "indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *Id.* (quotations omitted). A court should "determine the sufficiency of an indictment by practical rather than technical considerations." *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997).

Here, each count must allege that Defendants knowingly entered into an unreasonable restraint of interstate trade. Restraints of trade are either "vertical" or "horizontal." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 n.1 (10th Cir. 1990). Vertical restraints are agreements between firms operating at different market levels (e.g., manufacturers and retailers). *Id.* Horizontal restraints are agreements between firms operating at the same market level (e.g., rival

manufacturers competing for sales or rival employers competing for employees). *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 166-70 (1940) (seller cartel); *Anderson v. Shipowners' Ass'n*, 272 U.S. 359, 361-62 (1926) (employer cartel).

Restraints of trade can be unreasonable under one of two standards. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018). The first is a fact-intensive analysis of competitive impact under the rule of reason. *Id.* at 2284. The second is the per se rule, which treats certain categories of restraints as "manifestly anticompetitive." *Suntar Roofing*, 897 F.2d at 472. "Once a practice is identified as illegal per se, a court need not examine the practice's impact on the market or the procompetitive justifications for the practice advanced by a defendant before finding a violation of antitrust law." *Law v. NCAA*, 134 F.3d 1010, 1016 (10th Cir. 1998).

The per se rule typically applies to horizontal restraints, such as price fixing, *e.g., United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98 (1927) (price fixing among sellers); *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948) (price fixing among purchasers); bid rigging, *e.g.*, *United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992); and allocating or dividing markets, *e.g.*, *Suntar Roofing*, 897 F.2d at 472-73 (allocation of customers by roofing contractors); *United States v. Brown*, 936 F.2d 1042, 1043-45 (9th Cir. 1991) (allocation of billboard-site leaseholds by site renters). Such restraints can escape per se condemnation if "ancillary" to a separate procompetitive venture. *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-189 (7th Cir. 1985). Otherwise, "'collusion' among competitors is 'the supreme evil of antitrust.'" *Chamber of Commerce v. Seattle*, 890 F.3d 769, 780 (9th Cir. 2018) (quoting *Verizon v. Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)).

## ARGUMENT

### I.     The Indictment Properly States Per Se Violations of Section 1 of the Sherman Act

The Indictment charges that Defendants' employee-nonsolicitation agreements are per se unlawful market allocations. Indictment ¶¶ 9, 17. Naked agreements among employers not to solicit one another's employees are, in fact, horizontal market-allocation agreements and, as such, are per se unlawful. No further "judicial experience," Mot. at 2, nor analysis of "procompetitive benefits," *id.*, is needed to condemn them under the per se rule.

Contrary to Defendant's suggestion, Mot. at 7-8, a court should "focus on the particular practice involved, rather than the industry in which the allegedly unlawful practice was used," when deciding whether conduct fits into an established per se category, as the Tenth Circuit emphasized recently. *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018) (emphasis in original). "One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). However, "there is no rule that allocation agreements are only subject to the per se rule if" what is allocated is "divided geographically." *Kemp & Assocs.*, 907 F.3d at 1277. "Nor does it matter that the alleged agreement would only affect a small number of potential" victims, and "any lack of judicial familiarity with the . . . industry is largely irrelevant." *Id.*

Focusing on the practice alleged, multiple courts have held that naked agreements among competing employers not to hire or solicit each other's employees are "per se unlawful" under the Sherman Act because they constitute "horizontal service division agreements . . . like product division agreements." *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 471,

481-85 (W.D. Pa. 2019) (relying in part on *Kemp & Assocs.*); *see also, e.g.*, *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) (recognizing "naked" "agreements among employers not to compete for employees" are "illegal per se"); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120-22 (N.D. Cal. 2012) (holding alleged "'Do Not Cold Call' agreements" would constitute "a *per se* violation"); *Markson v. CRST Int'l, Inc.*, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021) (holding plaintiffs "alleged a per se violation" where employers agreed "not to poach drivers that are under contract with another competitor" (cleaned up)). That is because the nonsolicitation practice at issue has long been held to be a per se violation of the Sherman Act, and no employer-cartel exception exists.

## A.    Nonsolicitation Agreements Are Market-Allocation Agreements

Multiple courts of appeals have recognized that naked agreements among competitors not to compete actively for each other's customers, including agreements not to solicit each other's customers, are per se unlawful market allocations. Naked agreements among employers not to solicit each other's employees—as charged in the Indictment—fall into the same category.

