IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. DAVITA INC.,

2. KENT THIRY,

        Defendants.

**DEFENDANTS' JOINT REPLY IN SUPPORT OF MOTION TO DISMISS**

In its 25-page response, the government fails to identify a single case from any jurisdiction holding that a mere agreement not to solicit another company's employees was even unlawful, let alone *per se* illegal, or for that matter, that it was a market-allocation agreement. Instead, the government relies on faulty analogies to obscure its effort to make new law. Agreements not to *hire* another company's employees have far more significant anticompetitive effects than agreements merely not to affirmatively solicit, and even so it is not settled that no-*hire* agreements are *per se* illegal.  As for agreements not to solicit *customers*, the government's sole out-of-circuit case finding such an agreement *per se* illegal cannot be reflexively extended to the employment context given the significant differences between labor markets and goods markets.

Given this lack of precedent supporting the charges, the Indictment could survive only if the Court determined, for the first time, that employee no-solicit agreements are so pernicious

that they should be categorically prohibited and thus deemed *per se* illegal, even though they permit the employers to compete for each other's employees. A criminal case is no place to announce such a rule, especially when the government has not shown that such agreements "would always or almost always tend to restrict competition and decrease output," "have manifestly anticompetitive effects," and "lack any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (cleaned up). On the contrary, they have significant plausible procompetitive benefits, and there is no body of cases finding such agreements manifestly anticompetitive or unlawful even under the rule of reason. Given that backdrop, declaring the alleged agreements *per se* illegal would violate due process.

In the end, the Indictment cannot stand on its mere invocation of the word "allocate." It must allege an agreement that genuinely allocated a cognizable market. It has not.

## ARGUMENT

**I.     THERE IS NO AUTHORITY THAT THE ALLEGED AGREEMENTS ARE *PER SE* ILLEGAL**

A.     The indictment uses the word "allocate," but never actually alleges a market-allocation agreement. The government declares (at 5): "Naked agreements among employers not to solicit one another's employees are, in fact, horizontal market-allocation agreements …." But the government does not cite a single case saying that, nor does the government explain why it might be true. Tellingly, the government ignores defendants' explanation of why such agreements are *not* categorically market-allocation agreements. *See* Defs.' Mot. to Dismiss ("Mot.") at 6-7. "The essence of a market allocation violation … is that competitors apportion the market among themselves and cease competing in another's territory or for another's customers." *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 497 n.2 (10th Cir.

1983); *accord* DOJ, *Price Fixing, Bid Rigging, and Market Allocation Schemes* 3 (Feb. 2021), https://www.justice.gov/atr/file/810261/download.  But the Indictment never alleges that defendants ceased competing for employees—nor could it.  Rather, the Indictment concedes that the alleged agreements only prevented defendants from "proactive[ly] recruiting" employees, ¶ 11(a), (d)-(f); the agreements still permitted employees to switch employers and permitted employers to compete for employees, ¶¶ 11(d)-(e), 19(d)-(e).  This allegation is far from the cessation of competition that was critical in *Midwest Underground.*

   B. As the government notes (at 5), the Court should "'focus on the particular *practice* involved'" (quoting *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018)).  And as defendants anticipated in their Motion (at 8-9 & n.3, 12 n.5), the cases on which the government relies that arose in the employment context (at 5-6, 10 n.2, 12-13) involved *more* restrictive practices.  The defendants in *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039-1040 (N.D. Cal. 2013), and *In re Railway Industry Employee No-Poach Antitrust Litigation*, 395 F. Supp. 3d 464, 471, 481 (W.D. Pa. 2019), were alleged to have agreed both not to "solicit" *and* not to "hire" each other's employees.  The different language reflects the different effects: an agreement not to *solicit* still leaves the companies free to *hire*—and thus to compete for—the other's employees.  Indeed, *Railway Industry* considered only the no-*hire* provision to be market-allocating: "they agreed to not hire each other's employees, i.e., they entered into an agreement to allocate their employees." 395 F. Supp. 3d at 481.  Similarly, the agreement in *Roman v. Cessna Aircraft Co.* involved an agreement "not to hire each other's" employees, 55 F.3d 542, 543 (10th Cir. 1995), and the agreement in *Markson v. CRST Int'l, Inc.*, "precluded" employees "from working" for other companies, 2021 WL 1156863, at *2, 4 (C.D.

