# EXHIBIT A

2021 WL 5330783
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

IN RE: GEISINGER HEALTH AND EVANGELICAL COMMUNITY HOSPITAL HEALTHCARE WORKERS ANTITRUST LITIGATION

No. 4:21-CV-00196
|
11/16/2021

Matthew W. Brann, Chief United States District Judge

**MEMORANDUM OPINION NOVEMBER 16, 2021 I. BACKGROUND**

 *1 On March 18, 2021, Plaintiffs Nichole Leib, Kevin Brokenshire, Diane Weigley, and Jessica Sauer filed their First Amended Complaint individually and on behalf of all others similarly situated. Plaintiffs allege that Defendants Geisinger Health and Evangelical Community Hospital agreed not to poach each other's healthcare workers in violation of the Sherman Antitrust Act of 1890 and Pennsylvania's Unfair Trade Practices and Consumer Protection Law.

On May 17, 2021, Defendants filed a joint motion to dismiss for failure to state a claim and, alternatively, to strike class allegations. The motion is now ripe for disposition; for the reasons that follow, it is denied in part and granted in part. Further leave to amend is not granted.

**II. DISCUSSION**

**A. Motion to Dismiss Standard**

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted." A motion to dismiss "tests the legal sufficiency of a claim"[1] and "streamlines litigation by dispensing with needless discovery and factfinding."[2] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[3] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[4]

Following the Roberts Court's "civil procedure revival,"[5] the landmark decisions of *Bell Atlantic Corporation v. Twombly*[6] and *Ashcroft v. Iqbal*[7] tightened the standard that district courts must apply to 12(b)(6) motions.[8] These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[9]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[10] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[12] Moreover, "[a]sking for plausible grounds...calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[13]

 *2 The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[14] No matter the context, however, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."[15]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[16] However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."[17] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[18]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First,

it must tak[e] note of the elements [the] plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[19]

**B. Facts Alleged in the Amended Complaint**

The facts alleged in the Amended Complaint, which I must accept as true for the purposes of this motion, are as follows.

Geisinger Health is the largest health system in Central Pennsylvania.[20] And Evangelical Community Hospital is Central Pennsylvania's largest independent community hospital.[21] Together, these Defendants employ 70 to 75 percent of hospital healthcare workers in Central Pennsylvania.[22]

At least as early as 2010, Defendants agreed to not poach each other's physicians, nurses, psychologists, therapists, and other healthcare professionals in Central Pennsylvania.[23] Defendants' senior executives periodically reaffirmed, monitored, and policed this no-poach agreement.[24] For example, after learning that Geisinger had been recruiting Evangelical's nurses, Evangelical's CEO emailed Geisinger to "please ask that this stop."[25] The Geisinger executive then forwarded this email to Geisinger's Vice President of Talent Acquisition, instructing her to "ask your staff to stop this activity with Evangelical."[26]

Defendants also concealed their no-poach agreement.[27] Instead of placing this agreement in writing, Defendants trained new executives about it orally.[28] And when one of the Defendants' healthcare workers applied to work for the other Defendant, both Defendants communicated about the applicant without the applicant's knowledge.[29]

 **\*3**  Defendants intended that this no-poach agreement reduce competition for healthcare workers in Central Pennsylvania.[30] Indeed, this agreement suppressed job ability and wages for Plaintiffs, whom Defendants employed.[31] Without the no-poach agreement, Defendants would have competed for Plaintiffs' labor, thus resulting in higher wages.[32]

**C. Analysis**

**1. Sherman Act § 1**

**a. Article III Standing**

First, Defendants argue that Plaintiffs lack Article III standing because they have not plausibly alleged an actual injury. For Article III standing, plaintiffs must plead an "injury in fact" that is "actual or imminent, not 'conjectural' or 'hypothetical.' "[33] This injury must be "causally connected and traceable to an action of the defendant."[34]

Here, Plaintiffs allege that the no-poach agreement artificially reduced their wages.[35] Plaintiffs also allege that absent the no-poach agreement, Defendants would compete for each other's employees, thus increasing pay and job mobility.[36] At the pleading stage, these allegations plausibly show an injury for Article III standing.[37]

