# EXHIBIT A

1

————2:21-cr-00098-RFB-BNW————

1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3

4  UNITED STATES OF AMERICA,    )
                         )  Case No. 2:21-cr-00098-RFB-BNW

5             Plaintiff,    )
                         )  Las Vegas, Nevada

6        vs.             )  Tuesday, November 2, 2021
                         )  1:28 p.m.

7  RYAN HEE and VDA OC, LLC,    )
  formerly ADVANTAGE ON CALL,  )  MOTIONS HEARING

8  LLC,                     )
                         )  *C E R T I F I E D  C O P Y*

9            Defendants.

10

11

12     REPORTER'S TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS

13        THE HONORABLE RICHARD F. BOULWARE, II,

14           UNITED STATES DISTRICT JUDGE

15

16

17  APPEARANCES:       See next page

18

19

20

21

22  COURT REPORTER:    Patricia L. Ganci, RMR, CRR
                    United States District Court

23                    333 Las Vegas Boulevard South, Room 1334
                    Las Vegas, Nevada  89101

24  Proceedings reported by machine shorthand, transcript produced
  by computer-aided transcription.

25

Case 1:21-cr-00229-RBJ  Document 89-1  Filed 11/19/21  USDC Colorado  Page 3 of 55
Case 2:21-cr-00098-RFB-BNW  Document 60  Filed 11/05/21  Page 2 of 54

2

———2:21-cr-00098-RFB-BNW———

1  APPEARANCES:

2  For the Government:

3        **ERIC C. SCHMALE, AUSA**
         UNITED STATES ATTORNEY'S OFFICE
4        501 S. Las Vegas Boulevard
         Las Vegas, Nevada 89101
5        (702) 388-6281

6        **MIKAL JENNA CONDON, ESQ.**
         **ALBERT BILOG SAMBAT, ESQ.**
7        **CHRISTOPHER JAMES CARLBERG, ESQ.**
         U.S. DEPARTMENT OF JUSTICE
8        450 Golden Gate Avenue, Suite 10-0101
         San Francisco, California 94102
9        (415) 934-5300

10  For Defendant Ryan Hee:

11        **RICHARD A. WRIGHT, ESQ.**
          **SUNETHRA MURALIDHARA, ESQ.**
12        WRIGHT MARSH & LEVY
          300 S. Fourth Street, Suite 701
13        Las Vegas, Nevada 89101
          (702) 382-4004
14
    For Defendant VDA OC, LLC:
15
          **KATHLEEN BLISS, ESQ.**
16        KATHLEEN BLISS LAW, PLLC
          1070 West Horizon Ridge Parkway, Suite 202
17        Henderson, Nevada 89012
          (702) 463-9074
18
          **CAROLE RENDON, ESQ.**
19        BAKER & HOSTETLER
          127 Public Square, Suite 2000
20        Cleveland, Ohio 44114
          (216) 621-0200
21

22

23

24

25

3

———2:21-cr-00098-RFB-BNW———

1          LAS VEGAS, NEVADA; TUESDAY, NOVEMBER 2, 2021; 1:28 P.M.

2                              --oOo--

3                      P R O C E E D I N G S

4          THE COURT:  All right, Counsel.  I'm going to call this

5   case, United States versus Hee, et al., Case Number 2:21-cr-98.

6   If counsel would please announce their presence for the record

7   starting with Defense counsel.

8          MS. RENDON:  Good afternoon, Your Honor.  Carol Rendon

9   from Baker Hostetler on behalf of VDA OC.  And with me today is

10  Steve Herbert, who is our counsel -- our representative from the

11  company.

12         THE COURT:  Okay.

13         MR. WRIGHT:  Good afternoon, Your Honor.

14         MS. BLISS:  Sorry.  I was just going to say, Kathleen

15  Bliss appearing as local counsel on behalf of VDA.

16         MR. WRIGHT:  Okay.  Richard Wright present here in my

17  office with Mr. Hee, Ryan Hee, Your Honor.  I don't know if

18  you've ever met him, but he's the individual defendant in the

19  case.

20         THE COURT:  Okay.

21         MS. MURALIDHARA:  Good afternoon, Judge.  Sunethra

22  Muralidhara also on behalf of Mr. Hee.

23         THE COURT:  All right.  For the Government -- did I

24  miss someone?

25         For the Government?

PATRICIA L. GANCI, RMR, CRR   (702) 385-0670

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 5 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 4 of 54

4

—————————————2:21-cr-00098-RFB-BNW—————————————

1      MR. SAMBAT:  Good afternoon, Your Honor.  Al Sambat on

2  behalf of the United States.  I'm joined by my colleagues, Mikal

3  Condon and Chris Carlberg, but we're with the Antitrust

4  Division.  And also with us is Assistant U.S. Attorney Eric

5  Schmale from the District of Nevada.

6      THE COURT:  And you said Nevada properly, which is

7  impressive.

8      MR. SAMBAT:  Thank you, Your Honor.

9      THE COURT:  People don't usually get that right the

10  first time.

11      Counsel, what I do want to say to you, the reason why I

12  was delayed and we may have to delay these proceedings, I have

13  an emergency matter -- a situation on another matter that

14  requires urgent attention.  I need to delay this matter.  I

15  didn't want to delay anymore because I'm handling this other

16  matter that's come up, but I can come back at around 2:30 or

17  2:45.  Are counsel available to come back then?

18      I expect -- because I expect this hearing could take a

19  little bit of time, and I wanted to make sure we fully handled

20  the other matter first.  And so I wanted just to let -- to check

21  in with you to see whether or not you would be available at that

22  time if we needed to reschedule this.  But I apologize for that,

23  but there is a very urgent situation in another case that I

24  have.

25      So I'll start with Defense counsel for Mr. Hee,

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 6 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 5 of 54

5

————2:21-cr-00098-RFB-BNW————

1    Mr. Wright and Ms. Muralidhara?

2              MR. WRIGHT:  Yes, we're available, Your Honor.

3              THE COURT:  Okay.  For AOC or VDA?  I'm never -- I'm

4    not sure which name to use exactly.  So, Ms. Rendon, I'm not

5    sure.

6              MS. RENDON:  Yes.  Of course, Your Honor.  We're

7    available.

8              THE COURT:  All right.  Ms. -- Ms. Bliss, I know you

9    actually have a schedule that's almost as busy as mine at times.

10   So Ms. Bliss?

11             MS. BLISS:  Yes, Your Honor, I am available.

12             THE COURT:  All right.  And for the Government?

13             MR. SAMBAT:  Yes, Your Honor.  We're available.

14             THE COURT:  Okay.  All right then.  Did I miss anyone?

15             And I know that we have a few people who are

16   participating calling in.  You all are all welcome to rejoin,

17   but again I appreciate the -- everyone's patience.  As I said,

18   unfortunately we do have some matters that sometimes come up

19   that are urgent, and this is certainly one of them.

20             So I will see you all back, and I expect that it will

21   be -- I would ask that you come back around 2:30.  We should be

22   able to get started then, but no later than 2:45.  Again, thank

23   you all, but I will see you back here in about an hour.  Take

24   care.

25             MS. RENDON:  Thank you, Your Honor.

6

—————2:21-cr-00098-RFB-BNW—————

1           MR. SAMBAT:  Thank you.

2           (Recess taken at 1:32 p.m.)

3           (Resumed at 2:48 p.m.)

4           THE COURT:  All right, counsel.  I'm going to recall

5    this case.  I'm noting for the record that all of the previous

6    counsel that appeared are -- have returned.

7           I want to start with the motion to dismiss by Mr. Hee

8    and just get the latest from the Government as to where we stand

9    regarding notes, evidence, recordings at this point in time.  So

10   who's going to be arguing this for the Government?

11          MS. CONDON:  Yes.  Good afternoon, Your Honor.  It's

12   Mikal Condon for the Government.

13          THE COURT:  Okay.  Ms. Condon, you're going to have to

14   speak up a little bit.  I'm having a little difficulty hearing

15   you.  So just try to increase your volume just a little bit,

16   please.

17          MS. CONDON:  I will, Your Honor.  Is that better?

18          THE COURT:  Yes.  Thank you.

19          MS. CONDON:  Yes, Your Honor.  The Government has

20   produced the agent's raw notes that we referenced in our

21   filings, and I don't -- there are no further updates --

22          THE COURT:  Okay.

23          MS. CONDON:  -- with respect to production.

24          THE COURT:  Okay.  And are you arguing this motion

25   then?

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 8 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 7 of 54

7

2:21-cr-00098-RFB-BNW

1        MS. CONDON:  Yes, Your Honor.

2        THE COURT:  Okay.  So I just have -- let's start with

3    this question, which is the interview could have been recorded.

4    In fact, there's a backup recording and it wasn't saved, right?

5        MS. CONDON:  I would differentiate between recordings

6    and the backup that was not preserved, Your Honor --

7        THE COURT:  Okay.

8        MS. CONDON:  -- with respect to how the technology

9    works, but yes.

10       THE COURT:  Well -- well, the technology recorded the

11   interview, correct?

12       MS. CONDON:  The technology created a temporary backup

13   of the interview, but was not the evidentiary-grade recording

14   that could otherwise have been retrieved, created by hitting a

15   different button on the application.

