IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 21-cr-00229-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. DAVITA INC.,
2. KENT THIRY,

    Defendants.

## UNITED STATES' MOTION TO EXCLUDE DEFENDANTS' EXPERT

The United States moves *in limine* to exclude Dr. Pierre-Yves Cremieux from testifying as an expert under Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 702. Defendants' Rule 16 disclosure is inadequate, and Defendants have not met their burden of establishing that Dr. Cremieux's supposed expert economic opinions are relevant and reliable under Rule 702. Dr. Cremieux should therefore be excluded from testifying as an expert; in the alternative, the Court should order supplemental disclosure and require Defendants to satisfy their burden of relevance and reliability at a pre-trial *Daubert* hearing.

## BACKGROUND

On July 14, 2021, a grand jury in this district returned an Indictment charging Defendants with two counts of conspiring to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (ECF No. 1), and on November 3, 2021, the grand jury returned a Superseding Indictment adding an additional Section 1 charge (ECF No. 74). The Superseding Indictment charges Defendants with per se violations of the Sherman Act for conspiring to restrain competition for employees.

On July 20, 2021, both Defendants, "understanding [their] burden of reciprocal discovery as set forth in Rule 16(b)(1)(C)," elected in their respective Discovery Conference and Memorandum Order to "request[] disclosure of a written summary of testimony the government intends to use under Rule 702, 703, or 705 of the Federal Rules of Evidence, relating to expert testimony and opinions of experts, during its case in chief at trial, as set forth in Rule 16(a)(1)(G)" (ECF Nos. 21 & 22 at ¶ I.A.9). Defendants reiterated this request in a letter dated October 19, 2021. By letter dated October 28, 2021, the United States informed Defendants that the government "does not intend to introduce" such expert testimony "during its case-in-chief at trial," and asked Defendants to "provide promptly a written summary of any" such expert "testimony that either Defendant intends to use . . . at trial."

On December 3, 2021, two weeks before the Rule 702 motions deadline, *see* Order Setting Case Schedule (ECF. No. 39), Defendants purported to comply with their disclosure obligations pursuant to Rule 16(b)(1)(C) by disclosing "a summary of the expected testimony of Dr. Pierre-Yves Cremieux." This five-page letter is attached as Exhibit A. Defendants posit that Dr. Cremieux "will provide expert economic analysis" at trial, Ex. A at ¶ I.6, and "testify that . . . the economic evidence does not support the existence of a labor market allocation agreement," *id.* at ¶ II.A.1. The purported "economic evidence" consists of six separate sub-opinions summarized in approximately 565 words, and hereinafter referred to as Opinions A through F. *See* Ex. A at ¶ II.A.1.a.-f. Outside of the purported Rule 16 disclosure, Defendants have taken no additional steps to support the admissibility of Dr. Cremieux's proposed testimony.

## LEGAL STANDARD

**Rule 16.** Federal Rule of Criminal Procedure 16(b)(1)(C) provides that a defendant's expert disclosure must describe (1) the witness's opinions, (2) the bases and reasons for those

opinions, and (3) the witness's qualifications. Fed. R. Crim. P. 16(b)(1)(C).  The disclosure requirements are "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." 1993 Adv. Comm. Notes to Fed. R. Crim. P. 16. If a defendant fails to comply with Rule 16, the Court may order additional discovery, grant a continuance, exclude the evidence, or "enter any other order that is just under the circumstances," Fed. R. Crim. P. 16(d)(2), although excluding evidence is rare, *United States v. Sarracino*, 340 F.3d 1148, 1170 (10th Cir. 2003).

**Rule 702.** In addition to satisfying the discovery obligations of Rule 16, Defendants bear an independent "burden of showing that [their] proffered expert's testimony is admissible" under Rule 702. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (distinguishing between Rule 702 and Rule 16).

Expert testimony is admissible only if it "will help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), "is based on sufficient facts or data," *id.* 702(b), "is the product of reliable principles and methods," *id.* 703(c), and "the expert has reliably applied the principles and methods to the facts of the case," *id.* 703(d). "Put another way, the evidence must be both relevant and reliable." *Heatherman v. Ethicon, Inc.*, 2020 WL 5798533, at *2 (D. Colo. Sept. 29, 2020) (Jackson, J.) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)).

