IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

          Plaintiff,

v.

   1. DAVITA INC.,

   2. KENT THIRY,

          Defendants.

_____

**DEFENDANTS' JOINT OPPOSITION TO THE DIVISION'S MOTION TO EXCLUDE EXPERT TESTIMONY AND TO ORDER NEW EXPERT DISCLOSURE FOR NON-EXCLUDED TESTIMONY**
_____

      Defendants have disclosed a single, exceptionally well-qualified expert. The Antitrust Division of the Department of Justice (the "Division") moves to exclude nearly every opinion from that expert. Dkt. 106. Contrary to the Division's position, Dr. Pierre-Yves Cremieux's opinions are relevant to the elements of the charged offense, far more probative than prejudicial, properly disclosed, and reliable. The Court should deny the Division's motion.

## LEGAL STANDARD

### I. Relevant Elements of the Offense Charged

      Defendants are charged with three counts of conspiracy to "allocate" the market for employees, an allegedly "*per se* unlawful, and thus unreasonable," restraint of trade in violation of 15 U.S.C. § 1. *See* Super. Indict. ¶¶ 9, 17, 25. Pending before the Court is defendants' motion to dismiss based on the failure of the indictment to charge a *per se* violation of that Act. If the Court denies defendants' motion to dismiss and ultimately concludes that the *per se* standard

1

applies in this case, then to prevail at trial, even under the most restrictive set of elements,[1] the Division must prove "that the charged [market allocation] conspiracy existed at or about the times alleged," and that DaVita and Thiry "knowingly"—that is, "voluntarily and intentionally"—entered into the conspiracy, "knowing of its goal and intending to help accomplish it." Final Jury Instructions, *United States v. Penn*, No. 1:20-cr-00152, Dkt. 921 at 16 (D. Colo. Dec. 16, 2021).

## II. The Federal Rules

***Federal Rules of Evidence 401 and 403.*** Evidence is relevant if it "has any tendency to make a fact more or less probable" and "the fact is of consequence." Fed. R. Evid. 401. Courts may exclude relevant evidence "if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "In weighing the factors under Rule 403, the court should generally give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *SEC v. Peters*, 978 F.2d 1162, 1171 (10th Cir. 1992) (exclusion is "extraordinary remedy").

***Federal Rule of Criminal Procedure 16.*** Rule 16(a)(1)(G) requires that the government, at a defendant's request, "give to the defendant a written summary of any testimony" it "intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." If the defendant makes such a request and the government complies, then the defendant must make reciprocal disclosures upon the government's request. Fed. R. Crim. P. 16(b)(1)(C).

---

[1] As this is a novel case, defendants anticipate filing jury instructions that would require the Division to prove additional elements. Regardless, the evidence the Division attempts to exclude are admissible under any set of elements and instructions.

In both instances, the "summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id*. The Rule 16 summary "falls far short of the complete statement required of litigants in civil cases" and "does not require experts in criminal cases to provide written reports explaining their opinions" "or to make a written proffer containing the information required under the civil rules." *United States v. Shannon*, No. 18-cr-00353, 2019 WL 458911, at *2 (D. Colo. Feb. 6, 2019) (quotation omitted). The Rule's purpose is to promote "focused cross-examination." Fed. R. Crim P. 16, Advisory Comm. Notes (1993 Amendment).

If a party fails to comply with Rule 16, the Court may, among other things, "grant a continuance; prohibit that party from introducing the undisclosed evidence; or enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(A)-(D). "[E]xclusion of a witness's expert testimony is almost never imposed in the absence of a constitutional violation or statutory authority for such exclusion." *United States v. Sarracino*, 340 F.3d 1148, 1170 (10th Cir. 2003) (quotation omitted). In the "absence of a finding of bad faith, the court should impose the least severe sanction that will accomplish prompt and full compliance with" discovery obligations. *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002).

