IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Criminal Case No. 1:21-cr-00229-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

    1.  DAVITA INC.
    2.  KENT THIRY

      Defendants.

---

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

---

This case is before the Court on defendants' motion to dismiss, ECF No. 49, renewed at ECF No. 83. For the reasons stated below, the motions are DENIED.

## I.    FACTUAL BACKGROUND

This case arises from an alleged conspiracy between various companies and individuals who owned and operated outpatient medical facilities across the country. ECF No. 1 at ¶¶1–7. Count 1 alleges a conspiracy to allocate the market through an agreement not to solicit the senior employees of co-conspirators. *Id*. at ¶¶9–12. The agreement allegedly began as early as February 2012 and continued through July 2017. *Id*. at ¶9. The indictment explains how the agreement was reached (ECF No. 1 at ¶11(a)-(b)), enforced (¶11(c)-(f)), and followed (¶11(g)). Count 1 of the indictment alleges that "[t]he charged conspiracy consisted of a continuing agreement, understanding, and concert of action among DaVita, Thiry, and their co-conspirators, the

1

substantial terms of which were that DaVita and [co-conspirator] SCA would allocate senior-level employees by not soliciting each other's senior level employees across the United States." ECF No. 1 at ¶10. Count 1 alleges that DaVita and its co-conspirators allegedly carried out the conspiracy by meeting to discuss the terms of the agreement (*id*. at ¶11(a)); instructing certain executives and employees to refrain from soliciting senior employees from co-conspirator companies (*id*. at ¶11(c)); monitoring compliance with the agreement by requiring senior employees to notify their current employer before seeking employment with a co-conspirator company (*id*. at ¶11(d)–(e)); taking steps to remedy any violations of the agreement (*id*. at ¶11(f)); and generally refraining from soliciting the senior employees of parties to the agreement (*id*. at ¶11(g)).

Count 2 makes substantially similar allegations, but as to all employees instead of just senior employees. Count 2 alleges a conspiracy to allocate the market through an agreement not to solicit *any* employees of the competitor companies. *Id.* at ¶¶17–18. This agreement allegedly began in April 2017 and continued until at least July 2019. *Id*. at ¶17. For Count 2, the government alleges that the co-conspirators carried out the conspiracy by meeting to discuss the terms of the agreement (*id*. at ¶19(a)); agreeing not to solicit the employees of co-conspirator companies and reassuring co-conspirator companies of the parties' commitment to the agreement (*id*. at ¶19(b), (c)); monitoring compliance with the agreement by requiring employees to notify their current employer before seeking employment with a co-conspirator company (*id*. at ¶19(d), (e)); and generally refraining from soliciting the employees of co-conspirator companies (*id*. at ¶19(f)).

The government filed a superseding indictment that added a third count. ECF No. 74. Count 3 alleges a conspiracy identical to Count 2 except that it was executed between DaVita

and a different co-conspirator, Company C. *Id.* at ¶¶25–26. For Count 3, the government alleges that the co-conspirators carried out the conspiracy by meeting to discuss the terms of the agreement (*id*. at ¶27(a)); reaching an agreement and monitoring compliance, both internally and with the other co-conspirator (*id*. at ¶27(b)–(e)); requiring employees to notify their current employer before seeking employment with a co-conspirator company (*id*. at ¶27(f)); reporting violations of the agreement (*id.* at ¶27(g)); and generally refraining from soliciting the employees of co-conspirator companies (*id*. at ¶27(h)).[1]

The grand jury indicted defendants on violations of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1 (2004)). Ultimately, defendants moved to dismiss for failure to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v). Oral argument was held on the motion on November 19, 2021.

