IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Criminal Case No. 1:21-cr-00229-RBJ

UNITED STATES OF AMERICA,

      Plaintiff,

v.

    1.  DAVITA INC.
    2.  KENT THIRY

      Defendants.

---

## ORDER

---

This matter is before the Court on defendants' objections to specific statements sought to be introduced as co-conspirator statements, ECF No. 192. For the reasons stated below, the alleged co-conspirator statements are excluded in part as hearsay.

## I.    BACKGROUND

Defendant DaVita Inc. (DaVita) operates medical care facilities across the United States. Defendant Kent Thiry served as CEO of DaVita for the periods at issue in the superseding indictment, ECF No. 74. DaVita and Mr. Thiry are charged with participating in three different conspiracies to allocate the market for employees. In Count I, defendants are alleged to have conspired with Surgical Care Affiliates (SCA) from February 2012 through at least July 2017. The government alleges that the purpose of this agreement was to allocate the market for senior-level employees between DaVita and SCA. Count 2 alleges that defendants conspired with Hazel Health (Hazel) to allocate the market for employees. This agreement allegedly lasted from around April 2017 through June 2019. In Count 3, the government alleges that defendants

1

conspired with Radiology Partners, Inc. (RP).  The government alleges that this agreement was to allocate the market for employees between the two companies.  This conspiracy is alleged to have occurred roughly between November 2013 and June 2019.

The government seeks to introduce statements from various alleged co-conspirators to these agreements under the Federal Rule of Evidence's 801(d)(2)(E) exemption to the hearsay rules for co-conspirator statements.  The defendants requested a *James* hearing, which was held February 23, 2022.  *See* Transcript of *James* Hearing, ECF No. 189.  At that hearing, defendants primarily argued that none of the statements submitted by the government was subject to the co-conspirator exemption because the government could not show by a preponderance of the evidence that a conspiracy existed between DaVita and any of the other companies identified in the government's *James* log.  Defendants submitted a supplement to their *James* briefing following the Court's indication at the hearing that it would like to hear more specific challenges to the submitted *James* statements other than their categorical challenge to the existence of any conspiracy for Rule 801(d)(2)(E) purposes.  Further argument regarding *James* issues was heard briefly by the Court at a motions hearing on March 3, 2020.  *See* Transcript of Motions Hearing, ECF No. 200.

## II.     STANDARD OF REVIEW

Hearsay is generally inadmissible.  Fed. R. Evid. 802.  Statements by a party's co-conspirator made "during and in furtherance of the conspiracy" are excluded from the definition of hearsay and admissible against all co-conspirators.  Fed. R. Evid. 801(d)(2)(E).  Before statements may be admitted under this rule, the district court "must determine that (1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in

furtherance of the conspiracy." *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). The trial court must state its findings on the elements of the co-conspirator exception. *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017) (citing *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)).

A district court's preliminary conclusion that the predicate conspiracy existed, as required to support admission of co-conspirator statements as non-hearsay, must be supported by some independent evidence of the conspiracy other than the proffered co-conspirator statements themselves, although such independent evidence need not be substantial. *United States v. Stein*, 985 F.3d 1254, 1269 (10th Cir. 2021). The Tenth Circuit has defined "independent evidence" as simply "evidence other than the proffered [co-conspirator] statement itself." *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987). In addition, the Tenth Circuit has held that a co-conspirator's testimony regarding her "direct observations and contacts with defendant" qualifies as independent evidence. *United States v. Hernandez*, 829 F.2d 988, 995 (10th Cir. 1987); *see also United States v. Doran*, 882 F.2d 1511, 1526 (10th Cir.1989).

Most circuits have held that "conspiracy" as a matter of substantive criminal law is different from "conspiracy" as part of the Rule 801 evidentiary principle. *See United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir.1976). The rationale of the co-conspirator exemption to the hearsay rule "is the commonsense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not." *Trowery*, 542 F.2d at 626. To be admissible under Fed. R. Evid. 801(d)(2)(E),

the conspiracy at issue need not be charged and need not even be criminal.[1]  *United States v. Saimiento-Rozo*, 676 F.2d 146, 149 (5th Cir. 1982).

The requirements for being a co-conspirator for purposes of Rule 801(d)(2)(E) are likewise not the same as in a substantive criminal context.  Co-conspirators for Rule 801(d)(2)(E) purposes need only be engaged in the same common plan or joint enterprise.  *See* § 6778 Conspirator Statements (Rule 801(d)(2)(E))—Membership in a "Conspiracy", 30B Fed. Prac. & Proc. Evid. (2021 ed.).  In determining whether a conspiracy exists, there must also be some independent evidence that the declarant was a member of the conspiracy, though that evidence need not be substantial.  *Alcorta*, 853 F.3d at 1142.

The in-furtherance requirement of Rule 801(d)(2)(E) "embodies the drafters' desire to strike a balance between the great need for conspirators' statements in combating undesirable criminal activity which is inherently secretive and difficult of proof, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence."  *United States v. Perez*, 989 F.2d 1574, 1578 (10th Cir. 1993) (internal quotation marks omitted).  "When inquiring whether a statement was made 'in furtherance of' a conspiracy, we do not focus on its actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement."  *Id.* (quoting *United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991)).  Examples of statements that could satisfy the "in furtherance" requirement include:

---

[1] The Tenth Circuit does not appear to have addressed this issue directly.  In *United States v. LaHue*, 261 F.3d 993 (10th Cir. 2001), the Tenth Circuit explicitly declined to address the merits of defendant's argument that a lawful common plan or joint venture cannot be a conspiracy for purposes of Rule 801(d)(2)(E).  *Id.* at n.20.  The *LaHue* court seemed to assume that the district court's admission of statements under the Rule 801(d)(2)(E) exemption was error where the only conspiracy found was a lawful common plan, but it found that even if it was error, it was harmless error.  *Id.* at 1008.  Without any other direct Tenth Circuit precedent on point, I will follow the example of the other circuits in interpreting Rule 801(d)(2)(E)'s exemption as applying to non-criminal conspiracies.

4

> [S]tatements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities.

*Id*.

# III.   ANALYSIS

## A.  Statements Under the Alleged SCA Conspiracy

### 1.  Whether a Conspiracy Existed

I find that the government has proved, by a preponderance of the evidence, that there was a conspiracy between SCA and DaVita for purposes of Rule 801(d)(2)(E).  At the hearing, the government presented evidence in the form of testimony from Agent Timens, statements from Mr. Thiry and other DaVita agents and employees, and statements from alleged co-conspirators. I can consider all this evidence, but my finding that this was a conspiracy must be based in part on evidence independent from the co-conspirator statements at issue in the hearing.  *See Stein*, 985 F.3d at 1269.

Agent Timens testified about how the agreement worked in practice, the timing of the agreement, and how SCA and DaVita complied with the agreement.  *See* ECF 189 at 11.  She stated that, based on her knowledge from the investigation, the object of the agreement was to prevent SCA and DaVita from losing high-level employees.  *Id*.

