**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

    1. DAVITA INC.,

    2. KENT THIRY,

        Defendants.

_____

**DEFENDANTS' JOINT OPPOSITION TO THE GOVERNMENT'S RENEWED MOTION TO EXCLUDE EXPERT TESTIMONY**
_____

The Antitrust Division of the Department of Justice ("Division" or "Government") has moved for a *Daubert* hearing on two opinions described in the expert report of Defendants' sole expert, Dr. Pierre Yves Cremieux (the "Report"), and to exclude the remaining three opinions. Dr. Cremieux's anticipated expert testimony is all relevant, reliable, and offered for purposes consistent with this Court's prior rulings. It should be admitted pursuant to Federal Rule of Evidence 702. Any of the government's concerns with Dr. Cremieux's testimony are actually challenges to the weight of the testimony, not its admissibility, and can be explored on cross-examination.

1

The opinions the Government seeks to explore in the *Daubert* hearing[1] have been described in great detail in Sections V and VI of the Report. These sections and the relevant exhibits appendices explain the bases for Dr. Cremieux's opinions, the scientifically valid methodology employed, and the data utilized. All the data analyzed in connection with Dr. Cremieux's opinions in those sections was produced to the Division, along with code and instructions for reproducing Dr. Cremieux's analysis of that data. These data, code, and instructions allow the Division to replicate Dr. Cremieux's exact process and to test his results and conclusions. In other words, the Division knows exactly what these opinions are and exactly the data and methodology on which they are based, and tellingly, has <u>not</u> moved to exclude them. The methodologies Dr. Cremieux relied upon are well-established in his field of economics, the data on which he relied is reliable, and his testimony on the topics in Sections V and VI of the Report should be admitted.

The Division does not challenge the <u>reliability</u> of Dr. Cremieux's opinions and testimony outlined in Sections IV, VII and VIII of his Report, but instead argues that those opinions are either irrelevant or would not assist the trier of fact. In arguing that Sections IV and VIII should be excluded because the testimony "will not assist the trier of fact," (Dkt. 213 at 4), the Division misconstrues both Dr. Cremieux's anticipated testimony and the standard for "assistance" to the trier of fact. As described in those sections of the Report, observed movement of employees

---

[1] Although Defendants do not oppose the Division's request for a *Daubert* hearing—as the Court has indicated, an opposing party generally receives such a hearing if requested—the information and arguments set forth in this opposition demonstrate that a hearing is not required. *See United States v. Turner*, 285 F.3d 909, 912–13 (10th Cir. 2002) (reviewing the denial of a *Daubert* hearing for abuse of discretion, and expressly noting that a *Daubert* hearing "is not specifically mandated.").

between the alleged co-conspirators[2] and DaVita's responses to notice are economically inconsistent with the *existence* of a conspiracy with the purpose of allocating a market for employees. In addition, the testimony supports valid strategic purposes for companies to choose not to solicit employees of companies, like DaVita, that they view as actual or potential strategic partners.

The Division argues that the opinions described in Section VII of the Report are "irrelevant to a per se case." Dkt. 213 at 5. This argument is contradicted by this Court's prior rulings that the Division continues to ignore. In that Section of his Report, Dr. Cremieux opines that it would be illogical for DaVita and the alleged co-conspirators in the Superseding Indictment to believe that they could allocate a market for employees because of the hundreds of employers inside and outside the healthcare industry that also hired from DaVita. This undermines any argument that the purpose of any agreements was to allocate a market for employees. Dr. Cremieux's opinions in Section VII are plainly relevant to the central issue in this case: whether the alleged co-conspirators entered into non-solicitation agreements with the purpose of allocating markets for employees.

The Division's motion to exclude should be denied, and Dr. Cremieux should be permitted to provide expert testimony as described in his Report.

