IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-cr-0229-RBJ

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. DAVITA INC.,
2. KENT THIRY,

        Defendants.

---

**DEFENDANTS' RESPONSE TO
THE COURT'S PROPOSED MARKET ALLOCATION JURY INSTRUCTION**

---

In a series of rulings before trial, this Court held that not every no hire or non-solicitation agreement between two competing employers constitutes a *per se* illegal market allocation agreement, ECF No. 132 (Order on MTD) at 16-17, that the government must prove at trial that the defendants intended to enter an agreement to allocate "the market for senior executives (Count 1) and other employees (Counts 2 and 3)," *id.* at 18-19, and that *per se* market allocation agreements require the "cessation of meaningful competition in the allocated market." ECF No. 214 (Order on Jury Instructions) at 6. The defense case presented in DaVita's opening statement was based on those rulings—and was presented to the jury without objection from the government. Only a day after DaVita's opening statement did the government belatedly object that the defense opening had somehow misstated the law, and sought a new instruction to the jury that radically altered how this case could and should be considered by the jury.

1

Even after its untimely objection, the government has elicited from witnesses—and continues to do so—evidence indicating that competition for DaVita and SCA employees is fierce, spans state lines and involves many companies not a part of the alleged market allocation agreements.  The Court's proposed market instruction effectively calls on the jury to disregard the very evidence the government itself has elicited through its witnesses and that those witnesses have affirmed and expanded upon in cross examination.  That is inappropriate, highly prejudicial to the defense, and will be confusing to the jury.

The government's position—which has triggered the proposed instruction by the Court—is wrong as a matter of law.  Among other things, the draft jury instruction proposed by the Court on market allocation proposes the following language:

> The market … is *employment opportunities* for senior level employees at each other's companies.  The government contends that the companies, through their respective Chief Executive Officers Kent Thiry and Andrew Hayek, entered into agreements and understandings with the purpose of unlawfully allocating the market by ending meaningful competition between the two companies for their senior level employees.  *There are other companies in the health care industry and other industries that potentially would hire these same senior level employees, but that is not the market that is the subject of this case*.

Exhibit A (emphasis added).  The Court's proposed language instructs the jury that the "market" is the market "between the two [allegedly conspiring] companies," and that "other companies … that potentially would hire these same senior level employees … is not the market that is the subject of this case." *Id.*  This misstates the law, prejudices defendants, and invades the province of the jury in determining the market for senior executives (Count 1) and other employees (Counts 2 and 3) and defendants' intent.  If given, the Court's proposed instruction would not

2

only violate defendants' due process rights, but also would be reversible error on the merits of the instruction.[1]

## ARGUMENT

**I.   THE PROPOSED INSTRUCTION IMPROPERLY INSTRUCTS THE JURY THAT IT CANNOT CONSIDER COMPETITION IN "THE MARKET FOR SENIOR EXECUTIVES (COUNT 1) AND OTHER EMPLOYEES (COUNTS 2 AND 3)"**

The Court's proposed instruction that the "market" is simply the market "between the two [allegedly conspiring] companies," Exhibit A, is contrary to the law and this Court's prior holdings. Antitrust jurisprudence, including the labor market allocation cases that this Court's prior decisions cite and rely upon, identify the factual characteristics relevant to the determination of whether a restraint "allocates a market." One such factor is competition by other competitors who are not members of the alleged conspiracy. *See Bogan v. Hodgkins*, 166 F.3d 509, 515-16 (2d Cir. 1999). The Court's proposed instruction removes from the province of the jury a critical fact that can only be found by the jury. By instructing the jury to ignore the forces of supply and demand—the competition—for the employees in "the market for [DaVita and SCA] senior executives (Count 1) and [DaVita] employees (Counts 2 and 3)," MTD Order at 19, the Court would prevent the jury from determining whether there has been a "cessation of 'meaningful competition' in the allocated market," among competitors for employees in that market. Order on Jury Instructions at 6. In addition, it would prevent the jury from using that information to assess the purpose and intent at issue here.