Specifically, in *Suntar Roofing*, the Tenth Circuit affirmed the conviction of companies and executives for "agree[ing] . . . to allocate and divide among themselves customers for the construction and installation of roofs on new single and multi-family homes." 897 F.2d at 472. The charge "alleged that [defendants] agreed to stop competing and refrained from competing for the business of each company's established customers." *Id.* Just like Defendants here, who are alleged to have stopped competing with competitors for current (or "established") employees, the defendants in *Suntar Roofing* "argue[d] that the indictment in this case did not justify the trial court's application of *per se* analysis in that the restraint charged is not clearly 'pernicious' as a

matter of law," *id.* at 473, and they sought to "offer[] evidence of the reasonableness and/or economic justification for the alleged activities," *id.* at 472. The Tenth Circuit rejected that attempt and properly focused on the character of the restraint and its horizontal nature when holding that "an agreement to allocate or divide customers between competitors within the same horizontal market, constitutes a *per se* violation of § 1 of the Sherman Act." *Id.* at 473.

The Sixth Circuit similarly held that an agreement not to solicit current customers was per se unlawful. *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1371-72 (6th Cir. 1988). There, echoing Defendants' flawed reasoning here, the defendants argued the per se rule did not apply to what they characterized as merely a "'no-solicitation' agreement" that was "limited in scope" and "only prevented the respective parties from <u>actively</u> soliciting each other's customers" while leaving the defendants "free to accept <u>unsolicited</u> business from the competitor's customers." *Id.* at 1371. The defendants argued that "this type of alleged restraint on trade has never been challenged in the federal courts before and, therefore, the *per se* rule should not be applied." *Id.* But the Sixth Circuit rejected their arguments and affirmed their convictions: "[T]he agreement between the defendants not to call on each other's customers was an unreasonable restraint of trade as a matter of law." *Id.* at 1373. Indeed, the court emphasized that the "'no-solicitation' agreement" was "undeniably a type of customer allocation scheme." *Id.* And while Defendants here attempt to dismiss the *Cooperative Theatres*' holding as "isolated" and "unsubstantiated," Mot. 12, the Tenth Circuit cited it in support of its own holding in *Suntar Roofing*, 897 F.2d at 473.

Likewise, the Fifth Circuit held that an agreement among competitors to allocate markets by agreeing not to solicit one another's customers was per se unlawful. *United States v. Cadillac*

*Overall Supply Co.*, 568 F.2d 1078, 1087-90 (5th Cir. 1978). The court affirmed the Section 1 convictions of garment suppliers for entering into an agreement "whereby each would refrain from encouraging the other's customers from changing over to it" and would "active[ly] discourage[]" one another's customers "from changing suppliers." *Id.* at 1081. It recognized that the customer-allocation agreement was per se unlawful, explaining "it is easily observed that the restraint under scrutiny is a purely horizontal market division." *Id.* at 1088. And again, the Tenth Circuit cited *Cadillac Overall Supply* with approval in *Suntar Roofing.* 897 F.2d at 473.

The "practice" condemned as per se unlawful in *Suntar Roofing*, *Cooperative Theatres*, and *Cadillac Overall Supply* concerned a naked agreement among competitors not to compete actively for each other's established customers. *Cf. Mid-West Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir. 1983) ("The essence of a market allocation violation . . . is that competitors apportion the market among themselves and cease competing . . . for another's customers."). In *Cooperative Theatres* and *Cadillac Overall Supply*, moreover, the noncompetition "practice" was accomplished explicitly through agreements not to solicit established customers. The Indictment alleges the same type of nonsolicitation practice and suppression of competition by Defendants with respect to employees. *See* Indictment ¶¶ 9-10 & 17-18; *see also id.* ¶ 11(a) (Defendant Thiry reassuring co-conspirator at SCA that he "do[es] not do proactive recruiting into your ranks"). Therefore, Defendants' assertion that this Court would be "applying a newly announced *per se* rule," Mot. at 2; *see generally id.* at Part III.A., is simply not correct. Neither the Court, nor the United States, needs to reestablish per se treatment for a restraint that falls into a per se unlawful category. *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 351 (1982).

The charged nonsolicitation practice between competitors that has been held to be a per se violation contrasts with the cases cited by Defendants. *See* Mot. at 7 (citing *Mid-West*, 717 F.2d at 497 n.2; *Anesthesia Advantage, Inc. v. Metz Grp.*, 759 F. Supp. 638, 644 (D. Colo. 1991)). For example, in *Mid-West*, the plaintiff corporation alleged that its former president conspired with his new company to harm plaintiff's business through various unfair means. 717 F.2d at 495. One reason why the court refused to "h[o]ld that a conspiracy to eliminate a competitor by unfair means constitutes a per se violation," *id.* at 496, was because (unlike here) "[t]he conspiracy is not one of erstwhile competitors combining to supplant competition with cooperation," and "[n]one [of the defendants] competes with other defendants," *id.* at 497. And in *Anesthesia Advantage*, rather than any agreement not to compete as alleged here, the alleged agreement simply established a hospital "on call" schedule to ensure a physician was available each night of the week to supervise nurse anesthetists pursuant to hospital policy. 759 F. Supp. at 642-43. Far from restricting competition, the call schedule was actually necessary "to ensure the presence of one able to provide the service," *id.* at 646, and plaintiffs actually "disavow[ed] any independent claim for . . . market allocation," *id.* at 643.