3

Cal. Feb. 10, 2021). The agreement in *Anderson v. Shipowners' Ass'n of Pacific Coast* was even more restrictive: it established a process for "assign[ing]" each seaman on the Pacific coast to one of the employers, "fix[ed] the[ir] wages," and excluded from employment altogether any seaman who did not participate. 272 U.S. 359, 361-362 (1926).[1]

Of course, the cases cited by the government do not establish that even *no-hire* agreements are *per se* illegal; as defendants explained (at 9-10), the weight of authority is otherwise. For example, *eBay* determined that the allegation of a "no-solicitation/no-hire agreement" was insufficient to "determine with certainty the nature of the restraint, and by extension, the level of analysis to apply." 968 F. Supp. 2d at 1040. Contrary to the government's contention (at 13), the court's reason was not merely that the defendant claimed the agreement was "ancillary." Rather, the court explained that "when a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, per se treatment is inappropriate"—even for a "market allocation agreement," 968 F. Supp. 2d at 1039 (cleaned up); ancillarity was just the ground invoked by the defendant to meet that test. Here, as defendants explained (at 13-14), economic logic and judicial experience indicate that employee no-solicit agreements plausibly do have procompetitive benefits. In *Roman*, the court merely assumed the agreement was "illegal" for purposes of analyzing the

---

[1] The government is wrong (at 13-14) that *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F. 4th 1102 (9th Cir. 2021), rejected the notion that the distinction between no-solicit and no-hire is "salient" for antitrust purposes. The Ninth Circuit accepted the distinction but concluded it was "not determinative" in *that case* and specifically "decline[d] to decide" whether a mere no-solicit agreement is *per se* illegal—because the court concluded that the agreement was ancillary and therefore subject to the rule of reason *regardless* of "whether the restraint was a no-poaching agreement or a non-solicitation agreement" and regardless of whether no-solicit agreements are *per se* illegal. *Id.* at 1109-1110 nn.3-4.

distinct issue of "antitrust standing." 55 F.3d at 543-544. And contrary to the government's suggestion (at 10 n.2), *Anderson* has never been characterized as establishing a *per se* rule—and if it had, that would simply reflect the restraint's far more restrictive nature.

Even in *In re High-Tech Employee Antitrust Litigation*, the court did "not decide … whether *per se* or rule of reason analysis applie[d]" to the "'Do Not Cold Call' agreements." 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012). Although the government hangs its hat (at 13) on the court's statement that "Plaintiffs have successfully pled a *per se* violation of the Sherman Act for purposes of surviving a 12(b)(6) motion," 856 F. Supp. 2d at 1122, in context that statement reflects the court's decision to defer its determination of whether the agreements were subject to a *per se* rule until summary judgment—an option unavailable in this criminal case.[2]

Finally, the government's treatment (at 14-15) of defendants' cases is mistaken. The agreement in *Yi v. SK Bakeries, LLC*, had both "a vertical" restraint and "a horizontal one (the franchisee agrees not to solicit or hire another franchisee's employee without permission)," and the court analyzed only the horizontal part without relying on any claim of ancillarity. 2018 WL 8918587, at *4 (W.D. Wash. Nov. 13, 2018). Although *Bogan v. Hodgkins* said the restraint was "akin to an *intra* firm agreement," the court *continued*: "Even if the Agreement were interfirm, we still would not afford it *per se* illegal treatment." 166 F.3d 509, 515 (2d Cir. 1999).

C. The other cases on which the government relies (at 6-8, 11) arose in a fundamentally different business context—markets for goods—and even then only a single case

---

[2] Even under the government's reading, *High-Tech* illustrates that the prosecution must prove beyond a reasonable doubt the existence of an agreement that sought to restrain trade by actually allocating the relevant market.

involved a mere no-solicit agreement. *United States v. Suntar Roofing, Inc.*, addressed an agreement that went far beyond non-solicitation, and actually "divided" the market by using targeted higher prices and other means to "allocate specific customers between the two companies"—each company even took steps to switch certain customers to the other company. 897 F.2d 469, 472, 476 (10th Cir. 1990) (each company "was going to get their [customers] back" and certain customers "returned their business to" the other company). As defendants previously explained (at 8), the same was true of the agreement in *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1081, 1088-1090 (5th Cir. 1978). Only *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988), involved a mere no-solicit agreement, but as defendants explained (at 7-8), that agreement concerned customers rather than employees, and the defendants there (unlike here) completely "failed to articulate any potentially pro-competitive justification for the agreement." 845 F.2d at 1369.