Defendants counter that Plaintiffs cannot show injury because they do not allege that they sought work at other hospitals. Defendants analogize this to *Finkelman v. National Football League*.[38] The *Finkelman* plaintiffs claimed a conspiracy to raise Super Bowl ticket prices.[39] Because one of these plaintiffs "chose not to purchase any tickets," he "suffered no more injury than any of the possibly tens of thousands of people who thought about purchasing a ticket to the Super Bowl and chose not to."[40] And "the amount of any damages...suffered due to the NFL's alleged misconduct [was] completely indeterminate."[41] Thus, the Third Circuit held that the plaintiff did not allege an injury-in-fact and affirmed his claim's dismissal.[42]

But *Finkelman* did not involve no-poach agreements. And unlike that *Finkelman* plaintiff, Plaintiffs here are not one of "tens of thousands of people who thought about" doing something. Rather, Plaintiffs are a more limited group of skilled healthcare professionals who worked for one of two Defendants. Thus, *Finkelman* does not require dismissal in the matter at hand.

Defendants further counter that Plaintiffs cannot claim lower wages as an injury because they have not plausibly alleged market power. But "no market analysis is required at this time" because Plaintiffs allege a per se violation of the Sherman Act.[43] Therefore, Plaintiffs have plausibly alleged an Article III injury at the pleading stage.

**b. Antitrust Standing**

Defendants also argue that Plaintiffs lack antitrust standing because they have not shown an antitrust injury. An antitrust injury "is attributable to an anti-competitive aspect of the practice under scrutiny."[44] It "stems from a competition-reducing aspect or effect of the defendant's behavior."[45] "If antitrust injury is not found, further inquiry is unnecessary."[46]

 *4  Here, Plaintiffs allege that Defendants' no-poach agreement was intended to and did suppress their wages and job mobility.[47] Plaintiffs further allege that absent the no-poach agreement, Defendants would compete for each other's employees, thereby increasing pay and job mobility.[48] This adequately alleges an antitrust injury.[49]

Defendants counter that Plaintiffs' alleged injuries are too remote to confer antitrust standing. To support their argument, Defendants analogize this case to *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*").[50] In *AGC*, two unions sued an association of construction contractors for diverting contracts to nonunion firms.[51] But "the chain of causation between the Union's injury and the alleged restraint in the market for construction subcontracts contain[ed] several somewhat vaguely defined links."[52] "It [was] obvious that any such injuries were only an indirect result of whatever harm may have been suffered by [union] construction contractors and subcontractors."[53] Thus, the Supreme Court of the United States held that the unions did not have antitrust standing.[54]

Unlike in *AGC*, Plaintiffs in this matter do not allege injuries resulting from harm to another party. Instead, Plaintiffs allege that they personally suffered lower wages as a direct and proximate result of Defendants' no-poach agreement.[55] Because Plaintiffs allege that their injuries are a direct result of the no-poach agreement, they have adequately pled antitrust standing.

**c. Conspiracy**

Next, Defendants argue that Plaintiffs do not plausibly allege a conspiracy under Section 1 of the Sherman Act.[56] Pleading a § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made."[57] "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme."[58]

Again, Plaintiffs allege that Defendants are competitors who agreed not to poach each other's physicians, nurses, psychologists, therapists, and other healthcare professionals in Central Pennsylvania at least as early as 2010.[59] Plaintiffs further allege that Defendants periodically monitored and policed this no-poaching agreement.[60]

For example, Evangelical's CEO allegedly emailed Geisinger after learning that Geisinger was recruiting Evangelical's nurses.[61] In this email, Evangelical's CEO requested that Geisinger "please ask that this stop."[62] The Geisinger executive then forwarded this email to Geisinger's Vice President of Talent Acquisition, instructing her to "ask [her] staff to stop this activity with Evangelical."[63]

 *5  At the very least, Evangelical's email asking that Geisinger stop recruiting its nurses and Geisinger's subsequent instructions that recruiting staff "stop this activity with Evangelical" permit an inference of a no-poaching agreement. Indeed, district courts have found that similar communications support Sherman Act § 1 conspiracy claims.[64] Therefore, Plaintiffs have plausibly alleged a no-poaching agreement.