16       THE COURT:  True, Ms. Condon, but that certainly is no

17   different than agent's notes which may or may not be legible,

18   but nonetheless are considered by Courts to be evidence,

19   correct?

20       MS. CONDON:  It is true, Your Honor, that a backup was

21   created.  I do like to make the analogy that it's much more like

22   if you're working in a Word document and you get shut out.  When

23   the document opens up, sometimes it's saved and sometimes it

24   isn't.  And in any event, to answer your question directly, it

25   was not preserved.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 9 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 8 of 54

8

2:21-cr-00098-RFB-BNW

1          THE COURT:  Okay.  So why should I not suppress it?

2  The agent was --

3          MS. CONDON:  Well, Your Honor --

4          THE COURT:  As far as I know, the agent was aware of

5  the fact that it had the technology.  It could have been

6  recorded.  And it wasn't recorded, right.  There was a backup

7  that was created, and the backup was allowed to -- to be

8  destroyed.

9          So I don't see why, particularly where there's an issue

10  about potentially -- may or may not be an issue about what was

11  said, why would the Government get the benefit of allowing

12  statements that it had a recording of, but it allowed to be

13  destroyed?

14          MS. CONDON:  So, Your Honor, although the Government

15  does not agree that suppression is necessary or appropriate

16  under the facts, the Government has voluntarily elected not to

17  use the 302 or agent testimony regarding the interview.  And so

18  simply put, there's nothing left to suppress.  And, further,

19  there's no prejudice to the defendant because the statement will

20  not be used.

21          THE COURT:  So let me turn to the Defense for a moment

22  about that.  Mr. Wright or Mr. Muralidhara, whoever is going to

23  argue this, that was something that was said.  The question for

24  me, and I wasn't clear from your submission, is whether or not

25  you believe there's other evidence that has been gleaned from

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 10 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 9 of 54

9

─────2:21-cr-00098-RFB-BNW─────

1  the statement in this case.  And so the question is, apart from

2  dismissal -- because I don't know that this warrants dismissal.

3  I don't think that it rises to that level, at least as it

4  relates to the recording.  Mr. Wright and Ms. Muralidhara, what

5  other evidence do you assert was derived from this, if any, and

6  why would not using the statements be sufficient to address the

7  issue here?

8        MR. WRIGHT:  I do not -- this is Richard Wright

9  speaking.

10        I'm not aware of any fruits or additional evidence

11  coming from the interview, Your Honor.

12        THE COURT:  But, Mr. Wright, if they are agreeing not

13  to use the statement and the Court holds them to that agreement,

14  except potentially I guess in the context of cross-examination,

15  and as you know it would potentially be available for

16  cross-examination anyway even if suppressed, is there anything

17  else that we would need to do?

18        MR. WRIGHT:  Yeah, I think it should not be used for

19  any purpose, even cross-examination.  We have this peculiar

20  situation where there was an interview of my client.  It was, in

21  fact, recorded.  It was, in fact, intentionally or consciously

22  not preserved.  I have a right to it under Rule 16.  I have

23  never heard it.  The prosecutors in the case have heard it.

24        I've never seen a situation like this.  That's part of

25  the motion to disqualify them and to not make any use of it

Case 1:21-cr-00229-RBJ  Document 89-1  Filed 11/19/21  USDC Colorado  Page 11 of 55
Case 2:21-cr-00098-RFB-BNW  Document 60  Filed 11/05/21  Page 10 of 54

10

————2:21-cr-00098-RFB-BNW————

1   whatsoever.

2          THE COURT:  Okay.

3          So, Ms. Condon, let me ask you about the issue of the

4   disqualification.  So I'm not sure that would necessarily

5   disqualify the lawyers, but that might prevent them from

6   participating in the cross-examination of Mr. Hee since they

7   would have had the benefit of information that Defense counsel

8   would not have the benefit of.  What would be your position with

9   respect to that?

10         MS. CONDON:  Your Honor, I would argue that it's

11  absolutely unnecessary and would serve as a

12  quasi-disqualification.  And disqualification here is just

13  highly, highly disfavored and I don't think in any way

14  warranted.  I think that the prosecutors who listened to the

15  interview did not commit any ethical violations, and as such,

16  there's nothing that -- they should not be punished for it.

17         The Government has chosen not to benefit from the

18  defendant's statement, and that should in and of itself be

19  sufficient to redress any potential prejudice in this case in

20  this matter at all.

21         THE COURT:  How would I know that, Ms. Condon, unless I

22  have the agent and the prosecutors testify?  I could ask them

23  directly, "Did you know about this technology?  Did you know

24  about its capabilities?"  Because if they knew about it and they

25  didn't preserve it, they would be complicit in it being

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 12 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 11 of 54

11

—2:21-cr-00098-RFB-BNW—

1   destroyed, right.

2          Now, you've made that representation, but the Court

3   could have an evidentiary hearing, put the agent on the stand,

4   put the prosecutors on the stand, and ask them are they aware of

5   this technology, have they ever used it previously, are they

6   aware of its ability to save information.  Because if they were

7   and they are, that would be a problem, would it not?

8          MS. CONDON:  Your Honor, I don't believe that there is

9   any purpose to be served by having a hearing or by having the

10  prosecutors or the agents serve as witnesses where we have

11  voluntarily agreed not to use the evidence in question and it's

12  otherwise inadmissible.

13         THE COURT:  Well, let me ask you a question

14  hypothetically.  If the prosecutors were aware that it could be

15  recorded, were aware that in fact the backup was created, and

16  allowed it to be destroyed, are you telling me that wouldn't

17  potentially create an ethical problem for them at least in this

18  case?

19         MS. CONDON:  Well, Your Honor, I do have a duty to the

20  Court, and I am aware that that is not the situation that

21  presents itself here.

22         THE COURT:  Okay.  That's not -- I'm not saying that,

23  Ms. Condon.  You asked -- you raised an issue about an

24  evidentiary hearing, right, in the context of this case.  What

25  I'm saying to you is in the context of an evidentiary hearing if

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 13 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 12 of 54

12

—2:21-cr-00098-RFB-BNW—

1    those facts were what were established, that seems to me that

2    that would clearly be an ethical violation.  I am not saying,

3    Ms. Condon, that that's actually what's happened, but I'm

4    responding to your statement about the need for an evidentiary

5    hearing, right.  Because it does seem to me that if the

6    prosecutors had in fact previously used this technology, had

7    previously used recordings from this technology as evidence in

8    the case, for example, I'm not saying that happened, it would be

9    a very different situation than if they were completely unaware.

10   You wouldn't disagree with that.

11           MS. CONDON:  No, Your Honor, but may ...

12           THE COURT:  And so -- and so part of it -- part of what

13   I'm trying to decide here, Ms. Condon, I don't know that it's

14   always useful in these contexts to have prosecutors testify to

15   disqualify them.  I would agree.  However, it's a fairly serious

16   lapse here as it relates to the loss of a defendant's

17   statements.  There is a whole host --

18           MS. CONDON:  Your Honor?  Your Honor?  I don't mean to

19   interrupt you, but, Your Honor, the technology's cutting in and

20   out and I'm actually -- I'm not able to hear you.  I wasn't sure

21   if other people were having that trouble or if I should log off

22   and log back in because I want to make sure that I am addressing

23   your question, and I can't hear you right now.

24           THE COURT:  Okay.  Did anyone else have any difficulty

25   hearing me?  If you did, just raise your hand.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 14 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 13 of 54

13

—————————————2:21-cr-00098-RFB-BNW—————————————

1        So it may just be your connection, Ms. Condon.  But

2   let's try it again before you have to log off and log on.

3        MS. CONDON:  All right.

4        THE COURT:  The issue here is I'm not aware of the

5   circumstances of what transpired, other than what's in the

6   submissions.  Now, typically when there is a dispute as to facts

7   or there is a dearth of facts, the Court would have an

8   evidentiary hearing.  Now, I'm sensitive to that in this context

9   because it would mean having prosecutors who are involved in the

10  case testify.  And where I find that I don't have full

11  information, that's certainly something that, as you know, is

12  available to the Court.

13       And so the reason why I suggested the possibility of

14  these prosecutors not being involved necessarily in the

15  questioning is to avoid what may be a more potentially serious

16  intrusion that you say is unwarranted as relates to an

17  evidentiary hearing about what they knew.

18       And so the Court has some discretion in fashioning an

19  appropriate remedy for what is a loss of evidence here, and so

20  that's why I had asked you about that, the issue of a more

21  narrow remedy.  Because I want to avoid having to put the

22  prosecutors on the stand to confirm what they knew or didn't

23  know about the technology, but that may be unavoidable if we're

24  going to have squabbles about what they did or didn't know and

25  what the agent did or didn't know in this case.  That's why I'm

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 15 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 14 of 54

14

─────2:21-cr-00098-RFB-BNW─────

 1 raising this issue with you.

 2          MS. CONDON:  Well, Your Honor, I'd like to first say

 3 that Mr. Hee was at the interview and he does know everything

 4 that he said at the interview.  So all of that information is

 5 available to him.  We do not need to know if the agents or the

 6 prosecutors -- what they learned at the hearing.  But the

 7 Government will agree that in an abundance of caution it may

 8 make the most sense at this point to agree that the -- the

 9 prosecutors who were involved in the -- in the interview not

10 cross-examine Mr. Hee.