Rule 702 sets up an important gatekeeping function that "requires a district court to assess proffered expert testimony to ensure it is both relevant and reliable." *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012). "Although a district court has discretion in how it performs its gatekeeping function, 'when faced with a party's objection, [the court] must

3

adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.'" *Id.* (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000)). To do this, the Court "must assess the 'reasoning and methodology underlying the expert's opinion,' and must ultimately determine 'whether it is scientifically valid and applicable to a particular set of facts." *Heatherman*, 2020 WL 5798533, at *2 (quoting *Goebel*, 215 F.3d at 1087); *see also United States v. Vann*, 776 F.3d 746, 757 (10th Cir. 2015) ("[D]istrict court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact before permitting a jury to assess such testimony." (cleaned up)).

The Court "has discretion as to how to perform this gatekeeping function." *Heatherman*, 2020 WL 5798533, at *2. And although this "is not a role that emphasizes exclusion of expert testimony," the proponent still has a burden of establishing, and the Court still must find, that the testimony is relevant and reliable. *Id.*; *see also United States v. Yurek*, 2017 WL 2930577, at *2 (D. Colo. July 7, 2017) ("[S]ince Defendants are now on notice of the Government's *Daubert* challenge, they must carry that burden in their disclosure and/or response to Defendant's Motion, and cannot simply wait until trial to make at least a *prima facie* showing of admissibility under Rule 702."). The Court may hold a *Daubert* hearing to make this determination, but it may exclude the testimony even without such a hearing if a defendant does not satisfy its burden when confronted with a motion to exclude the testimony for failing to satisfy Rule 16 and Rule 702. *See Nacchio*, 555 F.3d at 1238-39, 1241-42 (affirming exclusion of expert testimony in criminal case following motion under Rule 16 and Rule 702 without a *Daubert* hearing).

Rule 16 and Rule 702 go hand in hand in one more important respect. "If a court deems expert testimony relevant and reliable, further challenges to that testimony should be directed to its weight, not its admissibility," where "[t]he challenging party has many tools at its disposal

4

even if the testimony is admitted," including "[v]igorous cross-examination." *Heatherman*, 2020 WL 5798533, at *2 (quoting *Daubert*, 509 U.S. at 596). And in order to perform such "vigorous cross-examination," the Rule 16 disclosure must be sufficiently robust. *See* 1993 Adv. Comm. Notes to Fed. R. Crim. P. 16 (Disclosure requirements "intended . . . to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.").

## ARGUMENT

Defendants' disclosure provides a bare-bones sketch of Dr. Cremieux's anticipated testimony, while providing no explanation of his methodologies or the data on which he relied for any specific opinion. More troublingly, the disclosure reflects that Defendants intend to use their expert as a backdoor means of offering impermissible testimony concerning purported procompetitive justifications of the agreement—testimony that is prohibited in per se cases.

### A.   Defendants' Expert Disclosure Is Insufficient Under Rule 16

The United States objects to Opinions A, B, C, D, E, and F for failing to provide adequate disclosure under Rule 16. *See* Ex. A at ¶ II.A.1.a.-d. "[C]ases involving technical or scientific expertise," such as the posited economic opinions here, "require greater disclosure" under Rule 16. *Yurek*, 2017 WL 2930577, at *2 (citing *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995)). Defendants' disclosure here fails to meet Rule 16's requirements.

Opinion A states in full:

> Dr. Cremieux's opinion is that the evidence regarding employee separations at DaVita does not align with the expected effect of a labor market allocation agreement. Dr. Cremieux analyzed DaVita's separation rates for the relevant sets of DaVita employees. That analysis confirms, in Dr. Cremieux's opinion, that the relevant separation rates were not depressed during the alleged conspiracy periods.

Ex. A at ¶ II.A.1.a. This summary fails to identify: (1) the *ex ante* "expected effect" on employee separations; (2) the economically sound methodology of the analysis performed to obtain the separation rates; (3) the source of the data analyzed pursuant to this methodology; (4) what "DaVita's separation rates" were; (5) who the "relevant sets of DaVita employees" encompass; (6) how those employees were identified and/or deemed to be "relevant"; and (7) what "separation rates" Dr. Cremieux found.