**Federal Rule of Evidence 702.** Rule 702 permits the admission of expert testimony that is "based on sufficient facts or data" and is "the product of reliable principles and methods" that have been "reliably applied" to the facts of the case. Fed. R. Evid. 702. To determine if this reliability standard has been satisfied, a district court must first consider "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). In *Daubert,* the Supreme Court listed non-

3

exhaustive factors for a trial court to consider in making its reliability assessment. *Kumho Tire v. Carmichael*, 526 U.S. 137, 149–50. However, in non-scientific cases, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150. Generally, the opinion must be based on "good grounds." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994).

The trial court plays a "gatekeeping" role that involves an assessment of the "reasoning and methodology underlying the expert's opinion" and a determination of "whether it is scientifically valid and applicable to a particular set of facts." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). However, the trial court has discretion as to how to perform this gatekeeping function. *Id. See, e.g.*, *Coffman v. Yeakel*, No. 17-cv-01472-RBJ, 2019 WL 2614558, at *2 (D. Colo. Apr. 1, 2019) (Jackson, J.) (holding that the expert's potential bias and the reliability of his opinions can be explored on cross-examination on trial). It is not a role that emphasizes exclusion of expert testimony. *Doornbos v. Windtree Apartments*, No. 17-cv-02893-RBJ, 2018 WL 7499811, at *1 (D. Colo. Dec. 21, 2018) (Jackson, J.) (noting that Rule 702 was intended to relax traditional barriers to admission of expert opinion testimony and that a "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule") (quotations omitted).

Expert testimony may touch on matters in dispute but is also admissible to provide explanatory background that may help the jury. *See, e.g.*, *Perry v. Union Pac. R.R. Co.*, No. 19-cv-00806-KLM, 2020 WL 6290511, at *5 (D. Colo. Oct. 27, 2020); *Bullock v. Daimler Trucks N. Am., LLC*, No. 08-cv-00491, 2010 WL 4115372, at *4 (D. Colo. Sep. 30, 2010).

## ARGUMENT

Defendants' economic expert, Dr. Pierre-Yves Cremieux, is expected to testify regarding six opinions based on the economic evidence in this case. *See* Ex. A (Rule 16 disclosures). Each of these opinions goes directly to the questions of whether the alleged conspiracies existed and whether defendants joined them with the intent to achieve the goal of allocating labor markets. Specifically, Dr. Cremieux opines that:

(i) "the evidence regarding employee separations at DaVita does not align with the expected effect of a labor market allocation agreement," including that "relevant separation rates were not depressed during the alleged conspiracy periods" (the "separation opinions"), *Id.* at 3;

(ii) "patterns of DaVita employee compensation do not align with the expected effects of a labor market allocation agreement," including that compensation data "does not reveal a depression in the compensation of DaVita senior-level employees" and "in fact, the elevation of median salary for DaVita senior-level employees above benchmarks is *higher* during the alleged conspiracy periods than before or after" (the "compensation opinions"), *Id.* at 3-4;

(iii) "employees at DaVita who provided notice . . . often received offers for promotions, increased compensation and/or different job responsibilities" (the "notice opinions"), *Id.* at 4;

(iv) "there was a lack of economic incentive for DaVita to enter into market allocation agreements for senior-level employees with the companies identified in the Indictment, making the existence of a labor market allocation agreement less likely" (the "lack of incentive opinions"), *Id.* at 4-5;

(v) "defendants' alleged conduct . . . was consistent with those companies' and individuals' independent self-interest" (the "self-interest opinions"), *Id.* at 5; and

(vi) "limitations on recruiting and hiring may help to promote or allow other joint economic activity" (the "joint economic activity opinions"), *Id.*

The Division moves to exclude all six of Dr. Cremieux's opinions on the ground that they are irrelevant, unreliable, or insufficiently disclosed. Mot. 5, 9, 11-12. The Division's motion ignores the rules of evidence and threatens defendants' Fifth and Sixth Amendment rights. *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997) ("the state may not arbitrarily deny a defendant the ability to present testimony that is relevant and material and . . . vital to the defense") (quotation omitted).