## II.   STANDARD OF REVIEW

An indictment is tested "solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Qayyum*, 451 F.3d 1214, 1218 (10th Cir. 2006) (quoting *United States v. Reitmeyer*, 356 F.3d 1313, 1316 (10th Cir.2004)). "A court may always ask 'whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offence' and dismiss the indictment if its allegations fail that standard." *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010) (quoting *United States v. Todd,* 446

---

[1] Defendants renewed their joint motion to dismiss in light of the superseding indictment. ECF No. 83. They stated that because the superseding indictment's allegations regarding Count 3 "are substantially the same as the allegations in support of Counts 1 and 2," therefore Count 3 "fails as a matter of law for the same reasons that Counts 1 and 2 fail." *Id.* at p. 2. This opinion will therefore cite primarily to the briefing regarding dismissal of the original indictment.

F.3d 1062, 1068 (10th Cir.2006)).  An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1). When determining the sufficiency of an indictment, the question "is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense."  *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006) (citations omitted).

## III.   LEGAL BACKGROUND

Violations of Section 1 are analyzed under the rule of reason as a default.  *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013) (citing II Phillip E. Areeda, Herbert Hovenkamp, Roger D. Blair & Christine Piette Durrance, Antitrust Law, ¶ 305e at 68 (3d ed. 2007)).  A rule-of-reason analysis requires the court to examine "a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

However, courts have found that the complex analysis required by the rule of reason is unnecessary for certain classes of restraints on trade that are so "manifestly anticompetitive" and "lacking any redeeming virtue" that they will almost always be illegal.  *See eBay*, 968 F.3d at 1037.  Such classes of restraints, which include price fixing, bid rigging, and horizontally allocating a market, are deemed per se unreasonable restraints on trade in violation of the Sherman Act.  *See Diaz v. Farley*, 15 F. Supp. 2d 1138, 1144 (D. Utah 1998), aff'd, 215 F.3d 1175 (10th Cir. 2000).  Only after "considerable experience with certain business relationships"

will courts classify them as per se violations of the Sherman Act.  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607–08 (1972).

Even an agreement that falls into a traditional per se category will not receive per se treatment under the Sherman Act unless it is a "naked" rather than "ancillary" agreement.  *See eBay*, 968 F.3d at 1037.  "Naked" restraints have "no purpose except stifling competition." *Topco*, 405 U.S. at 608.  Naked restraints contrast with those that are "ancillary to a legitimate procompetitive business purpose."  *eBay*, 968 F.3d at 1039 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984)).

Horizontal market allocation agreements are traditionally subject to per se treatment under Section 1 of the Sherman Act.  *Topco*, 405 U.S. at 608 (holding that the Court has "reiterated time and time again" that naked horizontal market allocation agreements have no purpose but to stifle competition).  A horizontal market allocation agreement is an agreement between competitors at the same level of the market structure to allocate a market order to minimize competition.  *Id*.  This can be accomplished by dividing geographic territory between competitors, *id.*, by "allocate[ing] or divid[ing] customers between competitors," *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1273 (10th Cir. 2018), or by allocating or dividing an employment market.  *See eBay*, 968 F.3d at 1038–39.  There is less precedent on per se treatment of horizontal market allocation agreements allocating employment markets, but that makes no difference.  Even if there were no such history, anticompetitive practices in the labor market are equally pernicious—and are treated the same—as anticompetitive practices in markets for goods and services.  *See Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544 (10th Cir. 1995) ("[P]laintiffs whose opportunities in the employment market have been impaired by an anticompetitive

agreement directed at them as a particular segment of employees have suffered an antitrust

injury."); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)

(The [Sherman Act] statute does not confine its protection to consumers, or to purchasers, or to

competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all

who are made victims of the forbidden practices by whomever they may be perpetrated."

(internal citations omitted)).

## IV.   ANALYSIS

### A. <u>Defendants' Argument that the Indictment Did Not Allege a Horizontal Market Allocation Agreement.</u>

Defendants' argued, in their motion to dismiss and at oral argument, that the practice

alleged in the indictment was not a horizontal market allocation agreement but instead a non-

solicitation agreement.  While the question of whether a non-solicitation agreement can be a

horizontal market allocation agreement as a legal matter will be dealt with later, as a preliminary

matter, I want to address the argument that the indictment did not allege a horizontal market

allocation agreement.