Statements from Mr. Thiry accord with Agent Timens's testimony.  Regarding an SCA applicant for a high-level position at DaVita, DaVita Chief Operating Officer (COO) Dennis Kogod wrote to Mr. Thiry and another DaVita employee that he believed the candidate was not subject to the "hands off" because the candidate had informed his supervisor at SCA that he intended to seek a job elsewhere.  Government's *James* Hearing Exhibit (GJHE) 23.  Mr. Thiry agreed that the candidate was fair game in those circumstances, but he also asked if he could tell

Mr. Hayak at SCA that DaVita had run the consideration of the candidate "through the right traps." *Id*. Another example of outlining the existence and terms of the conspiracy occurred on October 20, 2014. Mr. Thiry emailed Mr. Hayak stating that someone had approached him about recruiting one of Mr. Hayak's employees at SCA, and that he "explained that I do not do proactive recruiting into your ranks." GJHE 25. These statements provide independent evidence of an agreement between SCA and DaVita not to recruit high-level employees from each other's ranks.

The hearsay statements themselves also show that a conspiracy existed. For instance, there is an email exchange between Michael Rucker, the COO at SCA, and Dr. Bridie Fanning, the Chief Talent Officer at SCA. In that exchange, Mr. Rucker outlined his understanding regarding recruitment of DaVita employees. He wrote that for a candidate at DaVita to be considered at SCA, that candidate would have to "go to his one-up/supervisor to let him know he is actively looking to leave and exploring alternatives so that they could attempt to retain him with some advantage." GJHE 28. Considering all the evidence presented at the hearing, I find that the government has proved by a preponderance of the evidence, which includes some independent evidence, that a conspiracy between SCA and DaVita existed for purposes of Rule 801(d)(2)(E).

2. Specific Challenges

In addition to defendants' blanket objection to all alleged co-conspirator statements on the theory that no conspiracy for purposes of FRE 801(d)(2)(E) existed, they have also laid out specific challenges to certain statements or declarants.

a. Statements in *James* Log 12–17

Defendants claim that the statements made in *James* log 12 through 17 should be excluded as those statements were made before the conspiracy is alleged to have begun. In the

superseding indictment, the government alleged that the conspiracy began "at least as early as February 2012." ECF No. 74 at 3. Defendants argue that these statements, which were made as early as 2011, were not made during the course of the conspiracy and thus should not be admitted under the co-conspirator exemption for hearsay. However, what constitutes a conspiracy for purposes of Rule 801(d)(2)(E) is different than the requirements to charge a criminal conspiracy. The conspiracy requirement under Rule 801(d)(2)(E) can be met by a showing by the preponderance of the evidence that there was a common plan or joint venture. Admissible statements under Rule 801(d)(2)(E) therefore need not be bound by the dates indicated in the superseding indictment, which alleges a criminal conspiracy.

Having found above that, for present purposes, the government proved the existence of a conspiracy with SCA, the question remaining is whether there is evidence that the conspiracy existed at the time that the statements in documents 12 through 17 were made. The statements in document 12 were made on July 12, 2011. In that email, Mr. Rucker told Mr. Rodriguez, "we have been continuing to steer recruiting efforts away from DaVita teammates." GJHE 12. This is evidence that the SCA conspiracy or a similar concert of action existed when Mr. Rucker sent that email. Mr. Rucker made that statement to show Mr. Rodriguez that SCA was complying with the common plan.

Document 13 also shows a common plan between SCA and DaVita as of September 21, 2011. On that date, Mr. Rucker sent another email to Mr. Rodriguez regarding recruitment between the two companies. Mr. Rucker was dismayed that DaVita had recruited an SCA regional vice president and noted that it seemed that DaVita was planning to continue recruiting and hiring current SCA employees. He added, "important to note that since you and I last discussed recruiting and hiring plans we have not recruited or hired anyone from DaVita."

GJHE 13.  Mr. Rucker is attempting to enforce the agreement and informing Mr. Rodriguez that SCA was aware that DaVita was not in compliance with it.  This shows that a common plan regarding recruitment existed between SCA and DaVita at this time.

Statements in documents 14, 15, 16, and 17 all postdate the emails in documents 12 and 13.  Because the evidence shows that the conspiracy for purposes of Rule 801(d)(2)(E) existed as early as July 30, 2011, statements from these documents were made during the course of the conspiracy and are admissible at trial.

   b.   Declarant John Shultz, *James* Log Entries 11 and 39

John Shultz was a consultant with recruiting firm Spencer Stuart.  Defendants argue that there is no independent evidence of Mr. Shultz's role in the conspiracy or whether he knowingly participated in it.  *See* ECF No. 193 at 2.  However, based on the exhibits prepared by the government, there is sufficient independent evidence of Mr. Shultz's involvement in the conspiracy for Rule 801(d)(2)(E) purposes.  On December 12, Dr. Bridie Fanning, Chief Talent Officer at SCA, forwarded Mr. Shultz an email from Mr. Hayak which stated, "we can recruit junior people (below Director) [from DaVita], but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking."  GJHE 39.  Dr. Fanning added to this message, "note that [another company] and DaVita are off limits to SCA."  *Id*.  This is independent evidence that Mr. Shultz knew of the conspiracy and its terms and had a role in it.  Mr. Shultz himself then forwarded this chain to another employee at Spencer Stuart, with the message, "FYI."  *Id*.

There is sufficient independent evidence that Mr. Shultz knew of the common plan and informed others so that they could comply with it.  His role was ensuring that he and colleagues at Spencer Stuart complied with the agreement.  There is an independent basis for classifying

Mr. Shultz as a co-conspirator for Rule 801(d)(2)(E) purposes.  The government can introduce statements from Mr. Shultz under the Rule 801(d)(2)(E) hearsay exemption.

      c.  <u>Declarant Nate Haines, *James* Log Entries 34, 35, 42, and 159</u>

Mr. Haines was a consultant at Russell Reynolds, a consulting firm.  Defendants argue that the government presented no independent evidence of Mr. Haines's role or knowing participation in the alleged conspiracy.  *See* ECF No. 193 at 2.  I disagree.  The government has shown by a preponderance of the evidence, and with some independent evidence, that Mr. Haines was a co-conspirator for Rule 801(d)(2)(E) purposes.  In October 2015, Goran Dragolovic, an SCA vice president, wrote to Dr. Fanning regarding a DaVita employee who had been recruited by Russell Reynolds, a recruiting firm retained by SCA.  Dr. Fanning responded by contacting Mr. Haines regarding the recruitment.  She wrote Mr. Haines, "we must not under any circumstances be contacting people at DaVita—they are partners of ours and we have a commitment not to contact each other's people."  GJHE 34.  Dr. Fanning then asked Mr. Haines to "clarify what happened here and that we won't contact anyone at DaVita again."  *Id*.  This message shows that Mr. Haines had knowledge of the agreement and that his role was to prevent recruiters contacting DaVita employees on behalf of SCA.  This is independent evidence of his involvement in the conspiracy.