---

[2] An economic expert, like Dr. Cremieux, is uniquely qualified to opine on the economic meaning and implications of employee movements in the context of the conduct alleged by the Division. Moreover, only an economic expert could opine on employee movement in the context of broader movement patterns and statistical analysis of attrition patterns. The movement of employees must be viewed in the context of attrition and salary rates during the period.

## BACKGROUND

Defendants' economic expert, Dr. Cremieux, is expected to testify regarding five opinions outlined in his previously-filed Report (*see* Dkt. 201). Each of these opinions goes directly to (1) whether the alleged market allocation agreements existed; and (2) whether Defendants joined them with the purpose of allocating the markets for employees alleged. Specifically, Dr. Cremieux opines that:

Section IV: "Economic evidence is inconsistent with the stifling of labor competition between DaVita and alleged co-conspirators that would be expected if there were labor market allocation" because "DaVita competed with the three companies for existing at-issue employees during the alleged conspiracy periods," and "DaVita's response to notice from senior-level employees is inconsistent with the purpose of allocating labor markets." *Id.* at 13-18. Dr. Cremieux analyzed data showing movements of employees between the alleged co-conspirators and evidence of promotions, raises and other inducements offered by the companies to retain employees who provided "notice." *Id.*

Section V: "Economic evidence is inconsistent with the suppression of turnover that would be expected if there were labor market allocation agreements." *Id.* at 18-19. Dr. Cremieux analyzed DaVita's employee turnover rates relative to national benchmarks, employing a differences-in-differences benchmark methodology in reaching the conclusions outlined in this Section of the Report. *Id.*

Section VI: "Economic evidence is inconsistent with the suppression of compensation that would be expected if there were labor market allocation agreements." *Id.* at 20-21. Dr. Cremieux analyzed data on DaVita's compensation of its senior-level employees relative to

4

national benchmarks, employing a differences-in-differences benchmark methodology in reaching the conclusions outlined in this Section of the Report. *Id.*

Section VII: "Economic evidence is inconsistent with DaVita and its alleged co-conspirators having an economic incentive to enter into agreements for the purpose of allocating labor." *Id*. at 21-25. Dr. Cremieux analyzed data on the destinations of senior-level DaVita employees who departed the firm during the allegation periods. That analysis finds that there are at least hundreds of other companies, not limited to healthcare companies, that compete for the services of senior-level DaVita employees, Dr. Cremieux also analyzed data on the destinations of senior-level DaVita employees, senior-level SCA employees, and Company B and Company C employees outside the relevant allegation periods, and found that "[t]here was insignificant movement of at-issue employees between DaVita and its alleged co-conspirators outside the alleged conspiracy periods." *Id*. at 24. Dr. Cremieux's findings in the data imply that it would be economically non-sensical for the alleged co-conspirators to believe they could allocate a market or markets for employees through the bilateral non-solicitation agreements, as alleged in the Superseding Indictment. *Id.*

Section VIII: "Assessing whether an agreement has the purpose of allocating a labor market requires evaluating the unilateral incentives of the involved companies." *Id*. at 25-28. Dr. Cremieux opines that there are independent self-interested business reasons, distinct from the purpose of allocating markets for employees, a company (such as SCA) might choose not to solicit employees of another company (such as DaVita) that it viewed as an actual or potential strategic partner.

## ARGUMENT

The Division moves for a *Daubert* hearing to test the reliability of the opinions in Sections V and VI, moves to exclude the opinions in Sections IV and VIII on the grounds that they "do not assist the trier of fact," and also moves to exclude the opinion in Section VII as "irrelevant to a per se case." Dkt. 213. The Division's motion lacks merit, raising arguments that contradict rulings already made by this Court, and Dr. Cremieux should be allowed to testify as to all of his disclosed opinions.