---

[1] In response to the Court's request for comment on its draft instruction, defendants emailed the Court and the government a proposed redline to address some of the issues discussed in this brief. *See* Exhibit B. As noted in the email, defendants do not waive or withdraw their prior positions or arguments on jury instructions or the elements of the offense (as set forth in prior pleadings).

### A.     The Role of Competition in a Cognizable Antitrust Market

A market is the place where a product or service is bought and sold.  *See Bogan*, 166 F.3d at 516.  Markets are defined by the "reasonable interchangeability" of the product or service being bought and sold in the market, or the "cross-elasticity of demand between the product [or service] and its substitutes."  *Id.*  The Tenth Circuit has explained this definition as follows:

> [A] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered. We also look to the geographic reach of the group of sales or sellers to determine the relevant market. Further, because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the 'relevant market' rests on a determination of available substitutes.

*SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994).

"The determination of the relevant market is generally a question of fact" for the jury to decide.  *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 n. 4 (10th Cir. 1984); *see also In re High-Tech Employee Antitrust Litigation*, 856 F.Supp.2d 1103, 1122 (N.D. Cal. 2012) (in case challenging no-poach agreements in the employment market, the court held that "[t]he existence of a 'relevant market' is typically a factual inquiry for the jury").  Within a market, "well-defined submarkets may exist which, in themselves, constitute product [or service] markets for antitrust purposes."  *Id.*  "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's [or service's] peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  *Id.*; *see also Bogan*, 166 F.3d at 516 (plaintiffs could have attempted to prove a "submarket" but had "not even made an effort to do so").

Some markets—called duopolies—have just two competitors. Other markets have numerous competitors.[2] Antitrust markets are <u>not</u> defined by the number of competitors in them, nor are they defined by the membership of a conspiracy. Rather, "[b]y defining the relevant market, [] we identify the firms that compete with each other." *SCFC ILC*, 36 F.3d at 966.

Thus, for a market defined as employees of a given company (as the government has done here in its Indictment), the relevant inquiry requires identifying all competitors for those employees. *See id*. Indeed, that is precisely what the Second Circuit did in *Bogan*, finding that, in labor market allocation cases, the relationship between the employees subject to a no-hire agreement and the competitors for those employees is dispositive. *See Bogan*, 166 F.3d at 516. Courts deem unlawful only those allocation agreements whose conspirators have the purpose of actually allocating—that is, ending meaningful competition for—that which is being allocated. *See* Order on Jury Instructions at 6. Although the conspirators need not allocate the entire

---

[2] The evidence introduced at trial thus far makes clear that there were hundreds of competitors in the market for the senior employees of DaVita and SCA. *See, e.g.*, April 7, 2022 Tr. (Hayek testimony) at 23:10-18 ("Q. The market was competitive? A. Yes. Q. It would not be accurate to say that you recruited from just one or two or three or four different companies; right? A. Correct, we recruited from a large number of companies, and, you know, I think later we codified that in a list that was, you know, *hundreds of companies*.") (emphasis added); GX 70-1 (PowerPoint listing 560 companies from which SCA could recruit); April 6, 2022 Tr. (Fanning testimony) at 27:2-6 ("Q. …[O]ur focus has been your work on the possible target companies for SCA to hire, but the truth is, this also reflects to some extent companies that could hire from SCA, as well? A. Yes."), 161:20-25 ("Q. I believe you used the word talent previously, could you describe what that means to you? A. Yes. It means people that are highly skilled in high demand in the marketplace, there is a lot of competition for these people, and they likely have multiple option and possibly even multiple offers."); April 7, 2022 Tr. (Gabriel testimony) at 193:22-194:3 ("Q. … [Cameron Cleeton] considered four opportunities, in fact, considered which one he wanted, and ultimately came to Radiology Partners; correct? A. That's correct."); April 6, 2022 Trial Tr. (Rucker testimony) at 155:15-19 ("Q. During your tenure at SCA, how competitive was the job market for senior-level employees? A. I remember it being competitive, we needed to work hard to recruit people to SCA, tell our story, compensate, culture, allow people to work from home, things like that.").

5

market to be liable, they must have intended, through their agreement, to produce a cessation of meaningful competition in that market. *See id.* at 8, 6.