### B.      Nonsolicitation Agreements Among Employers Are Per Se Unlawful

To be sure, *Suntar Roofing*, *Cooperative Theatres*, and *Cadillac Overall Supply* "involved the allocation of customers," Mot. at 7, but "[j]ust as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services," *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544 (10th Cir. 1995) (quoting II Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 377c (rev. ed. 1995)). Accordingly, "[a]ntitrust law does not treat employment markets differently from other

markets." *Ry. Indus.*, 395 F. Supp. 3d at 481 (quoting *eBay*, 968 F. Supp. 2d at 1039); *cf. Kemp & Assocs.*, 907 F.3d at 1273 (instructing courts to "focus on the particular <u>practice</u> involved"). While employee-nonsolicitation agreements occur on the buy-side of the labor market, rather than the sell-side of a product market, that is a distinction without a difference. The Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these." *Mandeville Island Farms*, 334 U.S. at 236. Rather, it "is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices"—including employees selling their labor— "by whomever they may be perpetrated"—including employers purchasing it. *Id.*; *see also Brown*, 936 F.2d at 1044 (holding per se rule against horizontal market allocation applies with equal force when competing buyers agree to allocate input suppliers)[1]; *Anderson*, 272 U.S. at 361-65 (holding agreement among shipowners restraining competition for seamen violated the Sherman Act).[2]

The Tenth Circuit has long recognized that the Sherman Act applies with equal vigor to

---

[1] In *Brown*, the Ninth Circuit affirmed the criminal convictions of billboard-advertising companies and their executives under a per se market-allocation standard for agreeing not to bid on each other's former leaseholds to display billboards. 936 F.2d at 1043-45. Labor is also an input, *NCAA v. Alston*, 141 S. Ct. 2141, 2155 (2021), and Defendants' employees deserve no less protection under the Sherman Act than the leaseholders in *Brown*.

[2] Although *Anderson* does not state explicitly that this conduct was a per se Sherman Act violation, it is nonetheless properly viewed as a per se case. *Anderson* was decided some fourteen years prior to the Supreme Court's first explicit use of the phrase "per se" in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940). In describing "per se" violations as such for the first time, the Court in *Socony-Vacuum* recognized that the concept had existed "for over forty years." *Id.* at 218. In support, the Court quoted a price-fixing case that did not use the phrase "per se," but, similar to *Anderson*, held that the alleged agreements were "in themselves unlawful restraints within the meaning of the Sherman Act." *Id.* (quoting *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436, 458 (1940)).

the labor market and condemns horizontal collusion in it. In *Roman*, an employee sued alleging his employer and a competing employer "conspired to restrain trade by agreeing not to hire each other's engineers," and the district court dismissed for lack of antitrust standing. 55 F.3d at 543. Reversing, the Tenth Circuit explained that the "court's ruling is directly contrary to those allegations, which set out facts showing that the illegal agreement between defendants was the only reason Mr. Roman was not hired by Cessna." *Id.* at 543-44. The appeals court emphasized the antitrust laws seek to preserve competition among buyers and sellers of employment services just as they do with buyers and sellers of goods. *Id.* at 544.

Although *Roman* did not address the per se rule directly, it stated without caveat that the alleged "agreement not to compete for each others' employees" was an "illegal agreement" under the Sherman Act. 55 F.3d at 545. Moreover, it noted that "[t]he relevant cases hold that plaintiffs whose opportunities in the employment market have been impaired by an anticompetitive agreement directed at them as a particular segment of employees have suffered an antitrust injury under the governing standard." *Id.* at 544 (citing *Quinonez v. NASD*, 540 F.2d 824 (5th Cir. 1976)). The "governing standard" in *Quinonez*—which confronted a complaint alleging an agreement among firms not to "pirate" each other's employees and not to hire applicants who had been fired or rejected by the other firms, 540 F.2d at 827—was the per se rule: "For an aggrieved party to state a claim for relief under the Sherman Act it is necessary to allege only a per se violation of the Act." *Id.* at 828 (quotations omitted). In reversing the district court's dismissal, the Fifth Circuit noted that "[t]he clear purpose of the Sherman Act is to prohibit combinations which would probably interfere with the free exercise of the rights of those engaged in commerce and it is immaterial that the parties to the tainted agreement were

merely trying to regulate employment." *Id.* (citing *Anderson*, 272 U.S. 359).