The government insists (at 5, 9-12, 17) that the difference between customers and employees is "a distinction without a difference," noting that "[e]mployees are no less entitled to the protection of the Sherman Act from nonsolicitation agreements than are customers," and that a practice's status as *per se* illegal is not reevaluated with respect to each "industry" in which it might be used. Those are red herrings. Defendants' position is that the business context, not merely the industry, affects whether a practice is appropriately deemed *per se* illegal. The courts agree: In determining whether a practice is a *per se* illegal, courts must go "further than determining the general type of 'practice' at issue" and examine the business "context." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1050-1052 (9th Cir. 1983). As the Supreme Court has repeatedly said, the appropriateness of subjecting a given practice to a *per se*

rule requires careful examination of "the context of business relationships" in which the practice occurs. *Leegin*, 551 U.S. at 887 (cleaned up); *see also FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-459 (1986) (Court has "been slow … to extend *per se* analysis" to new business "context[s]"). The fact that antitrust law also protects employees does not imply that any practice that is *per se* illegal in certain customer contexts is automatically *per se* illegal in the employee context; the business context might well affect whether the practice is "so pernicious as to … be conclusively presumed to violate Section 1." *Drury Inn-Colorado Springs v. Olive Co.*, 878 F.2d 340, 342 (10th Cir. 1989). And as explained next, the type of agreement alleged here, in the employment context, does not meet that test.

## II.   THE ALLEGED AGREEMENTS ARE NOT CATEGORICALLY SO PERNICIOUS THAT THEY SHOULD BE DECLARED *PER SE* ILLEGAL

A practice may be deemed *per se* illegal only if it "would always or almost always tend to restrict competition and decrease output," "have manifestly anticompetitive effects," and "lack any redeeming virtue." *Leegin*, 551 U.S. at 886 (cleaned up). And courts must "have amassed considerable experience with the type of restraint," *National Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2151 (2021) (quotation marks omitted), and with its "demonstrable economic effect," *Leegin*, 551 U.S. at 887 (quotation marks omitted), in order to be able to "predict with confidence that [the type of restraint] would be invalidated in all or almost all instances," *Alston*, 141 S. Ct. at 2161 (cleaned up). As defendants explained (at 8, 13-14), and as the cases show, the requisite foundation for declaring employee no-solicit agreements *per se* illegal is missing. As previously explained (at 13-14) such an agreement may have important redeeming virtues that benefit employees, employers, and customers: they enable employers to invest more in employees, to support employees with additional training and professional opportunities, and to

entrust employees with valuable trade secrets. Moreover, the notification requirement alleged here may stimulate bidding wars between companies for each other's employees.

The government's attempt to respond lacks merit. First, the government says (at 16): "Consideration of the supposed justifications … is categorically foreclosed by the per se rule." But as defendants previously explained (at 13 n.6), the question here is not whether a particular agreement that *is already* subject to a *per se* rule is nonetheless justified, but whether the type of practice alleged here is subject to a *per se* rule *in the first place*; and the answer to *that* question is "no" if the *type* of practice has "plausible" procompetitive benefits. *California Dental Ass'n v. FTC*, 526 U.S. 756, 771, 775-776, 778 (1999); *Leegin*, 551 U.S. at 886; *Diaz v. Farley*, 215 F.3d 1175, 1177, 1182-1184 (10th Cir. 2000); *see* Mot. 10, 12-13.

Second, the government contends (at 17-18) that the "justifications Defendants offer" were "rejected in earlier cases." But the only case it cites in support is *Cadillac Overall Supply*, which rejected the risk of losing "capital investment" in "suppl[ies]" for "customer[s]" as justification for an agreement to assign customers between the companies. 568 F.2d at 1081, 1087-1088, 1090. As defendants' citations show (at 13-14), in the *employment* context courts have *accepted* the procompetitive benefits defendants cite. The government suggests (at 18-19 & n.7) these benefits are confined to *vertical* agreements, i.e., between employer and employee. That is wrong: they exist regardless of whether the agreement is horizontal or vertical, even if they are outweighed by the anticompetitive effects of some types of horizontal agreements.