Defendants further argue that a civil enforcement action by the United States Department of Justice does not salvage Plaintiffs' Complaint. But as I explain above, Plaintiffs' specific allegations regarding a no-poach agreement and the efforts to police it are sufficient at this stage. So Plaintiffs' Complaint does not need salvaging. Defendants' motion to dismiss is denied as to Plaintiffs' Sherman Act claim.

**d. Class Allegations**

Defendants also move to strike Plaintiffs' class allegations because they do not meet predominance, ascertainability, and typicality requirements. "In this circuit, 'class allegations [are] stricken prior to a motion for certification only when class certification is a clear impossibility.' "[65] Indeed, the Third Circuit has held that "the complaint itself demonstrates that the requirements for maintaining a class action cannot be met" in only a "rare few" cases.[66]

Beginning with predominance, Federal Rule of Civil Procedure 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Here, Plaintiffs allege that many questions of law and fact are common to the class, including whether the no-poach agreement violated Section 1 of the Sherman Act and the appropriate measure of damages.[67] Plaintiffs further allege that the no-poach agreement had a common impact on the class members by similarly suppressing their wages.[68] These allegations sufficiently indicate predominance at the pleading stage.[69]

Proceeding to ascertainability, Defendants argue that Plaintiffs' proposed class lacks any objective criteria to determine who falls within it. But "ascertainability only requires the plaintiff to show that class members can be identified."[70] And Plaintiffs allege that Defendants exclusively control business records identifying healthcare professionals in the class.[71] These allegations plausibly indicate ascertainability at the pleading stage.[72]

*6 As for typicality, Defendants argue that Plaintiffs' claims are not typical of the proposed class's claims because the email from Evangelical's CEO only concerns nurses. But "[v]arying fact patterns do not necessarily defeat typicality."[73] "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."[74] And Plaintiffs challenge the same conduct here: Defendants' no-poach agreement. Thus, the email regarding the nurses' recruiting does not defeat typicality at this stage.

In sum, this is not one of the rare cases in which the complaint demonstrates that class certification is impossible. When Plaintiffs move to certify a class, Defendants may challenge predominance, ascertainability, and typicality again. But at this point, Defendants' motion to strike class allegations is denied.

**2. Pennsylvania Unfair Trade Practices and Consumer Protection Law**
Finally, Defendants argue that Plaintiffs lack standing and otherwise fail to state a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law. Indeed, Plaintiffs explicitly abandon this claim in their response brief.[75] Plaintiffs' state law claim is therefore dismissed.

**III. CONCLUSION**
Defendants' motion to dismiss pursuant to Rule 12(b)(6) is denied as to Plaintiffs' first claim for relief under the Sherman Act. This federal antitrust claim survives. Defendants' motion to strike class allegations is also denied.

Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted with prejudice as to Plaintiffs' second claim for relief, which alleges a violation of Pennsylvania law. Leave to amend is not granted. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[76] A complaint is "futile" if it would fail to state a claim upon which relief could be granted even as amended.[77] Amendment would be futile here because Plaintiffs' response brief explicitly abandons their state law claim.[78]

An appropriate Order follows.

  BY THE COURT:

  *s/ Matthew W. Brann*

Matthew W. Brann

Chief United States District Judge

**All Citations**

Slip Copy, 2021 WL 5330783

## Footnotes

1 *Richardson v. Bledsoe*, 829 F.3d 273, 289 n.13 (3d Cir. 2016) (Smith, C.J.) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)).

2 *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

3 *Id.* at 326 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

4 *Id.* at 327.

5 Howard M. Wasserman, *The Roberts Court and the Civil Procedure Revival*, 31 Rev. Litig. 313 (2012).

6 550 U.S. 544 (2007).

7 556 U.S. 662 (2009).

8 *Id.* at 670.

9 *Id.*

10 *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

11 *Id.*

12 *Connelly v. Lane Constr. Corp.*, 809 F.3d 780 (3d Cir. 2016) (Jordan, J.) (cleaned up).

13 *Twombly*, 550 U.S. at 556.

14 *Iqbal*, 556 U.S. at 679.

15 *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557 (internal quotation marks omitted)).

16 *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

17 *Iqbal*, 556 U.S. at 678 (internal citations omitted).

18 *Id.* See also *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

19 *Connelly*, 809 F.3d at 787 (internal quotation marks and citations omitted).

20 Doc. 46 at ¶ 19.

21 *Id.* at ¶ 21.