11          THE COURT:  Okay.  So --

12          MS. CONDON:  And --

13          THE COURT:  I'm sorry.  Go ahead.

14          MS. CONDON:  And I should -- I was going to confirm

15 just because I'm not 100 percent sure that it will only apply to

16 one prosecutor on the team.

17          THE COURT:  Well, let me do this.  Let me ask -- before

18 we go through the details of that, Ms. Condon, let me talk with

19 Mr. Wright and Ms. Muralidhara about that.

20          Because it does seem to me, Mr. Wright, given what

21 you've said about not being aware of any other fruit from the

22 interview and it seems to me the only other possibility would be

23 the use of the fact that a prosecutor was listening in as a

24 means of either indirectly or unconsciously influencing a

25 cross-examination; if you don't have any fruits and you don't

15

———————2:21-cr-00098-RFB-BNW———————

 1   have that prosecutor, that does seem to eliminate whatever

 2   potential damage or prejudice there would be to Mr. Hee at this

 3   point, does it not?

 4        MR. WRIGHT:  Yes, but you're overlooking the

 5   exculpatory information that can be in the recording.  My client

 6   was interviewed two years ago almost to the day at a time when

 7   he did not know there was a criminal investigation.  It was

 8   concealed from him.  He did not know he was the target of the

 9   investigation.  He believed he was cooperating on some issues

10   with a nice, young agent.  He didn't know he was being

11   surreptitiously, secretly listened to by criminal prosecutors.

12   And he doesn't have a terrific memory of what took place over

13   what he believes was a 45-minute conversation.

14        I have at my -- only thing I have, other than talking

15   to him about an event that he doesn't recall that well, is I

16   have a 302 which supposedly characterizes this, what the

17   Government calls, half-hour interview.  And in that 302 there

18   are inconsistencies with the rough notes of the agent.  There

19   are words used like attributed to Mr. Hee about entering into a

20   no-poaching agreement when he doesn't even know what no poaching

21   meant at the time and it had to be explained to him by the

22   agent.  None of that appears in the 302.

23        THE COURT:  So, Mr. Wright, so let me -- let me

24   interrupt you.  Let me ask you this question.  If the statement

25   cannot be used, which would include the agent not being able to

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 17 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 16 of 54

16

─────2:21-cr-00098-RFB-BNW─────

1   testify about the statement in the Government's case-in-chief

2   and potentially even on rebuttal, and we can talk about if

3   Mr. Hee takes the stand, I don't see what other remedy you could

4   seek.

5           As you are aware, in order for me to dismiss the case,

6   I'd have to find that there was, in fact, something in the

7   evidence that was destroyed that could have affirmatively

8   assisted your client.  And as you have candidly acknowledged,

9   which I appreciate, you can't do that.

10          So my question to you is, apart from the issue of the

11  listening in and what the implication may be for that, and we'll

12  get to that, Mr. Wright, is just from the standpoint of the

13  spoliation issue it seems to me not being able to use the

14  statement and not having the prosecutors who participated in

15  listening in be able to cross-examine Mr. Hee and not allowing

16  the agent to testify about the statement would address whatever

17  damage was done, would it not?

18          MR. WRIGHT:  Yes, other than I'll make it qualified and

19  reserve it for when we get to the listening-in part, because I

20  take a more insidious view of what was orchestrated to get him

21  to purportedly voluntarily be interviewed.  And part of me

22  demonstrating that, to get to the threshold that the Court would

23  be satisfied that a remedy of dismissal would be necessary, part

24  of the evidence I would need is the recording that the agent

25  destroyed.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 18 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 17 of 54

17

————————2:21-cr-00098-RFB-BNW————————

1    He supposedly wrote a 302 27 days after the interview

2  from sketchy notes and then got rid of the recording.  And I

3  think the recording, aside from exculpatory evidence to use at

4  trial, would be that the evidence that I would need to show the

5  Court the stunt they were pulling during the interview of

6  Mr. Hee.

7    THE COURT:  Okay.  Well, let's get to the heart of that

8  issue.  It seems to me, to address this issue, what we would

9  need to have is the agent testify at a suppression hearing.  The

10  parties have very different views about what -- even in terms of

11  recollection of what may or may not have happened or what was

12  communicated.  I don't find that I can resolve that without

13  there being an evidentiary hearing in this case, and that would

14  address the issue of the dismissal.

15    I don't know what was communicated to this agent before

16  the interview, whether or not he was directed or not directed in

17  terms of what to say or how to say it, or what his recollection

18  is of the interview or the technology that was used.  But I do

19  think that that is all very relevant and that these are issues

20  that have been raised by the Defense.

21    So as it relates to that aspect of the motion to

22  dismiss I'm going to ask the parties to come up with a date

23  where we can have the agent testify about this interview because

24  I can't resolve this given the parties' differing views about

25  what happened in this case.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 19 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 18 of 54

18

2:21-cr-00098-RFB-BNW

1          MS. CONDON:  Your Honor, I would just argue that

2   Mr. Wright did concede that -- that suppression of the -- of not

3   using the evidence, which the Government has already voluntarily

4   agreed to do, and not allowing the relevant prosecutors to be

5   involved in the cross-examination, Mr. Wright agreed that that

6   eliminated any potential damage from the actions during the

7   interview.  So I honestly don't know what there is further to be

8   gained by having this evidentiary hearing.

9          THE COURT:  Well, I don't think that's what he said.  I

10  think what he said was that that -- those remedies address the

11  fact they don't have the recording.  There is a very different

12  issue which the Court has to resolve about the conduct in the

13  case, which is why the hearing would be necessary.  If the agent

14  was specifically directed, I'm not saying this happened, right,

15  to engage in certain types of conduct and this involved

16  prosecutors, that could result in dismissal in this case.

17          And so I'm separating out, Ms. Condon, the issue of the

18  loss of the statement versus the arguments that are raised,

19  which are different from the Court's perspective, about the

20  Government's conduct in this case.  Because there's some

21  disagreement about what the agent may or may not have known and

22  what he was doing and what his true purpose was.  That's a

23  factual dispute that the Court can only resolve by having an

24  evidentiary hearing.

25          So I agree with you that -- that as it relates to the

Case 1:21-cr-00229-RBJ  Document 89-1  Filed 11/19/21  USDC Colorado  Page 20 of 55
Case 2:21-cr-00098-RFB-BNW  Document 60  Filed 11/05/21  Page 19 of 54

19

─────2:21-cr-00098-RFB-BNW─────

1  failure to preserve the recording the remedy that the Court is

2  intending to adopt would address that, but there's a separate

3  argument raised in this motion regarding the conduct which it

4  seems to me can more readily be addressed and needs to readily

5  be addressed by the agent's testimony because I just can't

6  resolve it on the papers here.

7      So that would be the limited scope, Ms. Condon,

8  Mr. Wright, of the -- of the hearing.  It would really be just

9  about that aspect of the recording and how the interview came

10  about.  Because, Ms. Condon, there are at least allegations here

11  that the grand jury subpoena was used essentially as some type

12  of sort of Trojan horse with respect to eliciting specific

13  incriminating statements potentially at the direction of

14  prosecutors.

15      I make no factual findings about that at this point in

16  time, Mr. Wright and Ms. Condon, because I don't have a

17  sufficient evidentiary record and I have opposing views.  That's

18  what evidentiary hearings are for.

19      So we'll set one just as it relates to that issue.  And

20  I will direct the parties to meet and confer to come up with

21  some dates.  I'd like to try to come up with some dates next

22  month some time, if that's possible.  I don't expect this will

23  take more than half a day.  And I don't expect there to be any

24  other witnesses other than the agent.

25      At this time, and I just want to be clear, at this

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 21 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 20 of 54

20

—————————2:21-cr-00098-RFB-BNW—————————

1    time, Ms. Condon, Mr. Wright, it would not be the Court's

2    intention to require any testimony from any prosecutors or staff

3    at the U.S. Attorney's Office.

4         MR. WRIGHT:  Yes, sir.

5         THE COURT:  Okay.

6         All right.

7         MS. CONDON:  Yes, Your Honor.

8         THE COURT:  Let's -- is there anything else on this

9    particular motion?  So as it relates to this motion, I'm going

10   to defer ruling on it until we have the hearing, but I am going

11   to adopt the remedy we've discussed.  Now, that may be modified

12   depending upon what happens at trial if there is a trial in this

13   case.  Obviously, the remedy needs to be tailored to the trial

14   evidence and how the trial comes in and the trial theories which

15   I don't know fully at this point in time.

16        But for now what I will do is I will allow for there to

17   be an evidentiary hearing on the one issue, and then as it

18   relates to the statements, the Court will order that they not be

19   used or that they cannot be used in the Government's

20   case-in-chief or on rebuttal at this point in time.  Although,

21   Ms. Condon, you can ask for that to be reconsidered as we get

22   closer to trial depending upon what happens, and that the Court

23   would order that the -- any of the prosecutors who listened in

24   on the interview could not participate in the cross-examination

25   of Mr. Hee, should he take the stand.  And that would be the

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 22 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 21 of 54

21

2:21-cr-00098-RFB-BNW

1   limit -- the only limitation on their participation --

2   participation in any future trial.

3           All right.  Is there anything else that I'm missing as

4   relates to this motion?  Mr. Wright?