> Opinion B states in full:
>
> Dr. Cremieux's opinion is that patterns of DaVita employee compensation do not align with the expected effects of a labor market allocation agreement. In particular, Dr. Cremieux's analysis of DaVita-specific compensation data and national benchmarks does not reveal a depression in the compensation of DaVita senior-level employees specific to the alleged conspiracy periods; in fact, the elevation of median salary for DaVita senior-level employees above benchmarks is higher during the alleged conspiracy periods than before or after.

Ex. A at ¶ II.A.1.b. This summary fails to identify: (1) the *ex ante* "expected effects" on "patterns" of employee compensation; (2) the economically sound methodology of the analysis performed to obtain the "patterns" of employee compensation and determine there was no "depression"; (3) the source of the "DaVita-specific compensation data" analyzed pursuant to this method; (4) what the median salary was; (5) what "national benchmarks" or "benchmarks" Dr. Cremieux analyzed; (6) what period "before [and] after" the conspiracy period Dr. Cremieux selected and why; (7) the economically sound methodology used to compare DaVita's median salary to national benchmarks, including whether Dr. Cremieux utilized a regression analysis to account for supply and demand factors that influence the price of labor, as generally required when analyzing price differences between the conspiracy period and the non-conspiracy (normative) period, *see In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. 1497, 1502-05 (D. Kan. 1995); and (8) the actual results of that comparison.

>Opinion C states in full:
>
>Dr. Cremieux is expected to testify that evidence concerning employees at DaVita who provided notice that there [sic] were considering positions outside of DaVita often received offers for promotions, increased compensation and/or different job responsibilities, contrary to the allegation that DaVita entered into notice agreements with the entities identified in Counts 1, 2 and 3 of the Indictment as part of a market allocation agreement for labor. Dr. Cremieux is expected to testify and address the recruitment of specific employees that the Government may present at trial, including his analysis of the effects and incentives of alleged conduct.

Ex. A at ¶ II.A.1.c. This summary fails to identify: (1) what supposed evidence or scenarios Dr. Cremieux examined; (2) how the evidence or scenarios were selected by an economically sound method; (3) the rate of supposed positive employment outcomes; (4) the economically sound methodology used to determine his opinion that the rate found can be described as "often."

>Opinion D states in full:
>
>Dr. Cremieux is expected to testify that, in his opinion, there was a lack of economic incentive for DaVita to enter into market allocation agreements for senior-level employees with the companies identified in the Indictment, making the existence of a labor market allocation agreement less likely. In particular, Dr. Cremieux is expected to testify that:
>(i)     The competition for senior-level DaVita employees was broad. Data suggests that during and outside the alleged conspiracy periods, senior-level employees departed DaVita for hundreds of other companies. These destination companies were not confined to the outpatient care industry or to the broader healthcare industry (which comprises thousands of companies), and the pool of potential destinations may have been far larger than the set of actual destination companies.
>Even outside the alleged conspiracy periods, moreover, the three companies referenced in the Indictment are a destination for a tiny fraction of senior-level employees departing DaVita. Market allocation agreements with those three companies could not reasonably be expected to have a material impact on employee compensation or employee turnover rates.
>(ii)    The defendants and their alleged co-conspirators had little, if any, power to suppress competition and wages, and correspondingly little, if any, incentive to enter into an agreement since such an agreement could not restrict competition for labor.

Ex. A at ¶ II.A.1.d. The summary for sub-opinion (i) fails to identify: (1) the economically sound methodology Dr. Cremieux used to determine that competition for DaVita employees was

"broad"; (2) what "[d]ata" he analyzed; (3) the "tiny fraction" he purports to have found; (4) what economically sound methodology Dr. Cremieux used to opine that the "[m]arket allocation agreements . . . could not reasonably be expected to have a material impact on employee compensation or employee turnover rates"; (5) Dr. Cremieux's economically sound definition of "material"; (6) whether he performed a market analysis to arrive at the opinion, and; (7) if so, the results. The summary for sub-opinion (ii) fails to identify: (1) the economically sound methodology Dr. Cremieux to determine that the conspirators "had little, if any, power to suppress competition and wages"; (2) the economically sound methodology he use to determine that the conspirators had "little, if any, incentive to enter into an agreement"; (3) whether he performed a market analysis to arrive at the opinion, and; (4) if so, the results.