## I. Dr. Cremieux's Opinions Are Relevant

Dr. Cremieux's opinions are highly relevant to negate two elements of the offense: the existence of an unlawful agreement, and that the defendants intentionally entered such an agreement. Contrary to the Division's conclusory assertions, his opinions are not efforts to backdoor impermissible evidence or arguments in an attempt to show the conduct was reasonable or otherwise justified. *See* Mot. 10.

The admissibility of procompetitive effects or lack of anticompetitive effects for these specific purposes was recently confirmed here in the District of Colorado. In *United States v. Penn*, defendants sought to introduce expert testimony demonstrating that the economic outcomes "are not consistent with those that economists would expect to find in the presence of a price fixing or bid-rigging agreement." *Penn*, No. 1:20-cr-00152, Dkt. 362 at 5 (D. Colo. Aug. 16, 2021).[2] In moving to exclude this evidence, even the Division acknowledged that success of

---

[2] Despite the clear relevance and recency of the *Penn* decision, the Division makes no reference to this case in its motion.

6

the conspiracy, while not an element, is "perhaps relevant to the existence of an agreement[.]" *Penn*, No. 1:20-cr-00152, Dkt. 299 at 8 (D. Colo. July 26, 2021). In light of the indisputable relevance, the court held that the defendants could introduce economic evidence of procompetitive effects and the absence of anticompetitive effects specifically "as part of their theory that there was no agreement among them to fix prices in the first place." *Penn*, No. 1:20-cr-00152, Dkt. 649 at 7 (D. Colo. Oct. 15, 2021). Likewise, in ruling on the Division's separate motion to exclude evidence and argument that the conspiracy was either justified by procompetitive or other justifications, or did not result in harmful effects, the court held that while defendants were precluded from arguing that the alleged price fixing agreement was *justifiable* because it either did not cause economic harm or actually increased competition (rule of reason arguments)*,* defendants were *not* precluded "from introducing evidence that the prices were not fixed as a result of an agreement or from introducing evidence that a lack of harm suggests that defendants did not have an agreement to fix prices." *Penn*, No. 1:20-cr-00152, Dkt. 642 at 2 (D. Colo. Oct. 14, 2021).

This conclusion is consistent with the assessment of other federal courts, including the Supreme Court. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592 (1986) ("The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist."); *Cont'l Baking Co. v. United States*, 281 F.2d 137, 141, 145 (6th Cir. 1960) (defendants entitled to introduce "explanatory economic evidence" of "factors affecting price changes" to disprove existence of *per se* price-fixing agreement); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 804 (1946) (evidence of "price changes is circumstantial evidence of the existence of a [price-fixing]

conspiracy"). For example, in *United States v. Aiyer*, the defendant sought to introduce expert testimony in a *per se* case demonstrating that the trading at issue had "procompetitive effects or lacked anticompetitive effects." *United States v. Aiyer*, 470 F. Supp. 3d 383, 414 (S.D.N.Y. 2020). The Division moved to exclude this evidence, arguing that the "[d]efendant may not defend the conspiracy through procompetitive justifications or lack of anticompetitive effect." *Aiyer*, No. 1:18-cr-00333, Dkt. 93 at 25 (S.D.N.Y. July 26, 2019). Nevertheless, the court allowed the defendant to introduce this evidence at trial "for the limited and permissible purpose of showing that the defendant or one of his alleged coconspirators lacked the specific intent to engage in the conduct that comprised the object of the conspiracy, namely fixing prices and rigging bids." *Aiyer*, 470 F. Supp. 3d at 414.

In addition, courts routinely allow evidence of lack of motive in conspiracy cases. For example, in *Matsushita*, the Supreme Court held that "[l]ack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita Elec.*, 475 U.S. at 596–97. *See also Beltran v. Interexchange, Inc.*, No. 14-cv-03074, 2017 WL 4418710, at *4 (D. Colo. July 24, 2017) (noting that "[m]otive, of course, while not an element of an antitrust claim, is relevant to any litigation").