If the indictment failed to allege a naked horizontal market allocation agreement at all, as

defendants assert, the indictment would have failed to state an offense.  However, the indictment

does allege that the non-solicitation agreement allocated the market.  Though the indictment does

not use the phrase "horizontal market allocation agreement," it does allege the agreement was

one.  The indictment alleges in Count 1 that the co-conspirators entered an "agreement,

understanding, and concert of action" to "allocate senior-level employees by not soliciting each

other's senior-level employees across the United States."  ECF No. 1 at ¶10.  The allegation for

Counts 2 and 3 are substantially similar.  ECF No. 1 at ¶18 ("The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among [defendants] and their co-conspirators, the substantial terms of which were that DAVITA and Company B *would allocate employees* by Company B's not soliciting DAVITA's employees." (emphasis added)); ECF No. 74 at ¶26 ("The charged conspiracy consisted of a continuing agreement . . . that DAVITA and Company B *would allocate employees* . . . ." (emphasis added)).  These are clear allegations, for both counts, that the agreement entered was a horizontal market allocation agreement carried out by non-solicitation.

### B. <u>Defendants' Factual Argument</u>

Defendants' next make the factual argument that the indictment does not contain sufficient facts to support its allegation that the non-solicitation agreement was a tool used by defendants to allocate the market.

Count 1 of the indictment alleges that "the charged conspiracy consisted of a continuing agreement, understanding, and concert of action among DaVita, Thiry, and their co-conspirators, the substantial terms of which were that DaVita and Company B would allocate employees by Company B's not soliciting DaVita's employees."  ECF No. 1 at 6.  Count 1 alleges that the co-conspirators carried out the conspiracy by meeting to discuss the terms of the agreement (*id*. at ¶11(a)); instructing employees not to solicit senior employees from co-conspirator companies (*id*. at ¶11(c)); monitoring compliance with the agreement (*id*. at ¶11(d)–(e)); taking steps to address violations of the agreement (*id*. at ¶11(f)); and not soliciting senior employees of co-conspirator companies (*id*. at ¶11(g)).

For Count 2, the government alleged that the co-conspirators carried out the conspiracy by meeting to discuss the terms of the agreement (*id*. at ¶19(a)); agreeing not to solicit the employees of co-conspirator companies and assuring co-conspirators of their commitment to the agreement (*id*. at ¶19(b), (c)); monitoring compliance with the agreement (*id*. at ¶19(d), (e)); and not soliciting the employees of co-conspirator companies (*id*. at ¶19(f)).  Count 3 makes similar factual claims.  ECF No. 73 at ¶27.

The indictment also alleges facts indicating that the agreement imposed additional burdens and restrictions on the parties' and their employees beyond a simple prohibition on solicitation.  They allege that the agreement also required employees to tell their employers if they intended on seeking a job from a co-conspirator. *Id*. at ¶11(e).

These allegations support the claim that this was an agreement to allocate the market. They outline the ways that the agreement made it difficult for employees to move between co-conspirator companies to the point where the market was allocated.  They support the allegation that the purpose and effect of the agreement was to allocate the market.  At this stage, the indictment need only establish that if the allegations are true, they show a violation of the charged offense.  *Todd*, 446 F.3d at 1068.  For purposes of this motion, I must take these allegations as true.  If true, these allegations are sufficient to state a per se violation of Section 1 of the Sherman Act—the government has alleged that defendants allocated the market.

## C.  Defendants' Legal Arguments

Defendants present three legal arguments that, as a matter of law, the alleged agreements cannot be subject to per se treatment.  However, before I proceed to those arguments, I want to clarify an issue that comes up in each of those arguments.

There are potentially three steps in determining whether per se treatment for charged conduct is appropriate.  The preliminary step is to determine if the conduct falls into a category that has been found to be subject to per se treatment.  *See eBay*, 968 F.3d at 1037.  A second potential step, if the conduct does not fall into such a category, is the consideration by the court of whether the creation of a new category of per se unreasonableness covering the conduct is appropriate.  *See Northrop Corporation v. McDonnell Douglas Corporation*, 705 F.2d 1030, 1050 (9th Cir. 1983).  If the conduct is found to be in a traditional per se category or the court determines creation of a new category of per se treatment is appropriate, the court will proceed to the final step: the consideration of whether the practice was naked or ancillary.  The court still cannot subject the conduct to per se treatment until it finds that the conduct was naked, i.e. it had "no purpose except stifling competition."  *Topco*, 405 U.S. at 608.