Mr. Haines then confirmed that he would tell the DaVita employee that he should not have been contacted, that it was a mistake, and that the mistake was made because Mr. Haines "wasn't aware of the business relationship between SCA and DaVita."  *Id*.  He also confirmed "we will also not call anyone else from DaVita."  *Id*.  This shows that he did participate and act in furtherance of the conspiracy—he did not just know of its existence, he participated in it.  The government has shown, by a preponderance of the evidence, and with some independent

evidence, that Mr. Haines was a member of the conspiracy. As a result, his statements are admissible as non-hearsay under Rule 801(d)(2)(E).

### d.  Declarant Clare Metcalf, *James* Log Entry 42

Ms. Metcalf was not alleged as a co-conspirator for Rule 801(d)(2)(E) purposes in the government's "Co-Conspirator Guide" attached to its *James* materials. *See* ECF No. 128-2. To the extent that the government may attempt to introduce statements by Ms. Metcalf at trial under Rule 801(d)(2)(E), I find that the government has shown by a preponderance of the evidence that she was a co-conspirator. Dr. Fanning sent an email to Ms. Metcalf and Mr. Haines saying, "I just want to be sure you know that DaVita and USPI are off limits to SCA." GJHE 42. This is independent evidence that Ms. Metcalf knew the terms of the agreement and that she was understood to have a role in it. Ms. Metcalf responded, "Yes, thanks." *Id*. That statement confirms that Ms. Metcalf understood the agreement and that she was expected to uphold and enforce it. The government can introduce statements from Ms. Metcalf under the Rule 801(d)(2)(E) hearsay exemption.

### e.  Declarant Carrie Mayhan, *James* Log Entries 47 and 48

Ms. Mayhan was an associate at Spencer Stuart at the time of the conspiracy. Defendants argue that the government has not shown by a preponderance of the evidence and with any independent evidence that Ms. Mayhan knowingly participated in the conspiracy. I agree. Ms. Mayhan's statements were all on an internet database regarding specific candidates who had reached out to SCA for employment. A typical statement from Ms. Mayhan was made in response to an inquiry from a Sean Taylor. Ms. Mayhan wrote, "sent note back [to Mr. Taylor] stating client cannot recruit from DaVita or USPI, so not permitted to move him forward." GJHE 47. While this statement does show, by a preponderance of the evidence, that Ms. Mayhan both knew of and participated in the conspiracy for Rule 801(d)(2)(E) purposes, there is

no independent evidence of her participation—that is to say, the only evidence of her involvement are her own statements at issue in this motion.  Without that evidence, Ms. Mayhan's statements are not admissible to the Rule 801(d)(2)(E) hearsay exemption.

f.   Declarant Tom Usilton, *James* Log Entries 21 and 24

Mr. Usilton was a senior vice president at RP during the period of the conspiracy.  The government has not alleged that he is a co-conspirator for the Count 1 conspiracy in its "Co-Conspirator Guide."  *See* ECF No. 128-2.  Defendants argue that the government has not proved by a preponderance of the evidence or by any independent evidence that Mr. Usilton was a member of the conspiracy with SCA.  I agree.  Mr. Usilton's statements for the SCA conspiracy occurred in an email conversation between Mr. Usilton and Mr. Thiry.  Mr. Thiry requested that Mr. Usilton look for a candidate for a position open at DaVita.  Mr. Usilton recommended someone who "may work for Andrew Hayak."  GJHE 24.  Mr. Thiry responded that "I won't pursue [A]ndrew's senior folks."  Mr. Usilton responded, "Ok—your call."  This shows that Mr. Usilton knew that Mr. Thiry would not pursue senior SCA employees, but it does not show that Mr. Usilton knew that Mr. Thiry and Mr. Hayak had an agreement or common purpose or that he ever participated in such an agreement or common purpose.  The government cannot introduce statements from Mr. Usilton for the SCA conspiracy under the Rule 801(d)(2)(E) hearsay exemption.

g.   Declarant Sandra Mieczkowska, *James* Log Entries 40, 41, and 45

Ms. Mieczkowska is an assistant for Dr. Fanning.  The government does not allege that she is a co-conspirator for 801(d)(2)(E) in its "Co-Conspirator Guide."  *See* ECF No. 128-2.  The only statements from Ms. Mieczkowska are emails sending attachments to Dr. Fanning with recruitment materials.  There is no evidence in any of these statements that Ms. Mieczkowska

knew of the conspiracy or took any action in furtherance of the conspiracy. Ms. Mieczkowska's statements are not subject to the 801(d)(2)(E) hearsay exemption.

> h. Statements in *James* Log 12

Defendants argue that the statements in this document were not made in furtherance of the conspiracy. Here, Michael Rucker, the COO at SCA, sent an email to Javier Rodriguez, an executive at DaVita. Mr. Rucker wrote regarding a DaVita employee who had been recruited by an SCA recruiter. GJHE 12. Mr. Rucker began by telling Mr. Rodriguez, "We have been continuing to steer recruiting efforts away from DaVita teammates." *Id*. Mr. Rucker then gave an anonymized version of the events surrounding the recruitment of this DaVita employee that he had received from an internal SCA recruitment coordinator.

The defendants argue that this statement was not made in furtherance of the conspiracy because the DaVita employee at issue, the anonymized "Sue Smith," was a Facility Administrator, which was not the type of employee subject to the conspiracy alleged by the government in the superseding indictment—she is not a senior-level employee. They also argue that the statements made by declarants in the anonymized version of events should not be admissible because the declarant is not Mr. Rucker, but rather an unidentified internal SCA recruitment coordinator, giving the statements of unidentified DaVita employee "Sue Smith." This, defendants argue, is double hearsay and should not be admitted, even if Mr. Rucker's statement is subject to the 801(d)(2)(E) exemption.

The government has shown, by a preponderance of the evidence, that Mr. Rucker's first statement informing Mr. Rodriguez that SCA was holding up its end of the deal was in furtherance of the conspiracy. However, the anonymized version of events does contain multiple levels of hearsay and from two unidentified individuals who have not been alleged to be co-conspirators. That version of events is the statement of the unidentified SCA recruitment

coordinator, and, at some points, that coordinator quotes "Sue Smith." Quoting these unidentified individuals is hearsay, and absent a valid hearsay exception at both levels, the anonymized version of events is not admissible.