### I. THE OPINIONS IN SECTIONS V AND VI OF THE REPORT ARE RELEVANT AND RELIABLE, AND SHOULD BE ADMITTED

Sections V and VI of the Report analyze turnover and compensation for senior-level DaVita employees, concluding that turnover and compensation patterns for those employees are inconsistent with the patterns that would be expected if there had been a conspiracy to allocate the market for employees and a cessation of meaningful competition in the allocated market. The Division has not moved to exclude those opinions. Instead, the Division seeks a *Daubert* hearing to "fully analyze [Dr. Cremieux's] approaches in Section V and VI, given the late production of output files." Dkt. 213 at 4. The Division's argument is without merit. The methodologies employed by Dr. Cremieux, the data he analyzed, and the bases for his opinions in these Sections are fully described in the Report. Specifically, the Report describes:

- What Dr. Cremieux scientifically tested: whether turnover rates and compensation for senior-level DaVita employees were suppressed, as would be expected if there were labor market allocation agreements. (Report at ¶¶ 32-33);

- The methodology used in conducting those tests: a differences-in-differences approach comparing the turnover rate of senior-level DaVita employees to national turnover benchmarks before and during the alleged conspiracy periods (Report ¶¶ 42-44), as well as a differences in differences approach comparing compensation for senior-level DaVita employees to a national benchmark before, during, and after the alleged conspiracy periods (Report ¶ 47); and

- The data he relied upon in conducting those tests: compensation and termination information maintained by DaVita in the normal course of its business, data he collected on LinkedIn, data on salaries for U.S. management occupations in outpatient care centers published by the U.S. Bureau of Labor Statistics, and data on turnover for executives and managers in the U.S. healthcare industry published by the U.S. Census Bureau (*id.*).

Defendants have provided the Government with all of the data relied upon by Dr. Cremieux, as well as the computer code (scripts) with which he implemented his analysis. These computer scripts provide a detailed, step-by-step procedure for translating the data Dr. Cremieux relied on into the results he presented; indeed, running the code could *reproduce* Dr. Cremieux's results.[3]

---

[3] On March 18, 2022, Defendants produced revised LinkedIn data, and on March 20, 2022, at the Division's request, Defendants produced files for the publicly available data that had already been identified by Defendants. Otherwise, the Division has had the underlying compensation and employee movement data that Dr. Cremieux relies on for months, as Defendants produced it along with the production of its Rule 16 materials. These materials, along with the publicly available data, were identified on Defendants' January 24, 2022 draft exhibit list.

As the Tenth Circuit has explained, "[r]eliability is primarily a question of validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *See In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014). The methodologies Dr. Cremieux used—such as the difference-in-differences or benchmark before-during-after methodology—are well-recognized as valid methodologies for analyzing the economic impact of alleged conduct in antitrust cases. *See, e.g., Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 808 (7th Cir. 2012) (indicating that "economic and statistical methods used by the Federal Trade Commission … to analyze antitrust impact" include a "basic method, called 'difference-in-differences,'"); *In re Evanston Nw. Corp. Antitrust Litig.*, No. 07-CV-04446, 2013 WL 6490152, at *6 (N.D. Ill. Dec. 10, 2013) (noting that "the Seventh Circuit expressly credited" "difference-in-differences analyses"); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 391 (D.R.I. 2019) (finding "before-during-after" method "reliable"); *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 24 n.3 (1st Cir. 1999) (noting that the "before and after" method is an "accepted method[] of economic analysis").

The Division's bare assertion that "nowhere in the expert report does Dr. Cremieux cite a scholarly article that has ever taken this approach to determining whether an employee allocation agreement existed" is a red herring because the methodology relied upon has been allowed in antitrust litigation. *Id*. at 4. Dr. Cremieux's use of a "difference-in-differences" analysis and "before-during-after" approach are commonly accepted methods of economic analysis that are applied in a range of situations by professional economists, and so is his analysis of outcomes to benchmarks, *see In re Urethane Antitrust Litig.*, 768 F.3d at 1249 (affirming district court's

8

admission of expert testimony that included the use of a benchmark analysis). If the Division wishes to criticize Dr. Cremieux's accepted economic methodology, it can do so on cross examination. Exclusion is not appropriate when an attack clearly goes to the weight of the evidence. *See, e.g.*, *Coffman v. Yeakel*, No. 17-cv-01472-RBJ, 2019 WL 2614558, at *2 (D. Colo. Apr. 1, 2019) (Jackson, J.) (holding that the expert's potential bias and the reliability of his opinions can be explored on cross-examination on trial). Dr. Cremieux's opinions and the methods used to develop them are scientifically reliable under the *Daubert* standard and should be admitted.