### B. This Court Held That Not "Every Non-Solicitation Agreement or Even Every No-Hire Agreement Would Allocate the Market," and Cases Involving Such Agreements Show the Relevance of Competition By Non-Conspirators

In its motion to dismiss order, the Court held that "the government has sufficiently alleged that defendants allocated the market with their non-solicitation agreement. It does not follow that every non-solicitation agreement or even every no-hire agreement would allocate the market." MTD Order at 17. Rather, only those "no-hire agreements *that allocate the market* have been considered per se unreasonable as horizontal market allocation agreements." *Id.* at 17.[3] In so holding, this Court relied on *Bogan*, 166 F.3d 509. The Court again relied on *Bogan* in its order resolving disputes on proposed jury instruction, writing that "the Second Circuit found that [a no-hire] agreement was not subject to *per se* treatment because it did 'not allocate the market for agents to any meaningful extent.'" ECF 214 ("Order on Jury Instructions") at 7.

In *Bogan*, six "NML Agents" (employers) entered into a horizontal agreement not to hire each other's employees, thereby ending all competition among these six employers for all employees subject to the agreement. 166 F.3d at 511-12. In describing the facts of that case, the court highlighted several characteristics that might make no-hire agreements capable of causing

---

[3] The government has chosen to charge a *per se* case. And the Court has found it has alleged a restraint "so 'manifestly anticompetitive' and 'lacking any redeeming virtue' that [it] will almost always be illegal." MTD Order at 4. Specifically, the Court has found it has alleged a "horizontal market allocation agreement," which "is an agreement between competitors at the same level of the market structure to allocate a market [in] order to minimize competition." *Id.* at 5. The government could have chosen to allege something other than "market allocation"— that an agreement solely impacting the competition *between two companies* violated the Sherman Act—but that type of agreement does not fit within the "market allocation" category that courts have found "manifestly anticompetitive," and would be analyzed under the rule of reason.

6

the cessation of meaningful competition in the allocated market, i.e., capable of actually allocating the market for employees. *Id.* at 515. Explaining that "the parameters of a market [for employees] are defined by the cross-elasticity of demand between the product [i.e., employee services] and its substitutes," the Second Circuit declined to invoke the *per se* rule to the challenged no-hire agreement among the six employers, reasoning that:

> [Plaintiffs] suggest that the Agreement may be a supplier allocation, but the *facts* do not bear this interpretation; the Agreement permits transfers, and experienced NML agents do not comprise the entire set of suppliers of their services. Thus, while the Agreement may constrain General Agents to some degree, it does not allocate the market for agents to any meaningful extent.
>
> […] The [Plaintiffs] argue that the specialized training and expertise of experienced NML agents creates a submarket distinct from the market for all NML sales agents … and from the general market for insurance sales agents in New York. But they have introduced *no factual evidence* regarding the demographics of the New York insurance market. In the end, the problem with the [Plaintiffs]' proposed submarket is that *other insurance companies compete for the services of experienced NML agents, as is clearly evidenced by the [plaintiffs] having found other work after being terminated from NML.*

*Id*. at 515-16 (emphasis added; internal citations and quotation marks omitted).

Similarly, in *Coleman*, the district court found that, "as a matter of law," a no-hire agreement between 3M and General Electric did not "stifl[e] [] competition," and did not violate the Sherman Act even under the rule of reason, because:

> "[T]he *employees were free to choose* whether they desired employment with [another company] … the Court cannot find there was anything more than incidental, if that much, impact on the employment market. … ***[T]he agreement, if it did this much, only precluded the plaintiffs from selling their services to one corporation***, and there is no allegation, nor any basis for one, that this prevention had anything more than a de minimis impact on **the employment market in general**."

643 F. Supp. 1229, 1243 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987) (emphasis added).

And in *Deslandes v. McDonald's USA,* the district court explained that *per se* treatment is warranted only where there is "no competition for talent" such that employees "have no choice but to accept the salary set by their" employers. 2018 WL 3105955, at *6 (N.D. Ill. June 25, 2018).[4] In other words, the court found that market allocation would exist if the affected employees were forced to continue working at their current employer—not merely that the affected employees were precluded from moving to one of the companies that were party to the agreement (in that case, other McDonald's franchisees).