There is thus no basis to give the charged conspiracies special treatment under the Sherman Act. Employees are no less entitled to the protection of the Sherman Act from nonsolicitation agreements than are customers, and employer conspiracies are no less pernicious. Consistent with these longstanding principles, district courts have held that naked allocation agreements among competing employers, like the "gentlemen's agreement . . . re: poaching talent" charged here, Indictment ¶ 11(f), are per se unlawful under the Sherman Act. *See, e.g.*, *Ry. Indus.*, 395 F. Supp. 3d at 485; *eBay*, 968 F. Supp. 2d 1039; *High-Tech*, 856 F. Supp. 2d at 1120-22; *Markson*, 2021 WL 1156863, at *4.[3]

*eBay* is particularly instructive. The United States made a per se claim, alleging a handshake agreement among competitors not to solicit or hire employees from one another. 968 F. Supp. 2d at 1032-34, 1037. Denying a motion to dismiss, the court rejected the argument that the per se claim was not legally viable because it was not a "classic horizontal market allocation." *Id.* at 1038. "[A]n agreement among employers that they will not compete against each other for the services of a particular employee or prospective employee is, in fact, a service

---

[3] Contrary to the suggestion raised by Amicus, NACDL Br. at 3, 12, the application of the rule of reason to the labor-market price fixing in *Alston*, 141 S. Ct. 2141, does not counsel a different result. The Court followed *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), which applied that rule to "horizontal price fixing and output limitations" of televised collegiate football, despite such restraints' being "ordinarily condemned" as "illegal *per se*," only because "they arose in 'an industry'" in which some 'horizontal restraints on competition are essential if the product is to be available at all.'" *Alston*, 141 S. Ct. at 2157 (quoting 468 U.S. at 100-02). *Alston* demonstrates that courts apply the same analysis to labor restraints as product restraints. And the charged conspiracies here arose neither in a sports league nor in any other industry where horizontal restraints—let alone restraints on competition for labor—are essential for the product or service to be available. Tellingly, Defendants do not claim otherwise.

division agreement, analogous to a product division agreement." *Id.* (quoting Phillip Areeda &

Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*

¶ 2013b (3d ed. 2007)). Accordingly, the court held that the agreement as alleged "amounts to a

'classic' horizontal market division." *Id.* at 1038-39 (relying on *Topco*, 405 U.S. at 608, and

*Roman*, 55 F.3d 542).

The *eBay* holding is no less persuasive simply because the court did not "determine"

definitively what test to apply. Mot. at 9 n.3. It did not do so because the defendant "challenge[d]

the United States' assertion that the alleged agreement is a naked one, instead arguing that the

agreement is ancillary" to an overlapping board seat between the conspiring companies. 968 F.

Supp. 2d at 1039. For now, Defendants here disclaim any ancillarity argument. Mot. at 6 n.1. In

any event, the Indictment is to "be tested solely on the basis of the allegations made on its face,"

*Todd*, 446 F.3d at 1067 (quotation omitted), and the court in *eBay* held that the employee-

nonsolicitation and no-hire allegations on their face were sufficient to state a per se claim, 968 F.

Supp. 2d at 1039. Defendants' attempt to distinguish *High-Tech* as deferring the ultimate per se

decision to summary judgment, Mot. a 6 n.2, fails for the same reason. In *High-Tech*, the court

held that an allegation of "bilateral . . . 'Do Not Cold Call' agreements, whereby each

company . . . instructed recruiters not to cold call the employees of the other company," stated a

"*per se* violation of the Sherman Act for purposes of surviving a 12(b)(6) motion." 856 F. Supp.

2d at 1110, 1122.

Defendants point to the distinction drawn between no-hire agreements and nonsolicitation

agreements in *Aya Healthcare Servs., Inc. v. AMN Healthcare*, Inc., --- F. Supp. 3d ----, 2021

WL 2553181 (S.D. Cal. May 20, 2020). Mot. at 8-9. On appeal, in a decision Defendants ignore

completely, the Ninth Circuit faulted the lower court's reasoning that this was a salient distinction. Instead, the appeals court agreed with the United States that "whether the restraint was a no-poaching agreement or a non-solicitation agreement" is a "distinction [that] is not determinative" to the question of whether per se treatment is appropriate. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F. 4th 1102, 1109 n.3 (9th Cir. 2021). Rather, "[t]he relevant distinction is whether the restraint is an ancillary restraint or a naked restraint, not whether it is classified as a no-poaching agreement or non-solicitation agreement." *Id.* The Ninth Circuit held that the nonsolicitation provision in a contract was ancillary to a broader collaboration and therefore applied the rule of reason, but noted that the United States' position "that the *per se* rule applies to naked non-solicitation agreements" had "considerable merit." *Id.* at 1110 & n.4. The Indictment here charges Defendants with two such naked nonsolicitation agreements, Indictment ¶¶ 9-10 & 17-18, and the per se rule should apply.