Finally, the government argues (at 19) that the Court "must" accept "as true" the Indictment's assertion that the notification requirement was adopted to "monitor[] compliance with the agreement." That too is incorrect. The issue is whether this *type* of agreement has

8

plausible procompetitive benefits—and that is a question of law, *see* Mot. 4; *Leegin*, 551 U.S. at 885. Whatever the government believes was defendants' motive behind the alleged notification requirement, it is highly plausible that such a requirement stimulates bidding wars—a manifestly procompetitive benefit. Even if "employees could *always* opt to disclose" (Opp. 19), the notification requirement could encourage more of them to do so, to their advantage. Moreover, the government cites no authority finding such a requirement anticompetitive.

### III. DECLARING THE ALLEGED AGREEMENTS *PER SE* ILLEGAL FOR THE FIRST TIME HERE WOULD NOT COMPORT WITH DUE PROCESS

The Indictment also violates due process because the Sherman Act, even as construed by the courts, did not establish at the time of defendants' conduct (or today) "with sufficient definiteness [such] that ordinary people can understand" that the "conduct" alleged here "is prohibited." *Skilling v. United States*, 561 U.S. 358, 402 (2010) (cleaned up). Although courts have deemed classic market-allocation agreements *per se* illegal, the Indictment does not allege such an agreement. As discussed above, no court has ever declared mere employee no-solicit agreements to be market-allocation agreements or found such an agreement unlawful under any standard, and the Indictment shows that the alleged agreements did *not* allocate employees.

The government relies (at 21-23) on cases applying a *per se* rule to an old practice in a new industry or location—unremarkable given that such differences do not often affect a practice's competitive effects. But here, the government seeks to categorically condemn a *practice* for the first time. An ordinary person cannot reasonably anticipate or even comprehend the reasoning by analogy that the government espouses, particularly given, as discussed above, the significant competitive differences between no-solicit and no-hire agreements and between labor and goods markets, as well as the significant weight of authority indicating that neither no-

*hire* agreements nor *customer* no-solicit agreements are *per se* illegal. If courts cannot agree on the applicable rules, an ordinary person should not be expected to predict what rule will govern an employee no-solicit agreement, at peril of conviction and incarceration.

## CONCLUSION

The Court should dismiss the Indictment.

November 2, 2021

Respectfully submitted,

John F. Walsh III
JOHN F. WALSH III
WILMER CUTLER PICKERING HALE & DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80220
(720) 274-3154
john.walsh@wilmerhale.com

SETH P. WAXMAN
DAVID M. LEHN
WILMER CUTLER PICKERING HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000
seth.waxman@wilmerhale.com
david.lehn@wilmerhale.com

HEATHER S. NYONG'O
WILMER CUTLER PICKERING HALE & DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
(628) 235-1007
heather.nyong'o@wilmerhale.com

JOHN C. DODDS
ERICA A. JAFFE
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-4942
john.dodds@morganlewis.com

DANIEL CRUMP
WILMER CUTLER PICKERING HALE & DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
(213) 443-5300
daniel.crump@wilmerhale.com

J. CLAY EVERETT, JR.
TRACEY MILICH
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004-2541
(202) 739-5860
clay.everett@morganlewis.com
tracey.milich@morganlewis.com

*Counsel for Defendant DaVita Inc.*

CLIFFORD B. STRICKLIN
KING & SPALDING

JEFFREY E. STONE
DANIEL CAMPBELL

1401 Lawrence Street, Suite 1900
Denver, CO 80202
(720) 535-2327
cstricklin@kslaw.com

JUSTIN P. MURPHY
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8018
jmurphy@mwe.com

McDermott Will & Emery LLP
444 W Lake St.
Chicago, IL 60606
(312) 984-2064
jstone@mwe.com
dcampbell@mwe.com

THOMAS M. MELSHEIMER
WINSTON & STRAWN LLP
2121 N. Pearl St, Suite 900
Dallas, TX  75201
(214) 453-6401
tmelsheimer@winston.com

*Counsel for Defendant Kent Thiry*

CERTIFICATE OF SERVICE

I certify that on November 2, 2021, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

/s/ John F. Walsh III
John F. Walsh III