22 *Id.* at ¶ 29.

23 *Id.* at ¶¶ 1–6.

24 *Id.* at ¶ 9.

25 *Id.*

26 *Id.*

27 *Id.* at ¶¶ 64–66.

28 *Id.* at ¶ 65.

29 *Id.*

30 *Id.* at ¶ 3.

31 *Id.*

32 *Id.* at ¶ 41.

33 *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).

34 *The Pitt News v. Fisher*, 215 F.3d 354, 359 (3d Cir. 2000).

35 Doc. 46 at ¶ 87.

36 *Id.* at ¶¶ 41–48, 80.

37 See *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1123 n. 11 (N.D. Cal. 2012)

("Plaintiffs meet the requirements for Article III standing" because they "allege that their salaries were artificially reduced as a result of Defendants' alleged anticompetitive conduct and that their injury can be redressed through the payment of damages should Plaintiffs establish liability.").

| | |
|---|---|
| 38 | 810 F.3d 187 (3d Cir. 2016). |
| 39 | *Id.* at 188. |
| 40 | *Id.* at 195. |
| 41 | *Id.* |
| 42 | *Id.* at 196. |
| 43 | *High-Tech*, 856 F. Supp. 2d at 1122. |
| 44 | *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). |
| 45 | *Id.* at 344. |
| 46 | *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998). |
| 47 | Doc. 46 at ¶ 3. |
| 48 | *Id.* at ¶¶ 41–48, 80. |
| 49 | *See High-Tech*, 856 F. Supp. 2d at 1123 (holding that "Plaintiffs have adequately pled antitrust injury" because they "have asserted that their salary and mobility were suppressed by Defendants' agreements not to cold call, and that the alleged agreements were entered into to suppress competition for skilled labor"). |
| 50 | 459 U.S. 519 (1983). |
| 51 | *Id.* at 520–21. |
| 52 | *Id.* at 540. |
| 53 | *Id.* |
| 54 | *Id.* at 546. |
| 55 | Doc. 46 at ¶¶ 80, 82, 88. |
| 56 | 15 U.S.C. § 1. |
| 57 | *Twombly*, 550 U.S. at 556. |
| 58 | *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010). |
| 59 | Doc. 46 at ¶¶ 1–6. |
| 60 | *Id.* at ¶ 9. |
| 61 | *Id.* |
| 62 | *Id.* |
| 63 | *Id.* |
| 64 | *See United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1036 (N.D. Cal. 2013) ("For instance, the allegation that Mr. Cook responded to Ms. Whitman's complaints about Intuit's continued solicitation of eBay employees by promising to investigate 'how this slip up occurred again' suggests not only that an agreement between the two companies had been established, but also that Intuit executives other than Mr. Cook generally abided by it."); *see also In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 375 (M.D. Pa. 2008) ("At a minimum, this email is sufficiently ambiguous to support an inference of an anti-competitive agreement."). |
| 65 | *Dieter v. Aldi, Inc.*, No. CV 2:18-00846, 2018 WL 6191586, at *6 (W.D. Pa. Nov. 28, 2018) (quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1383 (3d ed. 2018)). |
| 66 | *Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 93 n. 30 (3d Cir. 2011), *opinion reinstated in part*, No. 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012). |
| 67 | Doc. 46 at ¶¶ 70–71. |
| 68 | *Id.* at ¶ 47. |

69  *See* *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1214 (N.D. Cal. 2013) ("First, the Court finds, as it did previously, that [Plaintiffs]...offer theories subject to common proof for how Defendants' antisolicitation agreements suppressed compensation broadly.").

70  *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n. 2 (3d Cir. 2013).

71  Doc. 46 at ¶¶ 68–69.

72  *See Trunzo v. Citi Mortg.*, No. 2:11-CV-01124, 2018 WL 741422, at **7–8 (W.D. Pa. Feb. 7, 2018) (holding that "Plaintiffs have met their burden of advancing a prima facie showing that discovery is likely to produce substantiation of the class allegations with respect to ascertainability" because Defendant "allegedly has business records and billing records that can alone identify who fits within the class description").

73  *Id.* at *10.

74  *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994).

75  Doc. 56 at 9.

76  *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).

77  *Id.*

78  Doc. 56 at 9.

---

**End of Document**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.