5           MR. WRIGHT:  No, Your Honor.

6           THE COURT:  Ms. Condon?

7           MS. CONDON:  No, Your Honor.  Thank you.

8           THE COURT:  All right.  Thank you.

9           All right.  Let's turn to our other motion that we

10  have.  Who's going to be arguing this for the defendant?

11          Now, I would like some clarity on how we're going to

12  reference the corporate or the limited liability company

13  defendant in this case or successor.  So that would be helpful

14  for the Court.

15          MS. RENDON:  Certainly, Your Honor.  Carol Rendon from

16  Baker Hostetler.  I will be arguing the motion on behalf of my

17  client.  And I think the most effective way to reference them is

18  the name that existed before they were dissolved, which is VDA

19  OC.

20          THE COURT:  Okay.

21          MR. SAMBAT:  And, Your Honor, Al Sambat here.  I'll be

22  arguing the motion for the Government, the opposition.

23          THE COURT:  Okay.  So, Ms. Rendon, let me ask you this

24  very basic question.  This is a motion to dismiss.  You're

25  arguing to me a fair amount of facts, which you're certainly

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 23 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 22 of 54

22

─────────────2:21-cr-00098-RFB-BNW─────────────

1   free to argue, but why are we doing this now?

2           MS. RENDON:  So, Your Honor, that's an excellent

3   question and a couple of reasons.  So, first of all, it really

4   is not a fact-based issue at all.  This is a legal issue for the

5   Court to determine.  Irrespective --

6           THE COURT:  Well, let me -- let me stop you just for a

7   moment, Ms. Rendon.  One of the arguments you raised is about

8   the complex, complicated nature of the healthcare industry and

9   the industry itself as it relates to why the -- the rule of

10  reason versus per se categorization should apply or the standard

11  should apply.  That is a factual argument.  That's not in the

12  indictment, right?

13          It doesn't need to be in the indictment.  And so it's

14  not as if you can't raise that or issues regarding, sort of --

15  sort of, ancillary procompetitive issues, but those are fact

16  issues.  I mean, these are all relevant issues potentially for

17  the Court to consider, but as I looked at many of the cases,

18  Ms. Rendon, many of them involved cases where evidence was being

19  considered or excluded, or situations in which potentially a

20  case may have been dismissed or not or considered to be

21  dismissed or not after evidence had been presented.

22          I didn't really find any case like this one, which at a

23  motion to dismiss stage before there had been a presentation of

24  evidence there was an argument about the facial aspects of the

25  indictment and about whether or not there could be an offense at

Case 1:21-cr-00229-RBJ  Document 89-1  Filed 11/19/21  USDC Colorado  Page 24 of 55
Case 2:21-cr-00098-RFB-BNW  Document 60  Filed 11/05/21  Page 23 of 54

23
───────────────2:21-cr-00098-RFB-BNW───────────────

1  this point.  And I say that because you're not saying that there

2  can't be per se violations of Section 1 of the Sherman Act.  You

3  acknowledge that.  You acknowledge that there could be per se

4  categorical violations.

5       What you're saying is that these allegations are not

6  those, right?

7       MS. RENDON:  Sort of.  So the principal argument, Your

8  Honor, and the reason that there is no case law for Your Honor

9  to look at that's like this is that this is the first ever

10  hearing that's ever been held on a motion to dismiss in a

11  criminal no-poach case.  And that's because this is only the

12  second criminal no-poach case that has ever been indicted by the

13  United States.  The prior one was only indicted a few months

14  before this one.  So there is no history of the United States

15  prosecuting as a crime no-poach agreements, and that's because

16  they have never been held to be a per se violation of the

17  Sherman Act.  That is a purely legal decision for the Court to

18  make with respect to whether or not a no-poach agreement is a

19  per se violation.

20       THE COURT:  Yes.  So --

21       MS. RENDON:  And the reason --

22       THE COURT:  So let me ask you this question.  Let's be

23  specific, then.  You call -- I mean, there are certain per se

24  violations that -- that can be criminal.  And I think one of the

25  issues that comes up in a case like this is it's almost like a

24

—2:21-cr-00098-RFB-BNW—

1  sort of qualified immunity analysis.  Is there a requirement

2  that the specific form of restraint had been previously found to

3  be a per se violation for it to be charged?  Are you arguing

4  that?

5          MS. RENDON:  So it was charged as a per se violation.

6          THE COURT:  That's not my --

7          MS. RENDON:  And not with --

8          THE COURT:  That's not my question.

9          MS. RENDON:  Yeah, so --

10         THE COURT:  Ms. Rendon, I want you to answer my

11  question, please.

12         MS. RENDON:  So the answer to your question is yes,

13  Your Honor, because unless there is a history, a judicial

14  history, in which the Court could find as a matter of law that

15  these types of restraints are always more anticompetitive, that

16  these are a -- they rise to the level of a per se violation of

17  the Sherman Act, it cannot be prosecuted criminally.

18         To do so without that body of case law and without

19  that -- those prior findings in this context, the context of a

20  no-poach agreement, is a violation of the due process clause of

21  the Constitution.  And we know that these types of cases have

22  not been brought before because there isn't a single one cited

23  in any of the briefs that were filed, Your Honor.

24         Every time the Government cited to the proposition that

25  no-poach agreements are a per se violation of the Sherman Act,

Case 1:21-cr-00229-RBJ  Document 89-1  Filed 11/19/21  USDC Colorado  Page 26 of 55
Case 2:21-cr-00098-RFB-BNW  Document 60  Filed 11/05/21  Page 25 of 54

25

2:21-cr-00098-RFB-BNW

1  which is what is charged here, a per se violation of the Sherman

2  Act, they cited to a treatise, an antitrust treatise, not to a

3  single case; because they've never brought a case before.  No

4  case has ever gone to a jury --

5          THE COURT:  So you're saying that they could never

6  bring a case if they haven't brought a case, but then how would

7  they bring a case if they could never bring a case?  In which

8  case --

9          MS. RENDON:  So --

10         THE COURT:  And I say that, Ms. Rendon, because in the

11  context of antitrust there are frequently first-time situations

12  that involve what are identifiable restraints on trade, right.

13  Agreements even -- whether it's on the supply side or buyer's

14  side, right, agreements as it relates to market allocation,

15  right, have long been recognized on both -- well, we focus

16  frequently on the supply side, but we also have law that talks

17  about buyer side versus supply side and there not being

18  distinctions.  But there's long been case law that describes how

19  market allocation is -- is unlawful restraint against trade.

20  Why is that not enough?

21         MS. RENDON:  So, Your Honor, they could develop the

22  body of case law that would be sufficient for Courts to some day

23  conclude that this -- that these no-poach agreements are, in

24  fact, a per se violation of the Sherman Act.  That has always

25  been done in the context of civil litigation and the development

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 27 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 26 of 54

26

───────────2:21-cr-00098-RFB-BNW───────────

 1    of the type of factual analysis that Courts need to undertake to

 2    decide whether or not these types of agreements are going to

 3    fail over and over and over again under the rule-of-reason test.

 4    That's how you determine -- that's how you flip the switch from

 5    a rule of reason to a per se violation of the Sherman Act, is

 6    judicial experience that tells the Courts and leads to findings

 7    that no matter what these types of agreements are going to fail

 8    that rule-of-reason test.

 9            THE COURT:  So hold on --

10            MS. RENDON:  There is no opportunity for --

11            THE COURT:  So hold on, Ms. Rendon.  I want to make

12    sure I'm understanding.  Is it your -- is what you're arguing to

13    me that the process by which you get to a per se violation that

14    could serve as a basis for a criminal charge would be they would

15    first have to go through a rule-of-reason analysis on the civil

16    side such that there's sufficient tracks and case law as it

17    relates to rule-of-reason analysis, that that would then support

18    a per se, sort of, violation categorization?

19            MS. RENDON:  That -- that's correct, Your Honor.  We

20    don't even have any civil cases in which a Court has held

21    definitively that a no-poach agreement is a per se violation of

22    a Sherman Act -- of the Sherman Act let alone a criminal

23    prosecution.  So this is a unique and novel first-of-its-kind

24    prosecution.  And we should not be developing the case law on

25    whether or not these types of no-poach agreements are a per se

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 28 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 27 of 54

27

—2:21-cr-00098-RFB-BNW—

1   violation of the Sherman Act in the context of a criminal case.

2   Because if it's charged as a per se violation and it goes

3   forward as a per se violation, the defendants in this case have

4   literally no opportunity to establish that this is, in fact, a

5   type of an agreement that would not fail under the

6   rule-of-reason analysis, because none of that comes in.  Right.

7          So in a bid-rigging case the defendant doesn't get to

8   put on evidence that the bid rigging in the case was more

9   procompetitive than anticompetitive under these, you know, very

10  specific factual circumstances because it's a per se violation.

11  So the Court has already found if the Court finds it's a per se

12  violation that the harm exists.  And the only question is

13  whether or not the agreement is, in fact, a no-poach agreement.

14         And so in the context of a criminal case, our client

15  and Mr. Hee are wholly unable to defend themselves in an area of

16  law that has never been pursued before.