> Opinion E states in full:
>
> Dr. Cremieux is expected to testify that the defendants' alleged conduct with regard to recruiting and hiring was consistent with those companies' and individuals' independent self-interest and thus provides no economic basis to infer a labor market allocation agreement from those actions.

Ex. A at ¶ II.A.1.e. This summary fails to identify: (1) what economically sound methodology Dr. Cremieux used to determine the "companies' and individuals' independent self-interest"; and (2) what that "independent self-interest" was.

> Opinion F states in full:
>
> Dr. Cremieux is expected to testify that limitations on recruiting and hiring may help to promote or allow other joint economic activity. DaVita discussed various business opportunities with SCA during the alleged conspiracy period, and Dr. Cremieux is expected to testify that limitations on recruiting may be expected, based on economic theory, to promote or allow such business arrangements, and so limitations that SCA may have placed on its own recruitment or hiring from DaVita would be in its own independent interest.

Ex. A at ¶ II.A.1.f. This summary fails to identify: (1) what "limitations on recruiting and hiring" Dr. Cremieux analyzed; (2) what economically sound methodology he used to determine such

8

limitations "may help" to promote or allow other joint economic activity; (3) the "various business opportunities with SCA" he examined; (4) what "economic theory" would cause him to "expect[]" to a degree of scientific certainty that "limitations on recruiting may be expected."

Finally, the disclosure provides only a six-bullet-pointed list of "[t]he bases of Dr. Cremieux's testimony" that are vague and not tied to any particular opinion. Ex. A at ¶ 2. None of the cited data include a citation by Bates number to any document produced in discovery. *Id.* at ¶ 2.a. ("compensation and termination data"); *id.* at ¶ 2.b. ("benchmark compensation and turnover data"); *id.* at ¶ 2.c. ("LinkedIn data"). One basis arguably includes every email produced in discovery: "His analysis of ordinary course communications and documents produced by the parties in the case." *Id.* at ¶ 2.d. And the remaining are so broad as to include the entirety of the labor market and Dr. Cremieux's expertise. *Id.* at ¶ 2.e. ("labor market conditions"); *id.* at ¶ 2.f. ("His experience and expertise").

### B. Even If Adequately Disclosed, the Opinions Are Not Relevant to a Per Se Sherman Act Charge

#### 1. Opinions A, B, C, and E Advance Impermissible Reasonableness Arguments

For per se illegal restraints "the law does not permit an inquiry into their reasonableness" or "economic justification." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). As the Tenth Circuit explained recently, defendants charged with per se antitrust offenses cannot extol a "restraint's salutary effect on competition and commerce" as a means of avoiding liability. *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th Cir. 2018); *see also United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990) (affirming ruling "preclud[ing]" defendants "from introducing evidence of reasonableness or justification at trial"). Defendants, however, seek to do just that through Dr. Cremieux.

Although couched as supporting an opinion that "the economic evidence does not support the existence of a labor market allocation agreement," Ex. A at ¶ II.A.1., Opinions A, B, and E are obvious efforts to backdoor impermissible evidence or arguments in an attempt to show the conduct was procompetitive or otherwise justified. Opinion A purports to opine that "separation rates were not depressed." *Id.* at ¶ II.A.1.a. Opinion B states that there was an "elevation of median salary for DaVita senior-level employees" during the conspiracy. *Id.* at ¶ II.A.1.b. These claimed "salutary effects," even if true, cannot be advanced as arguments to avoid liability. *See Kemp*, 907 F.3d at 1272. Likewise, for Opinion E, Dr. Cremieux plans to testify that the "defendants' alleged conduct with regard to recruiting and hiring was consistent with those companies' and individuals' independent self-interest." Ex. A at ¶ II.A.1.e. But all per se agreements are in the conspirators' independent self-interest, otherwise there would be no reason to enter into them. Opinion E, therefore, is nothing more than an "economic justification" for the alleged conduct that is not relevant to a Sherman Act charge. *Socony-Vacuum Oil Co.*, 310 U.S. at 224 n.59.