Here, Dr. Cremieux's opinions are relevant to all of these points: the existence of an agreement with the object to allocate employees; whether defendants knowingly, voluntarily, and intentionally entered into such an agreement; and whether defendants had a motive or economic incentive to engage in the charged conduct.

8

*First*, Dr. Cremieux's separation opinions—that the relevant separation rates were not depressed during the alleged conspiracy period (i.e., that employees did not leave their jobs at DaVita less frequently than before or after the alleged conspiracy)—makes it less likely that an agreement to allocate employee markets (i.e., a conspiracy to prevent employees from switching employers) existed in the first place, or that defendants intended to allocate employees. Indeed, one would expect to see fewer employees leave DaVita if those employees had been "allocated" to DaVita pursuant to a conspiracy. The fact that this did not happen is "strong evidence" that the alleged conspiracy "does not in fact exist." *Matsushita Elec.*, 475 U.S. at 592.

*Second*, Dr. Cremieux's compensation opinions—including that compensation data "does not reveal a depression in the compensation of DaVita senior-level employees" and "in fact, the elevation of median salary for DaVita senior-level employees above benchmarks is *higher* during the alleged conspiracy periods than before or after"—again makes it less likely that there existed allocation agreements in the first place, or that defendants intended to allocate employees. Ex. A at 3-4; *see also Penn*, No. 1:20-cr-00152, Dkt. 642 at 2 (D. Colo. Oct. 14, 2021) (allowing defendants to introduce lack of harm evidence in a *per se* case); *Aiyer*, 470 F. Supp. 3d at 414 (allowing defendants to introduce procompetitive effects and lack of anticompetitive effect to show that defendant or alleged coconspirators lacked the specific intent to engage in the conduct that comprised the object of the conspiracy). One would expect an employee market allocation agreement—if it existed—to push wages down, not up.

*Third*, Dr. Cremieux's notice opinions—that employees at DaVita who provided notice that they were seeking other employment "often received offers for promotions, increased compensation and/or different job responsibilities"—is directly relevant to the Division's

9

allegation that a notice requirement was used to monitor compliance with the alleged conspiracies. *See* Super. Indict. ¶¶ 11, 19, 27. If the notice requirement had procompetitive effects or lacked anticompetitive effects, it is less likely that defendants would have used it as a method for enforcing a conspiracy that had the alleged purpose of reducing competition. *See id*; *see also* DOJ Human Resources Manual at 2 ("competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment"). And contrary to the Division's assertions (*see* Mot. 11), Dr. Cremieux's opinions regarding employees at DaVita who provided notice will also assist "the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, as this opinion will help the jury understand the complicated dynamics of the labor market and the mechanics of the alleged conduct in order to determine two facts in issue: whether an agreement existed, and whether defendants had the requisite intent to enter into it.

*Fourth*, Dr. Cremieux's lack of incentive opinions—that there was a lack of economic incentive for DaVita or Mr. Thiry to enter into a market allocation agreement—supports the argument that defendants lacked a motive to enter into employee allocation agreements. This "[l]ack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence," and could suggest that "the conduct does not give rise to an inference of conspiracy." *Matsushita*, 475 U.S. at 596–97.

*Fifth*, Dr. Cremieux's self-interest opinions make it less likely that an agreement to allocate an employee market existed in the first place. Specifically, Dr. Cremieux will opine that the hiring patterns of the companies, including with regard to hiring between the companies, are consistent with them acting in their own independent interests, as opposed to acting collectively.

10

Thus, one cannot infer an agreement from what the government might argue is parallel conduct or conduct consistent with conspiracy. *See id.* ("if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy").

And **sixth**, Dr. Cremieux's joint economic activity opinions—that limitations on recruiting may help to promote or allow other joint economic activity[3]—likewise offers a potential explanation as to why companies might unilaterally adopt certain practices and are thus relevant as to whether an agreement to allocate employee markets existed in the first place. *Id.*

Accordingly, Dr. Cremieux's testimony should be admitted at trial.