Many of defendants' arguments mistake the legal standards that apply to one step for the legal standards of another, which was the cause of much confusion in the briefing and at oral argument.  The standards used to determine the propriety of creation of a new category of per se unreasonableness or to determine if conduct is a naked restraint simply do not apply when determining if that conduct falls into an existing category subject to per se treatment.  With that understanding, I will proceed through defendants' legal arguments that per se treatment is inappropriate for the conduct in this case.

1. <u>Some Non-Solicitation Agreements Can be Properly Categorized as Horizontal Market Allocation Agreements.</u>

Defendant's first argument is that non-solicitation agreements are not subject to per se treatment because the precedent does not show that they are.  They argue that there are no cases holding non-solicitation agreements illegal, aside from one readily distinguishable case.  The

government responds that the non-solicitation agreement in this case is a horizontal market allocation agreement, and that such agreements have long been per se unreasonable under Section 1 of the Sherman Act.

Violations of Section 1 are analyzed under the rule of reason as a default. *eBay, Inc.*, 968 F. Supp. 2d at 1037 (citing II Phillip E. Areeda, Herbert Hovenkamp, Roger D. Blair & Christine Piette Durrance, Antitrust Law, ¶ 305e at 68 (3d ed. 2007)).  Horizontal market allocation agreements are traditionally subject to per se treatment under Section 1 of the Sherman Act, meaning they need not be subjected to a rule-of-reason analysis.  *Id*. at 608 (holding that the Court has held "time and time again" that naked horizontal market allocation agreements have no purpose but to stifle competition).

Defendants are right that there are no cases perfectly analogous to this case.  But that is the nature of Section 1 of the Sherman Act: as violators use new methods to suppress competition by allocating the market or fixing prices these new methods will have to be prosecuted for a first time.

One case, however, is sufficiently analogous to inform my analysis of the current case. In *United States v. Cooperative Theatres of Ohio, Inc.* 845 F.2d 1367 (6th Cir. 1988), the government alleged that defendants engaged in horizontal market allocation by agreeing not to solicit the customers of horizontal competitors.  *Id.* at 1371.  Defendants in that case were corporations that served as middlemen between movie production companies and movie theaters, for whom they found and booked movies to be shown in each theater.  *Id*. at 1368.  Specifically, the parties to the agreement agreed they "would not attempt to become the booking agent for any theatre that was already served by [the other]."  *Id*. at 1371 (internal quotations omitted).  The

district court found the agreement alleged was a horizontal market allocation agreement subject to per se treatment. *Id*. at 1370.

On appeal, the defendants argued that the district court erred in applying the per se rule to the agreement because the agreement only prevented the competitors from "actively soliciting" each other's customers. *Id*. at 1371. The defendants argued that this agreement was a "no-solicitation agreement," rather than a horizontal market allocation agreement, and that this type of restraint on trade had never been challenged before, so a per se rule was inappropriate. *Id*. They cited *TopCo* for the proposition that per se treatment is inappropriate until there is considerable experience with the challenged practice. *Id*. Defendants in this case have raised the same arguments.

The Sixth Circuit rejected these arguments. It affirmed the requisite two-part finding that the non-solicitation agreement was both a horizontal market allocation agreement and a naked restraint on trade. *Id*. at 1372 (holding that the agreement was "plainly a form of customer allocation and, hence, is the type of 'naked restraint' which triggers application of the per se rule of illegality"). It further found that the non-solicitation agreement alleged was "undeniably a type of customer allocation scheme which courts have often condemned in the past as a per se violation of the Sherman Act." *Id*.