       i.   <u>Statements in *James* Log 13</u>

Defendants argue that these statements are not in furtherance of the conspiracy because they show employees moving between SCA and DaVita rather than anyone attempting to prevent movement. The statements at issue were made in emails between Mr. Rucker and Mr. Rodriguez regarding recruitment between the two companies. Mr. Rucker attached an email showing DaVita recruitment of an SCA employee. Mr. Rucker wrote that "it also appears to many at SCA that DaVita's plans include recruiting and hiring our people." GJHE 13. He added, "important to note that since you and I last discussed recruiting and hiring plans we have not recruited or hired anyone from DaVita," and that "we have turned away six or more inquiries from qualified DaVita teammates over the last six months." *Id.* These statements are in furtherance of the conspiracy. Mr. Rucker was trying to enforce the agreement. The implication of Mr. Rucker's statements is that he was surprised that DaVita was recruiting from SCA's ranks and reaffirmed that there was no reason for DaVita to deviate from the agreement because SCA was still complying with its terms. These statements are admissible pursuant to 801(d)(2)(E).

       j.   <u>Statements in *James* Log 14 and 15</u>

These statements are in an email chain between Mr. Thiry and Mr. Hayak. Defendants argue that these statements are not in furtherance of the conspiracy because they are mainly emails regarding scheduling and logistics. Mr. Hayak initiated the email chain by saying that he would "like to catch up in general and discuss recruitment philosophy specifically." GJHE 14. Mr. Thiry responded, "would be happy to discuss the one item mentioned—the lore within the

Village is you are quite the aggressor." *Id.* The remainder of the emails are an attempt to schedule a time to talk about this item.

These statements are not clearly regarding the conspiracy. Speaking about recruitment philosophy could refer to things other than the conspiracy. The government has not shown by a preponderance of the evidence that this conversation furthered the conspiracy. These statements are not admissible under the Rule 801(d)(2)(E) hearsay exemption.

   k. <u>Statements in *James* Log 21 and 22</u>

These documents contain two different types of statements, email statements and an attached document. The email statements pertain to DaVita's search for a Chief Development Officer (CDO). None of the email statements are related to SCA specifically, nor are they made by members of the SCA conspiracy. The attached document contains statements on the degree to which certain CDO candidates might be a good fit. However, it is not clear who prepared the document and whether the declarant was a member of the conspiracy. There is one statement in Document 22 regarding a candidate at SCA—the declarant wrote that the recruiting firm would not pursue a certain candidate because the client had requested that. The government has not shown by a preponderance of the evidence that the statement was made by a member of the conspiracy or that the statement was in furtherance of the conspiracy. As discussed above, there is no indication of who drafted the document and whether he or she was a member of the conspiracy. Further, there are many reasons that the client could have asked the recruitment firm not to pursue the candidate other than the conspiracy. The statements in these documents are not admissible under Rule 801(d)(2)(E).

l.   Statements in *James* Log 47 and 48

As I found above the government did not show by a preponderance of the evidence that Ms. Mayhan was a member of the conspiracy for purposes of 801(d)(2)(E), these statements will not be admissible as co-conspirator statements.

m.   Statements in *James* Log 159

These statements are contained in an email chain between Dr. Fanning and Mr. Haines discussing the potential recruitment of the employee of a DaVita affiliate.  Defendants argue that the statements in this chain are not in furtherance of any conspiracy but rather references to internal SCA policy.  I find that the government has shown by a preponderance of the evidence that these statements were in furtherance of the conspiracy.

Mr. Haines forwarded Dr. Fanning an email that he received from the DaVita candidate who specified that he was in a separate division from DaVita.  ECF No. 159.  Mr. Haines asked Dr. Fanning if that consideration changed their "situation."  Dr. Fanning responded that if the candidate "can get this leader[']s permission to pursue SCA then fine—otherwise no—DaVita is a no go for us."  This comports with the terms of the conspiracy alleged by a preponderance of the evidence.  Mr. Haines made his statement to ensure that he was in compliance with the conspiracy.  Dr. Fanning's response was made to inform Mr. Haines that pursuing this candidate was at odds with the conspiracy.  These statements were made in furtherance of the conspiracy. The government can introduce these statements under the Rule 801(d)(2)(E) hearsay exemption.

**B.   Statements Under the Alleged Hazel Conspiracy**

Defendants have made a blanket objection to all alleged co-conspirator statements on the theory that no conspiracy for purposes of Rule 801(d)(2)(E) existed.  It has also laid out its specific objections arguing that the government has not shown that certain individuals were co-

conspirators and that certain statements were not made in furtherance of the alleged Rule 801(d)(2)(E) conspiracy.

1.   Whether a Conspiracy Existed

I find that the government has shown by a preponderance of the evidence that a conspiracy existed between Hazel and the charged defendants.  At the *James* hearing, the government presented independent evidence of a conspiracy in the form of testimony from Agent Timens and documents containing statements from Mr. Thiry and various DaVita employees.  The government also introduced statements from alleged co-conspirators.

Agent Timens testified about the investigation into the alleged conspiracy and her review of the documents collected and interviews taken in the investigation.  She testified that the agreement was that "Hazel would not proactively solicit employees of DaVita."  ECF No. 189 at 27.  She also testified that, based on her understanding of the evidence obtained in the investigation, the goal of the agreement was "to keep employees at DaVita."  *Id*.

Statements from Mr. Thiry corroborate that there was a common plan or joint venture between the companies.  Josh Golomb, the CEO of Hazel, upset Mr. Thiry in late March and early April 2017 with his recruitment of a senior DaVita employee, Julio Quinones.  Mr. Golomb and Mr. Thiry exchanged texts regarding this recruitment, with Mr. Thiry asking Mr. Golomb to write him a note explaining, "how do you think about asking someone for a reference and then recruiting away someone with whom they are working regularly a few weeks later?"  GJHE 53.  This shows that Mr. Thiry believed that he and Mr. Golomb had an understanding regarding recruitment.

Mr. Golomb later sent an email to Mr. Thiry asking if a job applicant who currently worked for DaVita but who had told her manager that she was looking at other opportunities was

available for Hazel to recruit.  GJHE 61.  Mr. Thiry responded, "[a]bsolutely if the manager tells their boss that they are out interviewing, and it is true, I/we are totally supportive of her talking to you."  *Id.*  This is independent evidence of a conspiracy.

Co-conspirator statements confirm the existence of a conspiracy between DaVita and Hazel.  After some email, text, and phone conversations regarding Mr. Golomb's recruitment of Mr. Quinones, Mr. Golomb wrote in an email to Mr. Thiry on April 16, 2017, "[y]ou also have my commitment we discussed that I'm going to make sure everyone on my team knows to steer clear of anyone at DVA [DaVita] and that I'll come back to you and talk before ever [sic] get anywhere near a point that could contemplate someone else."  GJHE 54.  This outlines the terms of Mr. Golomb's commitment to Mr. Thiry and DaVita.

The government has succeeded in showing by a preponderance of the evidence that Mr. Thiry and DaVita were engaged in a conspiracy for purposes of FRE 801(d)(2)(E) with Mr. Golomb and Hazel.

### 2.  Specific Challenges

Defendants contend that declarants' statements in documents 53–55 were not made during the course of the conspiracy and as a result cannot be subject to the co-conspirator exemption from hearsay.  They also challenge statements in documents 58 and 62 as not being made in furtherance of the conspiracy.  They further argue that Matthew Weissert was not a member of the conspiracy, so his statements cannot be admitted under the Rule 801(d)(2)(E) exemption.