## II. THE OPINIONS OUTLINED IN SECTIONS IV AND VIII ARE RELIABLE AND WILL ASSIST THE TRIER OF FACT

The Division does not claim that the opinions described in Sections IV and VIII of the Report are unreliable under the *Daubert* standard. Instead, they argue that those opinions will not "assist" "the trier of fact to understand the evidence or to determine a fact in issue." Dkt. 213 at 4-5. That argument both misconstrues Dr. Cremieux's opinions described in those Sections and the Rule 702 standard, and ignores the Court's prior rulings in this case.

The Division argues that the opinions described in Section IV of the Report should be excluded because an expert is not needed to present *the evidence underlying those opinions*— specifically that the alleged co-conspirators hired one another's employees during the alleged conspiracy periods and offered competitive inducements to employees who provided "notice"— "in front of a jury" or for the jury to "digest[]" that evidence. Dkt. 213 at 5. But that misses the crux of Dr. Cremieux's expected testimony. Dr. Cremieux is not simply opining that employees in fact moved across companies or that they in fact received promotions or other competitive inducements; instead, Dr. Cremieux opines that, as a matter of economics, the existence of those

9

two sets of facts is inconsistent with the Division's allegations that a market allocation agreement existed in this case. *See* Report at ¶¶ 36-40. Those opinions bring to bear his expertise as an economist, which the Division has not challenged, and are part of, and cannot be separated from, his evaluation of various economic evidence to determine whether it is consistent with what economically could be expected if there were labor market allocation agreements.

These opinions are exactly the type of evidence that this Court has repeatedly ruled is admissible: "evidence of salary increases and other beneficial effects are relevant to disprove that the purpose of the agreement was to allocate a market." Order Resolving Disputes on Proposed Jury Instructions, Dkt. 214 at 10; Order Resolving Motions *in Limine*, Dkt. 210 at 11; *see also Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) ("[Plaintiffs] suggest that the Agreement may be a supplier allocation, but the facts do not bear this interpretation; the *Agreement permits transfers*" (emphasis added)); *United States v. Penn*, No. 1:20-cr-00152, Dkt. 649 at 7 (D. Colo. Oct. 15, 2021) (upholding introduction of expert testimony that the economic outcomes "are not consistent with those that economists would expect to find in the presence of a price fixing or bid-rigging agreement.").

In addition, the Court found that "a horizontal market allocation *requires cessation of 'meaningful competition'*" in the allocated market. Dkt. 214 at 6 (emphasis added). Dr. Cremieux's opinion that the economic evidence is inconsistent with the stifling of labor competition between DaVita and alleged co-conspirators that would be expected if there were a labor market allocation, will assist the trier of fact in evaluating whether there was the cessation of meaningful competition.