These three cases support this Court's prior holding that not "every non-solicitation agreement or even every no-hire agreement would allocate the market." MTD Order at 17; *see also id.* ("As the precedents on no-hire agreement show, there are no-hire agreements that do not allocate the market, and I assume the same is true of non-solicitation agreements. … What I conclude is that if naked non-solicitation agreements or no-hire agreements allocate the market, they are per se unreasonable."). And in each case, the court recognized that the specific agreement at issue might be incapable of causing a cessation of meaningful competition in the allegedly allocated market in part because numerous non-conspirator companies also competed for the services of the employees in the allegedly allocated market.

### C. This Court Held That Some Labor Non-Solicitation Agreements and No-Hire Agreements <u>Can</u> Allocate the Market, and Cases Involving Such Agreements Also Demonstrate the Relevance of Competition By Non-Conspirators

The Court has also held that non-solicitation agreements and no-hire agreements *can* constitute market allocation agreements under the right circumstances. *See* MTD Order at 16

---

[4] While the court found that the no-hire agreement at issue was not *per se* unlawful because it was ancillary to a franchise agreement, the court's language is nevertheless instructive on why naked horizontal no-hire agreements are *per se* unlawful.

8

("where no-hire agreements have been found per se unreasonable, it has been because the court found that the agreement was … a naked agreement to allocate the market."). This holding, too, is supported by the caselaw, which demonstrates that market allocation requires cessation of meaningful competition *in the allocated market*, not merely between two competitors.

Numerous cases illustrate the point. For example, in *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, the court found that plaintiffs had plausibly alleged an "overarching agreement among all three of the largest rail equipment suppliers" in the country not to compete for each other's employees. 395 F. Supp. 3d 464, 474, 481 (W.D. Pa. 2019). In so holding, the court noted plaintiffs' allegation that the three alleged conspirators were "the three largest rail equipment suppliers and some of the largest employers in the rail industry," and that there was a "high demand for and limited supply of skilled employees who have rail industry experience." *Id.* Thus, the court concluded that plaintiffs' allegations were "sufficient to support a reasonable inference that at least by 2014 when all three competitors had entered into no-poach agreements they were engaged in conduct that would limit competition for the employees of each company." *Id.* Likewise, in *In re High-Tech Emp. Antitrust Litig.*, seven large technology companies—in other words, most of the largest employers of skilled technology employees in the San Francisco Bay Area—allegedly entered into an "interconnected web of express bilateral agreements" not to solicit or hire the employees from each other. 856 F. Supp. 2d 1103, 1110 (N.D. Cal. 2012).

Had these cases been resolved on their evidentiary merits, the record may have shown that the no-poach agreements at issue allocated the market for the employees subject to those agreements—i.e., the market for skilled railroad employees (*In re Ry. Indus.*) and the market for skilled technology employees (*In re High-Tech*). The alleged evidence in all of these cases

9

reflected the limited supply of skilled employees in each industry, and that the co-conspirators who entered into the no-poach agreements were the main or sole competitors for those skilled employees. As such, the evidence in those cases may have supported the plaintiffs' claims that the agreements were capable of meaningfully suppressing competition in the markets because they eliminated the most important competitors in the competitive process for those employees.[5] Importantly, the no-poach agreements in these cases were capable of allocating the market for employees even though none of the agreements "allocated the entire market for" skilled railroad employees and skilled technology employees. *See* Order on Jury Instructions at 8.