Against this weight of authority, Defendants purport to cite just one case as holding an agreement between competitors not to solicit each other's employees should be judged under the rule of reason. *See* Mot. at 6 (citing *Yi v. SK Bakeries, LLC*, 2018 WL 8918587 (W.D. Wash. Nov. 13, 2018)). But even that single, unpublished case is inapposite because it analyzed no-hire and nonsolicitation provisions in Cinnabon's franchise agreements, *id.* at *1, which raise unique ancillarity issues. Under the "ancillary-restraints doctrine," agreements that are ordinarily condemned as per se unlawful are "exempt from the per se rule," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986), and subject to analysis under the rule of reason if they are ancillary to a legitimate business venture, such as a franchise agreement.

*Yi*, in fact, relied primarily on another franchisor-employee noncompete case that

supports the United States' position here. *Yi*, 2018 WL 8918587, at *5 (citing *Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955 (N.D. Ill. June 25, 2018)). *Deslandes* applied the rule of reason only because the plaintiff, just as in *Yi*, "alleged a horizontal restraint that is ancillary to franchise agreements." 2018 WL 3105955, at *7. But for the ancillarity issues in the franchise context, the *Deslandes* court noted, it would "ha[ve] no trouble concluding that a naked horizontal no-hire agreement would be a *per se* violation of the antitrust laws." *Id.* at *6.

The remaining cases cited by Defendants are no more availing. Without elaboration, Defendants cite *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999), Mot. at 9-10, but it concerned a restraint among an insurer's franchisees that was "not a classic interfirm horizontal restraint," 166 F.3d at 511. *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 337 (7th Cir. 1967), stated simply that no-hire agreements are tested by a "standard of reasonableness," which is Section 1's statutory standard for unlawfulness, *see Am. Express Co.*, 138 S. Ct. at 2283. And *Union Circulation Co. v. FTC*, 241 F.2d 652 (2d Cir. 1957), did not analyze the agreement as a market allocation, analyzing it incorrectly as a group boycott, *id.* at 656-57, but nonetheless affirmed an FTC injunction because the "tendency of the 'no-switching' agreements is to discourage labor mobility" and thus found them "harmful to competition," *id.* at 658.

The cases cited by Amici[4] fare no better. The "no hire agreement" that Amicus claims the Eleventh Circuit found "not 'an appropriate candidate for per se treatment'" was not a horizontal agreement among employers at all, but merely a covenant in a contract between an employer and

---

[4] Chamber of Commerce of the United States of America, ECF No. 50 ("Chamber Br."); National Association of Criminal Defense Lawyers, ECF No. 61 ("NACDL Br."); Colorado Chamber of Commerce, ECF No. 63 ("Colo. Br.").

employee. NACDL Br. at 11 (quoting *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983)). Amicus also points to *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001), and *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136 (D.N.J. 2002), NACDL Br. at 11, but both cases are distinguished by the Third Circuit's decision on appeal from *Weisfeld*'s denial of class certification, 84 F. App'x 257 (3d Cir. 2004). There, the Third Circuit found that whether the per se rule applied to the no-hire allegations was "irrelevant" to the class certification decision, yet nonetheless questioned the district court's refusal to apply the per se standard. *Id.* at 260 & n.2. It distinguished *Eichorn* as involving a no-hire agreement that was ancillary to a legitimate business transaction, contrasting it with plaintiff's allegation of a no-hire agreement among three competitors without a connection to any business transaction. *Id.*; *see also Ry. Indus.*, 395 F. Supp. 3d at 485 (noting that "the dictum in *Weisfeld* supports plaintiffs' argument that a conspiracy to not hire or solicit employees between employers who compete with one another may be a per se violation of § 1 of the Sherman Act.").

C.    **Defendants' Supposed Justifications Do Not Save Their Conspiracy from Per Se Condemnation**

Defendants' assertion that their allocation agreement was justified and thus that the per se rule is inapplicable, Mot. at 12-14, reflects a "misunderstanding of the *per se* concept." *Maricopa Cnty.*, 457 U.S. at 351. Consideration of the supposed justifications—in addition to relying on factual assertions not found in the Indictment—is categorically foreclosed by the per se rule. *See Socony-Vacuum Oil Co.*, 310 U.S. at 221-22 (rejecting considerations of reasonableness of fixed prices and good intentions of conspirators).[5] "Supreme Court jurisprudence is clear: where the

---

[5] Defendants quote *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999), to suggest that

per se rule applies, it is of no consequence that an agreement could potentially bring net economic benefits to some part of the market . . . . The per se rule recognizes that '[f]or the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable.'"[6] *Kemp & Assocs.*, 907 F.3d at 1277 (quoting *Maricopa Cnty.*, 457 U.S. at 344); *see also Suntar Roofing*, 897 F.2d at 473 (affirming ruling "preclud[ing]" defendants "from introducing evidence of reasonableness or justification at trial" in a customer-noncompete case). This categorical approach applies no less when the service being allocated is provided by employees. *See, e.g.*, *Maricopa Cnty.*, 457 U.S. at 351 (explaining that "the argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules.").