17         THE COURT:  But is that partly because we're talking

18  about supply-side issues?  I mean, look, the fact of the matter

19  is -- I mean, buyer-side issues.  The fact of the matter is that

20  that's often the case, right, that as it relates to, sort of,

21  employer/employment services you see fewer cases both on the

22  criminal and civil side.  That's -- part of that is a function

23  of the nature of how these cases are brought.  But we have clear

24  case law that says that those principles work on both the buyer

25  side and the supplier side.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 29 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 28 of 54

28

2:21-cr-00098-RFB-BNW

1          So you're saying that focusing really on that

2    distinction, but that's not a distinction the Court needs to and

3    has to recognize, is it?

4          MS. RENDON:  Well, so it's not because it's buyer side

5    or supply side, Your Honor.  It's because it's a no-poach

6    agreement.  And there is literally no case that has found, even

7    in the civil context, that a no-poach agreement is a per se

8    violation of the Sherman Act.  And it's because this is a new

9    and unique and novel thing that the Government has started.

10   They announced in 2016 that they were going to try to do this.

11   And it took them almost five years to find a case where -- where

12   they could try to prosecute somebody for this, and they've done

13   so.  They've indicted three cases this year on this new novel

14   theory that has never been tested before, and where there isn't

15   even a foundation in the civil law with respect to these types

16   of agreements.

17         So it's just like bid rigging is not the same as market

18   allocation.  No-poach agreements are not the same as bid

19   rigging.  They are not the same as market allocation.  They are

20   not the same as price fixing.  This is a different variety, a

21   different species, of alleged Sherman Act violations.

22         THE COURT:  So let me ask you a question.

23         MS. RENDON:  This is in part --

24         THE COURT:  Hold on second, Ms. Rendon.

25         MS. RENDON:  -- because these are not --

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 30 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 29 of 54

29

—2:21-cr-00098-RFB-BNW—

1          THE COURT:  Hold on.  Ms. Rendon, let me ask you a

2    question.  Are you saying to me that if you have two competitive

3    companies in the same industry, right, who are -- who are

4    competing for employee services and agree that they will not

5    hire other employees or will not consider applications from

6    other employees from the other company and that they will agree

7    to wages for all of these employees or potential employees, that

8    that wouldn't be a per se violation of the Sherman Act?

9          MS. RENDON:  So a wage-fixing conspiracy would be a per

10   se violation of the Sherman Act.  That's not what was charged

11   here.  What was charged here was a no-poach agreement that was

12   accomplished in a couple of ways, so a no-poach/no-hire one

13   another's employees.  And those actually, to the extent that

14   they have been litigated in the civil context, have always been

15   found to be under the rule of reason, not a per se violation.

16          So, for example, it happens all the time.  It happens

17   in the National Football League.  There are all sorts of rules

18   where I can't hire your cheerleaders and you can't hire my

19   football players during the season --

20          THE COURT:  I'm well aware -- so, Ms. Rendon, I am well

21   aware -- I actually have a case like this -- not like this, but

22   similar before me right now.  So I'm aware of this -- these

23   types of issues, but I wanted to narrow down something I think

24   that is important that you are raising, which is that you are

25   not saying that this is a wage fixing -- because they allege --

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 31 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 30 of 54

30

—2:21-cr-00098-RFB-BNW—

1   they argue that.  You're saying that this is not a wage-fixing

2   allegation because that's what they say.  They say that -- that

3   there's two types of restraint here, market allocation, which --

4   as it relates to employee services, but then there's also price

5   fixing or wage fixing as it relates to the services to be paid

6   for those employees or contractors.

7        Are you saying that they haven't -- that that's not by

8   itself -- the wage fixing is not itself a per se violation of

9   Section 1?

10        MS. RENDON:  So, Your Honor, the way that the case was

11   charged, and it was the Department of Justice that chose to

12   charge it this way, was as a single one-count conspiracy.  And

13   the conspiracy is a no-poach agreement accomplished in two ways,

14   one, by agreeing not to hire one another's employees and the

15   other by agreeing, they say, not to wage -- not to raise wages,

16   although that's far less clear in terms of the evidence or the

17   allegations in the indictment.  But it is not in a -- in a

18   free-standing wage-fixing claim.

19        The conspiracy that they charge and they chose to

20   charge is a no-poach conspiracy.  And so as a result they can't

21   now at this late date after having indicted the case now rewrite

22   the indictment and separate it into two separate conspiracies.

23   That's not how it's charged.  That's not how it's pled.  It's

24   pled as a per se violation of the Sherman Act as a result of a

25   no-poach agreement.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 32 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 31 of 54

31
2:21-cr-00098-RFB-BNW

1          And there's simply no foundation for that.  There is no

2     case law that would allow them to proceed on that theory on that

3     allegation.  And that's the allegation --

4          THE COURT:  Okay.  So let me -- I want to ask you this

5     other question because I want to make sure I'm understanding you

6     clearly.

7          Are you saying that if two companies are competing in

8     the same -- in the same industry as it relates to services for

9     contract employees and they agree that Company A will get

10    employees, let's say, whose names alphabetically are A through G

11    and the other company will get employees whose names are H

12    through Z, are you saying that that's not a per se violation of

13    the Sherman Act?

14         MS. RENDON:  That's correct, Your Honor.  That's never

15    been found to be a per se violation of the Sherman Act.  That --

16    that type of an agreement would have to be analyzed under the

17    rule of reason, and if it was concluded that there was no harm

18    to the agreement than procompetitive benefit, it would be found

19    to be a violation of the Sherman Act.  But it's not a per se

20    violation.

21         THE COURT:  So just give me a second.  What possible

22    procompetitive benefit would there be to not allowing employees

23    to be able to sell their services to another competing company?

24         MS. RENDON:  So if you look at some of the case law,

25    some of the procompetitive benefits that have been analyzed in

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 33 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 32 of 54

32

———2:21-cr-00098-RFB-BNW———

 1  the various cases include things like avoiding the free-rider

 2  problem.  Now, I don't know that you avoid the free-rider

 3  problem by dividing people up by the first letter of their last

 4  name, right.  That's a more extreme example.  It's obviously not

 5  what we have here.  But when you have situations where one

 6  company -- and this is why in the franchise context there are

 7  frequently these ancillary agreements not to hire that have been

 8  upheld after being -- you know, are analyzed only under the rule

 9  of reason, not as a per se violation.  It's because I own this

10  franchise.  I invest all of this money in recruiting, hiring,

11  doing background checks, training all of my employees.  And as

12  soon as they're up and running, you steal them to go work at

13  your franchise.  And that's a free-rider problem.

14         THE COURT:  Yes, but that's not what we have here.  I

15  mean, that's -- that's very dissimilar from this fact pattern,

16  even as alleged in the indictment.  This indictment basically

17  alleges in a very clearly defined input market that you have an

18  agreement between two companies, right, who are competing for

19  the same services, not to interview or hire employees who are

20  offering their services to the other company.  So in that

21  context, that specific context, could you identify for me what

22  would be a possible procompetitive reason for that?

23         MS. RENDON:  Absolutely, Your Honor.

24         THE COURT:  Okay.

25         MS. RENDON:  So the context here is a group of very

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 34 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 33 of 54

33

——————2:21-cr-00098-RFB-BNW——————

1   highly-skilled, specially-trained nurses who are hired to

2   provide continuity of care for medically-fragile students in a

3   single school in the Clark County School District.  And the

4   contracts last, like an NFL contract, instead of for a football

5   season, they last for an academic year because it is critically

6   important that these children have continuity of care from

7   specialized nurses who can take care of them.  These are

8   children who have tracheotomies, who are quadriplegics, who the

9   nurses go to their home in the morning to help get them ready

10  and on the bus, travel with them on the bus, are with them all

11  day.  And all of these nurses are working in the same

12  environment, helping one another with different students when

13  somebody needs coverage.

14        And if the nurses are switching from agency to agency,

15  those children will lose what it is that the Clark County School

16  District has bargained for.  And that is the critically

17  important continuity of care from the beginning of the school

18  year until the end of the school year for students with highly

19  complicated medical needs, medically-fragile students who need

20  to have that same nurse follow them from point A to point B.

21        THE COURT:  Okay.  All right.  I'll come back to you.

22  I have a few more questions for Ms. Rendon.

23        But, Mr. Sambat, I want to give you an opportunity to

24  be able to respond to some of the arguments that have been

25  raised.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 35 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 34 of 54

34

2:21-cr-00098-RFB-BNW

1      MR. SAMBAT:  Yes, Your Honor, and there are several.

2  And so I'll just start at the outset with respect to judicial

3  experience.  Judicial experience informs whether to create a per

4  se -- a new per se rule.  The per se rule need not be justified

5  for every single industry.  It creates a uniform rule for all

6  industries, and that was recognized in Arizona v. Maricopa

7  County, in that case.

8      As to Defense counsel's statement regarding there's no

9  cases regarding a Court's holding that employee allocation

10 agreements are per se legal, that's just flatly wrong.  There

11 are several courts have already recognized the same conduct that

12 the grand jury alleges here is per se illegal.  Granted, they're

13 in the civil context, but the Sherman Act is enforceable both

14 criminally and civilly.  So you've got In Re: Animation Workers

15 Antitrust, U.S. v. eBay, In Re: High-Tech --

16      THE COURT REPORTER:  I'm sorry.  You're going to have

17 to repeat that slower.  I'm sorry.  I'm Sorry.  Your Honor?