Opinion C does not even attempt to hide its procompetitive arguments behind what one would "expect" if there was an agreement and instead is a straightforward argument that the illegal agreements benefited employees. Defendants' expert is attempting to opine that "employees at DaVita who provided notice that there [sic] were considering positions outside of DaVita often received offers for promotions, increased compensation and/or different job responsibilities." Ex. A at ¶ II.A.1.c. Unlike Opinions A, B, and E, there is not even the veneer of comparing the rate or magnitude of the offers to what would be "expected" absent an illegal agreement. The supposed benefits of the agreement in Opinion C are not relevant to a per se charge and should be excluded.

Finally, Opinion D is nothing more than an opinion on a supposed lack of market power that is irrelevant to the per se analysis. There, Dr. Cremieux purports to examine the economic incentives of Defendants given his opinion that the "competition for senior-level DaVita employees was broad" and they had "little, if any, power to suppress competition and wages." Ex. A at ¶ II.A.1.d. But such an inquiry into market forces is foreclosed by the per se rule. *See Socony-Vacuum*, 310 U.S. at 224 n.59 (finding irrelevant whether conspirators "have power to control the market").

### 2. Opinion C Does Not "Assist the Trier of Fact"

Expert opinion must be based on "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702(a); *see also Vann*, 776 F.3d at 757. For Opinion C, Dr. Cremieux plans "to testify that evidence concerning employees at DaVita who provided notice that there [sic] were considering positions outside of DaVita often received offers for promotions, increased compensation and/or different job responsibilities." Ex. A at ¶ II.A.1.c. Although such evidence of "salutary effect[s]" is not relevant to a per se case, *Kemp*, 907 F.3d at 1272; *see also* Part B.1, *supra*, an offer of promotion or increased compensation would be obvious to the jury from any direct evidence Defendants could admit. There is no reason why an economic expert is needed to interpret such evidence, and Opinion C does not even purport to offer any expert interpretation.

### 3. Opinion F Is Irrelevant to Any Ancillarity Defense

Opinion F—where Dr. Cremieux plans to opine "that limitations on recruiting and hiring may help to promote or allow other joint economic activity"—should be excluded as irrelevant. As an initial matter, an opinion that the nonsolicitation agreements "may help" other joint

11

economic activity is of no help to the jury because it is entirely consistent with an opinion that it may not. Even if credited, the opinion is irrelevant to an ancillarity defense.

The ancillary-restraints doctrine "governs the validity of restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006). Under the doctrine, an agreement in restraint of trade (such as a market allocation agreement) ordinarily condemned as per se unlawful becomes subject to the rule of reason if it is truly ancillary. To be ancillary, the restraint, at the time it was adopted, must be subordinate and collateral to a legitimate business venture, and must be reasonably necessary to achieve the legitimate purpose of the legitimate business venture. *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985); *Addyston Pipe*, 85 F. at 281 (6th Cir. 1898); *Aya Healthcare Servs. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021).

In Opinion F, Dr. Cremieux cannot point to any "legitimate business venture" that would qualify as a valid predicate for an ancillarity defense. Ex. A at ¶ II.A.1.f. Instead, he plans to opine on how the illegal agreements "may help to promote or allow other joint economic activity." Ex. A at ¶ II.A.1.f. But the ancillary-restraints doctrine requires an actual business venture that the restraint is subordinate and collateral to at the time it was adopted, not in anticipation of a venture, let alone a venture that never materialized. *See Polk Bros.*, 776 F.2d at 188-89. Opinion F is simply irrelevant to the ancillary-restraints question and should therefore be excluded.

    **C.**    **The Opinions Are Not Reliable Under Rule 702.**

"Reliability questions" under Rule 702, "may concern the expert's data, method, or his application of the method to the data." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir.

2009) (en banc). By failing to disclose Dr. Cremieux's data and methodology, Defendants fail to establish any one of these three reliability requirements.