## II.   Dr. Cremieux's Opinions were Properly Disclosed

Defendants' disclosure complies with the requirements of Federal Rule of Criminal Procedure 16, and describes Dr. Cremieux's opinions as well as the basis and reasons for those opinions. *See* Ex. A at 3-6. Nothing more is required. Rule 16 disclosures need not resemble the "complete statement" of expert opinions "required of litigants in civil cases." *Shannon*, 2019 WL 458911, at *2 (quotations omitted); *see United States v. Nacchio*, 608 F. Supp. 2d 1237, 1252 n.23 (D. Colo. 2009) (Rule 16 disclosures "are not drafted to address the requirements of Rule 702"). "In particular, Rule 16 does not require experts in criminal cases to provide written reports explaining their opinions or to make a written proffer containing the information required under the civil rules." *United States v. Nacchio*, 555 F.3d 1234, 1262 (10th Cir. 2009). To

---

[3] The Division also asserts that the joint economic activity opinions are irrelevant to an ancillarity defense. Defendants disagree. Nevertheless, that evidence is also relevant as to whether an agreement to allocate employees existed in the first place and whether defendants knowingly entered into such an agreement.

11

accept the Division's position and impose additional requirements on defendants "would result in grossly incongruent and inequitable disclosure obligations, which are surely not required under the rules," and which the Constitution protects against. *United States v. Mehta*, 236 F. Supp. 2d 150, 155–58 (D. Mass. 2002) (defendant need not disclose "final opinion" while discovery ongoing or a "line by line" accounting of why the expert raises certain challenges).

More specifically, Rule 16 does not require disclosure of the specific data or documents reviewed. *United States v. Reulet*, No. 14-40005-DDC, 2015 WL 7776876, at *6 (D. Kan. Dec. 2, 2015); *United States v. Schneider*, No. 07-10234-MLB, 2008 WL 11396783, at *2 (D. Kan. July 15, 2008); *compare* Mot. 8-10 (demanding sources of data for all six opinions). And Rule 16 does not require Defendants to "specifically describe the expert's methodology." *United States v. Brown*, 592 F.3d 1088, 1091 (10th Cir. 2009); *Reulet*, 2015 WL 7776876, at *6 (same); *Schneider*, 2008 WL 11396783, at *2 (same); *compare* Mot. 6-8 (demanding methodology for all six opinions).

Under Rule 16, if a party has "full notice of the actual opinions to which the [expert] intend[s] to testify"—as the Division does here—the disclosure is sufficient. *United States v. Heller*, No. 19-cr-00224, 2019 WL 5101472, at *1 (D. Colo. Oct. 11, 2019) (when actual opinions disclosed, court is "unpersuaded" by "criticism of the lack of detail regarding the bases for those opinions"); *see United States v. De La Rosa-Calderon*, No. 20-cr-036, 2021 WL 3186631, at *1 (D. Colo. July 28, 2021) (holding that Rule 16 notice in which the government disclosed merely each chemist's curriculum vitae, and stated that "[e]ach chemist bases their opinions on their education, training, examination, and analysis of the exhibits [which] were submitted for analysis in this case" to be sufficient) (quotations omitted).

### III. Dr. Cremieux's Opinions are Reliable Under Rule 702

Dr. Cremieux's opinions are reliable and admissible pursuant to Rule 702. They largely focus on an explanation of economic incentives in the specific factual context of this case. That is the heartland of what professional economists do: they interpret behavior, and in some cases predict behavior, based on economic theories of incentives. Dr. Cremieux's methodology, rooted in his experience, expertise, and the evidence in this case, is comparable to those of antitrust economists deemed reliable by numerous courts. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015) ("[The expert's] reasoning is based principally upon [her] experience and research in the world of [economics], which qualify [her] to opine on such matters. . . . [S]pecialized knowledge may be relevant and reliable, and therefore admissible . . . even if the field of knowledge . . . does not readily lend itself to a formal or quantitative methodology.") (quotations omitted); *U.S. Info. Sys. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 229, 236–37, 240 (S.D.N.Y. 2004) (antitrust economist applied reliable methodologies where testimony "includes the inferences an economist would draw from the facts in the record concerning the nature of the market," particularly because "[t]here is no single, established methodology for determining whether the relevant market reflects evidence of anticompetitive behavior").