Defendants here argue that there are two significant differences between the current case and *Cooperative Theatres*. First, in *Cooperative Theatres* the agreement was to allocate customers, and here the alleged agreement was to allocate employees. Second, the *Cooperative Theatres* defendants failed to raise any potential pro-competitive justifications for the agreement, while here the defendants have raised several possible procompetitive justifications.

11

On the first point, defendants cite *Northrop Corporation v. McDonnell Douglas Corporation* for the proposition that "in determining whether a practice is per se illegal, courts must go further than determining the general type of practice at issue and examine the business context." ECF No. 72 at 6 (internal quotations omitted). However, the court in *Northrop* only proceeded to the issue of differing business contexts *after* it had concluded that the practice was not a horizontal market allocation agreement, i.e., only after it determined that the practice did not fall into any existing category subject to per se treatment. *Northrop* 705 F.2d at 1050. The question of business context is only relevant in determining whether a novel practice should be considered a *new* category subject to per se treatment. That is not necessary here. I found above that the government sufficiently alleged that this non-solicitation agreement falls under the umbrella of an existing category subject to per se treatment: horizontal market allocation agreement. Because the Court need not create a new per se category to find the indictment survives defendants' motion to dismiss, the difference in business contexts are irrelevant.

On the second potential difference, the ostensible procompetitive benefits alleged here do not change the analysis at this stage of litigation. Whether a practice has procompetitive aspects is only relevant in two circumstances. First, a court will consider the procompetitive elements of a practice when determining if a practice is a naked restraint on trade. *See Paladin Assoc., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir.2003) (holding that "when a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive," i.e. argues that the practice is ancillary rather than naked, "per se treatment is inappropriate, and the rule of reason applies"). Second, if a practice is deemed not to fall into a category that is traditionally subject to per se treatment, courts will consider the procompetitive

qualities of that practice to determine if the practice should be its own, new category subject to per se treatment under Section 1.  *See Northrop*, 705 F.2d 1052 ("that a practice enhances overall efficiency and makes markets more competitive, per se treatment is inappropriate, and the rule of reason applies"); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220–21 (1940) (holding that procompetitive justifications should not be considered when an alleged act falls into an existing per se category).  The situation here does not fall into either of these categories. Here, defendants have chosen not to raise the argument that the agreement was ancillary to a procompetitive purpose in the instant motion, reserving their right to litigate that issue later. ECF No. 49 at n. 1.  And I held above that this falls into the established category of horizontal market allocation; there is no need to determine if a new category subject to per se treatment should be created.  This difference between *Cooperative Theatres* and this case is immaterial.

These two differences do not change the point made by the Sixth Circuit regarding non-solicitation agreements.  The Sixth Circuit agreed that the district court had properly classified the non-solicitation agreement alleged as a horizontal market allocation agreement and therefore properly subjected it to per se treatment.  *See Cooperative Theatres*, 845 F.2d at 1372.  None of the differences between this case and *Cooperative Theatres* justify a departure from the outcome in *Cooperative Theatres*, at least for the purposes of this motion.  *Cooperative Theatres* rebuts defendants' argument that non-solicitation agreements can never properly be subject to per se treatment.

Though *Cooperative Theatres* is the only case finding a pure non-solicitation agreement to be a potential violation of Section 1, it remains persuasive because of the unique nature of the Sherman Act—there will always have to be a first prosecution when there is a new method of

allocating the market.  *See Socony-Vacuum Oil Co.*, 310 U.S. at 223 (holding that, in the context

of price fixing, "the machinery employed by a combination for price-fixing is immaterial"—the

practice of price fixing remains subject to per se treatment even if carried out by an otherwise-

lawful agreement with powerful procompetitive justifications).  Even if there were *no* prior cases

finding that a non-solicitation agreement had violated Section 1, that would not prevent me from

finding that this non-solicitation agreement was sufficiently alleged to have allocated the market,

and thus that per se treatment was appropriate.

However, other than the proposition that some non-solicitation agreements can be subject

to per se treatment, it is of limited help in determining the outcome of this motion.  The issue

addressed by this order is whether *this* non-solicitation agreement has been sufficiently alleged to

have allocated the market.