#### a.  Statements in *James* Log 53, 54, and 55

These are statements in text messages and emails between Mr. Thiry and Josh Golomb, the CEO of Hazel.  Defendants object to admission of these statements under 801(d)(2)(E) because they occurred before the conspiracy began.  Though the charged conspiracy was alleged

to have begun as early as April 2017, a criminal conspiracy is different than a conspiracy for purposes of 801(d)(2)(E); and the common plan required for 801(d)(2)(E) purposes began before April 2017.  Further, though some of the text messages were sent in late March 2017, many of the texts and all of the emails were sent in April 2017.  The government contends that the statements are part of an 801(d)(2)(E) conspiracy even if they were not part of the criminal conspiracy charged in the indictment.

I agree with the government.  The texts and emails themselves show that even before April 2017, Mr. Golomb and Mr. Thiry had a common plan to keep DaVita employees at DaVita as much as possible.  Mr. Golomb wrote via text on March 29, 2017, "[d]o want you to know that I take this stuff crazy seriously and have complete respect for you and have very clear lines of things I would not do and inquiries I have already rebuffed."  GJHE 53.  He continued that he should have "made sure we were aligned on the right way to do things instead of operating from what felt like the highest integrity position (and what others told me is how they do things)."  *Id*. This shows that Mr. Thiry and Mr. Golomb already had a common plan to keep DaVita employees at DaVita.  Though Mr. Golomb admits in these texts that he should have spoken to Mr. Thiry about the best way to carry out that common plan, they were still acting together for the same purpose.

In an email on April 8, 2017, Mr. Golomb laid out the ways that he had already been acting pursuant to this common plan: he told Mr. Thiry that he had been "making sure not to offer title[,] let alone a better one, making sure [Mr. Quinones] knew comp would be vastly lower than anything he had at DaVita," and "telling him to take his time and explore every option DVA was going to put in front of him."  GJHE 54.  Mr. Golomb added, "I am a great recruiter and steps I was taking were exact opposite of what I would do if I was trying to

maximize success in getting the candidate." Mr. Golomb, by his own admission, was minimizing his success at hiring candidates from DaVita. And the reason that Mr. Thiry was so upset following the recruitment of Mr. Quinones is because he had understood that he and Mr. Golomb were both acting in furtherance of their common plan to keep employees at DaVita. As Mr. Golomb and Mr. Thiry were already acting pursuant to a common plan, Mr. Golomb's statements in *James* log 53, 54, and 55 are co-conspirator statements admissible under Rule 801(d)(2)(E).

      b.  <u>Statements in *James* Log 58</u>

This document is an email sent by Mr. Golomb to then-DaVita employee Julio Quinones. Defendants argue that the statements in this email were not made in furtherance of any conspiracy because Mr. Quinones was not aware of any conspiracy.

Defendants' argument is incorrect. Just because a statement is made to a person who is not a co-conspirator does not mean that statement was not made in furtherance of the conspiracy. In the email, Mr. Golomb took great pains to encourage Mr. Quinones to remain at DaVita if he was not extremely passionate about Hazel. He also made clear that, because Mr. Quinones was currently employed at DaVita, his salary at Hazel would be lower than it would have been if he were not coming from DaVita. Mr. Golomb also encouraged Mr. Quinones to not pay too much attention to the title that he will receive. This is because part of Mr. Golomb's commitment to Mr. Thiry not to solicit his employees was that he would not offer DaVita employees a salary or title bump. These statements show how the agreement worked in practice and they were in furtherance of the conspiracy. The government can introduce these statements under the Rule 801(d)(2)(E) hearsay exemption.

c.   Statements in *James* Log 62

This document contains texts between Mr. Golomb and Matthew Weissert, senior vice president at DaVita affiliate Paladina Health, regarding the potential recruitment of a DaVita employee.  Defendants argue that Mr. Weissert has not been shown to be a member of the conspiracy by independent evidence, and that his statements were not in furtherance of the conspiracy because his statements related to concerns over non-solicitation clauses in individual employment contracts rather than any conspiracy or common plan.  I agree that there is no independent evidence that Mr. Weissert was a member of the conspiracy.  The only evidence that he is a member of the conspiracy was his own statement to Mr. Golomb.  Mr. Golomb asked Mr. Weissert about potential recruitment of a DaVita employee, and Mr. Weissert responded, "just make sure you clear with kt [Kent Thiry] when you need to."  There is not sufficient independent evidence that Mr. Weissert was a member of the conspiracy—his statements cannot be considered co-conspirator statements under 801(d)(2)(E).

**C.   Statements Under the Alleged RP Conspiracy**

1.   Whether a Conspiracy Existed

I find that the government has shown, by a preponderance of the evidence, that defendants entered a conspiracy for purposes of Rule 801(d)(2)(E) with RP.  At the *James* hearing, the government presented evidence in the form of testimony from Agent Timens, statements from Mr. Thiry and agents and employees of DaVita, as well as co-conspirator statements.

Agent Timens testified that DaVita and RP entered an agreement that RP would not proactively solicit employees of DaVita.  ECF No. 189 at 41.  She testified that, in practice, the agreement worked because Mr. Thiry and Rich Whitney, the CEO of RP, agreed to the terms and

then "provided the terms of the agreement to their executive teams and recruiters, and they

monitored and enforced the agreement." *Id*. at 40.  She testified that the goal of the agreement

was "to keep the employees at DaVita from leaving DaVita for Radiology Partners." *Id*. at 41.

       Mr. Thiry and DaVita agents and employees also made statements that support the

government's assertion that there was a common plan between DaVita and RP to keep

employees at DaVita.  On October 21, 2013, Mr. Thiry sent an email to several DaVita

executives with the subject line, "[W]hitney and [G]abriel recruiting folks.  what should we do?"

In the body of the message, Mr. Thiry wrote, "Me call [R]ich?  Make sure search firms go after

theirs?  Both?"  GJHE 91.  This shows that Mr. Thiry anticipated being able to stop Mr. Whitney

from recruiting activities with a phone call.  In response to a question from RP CEO Rich

Whitney regarding the potential hiring of a current DaVita employee, Mr. Thiry asked, "did the

process of recruiting this person fit our guidelines?"  GJHE 134.  These statements provide

independent evidence that DaVita and RP had entered a common plan.

       The existence of a common plan is affirmed by co-conspirator statements.  The clearest

evidence of an agreement is an email from Mr. Whitney to Mr. Thiry, where Mr. Whitney laid

out "ground rules" that "would not create any legal agreement but instead serve to create clarity

around what we hopefully can both agree is a fair way to treat each other."  GJHE 98.  Mr.