The Division's argument that the opinions outlined in Section VIII of the Report—which address the economic incentives of the alleged co-conspirators in Count 1—are inadmissible is a *non sequitur*. Specifically, the Division argues that Dr. Cremieux's opinion that companies, such as SCA, have unilateral interests in not soliciting employees from companies, such as DaVita, which they view as actual or potential strategic partners will not "assist the trier of fact" because the only issue in the case is "whether the alleged agreement existed." Dkt. 213 at 5. First, the Court has ruled on several occasions now that the Division must prove not only that an agreement to allocate the market for employees existed, but that the agreement has the purpose of actual allocation of employee markets, i.e., the purpose of cessation of "meaningful competition" in the allocated market. Dkt. 214 at 6. Dr. Cremieux's proffered opinion is directly relevant to both aspects. First, the opinion is relevant to whether a labor market allocation agreement existed: if a company has unilateral economic interests in engaging in the conduct (non-solicitation) charged, that is probative of whether or not such conduct was undertaken unilaterally or pursuant to an agreement to allocate labor markets. Moreover, and perhaps more significantly, the opinion goes to the critical issue identified by this Court in both the Motion to Dismiss Order and with respect to the jury instructions. As this Court has held, the Division must prove that the alleged conspirators acted with a purpose to allocate markets. Companies that decide not to solicit, or to limit solicitation, from other companies in order to promote opportunities for other collaborations are not acting with a purpose of allocating markets. While the Court has determined that there can be multiple purposes, Dr. Cremieux's opinions in Section VIII of the Report are highly relevant to the assessment to what the purpose was in this case and will assist the jury in deciding those central questions.

11

At bottom, the Division's argument rests on a basic misunderstanding of the purpose of expert testimony. The Rule 702 issue is not whether the evidence underlying opinion evidence could be introduced through other means; nor is it whether the jury is capable of "digesting" or interpreting that evidence. *Cf.* Dkt. 213 at 5. "Whether an expert's testimony will *assist* the trier of fact to understand the evidence or to determine a fact in issue, as set forth in Fed.R.Evid. 702, is the central criterion for allowing his or her testimony. Under the Rules, courts allow an opinion by a legal expert in which the expert applies the principles of his expertise … to the facts in evidence. Doubts about the usefulness of expert testimony should generally be resolved in favor of admissibility." *Gindes v. Gindes*, 864 F. Supp. 159, 162 (D. Colo. 1994) (emphasis added; internal citations and quotation marks omitted). That is precisely what Dr. Cremieux's opinions outlined in Sections IV and VIII of the Report do. They apply Dr. Cremieux's expertise in economics to interpret economic evidence, specifically, whether the economic evidence is consistent or inconsistent with agreements to allocate labor markets or entered with a purpose of allocating labor markets. *See generally*, *Cont'l Baking Co. v. United States*, 281 F.2d 137, 141, 145 (6th Cir. 1960) (defendants entitled to introduce "explanatory economic evidence" of "factors affecting price changes" to disprove existence of *per se* price-fixing agreement). Testimony concerning those opinions should therefore be admitted to aid the jury.

### III.     THE OPINIONS IN SECTION VII OF THE REPORT ARE RELEVANT.

The Division's final argument—that Dr. Cremieux's opinion in Section VII is not relevant in this case—should likewise be rejected. In Section VII, Dr. Cremieux posits that "a labor market allocation agreement would only make *economic* sense if conspiring firms had power to meaningfully reduce labor competition and suppress compensation" and finds that

12

because the competition for at-issue employees was so broad, DaVita and its alleged co-conspirators did not have the ability to "meaningfully suppress competition for labor or put downward pressure on compensation" and therefore "lacked economic rationale to enter into market allocation agreements for the purpose of allocating labor." Report at ¶¶ 48-49; 55. This opinion is highly relevant to issues central to this case: whether the alleged conspirators had a purpose of allocating labor markets, and whether labor market allocation agreements existed.

This Court has repeatedly held that, as part of its case-in-chief, the Division must prove that Defendants had the "intent to allocate the market" for senior executives (count 1) and other employees (counts 2 and 3). *See, e.g.*, Order Resolving Motions *in Limine*, Dkt. 210 at 11 ("[T]he Court has held that defendants' intent matters. The evidence in question might be probative of the defendants' intent or lack of intent to enter into a horizontal market allocation agreement, or in the Court's words, whether the defendants intended to allocate the market as charged in the indictment."); Order Denying Defendants' Motion to Dismiss, Dkt. 132 at 18-19 (the Division "will not merely need to show that the defendants entered [a] non-solicitation agreement," but "will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the market for senior executives (Count 1) and other employees (Counts 2 and 3)," and "that the defendants intended to allocate the market."); Order Resolving Disputes on Proposed Jury Instructions, Dkt. 214 at 8-9 ("In my understanding, conspiracy requires two types of intent: the intent to join the conspiracy and the intent to further the conspiracy's ends. The Court was referring to the second type of intent when it held that the government will have to prove beyond a reasonable doubt that defendants entered into an

13

agreement with the purpose of allocating the market for employees."); *Id*. at 6 ("I find that a horizontal market allocation *requires cessation of 'meaningful competition'*") (emphasis added).