Indeed, even the customer allocation cases relied upon by the government involved factual situations suggesting that the conspirators had the power, or at least believed that they did, to control the market outcomes for the customers allocated in those cases. In *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 476 (10th Cir. 1990), the evidence was that the conspirators met, and "[a]fter that meeting, Pratt told Boxley that 'the price war [is] over, that [Pratt] and [Ronan] had reached an agreement' and that 'Ronan's was going to get their builders back and that [Suntar] would be getting [their] builders back.'" In other words, the evidence was that the conspirators in that case believed that they could, solely through their agreement, control which customers each competitor would get (i.e., Ronan was going to "get their builders back" and Suntar was going to "get their builders back"). Similarly, in *United States v. Kemp Assocs., Inc.*, 907 F.3d 1264 (10th Cir. 2018), the agreement applied only to those customers (heirs) which both conspirator companies initially approached and which *one of the conspirators* secured as a customer. No other jury instruction of which we are aware—including the various instructions

---

[5] *See supra* n.2.

cited by the government—even implicitly instructs the jury to disregard competition that might affect competitive outcomes for that which was allegedly allocated and, thus, implicate whether the underlying agreements had the purpose of allocating markets (or customers).[6]

### D. The Court's Proposed Instruction Contradicts These Antitrust Principles and the Court's Own Holdings

The Court's proposed instruction states, "[t]he market … is employment opportunities for senior level employees at each other's companies" and "[t]here are other companies in the health care industry and other industries that potentially would hire these same senior level employees, but that is not the market that is the subject of this case." Ex. A. This language contradicts the Court's prior holding that the government "will have to prove beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the market for senior executives (Count 1) and other employees (Counts 2 and 3)." MTD Order at 18-19.

The Court's proposed language conflates *what* is being allocated (i.e., the market for the labor of DaVita's and SCA's senior executives in Count 1 and DaVita's employees in Counts 2 and 3) with *who* can compete in that market (the alleged co-conspirators, as well as any other company that might recruit the employees in the market). The Court's proposed language relieves the government of the burden to prove that the alleged no-solicitation agreements had the purpose of allocating—ceasing meaningful competition in—a genuine market. *See* Order on

---

[6] The Court was correct in finding "[t]he novelty of this case" warrants "depart[ure] from the instructions of customer-allocation cases." Order on Jury Instructions at 3. Labor market allocation is very different than customer allocation. Customers seek to buy a very specific product (e.g., a TV) or service (e.g., a notary public) and are typically unwilling to travel long distances to purchase marginally cheaper competing products, making it easier for sellers to allocate the market for those customers. By contrast, DaVita senior executives were recruited by companies inside and outside the healthcare industry and would often relocate for the right job.

11

Jury Instructions at 6. The proposed instruction would make every non-solicitation and no-hire agreement a violation of the Sherman Act, even if the conspirators had no intent to cease meaningful competition in a labor market—a result that directly conflicts with this Court's finding that not "every non-solicitation agreement or even every no-hire agreement would allocate the market." MTD Order at 17. The Court's proposed language improperly defines the market under Tenth Circuit and Supreme Court precedent and improperly invades the province of the jury to determine whether competition meaningfully ceased in the relevant market as a matter of fact. *See Slocum v. New York Life Ins. Co.*, 228 U.S. 364, 385 (1913) ("It was the province of the jury to pass upon the issues of fact, and the right of the defendants to have this done was secured by the Constitution of the United States.").

A simple hypothetical highlights the point. There are hundreds of babysitters in the Central Park neighborhood in Denver. Two neighbors have children the same age, and both families hire babysitters, meaning that the two neighbors are horizontal competitors in the market for babysitters. Assume that the two neighbors agree not to solicit or hire each other's babysitters for the sake of not causing tension with one another. Under the Court's proposed jury instruction, the two neighbors violated the Sherman Act because they "allocated" the two babysitters to their respective households. This outcome is nonsensical, as the two babysitters subject to the non-solicit or no-hire agreement could be solicited and hired by hundreds of other families in Central Park, and presumably thousands of families in the Denver area, or even day care centers, making abundantly clear that competition in the market for babysitters in Central Park and elsewhere in Denver could not possibly have ceased in any meaningful way.