Indeed, the justifications Defendants offer to distinguish employee allocation from customer allocation actually closely resemble the excuses offered and rejected in earlier cases, showing again that this is a distinction without a difference. For example, Defendants argue that, if the agreements "hinder employee mobility," the lack of mobility "enabl[es] employers to invest more in their employees" with "additional training and professional opportunities." Mot. at 13. But in *Cadillac Overall Supply*, the Fifth Circuit rejected the analogous argument that the customer-nonsolicitation agreement supported the "substantial capital investment in purchasing

_____

"'plausible' *procompetitive* effects . . . 'rule[] out . . . abbreviated review.'" Mot. at 12-13 (quoting 526 U.S. at 771, 775-776, 778). But the Court there considered only whether "abbreviated, or 'quick look'" rather than full rule-of-reason analysis should apply. 526 U.S. at 759, 763. Its decision is inapposite because the per se rule was not at issue; instead, the question presented assumed some version of the rule of reason applied. *See id.* at 759, 764-65.
[6] Application of the per se rule therefore leads directly to the "certainty" the Chamber seeks for its employers "to structure their conduct and affairs." Chamber Br. at 12.

garments to supply each new customer" and "that free and open competition would result in the raiding of accounts which would result in the loss of this capital investment." 568 F.2d at 1088. These types of arguments "have been previously rejected," for example because "risk is inherent in all capital investment to one degree or another" and "the most efficient allocation of capital resources may be achieved by eliminating restrictions that serve to isolate artificially a particular industry from competition." *Id.* at 1089-90 (quotations omitted). In other words, Defendants' argument that they should be insulated from competition for employees in order to make investments in employee training and opportunities is not actually a procompetitive argument. It is simply an argument that they should be allowed to avoid competition entirely. The argument should be taken no more seriously than price-fixers arguing their high prices are justified because it allows them to invest more in research and development.

Further, no horizontal restraint among employers is necessary for Defendants "to entrust [employees] with valuable trade secrets." Mot. at 13. Defendants cite *Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983), to support their trade secrets point, Mot. at 13-14, but *Aydin* demonstrates how employers can enter into legitimate vertical agreements with employees to protect trade secrets and contrasts with the naked horizontal agreement not to compete alleged here. In *Aydin*, the corporate defendants had entered into an agreement with a departing executive where, in exchange for "resolving salary and stock obligations," the executive agreed to preserve the confidentiality of trade secrets and not "raid[]" employees. 718 F.2d at 899. The court rejected the argument that the agreement was a horizontal market allocation because the executive and his previous employer were not competitors and did "not operate at the same level of the market structure." *Id.* at 899-900. But a naked horizontal market allocation between

competing employers is exactly what the Indictment alleges here.[7]

Lastly, Defendants attempt to turn the Indictment on its head, arguing that the mechanism the conspirators adopted to monitor compliance with the nonsolicitation agreements somehow increased competition. Mot. at 13. Specifically, the Indictment alleges that Defendants and their co-conspirators "monitored compliance with the agreement not to solicit employees by requiring . . . employees . . . who applied to the other company to notify their current employer that they were seeking other employment in order for their applications to be considered." Indictment ¶ 11(d); *see also id.* ¶ 19(d). Defendants ignore the allegation (which at this stage must be taken as true) that this notification provision was done to "monitor[] compliance with the agreement" not to solicit, *id.*, and instead assert that the "arrangement allowed employees to pit their current and prospective employers against each other, potentially triggering a bidding war between the two employers," Mot. at 13. But the assertion has no factual basis and falls apart under the lightest of scrutiny. It did nothing to enable that competition because employees could always opt to disclose to their current employer other opportunities at a time and place of their choosing, unencumbered by an agreement between employers over which they were given no say. Defendants' agreements, however, forced employees to notify their employers or else they would not even "be considered" by the conspiring companies until notification was made. Indictment ¶¶ 11(d) & 19(d).

More fundamentally, the agreement not to solicit employees meant those employees who

_____

[7] Defendants' quotation from *Polk Bros., Inc. v. Forest City Enters., Inc.* likewise arises in the context of a vertical agreement between employer and employee. *See* Mot. at 14 (quoting 776 F.2d 185, 189 (7th Cir. 1985)).

were never solicited had no such option. By "monitor[ing] compliance with the agreement not to solicit employees," Indictment ¶ 11(d), Defendants and their co-conspirator employers minimized outbreaks of competition for employees by preventing solicitations in the first place. Regardless, this proffered procompetitive benefit is irrelevant to the analysis, as the Supreme Court "has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because they are allegedly developed to increase competition." *Topco*, 405 U.S. at 610; *see also Socony-Vacuum Oil Co.*, 310 U.S. at 235 n.61 (rejecting argument that price-fixing conspiracy "did not eliminate all competition" as "wholly immaterial" to decision to apply per se rule).