18      MR. SAMBAT:  -- as well is that all of these cases have

19 held that plaintiff properly filed a per se violation of the

20 Sherman Act where employers agreed to not solicit or hire the

21 respective employees.

22      THE COURT:  So, Mr. Sambat, let me ask you -- I want to

23 ask you a different question because --

24      MR. SAMBAT:  Yes, Your Honor.

25      THE COURT:  -- one of the concerns that the Court does

Case 1:21-cr-00229-RBJ  Document 89-1  Filed 11/19/21  USDC Colorado  Page 36 of 55
Case 2:21-cr-00098-RFB-BNW  Document 60  Filed 11/05/21  Page 35 of 54

35
─────2:21-cr-00098-RFB-BNW─────

1  have is about the blending of two theories of criminal liability

2  in one count.  Even by your own brief you appear to acknowledge

3  that there may be different theories by which a case may --

4  　　　　　　THE COURT REPORTER:  Your Honor?

5  　　　　　　THE COURT:  -- proceed as to whether or not it's wage

6  fixing or if it's market allocation.  I want you to address the

7  issue of whether or not in fact there are two theories of

8  criminal liability here or just one that's accomplished in two

9  mutually-reinforcing ways and, sort of, how the Court makes that

10  distinction in this context.

11  　　　　　　THE COURT REPORTER:  Your Honor?

12  　　　　　　MR. SAMBAT:  So, Your Honor --

13  　　　　　　THE COURT REPORTER:  Your Honor?

14  　　　　　　MR. SAMBAT:  -- as the Ninth Circuit has held --

15  　　　　　　THE COURT:  Hold on.  Hold on.  Wait.  Hold on a

16  second.

17  　　　　　　I'm sorry, Ms. Ganci.

18  　　　　　　THE COURT REPORTER:  I'm sorry.  I tried to interrupt

19  earlier.  Mr. Sambat said the cases really fast, and I didn't

20  get it, and nobody stopped.  And Ms. Rendon keeps shuffling her

21  papers, and so that's why I'm losing him.  So I don't know if we

22  can mute her while he's speaking.

23  　　　　　　THE COURT:  We can.

24  　　　　　　Ms. Rendon, I'd ask you to mute yourself while

25  Mr. Sambat is speaking and while you're speaking not to shuffle

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 37 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 36 of 54

36

———2:21-cr-00098-RFB-BNW———

1   papers because it does pick --

2          MR. SAMBAT:  Yes, Your Honor, I apologize.

3          THE COURT:  Well, no, it was Ms. Rendon I think who was

4   doing that.

5          So, Ms. Rendon, if you can mute yourself for now and

6   then we'll come back to you when we have questions.  All right.

7          MR. SAMBAT:  So to -- so to answer your question, Your

8   Honor, the Government has charged one overarching conspiracy

9   with multiple objects and the -- you know, you can have multiple

10  objects in a conspiracy.  And they all revolve around the same

11  nucleus of facts.  There was an agreement among the employers as

12  alleged in the indictment --

13         THE COURT:  I want to distinguish, Mr. Sambat, between

14  objects of conspiracy and criminal theories of liability.  Those

15  are not the same thing, right.  So --

16         MR. SAMBAT:  Yes.

17         THE COURT:  -- if you're saying that the conspiracy had

18  two objects --

19         MR. SAMBAT:  Yes.

20         THE COURT:  -- and those two objects also correspond to

21  independent bases for criminal liability, then the question is

22  whether or not those are improperly joined in one count.  Or if

23  you're saying that there's just one theory of criminal liability

24  here, and if there is, tell me what that is.

25         MR. SAMBAT:  Yes, Your Honor.  I mean, there are two

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 38 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 37 of 54

37

2:21-cr-00098-RFB-BNW

1   theories of liability.  They all rise out of one nucleus set of

2   facts, and it was part of a conspiracy.  So, you know, what was

3   charged here was that there was -- it -- as the Court has talked

4   about and we've already talked about, the agreement not to

5   solicit employees, but part and parcel of that was not to

6   entertain further wage increase, which is a form of price

7   stabilization, and they all arise out of the same nucleus of

8   facts.

9       And so you have -- as the Ninth Circuit has held in the

10  antitrust context, the character and effect of a conspiracy are

11  not prejudged by dismembering and viewing it in separate parts.

12  So, for example, if the Court has issues hypothetically with no

13  poach, I mean, you know, we can still proceed on the wage-fixing

14  theory because it -- you know, the wage fixing, and the Defense

15  is able to contest this, is clearly fix pricing.  But it's not

16  improperly joined because you can have multiple objects of an

17  overarching conspiracy to restrain trade under the Sherman Act,

18  and it has been done in other cases.

19      I think this issue arose in the In Re: Animation

20  Workers Antitrust Litigation where Judge Koh rejected a similar

21  argument.  And there's a case I believe charged out of -- I

22  believe it's Tokio where you can have one single count of

23  restraint of trade with multiple objects here and several ways

24  to accomplish the restraint in question.  So you can have bid

25  rigging and market allocation as they did in the -- which was in

38

———2:21-cr-00098-RFB-BNW———

1  some of the cases that we've cited.

2         THE COURT:  Okay.  So if I'm understanding you

3  correctly, you're saying there's a conspiracy to violate Section

4  1 of the Sherman Act.

5         MR. SAMBAT:  Yes.

6         THE COURT:  And that the indictment alleges two ways in

7  which that was accomplished, and there are two independent ways

8  by which it could be accomplished.  And so you're saying they

9  were the same -- they were -- they are objects of the same

10 conspiracy, but each of those separate objects in the conspiracy

11 related to those particular objects could itself independently

12 serve as a basis for criminal liability.  Is that what you're

13 arguing to me?

14        MR. SAMBAT:  Yes, that's correct, Your Honor.  And the

15 jury would have to -- okay.

16        THE COURT:  No, that's fine.  I just -- I wanted to

17 make sure what I'm understanding is what you would be saying to

18 the jury is that they would be presented with alternative

19 theories of liability as it relates to conspiracy; that the jury

20 would either be able to find that they violated Section 1 by

21 agreeing not to hire or they could be found to have violated by

22 agreeing to fix wages, right?

23        MR. SAMBAT:  That's correct, Your Honor.  We presume a

24 unanimity instruction where they have to agree unanimously on

25 that object.  But, yes, that's correct.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 40 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 39 of 54

39

2:21-cr-00098-RFB-BNW

1          THE COURT:  Okay.  I want you to address the issue of

2   the market allocation and being a per se violation in the

3   context of employee, sort of, services here.

4          MR. SAMBAT:  Yes, Your Honor.  So the -- as I stated

5   earlier, judicial experience informs whether to consider a

6   new --

7          THE COURT:  I don't want you to focus on judicial

8   experience.  I agree with you --

9          MR. SAMBAT:  Yes.

10          THE COURT:  -- that the judicial experience isn't

11   required.  What's required is that there needs to be an

12   identifiable category of restraint on trade that the Court could

13   associate with the theory of liability.

14          MR. SAMBAT:  Yes.

15          THE COURT:  So what -- I think you've identified that.

16   I just want to make sure I'm understanding as it relates to your

17   theory regarding at this point what would be, sort of, market --

18   market allocation on the buyer's side.

19          MR. SAMBAT:  Yes.

20          THE COURT:  That you believe from the cases you've

21   cited they have identified that as a possible basis for per se

22   violation, and the Ninth Circuit actually having had their case

23   law on this.  But go ahead.

24          MR. SAMBAT:  Yes, Your Honor.  Well, I mean, going back

25   in terms of applying -- the Sherman Act, you know, condemns both

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 41 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 40 of 54

40

─────────2:21-cr-00098-RFB-BNW─────────

1   buyer-side and seller-side cartels.  U.S. v. Brown established

2   that in the Ninth Circuit with respect to allocation inputs.

3   Labor is a form of input as has been recognized in early case

4   law and most recently in the U.S. Supreme Court's opinion in

5   Alston.

6           As far back as 1926 in the Anderson v. Shipowners

7   Association case, the Court found a violation of the Sherman Act

8   where you had a shipowner's association made up of shippers and

9   owners who implemented a regime to allocate the seamen with

10  respect to, you know, where they would work, the capacity that

11  they would work in, and the wages that they would be paid.

12          And so Courts have had no issue applying the Sherman

13  Act and the per se rule to the labor market.  I've talked about

14  some of these civil cases or other cases -- Circuit-level cases

15  that have applied the per se rule on charges arising out of

16  no-hire agreements among employers such as the Quinonez v.

17  National Association of Securities Dealers, Roman v. Cessna

18  Aircraft Company, and even Defense counsel talked about the

19  sports league cases.

20          Well, all of those cases arise out of an industry where

21  you need necessarily horizontal restraints to create the

22  product.  All of those cases also recognize -- NBA v. Williams

23  as an example -- that outside of the context of sports leagues

24  and other ventures, it's per se illegal for employers who

25  compete for labor to agree among them themselves to purchase

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 42 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 41 of 54

41

—2:21-cr-00098-RFB-BNW—

1    that labor only on specified terms.

2            But just stepping back here, and I think the Court

3    alluded to this in its questions to Defense counsel, the

4    indictment alleges that employers got together to agree not to

5    solicit or hire their employee nurses.  This is heartland, core

6    market allocation, and the labor market is just another market.