Defendants "must show that the method employed by the expert . . . is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements." *Nacchio*, 555 F.3d at 1241 (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)). Proffered expert testimony should be excluded if even one "step" of the methodology is unreliable, and "[t]his is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Id.* (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)). "In making a reliability determination, '[g]enerally, the district court should focus on an expert's methodology rather than the conclusions it generates.'" *Id.* (quoting *Dodge*, 328 F.3d at 1222). If the expertise is in a field where academic papers are published, such as the economics field in which Dr. Cremieux publishes, courts often consider whether the expert has shown that the methodology is supported by published articles or papers that validate the approach used. *See, e.g.*, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 157 (1999) (rejecting tire expert's methodology and observing that there was no reference "to any articles or papers that validate [the expert's] approach"); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025 (10th Cir. 20002) (affirming exclusion where, inter alia, economist failed to cite studies); *Law v. NCAA*, 185 F.R.D. 324, 341 (D. Kan. 1999) (excluding expert where "record contains no evidence that expert economists do the job that Dr. Umback purported to do in his damage calculations"); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1502-05 (D. Kan. 1995) (excluding economic expert because model failed to use regression analysis).

As described in Part A, *supra*, Defendants' disclosure fails to detail what data Dr. Cremieux relied on for any opinion. Without explaining what data sets he used for each separate

13

opinion, and the rationale for the data sets selected, it is impossible for the Court to make the required threshold finding that Dr. Cremieux's opinions are "based on sufficient facts or data," Rule 702(b), or whether he applied the right methodology to the data, *Nacchio*, 555 F.3d at 1241; *see also Lantec*, 306 F.3d at 1025 (10th Cir. 20002) (affirming exclusion of expert economist where, inter alia, he "used unreliable data").

As further described in Part A, *supra*, Defendants' disclosure also fails to explain what economically rigorous methodology Dr. Cremieux used to arrive at any one of his opinions. Defendants' disclosure here is remarkably similar to the one rejected by the district court in *Nacchio* and affirmed by the Tenth Circuit. In *Nacchio*, the defendant was charged with insider stock trading. 555 F.3d at 1236. The proposed economic expert opinion "that the economic evidence is not consistent with the Government's allegation that Mr. Nacchio's stock sales . . . were made on the basis of material nonpublic information." United States' Mot. to Exclude Testimony, *United States v. Nacchio*, No. 05-cr-00545-EWN, 2007 WL 1017516, at Part III.A. (D. Colo. April 3, 2007) (quoting disclosure). This opinion was supported by various sub-opinions, including that the expert analyzed various trades before and after the questioned trades and found the "pattern" to be "consistent" with the questioned trades, that the questioned trades were "consistent" with the defendant's "stated preference," and that defendant did not have "any incentive to not disclose material inside information." *Id.* at Part III.A.1.-3. Even though the expert disclosure therefore "outlined the bases for [the expert's] opinions and highlighted specific expected areas of testimony as well as the documents and data reviewed," including how the expert had conducted a study of the stock sales compared "to various benchmarks," 555 F.3d at 1238, the district court found the disclosure to suffer from a "gross defect in failing to reveal the methodology" and excluded the opinion, *id.* at 1239 (quoting and affirming district court's

14

exclusion order). So too here. All Defendants have done is disclosed Dr. Cremieux's ultimate conclusions, but have failed to explain his method for arriving at them.

## CONCLUSION

For the foregoing reasons, the Court should exclude the testimony of Dr. Cremieux or, in the alternative, require additional disclosure and hold a *Daubert* hearing.

DATED: December 17, 2021

Respectfully submitted,

*/s/ William J. Vigen*
William J. Vigen, Trial Attorney
Megan S. Lewis, Assistant Chief
Anthony W. Mariano, Trial Attorney
Sara M. Clingan, Trial Attorney
Terence A. Parker, Trial Attorney
U.S. Department of Justice, Antitrust Division
Washington Criminal II Section
450 Fifth Street, N.W.
Washington, D.C. 20530
Tel: 202-598-2737 / 202-598-8145 / 202-480-1951 / 202-353-2411 / 202-705-6156
FAX: 202-514-9082
E-mail: william.vigen@usdoj.gov
megan.lewis@usdoj.gov / anthony.mariano@usdoj.gov
sara.clingan2@usdoj.gov / terence.parker2@usdoj.gov

## CERTIFICATE OF CONFERENCE

In compliance with Local Rule 7.1(a), the United States conferred with counsel for Defendants regarding this motion on December 14, 2021, and Defendants confirmed that they oppose the motion.

## CERTIFICATE OF SERVICE

On December 17, 2021, I filed this document with the Clerk of the Court using CM/ECF, which will serve this document on all counsel of record.

*/s/ William J. Vigen*
William J. Vigen