Here, Dr. Cremieux's summary of his qualifications and opinions makes clear that he is a well-regarded and experienced antitrust economist and that he will base his opinions on his review of compensation and termination data, LinkedIn data, communications and documents produced in this matter, his analysis of labor market conditions, and his experience in the field of economics. Ex. A at 2-3, 6.

The Division's reliance on *Nacchio* is entirely misplaced. In *Nacchio*, the defendant announced that he would be calling an expert for the first time just three days before trial, and the court gave him an opportunity to supplement his disclosure during trial. *Nacchio*, 608 F. Supp. 2d at 1253. Only when that supplemental, mid-trial disclosure fell short did the court exclude the defendant's expert. *Id.* at 1254. By contrast, defendants here provided Rule 16 disclosures five months before trial, and the Division made no effort to seek additional information regarding Dr. Cremieux's testimony before filing this motion. Instead, during a meet and confer two days prior to filing this motion, the Division simply informed defendants that it would be moving on Rule 16 and Rule 702 grounds, without any explanation for how the disclosures were inadequate and without any request that defendants supplement their disclosures.

In addition, the Division will have ample opportunity to explore the reliability of Dr. Cremieux's opinions via cross-examination at trial. *See, e.g.*, *Coffman*, 2019 WL 2614558, at *2 (Jackson, J.) (holding that the expert's potential bias and the reliability of his opinions can be explored on cross-examination and "entrust[ing] the jury with the task of evaluating counsel's arguments as to bias and reliability.") Reliability of expert testimony in criminal cases is often tested on the stand at trial; and in any event, should the Court find Dr. Cremieux's pre-trial disclosures inadequate, defendants should be given the opportunity to supplement their disclosures. *See, e.g.*, *Doornbos*, 2018 WL 7499811, at *4 (Jackson, J.) (providing plaintiff the opportunity to supplement his expert report with the appropriate foundation for his opinions). Courts have universally found the proper remedy for any technical fault to be additional disclosure, not exclusion. *Brown*, 592 F.3d at 1090 n.4 (exclusion is "extreme"); *United States v.*

14

*Yurek*, No. 15-cr-394-WJM, 2017 WL 2930577, at *2 (D. Colo. July 7, 2017) ("appropriate remedy" is "to direct supplementation, rather than to exclude the testimony").

## CONCLUSION

Dr. Cremieux's opinions are relevant, reliable, and properly disclosed, and there is no basis to exclude his testimony or order supplementation. The motion should be denied.

Dated: January 14, 2022

Respectfully submitted,

Cliff Stricklin
King & Spalding
1401 Lawrence Street, Suite 1900
Denver, CO 80202
(720) 535-2327
cstricklin@kslaw.com

Jeffrey Stone
Daniel Campbell
McDermott Will & Emery LLP
444 W Lake St.
Chicago, IL 60606
(312) 984-2064
jstone@mwe.com

Justin P. Murphy
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756-8018
jmurphy@mwe.com

*Counsel for Defendant Kent Thiry*

/s/ *John F. Walsh III*
John F. Walsh III
Wilmer Cutler Pickering Hale & Dorr LLP
1225 17th Street, Suite 2600
Denver, CO 80220
(720) 274-3154
john.walsh@wilmerhale.com

John C. Dodds
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-4942
john.dodds@morganlewis.com

*Counsel for Defendant DaVita Inc.*

## CERTIFICATE OF SERVICE

I certify that on January 14, 2022, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

/s/ *John F. Walsh III*
John F. Walsh III