2.   <u>A New Category of Per Se Treatment Specific to Non-Solicitation Agreements is not
     Warranted</u>.

Defendants' second argument in support of their contention that no non-solicitation

agreements are per se unreasonable is that there is no precedent that would warrant this court

finding that non-solicitation agreements should be made into a new category subject to per se

treatment.  ECF No. 49 at 10.  I agree.  For per se treatment to be warranted, a practice must be

so "manifestly anticompetitive" and "lacking any redeeming virtue," that they will almost always

be unreasonable.  *See eBay*, 968 F.3d at 1037.  It is only after considerable experience with

certain business relationships that courts classify them as per se violations of the Sherman Act.

*Topco Assocs., Inc.*, 405 U.S. at 607–08.

There are no cases finding that non-solicitation agreements are so pernicious, in and of

themselves, that they should be classified as per se unreasonable.  The only case finding a pure

non-solicitation agreement unreasonable, *Cooperative Theatres*, so found because the agreement fell under an existing category of per se treatment. *See Cooperative Theatres of Ohio, Inc.*, 845 F.2d at 1371. The court did not find that the practice of entering non-solicitation agreements was pernicious. Rather, the problem was that the non-solicitation agreement in that case was a naked agreement to allocate the market. *Id*. at 1371–73. Even if non-solicitation agreements and no-hire agreements were to be lumped into the same category, a long judicial history is lacking. Those agreements have been held illegal where they are naked agreements to allocate the market. *See Kemp & Assocs., Inc.*, 907 F.3d at 1277. Where they have been found not to allocate the market or to be ancillary, courts have not found no-hire agreements to be inherently anticompetitive. There is no long judicial experience that would justify creating a new category subject to per se treatment. However, as I have found above that the agreement at issue fell into an existing category of per se unreasonableness, this argument does not affect my disposition of the motion.

   3.  <u>The Conflicting Precedent on Per Se Treatment of No-Hire Agreements</u>.

   Lastly, defendants argue that this non-solicitation agreement cannot be subject to per se treatment even if the specifics of the agreement make it a no-hire agreement. Defendants say this is because no-hire agreements have not conclusively been found subject to per se treatment themselves. However, this lack of uniformity on the per se unreasonableness for no-hire treatment makes perfect sense. Like non-solicitation agreements, no-hire agreements are not themselves so pernicious that they would almost always be unreasonable restraints on trade. But no-hire agreements that nakedly *allocate the market* are per se unreasonable because they would almost always be an unreasonable restraint on trade. Defendants are correct that no-hire

agreements have not been made into their own category subject to per se treatment.  However, those naked no-hire agreements that allocate the market have been considered per se unreasonable as horizontal market allocation agreements.

For example, in *Bogan v. Hodgkins* the Second Circuit held that the no-hire agreement, as alleged, was not a per se violation because it did not "fit into any of the established per se categories."  166 F.3d 509, 515 (2d. Cir. 1999).  Though plaintiff alleged that the practice was a naked supplier allocation, the Second Circuit found that it was not—the record revealed no geographic or market allocation.  *Id*.  This no-hire agreement was not per se unreasonable because it was not a naked horizontal market allocation agreement.

On the other hand, where no-hire agreements have been found per se unreasonable, it has been because the court found that the agreement was (or was alleged to be, depending on the stage of litigation) a naked agreement to allocate the market.  *See*, *e.g.*, *eBay*, 968 F.2d at 1039 (holding that the government adequately alleged that a no-hire agreement allocated the market and thus, if naked, would be subject to per se treatment); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990) (finding that the government had presented sufficient evidence at trial for a jury to find that defendants' no-hire agreement allocated the market).  Defendants' argument that because not all no-hire agreements are per se unreasonable, therefore no no-hire agreement could ever be per se unreasonable does not correspond with the law.

### D.  A Legal Argument From the Government

There is one more legal argument I want to address.  That argument is the government's apparent assertion that *all* non-solicitation agreements and *all* no-hire agreements are horizontal market allocation agreements and thus per se unreasonable.  *See* ECF No. 67 at 6.  I do not agree.