Whitney proposed that RP and its recruiters "will not initiate contact with DaVita teammates

about positions at RP."  *Id*.  Additionally, when a DaVita employee reached out to RP, RP would

not pursue that applicant unless "they represent to us that they are actively pursuing other

opportunities outside of DaVita . . . OR that they have had a specific conversation with their boss

telling him/her that they are interested in pursuing opportunities outside DVA."  *Id*.  Mr.

Whitney stated that this was not a "legal agreement," but the email does clearly outline the

common purpose that RP and DaVita had.  While Mr. Thiry responded that he was "not comfortable with this, as it is fundamentally asymmetrical, to our disadvantage," he also asked Mr. Whitney "how might you propose to deal with this?"  While the parties did not agree on the exact terms in this email, it is clear from other exhibits that an agreement with substantially similar terms was understood and enforced by RP and DaVita.

    2.  <u>Specific Challenges</u>

    a.  <u>Statements in *James* Log 91–97</u>

These statements all occurred in October 2013.  They are largely inter-RP conversations, as well as some inter-DaVita emails.  There is one email thread between Mr. Whitney and Mr. Thiry.  Though the charged conspiracy with RP is only alleged to have begun as early as November 2013, these emails are still part of a conspiracy for purposes of Rule 801(d)(2)(E). The emails show that there was a common plan between RP and DaVita.  First, there was a series of emails between Mr. Thiry and other high-level DaVita employees regarding several DaVita employees who had left to join RP.  Mr. Thiry asked what he should do in response to these recruitments—he asked whether he should call Mr. Whitney, instruct recruitment firms to go after RP employees, or both.  GJHE 91.

A few hours after Mr. Thiry sent that email to his colleagues, he sent Mr. Whitney an email with the subject line, "targeting our teammates . . . I would like to discuss, okay?"  GJHE 91.  Mr. Whitney responded a few days later, "btw . . . we are definitely not targeting . . . but we'll talk next week."  GJHE 92.  A few days later, on October 29, 2013, Mr. Whitney sent an email to several of his colleagues speaking about the potential recruitment of a current DaVita employee.  He asked, "are we 100% whole on this one in terms of believing he is leaving DVA in any event and that we aren't encouraging him to leave?"  He continued, "I am about to make

that commitment to Kent…we really need to be sure that we are living up to it . . . or I shouldn't say it."

Though Mr. Whitney said he was "about to make that commitment to Kent," that does not mean that Mr. Whitney and Mr. Thiry had not already entered a common plan.  In fact, if they were not already acting in furtherance of this common plan, there would be no reason to comply with the agreement before the commitment was made.  Mr. Thiry and Mr. Whitney, as well as the other co-conspirators involved in these email chain, understood at this point that they were to be acting in conformance with the goal of attempting to keep employees at DaVita.  The government can introduce these statements under the Rule 801(d)(2)(E) hearsay exemption.

      b.   <u>Declarant Basak Ertan, *James* Log Entries 67–70, 72–75, 77, 88, 90, 104, 120–21, 123, 128. 129. 139, 147, and 151–52</u>

Ms. Ertan is a former DaVita employee who was hired at RP as Chief Revenue Officer.  Defendants argue that there is no independent evidence of Ms. Ertan's membership in the conspiracy.  I disagree.  Shital Desai, a vice president at RP, asked Ms. Ertan specifically, "what is the appropriate protocol for DaVita teammates that have reached out to us for a position that is open."  GJHE 147.  This shows that Ms. Ertan was known both to understand there to be an agreement and to know its terms.  This is independent evidence of Ms. Ertan's membership in the conspiracy between RP and DaVita.

Ms. Ertan's own statements show that she was a member of the conspiracy.  In response to the email from Ms. Desai asking what the appropriate protocol was for pursuing DaVita employees, Ms. Ertan laid out, step-by-step, what RP needed to do to comply with the agreement with DaVita.  *Id.*  There is also evidence that Ms. Ertan helped to enforce the common plan.  There is further evidence that Ms. Ertan actively sought to comply with the terms of the agreement herself.  GJHE 139.  In an email, she asked Mr. Whitney whether the recruitment of

two different DaVita employees complied with the agreement and whether the agreement

required that RP let DaVita know about the recruitment. *Id.* The government has shown that

Ms. Ertan is a co-conspirator for Rule 801(d)(2)(E) purposes by a preponderance of the evidence.

The government can introduce statements from Ms. Ertan under the Rule 801(d)(2)(E) hearsay

exemption.

> c. Declarant Guy Seay, *James* Log Entries 91 and 93–94

Defendants argue that Guy Seay, a division CFO at DaVita, was not a member of the

conspiracy because there is no independent evidence regarding his role or knowing participation

in the alleged conspiracy. However, I find that there is some independent evidence that Mr. Seay

was aware of the agreement and had at least some role in it. He was a recipient on several emails

from Mr. Thiry, Mr. Kogod, and Mr. Javier Rodriguez, all high-level DaVita executives. The

subject line in this email chain says, "[W]hitney and [G]abriel recruiting folks. What should we

do?" In these emails, Messrs. Thiry, Kogod, and Rodriguez were discussing RP's recruitment of

several DaVita employees. GJHE 91. They were discussing what actions DaVita should take in

response to this recruitment. *Id.* This, coupled with the fact that Mr. Seay responded on this

email chain, is independent evidence that Mr. Seay had an understanding that there was an

agreement and that he had a role in it.

Mr. Seay's membership in the conspiracy is further confirmed by his own statements. In

response to the emails on the above-discussed email chain, Mr. Seay listed three former DaVita

employees whom he believed had recently been recruited away by RP. He also wrote his more

detailed understanding of one recruitment by RP, where the DaVita employee had been offered a

salary that was $20,000 higher than it was at DaVita, with a $10,000 bonus potential. He added

that he thought the "recruiter targeted him because of his DaVita background." GJHE 94. This

shows that Mr. Seay was involved in the same common plan. Mr. Seay's inclusion of the fact

that a recruited employee was offered a higher salary shows that he understood the offer of a higher salary to be solicitation, which was contrary to the agreement, and he positively asserted that Mr. Whitney and RP were not holding up their end of the common plan.  By a preponderance of the evidence, and with some independent evidence, the government has shown that Mr. Seay was a co-conspirator.  The government can introduce statements from Mr. Seay under the Rule 801(d)(2)(E) hearsay exemption.

        d.  <u>Declarant Belinda Reynaga, *James* Log Entries 138, 141, 145, and 147</u>

Defendants argue that there is no independent evidence on Ms. Reynaga's role or knowing participation in the conspiracy.  However, I find that there is independent evidence that Ms. Reynaga knew that the conspiracy existed, what its terms were, and that she had some role in it.  She was a recipient on an email chain including Ms. Desai and Ms. Ertan regarding the agreement between RP and DaVita.  Ms. Desai asked Ms. Ertan what the appropriate protocol was for recruitment of DaVita teammates.  GJHE 147.  Ms. Ertan responded with a detailed, step-by-step explanation of the terms of the agreement.  Ms. Desai then asked Ms. Reynaga to, pursuant to Ms. Ertan's explanation, confirm that a candidate currently employed at DaVita applied to the position at RP without solicitation.  He also asked Ms. Reynaga to ask this candidate to inform her boss that she was looking for alternate employment.  This is independent evidence that Ms. Reynaga knew of the agreement and its terms and was asked to ensure that candidates complied with those terms.