Dr. Cremieux's opinion, based on his review of the economic evidence about which companies hired senior-level DaVita employees, senior-level SCA employees, Company B employees, and Company C employees is that the alleged conspirators could not reasonably have believed that the limited alleged agreements between them could allocate the markets which encompass DaVita employees. This opinion is clearly relevant and probative of whether the alleged conspirators actually had that purpose. *See Bogan*, 166 F.3d at 515 ("[E]xperienced NML agents do not comprise the entire set of suppliers of their services. Thus, while the Agreement may constrain General Agents to some degree, it does not allocate the market for agents to any meaningful extent.").

The Division does not challenge the reliability of Dr. Cremieux's methodology for assessing competitive alternatives available to employees of DaVita, or his assessment of the economic implications of those alternatives. Those opinions are also reliable and admissible pursuant to Rule 702. Any issue the government takes with these opinions can be explored on cross examination and go to the weight the jury should give the opinions, not the admissibility.

## CONCLUSION

Dr. Cremieux's opinions are relevant and reliable. There is no legal basis to exclude his testimony. The Division's motion should therefore be denied.

| | |
|---|---|
| Dated: March 29, 2022 | Respectfully submitted, |
| | /s/ *John F. Walsh III* |
| SETH P. WAXMAN | JOHN F. WALSH III |
| WILMER CUTLER PICKERING HALE & DORR LLP | WILMER CUTLER PICKERING HALE & DORR LLP |
| 1875 Pennsylvania Avenue NW | 1225 17th Street, Suite 2600 |
| Washington, DC 20006 | Denver, CO 80220 |
| (202) 663-6000 | (720) 274-3154 |
| seth.waxman@wilmerhale.com | john.walsh@wilmerhale.com |
| | |
| JOHN C. DODDS | J. CLAYTON EVERETT, JR. |
| MORGAN LEWIS & BOCKIUS LLP | MORGAN LEWIS & BOCKIUS LLP |
| 1701 Market Street | 1111 Pennsylvania Ave. NW |
| Philadelphia, PA 19103-2921 | Washington, DC 20004-2541 |
| (215) 963-4942 | (202) 739-5860 |
| john.dodds@morganlewis.com | clay.everett@morganlewis.com |

*Counsel for Defendant DaVita Inc.*

| | |
|---|---|
| CLIFFORD B. STRICKLIN | JEFFREY E. STONE |
| KING & SPALDING | DANIEL CAMPBELL |
| 1401 Lawrence Street, Suite 1900 | McDermott Will & Emery LLP |
| Denver, CO 80202 | 444 W Lake St. |
| (720) 535-2327 | Chicago, IL 60606 |
| cstricklin@kslaw.com | (312) 984-2064 |
| | jstone@mwe.com |
| | dcampbell@mwe.com |
| JUSTIN P. MURPHY | |
| MCDERMOTT WILL & EMERY LLP | THOMAS M. MELSHEIMER |
| 500 North Capitol Street, NW | Winston & Strawn LLP |
| Washington, DC 20001-1531 | 2121 N. Pearl Street, Suite 900 |
| (202) 756-8018 | Dallas, TX 75201 |
| jmurphy@mwe.com | (214) 453-6401 |
| | tmelsheimer@winston.com |

*Counsel for Defendant Kent Thiry*

**CERTIFICATE OF SERVICE**

I certify that on March 29, 2022, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

/s/ *John F. Walsh III*
John F. Walsh III