The jury must decide, based on the evidence introduced at trial,[7] whether the charged non-solicitation agreements were capable (if successfully implemented) of actually allocating "the market for senior executives (Count 1) and other employees (Counts 2 and 3)," MTD Order at 19, by causing a "cessation of 'meaningful competition' in the allocated market," Order on Jury Instructions at 6. This requires the jury to consider the totality of the supply and demand dynamics *for those employees*. Instructing the jury to ignore evidence about the demand from numerous other competitors for the affected employees—indeed, there are numerous companies competing for DaVita's employees in Colorado alone—denies the jury its ability to determine whether the purpose of the agreements was to cease meaningful competition in the market. To do so at this late juncture would confuse the jury as to the extensive trial evidence about the competition for DaVita executives and employees.

## II. THE PROPOSED LANGUAGE IMPROPERLY INSTRUCTS THE JURY ON THE ELEMENT OF INTENT

The Court's proposed language also improperly instructs the jury on the element of intent. Even if the Court could define the market for the jury as the market "between" two conspirators, the Court's proposed language contradicts its own prior ruling on the motion to dismiss and effectively instructs the jury not to fully consider the state of mind of defendants. Again, the babysitter example is instructive. Just as the neighbors in the babysitter example above may not have intended to allocate the market for their babysitters given the thousands of other families in Denver who could hire their babysitters, defendants may not have *intentionally* allocated "the market for senior executives (Count 1) and other employees (Counts 2 and 3),"

---

[7] *See supra* n.2.

MTD Order at 19, because defendants may not have reasonably expected or believed their agreements would result in the cessation of meaningful competition for those employees in part based on the breadth of other available market alternatives. It would also instruct the jury to ignore other forms of competition—including evidence of procompetitive effects the Court has held is admissible and probative of intent. *See* ECF No. 210 (Order on Pending Motions) at 3-4.[8]

This type of intent evidence is commonly admitted in antitrust cases. *See U.S. v. Aiyer*, 470 F. Supp. 3d 383, 414 (S.D.N.Y. 2020) (admitting market-wide pricing evidence for the "permissible purpose of showing that the defendant … *lacked the specific intent* to engage in the conduct that comprised the object of the conspiracy.") (emphasis added); *U.S. v. Usher*, No. 17-cr-0019, Dkt. 158 at 33 (S.D.N.Y. Sept. 28, 2018) (admitting "market practices" as evidence of intent to fix prices); *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 446 (1978) ("it would be correct to instruct the jury that it may infer intent from an effect on prices"); *U.S. v. Penn*, No. 1:20-cr-00152, Dkt. 649 at 7 (D. Colo. Oct. 15, 2021) (admitting procompetitive effects "as part of [the defendants'] theory that there was no agreement."). But the Court's proposed instruction would effectively tell the jury that it cannot infer the lack of intent from such evidence, and thus tell the jury what result to reach on that element of the offense.

---

[8] For example, the proposed instruction would effectively tell the jury to ignore procompetitive evidence that, by providing notice to their supervisors of their interest in exploring outside job opportunities, some DaVita employees received raises and promotions as part of DaVita's efforts to retain them. *See* Apr. 6, 2022 Tr. (Rucker testimony) at 123:21-124:1 ("Q. … the tell your boss provision of the agreement, your understanding was that the purpose of that provision was to allow whichever company was being recruited from to try to compete to keep the employee; correct? A. Correct."). And it would also tell the jury to ignore evidence that Richard Whitney's purpose—maintaining a business relationship with Mr. Thiry and DaVita—bore fruit when Mr. Thiry introduced Mr. Whitney to an important business partner named Harry Kraemer. *See* Apr. 8, 2022 Tr. (Whitney testimony) at 115:13-116:9.

### III. THE PROPOSED INSTRUCTION WOULD VIOLATE DEFENDANTS' DUE PROCESS RIGHTS

The Court's proposed instruction would violate defendants' due process rights. In addition to misstating the law, and instructing the jury to ignore competition in the market, the proposed instruction contradicts numerous of the Court's decisions in this case on which defendants reasonably relied to prepare their trial defense. These include:

- The Court's order on defendants' motion to dismiss, which held that the government must prove an "agreement with the purpose of allocating the market for senior executives (Count 1) and other employees (Counts 2 and 3)," MTD Order at 19; contained a paragraph-long discussion of *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999); and said nothing about a "market *between the two companies*," Exhibit A;

- The Court's order on jury instructions, which held that "horizontal market allocation requires cessation of 'meaningful competition' in the allocated market," Order on Jury Instructions at 6; found that "[t]he novelty of this case persuades me to depart from the instructions of customer allocation cases," *id.* at 3, again cited *Bogan*, *id.* at 7, and again said nothing about a "market *between the two companies*," Exhibit A;

- The Court's preliminary jury instruction, which told the jury that "in this case the government alleges that the defendants conspired with three competitor companies to allocate the market for employees," ECF No. 234 at 1; and again said nothing about a "market *between the two companies*," Exhibit A.