## II.    The Sherman Act as Construed by the Courts Provides the Notice Required by Due Process that Employee-Nonsolicitation Conspiracies Are Unlawful

The Sherman Act itself, and judicial decisions interpreting it, provided Defendants with fair notice that (i) nonsolicitation agreements between competitors are per se unlawful, and (ii) the Sherman Act's prohibitions apply equally to all industries and markets, including labor markets. Indeed, as explained above, the application of the per se rule here is based on decades of precedent. Thus, the charged horizontal conspiracies to allocate markets through nonsolicitation agreements comports with due process. Courts have recognized since 1899 that horizontal market allocations are unlawful, *United States v. Addyston Pipe & Steel Co.*, 175 U.S. 211, 241-42 (1899), and nonsolicitation agreements among competitors, including employee-nonsolicitation agreements among employers, have long been recognized to be subject to the same rule, *see supra* Parts I.A. & B.; Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 2013b (3d ed. 2007) (categorizing no-poach restraints as "generally unlawful per se").

To satisfy the Due Process Clause's fair-notice requirement, a criminal statute, "standing

alone or as construed," need only "ma[k]e it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997); *see also id.* at 266 (judicial decisions may supplement statutory text and provide "clarity at the requisite level" through "judicial gloss."). This means that the statute must "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (cleaned up). A criminal statute need not delineate all of its potential applications; "no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). "Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Id.*; *see also Nash v. United States*, 229 U.S. 373, 377 (1913) (rejecting facial vagueness challenge to Sherman Act and explaining that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree."); *id.* at 378 ("[T]here is no constitutional difficulty in the way of enforcing the criminal part of the [Sherman Act].").

Applying Section 1 to the charged conduct in this case comports with fair-notice principles. The statute itself, and decades of "judicial gloss," *Lanier*, 520 U.S. at 266, gave Defendants more than "reasonably clear" notice, *id.* at 267, that employee-nonsolicitation agreements not only came "perilously close to," *Boyce Motor Lines*, 342 U.S. at 340, but indeed crossed, a line that subjected them to criminal prosecution, *see supra* Parts I.A. & B.

As discussed above, Defendants are wrong that this case would be the "first time ever" a court recognized that naked employee-nonsolicitation agreements are per se illegal, Mot. at 14.

*See supra* pp. 5-6.[8] Even still, the United States can prosecute criminal conduct in new markets

without violating due process, provided that the criminal prosecution falls within existing

principles of law. *Cf. United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 6 (1st Cir. 1997)

(court "not impressed" by argument that prosecution was "first criminal case in which the United

States endeavors to extend Section One to wholly foreign conduct," noting that there "is a first

time for everything"). That is true even when the prosecution involves untested fact patterns or

novel industries. *See, e.g.*, *United States v. Hsiung*, 778 F.3d 738, 750 & n.6 (9th Cir. 2015)

(rejecting defense arguments that (1) rule of reason applied where illicit agreement occurred

abroad and (2) application of the per se rule violated the fair notice principle of the Due Process

Clause); *United States v. Pook*, 1988 WL 36379, at *1 (E.D. Pa. Apr. 18, 1988) (rejecting fair-

notice challenge even "[t]hough the government point[ed] to no prior case where the Sherman

Antitrust Act has been applied to anti-competitive conduct at antique auctions").

Defendants' argument is nearly identical to that rejected in *United States v. Cinemette*

*Corp. of America*, 687 F. Supp. 976 (W.D. Pa. 1988). There, the United States charged movie

theaters with a violation of Section 1 for entering into "split agreements" related to film licensing

that allocated the "films for which they otherwise would be competing." *Id.* at 978. The

defendants argued that they lacked notice of the illegality of the agreement because "at the time

of the actions charged in the indictment, no court had held that split agreements amounted to

---

[8] Defendants are not being singled out for criminal prosecution, nor is the State of Colorado being used as a "laboratory." Colo. Br. at 4-5. Certain of Defendants' co-conspirators were indicted prior to this action in the Northern District of Texas, *see* Mot. at 3, and the Department of Justice has since charged similar conduct against others in the appropriate venue, *see United States v. Hee, et al.*, No. 2:21-cr-98 (D. Nev.).

criminal violations of the Sherman Act." *Id.* The district court concluded that the split

agreements were essentially bid rigging and were, therefore, per se unlawful. *Id.* at 979. "In light

of . . . the substantial case law holding that restrictions upon competitive bidding constitute price

fixing, a *per se* violation of the Sherman Act, the Court finds little merit in defendants' claims

that they were not given fair notice that split agreements could constitute violations of § 1." *Id.*

The court further declared that, given the existing law, the "government could have initiated

criminal prosecutions concerning split agreements without providing any advance notice." *Id.* at

982. The *Cinemette* court reasoned that the Sherman Act "establishes one uniform rule

applicable to all industries alike." *Id.* (quoting *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S.