7            So -- so the indictment does allege a per se violation

8    of the Sherman Act, and there are no facts on the indictment --

9    in the indictment that can discern that there -- that would take

10   this allegation outside of the per se rule.

11           I think you also -- or Your Honor also asked about why

12   we are deciding this now.  Well, I think you might have been

13   alluding to, like, ancillary defenses that have been raised in

14   the motions, but ancillarity [sic] is a question of fact for the

15   jury to decide.  And that's -- to decide that issue now would

16   improperly intrude on the fact-finding role of the jury.

17           Well, what the Court ensures, as the Court is aware, is

18   to look at -- it has to do with examining the allegations in the

19   indictment and see whether it pleads a per se violation of the

20   Sherman Act, which we allege it does because it's an allocation

21   of the labor market.  And it's -- in comparison to some of the

22   other cases, and I don't want to digress too much, the Courts

23   when they are faced with a case, a Sherman Act case, often have

24   to look at the restraint in issue and then look at whether it's

25   tantamount to or a form of conduct that falls within the

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 43 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 42 of 54

42

—2:21-cr-00098-RFB-BNW—

1   categories of per se unlawful conduct that's been recognized by

2   the Courts:  market allocation, price fixing, and bid rigging --

3   bid rigging.  And market allocation has been per se illegal for

4   over 120 years, Your Honor.

5          In this case the Court doesn't even have to make that

6   big logical leap in looking at the restraint in issue, unlike,

7   say, in Catalano v. Target Sales where you have, like, credit --

8   interest for credit being restrained or Arizona where you're

9   looking at -- I'm sorry -- Maricopa where you had price maximums

10  and the like.  They agreed to allocate the labor market.  It was

11  plain and simple.  It's about as cut and clear as one can get in

12  looking at whether you're putting -- you know, this falls or is

13  a form of per se unlawful conduct.  And Courts have already

14  recognized this.  We're not asking the Court to break new ground

15  contrary to Defense counsel's assertion.  The case law is clear

16  that an allocation of a market, an allocation of inputs, which

17  labor is a form of, is per se unlawful.

18         And so the motion to dismiss motion should be denied.

19         THE COURT:  Thank you, Mr. Sambat.

20         Ms. Rendon, I will give you an opportunity to be able

21  to respond.

22         THE COURT REPORTER:  I'm going to need Mr. Sambat to be

23  muted while she's speaking please.

24         THE COURT:  Okay.  Mr. Sambat, if you could mute

25  yourself, please.

43

———2:21-cr-00098-RFB-BNW———

1          MR. SAMBAT:  Yes, Your Honor.

2          THE COURT:  Thank you.

3          Okay, Ms. Rendon.  We can't hear you just yet.  Hold on

4    a moment.  You have to make sure that you're unmuted.  Sometimes

5    it takes a few seconds for that to happen.  I'll let you know

6    when it appears to me from the symbols on the screen that you

7    are unmuted, which is now.

8          MS. RENDON:  Okay.  Thank you, Your Honor.

9          So, yeah, I appreciate the opportunity to respond, and

10   I'm not going to respond point by point to all of the cases.

11          THE COURT:  Well, let me --

12          MS. RENDON:  And I --

13          THE COURT:  Let me help you.  Hold on a second.  Let me

14   help you here.  I'm focussed on the four corners of the

15   indictment and whether or not the four corners of the indictment

16   allege a recognized form of restraint on trade in the context of

17   market allocation, right, for in this case purchasers of labor.

18          MS. RENDON:  And, Your Honor, I would submit the answer

19   to that question is, no, it does not.  So market allocation is

20   not an appropriate analogy for the conspiracy that is alleged in

21   this case.  That's why no-poach cases are new and different.

22   The DOJ has said so repeatedly in its guidance to the industry

23   and in press conferences and at conferences.  This is a new and

24   novel approach.  Labor and markets are two separate things, and

25   labor markets are not interchangeable.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 45 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 44 of 54

44

2:21-cr-00098-RFB-BNW

1          THE COURT:  Well, hold on.

2          MS. RENDON:  People are not --

3          THE COURT:  Hold on.  I want you to address the fact

4   the Supreme Court has recognized that labor can be an input.

5   That on the labor -- and, again, on the buyer side as it relates

6   to labor and employee services that there can be restraint as it

7   relates to agreements about how companies who purchase those

8   services agree to not infringe upon or not partake in certain

9   types of conduct.

10          But are you saying -- because I want to make sure I'm

11  clear about this.  Are you saying that, in fact, there cannot be

12  in the context of the buyers of, sort of, labor or labor's input

13  a restraint on trade based upon companies agreeing not to

14  solicit other companies', sort of, applicants or employees?

15          MS. RENDON:  So what I'm saying, Your Honor, is in this

16  context with this highly specific labor market, specialized

17  nurses who are trained and capable of taking care of

18  medically-fragile children, you would have to undergo a

19  rule-of-reason analysis to determine whether or not an agreement

20  not to hire one another's nurses in the middle of the school

21  year would be an anticompetitive or procompetitive agreement

22  that would help the Clark County School District fulfill the

23  purposes of its contract with these various staffing agencies,

24  which is to ensure continuity of care for these very unique

25  children for the entirety of the school year.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 46 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 45 of 54

45

———2:21-cr-00098-RFB-BNW———

1           And so because you have to engage in that

2    rule-of-reason analysis in this new, unique, and novel labor

3    market -- this can't be compared to billboards on a highway.

4    These nurses are different and unique.  You have to engage in a

5    rule-of-reason analysis.  And that can't be done here because

6    the case was indicted as a per se agreement and because there

7    has never been a rule-of-reason antitrust case brought as a

8    criminal case.  There isn't even a jury instruction for a

9    rule-of-reason analysis.

10          Mr. Sambat says that the jury would have to decide

11   that.  Well, they say in their opposition brief that this

12   shouldn't even be raised because it's not a jury question, and

13   he's right.  If there is a per se agreement, nobody ever gets to

14   balance the harm and the procompetitive nature of the agreement,

15   which has to be done when you're first looking at a unique type

16   of market, this very particular labor market, for the very first

17   time.  And so --

18          THE COURT:  Well, let me ask you a question,

19   Ms. Rendon.  Isn't that determination about whether or not it's

20   a unique market or not or whether or not there's something about

21   the market that would suggest that I have to apply the

22   rule-of-reason analysis a factual inquiry that would be

23   inappropriate for me to decide at this point?  I'm not saying,

24   Ms. Rendon, that you couldn't raise these arguments, as I've

25   said to you at the beginning.

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 47 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 46 of 54

46

———————2:21-cr-00098-RFB-BNW———————

1          My first question to you is why now --

2          MS. RENDON:  So --

3          THE COURT:  -- because the arguments that you keep

4    raising to me are arguments that are outside of what's in the

5    indictment.  You keep talking about the specific nature of this

6    industry, how there's a unique issue of continuity of care.

7    These are all issues that are not in the indictment.  It's not

8    my role, at this point anyway, to make those types of

9    determinations as it relates to a motion to dismiss an

10   indictment.  That's an incredibly high standard in a criminal

11   case.

12          It's not to say that you aren't raising what are

13   significant arguments and arguments that couldn't be raised at a

14   later stage in this case, but it does seem to me that you keep

15   coming back to facts that are simply not in the indictment and

16   not appropriate for me to consider.  So I'll ask you again what

17   is it about the -- what's in the indictment itself, right, that

18   would suggest that it's appropriate to dismiss it now.

19          MS. RENDON:  So the indictment itself actually does

20   contain actually a lot of these facts with respect to the

21   purpose of these contracts and the fact that the nurses were

22   there to take care of medically-fragile students.  That's all in

23   the indictment.

24          And the only reason that I raise it, Your Honor, is

25   because there is no case out there whatsoever, there is not a

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 48 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 47 of 54

47

——2:21-cr-00098-RFB-BNW——

1    single criminal case finding that a no-poach agreement is a per

2    se violation of the Sherman Act.  And so what the Government has

3    done is they've asked Your Honor to look at this by analogy to

4    random market allocation cases.

5           And so I was pointing out those facts as a way of

6    explaining to Your Honor what I think is -- I hope came across

7    in our pleading, which is you cannot analogize to

8    run-of-the-mill market allocation cases, not in the context of a

9    criminal case.

10          And you're right.  A motion to dismiss is a highly

11   unusual thing.  This is only the second one I've ever filed in

12   my career involving a criminal case.  But, Your Honor, you

13   should take note of the fact that the Government has filed

14   three, and exactly three, no-poach criminal cases in its entire

15   history.  All of which were filed this year.  All of which the

16   defendants have filed motions to dismiss because this is outside

17   the bounds of what the Sherman Act -- what the Government is

18   allowed to do with respect to criminal prosecutions under the

19   Sherman Act.

20          And the reason that this can't be raised later is once

21   the defendants have been put in jeopardy -- so, first of all,

22   they shouldn't have to be in that situation with a legally

23   deficient indictment, and this indictment on its face is legally

24   deficient.  But also, Your Honor, there is no mechanism to raise

25   these facts at trial.  Because if it is a per se violation, as

48

—2:21-cr-00098-RFB-BNW—

1    alleged in the indictment, the rule of reason, the factual basis

2    for that, is irrelevant and the Government has already said it's

3    inadmissible.  It would require expert testimony in --

4            THE COURT:  Well, first of all, I have not -- I haven't

5    found that, one.  Let's be clear about what the Government has

6    said and what the Court would have to find, right.  Even in the

7    context of per se violation cases there are defenses that are

8    available that can be raised that relate to ancillary and

9    procompetitive issues, right.  That's acknowledged in the case

10   law itself.