As the precedents on no-hire agreement show, there are no-hire agreements that do not allocate the market, and I assume the same is true of non-solicitation agreements.

My conclusion regarding non-solicitation and no-hire agreements is much more limited than the government's argument.  Here, the government has sufficiently alleged that defendants allocated the market with their non-solicitation agreement.  It does not follow that every non-solicitation agreement or even every no-hire agreement would allocate the market and be subject to per se treatment.  And as discussed in a prior section, my conclusion is also more limited than the defendants' argument on this point—I do not agree with defendants' contention that non-solicitation agreements are *never* properly subject to per se treatment as horizontal market allocation agreements.  What I conclude is that if naked non-solicitation agreements or no-hire agreements allocate the market, they are per se unreasonable.

### E. Defendants' Argument that Allowing this Case to Proceed Under a Per Se Theory Violates Their Due Process Rights

Defendants argue that application of a "per se rule to agreements like those alleged here for the first time would violate defendants' right to 'fair warning' under the Due Process Clause."  ECF No. 49 at 14.  Fair warning is the principle of due process that no person "shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'"  *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).  "Due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).

This decision makes no novel construction of Section 1 of the Sherman Act.  Horizontal market allocation agreements have long been held per se unreasonable.  *See Topco Assocs., Inc.*, 405 U.S. at 608.  Non-solicitation agreements are a method of allocating the market that have rarely, if ever, been prosecuted.  However, as discussed at length above, the conduct proscribed by Section 1 is allocating the market, an action that defendants knew or should have known was illegal.  The fact that defendants allegedly allocated the market in a novel way—by using a non-solicitation agreement—does not matter.  Defendants had ample notice that entering a naked agreement to allocate the market would expose them to criminal liability, however they did it.

One more due process issue I want to address is the question of what happens after I deny this motion.  At oral argument there was some confusion about whether the denial of this motion was essentially a finding that these defendants were guilty without a trial.  *See* ECF No. 90 at 13–14.  This is not the case for two reasons.

First, defendants have limited this motion to the question of whether non-solicitation agreements fall into a category subject to per se treatment.  However, even after a practice is found to fall into a category traditionally subject to per se treatment, per se unreasonableness will not be applied unless the practice is also found to be a naked agreement, an agreement whose main purpose was stifling competition.  *Topco*, 405 U.S. at 608.  Defendants chose not to raise this issue in this motion but could choose to challenge the government's allegations that this was a naked agreement to escape a per se designation.

Second, at trial, the government will not merely need to show that the defendants entered the non-solicitation agreement and what the terms of the agreement were.  It will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of

allocating the market for senior executives (Count 1) and other employees (Counts 2 and 3). This understanding of the trial is confirmed by *United States v. Socony-Vacuum Oil Co.*, a criminal price fixing case, where the Supreme Court agreed with the district court's decision to instruct the jury that per se liability for price fixing was appropriate, but the government had to prove that certain business practices were undertaken in order to fix prices. *See* 310 U.S. 150 (1940).  The district court instructed the jury that it could only find defendants guilty "if you find that . . . the defendants and these other persons acting with them have knowingly engaged in a combination to raise or fix the price to be charged for gasoline to jobbers or consumers in the Mid-Western area as charged in the indictment." *United States v. Socony-Vacuum Oil Co.*, 105 F.2d 809, 832 (7th Cir. 1939), rev'd, 310 U.S. 150 (1940).  Similarly, here, the government will have to prove more than that defendants had entered into a non-solicitation agreement—it will have to prove that the defendants intended to allocate the market as charged in the indictment. This order, holding that the case can proceed under a per se theory, will not deprive defendants of their right to a full and fair jury trial.

## ORDER

For the reasons above defendants' motion to dismiss, ECF No. 49, renewed at ECF No. 83, is DENIED.

DATED this 28th day of January, 2022.

BY THE COURT:

R. Brooke Jackson
Senior United States Senior District Judge