Ms. Reynaga's own statements confirm that she had a role in the common plan in helping to ensure that RP was incompliance with the agreement.  Ms. Reynaga responded to Ms. Desai that the candidate had applied on her own, and that she would ask her to inform her boss.  Later, she confirmed that she had spoken to the candidate, and the candidate had spoken with her boss.  These statements are evidence that Ms. Reynaga did her best to conform with the terms of the

common plan and ensure that candidates from DaVita conformed with the agreement likewise. This is enough to show, by a preponderance of the evidence, that Ms. Reynaga was a co-conspirator for purposes of Rule 801(d)(2)(E). Her statements will be admissible as co-conspirator statements at trial.

   e. <u>Declarant Sarah Hendricks, *James* Log Entries 141 and 144</u>

   Defendants argue that there is no independent evidence on what Ms. Hendricks's role or knowing participation in the conspiracy was. I agree. Ms. Hendricks is copied on a series of emails among several RP employees regarding the recruitment of a DaVita employee, the subject line of which was "Elliot Holder – Clarification for DVA Rules of Engagement." GJHE 144. Keegan Scanlon, a director at RP, asked his team, including Ms. Hendricks, to answer some questions about this DaVita recruit. The questions were whether the recruit had reached out to RP, whether the recruit's boss was aware that he was looking, whether he was looking anywhere besides RP, and whether he had any offers outside of RP." None of these questions alone, nor any of the responses of her colleagues on this thread, indicate that Ms. Hendricks knew of the agreement or its terms. As there is no independent evidence that Ms. Hendricks knew that there was an agreement or knowingly participated in it, I cannot find that she was a co-conspirator for purposes of Rule 801(d)(2)(E). The government cannot introduce statements from Mr. Shultz under the Rule 801(d)(2)(E) hearsay exemption.

   f. <u>Declarant Philipp Stephanus, *James* Log Entry 66</u>

   Defendants argue that Mr. Stephanus, a DaVita Senior vice president, is not a member of the conspiracy because there is no independent evidence of his role or his knowing participation in the conspiracy with RP. I agree. The only mentions of Mr. Stephanus are in notes taken in an FBI interview with Ms. Ertan and some inter-DaVita emails regarding Ms. Ertan's departure for RP. I did not see any statements in the Government's *James* Hearing Exhibits from Mr.

Stephanus regarding the RP conspiracy. Regardless, the extremely limited independent evidence regarding Mr. Stephanus does not show that he knew that the conspiracy existed nor that he participated in it. Mr. Stephanus is not a member of the RP conspiracy for purposes of Rule 801(d)(2)(E), and his statements cannot be introduced under that hearsay exemption at trial.

### g.   Declarant Jeff Lombrado, *James* Log Entry 146

Defendants argue that there is no independent evidence that Mr. Lombrado, the principal at recruiting firm BlueSky Professional, had a role in the conspiracy and knowingly participated in it. I disagree. Mr. Lombrado submitted a current DaVita employee as a candidate for a position at RP. Alex Won, a vice president at RP, responded by telling Mr. Lombrado, "going forward, we would like to avoid recruiting from DaVita as it will be a longer recruiting process due to some existing agreements." GJHE 146. Mr. Lombrado's receipt of this email shows that he knew of the common plan that RP not recruit from DaVita, and that he was being asked to participate in this plan. Mr. Lombrado's own statement further confirms that he knowingly participated in the conspiracy. He responded to Mr. Won, "[n]oted about DaVita . . . Me and my team will refrain from reaching out to current DaVita employees going forward." *Id*. Mr. Lombrado made a commitment to Mr. Wong to comply with the terms of the common plan—the government has thus shown that Mr. Lombrado was a member of the conspiracy by a preponderance of the evidence. The government can introduce statements from Mr. Lombrado under the Rule 801(d)(2)(E) hearsay exemption.

### h.   Declarant Shital Desai, *James* Log Entry 147

Defendants contend that there is no independent evidence that Ms. Desai was a member of the conspiracy. I disagree. She was the recipient of the email from Ms. Ertan that laid out the terms of the agreement. GJHE 147. This is independent evidence that Ms. Desai knew about the agreement and had at least some role in it. Ms. Ertan was not sharing how the agreement worked

for kicks—she shared that information so that Ms. Desai could comply with and enforce the agreement.

Ms. Desai's own statements affirm her role as a co-conspirator. It was Ms. Desai's request that prompted Ms. Ertan to share the terms of the agreement. She asked Ms. Ertan, "what is the appropriate protocol for DaVita teammates that have reached out to us for a position that is open?" *Id*. After Ms. Ertan shared the terms, Ms. Desai then sent an email to Ms. Reynaga to ask if the candidate at issue had complied with the agreement. *Id*. This is sufficient evidence, and includes sufficient independent evidence, to show Ms. Desai was a member of the conspiracy for purposes of Rule 801(d)(2)(E) and her statements will be admissible at trial as co-conspirator statements.

> i. Statements in *James* Log 104

Defendants also argue that statements made by Ms. Ertan when she herself was leaving DaVita for RP should not be admissible under Rule 801(d)(2)(E). Defendants argue that Ms. Ertan's statements were not made in furtherance of the conspiracy.

Document 104 contains an email thread with statements from Ms. Ertan and Mr. Whitney. Ms. Ertan told Mr. Whitney that she had a call scheduled with Mr. Thiry for the following day and asked if there were "any messages I can help reinforce with him or any topics to avoid based on how your discussions with him are going?" GJHE 104. Mr. Whitney responded, "just that we weren't the reason you were exploring other options." Ms. Ertan's statements about Mr. Whitney's "discussions" with Mr. Thiry, were made on November 19, 2013, at which time, other evidence shows, Mr. Thiry and Mr. Whitney were discussing the terms that would best accomplish the goal of keeping employees at DaVita. Ms. Ertan was asking what she could tell Mr. Thiry that would help Mr. Whitney maintain the agreement with Mr. Thiry. Ms. Ertan's statement was an attempt to help Mr. Whitney come to an agreement

28

with Mr. Thiry.  The government has shown by a preponderance of the evidence that Ms. Ertan's statement was in furtherance of the conspiracy.  The government can introduce these statements under the Rule 801(d)(2)(E) hearsay exemption.

### D.  Statements Under the Alleged IntegraMed Conspiracy

1.  Whether a Conspiracy Existed

Defendants argue that the government has not shown by a preponderance of the evidence that there was a conspiracy or common plan for Rule 801(d)(2)(E) purposes.  The government introduced evidence of the IntegraMed conspiracy through testimony from Agent Timens, in the form of statements from Mr. Thiry, as well as the hearsay statements that the government seeks to introduce under Rule 801(d)(2)(E).  Agent Timens testified that, in the course of the investigation, investigators learned of an agreement between DaVita and IntegraMed.  The agreement was that IntegraMed would not proactively solicit DaVita employees.  ECF No. 189 at 56.