Defendants acted in reasonable reliance on this "law of the case." *United States v. Burger*, 16 F.3d 417 (1993) ("The law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"). They gave their opening statement based on the Court's preliminary instruction, ECF No. 234, and have tailored their trial strategy to the totality of the Court's decisions to date. To create an entirely novel instruction, inconsistent with the Court's prior rulings (and wrong as a matter of law), halfway through trial would deprive defendants of their right to a fair trial. *See Sandstrom v. Montana*, 442 U.S. 510, 520-521 (1979) (jury instruction unconstitutional where it

15

"had the effect of shifting the burden of proof on the issue of purpose or knowledge"); *U.S. v. Kamahele*, 748 F.3d 984 (10th Cir. 2014) (reversal warranted if there is "substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations").

As the Court itself has repeatedly observed, the Court and the lawyers for both the defendants and the United States do not have "even a remotely similar idea" as to the meaning of market allocation. *See* 4/5/21 Rough Trial Tr. at 232:3-5; 4/6/21 Rough Trial Tr. at 1:6-10. The Court's common-sense observations define the problem: under these circumstances—imposing a novel and incorrect instruction after the trial has begun, opening statements have been made, evidence has been tendered and subject to cross-examination and the government is about to rest its case—prejudices defendants.[9] This prejudice is compounded by the proposed instruction's departure from the prior rulings of the Court. For the reasons tendered in defendants' motion to dismiss and earlier submissions on the question of proposed instructions, defendants object to the new and erroneous instruction proposed by the Court as a violation of their due process rights.

## CONCLUSION

The jury instruction proposed by the Court violates defendants' due process rights, misstates the law, and deprives defendants of their right to a fair trial. It would be reversible error. Defendants respectfully request that the Court instruct the jury on the meaning of market allocation consistent with the law and this Court's prior rulings.

---

[9] The very fact that this dispute over the proper definition of the basic elements of the crime charged in this case persists, underscores why the novel language now proposed for the first time by the Court demonstrates how the defendants did not have "fair warning" that their conduct might be considered criminal. "To satisfy due process," the law "must define the criminal offense … with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Skilling v. United States*, 561 U.S. 358, 402 (2010) (cleaned up).

| Dated: April 8, 2022 | Respectfully submitted, |
|---|---|
| Jeffrey E. Stone<br>Daniel Campbell<br>McDermott Will & Emery LLP<br>444 W Lake St.<br>Chicago, IL 60606<br>(312) 984-2064<br>jstone@mwe.com | /s/ *John F. Walsh III*<br>John F. Walsh III<br>Wilmer Cutler Pickering Hale & Dorr LLP<br>1225 17th Street, Suite 2600<br>Denver, CO 80220<br>(720) 274-3154<br>john.walsh@wilmerhale.com |
| Justin P. Murphy<br>McDermott Will & Emery LLP<br>500 North Capitol Street, NW<br>Washington, DC 20001-1531<br>(202) 756-8018<br>jmurphy@mwe.com | John C. Dodds<br>Morgan Lewis & Bockius LLP<br>1701 Market Street<br>Philadelphia, PA 19103-2921<br>(215) 963-4942<br>john.dodds@morganlewis.com |
| *Counsel for Defendant Kent Thiry* | *Counsel for Defendant DaVita Inc.* |

**CERTIFICATE OF SERVICE**

I certify that on April 8, 2022, I filed the above document with the Clerk of the Court using CM/ECF, which will send electronic notification thereof to all registered counsel.

/s/ *John F. Walsh III*
John F. Walsh III