332 (1982)). Accordingly, "the government [was] under no obligation to pursue a history of civil

enforcement proceedings in a particular industry in advance of bringing criminal prosecutions for

anti-competitive conduct." *Id.*

Amicus purport to divine a trend in the Supreme Court's due process decisions

supposedly "rebuk[ing]" the government. NACDL Br. at 3. None of them, however, involved the

Sherman Act and thus shed no light on its proper interpretation. In any event, courts have

consistently rejected due process challenges to the Sherman Act. *See, e.g.*, *United States v. Penn*,

2021 WL 4521904, at *4-5 (D. Colo. Oct. 4, 2021); *United States v. Harwin*, 2021 WL 719614,

at *7 (M.D. Fla. Feb. 24, 2021).

Defendants also claim a trend of Supreme Court decisions overruling precedents that had

applied the per se rule to vertical restraints. Mot. at 11. But the Supreme Court and the Tenth

Circuit have been steadfast in applying the per se rule to naked horizontal restraints. If anything,

the trend is for appellate courts to critique and reverse courts when they fail to apply the per se

rule to naked, horizontal restraints. *See, e.g.*, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990) (per curiam reversal holding per se rule applied to horizontal agreement among bar review course providers to allocate market); *FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 429-30 (1990) (reversing insofar as lower courts held the per se rules inapplicable to horizontal boycott and price-fixing agreements among competing lawyers); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 644, 648-49 (1980) (reversing and holding per se rule applied to horizontal agreement among wholesalers to require retailers to pay in advance or upon delivery); *United States v. Kemp & Assocs.*, 907 F.3d 1264, 1278 (10th Cir. 2018) (holding no appellate jurisdiction, but encouraging district court to "reconsider" ruling that rule of reason applied to customer allocation agreement in unique industry), *on remand* 2019 WL 763796, at *4 (D. Utah Feb. 21, 2019) (reconsidering ruling and applying per se rule); *United States v. Reicher*, 983 F.2d 168, 172 (10th Cir. 1992) (reversing judgment of acquittal, reinstating guilty verdict, and holding that bid-rigging agreement involving a single bid where one conspirator could not have performed was a per se unlawful offense).

Amici make a separation-of-powers argument, *see* Chamber Br. at 8, but it is improper, *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1226 n.6 (10th Cir. 2021) (declining to consider arguments raised "solely by amici"). In any event, the Department of Justice did not "pronounce," Chamber Br. at 8, a new per se rule in its 2016 guidance document to human resources professionals. All agree that guidance documents or criminal indictments do not amend statutes, but describe or seek to enforce them. The Sherman Act, along with judicial decisions construing it, establish the fair notice that one may be criminally prosecuted for the conduct charged here. That the government conveyed these principles in a guidance document only

confirms the clarity of the law at the time of Defendants' conspiracy.

Finally, contrary to the suggestion by Amicus, NACDL Br. at 5-8, there is no basis in law to grant the motion to dismiss to fast-track an appeal and delay trial. If the Indictment states an offense under the applicable standard, the motion must be denied. Congress's decision not to authorize interlocutory appeals by a defendant in that circumstance does not suggest otherwise. To the contrary, that decision reflects Congress's determination that appellate jurisdiction lies for defense appeals only after trial. This Court is well-equipped to apply existing precedents and standards and need not abdicate its role.

## CONCLUSION

For the foregoing reasons, Defendants' Joint Motion to Dismiss should be denied.

DATED: October 19, 2021    Respectfully submitted,

          *s/ William J. Vigen*
          William J. Vigen, Trial Attorney
          Megan S. Lewis, Assistant Chief
          Anthony W. Mariano, Trial Attorney
          U.S. Department of Justice, Antitrust Division
          Washington Criminal II Section
          450 Fifth Street, N.W.
          Washington, D.C. 20530
          Tel: 202-353-2411 / 202-598-8145 / 202-598-2737
          FAX: 202-514-9082
          E-mail: william.vigen@usdoj.gov /
          megan.lewis@usdoj.gov / anthony.mariano@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on October 19, 2021, I filed this document with the Clerk of the Court using CM/ECF, which will serve this document on all counsel of record.

          *s/ William J. Vigen*
          William J. Vigen