11           So I'm a little confused by what you mean by that,

12   Ms. Rendon, because I haven't made any findings that these facts

13   could not be raised later, and to the contrary, I've said that

14   they could be raised later, actually.  And I haven't made any

15   specific findings about what would and would not be admissible

16   and could be presented as defenses.  I haven't said that at all.

17   So I'm not sure why you're saying that it couldn't be raised

18   later because I haven't made any type of ruling to that effect

19   whatsoever in this case.

20           MS. RENDON:  So the reason that I say that, Your Honor,

21   is, first of all, there doesn't exist anywhere that we can find

22   any jury instruction on rule of reason because rule-of-reason

23   Sherman Act violations have never been brought by the Department

24   of Justice as a criminal case ever in any context, in market

25   allocation, bid rigging, price fixing.  They have never

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 50 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 49 of 54

49

─────────2:21-cr-00098-RFB-BNW─────────

 1   prosecuted a person or an entity on a rule-of-reason case.  They

 2   only bring per se cases because under the due process clause of

 3   the Constitution people need to know exactly what it is that is

 4   violative of the Sherman Act, what kind of conduct is not

 5   permitted, that doesn't involve a balance and a weighing.

 6            And so there's no mechanism.  I mean, I suppose Your

 7   Honor could let in whatever facts you want to, but there's no --

 8   there's no way to defend a criminal case like this that is

 9   charged as a per se violation when that indictment is improperly

10   brought and it's not a per se case.

11            THE COURT:  I'm sorry.  Hold on.

12            MS. RENDON:  So I think that if Your Honor --

13            THE COURT:  Hold on.  Hold on.  If I -- if I allow it

14   to go forward as a per se case, there are in fact specific

15   defenses that relate to per se violations, are there not?

16            MS. RENDON:  But not a rule-of-reason defense.  That is

17   not a defense to a per se violation.  Once you find that this is

18   in fact a per se violation, by definition that means that you've

19   already found that the harm existed.

20            THE COURT:  No.  Well --

21            MS. RENDON:  That's the meaning --

22            THE COURT:  -- it wouldn't mean that.

23            MS. RENDON:  -- of a per se violation.

24            THE COURT:  Well, and I think that's an important

25   conversation we're having.  It may very well mean that in the

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 51 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 50 of 54

50

—2:21-cr-00098-RFB-BNW—

1  context of construing the indictment that the Court would limit

2  what that per se violation would be.  We haven't actually talked

3  about that, Ms. Rendon, but the fact of the matter is I could

4  say, "Well, I agree that it can't be any and all conduct, but

5  that there can be certain types of conduct that would establish

6  a per se violation."

7          You're not saying that in the context of even this

8  market that there couldn't be per se violations.  What you're

9  saying is that they have not identified one.  While the Court,

10  as you know, also has the ability on this type of a motion or in

11  these type of cases to more clearly define what the nature of

12  the criminal liability is moving forward.  That doesn't

13  necessarily involve dismissal, but that does involve a more -- a

14  more clear definition of the criminal conduct that would be

15  clearly violative.

16          So why wouldn't I do that?  Why wouldn't I say, "Well,

17  having heard your arguments, there is per se conduct that could

18  be violative of Section 1, that is clear and obvious for which

19  there would be notice," and I identify that?  And I guess the

20  only argument you would say is that there's no such identifiable

21  conduct here.  But I could do that as well, though, could I not?

22          MS. RENDON:  Well, so, Your Honor, the problem is in

23  this case they charged a single conspiracy, and it is a

24  conspiracy not to poach one another's employees.  So it is a

25  single no-poach conspiracy.  And as Your Honor pointed out,

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 52 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 51 of 54

51

--- 2:21-cr-00098-RFB-BNW ---

1   there is, you know, this one mechanism that they threw in there

2   as a way to help ensure that employees are not poached, and

3   that's by not raising wages, right.  It's not charged as a

4   wage-fixing or price-fixing conspiracy.  It's charged as one of

5   the first ever per se Sherman Act violations that is a no-poach

6   agreement.

7           So Your Honor would have to literally rewrite the

8   indictment and charge a different conspiracy for this to be a

9   case that could go forward as a wage-fixing case, because that's

10  not how it was charged.  It was just thrown in as one of the

11  mechanisms by which the no-poach conspiracy was accomplished.

12          And so I don't think that under the law as it currently

13  exists that this case can go forward as a matter of law on the

14  theory that the Government, that the Department of Justice,

15  chose to pursue.

16          THE COURT:  Okay.  Final word, Mr. Sambat.  I'll let

17  you have one final word, and then we'll close this out.

18          MR. SAMBAT:  Yes, Your Honor.

19          That's just not the law.  As it -- if the entire

20  conspiracy is subject to per se treatment where it involves per

21  se restraint, even if other conduct might -- might on its own be

22  jettisoned under the rule of reason, the case can go forward,

23  Monsanto Company v. Spray-Rite Service Corporation, 1984, Note

24  6.

25          And I think the Court -- the Court is correct.  If

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 53 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 52 of 54

52

————————2:21-cr-00098-RFB-BNW————————

1   there are defenses that the Defense wants to raise with respect

2   to it sounds like an ancillarity [sic] restraints defense, they

3   can properly raise that defense and provide sufficient evidence

4   at the close of the Government's case to establish a prima facie

5   case of ancillarity, that there is a legitimate business

6   collaboration and that it was reasonably necessary to achieve a

7   procompetitive purpose, which Defense counsel has alluded to

8   several times regarding continuity of care.  And we don't

9   disagree on that.

10          But now, the Court is correct, is not the time to make

11   that determination.  The time to hear defenses and to determine

12   whether there is an ancillary restraints defense is at trial.

13   But, as the Court stated, the Court is bound to -- can't just

14   dismiss an indictment by bringing in extraneous evidence or

15   deciding, you know, fact-specific defenses at this juncture.

16   There's no summary judgment in the criminal context.  If the

17   defendants have a defense, they can raise it at trial, Your

18   Honor.

19          So the motion to dismiss should be denied.

20          THE COURT:  Okay.  Well, I appreciate the arguments of

21   counsel.  I'll take the motion under submission at this point in

22   time, but the case should go ahead and proceed on its normal

23   course and I'll decide this in due course.  But I'm not sure

24   that I anticipate that the Court would grant the motion at this

25   point in time.

53

—————————2:21-cr-00098-RFB-BNW—————————

1            So is there anything else we need to do today as it

2    relates to the case and discovery or other issues?  I know this

3    is not a civil case, but in these types of cases discovery can

4    become an important and relevant issue for consideration.

5            MS. CONDON:  Well, Your Honor, just relating back to

6    the first motion before we move onto whether there are any other

7    issues, before we meet and confer, had you anticipated that the

8    hearing would be in person or by Zoom?

9            THE COURT:  Uhm.  For criminal cases I tend to prefer

10   to have the hearings in person.  However, as this case involves

11   individuals from multiple states, we don't have to do it that

12   way.

13           MS. CONDON:  It would be the Government's preference,

14   Your Honor, and I believe that the relevant individuals for the

15   most part are located in Las Vegas.

16           THE COURT:  Okay.

17           MS. CONDON:  And the Government is willing to travel.

18           THE COURT:  Okay.  Well, and I believe that Mr. Wright

19   and Ms. Muralidhara are here in Las Vegas.  And so -- and

20   Mr. Hee appears to be here at least today.  So I'm happy to set

21   this for an in-person hearing.

22           MS. CONDON:  Okay.  We'll keep that in mind when we're

23   meeting and conferring.  Thank you, Your Honor.

24           THE COURT:  Anything else?  Mr. Wright?

25   Ms. Muralidhara?

Case 1:21-cr-00229-RBJ   Document 89-1   Filed 11/19/21   USDC Colorado   Page 55 of 55
Case 2:21-cr-00098-RFB-BNW   Document 60   Filed 11/05/21   Page 54 of 54

54

2:21-cr-00098-RFB-BNW

1        MR. WRIGHT:  No, Your Honor.  Thank you.

2        THE COURT:  All right.

3        MR. SAMBAT:  Thank you, Your Honor.

4        THE COURT:  All right.  If there's nothing else then,

5   everyone please be well and be safe.  We'll be adjourned.  Thank

6   you.

7        MR. SAMBAT:  Thank you, Your Honor.

8        MS. CONDON:  Thank you, Your Honor.

9        MS. RENDON:  Thank you, Your Honor.

10        (Whereupon the proceedings concluded at 3:58 p.m.)

11                        --oOo--

12              COURT REPORTER'S CERTIFICATE

13

14        I, PATRICIA L. GANCI, Official Court Reporter, United

15   States District Court, District of Nevada, Las Vegas, Nevada,

16   certify that the foregoing is a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19   Date:  November 5, 2021

20                        /s/ **Patricia L. Ganci**

21                        Patricia L. Ganci, RMR, CRR

22                        CCR #937

23

24

25

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670