There is independent evidence of the existence of the IntegraMed conspiracy.  Mr. Hughson, the CEO at IntegraMed, sent an email to Mr. Thiry following a phone conversation indicating his thoughts following the conversation.  Mr. Thiry responded with his own thoughts on the phone call.  GJHE 156.  Mr. Thiry clarified that two DaVita employees were not on their way out of DaVita.  He also said, "I issued zero threats . . . All I said was you could expect fierce competition if you pursue our people."  *Id*.  These statements provide some independent evidence of the IntegraMed conspiracy.  Mr. Thiry is explaining the terms of the agreement when he mentions the two employees were not on their way out—Mr. Thiry understood that Mr. Hughson and IntegraMed had agreed not to recruit DaVita employees who had not told their supervisors that they were looking elsewhere.  Likewise, Mr. Thiry's statements regarding competition are independent evidence of the common plan.  Mr. Thiry is attempting to enforce

the agreement by reminding Mr. Hughson what the consequences will be if he and IntegraMed do not comply with the terms of the agreement.

With some independent evidence presented, the government has shown by a preponderance of the evidence that a conspiracy existed between IntegraMed and DaVita using the co-conspirator statements.  For instance, in response to the email from Mr. Thiry referenced in the previous paragraph, Mr. Hughson wrote, "as I said, I will never pursue people who work at DaVita." *Id*.  He continued, "that's a commitment, and I will honor it." *Id*.  About a month after that email exchange, Mr. Hughson sent Mr. Thiry another email.  He explained, "I will respect your proposed process with regard to people who come to me looking for opportunities at IntegraMed Fertility, and have already given that feedback to a couple of people who have reached out to me in the past few months."  GJHE 155.  The government has shown by a preponderance of the evidence that a conspiracy for purposes of Rule 801(d)(2)(E) existed.

2.  <u>Specific Challenges</u>

Defendants raise only one specific challenge to a statement pursuant to the IntegraMed conspiracy.  That challenge is to the statements by Philipp Stephanus—defendants argue there is no independent evidence that Mr. Stephanus was a co-conspirator for Rule 801(d)(2)(E).  Mr. Thiry forwarded an email that he received from Mr. Hughson to Mr. Stephanus, with the caption, "FYI."  GJHE 154.  The original message from Mr. Hughson sought to explain IntegraMed's unsuccessful recruitment of Ms. Ertan.  Mr. Hughson explained, Ms. Ertan was "in discussions with others well before I ever spoke with her and she had an offer from another party before she and I ever discussed an offer from me." *Id*.  Mr. Hughson continued, "this is absolutely consistent with my behavior in general and with my commitment to you that I will not proactively recruit from DaVita." *Id*.  That Mr. Stephanus received this message from Mr. Thiry

30

is independent evidence that Mr. Stephanus knew of the agreement and was expected to have interest in Mr. Hughson's interpretation of it and compliance with it.

Mr. Stephanus's response allows the government to meet its burden of showing by a preponderance of the evidence that Mr. Stephenson was a co-conspirator for purposes of Rule 801(d)(2)(E).  In response to Mr. Thiry's "FYI" email, Mr. Stephanus responded, "This underscores the importance of the rule that you were insisting on with Rich—namely that they must not engage in any discussion unless the person's supervisor at DaVita has been informed." *Id*.  He continued, "Without that, we'll always hear the excuse that 'he/she was already talking to others.'"  *Id*.  Not only did Mr. Stephanus know of the common plan with IntegraMed, he compared the efficacy of that plan with a similar conspiracy between DaVita and Mr. Whitney/RP.  He was participating in the common plan and explaining to Mr. Thiry how the common plan could be improved.  The government has shown, by a preponderance of the evidence, and including some independent evidence, that Mr. Stephanus was a member of the conspiracy for purposes of Rule 801(d)(2)(E).  The government may introduce statements from Mr. Stephanus for the Integramed conspiracy under the Rule 801(d)(2)(E) hearsay exemption.

### E.  Statements Under the Alleged Spectranetics Conspiracy

The government has not shown by any independent evidence that a conspiracy existed between DaVita and Spectranetics.  The government presented only two exhibits to support the existence of this conspiracy, both from the same email thread.  In that email thread, Scott Drake, CEO of Spectranetics, emailed Mr. Thiry, "a quick note to let you know our system/agreement is working."  GJHE 158.  He continued, "an open position we are recruiting for yielded a DaVita teammate," but "our HR and senior leader of the department saw the resume and stopped the process with the individual."  *Id*.  Mr. Thiry forwarded that email to several DaVita employees

with the message, "I assume we had the right communications internally. . . given [S]cott's

company is a likely client, etc." *Id*.

Mr. Thiry's statement does not provide the independent evidence necessary for a finding

of a conspiracy under Rule 801(d)(2)(E). It is unclear exactly what Mr. Thiry's statement means,

and Agent Timens's testimony regarding the Spectranetics conspiracy does not reveal the

meaning of this statement. Without fully understanding the meaning of Mr. Thiry's statement, I

can see that it does not directly reference any agreement or its terms. This is not independent

evidence of a Spectranetics conspiracy. Though Mr. Drake's email makes clear that there was

some sort of agreement around recruiting, without at least some independent evidence, I cannot

find there was a conspiracy for purposes of Rule 801(d)(2)(E). The government cannot

introduce statements from Mr. Drake under the Rule 801(d)(2)(E) hearsay exemption.

## ORDER

1.     For Count 1, the statements of Ms. Mayhan in *James* log 47 and 48, of Mr.

Usilton in *James* log 24, of Ms. Mieczkowska in *James* log 40, 41, and 45, the anonymized

statement in *James* log 12, and the statements in *James* log 14, 15, 21, and 22 do not meet the

three requirements for admission under Rule 801(d)(2)(E) and are not admissible as co-

conspirator statements.

2.     For Count 2, the statements of Mr. Weissert in *James* log 62 do not meet the three

requirements for admission under Rule 801(d)(2)(E) and are not admissible as a co-conspirator

statement.

3.     For Count 3, the statements of Ms. Hendricks in *James* log 141 and 144 and the

statements of Mr. Stephanus in *James* log 66 do not meet the three requirements for admission

under Rule 801(d)(2)(E) and are not admissible as a co-conspirator statement.

4.     For the Spectranetics conspiracy, the statements of Mr. Drake in *James* log 157 and 158 do not meet the three requirements for admission under Rule 801(d)(2)(E) and are not admissible as co-conspirator statements.

5.     The remainder of statements meet the requirements for admission under Rule 801(d)(2)(E).

DATED this 21st day of March, 2022.

BY THE COURT:

_____
R. Brooke Jackson
United States Senior District Judge