IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cr-00229-RBJ

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

1. DAVITA INC., and
2. KENT THIRY,

    Defendants.

_____

**REPORTER'S TRANSCRIPT**
TRIAL TO JURY - DAY THREE

_____

      Proceedings before the HONORABLE R. BROOKE JACKSON,
Senior Judge, United States District Court for the District of
Colorado, continuing at 9:05 a.m., on the 6th day of April,
2022, in Courtroom A902, United States Courthouse, Denver,
Colorado.

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1                     **A P P E A R A N C E S**

2            MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE
   CLINGAN and ANTHONY WILLIAM MARIANO, Attorneys at Law, U.S.
3  Department of Justice, Antitrust Division, Washington Criminal
   II Section, 450 5th Street N.W., Washington, DC, 20530,
4  appearing for the Government.

5            JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius
   LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103,
6  appearing for Defendant DaVita.

7            JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP,
   1225 17th Street, Suite 2600, Denver, Colorado, 80220,
8  appearing for Defendant DaVita.

9            THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn
   LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201,
10 appearing for Defendant Thiry.

11           JUANITA ROSE BROOKS, Attorney at Law, Fish &
   Richardson, 12860 El Camino Real, Suite 400, San Diego,
12 California, 92130, appearing for Defendant Thiry.

13                     *   *   *   *   *

14                   **P R O C E E D I N G S**

15        (In open court at 9:05 a.m.)

16        *THE COURT:*  Who are the brief writers who didn't get

17 any sleep last night?

18        *MS. LEWIS:*  No comment, Your Honor.

19        *THE COURT:*  Well, you folks have submitted another set

20 of instructions.  Despite the order that we sent out giving our

21 thoughts about instructions, you still are disagreeing on

22 almost every substantive instruction.  We'll take it from here,

23 and you'll get what you get.  I'll do the best I can.

24        (Jury in at 9:06 a.m.)

25        *THE COURT:*  Good morning, ladies and gentlemen.  Just

Bridget Fanning - Cross

1    think how lucky you are to be on jury duty.  You don't have to

2    be out there in the wind.  Nice and quiet in here; right?

3              Well, there is a little hot air in the courtroom

4    sometimes.

5              I'm sorry, Mr. Melsheimer.  I didn't mean you.

6              *MR. MELSHEIMER:*  Your Honor, I'm going to object to

7    facts not in evidence.  Unless you were referring to something

8    else, Your Honor.

9              *THE COURT:*  We're ready to continue your

10   cross-examination.

11             *MR. MELSHEIMER:*  We are.  We are missing only the

12   witness, Your Honor.

13             *THE COURT:*  Looks like somebody is bringing her for

14   you.

15             Good morning.

16             *THE WITNESS:*  Good morning.

17             *THE COURT:*  You're still under oath from yesterday.

18             Go ahead, Mr. Melsheimer.

19      (**BRIDGET FANNING, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**)

20                    **CROSS-EXAMINATION CONTINUED**

21   *BY MR. MELSHEIMER:*

22   *Q.*  Good morning, Dr. Fanning.  How are you?

23   *A.*  Good morning.  Thank you.

24   *Q.*  I want to start off where we ended yesterday, where we were

25   talking about the business of SCA.  Do you remember that?

Bridget Fanning - Cross

1   A.   Yes, I do.

2   Q.   And we were talking about the notion that SCA to be

3   successful needed to have relationships with other healthcare

4   providers and healthcare companies; right?

5   A.   Yes.

6   Q.   Because one of the things that SCA is looking for is

7   patients; right?

8   A.   Yes.

9   Q.   Because SCA operated these various ambulatory surgery

10  centers throughout the country, but they needed -- you know,

11  for people that needed the care, they needed people to come in

12  and get whatever surgical procedure that person needed; right?

13  A.   Yes.

14  Q.   You know that DaVita is a big dialysis company; right?

15  A.   Yes.

16  Q.   And it has thousands of patients that go to DaVita clinics

17  three times a week; right?

18  A.   Yes.

19  Q.   Those patients are having some pretty serious health

20  problems with end-stage renal disease; right?

21  A.   Yes.

22  Q.   But they also have other needs from a doctor or surgeon;

23  correct?

24  A.   I would suspect so, but I don't know that.

25  Q.   Well, just because you have end-stage renal disease doesn't

Bridget Fanning - Cross

1    mean you can't break your hip; right?

2    A.   Exactly.

3    Q.   Or need a knee replacement; right?

4    A.   Yes.

5    Q.   And so those -- that population of patients could have been

6    something very interesting to SCA's surgery centers to be able

7    to possibly affiliate or send patients to so they could get the

8    procedures there, as opposed to someone else; is that a fair

9    statement?

10   A.   You know, I've got to say, I'm not knowledgeable enough to

11   really say that.  I mean, I'm not familiar with the medical

12   situation of these patients.  I know that they needed dialysis,

13   but much beyond that -- I mean, everybody needs to see a

14   doctor.  But much beyond that, it's really out of my arena to

15   say.

16   Q.   Totally understand that, ma'am.  I don't really want to

17   focus on their particular need.  I'm really trying to focus on

18   the notion that patients that have -- wherever they're coming

19   from -- patients that have the need for surgeries are exactly

20   what SCA was looking for; fair statement?

21   A.   Yes.

22   Q.   That's why SCA developed these partnerships with other

23   surgical groups; right?

24   A.   Such as?

25   Q.   Such as surgeon groups, like an orthopedic surgeon group,

Bridget Fanning - Cross

1    like you talked about yesterday.

2    *A.*  Well, in those cases they were actual partnerships and

3    acquisitions that they made with the surgeons.

4    *Q.*  So in some cases SCA would actually, in a sense, invest

5    together with a group of doctors; fair?

6    *A.*  Yes.  Correct.

7    *Q.*  And in other cases, SCA would get relationships with

8    hospitals or health insurers or other health-related businesses

9    to get business for its surgery centers; fair?

10   *A.*  Yes.  Over my time with SCA, that business did grow.

11   *Q.*  But that really wasn't your role at the company, to

12   understand how all of that worked; right?

13   *A.*  No.

14   *Q.*  You didn't negotiate those kinds of relationships; right?

15   *A.*  No.

16   *Q.*  And you didn't have any real detailed knowledge of how all

17   of that worked; is that fair?

18   *A.*  Detailed knowledge, no.

19   *Q.*  So I want to go back to something you talked about -- so

20   thank you for that.

21        I want to go back to something we talked about

22   yesterday, which is Government Exhibit 278.  And if you recall,

23   ma'am, this was this gentleman, Mr. McKessar, who at the bottom

24   was seeking the possibility of seeking a position at SCA.  He

25   was at DaVita.  Do you remember this?

Bridget Fanning - Cross

1   A.  Yes, I do.

2   Q.  I wanted to point out to you the first bullet point he

3   gives there on his credentials.  He says, "Work for Lifeline,

4   which is a separate division from DaVita."

5            Now, if you don't know this, please tell me; but are

6   you aware that Lifeline was related to a business of DaVita

7   that involved something called vascular access, which is this

8   notion that to get kidney dialysis, you have to be able to have

9   a spot in someone's vein to be able to do the procedure?  Are

10  you familiar with that?

11  A.  No, I'm not.

12  Q.  Okay.  So -- and I take it if you're not familiar with

13  that, then are you also not familiar with the fact that SCA was

14  very interested in partnering with DaVita in connection

15  specifically with this Lifeline business, which involved

16  vascular surgery or vascular access surgery?  You don't know

17  anything about that; is that fair?

18  A.  I don't know what date that was, but I wasn't aware of

19  that.  But I don't know what date that discussions or whatever

20  took place.

21  Q.  Right.  But, of course, when you say you don't know what

22  date, the point is, you don't know one way or the other; right?

23  A.  No.  That's not true.

24  Q.  Well, let me ask it this way:  You came to DaVita -- you

25  came to SCA in about 2015; correct?

1    A.   No.

2    Q.   2014?

3    A.   Correct.

4    Q.   Right.  So if these discussions started in -- if there were

5    discussions, for example, in 2012, we can agree, you weren't at

6    the company at that time?

7    A.   That is correct.

8    Q.   I want to go to the top of that email, ma'am.  And I

9    think you and I are going to be talking a bit about this

10   concept.  But you respond to Mr. Haines -- and Mr. Haines was

11   one of these recruiters; right?

12   A.   Yes.

13   Q.   Are those sometimes called headhunters?

14   A.   Yes.

15   Q.   Because those are companies that make their money, in

16   effect, by going out and finding people to fill jobs; right?

17   A.   Yes.

18   Q.   They're hunting heads.  It's kind of a crude way of putting

19   it, but it's a common way of putting it?

20   A.   It's a very common term.

21   Q.   You say in response to this exchange with respect to

22   Mr. McKessar, you say, "Nate, if he can get his leader's

23   permission" --

24          Could you highlight that, sir?

25          Now, the word "permission" is nowhere in the emails

1   that we've seen from Mr. Hayek to you describing the agreement;

2   can we agree on that?

3   A.   Yes.

4   Q.   That's your word?

5   A.   Correct.

6        MR. MELSHEIMER:  Excuse me one moment.

7   BY MR. MELSHEIMER:

8   Q.   Thank you, Doctor.  Shifting gears a bit.  As we discussed

9   earlier -- yesterday -- your primary role at DaVita -- at SCA

10  was corporate recruiting; right?

11  A.   It was one of my responsibilities around talent management.

12  Q.   Let's put it this way:  That's most of what you talked

13  about yesterday when the prosecution asked you questions;

14  right?

15  A.   Yes.  That's right.

16  Q.   And during the time you were involved in that, you

17  identified hundreds of companies to recruit from -- to recruit

18  these senior employees from; correct?

19  A.   Correct.

20  Q.   You and others at SCA built lists of companies that you

21  could recruit from with the aid of certain recruiting or

22  headhunting firms; fair?

23  A.   Yes.  Correct.

24  Q.   So you reviewed some of those documents when the government

25  was asking you questions yesterday, but I want to go over a few

Bridget Fanning - Cross

1    of those things again.  Is that all right?

2    A.  Sure.

3    Q.  Okay.  Thank you.  So you involved -- so to be clear,

4    you've had decades of experience in the talent business; right?

5    A.  Yes.

6    Q.  I think you told us yesterday that you've been involved in

7    hiring thousands of people; is that right?

8    A.  Yes.

9    Q.  But you weren't knowledgeable enough just on your own to be

10   able to identify the companies from which SCA could potentially

11   recruit executives; fair?

12   A.  It was a collaborative effort.  Yes.

13   Q.  Right.  And that's not criticizing you at all.  I'm just

14   saying, you didn't have the knowledge -- even with your vast

15   experience, you didn't have the knowledge in this particular

16   space to identify on your own, without help, all of the

17   potential recruiting opportunities; is that fair?

18   A.  Yes.

19           MR. MELSHEIMER:  So I'd like to start with looking at

20   Government Exhibit 53-1, which is in evidence, Your Honor.

21   BY MR. MELSHEIMER:

22   Q.  And we're going to try to take this in chronological order,

23   ma'am.  But this is June of 2015; right?

24   A.  Yes.

25   Q.  And this is about, what, nine or ten months into your

Bridget Fanning - Cross

1    tenure at the company; is that fair?

2    A.  Yes.

3    Q.  This is an email from Mr. Hayek to you, where he's

4    responding to something you sent him from Spencer Stuart, which

5    is one of these recruiting outfits; right?

6    A.  Yes.

7    Q.  You actually say something that I noted on your direct

8    examination.  You said, "I'm surprised how interested I am in

9    these guys.  Mark seems to really in a genuine way" -- and you

10   have that sort of parentheses -- "for a recruiter."  Now, I

11   take it you meant -- well, what did you mean by that?

12   A.  Recruiters are paid substantial sums of money, about

13   33 percent, to recruit executives.  So each job is worth about

14   150, $200,000 to a recruiter; so I'm pretty cynical about

15   recruiters really working in my best interests.  I think

16   they're in it for the money in the main.  I think it's easy

17   money.

18   Q.  And that's what you meant for recruiters, like saying

19   someone is a nice person for a lawyer?

20   A.  I think there is a good comparison there.

21   Q.  It's a good comparison.  Okay.  So you made a point there

22   that I want to make sure that I understand.  The recruiters --

23   you said they're in it for the money; did I hear you right?

24   A.  Yes.

25   Q.  And so it's certainly conceivable -- and you've had this

Bridget Fanning - Cross

1    experience yourself -- that recruiters may present someone to

2    you or say something to you about someone being a great

3    candidate or being super interested, and they really may not be

4    that interested.  Fair?

5    A.  Yeah.  That's possible.

6    Q.  Because they're -- they have their role in the process, and

7    you have your role; fair?

8    A.  Yes.

9    Q.  Now, you sent what -- you say, "Any questions or thoughts

10   on the attached?"  And then he responds -- Mr. Hayek responds

11   and he gives some comments.  He says, "A few comments on the

12   attached."  And he says, page 7, "Overall, good outline."  He

13   gives a few specifics.  And then he says on the second bullet

14   point, "DaVita is off the table, given our relationship."  Do

15   you see that?

16   A.  Yes.

17   Q.  Now, you told the ladies and gentlemen of the jury

18   yesterday that the word -- that you read that to mean the

19   agreement between SCA and DaVita.  That's what you told the

20   jury; right?

21   A.  The agreement between Andrew Hayek and Kent Thiry.  Yes.

22   Q.  Understood.  I think we're talking about the same thing.

23   But to be fair -- I want to ask you two questions about that.

24   One is, I think you've already told me that you were not aware

25   of all the business relationships between SCA and all of the

Bridget Fanning – Cross

1    different companies; fair?

2    *A.* Not all of the relationships.  No.

3    *Q.* And, again, you just started with the company in 2014, not

4    back in 2012; right?

5    *A.* Correct.

6    *Q.* And he, Mr. Hayek, used the word "relationship."  Right?

7    *A.* Yes.

8    *Q.* All right.

9    *A.* In this email, he did.

10          *MR. MELSHEIMER:*  Then if we could go to what is

11   attached -- actually, this is a different attachment, ma'am.

12   Let me go to Exhibit 59-1.

13          Your Honor, 59-1 is not yet in evidence.  I offer it

14   as a Government Exhibit.

15          *MS. LEWIS:*  No objection, Your Honor.  But we just ask

16   maybe the cover email for context just to be shown to the

17   witness.

18          *THE COURT:*  Well, no objection.  59-1 is admitted.

19          (Exhibit 59-1 admitted.)

20   *BY MR. MELSHEIMER:*

21   *Q.* Do you recognize Exhibit 59-1, ma'am, as the result of some

22   of this collaboration that you were telling us about earlier?

23   *A.* Well, this is a list that Heidrick & Struggles put

24   together, I believe.  I don't believe it's part of the target

25   list we put together.  I would need to see the email to be

Bridget Fanning – Cross

1    certain, I believe it's their list that they put together.

2            MR. MELSHEIMER:  Let's take a look at Exhibit 57,

3    ma'am.

4            Your Honor, 57, I offer it.  It's the email that has

5    this attachment on it.

6            THE WITNESS:  Thank you.

7            THE COURT:  Which is what you were talking about also?

8            MS. LEWIS:  Correct.  No objection, Your Honor.

9            THE COURT:  Admitted.

10           (Exhibit 57 admitted.)

11   BY MR. MELSHEIMER:

12   Q.  So just to make sure we're on the same page, ma'am, about

13   this sort of thing.  You reached out to a lot of these

14   recruiters over time; right?

15   A.  Yes.

16   Q.  You asked them to do their best to come up with what it

17   called a target list; right?

18   A.  Yes.

19   Q.  You actually asked multiple different recruiting firms to

20   do this; correct?

21   A.  Yes.  It's a standard part of the process.

22   Q.  It's standard policy, because you want to get the broadest

23   possible list of opportunities; right?

24   A.  "Broadest" is probably not the right word.

25   Q.  What is the right word?

Bridget Fanning - Cross

1    *A.*  You want the best targets, the best bull's-eye to recruit

2    candidates from.  So you actually -- you don't want thousands

3    of companies, because that's no good.  You can't reach out to

4    thousands of companies.  What you want is a list where you're

5    going to find qualified candidates.  So "broadest" wouldn't be

6    the word I would use.

7    *Q.*  Fair enough.  Is it fair to say that you want to get the --

8    a good set of targets, but you want to get enough targets.  Is

9    that fair?

10   *A.*  Yes.

11   *Q.*  So when you say "bull's-eye," I think about sort of

12   something really small; and that's not really what we're

13   talking about here.  Right?

14   *A.*  Well, it depends on the entire universe.  Right?  If there

15   are thousands and thousands of companies, and you've got a list

16   of 20 or 30, I would call that a bull's-eye.

17   *Q.*  But here, of course, we end up with a list of hundreds;

18   don't we?

19   *A.*  Well, I don't think that was hundreds that was on that

20   list.  I've not counted them, but it looked like a list of

21   about 30 companies to me.  Maybe more.

22   *Q.*  And I apologize.  My question was unclear.  You end up

23   after this process with a list of hundreds of targets; fair?

24   *A.*  No.  I think --

25   *Q.*  What's --

Bridget Fanning - Cross

1    *A.*   I think we're talking two different things.  There is the

2    target company list that I put together with Andrew and the

3    team and the recruiters.  That was our foundational list that I

4    was creating to make sure that we -- I was understanding all

5    the organizations out there.  What this email is referring to

6    and what you've just showed me was the list that Heidrick &

7    Struggles put together where they believed they were going to

8    find the most qualified candidates.

9         And then I had a meeting with Michael Loiacano -- I'm

10   sorry.  I can't say his name either -- and he made some edits

11   to that list based on the conversation that we had.  I don't

12   know how many companies were on that list.  If you were to go

13   back to it, we could take a look at it.

14   *Q.*   We're going to.

15   *A.*   Okay.

16   *Q.*   So why don't we do that.  Thank you for that.

17        So he sends you from his perspective what he calls a

18   list of target companies; right?

19   *A.*   The target universe for discussion.  So the total potential

20   of where we could find target candidates.

21   *Q.*   Let's look at the email, and let's see what the

22   attachment is called, just so you and I are on the same page.

23        The document is entitled "SCA target list, final."

24   Right?  That's what he titled it.

25   *A.*   Well, when I look at the title on the document, I'll tell

Bridget Fanning - Cross

1    you what he titled it.  If we go back to the document.

2    Q.  Can we just focus first on the email, ma'am?  I'm sorry.

3    I'm focused --

4    A.  Right.  But I don't know that that is actually the list

5    that we were just looking at.  I know the title that is on the

6    document that you just showed me, and he called it the

7    potential target universe, something like that, on that list.

8    Q.  So let's look at that.

9    A.  Yeah.

10   Q.  Okay.  That's Exhibit 59-1.

11   A.  Yeah.  He calls it "potential target universe for

12   discussion."

13   Q.  And --

14   A.  That's what he's titled that document.

15   Q.  And what he said in his email is he wants to get feedback

16   from you about this; right?

17   A.  He wants feedback on the entire assignment spec, I believe.

18   It wasn't just this list.

19   Q.  And he has a bunch of different categories of companies

20   there.  Can we just go over them briefly, ma'am.  Healthcare

21   services.  That's one category; right?

22   A.  Yes.

23   Q.  Health insurance and managed care is one category; right?

24   A.  Yes.

25   Q.  Multi-site healthcare service providers, is that one

Bridget Fanning - Cross

1    category?

2    *A.*   Yes.

3    *Q.*   And integrated health systems and other risk-bearing

4    entities is another category; right?

5    *A.*   Yes.

6    *Q.*   Now, there is some -- there is a legend at the bottom there

7    in blue.  It says "SCA off-limit sensitivities."  Do you see

8    that?

9    *A.*   Yes.

10   *Q.*   And then it says "H&S off-limit sensitivities."  Right?

11   *A.*   Yes.

12   *Q.*   Let's focus on the blue.  There is a number of companies in

13   blue.  You mentioned DaVita HealthCare Partners yesterday;

14   right?

15   *A.*   Yes.

16   *Q.*   There is also United Surgical Partners.  Is that USPI?

17   *A.*   I believe so, yes.  It's a tenant.

18   *Q.*   There is a company in blue called Advocate; right?

19   *A.*   Right.

20   *Q.*   There is a company in blue called Brown and Toland; right?

21   *A.*   Yes.

22   *Q.*   There is a company in blue called Hill Physicians?

23   *A.*   Yes.

24   *Q.*   And there is a company in blue called Monarch?

25   *A.*   Yes.

Bridget Fanning - Cross

1    *Q.*  Now, this list evolved over time, did it not, ma'am?

2    *A.*  Well, this is -- I'm sorry -- but this is the list that

3    Heidrick & Struggles put together.  It wasn't the target

4    company list that we were talking about yesterday that had many

5    versions on it.  So this is the first time I'm engaging

6    Heidrick & Struggles on a search.  And this is their list that

7    they came up with, so I don't think it's accurate to say it

8    evolved.

9    *Q.*  Let me ask you this way, ma'am:  You had additional

10   discussions within the company and with the recruiters about

11   the potential target universe; is that fair?

12   *A.*  I don't think so with regards to this list.

13   *Q.*  Okay.

14   *A.*  This list in particular came from Heidrick & Struggles.

15         *MR. MELSHEIMER:*  Well, let's take a look at Exhibits

16   63 and 64.  Let's take a look at 64-1.

17   *BY MR. MELSHEIMER:*

18   *Q.*  Now, this is an email that you sent to the Cabin Team.  Do

19   you see that?

20   *A.*  Yes.  I'm very familiar with it.

21   *Q.*  And you say, "Hi team.  Could really do with some help.

22   Trying to put consolidated list" --

23         I believe, Your Honor, this is in evidence.  If not,

24   I'm going to offer Government Exhibit 64-1.

25         *THE COURT:*  Government 64-1 is now admitted.

Bridget Fanning - Cross

1              (Exhibit 64-1 admitted.)

2    *BY MR. MELSHEIMER:*

3    *Q.*  So you're saying you want to put together this list for RVP

4    recruitment, will expand or add.  And you say, "attached is an

5    early draft."  Do you see that?

6    *A.*  Yes, I do.

7    *Q.*  And let's pull up 63-1, which I believe is the attachment

8    to this email.

9    *A.*  I'm not sure that it -- can we just -- can you just flip

10   through, because it looks like it's page 1 of 3.

11           *THE COURT:*  First of all, 63-1 has been stipulated.

12   It's admitted.

13              (Exhibit 63-1 admitted.)

14           *MR. MELSHEIMER:*  Flip through that, please.

15           *THE WITNESS:*  Yeah, this is starting to look more

16   familiar as you go through it.  Yeah.

17              So what I was doing here --

18   *BY MR. MELSHEIMER:*

19   *Q.*  Please.

20   *A.*  This is much later than the email from Heidrick &

21   Struggles.  The list that we were looking at a moment ago was

22   the list that Heidrick & Struggles put together.  What I'm now

23   doing is I'm taking the list that Heidrick & Struggles gave

24   me -- I make them do some work.  We're paying them a lot of

25   money -- and I added to this, and now I'm building my own list

Bridget Fanning - Cross

1    that I am collaborating with with SCA executives to try and

2    identify as many possibilities as possible.

3            So, for example, consulting I don't think was on

4    Heidrick & Struggles list; but that turned out to be a powerful

5    category for us.  So the Heidrick & Struggles list was their

6    list and their attempt.  We had a conversation about it.  What

7    this is me now owning the list and working with the team to put

8    this target list together.  And this is a very early draft.

9    There must have been ten, twelve, fifteen drafts of that.  We

10   looked at that yesterday.

11           So this is dated August 2015.  The email between

12   Andrew and I, where Andrew made a lot of edits, I believe was

13   in October 2015.  So we've moved on some months at this time.

14   The Heidrick & Struggles list was from June 2015, right at the

15   beginning, when we started to think about what target companies

16   should be.  Because up to that point, we were only working with

17   Caldwell and CT Partners.

18   Q.  I want to make sure we're right on the dates, ma'am.  Let's

19   go back to Exhibit 53-1, the first email I showed you from

20   Mr. Hayek.  That's June of 2015; correct?

21   A.  Yes.

22   Q.  Then the email we looked at from Heidrick & Struggles,

23   Exhibit 57, that was July of 2015; right?

24   A.  Yes.  Correct.

25   Q.  Your email we're just talking about is a little over a

Bridget Fanning - Cross

1    month later, in August 2015; right?

2    A.   Yes.  It's a couple of months later, in fact.  But, yes.

3    Q.   Well, just to make sure we're understanding each other.

4    The email from Mr. Loiacano was July 21; right?

5    A.   I believe so.  Yes.

6    Q.   And the email that you were talking about now, that we're

7    going to talk about for a moment, is July -- August 28;

8    correct?

9    A.   Correct.

10   Q.   Okay.  So the -- so you were talking about needing some

11   feedback from the Cabin Team; do I have that right?

12   A.   Yes.  That's right.

13   Q.   And the Cabin Team included Mr. Hayek?

14   A.   Yes.

15   Q.   It included the general counsel for SCA; is that right?

16   A.   Yes.

17   Q.   Who was that gentleman?

18   A.   Richard Sharff.

19   Q.   And Richard Sharff, he's a lawyer?

20   A.   He is a lawyer.

21   Q.   And who else is on the Cabin Team?

22   A.   Goran Dragolovic -- I didn't do any better there -- Joe,

23   who is the chief development officer; the CFO, Tom; Michael

24   Rucker, who is the chief operating officer.  I may have missed

25   someone, but that was kind of -- it was a relatively small core

Bridget Fanning - Cross

1    team.

2    *Q.*  But all of those people to your knowledge had at least the

3    opportunity to give input into this list and discuss the

4    recruiting strategies for SCA; fair?

5    *A.*  Well, which list -- is that the one with the attachment

6    that I --

7    *Q.*  Yes, ma'am.

8    *A.*  Then, yes.  And we had multiple iterations of it.  We

9    talked about it in the Cabin Team meeting.  I think you'll see

10   there are lots of emails between me and that group over time,

11   putting that target list together.

12   *Q.*  Just so you're on the same page, of course, this was not a

13   one-and-done kind of thing; right?

14   *A.*  No.

15   *Q.*  This took a lot of work by you; right?

16   *A.*  Yes.

17   *Q.*  And a lot of time and effort.  And it was collaborative?

18   *A.*  Yes.

19   *Q.*  At times you would work on your own, and at times you would

20   seek input at the appropriate time from Mr. Hayek or others

21   about the list.  Right?

22   *A.*  That is correct.

23   *Q.*  Because this was very important to the company; true?

24   *A.*  I believed so.

25   *Q.*  Well -- you had no reason to believe it wasn't; right?

Bridget Fanning - Cross

1  *A.*  I thought it was important.  I'm not sure my peers would

2  necessarily agree with me, but it was important to me.

3  *Q.*  Well -- so it's funny, ma'am.  You and I talked on the

4  phone briefly a couple of times; right?

5  *A.*  Uh-huh.

6  *Q.*  And do you remember one time you told me that sometimes not

7  everybody respects the important role of HR and talent

8  acquisition; do you remember that?

9  *A.*  Yeah.  This is true.

10  *Q.*  We're going to show you all the respect we can here, ma'am.

11  But it was a big job; right?

12  *A.*  I believed so.

13  *Q.*  Okay.  And we're going to go through some of this, but

14  let's take a look at this one.  And I want to make sure, so you

15  don't feel like I'm -- I want to make sure I'm 100 percent

16  accurate with you.  This was just one snapshot of the process;

17  right?

18  *A.*  Yes.

19  *Q.*  As of August 2015; right?

20  *A.*  Yes.

21  *Q.*  So if I ever suggest otherwise, would you speak up?

22  *A.*  I think I will.  Yes.

23  *Q.*  Okay.  I think you will, too.

24  *A.*  Uh-huh.

25          *MR. MELSHEIMER:*  So let's take a look, if we can, at

Bridget Fanning - Cross

1   63-1.

2   *BY MR. MELSHEIMER:*

3   Q.   Now, a couple of things that are different from this list

4   than the one we just looked at -- right?  There is some

5   different things about it; correct?

6   A.   I suspect so, but I'd have to look at them side by side.

7   Right?  Okay.  To be fair --

8   Q.   Well, let me -- I think we can do that.

9   A.   Yeah.  Thank you.

10  Q.   So on the left I'm showing you the potential target -- this

11  is this earlier iteration of the list.

12  A.   So --

13  Q.   And on the right is the August -- let's call it the

14  August 2015 iteration.  Are you with me?

15  A.   Yeah, now I'm following.  Thank you.

16  Q.   Okay.  Now, it's the same format; right?

17  A.   I copied their format.  Yes.

18  Q.   Okay.  Nothing wrong with that.  Okay.  And so you've got a

19  lot of the same categories; right?  But there is additional

20  companies mentioned; true?

21  A.   Yes.  I would have added them.

22  Q.   Those additional companies are the result of a lot of hard

23  work that you and others did to identify the potential target

24  universe for discussion; fair?

25  A.   Well, at that point, I think it was me and my executive

Bridget Fanning - Cross

1    assistant pulling together the list and copying them from the

2    internet and places like that.  I think the first time I

3    started the broader collaboration process was the email we

4    just looked at, when I said, "Hi, Cabin Team," which was the

5    end of August.

6    Q.   August of 2015?

7    A.   Yes.

8    Q.   But the work that went into this with you and your

9    executive assistant also included at least initial input from

10   some recruiting firms; right?

11   A.   Yes.  I took all of the recruiting firms' target lists and

12   combined them.  I was trying to create a master list of

13   everywhere we could possibly find candidates from.  It was a

14   foundational list.

15   Q.   And this is just a part of that process?

16   A.   Correct.

17   Q.   So you've added some names from the left to the right.

18   There are additional names added on the right; is that fair?

19          MS. LEWIS:  Objection, Your Honor, to the issues we've

20   been discussing about the addition of companies upon companies

21   here.

22          THE COURT:  Overruled.

23          THE WITNESS:  I'm sorry.  Can you ask me again?

24   BY MR. MELSHEIMER:

25   Q.   I can.  Pretty straightforward question.

Bridget Fanning - Cross

1          *MS. LEWIS:*  Excuse me.  Mr. Melsheimer, I think you

2   may be referring to the wrong left and right, which is why

3   there may be confusion.

4          *MR. MELSHEIMER:*  Ah.  I've never been told before I

5   can't tell left from right, Your Honor.  But it may be that I

6   am not getting it.  Thank you.

7          Let me call it by number.

8   *BY MR. MELSHEIMER:*

9   *Q.*  63-1 --

10  *A.*  Is the list I was growing and putting together at the later

11  date.

12  *Q.*  59-1 is what?

13  *A.*  Is the Heidrick & Struggles list that they put together.

14  *Q.*  Got it.

15  *A.*  But I had input into, because we had a conversation.  It

16  was their list.

17  *Q.*  63-1 has additional companies; true?

18  *A.*  Yes.  It's now three pages and not one.

19  *Q.*  Let's flip through it, ma'am.  63-1, that's the second

20  page?

21  *A.*  Yeah.

22  *Q.*  You've also added some additional categories?

23  *A.*  Yeah.  We added even more over time.  But, yeah.

24  *Q.*  Now, you've added the category -- let's go to the end.

25  You've added the category of healthcare outsourcing and health

Bridget Fanning - Cross

1   software.  But as of yet, you didn't have any specific

2   companies to add to the list?

3   A.  Correct.

4   Q.  Let's go back to the pages -- page 2, you've added an

5   additional -- I haven't counted them up, ma'am; but you've

6   added multiple companies to the list from the earlier 59-1

7   version; true?

8   A.  Yeah.  A lot of companies.  Most of them are clients, so

9   they're all off limits.  But, yeah.

10  Q.  That is what I was -- you anticipated my question.  There

11  is a lot of blue there, isn't there, ma'am?

12  A.  Well, the thing is, these were sectors that were

13  specifically our clients.  Right?  So SCA had partnerships with

14  health systems and integrated health systems.  The reality was,

15  these weren't really organizations we were going to find great

16  candidates for SCA for; but they were very much client

17  organizations.  That's why you can almost see only in blue.

18  Q.  So I think my question was, there is a lot more blue?  And

19  you agreed that there is?

20  A.  In these sectors, yes.

21  Q.  And blue represents off-limits sensitivities?

22  A.  They're clients.  They are people we have partnerships and

23  relationships with.  Yes.

24  Q.  I'd like to move on to another version of this exercise,

25  ma'am, which is Government Exhibit 66-2.

Bridget Fanning - Cross

1          *THE COURT:*  It's admitted.

2          *MR. MELSHEIMER:*  I offer that, Your Honor.

3          (Exhibit 66-2 admitted.)

4   *BY MR. MELSHEIMER:*

5   *Q.*  If you could -- can you see that okay, ma'am, up there?  Or

6   do you need --

7   *A.*  No.  I'm actually doing okay.  Thank you.

8   *Q.*  Okay.  Let me stop and ask you one thing before we talk

9   about that.  On these lists of target companies or

10  opportunities that we were talking about, is it also the

11  case -- and to your knowledge -- that those would also be

12  companies that could hire from SCA?

13  *A.*  I'm sure, quite frankly, at the surgery level, they

14  probably did.  I mean, there would have been tons of traffic

15  going on at more junior levels.

16  *Q.*  So your focus -- our focus has been on your work on the

17  possible target companies for SCA to hire.  But the truth is,

18  this also reflects to some extent companies that could hire

19  from SCA, as well?

20  *A.*  Yes.

21  *Q.*  So 66-2 is a few months later from our August date; right?

22  *A.*  Yeah.

23  *Q.*  This is really reflective of all of this hard work that

24  you're doing during the summer and the fall; true?

25  *A.*  Attempting to.  Yes.

Bridget Fanning - Cross

1   *Q.*  And you say to him -- remind us who Joe Clark is.

2   *A.*  Joe is the chief development officer.  So he's, like, a

3   number two to Andrew but on the business development side.

4   Michael was number two on the operating of the company side.

5   *Q.*  And you say, "Ignore, off limits.  Too complicated for

6   now."  Right?

7   *A.*  Yeah.

8   *Q.*  That's all that blue that we looked at?

9   *A.*  Yeah.  It was just getting silly.

10  *Q.*  And then you say, "Mainly, the entire healthcare universe

11  for targeting candidates for hiring."  Did I read that

12  correctly?

13  *A.*  Yeah.  I was responding to Joe's email.

14  *Q.*  And that was true, wasn't it?

15  *A.*  Well, what I was trying to do was just capture, really,

16  where could we find candidates?  Let's get a big list together,

17  and then we can narrow down job by job what would be the

18  appropriate target list.  But let's just get all of them out on

19  the table first, so that's what we were doing there.  We're

20  creating a foundational list that we could then leverage when

21  we were doing searches that might end up being smaller lists.

22  But to start with, just knowing what your universe was is a

23  good starting point.

24  *Q.*  You described it as the entire healthcare universe for

25  targeting candidates for hiring; fair?

Bridget Fanning - Cross

1    *A.*  Yes.

2           *MR. MELSHEIMER:*  Let's go to Exhibit 67-3, which I

3    believe is in evidence, Your Honor.  If not, I offer it.

4           *THE COURT:*  No, it's already in evidence.

5    BY MR. MELSHEIMER:

6    *Q.*  67-3, just for the ladies and gentlemen of the jury to

7    track, this is still in October; right?

8    *A.*  Yeah.  I think this is -- is this a couple of weeks on from

9    it?

10   *Q.*  Yes, ma'am.

11   *A.*  I can't recall.  Yeah.  I mean, it kind of -- it had a lot

12   of activity, then nothing, then a lot of activity.  So I think

13   at this point, I'm really working it.  I'm really trying to get

14   the list together.

15   *Q.*  And the attachment -- this is an email that Mr. Hayek is

16   responding to you from something that you sent him?

17   *A.*  Yes.  This is now the master list that I've been putting

18   together with Sandra; and it's pretty comprehensive at this

19   point.  I'm feeling quite good about the list.

20   *Q.*  And the attachment is entitled, "Companies for SCA to

21   recruit from."  Right?

22   *A.*  Yes.  That's what I called it.

23   *Q.*  He says, "This list looks great.  Minor edits."

24          Then let's go to the second bullet point.  You talked

25   about this a little bit yesterday.  "Putting two companies in

Bridget Fanning - Cross

1  italics, USPI and DaVita.  We can recruit junior people below

2  director."  Let me stop there.

3          Were you involved in that process of recruiting more

4  junior people?

5  *A.*  Not so much.  I was responsible for setting up -- so these

6  surgery centers were part owned by SCA.  So a lot of the

7  surgery recruiting, medical staff recruiting was done at a

8  local level, at the surgery level.  I was responsible for

9  organizing a process so that those surgeries would have a

10  recruiter to work with.  So there were some people on my team

11  that did recruiting.  I outsourced it to a firm called Cielo.

12  So I was responsible for the governance and setting up a

13  process.  But I wasn't involved in interviewing candidates and

14  that kind of thing, not in the way I was at the VP level.

15  *Q.*  So whatever was happening at the junior level below

16  director, that was something you would not have as much

17  knowledge of; fair?

18  *A.*  Absolutely.  Yeah.

19  *Q.*  He goes on, "But our agreement is that we would only speak

20  with senior executives if they have told their boss already

21  they want to leave and are looking."  Do you see that?

22  *A.*  Yes.

23  *Q.*  Now, he doesn't say, we can't recruit from DaVita in this

24  email; correct?

25  *A.*  He is as good as saying it, looking at this.

Bridget Fanning - Cross

1    Q.  Well, let's look at the email, ma'am.  He says, "Our

2    agreement is we can only speak with senior executives if they

3    have told their boss already and they want to leave and are

4    looking."  That's what he says?

5    A.  They effectively have resigned.  Yes.

6    Q.  So, ma'am, if you could just answer my question.  Is that

7    what he says?

8    A.  Yes.

9    Q.  He doesn't say anything in this email, ma'am, about

10   keeping people at SCA or keeping people at DaVita; fair?

11   A.  Absolutely, no, he doesn't.

12   Q.  Now, let's take a look at this broader list that has

13   evolved with all of the efforts of you and with the input that

14   you got from the Cabin Team.  Let's take a look at that.  That

15   is Government Exhibit 70-1.

16   A.  Yes.

17          MR. MELSHEIMER:  Your Honor, I offer this, if it has

18   not already been admitted.

19          THE COURT:  It was already admitted before.

20          MR. MELSHEIMER:  Thank you.

21   BY MR. MELSHEIMER:

22   Q.  So this is a broader version -- let me strike that, ma'am.

23          This is the October version --

24   A.  Yes.

25   Q.  -- of this list?

333

Bridget Fanning - Cross

1    A.   Yeah.

2    Q.   October of 2015?

3    A.   Correct.

4    Q.   And you've got specific companies identified; right?

5    A.   Yes.

6    Q.   You've also got categories identified; right?

7    A.   Yes.

8    Q.   So it starts with surgical service companies.  And I

9    haven't counted this on the first page, ma'am; but it looks to

10   me like maybe 40 or 50 companies.  Does that seem fair?

11   A.   Yes.

12   Q.   And it starts out with ambulatory healthcare strategies,

13   and it ends up with visionary enterprises on this page; right?

14   A.   Yes.

15   Q.   Now, I want to ask you a question.  You've seen this firm

16   called USPI, United States -- excuse me -- United Surgical

17   Partners, International?

18   A.   Yes.

19   Q.   You weren't asked any questions about that, but did

20   Mr. Hayek also have some sort of agreement with USPI that was

21   identical to the DaVita agreement that you described?  Or do

22   you know?

23   A.   It looked identical to me.  Because when his emails talked

24   about DaVita, they also referred to USPI.

25   Q.   And USPI is not in any way related to DaVita?

Bridget Fanning - Cross

1   *A.*   No, not at all.  It's owned by a tenant, I think.

2   *Q.*   USPI is actually a company that also operates surgical

3   centers; right?

4   *A.*   Yes.  It was a direct competitor to SCA.

5   *Q.*   So Mr. Hayek had an agreement -- do you know a man named

6   Wilcox?

7           *MS. LEWIS:*  Objection, Your Honor.  403.  Irrelevant.

8           *THE COURT:*  Overruled.

9           *THE WITNESS:*  Is that the CEO of USPI?

10  *BY MR. MELSHEIMER:*

11  *Q.*   Yes, ma'am.

12  *A.*   I don't know him.  I've not met him or anything else, but I

13  know of him.

14  *Q.*   So you know of him.  Mr. Wilcox is the CEO of USPI.  And as

15  far as you know, Mr. Hayek had the same arrangement with Bill

16  Wilcox that you've described that he had with Kent Thiry; is

17  that fair?

18  *A.*   Yes.  That is correct.

19          *MR. MELSHEIMER:*  Let's take a look at page 2.

20  *BY MR. MELSHEIMER:*

21  *Q.*   Large for-profit hospital companies, starting with AHMC

22  Healthcare, ending with Victory Healthcare; right?

23  *A.*   Yes.  That's correct.

24  *Q.*   Maybe 15 companies there?

25  *A.*   Yes.

Bridget Fanning - Cross

1    *Q.*  Page 3, large not-for-profit health systems, starting with

2    Adventist Health System and ending with UPMC.

3    *A.*  Yes.

4    *Q.*  Right?

5    *A.*  Yes.

6    *Q.*  Now, to be clear, this list -- and I want you to give me

7    the right words.  This has been refined since July; correct?

8    *A.*  Yes.

9    *Q.*  It's not simply just a -- well, it's not just some

10   brainstorming that someone came up with over the weekend.  This

11   is the result of a lot of hard work, discussion that you did

12   and had with Mr. Hayek and others about how to create the list

13   for target companies; right?

14   *A.*  Yes.

15   *Q.*  Because this enterprise of hiring people was going to in

16   some ways be governed by this list; right?

17   *A.*  It's a good starting point from when you're doing executive

18   search.  Yes.

19         *MR. MELSHEIMER:*  If we could go to the next page.

20   *BY MR. MELSHEIMER:*

21   *Q.*  For-profit ancillary services, other multi-site companies,

22   starting with 21st Century Oncology and ending with Walgreens.

23   Do you see that?

24   *A.*  Yes.

25   *Q.*  Now, when you say "Walgreens," you're not talking about

Bridget Fanning - Cross

1    hiring someone from a local Walgreens store.  You're talking

2    about an executive person at the Walgreens headquarters, or

3    something like that; right?

4    A.  Yeah.  Most of my agreement was executive recruiting,

5    corporate recruiting.

6         MR. MELSHEIMER:  Continue.  Page 5.

7    BY MR. MELSHEIMER:

8    Q.  Large physician groups, starting with Accountable

9    Healthcare, ending with OmniCare Medical Group?

10   A.  Yes.

11   Q.  And, again, it looks like -- I haven't counted them, ma'am,

12   but looks like maybe about 60 different large physician groups;

13   fair?

14   A.  True.

15   Q.  Just to make this clear, when you're talking about hiring

16   from a physician group, you're not talking about finding a

17   doctor to work at one of the surgery centers.  You're talking

18   about finding someone with executive expertise and knowledge

19   about running a business, which is what SCA was trying to find;

20   true?

21   A.  True.

22   Q.  And these groups, these large physician groups, in addition

23   to having very capable doctors of all kinds, may be big enough

24   to have people that have management or business expertise, as

25   well; fair?

Bridget Fanning - Cross

1    *A.*  Possibly.  Yes.

2    *Q.*  That's why they're on the list?

3    *A.*  Well, I'm not sure by the end of it we'd really screened

4    the list that well.  But it was -- it was certainly -- so I

5    would say, possibly, when you're talking physician groups.  I

6    mean, you're dealing with very different category sector of

7    company when you're looking at physician groups than when

8    you're dealing with a company that has 20,000 people in it.

9    Right?  So that's why I say possibly.

10   *Q.*  Possibly.  Okay.  And if we go to page 7, ma'am.  We've got

11   health insurance and managed care.  These are some very big

12   companies; right?  Aetna?

13   *A.*  Yeah.  So these would have more corporate executive types

14   in it than, say, physician groups.

15   *Q.*  So someone like Aetna, big insurance outfit, might have

16   someone with a lot of management and executive experience;

17   right?

18   *A.*  Yes.

19   *Q.*  Something like Wellcare also a big healthcare outfit;

20   right?

21   *A.*  Yes.

22   *Q.*  And then you see Optum there.  Do you see that?

23   *A.*  Yes.

24   *Q.*  Optum actually ended up buying SCA; didn't they?

25   *A.*  Yes, that's right.  I was involved in the early stages.

Bridget Fanning - Cross

1          MR. MELSHEIMER:  If we could go to page 8.

2     BY MR. MELSHEIMER:

3     Q.  These are health consulting and brokerage firms.  We go

4     from Accenture at the top to Veralon at the bottom?

5     A.  Yes.

6     Q.  Again, these are firms that may have some expertise in the

7     healthcare space.  Like, Accenture may be doing consulting for

8     healthcare firms; and those individuals might prove to be

9     really good candidates for a position at SCA.  True?

10    A.  Yes, particularly with the relationship selling.  It was

11    the relationship selling skills that was the most difficult to

12    find.

13         MR. MELSHEIMER:  So -- and, then, the last page --

14    let's just go to the last -- let's sort of --

15    BY MR. MELSHEIMER:

16    Q.  Spoiler alert here.  We're going to get to the last page.

17    We skipped some, so we skipped 9 and 10 and 11 and 12 and 13

18    and 14.  If you want to stop, we could talk about any of them

19    that you think there is something important.

20    A.  No.  I think we're good.

21    Q.  All right.  And then we end with some orthopedic

22    manufacturers; right?

23    A.  Yes.

24    Q.  You mentioned yesterday, did you not, that one of SCA's

25    specialties was orthopedic surgery; true?

1   A.   Yes.

2   Q.   So getting someone from Stryker or DePuy may be actually

3   very useful for their business; true?

4   A.   Possibly.  If they had the relationship selling skills.

5   Q.   So all in all, ma'am -- we've got about 15 pages here, and

6   I -- would you take my estimate that there is about 500

7   companies on these pages?

8   A.   I'm just going to --

9        MS. LEWIS:  Objection, Your Honor.  Mr. Melsheimer is

10  implying relevance.

11       THE COURT:  The objection is overruled.  I know what

12  your point is.  I get it.

13       MS. LEWIS:  Thank you.

14       THE COURT:  I'll deal with it, but not this way.

15       MS. LEWIS:  Understood.  Thank you, Your Honor.

16  BY MR. MELSHEIMER:

17  Q.   And to be plain -- I'm sorry.  It's about 500?

18  A.   You know, I didn't count them.  Right?  But I'm not about

19  to sit here and count them.  I'm sure that's not what people

20  want me to do.  If you say it's 500 on this list, fine.

21  Q.   Okay.  I didn't -- okay.  Ma'am.  Thank you.

22       Just to be clear, ma'am, I'm not saying -- all I'm

23  asking you about is, are these the companies that you

24  identified as -- in October of 2015, as opportunities to hire

25  executives from?

Bridget Fanning – Cross

1  A.  In the total universe, yes.

2  Q.  Ma'am, we're going to move on to something else.  You

3  talked a little bit yesterday about the value of solicitations.

4  Do you remember that?

5  A.  Yes, I do.

6  Q.  And what I heard you say was -- is one way a candidate can

7  use a solicitation -- one way -- is by telling your employer

8  about it and maybe leveraging it, I think was the word you

9  used, to get a raise?

10  A.  Yes.  If they're clever about how they discuss it and talk

11  about it, like, I'm loyal.  I'm staying.  I love it here, but

12  you need to know that I'm getting approached for other roles,

13  and the compensation is a lot higher.  It's a game.

14  Q.  It can be.

15  A.  Can be.  Yeah.  I mean, if you're going to go and tell your

16  employer you're looking, then you're either resigning or you're

17  playing a game.  I think it's a dangerous game; but people do

18  play that game, particularly if they're highly valued.

19  Q.  Well, let's talk about, though, this leverage and how it

20  works.  You've got no leverage if you keep the opportunity to

21  yourself; right?

22  A.  In direct respect to nonsolicitation, correct; but I'd

23  never say an employee doesn't have leverage.

24  Q.  We're talking about solicitation.

25  A.  Then, yes.

Bridget Fanning - Cross

1   *Q.*  So -- and I want to make sure I understand what you're

2   saying.  The idea of leverage of a solicitation exists when the

3   employee tells someone about it; right?

4   *A.*  Yes.

5   *Q.*  Because if you keep it to yourself, that there is this

6   opportunity elsewhere -- whether you think that's a good idea

7   or not, if you don't tell someone about it, you don't have that

8   leverage; true?

9   *A.*  Correct.

10  *Q.*  You mentioned just a minute ago even that this really only

11  works if you're a very difficult-to-replace person; right?

12  *A.*  And highly valued.

13  *Q.*  Let's make a list.  Highly valued by your employer?

14  *A.*  Yeah.

15  *Q.*  Difficult to replace.  Highly skilled?

16  *A.*  Yes.

17  *Q.*  Maybe a high demand --

18  *A.*  Yes.

19  *Q.*  -- by other companies?  So we're talking, really, aren't we

20  in -- for the most part with more senior-level people?

21  *A.*  Yeah, we're talking senior people.

22  *Q.*  You told us yesterday that when this happens, when a --

23  when a company has someone that is hard to replace or that they

24  can't replace, that it's -- it poses a real challenge for a

25  company, and that can cause disruption to the business.  Did I

Bridget Fanning - Cross

1   hear that right?

2   *A.*   Yes.

3   *Q.*   That is something that every company would like to avoid;

4   isn't it?

5   *A.*   Yes.

6   *Q.*   Leverage will not work if someone is timid or shy; fair?

7   *A.*   True.

8   *Q.*   You have to have a certain amount of confidence to go to

9   your boss and negotiate, in a sense, on behalf of yourself;

10  right?

11  *A.*   Well, here is something I'd say:  You have to have

12  confidence in your employer.  It's not just confidence in self.

13  You have to have trust as to what your employer is going to do

14  with that information.  I mean, some CEOs would say, All right,

15  okay, off you go, then.  Some CEOs will say, Don't go.  Please

16  stay.  Here is more money.  I mean, it's not just -- that's why

17  I say the game is dangerous.  Right?  It's like, you're putting

18  a lot of trust in what the employer is going to do with that

19  information.

20  *Q.*   So just to make sure I understand what you're saying, it

21  could go both ways; right?

22  *A.*   Yeah.  It could go either way.

23  *Q.*   The CEO could say, I think you said, On your way?

24  *A.*   Yes, something like that.

25  *Q.*   Or the CEO could say, My goodness, no.  We want to keep

Bridget Fanning - Cross

1  you.  How do we keep you?  Right?

2  A.  Yes.

3  Q.  You've kind of done that yourself, at least one time;

4  right?

5  A.  No.

6  Q.  Well, maybe I have this wrong; but didn't you go to SCA and

7  Mr. Hayek and say, I've got other opportunities.  You're not

8  paying me enough.  I'd like to be paid more money?

9  A.  No, I didn't.  That wasn't a conversation I had with

10  Andrew.  I can tell you the conversation I had, but I've never

11  done that.

12  Q.  Well, let me ask you this way:  Did you go to him and ask

13  for a raise?

14  A.  He cut my pay when I was joining, and he should have been

15  paying me what I asked for.  He negotiated me down.  And when I

16  got to SCA, it wasn't what he had promised me in terms of the

17  hours I would be working.  I was working 14-hour-plus days.  So

18  I went to Andrew and said, Look, this is much more of a mess

19  than you told me about.  I'm working 24 by 7 to fix and clean

20  all of this up.  And when I work for you, I lose money.  So I

21  want you to pay me what we talked about when I was joining.

22  And he paid me what I was earning.

23        At no point -- at no point did I possibly imply that

24  if you don't give me a pay increase, I'm out of here, or did I

25  suggest in any way that if he didn't meet my demands in a

Bridget Fanning - Cross

1    blackmail kind of way, I would have an issue with it.  It was,

2    please, I really think you owe this to me.

3    Q.  Okay.  Thank you for clarifying that, because I don't -- I

4    didn't understand your particular situation.  Let me make sure

5    I do understand it.  You were making -- you wanted about $4,000

6    a day --

7    A.  Yeah.  It's a lot of money.

8    Q.  -- when you started.  And you weren't paid $4,000 a day,

9    even though you thought you were worth it?

10   A.  Correct.  I was paid 3,750.

11   Q.  So you wanted to get that 4,000 that you thought -- that

12   you merited; right?

13   A.  Yes.

14   Q.  You deserved that?

15   A.  I did.

16   Q.  So you went to him and had this conversation with him and

17   said you wanted to make more money?

18   A.  Yes.

19   Q.  Certainly, he knew or you had told him that while you were

20   working for SCA, you also had other jobs; right?

21   A.  Oh, absolutely.  I was very open about it.

22   Q.  So you were very open about the fact that SCA was not your

23   only -- was not the only game in town for you; right?

24   A.  Well, Andrew knew that.  He knew it all the time.  Right?

25   It was part of the consulting agreement that I had.  And he

Bridget Fanning - Cross

1   felt that he -- he could give me a discount on my day rate

2   because I was working so many days with SCA.  So he said, given

3   you're going to be working here ten plus days a month, I think

4   I should get a volume discount.  So I'm not going to pay you

5   4,000 a day; I'm going to pay you 3,750.  And he made it clear

6   that I either took it or I left it, so I took it.  And when I

7   got there, it wasn't what we discussed.  I was working 24 by 7.

8           So I went back to him and said, You know this

9   negotiated rate that you promised me and the job you promised

10  me?  It's not what you said, so you should pay me what I'm

11  worth, based on what I now see.  And he agreed, and he

12  increased my rate to 4,000.  I was very happy about that.

13  Q.  Both in terms -- what you meant by what you now see, you

14  now meant, hey, this is a lot of work?

15  A.  Yeah.

16  Q.  I shouldn't be doing this at a discount?

17  A.  Yeah.  That's exactly the conversation I had.

18  Q.  I want to switch subjects.  You were asked yesterday about

19  the term to describe the agreement between Mr. Hayek and

20  Mr. Thiry, and you said that you thought the term "no-poach"

21  was the most common term used.  Do you remember that?

22  A.  Yes, I do.

23  Q.  And you testified that those agreements are actually not

24  uncommon; do you remember saying that?

25  A.  Yes, I do.  They're more common.

Bridget Fanning - Cross

1  *Q.*  So when you -- when you arrived at SCA, the idea of a

2  no-poach agreement was not something new to you; true?

3  *A.*  True.

4  *Q.*  And, in fact, it wasn't even an uncommon agreement at SCA,

5  because you described another similar agreement with USPI;

6  true?

7  *A.*  I would say two agreements out of the, what, 500 companies

8  that we talked about that were unique with regards to that.  I

9  would say that's still uncommon.  Right?

10  *Q.*  But there were two of them at SCA?

11  *A.*  There was two of them.  Yes.

12  *Q.*  So you were also asked about -- let's separate this -- a

13  lot of people at the -- you've identified multiple people at

14  the company that knew about the agreement; right?

15  *A.*  Yes.

16  *Q.*  Certainly, everyone at the Cabin Team knew about it; right?

17  *A.*  Yes.  And each of the regional managers.  I think we had

18  five regions, so they would have known about it.

19  *Q.*  So that's about a dozen or more people, would you say?

20  *A.*  A dozen at max, I would say.

21  *Q.*  And you were asked this question -- the people that didn't

22  know about it.  You said -- do all of the people covered by the

23  agreement know about the agreement?  And you said no; right?

24  *A.*  Correct.

25  *Q.*  Now, I want to just explore this concept with you based on

Bridget Fanning – Cross

1   your experience as a human resources -- having a lot of human

2   resources expertise; fair?

3   *A.*   Yes.

4   *Q.*   So nonsolicits sometimes exist in employment contracts;

5   right?

6   *A.*   Yes.   I mean, usually an employment agreement will have

7   some form of nonsolicit in it.

8   *Q.*   And those are negotiated between the company and the

9   employee; right?

10  *A.*   Yes.

11  *Q.*   And they sometimes require or obligate the employee to not

12  solicit anyone from the company for a period of time?

13  *A.*   Yes.   I had one.

14  *Q.*   Now, all the people that are covered by that nonsolicit

15  agreement, they don't necessarily know about it; right?

16  *A.*   No, they don't.

17  *Q.*   So --

18  *A.*   But, actually -- sorry.   Andrew had it in his contract, as

19  did each of the executives.   And all their documents were on

20  the internet.   It was a public company, so people could see

21  that their nonsolicit was there.   All the other executives that

22  had an agreement would have the nonsolicit, so they would know.

23  But people at the director level, unless they were looking at

24  the internet or looking at the executives' agreements, they

25  wouldn't have known that.

Bridget Fanning - Cross

1   Q.  So there could be a lot of people subject to the nonsolicit

2   agreement that wouldn't know about it; fair?

3   A.  Yes.

4   Q.  Different topic, Dr. Fanning.  You were asked --

5          Your Honor, are we going to go until about 10:30, do

6   you think?

7          THE COURT:  Well, it depends on when somebody wants a

8   break.

9          Do you want one?

10         MR. MELSHEIMER:  I do not, Your Honor; but I want to

11  make sure I've got some sense of where I should stop for the

12  break.  That's all.

13         THE COURT:  We're good.

14         MR. MELSHEIMER:  Thank you, Your Honor.

15  BY MR. MELSHEIMER:

16  Q.  Dr. Fanning, you talked about your understanding yesterday

17  of the agreement between Mr. Hayek and Mr. Thiry; true?

18  A.  Yes.

19         MR. MELSHEIMER:  If we can pull up 67-3.

20  BY MR. MELSHEIMER:

21  Q.  This is Mr. Hayek's October 16, 2015, email.  We talked

22  about this a minute ago, ma'am.  But this is -- this is Andrew

23  Hayek describing to you in this email the terms of the

24  agreement; true?

25  A.  Yes.

Bridget Fanning - Cross

1    *Q.*  You looked at several exhibits with the government

2    yesterday where you described the agreement to outside people

3    using your own words, not Mr. Hayek's words; fair?

4    *A.*  Yes.  That's true.

5    *Q.*  So, for example, if we go to Government Exhibit 100, this

6    is an email about ten days after Mr. Hayek's email to you.

7    And if we can go to page 2, the bottom -- I'm sorry -- towards

8    the top.  I apologize.  This is this gentleman, Mr. Thau;

9    correct?

10   *A.*  Yes.

11   *Q.*  And, ma'am, at any point if you need -- so I'm highlighting

12   certain portions.  But at any point if you want to see the

13   whole exhibit, will you just let me know?

14   *A.*  Yes.

15   *Q.*  This is you talking to a recruiter at Russell Reynolds who

16   has identified Mr. Thau as a potential candidate; right?

17   *A.*  Yes.

18   *Q.*  You say, "Nate, this is a no-go.  We must not under any

19   circumstances be contacting people at DaVita."  Do you see

20   that?

21   *A.*  Yes.

22   *Q.*  Can we agree that those are not the words that Mr. Hayek

23   used in his email to you?

24   *A.*  No, they're not.

25              *MR. MELSHEIMER:*  Let's take a look at Government

1   Exhibit 101, which is a December 12, 2015, email to a

2   recruiter at Spencer Stuart.

3   *BY MR. MELSHEIMER:*

4   *Q.*  This is just a few months later.  And this is your email,

5   ma'am; correct?

6   *A.*  Yes, that's correct.

7   *Q.*  It's to a man named Schultz at Spencer Stuart; right?

8   *A.*  Yes.

9   *Q.*  That's one of those headhunting firms; correct?

10  *A.*  Yes.

11  *Q.*  You say to him, "Note that USPI and DaVita are off limits

12  to SCA."  Right?

13  *A.*  Yes.

14  *Q.*  That's not the term that Mr. Hayek used in his email to

15  you that we just looked at, is it?

16  *A.*  It's not the term.  No.

17  *Q.*  And, in fact, you actually attached to the email that you

18  sent Mr. Schultz, Mr. Hayek's email; right?

19  *A.*  I did.  Yes.

20       *MR. MELSHEIMER:*  Let's take a look at that.

21  *BY MR. MELSHEIMER:*

22  *Q.*  Now, you talked about -- just to focus on this for a

23  second, ma'am.  You said at the end of the day yesterday, you

24  said when you were talking to someone about this agreement that

25  you wanted to be diplomatic.

Bridget Fanning - Cross

1    *A.*   Yes.

2    *Q.*   You didn't want to -- you were kind of embarrassed about

3    it, I think were the words you used; is that fair?

4    *A.*   Yes.

5    *Q.*   But, of course, you just sent this recruiter the exact

6    email you got from Mr. Hayek without any qualification on it;

7    true?

8    *A.*   Yeah.  I mean, it's a big difference talking to a recruiter

9    than talking to a candidate who approached me directly.

10   *Q.*   But this is someone outside the company; right?

11   *A.*   This is a recruiter.

12   *Q.*   Outside the company?

13   *A.*   Who has engaged and we're paying $200,000 to do this

14   search.

15   *Q.*   I'm sorry, ma'am.  Maybe I asked a bad question.  This is

16   someone that didn't work for you at SCA, that you were letting

17   them know about this; true?

18   *A.*   I believe they worked for me, but they were an external

19   partner.

20        *MR. MELSHEIMER:*  Let's take a look at GX108, 109.

21   *BY MR. MELSHEIMER:*

22   *Q.*   This is the December email exchange, ma'am, between --

23   now, is this Sandra -- Ms. Mieczkowska -- did she work with

24   you?

25   *A.*   Yes.  She was my executive assistant.

Bridget Fanning - Cross

1   *Q.*  She was helping you -- you mentioned her a few minutes ago;

2   right?

3   *A.*  Yes.

4   *Q.*  So she was helping you with some of the work at putting

5   this list together; right?

6   *A.*  Yes.  That's right.

7   *Q.*  And this is an email where you and she are reviewing and

8   revising this 15-page sheet of companies that we looked at

9   earlier.

10          And if we can look at 109 real quickly, ma'am, just so

11  I can show the sheet.  This is the email -- what we talked

12  about earlier, this list --

13  *A.*  Yes.

14  *Q.*  Right?

15  *A.*  Sandra and I worked on that together.  And, as I said,

16  there were many iterations of it.

17  *Q.*  And you -- you testified that -- excuse me -- yesterday the

18  key in the right -- in the bottom right was -- says "off

19  limits," right, in italics?  Right?

20  *A.*  Yes.

21  *Q.*  Now, this legend, ma'am, was not on the version that

22  Mr. Hayek sent you and commented on in October of 2015; right?

23  *A.*  I don't know.  I mean, we'd have to have a look at it.

24  *Q.*  Well --

25  *A.*  But if you say it's not, then I'm going to go with, it's

Bridget Fanning - Cross

1    not.

2    *Q.*  Well, we certainly know that Mr. Hayek in his email to

3    you didn't say that DaVita and USPI -- didn't use the words to

4    you that they were off limits; right?

5    *A.*  Not in that email, he didn't.  No.

6           *MR. MELSHEIMER:*  Let's take a look at Government

7    Exhibit 345.

8    *BY MR. MELSHEIMER:*

9    *Q.*  This is -- now we're into the next year, ma'am.  This is

10   January 2016.  And this is an exchange you have with

11   Mr. Haines, who is one of these headhunters; correct?

12   *A.*  Yes.

13   *Q.*  He's asking about a particular candidate, and you say --

14   from DaVita.  And you say, "Nope.  Completely off limits unless

15   they have left or talk to their boss and get permission."

16   Right?

17   *A.*  Yes.

18   *Q.*  Now, this is you using this word "permission" again.  And I

19   think we've agreed that that word was not in Mr. Hayek's

20   October 16 email; fair?

21   *A.*  Correct.  But there was another email that had come up.

22   But, yes.

23          *MR. MELSHEIMER:*  Let's take a look at GX344.

24   *BY MR. MELSHEIMER:*

25   *Q.*  You were asked about this on your direct examination.  And,

Bridget Fanning - Cross

1    again, you used this term "off limits" to SCA?

2    A.  Yes.  That's generally how we referred to those kind of

3    agreements.  Right?  In the same way no-poach agreement, off

4    limits is another way of saying that.  But, yes, they're my

5    words.

6    Q.  Now, let's talk about Mr. Andy Kay -- or Andrew Kay, I

7    believe.  Do you remember the government asking you about in

8    your direct examination the email you wrote to Mr. Kay in

9    April of 2016?

10   A.  Yes, I do.

11           MR. MELSHEIMER:  Let's take a look at this exhibit.  I

12   believe it's A002.  Your Honor, if it's not in evidence, we

13   offer it.

14           THE COURT:  Well, it's not in evidence.  And yes, it's

15   admitted.

16           (Exhibit A002 admitted.)

17   BY MR. MELSHEIMER:

18   Q.  Just to set the timing here, ma'am, let's go to the bottom.

19           So this was an inquiry from Mr. Kay at DaVita, who

20   says, "I'm writing to share my profile with the hopes of

21   learning more about SCA."

22           If we can go up in the email string.

23           This is your response to him:  It says, "Dear Andrew,

24   firstly, thank you for proactively reaching out."

25           Let's go now to Government Exhibit 81, which is your

Bridget Fanning - Cross

1    exchange with Mr. Hayek about this candidate.

2           Do I have that right?

3    A.  Yes, that's right.

4    Q.  You actually forward him the email string at 12:39 on

5    Saturday, April 23, 2016; correct?

6    A.  I worked a lot of Saturdays.  Yes.

7    Q.  It sure seems like you did, ma'am.  "Andrew, I think I

8    probably know the answer, but I thought I'd ask.  This possible

9    candidate has reached out to me and is a senior group director

10   of ops with DaVita.  Is it a no-go?"  And then you say, "I can,

11   of course, diplomatically explain that DaVita is a partner and

12   we don't recruit from partners without permission."  Is that

13   what you said?

14   A.  Yes.

15   Q.  Let's look at his response, which is, "I think the same

16   rules apply.  Would give him the message that we would only

17   engage if he had already shared with his supervisor that he

18   wants to explore outside opportunities and speak with SCA."

19   Did I read that correctly?

20   A.  Yes.

21   Q.  Then he goes on to say, "We're at a very sensitive stage

22   right now with DaVita."

23   A.  That's right.

24   Q.  This is April of 2016; right, ma'am?

25   A.  Yes.  So this is near the end of my time with SCA.  And

Bridget Fanning - Cross

1   Andrew and I had had a conversation around this time, when

2   Andrew had said that DaVita was strategic partners.  And that

3   was the first I heard of it.

4   Q.   That's what you understood him to mean about the sensitive

5   stage?

6   A.   Yes, because we just had a conversation about it.  It was

7   around this time.  It would have been within a couple of weeks

8   or so of this timing.

9   Q.   So let's go back to your communication with Mr. Kay, which

10  is Exhibit A002.

11       And you say to him, "DaVita is strategic partners for

12  us, and we have a company policy that we don't recruit from our

13  clients and strategic partners unless candidates have been

14  given explicit permission."  Do you see that?

15  A.   Right.

16  Q.   Now, again, Mr. Hayek didn't say anything about -- he did

17  not use the words "explicit permission" in his email to you

18  that we just reviewed; correct?

19  A.   He said they had to notify their supervisors and let them

20  know they want to be considered by SCA.  So if you have to go

21  to your boss and say, I want to be considered for a job at SCA,

22  you're effectively asking for permission.  But he didn't use

23  those words.

24  Q.   So --

25  A.   It's my interpretation of it.

357

Bridget Fanning - Cross

1  Q.  Okay.  Thank you for saying it that way.  So that was your

2  interpretation of what Mr. Hayek said in his email; correct?

3  A.  Yes.

4  Q.  Mr. Hayek did not tell you in that email that Mr. Kay

5  could not be hired by SCA, did he, ma'am?

6  A.  He told me -- I mean, we'd have to go to the email.  But

7  what he specifically said was he has to tell his boss he is

8  leaving and that he shared with his supervisor he wants to

9  explore opportunities and speak with SCA.

10       MR. MELSHEIMER:  Your Honor, I'm about to move to a

11  different spot.  I think I could finish up rather quickly if we

12  could take our break around this time.

13       THE COURT:  Okay.

14       How much time would you like today, folks, for a

15  morning break?

16       JUROR:  Ten minutes.

17       THE COURT:  How about eleven?

18       Eleven minutes.  10:40.

19       (Jury out at 10:29 a.m.)

20       MR. MELSHEIMER:  Your Honor, I'd like to take up

21  something about the next area of questions outside the presence

22  the witness.  I don't want to cut into the Court's break.  This

23  is I want to get some guidance from the Court because I know

24  there is a motion *in limine* on a different subject, and I want

25  to make sure I'm adhering to the Court's rules.

Bridget Fanning - Cross

1           The government filed a motion *in limine* with respect

2     to the -- the illegality -- you may remember this -- of the --

3     that the defendants' knowledge of the legality or illegality

4     was not to be gotten into.

5           THE COURT:  That's right.

6           MR. MELSHEIMER:  We're not doing that.  I think I'm

7     entitled to get into what this witness has told the

8     investigators multiple times, that she did not think this was

9     illegal.  And the reason for that is, she has said on her

10    direct examination, elicited by the government, that she

11    thought the agreements were -- she wasn't comfortable with

12    them, she was embarrassed by them, she thought they were wrong.

13    And I think I'm entitled to -- so they've left the jury with

14    that impression, that this HR person, you know, thinks really

15    poorly of these agreements.  And I think I'm entitled to say,

16    ma'am, that may well be; but you told the government multiple

17    times that you didn't think there was anything illegal about

18    this type of agreement.  So I wanted to make --

19          What you said in your clarifying order, you said, the

20    defendants will stick to the letter and the spirit.  And I want

21    to make sure I'm not, you know, the letter killeth but the

22    spirit giveth life.  So I want to make sure that I am not

23    violating the spirit of that order.

24          MS. LEWIS:  Thank you, Your Honor.

25          I think our position was, as stated in our motion,

Bridget Fanning - Cross

1    that the defendants' knowledge or lack thereof of the

2    illegality of these agreements is not relevant to the elements

3    of the crime, certainly it is not relevant whether the witness

4    did or did not know the nuances of the Sherman Act.  She's been

5    able to testify to her personal knowledge, her understanding of

6    these agreements as a layperson.  That's perfectly appropriate,

7    entirely within the province of the jury to hear that evidence,

8    to weigh that evidence.  The issue of legality or illegality

9    simply is not relevant.

10          *THE COURT:*  All right.  Thank you.  Thank you for

11   bringing that up.  I agree with the government.

12          Now let's take our break.

13          (Recess at 10:31 a.m.)

14          (In open court at 10:57 a.m.)

15          *THE COURT:*  That was a Texas eleven minutes.

16          *MR. MELSHEIMER:*  Everything is bigger.

17          (Jury in at 10:59 a.m.)

18          *THE COURT:*  Sorry about the eleven minutes.  I had a

19   couple of things I had to deal with, but we're ready to go.

20          *MR. MELSHEIMER:*  May it please the Court.

21   *BY MR. MELSHEIMER:*

22   *Q.*  Dr. Fanning, I'm almost finished, and I appreciate your

23   patience.  I want to start, though, with something we ended

24   with, which was that October 2015 email from Mr. Hayek

25   describing the agreement.

Bridget Fanning - Cross

1          So fair to say that being here in court is not the

2    first time you looked at that email; right?

3    *A.*   Correct.

4    *Q.*  You've looked at that email multiple times with your

5    meetings with the government, for example; right?

6    *A.*   Yes.

7    *Q.*  You have just also looked at it on your own, because you

8    too -- you actually had some of your emails from when you

9    worked at SCA after you left; fair?

10   *A.*   Yes.

11   *Q.*  You actually went through on your own at one point and

12   looked for things on your computer that you thought might be

13   useful; fair?

14   *A.*  Relevant.  I don't know about useful, but certainly to this

15   situation.  Yes.

16   *Q.*  But to be fair, you don't know what is relevant to this

17   case or not; right?  That's the judge's job; right?

18   *A.*  Right.  I was just looking for things that were about this

19   agreement or recruitment.  I mean, there is 60,000 emails or

20   more on my laptop.

21   *Q.*  But this is one you looked at multiple times?

22   *A.*   Yes.

23   *Q.*  Right?  So I asked you about it before we took the break,

24   and you said -- let me just see if you remember saying this --

25   "I mean, we have to go to the email.  But what he

Bridget Fanning - Cross

1   specifically said was he has to tell his boss he is leaving and
2   that he shared with his supervisor he wants to explore
3   opportunities."  And I emphasize that word "leaving," because
4   that was your word.  I just want to go back and look at the
5   email, maybe not for the last time -- because we're going to
6   hear from Mr. Hayek, it sounds like.  But what he says is, "We
7   can recruit junior people below director, but our agreement is
8   that we would only speak with senior executives if they have
9   told their boss already they want to leave and are looking."
10  A.   Yes.  That's what it says.
11  Q.   Okay.  So let me ask you about something else.  You have
12  been -- fair to say, you've been critical of the agreement that
13  we're here to talk about today; right?
14  A.   Yes.
15  Q.   And in 2014, when you joined SCA and you said you had
16  learned of the agreement, you had had about 20 plus years in
17  human resources experience; fair?
18  A.   Yes.
19  Q.   You had leadership roles in various HR organizations at
20  some of the largest companies in the world, including General
21  Electric; fair?
22  A.   Yes.
23  Q.   You know that the government in this case, the Division,
24  has turned over thousands of emails from SCA to this side of
25  the room; right?

Bridget Fanning - Cross

1   A.   Yes.

2   Q.   You also provided some emails to the government; right?

3   A.   Yes.

4   Q.   Does it sound right that you provided at least 38,000

5   emails to the government?

6   A.   At least.

7   Q.   Would it surprise you, with attachments, that that ended up

8   being hundreds of thousands of files?

9   A.   That I provided?  Hundreds of thousands of files?

10  Q.   You provided -- electronic files, attachments and things

11  like that.

12  A.   There were -- I mean, I know -- I would agree with you on

13  the number of emails.  I have not counted the number of

14  attachments.  But I'm surprised out of a population of 60,000

15  emails I could have hundreds and hundreds of thousands of

16  files.

17  Q.   So, you know what, let's stop with what we can agree.

18  A.   Yeah.

19  Q.   It's about 38,000 emails; fair?

20  A.   At least.  Yeah.

21  Q.   Okay.  And you told the government in some of your meetings

22  with them -- and I want to talk about those briefly -- that

23  there were a few emails that stood out to you.

24  A.   Yes.

25  Q.   So during your direct testimony, ma'am -- tell me if I have

Bridget Fanning - Cross

1    got this right -- which was yesterday.

2    A.   Uh-huh.

3    Q.   You weren't shown a single email that you sent between

4    when you started work at SCA in 2016, where you in an email

5    voiced any displeasure about the agreement?

6    A.   No, I never voiced my displeasure through emails.  It's

7    pretty rare for me to do that.  That's a conversation.

8    Q.   Have you seen such an email in your review of thousands of

9    emails that you had on your computer?

10   A.   There wouldn't be one.  Not an email.  It's a sensitive

11   topic.  I would talk to the CEO directly.

12   Q.   Well, ma'am, you certainly had no issue putting the terms

13   of the agreement in emails to outside recruiting firms; fair?

14   A.   Correct.  And forwarding Andrew's emails, yes.

15   Q.   You had no problem discussing by email the terms of the

16   agreement with Mr. Hayek; right?

17   A.   Correct.

18   Q.   I want to talk just briefly here at the end, Dr. Fanning --

19   you first spoke to the government about this case in about May

20   of 2019; do I have that right?

21   A.   Yes.

22   Q.   Am I right that in one of your early meetings, you told

23   the -- the Division that Andrew Hayek was one of the most

24   ethical CEOs you ever worked with?

25   A.   Yes.

Bridget Fanning - Cross

1    Q.   Now, you had an initial call in May of 2019 by phone; do

2    you remember that?

3    A.   Yes.

4    Q.   And then you had a number of meetings with the government

5    after that; fair?

6    A.   Yes.

7    Q.   Some of those were in-person meetings?

8    A.   Yes.

9    Q.   Some of them were via videoconference?

10   A.   I remember one by videoconference, possibly two or three.

11   Yes.

12   Q.   You've also exchanged text messages with Special Agent

13   Hamel, who is sitting here at the Division's table; right?

14   A.   Yes.

15   Q.   And the government produced to us about 28 text messages

16   that you and Mr. Hamel exchanged.  Does that sound about right?

17   A.   Yes.  I haven't counted them; but, I mean, yes, I would

18   think so.

19   Q.   You emailed Special Agent Hamel and others at the FBI on

20   a number of times; correct?

21   A.   Well, pretty much most of my communications were directly

22   through Agent Hamel.  Most recently organizing my flights and

23   the administration for being here.  There were other people I

24   communicated with.

25   Q.   Most recently -- thank you for clarifying that.  Most

Bridget Fanning - Cross

1    recently, you met with the Division and their lawyers a few

2    times in February --

3    *A.*   Yes.

4    *Q.*   -- and in March --

5    *A.*   Yes.

6    *Q.*   -- to prepare for your testimony; fair?

7    *A.*   Yes.

8    *Q.*   So I've counted in that production, ma'am -- you just tell

9    me if this sounds right to you.  If it doesn't, speak up --

10   about 65 or so communications or meetings you had with the

11   government about this case since May of 2019?

12   *A.*   Yeah, that could be about right.  I've not counted them,

13   but I've met with them a lot.

14   *Q.*   The FBI even texted you a copy of the government's press

15   release about this case being on file; do you remember that?

16   *A.*   Yes.  I think so, yes.

17   *Q.*   And you texted him back, "Thanks, Matt."

18   *A.*   Yes.  Sounds about right.

19   *Q.*   At the end of February, you obtained a non-prosecution

20   agreement from the government; isn't that right?

21   *A.*   Yes, I did.

22   *Q.*   That was on or about February 25, 2022.  Does that sound

23   about right?

24   *A.*   Yes.

25   *Q.*   And what that letter says is that you will not be

Bridget Fanning - Cross

1   prosecuted for anything that you've talked about in connection

2   with your testimony; fair?

3   A.  Says I won't be criminally prosecuted.

4   Q.  Okay.  Well, you understand this is a criminal case, a

5   felony case, ma'am; right?

6   A.  From the notice to Human Resources Professionals in

7   October 2016, yes, I understand this is a criminal case.

8   Q.  Okay.  And you're talking about something you read in

9   October of 2016 about a change in policy --

10         MS. LEWIS:  Your Honor, I'm going to object to this

11   line, in light of the motion *in limine* ruling.

12         THE COURT:  Where are you going with this?

13         MR. MELSHEIMER:  I'm just following up on what she

14   said, Your Honor.

15         MS. LEWIS:  Your Honor, we could approach if that

16   would be helpful.

17         MR. MELSHEIMER:  I can withdraw the question, Your

18   Honor.  I can withdraw it.

19         THE COURT:  Okay.

20         MR. MELSHEIMER:  May I have one moment, Your Honor?

21         THE COURT:  Yes.

22         MR. MELSHEIMER:  You know the old joke, Your Honor.

23   Three lawyers, four opinions.

24         THE COURT:  No.

25         MR. MELSHEIMER:  Pretty good joke, though.

Bridget Fanning - Cross

1   *BY MR. MELSHEIMER:*

2   *Q.*   Ma'am, just to get back to that.  You will not be

3   prosecuted criminally; is that what you told us?

4   *A.*   Yes.

5   *Q.*   That's what your non-prosecution agreement is?

6        *THE COURT:*  Mr. Melsheimer, she said that several

7   times.  You're getting very repetitive in your cross.

8        *MR. MELSHEIMER:*  I apologize, Your Honor.  I

9   apologize.

10  *BY MR. MELSHEIMER:*

11  *Q.*   That agreement followed all of these communications with

12  the government that started in May of 2019; is that fair?

13  *A.*   Yes.

14  *Q.*   Just, finally, you left SCA in about the summer of 2016; is

15  that correct?

16  *A.*   Yes.  The end of June, first week of July 2016.

17  *Q.*   You wanted to stay on if you could have worked something

18  out; true?

19  *A.*   No.  I was done with SCA.

20  *Q.*   Didn't you attempt to negotiate a longer-term arrangement

21  with SCA and Mr. Hayek?

22  *A.*   Kind of, but not really.

23  *Q.*   Okay.  I've got to ask you, what does that mean?

24  *A.*   Well, Andrew wanted to cut my time back to 20 percent.  And

25  to be honest, I was working 24 by 7 at SCA.  I was doing a

Bridget Fanning - Cross

1    full-time job and getting paid part time for it.  And what

2    Andrew wanted to do was, now that I had hired 13 VPs or more,

3    he no longer really needed a talent officer; but he really

4    didn't want me to leave.  So he wanted to take my time down and

5    get me focused onto kind of recruiting and talent, the things

6    that he -- specifically that were really difficult, that

7    someone of my caliber and skills, he really needed.  But he

8    didn't want me to carry on running the HR function.  So I

9    didn't want to carry on doing that, so I just moved on.  I have

10   a lot of opportunities.

11   Q.  Thank you for explaining that.  Just two other questions

12   about that.  One is, no doubt you were working very, very hard.

13   You were being paid by the day; right, ma'am?

14   A.  Yes, I was.

15   Q.  So when you worked on Saturdays, you were being paid the

16   $4,000 --

17   A.  No, I wasn't.  That was also part of the problem.  It was

18   $4,000 a day for eight-hour days.  I was working on my

19   vacations, sometimes five, six days a week without being paid.

20   I would sometimes work a 16-hour day on a Saturday.  I would

21   not get paid.  I sometimes did the same thing on a Sunday.  And

22   I was working 24 by 7, and I was getting paid for eight hours a

23   day at 4,000 a day, with a cap of so many days a month.  And

24   whether I worked 20 days or more, I wasn't getting paid for

25   that.  But I was well paid.  Right?  So I'm not complaining

369
Bridget Fanning - Cross

1    about my pay.  But, no, that wasn't the case.

2    Q.  Ma'am, I don't want to touch a sore subject.  Do I

3    understand you to be saying, though, that if the working

4    conditions had been better in terms of your time commitment and

5    your role, that you would have been interested in staying at

6    SCA?

7    A.  No.  I think at that point -- when talent no longer became

8    the priority -- Andrew was looking at selling the company to

9    Optum, and it was no longer a number one priority -- we had

10   hired all of these people, a lot of the problems had been

11   solved, quite frankly, the role was less interesting to me once

12   the strategy changed.

13   Q.  So you -- there wasn't as much of a hiring strategy, so

14   that job wasn't as appealing to you.  Fair?

15   A.  Correct.

16   Q.  You're talking about selling the company, that Mr. Hayek

17   was trying to sell the company?

18   A.  Uh-huh.

19   Q.  Were you aware that DaVita was one of the suitors to buy

20   Surgical Care Affiliates?  Were you aware of that?

21   A.  No, I don't think so.  But I knew that there was some kind

22   of business relationship at that point.

23   Q.  Dr. Fanning, thank you for being so patient and coming in.

24   Thank you.

25            THE COURT:  All right.  Redirect.

Bridget Fanning – Redirect

1                          **REDIRECT EXAMINATION**

2      *BY MS. LEWIS:*

3      *Q.*  Good morning again, Dr. Fanning.

4            Dr. Fanning, we looked at the email exchange with

5      the individual, Andrew Kay.  Do you remember that email

6      exchange?

7      *A.*  Yes, I do.

8      *Q.*  And did Mr. Kay have any sort of offer or anything he could

9      have used to negotiate with his boss as a result of that

10     email exchange?

11     *A.*  Not from SCA.  No.

12     *Q.*  You gave him a bit of a stiff arm in that email, didn't

13     you?

14     *A.*  Yes.

15     *Q.*  Okay.  And you couldn't even talk to Andrew Kay because of

16     this no-poach agreement; is that right?

17            *MR. MELSHEIMER:*  Objection.  Leading.

18            *THE COURT:*  Sustained.

19     *BY MS. LEWIS:*

20     *Q.*  Why couldn't you talk to Andrew Kay?

21     *A.*  Because of the agreement between Kent Thiry and Andrew

22     Hayek.

23     *Q.*  And, Dr. Fanning, Mr. Melsheimer asked you about your

24     involvement in business transactions; do you recall that?

25     *A.*  Yes, I do.

Bridget Fanning - Redirect

1    Q.  And did you have some involvement in business deals at SCA?

2    A.  Yes, I did.

3    Q.  What was your role?

4    A.  I was responsible for mergers and acquisitions and all the

5    people implications with regards to business deals.  So I was

6    involved very early on into the due diligence process with

7    regards to looking at the talent, analyzing compensation,

8    looking at the benefits.

9         When you're looking at acquiring a company, or vice

10   versa, you have to look at the benefits the employees are on

11   this side and the benefits that you have, because it affects

12   the price of the deal more than anything else.  And I was

13   responsible for that activity and did that activity for SCA.

14   Q.  And was this no-poach agreement with DaVita part of any

15   business transaction that you were aware of?

16   A.  Not that I was aware of.

17   Q.  And then you also looked at several documents regarding the

18   potential universe for talent with Mr. Melsheimer.  Do you

19   recall that?

20   A.  Yes, I do.

21   Q.  And you indicated, I believe, that not all of those

22   companies would have been good candidates for talent; is that

23   right?

24   A.  Correct.  They're not all created equal.

25   Q.  And you referred to kind of a bull's-eye approach.  I want

1   to ask you, Dr. Fanning, where would DaVita fall within that

2   bull's-eye as a potential target for talent?

3   A.   It would have been in the top.

4   Q.   And then you also testified about the communications that

5   you had with regard to Heidrick & Struggles.  Do you recall

6   that?

7   A.   Yes, I did.

8   Q.   We looked at documents that were roughly July of 2015; is

9   that right?

10  A.   Yes.  That's right.

11  Q.   Were you aware of the no-poach agreement with DaVita prior

12  to July of 2015?

13  A.   Oh, yes.  Yeah.

14  Q.   And did you have conversations with Heidrick & Struggles

15  about the off-limits with DaVita?

16  A.   Yes, I did.

17  Q.   And why was DaVita specifically off limits?

18  A.   Because of the agreement between Andrew Hayek and Kent

19  Thiry.

20  Q.   And, Dr. Fanning, I think you testified that you thought

21  these no-poach agreements were common.  Did I hear that

22  correctly?

23  A.   Yes, you did.

24  Q.   And it looked like you wanted to explain that.  Could you

25  just explain what you meant by that.

Bridget Fanning - Redirect

1   A.   Yeah.   CEOs often make agreements with other CEOs.   I

2   suspect they'll make them less now.   But those that are in tier

3   two cities, for example, like Milwaukee, Pittsburgh,

4   whatever -- when I was at General Electric, Jeff Immelt made an

5   agreement with the CEO of Bank of America not to hire each

6   other's employees.   That was hundreds of thousands of people

7   put off limits between two companies, between Jeff Immelt and

8   the CEO at the time of Bank of America.   But what they were,

9   really, was nonsolicit agreements, which is, we're not going to

10   proactively reach out to your people.   But if people apply,

11   then they're fair game.   So I've come across them multiple

12   times.

13   Q.   And those types of no-poach agreements that you're

14   referring to, you're not referring to ones that are integrated

15   into business deals or transactions; are you?

16   A.   No --

17        MR. MELSHEIMER:   Your Honor, objection.   Leading

18   again.

19        THE COURT:   Sustained.

20   BY MS. LEWIS:

21   Q.   Were the no-poach agreements that you were referring to

22   part of any business transaction or not?

23   A.   No.

24   Q.   And Mr. Melsheimer also asked you on direct -- I'm sorry --

25   on cross-examination that if Mr. Hayek used the term "off

Bridget Fanning - Redirect

1   limits" -- and we looked at the email, and he made a point

2   that it wasn't using the phrase "off limits" in that email.

3   Dr. Fanning, why did you characterize this as an off-limits

4   agreement?

5   A.  Because that's how we discussed it.  I mean, we had

6   multiple conversations about it.  We talked about it when I

7   first joined.  And in the industry, that's what you call these

8   kind of agreements, no-poach agreement, off limits is a way of

9   referring to a company that means you can't recruit.  So if you

10  look at any of the recruitment documents, the recruiters will

11  have put in their list of off-limits.  It's a term -- very

12  commonly used term that is used.

13  Q.  And Mr. Melsheimer also made the point that the email

14  that we looked at from Andrew Hayek, where he was putting the

15  companies in italics, that it didn't say anything about keeping

16  DaVita at DaVita; it didn't say anything about keeping SCA at

17  SCA.  Do you remember Mr. Melsheimer discussing that with you?

18  A.  Yes, I do.

19  Q.  And did you understand that to be the purpose of this

20  agreement?

21  A.  I believed it was to avoid the business disruption that

22  comes with executives leaving.

23  Q.  And how did this agreement avoid that disruption?

24  A.  It kept SCA executives from leaving to go to DaVita, and it

25  kept DaVita executives from leaving and going to SCA.

1          *MS. LEWIS:*  Thank you, Dr. Fanning.  Nothing further.

2          *THE COURT:*  Any questions from the jurors for the

3     witness?

4          Yes.

5          (Hearing commenced at the bench.)

6          *THE COURT:*  Here is No. 2.

7          *MR. MELSHEIMER:*  I think she's going to say she

8     doesn't know, but it's not an inappropriate question.

9          *MS. LEWIS:*  No objection.

10         *MR. MELSHEIMER:*  I don't object, Your Honor.  Sorry.

11         *THE COURT:*  No. 3.

12         *MS. LEWIS:*  May I, Your Honor?

13         No objection.

14         *MR. MELSHEIMER:*  No objection.

15         *THE COURT:*  No. 4.

16         *MS. LEWIS:*  No objection.

17         *MR. MELSHEIMER:*  No objection.

18         *THE COURT:*  Here is No. 5.

19         *MS. LEWIS:*  I think, Your Honor, this one may be

20     getting into asking her to opine on legality.  I don't know if

21     there is a particular way to strike portions.  I'm not sure

22     what the Court's practice is.

23         *MR. MELSHEIMER:*  We don't have an objection.

24         *MS. CLINGAN:*  Can we just see --

25         *MS. LEWIS:*  I think that's fine.  No objection.

376

1              THE COURT:  It could cut both ways, folks.

2              MS. LEWIS:  No objection.

3              MR. MELSHEIMER:  No objection.

4              THE COURT:  No. 7.

5              MS. LEWIS:  We would object to question one of the

6        two.

7              MR. MELSHEIMER:  You shouldn't have sustained that

8        objection, Judge.  They're dying to know the answer.

9              MS. LEWIS:  It's not an element of the offense.

10             THE COURT:  Actually, according to Julie, one of the

11       jurors does have a question about law that she wants to ask.  I

12       don't know what it is.

13             MR. MELSHEIMER:  Maybe it's this one.

14             MS. CLINGAN:  There is two issues.  One, it's likely

15       to get into privileged information.  And, two, it's not

16       relevant to the offense charged.

17             MR. MELSHEIMER:  Can we see it when you're through,

18       Your Honor, again, just to study it?

19             Can we just have a moment, Your Honor?

20             MS. CLINGAN:  Can I take a peek at No. 2?

21             MR. MELSHEIMER:  We don't -- Your Honor, again, we

22       don't have an objection to either one of these questions.  I

23       understand you didn't want me to ask her what she thought, but

24       this is just whether or not she did certain things.  And I

25       think it's a fair question.

1      MS. LEWIS:  We would continue to maintain our

2  objection.  We also note that she mentioned that the general

3  counsel of SCA was involved in some of the discussions, and we

4  do not want to invade SCA's potential privilege on this issue.

5      THE COURT:  Well, that could be fixed by just asking

6  if it was discussed with Hayek.

7      MS. LEWIS:  We would continue to object on the

8  relevance of her and/or Hayek knowing --

9      MS. CLINGAN:  It's just a backdoor way of getting the

10  witness to opine on legality.

11      MR. MELSHEIMER:  I don't know what the witness is

12  going to say, Judge.

13      THE COURT:  They don't either.

14      MR. MELSHEIMER:  They do, I think.

15      I think that's a good point, Judge.  I don't know that

16  anyone actually knows what she's going to say.  I agree with

17  that.

18      THE COURT:  But -- all right.  I'll sustain the

19  objection.  It's a close call.  It's not quite the same.

20      MR. MELSHEIMER:  Can you modify the question, Judge?

21      THE COURT:  How?

22      MR. MELSHEIMER:  I hate not to ask a juror question if

23  I think it's a good one.

24      THE COURT:  How would you modify it?

25      MR. MELSHEIMER:  Well, I think if I could -- do you

378

 1    mind if I can see it again?

 2          THE COURT:  I mean, we can ask, Did you ever talk with

 3    Hayek about whether it was an ethical thing to do?  But that's

 4    really not their question.

 5          MR. MELSHEIMER:  I wouldn't ask that one.

 6          MS. LEWIS:  I don't believe there is a way to ask

 7    anything about the legality without getting --

 8          MR. MELSHEIMER:  Has she ever talked to anybody about

 9    its legality.  That's just a yes or no.  You could tell her to

10    say --

11          THE COURT:  All right.  The objection is sustained to

12    the question.  But there is no objection to question 2?

13          MS. LEWIS:  Correct, Your Honor.

14          MR. MELSHEIMER:  Your Honor, can I raise one point?

15          THE COURT:  Uh-huh.

16          MR. MELSHEIMER:  Your Honor, I just want to move into

17    evidence with her B474, which is the non-pros.  I wanted to

18    move that into evidence.  I don't think there is an objection

19    to it.

20          MS. LEWIS:  No objection, if they could just let the

21    jurors see it so they're aware.

22          MR. MELSHEIMER:  I can pull it up on the screen, Your

23    Honor.  Just --

24          THE COURT:  384?

25          MR. MELSHEIMER:  474.

1          *THE COURT:*  474 is an email chain.

2          *MR. MELSHEIMER:*  B474.

3          *MS. LEWIS:*  It's a defense exhibit.

4          *MR. MELSHEIMER:*  I'm sorry.  I apologize.

5          *THE COURT:*  You can offer that.  I'm going to ask you

6   both if you have follow-up questions to these, and you can do

7   that.

8          *MR. MELSHEIMER:*  Can I follow up with the question you

9   didn't ask?  Joking.

10          (Hearing continued in open court.)

11          *THE COURT:*  Well, your questions certainly drew a lot

12   of interest from the lawyers.  And if there is one that I don't

13   ask, remember it's not because it wasn't a good question; it's

14   just because of possibly crossing a line as to what can be

15   asked.  But here we go.

16          Questions from the jury for you.

17          *THE WITNESS:*  Okay.

18          *THE COURT:*  Question:  Was Lifeline part of DaVita?

19          *THE WITNESS:*  Yes, it was.

20          *THE COURT:*  And, therefore, was Lifeline part of the

21   agreement?

22          *THE WITNESS:*  Yes, it was.

23          *THE COURT:*  Question:  What other companies fell into

24   this category and agreement?

25          *THE WITNESS:*  I couldn't say, but DaVita had a lot of

1    divisions and subdivisions and affiliates and things.  My

2    understanding is the agreement was total, anything that Kent

3    Thiry was responsible for with regards to DaVita.

4          THE COURT:  Question:  Did any other companies with an

5    off-limits or no-poach agreement also have a

6    tell-your-boss-first first part of the agreement.

7          THE WITNESS:  USPI and DaVita had -- and the DaVita

8    agreement were similar.

9          THE COURT:  And the next question was:  Or was the

10   tell-your-boss part -- was the tell-your-boss part unique to

11   DaVita?  And was it common or uncommon in your industry?

12         THE WITNESS:  I've never seen it before.  Usually

13   these no-poach agreements were, we won't proactively reach out

14   and solicit your people; but if they apply, then we've got to

15   consider them.  I've never seen this inform your boss that

16   you're leaving before.  It was unique to DaVita and USPI.

17         THE COURT:  Question:  Did Andrew have a nonsolicit --

18   did Andrew -- I think the question means Hayek, I think.  Did

19   Andrew have a nonsolicit written agreement with DaVita?  So it

20   would have been Andrew Kay, we're talking about?

21         MR. MELSHEIMER:  Your Honor, I believe it's -- sorry.

22         THE COURT:  Well, the question says "Did Andrew have a

23   written nonsolicit agreement with DaVita?"

24         THE WITNESS:  Quite possibly when he joined.  I'd be

25   surprised if he didn't.  And I suspect him recruiting Michael

1    may have breached that, which was part of the fallout that

2    happened.  But a nonsolicit agreement in a contract is

3    time-bound, so they're usually twelve months.  SCA's nonsolicit

4    in my consulting agreement, which was the same in people's

5    employment agreements, was 24 months.  I believe in Andrew's,

6    it was twelve, in terms of if he left SCA, he couldn't solicit

7    people for twelve months.

8            Whatever Andrew's agreement would have been with

9    DaVita, I don't know, but it would have been time-bound.  It

10   would have been unusual for it to have been more than twelve

11   months after he left.

12        *THE COURT:*  And the juror got right to the point.

13   Follow-up was:  If so, was it time-bound?  For what period?

14        *THE WITNESS:*  Twelve months is what would be usual,

15   but I didn't see the agreement or know the arrangement that

16   Andrew would have had with DaVita.  But I've seen hundreds of

17   these agreements, and it usually means you can't recruit from

18   that company that you just left for twelve months.

19        *THE COURT:*  Question:  In your experience, have you

20   seen that if a company has a legal no-poach agreement --

21   business deal with other companies, do they need to inform

22   employees of the deal or deals upon hiring or at some point so

23   that the employee knows?

24        *THE WITNESS:*  That's a great question.  No, not

25   everybody subject to the no-poach in a business transaction may

1    know about the agreement.  Everybody directly involved in the

2    transaction will, because it's written into the nondisclosure

3    agreement that they have to sign, that they'll keep everything

4    confidential, they won't recruit people, et cetera, et cetera.

5    But these agreements that are in business transactions are

6    normally restricted to the people or the information that they

7    receive as part of the transaction.

8          So if you're part of the transaction, you'll know

9    about this agreement, because you've had to sign it.  But it's

10   possible you could be subject to the transaction.  So if you're

11   looking at buying a company, there could be a manager in that

12   company that doesn't know about the company might be getting

13   sold and who signed a nondisclosure agreement.  But they could

14   be subject to it because they may have been provided a list of

15   people that are in the company or organization charts.  So they

16   might not be aware of it.  But it's usually kind of limited in

17   some way.  It's not usually, you know, 200,000 people, 50,000

18   people.  There's normally a restriction of some kind.

19          *THE COURT:*  Question:  Are legal no-poach business

20   deals typically documented in a formal written, signed

21   agreement?

22          *THE WITNESS:*  Yes.

23          *THE COURT:*  Question:  You mentioned that no-poach

24   agreements are not uncommon.  How did the DaVita/SCA agreement

25   differ from other more common no-poach agreements.

1          THE WITNESS:  Okay.  This is the -- these agreements

2     that happen between CEOs -- as I said, I have never liked them.

3     But those agreements that take place usually means, I won't

4     reach out and solicit your employees if you don't reach out and

5     solicit my employees.  And it's a gentlemen's agreement between

6     two CEOs.  It doesn't have, but if they go and tell their boss,

7     then we can consider them.  So if somebody applies for a job or

8     reaches out and says, I want to be considered for a job, you

9     have to consider them.  The no-poach is invalid.  I've never

10    seen this inform your boss that they're leaving and tell them

11    they want them to be considered by SCA.  I've not seen that

12    before.

13         THE COURT:  And I think the follow-up question, you

14    just answered.  Is the only difference the requirement to tell

15    your boss?

16         THE WITNESS:  Yes.

17         THE COURT:  Question:  I am confused.  Are DaVita

18    executives always off limits to hire, or is it okay to hire if

19    DaVita -- DaVita's boss is aware?

20         THE WITNESS:  If -- if their boss at DaVita is aware

21    that they want to be considered for a job at SCA, then they can

22    be considered for a job at SCA, and they could go through the

23    full recruitment process and receive an offer letter.

24         THE COURT:  Also, if the DaVita person initiates, is

25    he or she still off limits?

Bridget Fanning – Examination

1          THE WITNESS:  Yes.  That was a lot of the emails,

2    Craig McKessar, Andrew Kay, John Lee, Jordan Thau.  There were

3    multiple occasions where people reached out to us proactively

4    asking to be considered for opportunities, and we had to tell

5    them, no, there is a go-and-tell-your-boss-that-you're-leaving,

6    and then we can consider you.

7          THE COURT:  Those are the jurors' questions, unless

8    you have some additional questions.

9          No.  All right, then.

10          Ms. Lewis, do you have any follow-up questions?

11          MS. LEWIS:  Yes, just a couple of brief ones.

12                           **EXAMINATION**

13   BY MS. LEWIS:

14   Q.  Dr. Fanning, you were testifying about an Andrew with the

15   nonsolicitation provision.  I just wanted to clarify, is that

16   Andrew Hayek that you were referring to?

17   A.  Yes, it was Andrew Hayek.

18   Q.  And what year, if you know, did he leave DaVita?

19   A.  Gosh, I don't know.  He had been at SCA six years when I

20   joined in 2014, so if you do the math -- I haven't done the

21   math.  I'm too nervous to do the math.

22   Q.  Roughly 2008 time period; does that sound roughly right?

23   A.  Yeah.  Actually, that sounds about right, yeah.

24   Q.  And you testified that any nonsolicitation provision

25   typically you thought would have been maybe a year at most?

1    *A.*   Yes.

2    *Q.*   Okay.  And then with regard to this -- the tell-your-boss

3    provision, I'll call it, you testified about that.  Does that

4    provision make these nonsolicitation, no-poach agreements --

5    does it make it more restrictive or less restrictive?

6    *A.*   More restrictive.  It means even if I really want to be

7    considered for a job, I can't consider you unless you go and

8    tell your boss.  And people don't want to go and tell their

9    boss, I am leaving, and I want to be considered by the other

10   company, because you don't know how your boss is going to

11   react.  In a lot of cases, they're going to say, Okay.  Bye.

12   And then you're unemployed for six or twelve months until you

13   find another job.

14   *Q.*   And how many, if you recall, candidates successfully jumped

15   through those hoops and got an offer from SCA?

16   *A.*   None.

17         *MS. LEWIS:*  Thank you.

18         *THE COURT:*  Mr. Melsheimer, any re-recross?

19         *MR. MELSHEIMER:*  Your Honor, I don't.  But may we

20   approach the bench with one issue related to an answer?

21         *THE COURT:*  Okay.  Maybe I ought to just put a chair

22   up here for you, Mr. Melsheimer.

23         (Hearing commenced at the bench.)

24         *MR. MELSHEIMER:*  Your Honor, it just strikes me as

25   peculiar that she was allowed to answer a question about a

386

```
 1   legal no-poach agreement --
 2           THE COURT:  You didn't object.
 3           MR. MELSHEIMER:  Well, Your Honor, I didn't think --
 4   that's true.  But you sustained an objection to a question that
 5   also asked that, so I just --
 6           THE COURT:  I might have sustained an objection to
 7   that one, but you didn't make it.
 8           MR. MELSHEIMER:  Okay.  Thank you, Your Honor.
 9           (Hearing continued in open court.)
10           THE COURT:  All right.  That's it.
11           Dr. Fanning, thank you for your testimony.
12           MR. MELSHEIMER:  Your Honor, may it please the Court.
13   Just that one exhibit.
14           THE COURT:  Yes.  You wanted to admit --
15           MR. MELSHEIMER:  Your Honor, we move to admit into
16   evidence Defense Exhibit B474, which is the non-prosecution
17   agreement.  I'd just like to show it on the screen for the
18   jury's benefit.
19           THE COURT:  All right.  It's admitted.
20           (Exhibit B474 admitted.)
21           So that's all.  But I'm curious, I'm going to ask you
22   a question.
23           THE WITNESS:  Oh.
24           THE COURT:  Where does the accent come from?
25           THE WITNESS:  I'm from London originally.  But I've
```

```
 1   been here 20 years now, I'm an American citizen, so I've picked
 2   up a twang.  Everyone thinks I'm from Australia.
 3            THE COURT:  Thank you for your testimony.
 4            THE WITNESS:  Thank you very much.
 5            THE COURT:  You're excused and free to leave.
 6            THE WITNESS:  Thank you.
 7            THE COURT:  Next.
 8            MR. VIGEN:  Your Honor, William Vigen for the
 9   United States.  We'd call Michael Rucker as the next witness.
10            THE COURT:  Okay.
11            (MICHAEL RUCKER, GOVERNMENT'S WITNESS, SWORN)
12            THE COURT:  Thank you.
13                       DIRECT EXAMINATION
14   BY MR. VIGEN:
15   Q.  Can you please introduce yourself to the jury.
16   A.  Yes.  My name is Michael Rucker.
17   Q.  Please spell your last name for the court reporter.
18   A.  Yes.  It's R-U-C-K-E-R.
19   Q.  And where do you live?
20   A.  I live in Wilmette, Illinois.
21   Q.  Where are you currently employed?
22   A.  At Ivy Rehab.
23   Q.  What is your position at Ivy Rehab?
24   A.  I'm the chief executive officer.
25   Q.  Can you give the jury a general sense of your educational
```

1   background, please.

2   *A.*   Undergrad degrees in accounting and finance and an MBA.

3   *Q.*   And, Mr. Rucker, have you received a letter indicating you

4   will not be prosecuted for the conduct we are going to discuss

5   today?

6   *A.*   I have.

7   *Q.*   Do you know one of the defendants, Mr. Kent Thiry?

8   *A.*   I do.

9   *Q.*   And how do you know Mr. Thiry?

10  *A.*   Mr. Thiry was the chief executive officer at DaVita when I

11  was a teammate there.

12  *Q.*   Okay.  And how did you become a teammate at DaVita?

13  *A.*   DaVita acquired Gambro Healthcare, and I was an employee at

14  Gambro Healthcare prior to that.

15  *Q.*   And approximately what year did DaVita acquire Gambro?

16  *A.*   2005.

17  *Q.*   And then did you stay at DaVita?

18  *A.*   I did, through about 2008.

19  *Q.*   And what was your role while you were at DaVita?

20  *A.*   I was a regional vice president.

21  *Q.*   What did that job -- what did that job entail?

22  *A.*   I had responsibility for the operations of a portfolio of

23  dialysis centers from Virginia, including the District of

24  Columbia, Maryland, and parts of Pennsylvania.

25  *Q.*   So you covered that area of the centers?

Michael Rucker - Direct

1    A.   Yes.

2    Q.   Okay.  And you said you worked at DaVita until 2008.  Who

3    did you report to toward the end of your time at DaVita?

4    A.   Javier Rodriguez.

5    Q.   And what was his role at the time?

6    A.   I believe his title was group president.

7    Q.   And who did Mr. Rodriguez report to at that time?

8    A.   He reported to the chief operating officer, Joe Mello.

9    Q.   And then who did Mr. Mello report to?

10   A.   Mr. Thiry.

11   Q.   So you mentioned you worked at DaVita up until 2008.

12   A.   Yes.

13   Q.   Then where did you go?

14   A.   I went to Surgical Care Affiliates, SCA.

15   Q.   And what was your role at Surgical Care Affiliates?

16   A.   I joined as a senior vice president of operations.

17   Q.   And did you join with any understanding about how that role

18   may or may not evolve over time while at SCA?

19   A.   I did.  Prior to joining, I had a lot of conversation with

20   Andrew Hayek, the gentleman who hired me, around being promoted

21   to the chief operating officer, assuming things went well in my

22   first number of months.

23   Q.   Did things go well?

24   A.   Yes.

25   Q.   Were you elevated to the chief operating officer position?

390

Michael Rucker - Direct

1    A.   Yes, I was.

2    Q.   And from the time that you began at SCA through the time

3    when you ultimately left, who did you report to?

4    A.   Andrew Hayek.

5    Q.   And did you reach out to Andrew for a role, or did he

6    recruit you from DaVita to go to SCA?

7    A.   After Andrew left DaVita, we stayed in touch.  And I would

8    say, though, that Andrew wound up recruiting me into the role

9    that I accepted at SCA.

10   Q.   Okay.  How long did you work at SCA?

11   A.   About nine years.

12   Q.   Okay.  From 2008 until -- then when did you leave?

13   A.   About 2017.

14   Q.   Okay.  And what was your next role?

15   A.   That was when I left to join Ivy Rehab as the chief

16   executive officer there.

17   Q.   Where you still are today?

18   A.   Yes, sir.

19   Q.   How did you come to work at Ivy Rehab?

20   A.   Was recruited to join the board at Ivy Rehab.  Did so.

21   Served as a member of the board of directors for the better

22   part of a year.  And then there was a search ongoing for the

23   chief executive officer role, and I expressed interest in it,

24   and ultimately accepted the offer to join.

25   Q.   Okay.  Did Ivy Rehab recruit you into these positions?

Michael Rucker - Direct

 1    A.   Yes.

 2    Q.   I want to back up and do sort of an overview of your career

 3    arc.   I want to go back to your decision to leave DaVita in

 4    2008 for SCA that you testified about.   What was appealing to

 5    you about the opportunity to work at SCA?

 6    A.   I think there were a number of things that were appealing

 7    about it.   The organization was a little smaller at the time.

 8    The organization had a number of issues that I felt uniquely

 9    qualified to be able to address.   It was appealing to me to

10    step into a role with additional responsibility and to be one

11    of the senior-most executives of the organization.   And there

12    was an economic package -- a compensation package that was

13    greater than the one that I was in at DaVita.

14    Q.   Mr. Rucker, what was the culture like at DaVita?

15    A.   The culture was very strong.   The culture was oriented

16    Andrew Hayek a set of core values.   The culture was oriented

17    around patient care and being a clinical organization first.

18    The culture was oriented around the notion that we could be a

19    community first and a company second; and the culture was

20    oriented around high performance, among other things.

21    Q.   Was there anything about the culture at DaVita that you did

22    not like that played into your role -- your decision to move on

23    to SCA?

24    A.   I think that there were elements of the culture as one

25    progressed to the most senior levels of the organization where

Michael Rucker - Direct

1  the level of intensity around matters of performance were very,

2  very high.  So I think that may have played into my decision to

3  orient to -- to seek other employment opportunities.  And then,

4  again, as I said a minute ago, I thought that my skill set and

5  personality played I think a little better at a little bit of a

6  smaller -- in a little bit of a smaller organization.

7  Q.  Thank you.  Was there any expectation at DaVita that if you

8  left to join another company, that you would not recruit

9  employees at DaVita to come and work at your new company?

10 A.  I can recall conversations and messaging around executives

11 that left who either attempted to or did draw talent out of

12 DaVita and bring them to the new organization that led me to

13 believe that if folks were to do that, they would be looked at

14 unfavorably, sort of *persona non grata*, you know, as it relates

15 to their alumni status in and around DaVita.

16 Q.  Did you tell anyone at DaVita about your discussions with

17 SCA or Mr. Hayek before you had an offer from SCA for

18 employment?

19 A.  No, I did not.

20 Q.  Why not?

21 A.  I thought that having a written offer from SCA represented

22 a certain security and certainty that was important to me

23 personally.

24 Q.  After SCA gave you an offer, did you tell anyone at DaVita

25 that you would be leaving?

Michael Rucker - Direct

1    *A.*   Yes, I did.

2    *Q.*   Who did you tell?

3    *A.*   I first told my boss, Javier Rodriguez.

4    *Q.*   And what was his reaction?

5    *A.*   His reaction was -- he had a couple different reactions.

6    One was, I think on a personal level, he was happy for me.  He

7    also expressed some concern about how this may reflect on him

8    and, you know, I think was processing how and what exactly the

9    message would be that he would deliver to his boss.

10   *Q.*   Were DaVita executives evaluated on their ability to retain

11   their direct reports?

12   *A.*   I don't recall that being a direct evaluation point, but it

13   was certainly something that would have been considered in an

14   indirect way.

15   *Q.*   Did Mr. Thiry contact you after you informed Javier

16   Rodriguez that you would be leaving for SCA?

17   *A.*   He did.

18   *Q.*   Okay.  And you testified that your boss was Mr. Rodriguez,

19   and his boss was Mr. Mello, and then Mr. Mello's boss was

20   Mr. Thiry.  So this was your boss's boss's boss calling you?

21   *A.*   Yes.

22   *Q.*   What did Mr. Thiry express to you?

23   *A.*   He was interested in having a conversation about whether or

24   not there was anything that we could do to change the outcome

25   and have me stay at DaVita.  He expressed that there had

Michael Rucker - Direct

1   recently been some discussions among the senior-most team

2   around the potential promotion or opportunity for me to be

3   promoted and for the compensation package that I was in to be

4   enhanced.

5   Q.  What was your reaction, if at all, to the timing of the

6   idea that you were being considered for a promotion or --

7   and/or a raise?

8   A.  Well, I thought that, you know, perhaps there was a

9   promotion or raise coming; but there was a certain convenience

10  to that being part of the conversation, you know, on the heels

11  of my messaging that I was planning to leave.

12  Q.  And how did you respond to Mr. Thiry when he raised these

13  ideas?

14  A.  I indicated that I was flattered and appreciated it and

15  that, you know, my decision was final to leave.  I had thought

16  a lot about it, and it would be better if we focused on how I

17  could productively transition from the company.

18  Q.  Did the tone of the conversation change after you told him

19  that?

20  A.  I don't know -- I don't know if the tone of the

21  conversation changed, but there was more discussion around the

22  fact that he -- he thought that there was likely to be -- the

23  situation was likely to be litigious.  And, you know, there was

24  sort of an apology of sorts ahead of anything like that

25  happening because I'd wind up, you know, kind of in the middle

Michael Rucker - Direct

1   of DaVita protecting its interests in every way that it could

2   legally as it relates to Mr. Hayek recruiting me away from

3   DaVita.

4   Q.  Did he mention -- in this apology, were you the only one

5   that he mentioned as being potentially impacted, or were there

6   others?

7   A.  Yeah.  There was a -- the specific reference was, you know,

8   for -- you know, you and your family, you know, and any stress

9   that comes through, you know, being involved in a potentially

10  litigious situation.  So there -- yes.

11  Q.  Okay.  Mr. Rucker, did anyone else contact you about you

12  leaving after your discussion with Mr. Thiry?

13  A.  I received another phone call from -- or another phone call

14  may have been arranged -- I can't remember -- with Joe Mello,

15  the chief operating officer.

16  Q.  Okay.  This is your boss's boss?

17  A.  Yes.

18  Q.  Okay.  What did he express to you?

19  A.  Disappointment that I had decided to leave, an interest in

20  talking about whether or not there was anything that we could

21  do to change that.  And then from there, kind of the

22  conversation took a similar turn around, you know, gosh, this

23  could get, you know, twisted up with lawyers and wanting to

24  make sure that Andrew Hayek was not doing something that he

25  shouldn't have been doing in recruiting me.

Michael Rucker - Direct

1    Q.   Okay.  Was there any litigation that followed?

2    A.   Not that I'm aware of.

3            MR. VIGEN:  Your Honor, this might be a good time to

4    pause for lunch, or we can keep going.  I'm just going to move

5    on to a document --

6            THE COURT:  Let's keep going for five more minutes.  I

7    have a judges' meeting at 12:15 that usually lasts to 1:15, so

8    let's use up five more minutes, and then we can take a recess

9    until 1:15.

10           MR. VIGEN:  Excellent.  Thank you.

11   BY MR. VIGEN:

12   Q.   Mr. Rucker, after you left DaVita for SCA, in the time

13   period from 2008 through 2011, did SCA hire DaVita employees?

14   A.   Yes.  I believe so.

15           MR. VIGEN:  Okay.  At this time can we show Government

16   Exhibit 26.  And I move this in as stipulated.

17           THE COURT:  Admitted.

18           (Exhibit 26 admitted.)

19   BY MR. VIGEN:

20   Q.   Mr. Rucker, if we can please start at the very bottom of

21   this email.

22           If we can blow up the whole portion of that down to

23   the signature block, please.

24           Let's start with the date.  This is September 20,

25   2011.  Do you see that?

Michael Rucker - Direct

1    *A.*   Yes.

2    *Q.*   Okay.  And down at the bottom here, it's from an Elizabeth

3    Bicknese at Spencer Stuart.  What is Spencer Stuart?

4    *A.*   Spencer Stuart is a global executive search firm.

5    *Q.*   And who is this email to?

6    *A.*   This email is to Joe Clark.

7    *Q.*   And who is Joe Clark?

8    *A.*   Joe Clark at the time was serving as Surgical Care

9    Affiliates' -- SCA's -- chief development officer.

10   *Q.*   Generally in this email from Spencer Stuart to Joe Clark,

11   what is the Spencer Stuart recruiter doing there, if you can

12   sort of summarize what this is?

13   *A.*   I think the email describes DaVita and a specific

14   position that the recruiter is soliciting Joe Clark to consider

15   as, you know, a new job.

16        *MR. VIGEN:*  And then if we can go up.

17   *BY MR. VIGEN:*

18   *Q.*   What do you do with this email?

19        If we can go to the next one in the chain.

20   *A.*   I forward -- I forwarded the email to Javier Rodriguez.

21   *Q.*   And if you could please read your email to Mr. Rodriguez

22   for the jury.

23   *A.*   Sure.  "Javier, as we discussed last week, Joe Clark is the

24   head of our business development team, and the inquiry below

25   attracted quite a bit of attention here at SCA.  Subsequent to

Michael Rucker - Direct

1    our conversation, I learned that DaVita has recruited and is

2    planning to hire Aaron Luther, one of our regional vice

3    presidents of operations.  While we are pleased for Aaron, it

4    also appears to many at SCA that DaVita's plans include

5    recruiting and hiring our people.

6            "Important to note that since you and I last discussed

7    recruiting and hiring plans, we have not recruited or hired

8    anyone from DaVita.  In fact, we've turned away six or more

9    inquiries from qualified DaVita teammates over the last six

10   months.  As always, I'd be happy to discuss."

11   Q.  Thank you.  Mr. Rucker, in your opinion, is this an example

12   of DaVita targeting Joe Clark, an SCA employee, in 2011?

13   A.  Yes.  Through their agent, the search firm, it would appear

14   that, you know, Joe Clark was being targeted for this role.

15   Q.  And your email also stated that DaVita has recruited and

16   is planning to hire Aaron Luther.  Was Aaron Luther an SCA

17   employee at the time?

18   A.  Yes.

19   Q.  Mr. Rucker, did Andrew Hayek tell you whether he had one or

20   more conversations with Kent Thiry about recruiting?

21   A.  Yes.

22   Q.  What did Mr. Hayek tell you about those conversations

23   between himself and Mr. Thiry?

24           MR. DODDS:  Your Honor, I'll object.  Hearsay.

25           MR. VIGEN:  Your Honor, this is James Log No. 6 that

399

Michael Rucker - Direct

 1  was discussed -- ruled on previously.

 2          THE COURT:  All right.  Now, in the *James* Log,

 3  Mr. Dodds, I went over dozens and dozens -- I don't remember

 4  them all.

 5          MR. DODDS:  You're correct, Your Honor.

 6          THE COURT:  I expect you to know them.

 7          MR. DODDS:  I was so focusing on documents and not

 8  thinking about testimony.  I withdraw the objection, Your

 9  Honor.

10          THE COURT:  Thank you, sir.

11          MR. DODDS:  Thank you.

12  BY MR. VIGEN:

13  Q.  I'll restate.  What did Mr. Hayek tell you about his

14  conversations with Mr. Thiry about recruiting?

15  A.  That through a series of conversations with Mr. Thiry, they

16  had arrived at a form of a gentlemen's agreement.

17  Q.  And who was this gentlemen's agreement between?

18  A.  Between DaVita and Surgical Care Affiliates, SCA.

19  Q.  Did this gentlemen's agreement allow SCA to directly

20  solicit DaVita employees?

21  A.  No, it did not.

22  Q.  Did the gentlemen's agreement allow DaVita to directly

23  solicit SCA employees?

24  A.  No, it did not.

25  Q.  What about for a DaVita employee that applied on his or her

1    own for a position at SCA, did the gentlemen's agreement apply

2    to that scenario?  And if so, how?

3    A.  It did.  And the interpretation of the gentlemen's

4    agreement would have the hiring manager at SCA -- if a DaVita

5    teammate applied for a role at SCA, that the hiring manager

6    prior to providing a written offer to the DaVita -- the then

7    DaVita teammate or employee would mandate that the DaVita

8    teammate or employee would go back to their supervisor and say,

9    I am exploring alternative employment opportunities, and one of

10   those opportunities is for the X, Y, Z role at SCA.

11   Q.  Thank you.  Did it work the same way for SCA employees who

12   applied to DaVita on their own?

13   A.  Yes.  That's my understanding.

14          THE COURT:  All right.  Yes.  This is a perfect time.

15   Thank you, Mr. Vigen.

16          MR. VIGEN:  Thank you, Your Honor.

17          THE COURT:  Folks, would you mind if I give you an

18   hour and ten minutes?

19          JUROR:  If we could do an hour and 15, would that

20   work?

21          THE COURT:  1:20?  Got it.  See you at 1:20.

22          (Recess at 12:05 p.m.)

23          (In open court at 1:22 p.m.)

24          THE COURT:  The   juror's question was -- one of the

25   jurors asked Julie if I could tell the juror what the Sherman

 1  Act is.

 2          MS. LEWIS:  No objection, Your Honor.

 3          THE COURT:  Well, there are different ways -- I can

 4  tell them in my words, I can reread the portion of the

 5  preliminary instruction that concerns that, or we could give

 6  them a copy of the preliminary instruction.

 7          MS. LEWIS:  We would have no objection to giving them

 8  a copy of the preliminary instruction or rereading portions.

 9          MR. MELSHEIMER:  Three lawyers, four opinions.

10          May it please the Court.  What if you just read the

11  portion of the preliminary instruction that dealt with the

12  Sherman Act?  Is there such a portion?

13          THE COURT:  Do you have your copy?

14          MR. DODDS:  I'm looking at mine here.  I think the

15  part we would be talking about is paragraph 3 on page 1.

16          THE COURT:  Paragraph 3 or paragraphs 3 and 4.  You

17  tell me what you want.

18          MS. LEWIS:  We would prefer paragraphs 3 and 4, Your

19  Honor.

20          MR. WALSH:  Your Honor, if you're going to read 3 and

21  4, we'd ask that 5 be read.

22          MR. DODDS:  That's why I was suggesting maybe just 3

23  is the way to go.

24          MS. LEWIS:  Your Honor, perhaps it may make sense to

25  give them the whole instruction again.

1          *MR. MELSHEIMER:*  It would be our position -- I think

2    rereading the whole thing would be a little unusual.  I think

3    paragraph 3, "In this case the Indictment charges the defendant

4    with violation of a federal statute, referred to as the Sherman

5    Act," and then you say what the Sherman Act is.  You're going

6    to give them later instructions, you know, about the law

7    generally.

8          *THE COURT:*  All right.  I'll do it my way.  Thank you,

9    folks.

10         (Jury in at 1:26 p.m.)

11         *THE COURT:*  All right.  Have a seat.

12         So, ladies and gentlemen, one of you communicated to

13   me through Julie that he or she had a question about what the

14   Sherman Act is.  That's a very appropriate question.  You've

15   been hearing many references to it.  Now, I did read you a

16   preliminary instruction at the beginning; but that was way back

17   at the very beginning, before you were selected, before you had

18   any notion, really, about what was coming at you.  So I'm going

19   to read to you again a portion of that preliminary instruction,

20   just as a reminder for all of us about this very basic concept

21   that I wouldn't expect you to have any knowledge of.

22         I'm going to read three paragraphs of my original

23   instruction to you.

24         Criminal -- charges in criminal cases are brought in

25   what is called an Indictment.  In this case, the Indictment

1    charges the defendants with violations of a federal statute

2    referred to as the Sherman Act.  The Sherman Act addresses what

3    are sometimes called antitrust violations, basically meaning

4    that certain types of business combinations, conspiracies, or

5    agreements are illegal because they unreasonably restrain trade

6    or competition.

7         You'll hear the phrase "market allocation agreement."

8    An example of a market allocation agreement would be if two

9    companies who sell similar products agree not to compete for

10   the business of a particular customer or customers for such

11   products, thereby eliminating competition for customers that

12   might reduce prices.  Such a conspiracy would be illegal.  This

13   case -- the one we're all here about -- does not involve any

14   allocation of the market for customers.  Rather, in this case,

15   the government alleges that the defendants conspired with three

16   competitor companies to allocate the market for employees.  The

17   defendants deny the claim.

18        The Indictment has three counts.  Count 1 charges that

19   the defendants conspired with Surgical Care Affiliates, another

20   healthcare company, to allocate the market for senior-level

21   employees beginning at least as early as February of 2012 and

22   continuing at least as late as July 2017.

23        The government charges that the conspiracy was

24   implemented by means of various informal agreements and

25   understandings, whereby the two companies agreed not to solicit

1    each other's senior-level employees and, in addition, they

2    would not consider an application from one of the other

3    company's senior-level employees unless that person first

4    informed his or her employer that he or she was seeking other

5    employment.

6         The government claims that the purpose of the

7    conspiracy was to allocate the market for the company's

8    senior-level employees by suppressing meaningful competition

9    between them for such employees.

10        Now, that preliminary instruction goes on to talk

11   about Counts 2 and 3 of the Indictment, which are similar,

12   except that the date ranges are a little different, and those

13   talk about employees in general, as opposed to just

14   senior-level employees.  And those two companies are Hazel

15   Health and Radiology Partners.

16        So that's basically -- the Sherman Act is a very old

17   statute.  It goes way back, decades and decades.  It's the

18   basic antitrust statute in the United States.  And there are a

19   lot of different things that in the antitrust laws are

20   potentially covered by the Sherman Act.

21        You might have heard monopolization, for example.  You

22   might have heard about tie-in agreements.  There are a lot of

23   things that let's say in a course in law school on antitrust

24   law you learn about.  But this one has to do with allocation of

25   a market.

1          Now, later in the case, I'm going to give you very

2     detailed instructions on every aspect of this, on what the

3     government has to prove, on what the market is that is the

4     subject of the proposed allocation -- or the alleged, I should

5     say allocation.  Because, importantly, the defendant denied

6     that they agreed to allocate any market, and they deny that

7     they have -- had any intent or purpose to do so.  That's why

8     we're here.

9          And I'll give you very detailed instructions.  They'll

10    be in writing and oral.  I will give you each a copy of the

11    instructions.  I'll go over them with you, and that will help I

12    think clarify the details of the law.  But the basic idea of

13    what this case is about and what the Sherman Act is, is what I

14    just told you.

15         Does that help a little bit?  Good.

16         Now we're ready to keep going.

17         *MR. VIGEN:*  Thank you, Your Honor.

18         *THE COURT:*  You're still under oath, Mr. Rucker.

19    BY MR. VIGEN:

20    Q.  Good afternoon, Mr. Rucker.  Before lunch, you were

21    describing the terms of the gentlemen's agreement.  Now I want

22    to ask you a few more questions about that.

23         First, was the gentlemen's agreement reached before or

24    after you moved from DaVita to SCA?

25    A.  It's my understanding it was reached after.

1    *Q.*  Okay.  And earlier you testified that you were directly

2    recruited by Andrew Hayek for the role at SCA.  Did you benefit

3    from that recruitment?

4    *A.*  Yes, I believe I did.

5    *Q.*  How do you believe you benefited from it?

6    *A.*  I had an opportunity to move to another organization and

7    build a company together with a team and apply everything that

8    I had learned at DaVita and in other experiences previously.

9    And I believe there was also an economic benefit to me, in that

10   the compensation that I was afforded in the role at SCA was

11   greater than that at DaVita.

12   *Q.*  What impact, if any, did the gentlemen's agreement have on

13   the type of contact that Mr. Hayek made directly to you before

14   the gentlemen's agreement was formed?

15   *A.*  None, if I'm understanding the question.

16   *Q.*  Sure.  Let me rephrase.  So you testified that the

17   gentlemen's agreement was in place after you left from DaVita

18   to SCA.  You also testified previously that Mr. Hayek directly

19   recruited you for that role.  So I'm wondering, in a similar

20   position, after the gentlemen's agreement was reached, what

21   type of impact would the gentlemen's agreement have on that

22   type of contact that you received from SCA and Mr. Hayek?

23   *A.*  Well, it could have either eliminated the initiation of the

24   conversation by Andrew Hayek with me and/or affected the way

25   that I received an offer -- the timing that I would have

1  received a written offer, and would have required me to first

2  have a conversation with Javier Rodriguez, my supervisor at

3  DaVita, ahead of SCA or Andrew Hayek writing the offer.

4  *Q.*  And when you were in those discussions with SCA, did you

5  want to wait to tell your supervisor at DaVita until after you

6  had an offer, or were you -- what was your position on that?

7  *A.*  Yes.  Yes.  I told SCA that I would be happy to have the

8  conversation with Javier but after I had a written offer.

9  *Q.*  And did that happen?  Did you tell Javier after you had a

10  written offer?

11  *A.*  Yes.

12  *Q.*  And why did you want to wait until after you had a written

13  offer?

14  *A.*  I wanted to wait because that written offer represented a

15  level of security and certainty that I didn't feel like I had

16  without the written offer.

17  *Q.*  Okay.  Was that same level of certainty and security

18  allowed by the gentlemen's agreement?

19  *A.*  No.

20  *Q.*  Mr. Rucker, was retention of employees important to SCA?

21  *A.*  Yes.

22  *Q.*  And why was that?

23  *A.*  Why was that?

24  *Q.*  Why was it important to SCA to retain employees?

25  *A.*  Well, the -- the cost of turnover is substantial.  The cost

1    of replacing employees and/or executives is substantial on a

2    number of levels.  There could be a disruption in one part or

3    another of a company's operations if executives were to decide

4    to leave and take a job at another company.

5    *Q.*  What was your understanding -- your understanding of the

6    purpose of the gentlemen's agreement?

7    *A.*  My understanding of the gentlemen's agreement was to limit

8    the number of employees or teammates that moved from DaVita to

9    SCA or from SCA to DaVita.  And in the event that there were

10   situations where specific employment opportunities were being

11   discussed between the two organizations -- between an employee

12   of one organization and the other organization, that it would

13   be mandated that that employee would need to go to their

14   supervisor, their one-up, to describe the fact that they were

15   seeking employment, exploring employment opportunities, and

16   that one of those employment opportunities was with SCA.

17   *Q.*  And what is your opinion with regards to an employee's

18   willingness to take that step?

19   *A.*  I was not willing to take the step.  There were some

20   employees willing to take that step, and not all.

21   *Q.*  Based on your experience, did the gentlemen's agreement --

22   that part of the gentlemen's agreement that SCA and DaVita

23   would not solicit each other's employees help or hurt

24   employees?

25   *A.*  I think it limited the -- it limited the number of

1    opportunities by the amount of opportunities they might

2    consider at that -- at the other organization.

3    *Q.*  And based on your experience, did the gentlemen's agreement

4    help or hurt SCA?

5    *A.*  I think that the gentlemen's agreement wound up helping

6    SCA, in that there were fewer of its teammates and employees

7    who would be pursued by DaVita for opportunities at DaVita.

8    And I think to some degree, it hurt SCA, in that we were not

9    able to readily recruit teammates and leaders from DaVita, of

10   which there were many qualified.

11   *Q.*  Let me move on to a separate topic.  Did SCA and DaVita

12   ever explore any business opportunities together?

13   *A.*  Yes.

14   *Q.*  Was the gentlemen's agreement formed before or after any of

15   those business opportunities were explored?

16   *A.*  My understanding is they were formed before.

17   *Q.*  Could SCA and DaVita have explored those business

18   opportunities that they did explore after the agreement was

19   reached without the gentlemen's agreement?

20   *A.*  Yes.

21   *Q.*  All right.  Now I'd like just to talk a little bit

22   generally about the hiring at SCA.  Switching gears just a

23   moment.  Were you involved personally in hiring at SCA?

24   *A.*  Yes.

25   *Q.*  And about how many people did you hire?

1    *A.*   I'm guessing, but between 50 and 100.

2    *Q.*   And what was your role in the hiring process?

3    *A.*   Well, I played a number of different roles.  I was the

4    hiring manager for people that I was going to hire into roles

5    that were going to report to me.  From time to time, I'd serve

6    on an interview panel of -- and provide my insight and, you

7    know, interview results for people who were going to wind up

8    reporting to other members of the organization.

9    *Q.*   And did Andrew Hayek have a role in hiring?

10   *A.*   Yes.

11   *Q.*   What was his role?

12   *A.*   Very similar.  You know, he would be, you know, directly

13   involved and a decision maker for anybody that would wind up

14   coming aboard at SCA and reporting directly to him.  And he

15   would very frequently serve on the interview panel for

16   candidates for a variety of senior executive positions.

17   *Q.*   As the CEO, did he have any special authority in hiring?

18   *A.*   As the CEO, maybe -- yes, I -- I suppose he had special

19   authority in hiring, in that he was in a position to, you know,

20   influence, weigh in on, or ultimately make a decision about who

21   got hired and who didn't.  Yeah.

22   *Q.*   Do you know Bridie Fanning?

23   *A.*   Yes.

24   *Q.*   Approximately when was she hired by SCA?

25   *A.*   I would be guessing.  I don't know exactly, but maybe four

1   or five years after I came to SCA.  So 2013, perhaps, in that

2   ballpark.

3   Q.  And that's based on your memory?

4   A.  Yeah.  That's my guess.

5   Q.  Who did she report to?

6   A.  She reported to Andrew Hayek, CEO.

7   Q.  Prior to Dr. Fanning joining SCA, who did the head of HR or

8   who had Ms. Fanning's position -- Dr. Fanning's position report

9   to?

10  A.  The previous two or three heads of HR reported to me, the

11  chief operating officer.

12  Q.  And why was Dr. Fanning brought into SCA?

13  A.  Quite literally, to be the chief people officer and to lead

14  our human resources function.

15  Q.  Did she have a role of interacting with external

16  recruiters?

17  A.  She did.  One of the things that she assumed responsibility

18  for was the management of all relationships with external

19  recruiters.  Yes, executive search firms.

20  Q.  And prior to Dr. Fanning joining SCA, who held that role,

21  managing external search firms?

22  A.  The individual hiring managers would retain the search firm

23  and then manage the relationship and the engagement until the

24  search was complete.

25  Q.  Did Andrew Hayek communicate the gentlemen's agreement he

1    reached with Mr. Thiry to anyone else at SCA?

2    *A.*   Yes.

3    *Q.*   And how did -- how or where did you -- what's your basis

4    for your answer to that question?

5    *A.*   Well, I think it was part of a number of group

6    conversations where the topic came up.  And it was discussed

7    openly, and Andrew would have described it.  Yeah.

8    *Q.*   Okay.  Did you communicate the agreement -- the gentlemen's

9    agreement to anyone within SCA?

10   *A.*   Yes.

11   *Q.*   Who would have that been?

12   *A.*   Certainly, to the members of the team that reported

13   directly to me, as a chief operating officer.  And from time to

14   time, I'd have interaction with other members of the human

15   resources or recruiting teams, members of the SCA team who

16   reported into the folks that I worked most closely with.  So a

17   reasonably broad group.

18   *Q.*   Going back to your testimony that Andrew Hayek sort of

19   discussed the gentlemen's agreement -- communicated the

20   gentlemen's agreement in group conversations, could you please

21   expound on that.  Explain who that group was.

22   *A.*   Well, Andrew's team of direct reports at SCA was known as

23   the Cabin Team.  And the Cabin Team was comprised of our chief

24   people officer -- at one point that was Bridie Fanning -- our

25   chief development officer, Joe Clark; our general counsel, Rich

 1    Sharff; and there were two or three different chief financial
 2    officers over the course of my tenure that would have also been
 3    members of the Cabin Team during their tenure with SCA.
 4    Q.   And, then, did you communicate the gentlemen's agreement
 5    with anyone outside of SCA?
 6    A.   Yes.
 7    Q.   Who was that?
 8    A.   While, I don't specifically recall which executive search
 9    firms, there were numerous executive search firms that I would
10    have communicated the notion that a definite -- that a
11    gentlemen's agreement did exist between the two organizations
12    and that we would, as a result, want to steer away from
13    targeting executives and teammates at DaVita.
14          MR. VIGEN:   If we can please show Government
15    Exhibit 50.
16          Your Honor, I'd move this into evidence as stipulated.
17          THE COURT:   All right.   50 is admitted.
18          (Exhibit 50 admitted.)
19    BY MR. VIGEN:
20    Q.   If we can look at the bottom email, please.
21          Mr. Rucker, do you see this as an email from yourself
22    to Bridie Fanning dated May 21, 2015?
23    A.   I do.
24    Q.   What is the subject of your email?
25    A.   DVA candidate -- or DaVita candidate.

414

1    *Q.*   Who was the candidate in question?

2    *A.*   Jung Lee.

3    *Q.*   And was Jung Lee an employee of DaVita at the time?

4    *A.*   He was.

5    *Q.*   Okay.  Was Jung Lee directly solicited by SCA, or did he

6    apply on his own?

7    *A.*   I believe Jung Lee applied on his own.

8    *Q.*   Okay.  And in your email here to Bridie, you write,

9    "Spoke to AH."  Who is AH?

10   *A.*   Andrew Hayek, the CEO at Surgical Care Affiliates, SCA.

11   *Q.*   Okay.  Why did you talk to Mr. Hayek about Jung Lee?

12   *A.*   There was some question about how we were going to proceed

13   with Jung Lee as a candidate for an open position at SCA.  And

14   I wanted to clarify, you know, kind of how we would apply the

15   gentlemen's agreement in this specific situation.

16   *Q.*   And then in this email, are you communicating to Bridie

17   Fanning what Mr. Hayek instructed you to do?

18   *A.*   Yes.

19   *Q.*   Can you please read that to the jury, the remainder of the

20   email.

21   *A.*   Yes.  "We landed on a more strict interpretation of the

22   spirit of the understanding previously arrived at.  I suggest I

23   call him to let him know, if he want us to formally consider

24   him, he would need to go to his one-up or supervisor to let him

25   know he is actively looking to leave and exploring alternatives

1   so that they could attempt to retain him with some advantage.

2   Let me know if you concur, and I will plan to call him likely

3   tomorrow."

4   Q.   Is your email's reference to the spirit of the

5   understanding previously arrived at a reference to the

6   gentlemen's agreement you have testified to?

7   A.   Yes.

8          MR. VIGEN:   If we can please look at Dr. Fanning's

9   response.

10   BY MR. VIGEN:

11   Q.   How does Bridie respond to you?

12   A.   Bridie says, "Okay.  I think we can safely say, this ain't

13   happening.  You should call Jung Lee."

14   Q.   What does your email indicate?

15   A.   My response is, "Done."

16   Q.   Which means?

17   A.   Indicating that I have called him, and I believe I left him

18   a voicemail.

19   Q.   Did SCA end up giving Jung Lee an offer for employment?

20   A.   No, I don't believe so.

21          MR. VIGEN:   If we can now go to Government Exhibit 84.

22   And, Your Honor, I would offer this as stipulated.

23          THE COURT:   All right.  Admitted.

24          (Exhibit 84 admitted.)

25          MR. VIGEN:   If we can scroll down, please, and let's

1    look at this bottom email.

2    *BY MR. VIGEN:*

3    *Q.*  Generally, Mr. Rucker, can you just explain to the jury

4    what is happening in this bottom email.

5    *A.*  Yes.  There is a woman, Katrina Palmieri, who is a

6    recruiter that is an employee or teammate at DaVita.  And she

7    has reached out to Christian Ellison, who was a senior vice

8    president of operation or a group president at the time and is

9    asking him about his level of interest in a position that's

10   open at DaVita.

11   *Q.*  Where did Mr. Ellison work at this time?

12   *A.*  He was an employee at Surgical Care Affiliates.

13   *Q.*  And who did Mr. Ellison report to?

14   *A.*  He reported to me.

15   *Q.*  You testified earlier that you communicated the gentlemen's

16   agreement to your direct reports.  Is Mr. Ellison an example of

17   that?

18   *A.*  Yes.

19            MR. VIGEN:  Okay.  If we could please see the next

20   email.

21   *BY MR. VIGEN:*

22   *Q.*  Does Mr. Ellison forward this recruiting attempt by DaVita

23   to you?

24   *A.*  Yes, he does.

25   *Q.*  And Mr. Ellison writes, "I thought there was a gentlemen's

Michael Rucker - Cross

1  agreement between us and DaVita re poaching talent."  How do

2  you respond?

3  *A.*  My response is, "There is.  Do you mind if I share with

4  Andrew, who has most recently addressed with Kent?"

5  *Q.*  And what is the date of this email?

6  *A.*  June 14, 2016.

7  *Q.*  And then do you forward this email to Andrew Hayek?

8  *A.*  Yes, I -- I don't think you -- yes, I did.  Yes.

9  *Q.*  And what -- what do you tell Mr. Hayek?

10  *A.*  I say, "Would you consider raising with Kent the thought,

11  of course, being Christian is a pretty senior, high-profile guy

12  for them to be reaching out to."

13  *Q.*  And Mr. Hayek responds, "Michael, will do.  Thanks."  Did

14  you expect Mr. Hayek to follow through on your request for him

15  to contact Mr. Thiry about this situation?

16  *A.*  Yes.  It would have been unusual for him not to do that.

17        *MR. VIGEN:*  No further questions.  Thank you.

18        *THE COURT:*  Cross-examination.

19        *MR. DODDS:*  Yes, Your Honor.

20                      **CROSS-EXAMINATION**

21  *BY MR. DODDS:*

22  *Q.*  Mr. Rucker, good afternoon.

23  *A.*  Good afternoon.

24  *Q.*  My name is Jack Dodds, and I represent DaVita.  I just have

25  a few questions for you today.

418

Michael Rucker - Cross

1              Let's start with the testimony that you gave a few

2     moments ago about Jung Lee.  Do you remember that?

3     A.   About Jung Lee?

4     Q.   Yes, sir.

5     A.   Yes, sir.

6     Q.   And you told Mr. Vigen in response to his questions that

7     SCA did not end up making an offer to Jung Lee; is that so?

8     A.   Yeah.  To the best of my recollection, I don't think we

9     made an offer to Jung.

10    Q.   But Jung Lee -- let me back up.  You said that you thought

11    you left Mr. Lee a voicemail telling him that he would have to

12    let his one-up boss at DaVita know if he wanted to continue

13    conversations with you; right?

14    A.   Well, let me try to clarify.

15    Q.   Please.

16    A.   I don't have the email in front of me again.  But when I

17    said "done," which was I think my response to the message from

18    Ms. Fanning, what I intended to convey, I believe, at the time

19    was, done, I made a phone call, or I did call him.  I don't

20    know exactly what I left in terms of the voicemail.  It could

21    have been, you know, It's Michael Rucker.  Please call me back.

22    It would have been unusual for me to leave him a voicemail that

23    said, Hey, I need you to check with your boss, and, you know,

24    so on, versus, Jung, why don't you give me a call.  I need to

25    talk to you about the next step in the process here.

Michael Rucker - Cross

1          MR. DODDS:  Okay.  Let's back up, and if you could,

2    let's pull up Government Exhibit 50, the email that

3    Mr. Rucker looked at a few minutes ago.

4    *BY MR. DODDS:*

5    *Q.*  And let's focus on your email at 10:18 to Bridie.  Do you

6    have that in front of you, sir?

7    *A.*  Yes.

8    *Q.*  Okay.  You'll see that you told Bridie Fanning that you

9    spoke to Andrew Hayek, "and we landed on a more strict

10   interpretation of the spirit of the understanding previously

11   arrived at."  Do you see that language?

12   *A.*  Yes, I do.

13   *Q.*  This is in May of 2015; right?

14   *A.*  Yes.

15   *Q.*  Is it fair to say that up until this time and at various

16   points during the existence of the gentlemen's agreement, that

17   precise parameters and terms of it ebbed and flowed now and

18   again?

19   *A.*  Yes.

20   *Q.*  And that ebb and flow happened depending on what was going

21   on between SCA and DaVita at a given time?

22   *A.*  Yes.

23   *Q.*  And that ebb and flow happened depending upon what was

24   happening in personal relationships -- for example,

25   relationships with Mr. Thiry; correct?

420

Michael Rucker - Cross

1    *A.*  I think so.

2    *Q.*  So you talked about the spirit of the understanding.  Is it

3    fair to say that the spirit of the understanding as you

4    understood it was that, generally speaking, when it came to SCA

5    and DaVita recruiting from each other, they would be sensitive

6    about the way they did it?

7    *A.*  Yes.

8    *Q.*  And that sensitivity would be heightened the higher in the

9    organization the recruit happened to be; is that fair?

10   *A.*  Yes.

11   *Q.*  And the sensitivity would be heightened depending upon what

12   business arrangements, business relationships, business

13   discussions were happening between SCA and DaVita at a given

14   time; is that fair?

15   *A.*  Yes.

16   *Q.*  And so at this point in time -- at this point in time,

17   Mr. Hayek impressed upon you a more strict interpretation of

18   the agreement than had existed up to that point in time;

19   correct?

20   *A.*  Yes.

21   *Q.*  And that more strict interpretation led you to say to

22   Bridie Fanning that, you should let Jung Lee know if he wants

23   us to formally consider him, he'd need to go to his one-up,

24   supervisor to let them know he's actively looking to leave and

25   exploring other opportunities.  Correct?

Michael Rucker - Cross

1    *A.* Yes.

2    *Q.* And then you said, "So they could attempt to retain him

3    with some advantage."  Is that right, sir?

4    *A.* Yes.

5    *Q.* And by that you meant, so that DaVita had an opportunity to

6    try to compete to keep him; right?

7    *A.* Yes.

8    *Q.* And, in fact, in this instance, that is what happened;

9    isn't it, sir?

10   *A.* I believe so.

11   *Q.* And, in fact, Mr. Lee did tell his supervisors at DaVita

12   that he was talking with SCA about a position; yes, sir?

13   *A.* Yes.

14   *Q.* And, again, in response to that, they competed to try to

15   keep him?

16   *A.* Yes.

17   *Q.* And he remained at SCA -- at DaVita; correct?

18   *A.* Yes.

19   *Q.* And, in fact, he stayed at DaVita and became a senior VP in

20   the HealthCare Partners business right through the time that

21   Optum bought HealthCare Partners; is that so?

22   *A.* I'm not familiar with that fact but -- so I can't --

23   *Q.* Fair enough.  If you don't know, you don't know.

24   *A.* I don't know.

25   *Q.* All right.  Thank you.  So let's go back and talk a little

Michael Rucker - Cross

1    bit, sir, about the circumstances under which you left DaVita.

2            When you told Mr. Rodriguez that you were planning to

3    go to SCA, he presumably told Kent Thiry and Joe Mello, because

4    then you heard from them; right?

5    A.   Yes.

6    Q.   And Kent Thiry and Joe Mello tried to convince you to stay?

7    A.   Yes.

8    Q.   And, again, they competed to try to keep you?

9    A.   Yes.

10   Q.   But you made the decision that you were going to go on to

11   SCA?

12   A.   Yes.

13   Q.   And you talked earlier about, there was some talk of the

14   possibility of you getting caught up in a lawsuit; do you

15   remember that, sir?

16   A.   Yes, I do.

17   Q.   Now, Andrew Hayek went from DaVita to SCA in 2008; is that

18   right, sir?

19   A.   Yes.

20   Q.   And he hired you over to SCA that same year -- later that

21   same year; is that so?

22   A.   Yes.

23   Q.   Within twelve months of him leaving DaVita, he went ahead

24   and hired you over to SCA; is that so, sir?

25   A.   Yes.

423

Michael Rucker - Cross

1   *Q.* And when there was this discussion about a lawsuit, was

2   there not also a discussion about that being a violation of

3   Mr. Hayek's nonsolicit provision in his employment agreement

4   with DaVita?

5   *A.* I think that -- I can't remember -- I can't remember that

6   being a specific part of the conversation that I had, but that

7   was implied, or that was my understanding.

8   *Q.* Okay. Okay. But, ultimately, there was no lawsuit that

9   was filed, so far as you know; correct?

10  *A.* Correct.

11  *Q.* Now, when Mr. Vigen asked you what was attractive about

12  going to SCA, I think the first thing you said -- at least one

13  of the first things you said was that it was an opportunity to

14  apply everything that you had learned at DaVita. Do you recall

15  saying that, sir?

16  *A.* Yes.

17  *Q.* Could you explain to the members of the jury what you meant

18  by that?

19  *A.* I had a very positive employment experience at DaVita. I

20  learned a great deal about a lot of things, as I had -- and I

21  feel lucky about having had very positive employment

22  experiences at other previous employers. And what I meant by

23  what I said was, I was able to apply, you know, a lot of that

24  which was most positive about my time at DaVita and other

25  places to the work that I would do at SCA.

Michael Rucker - Cross

1    *Q.*  And so, obviously, you valued your time at DaVita; is that

2    so, sir?

3    *A.*  Yes.

4    *Q.*  And you valued it on a professional level, obviously,

5    because it sounds like it helped to prepare you for the move

6    you made to SCA and then finally to become CEO of your company

7    now; right?

8    *A.*  Yes.

9    *Q.*  And I assume you valued it on a personal level, too.  You

10   had friends there?

11   *A.*  Yes.

12   *Q.*  Javier Rodriguez was one of them?

13   *A.*  Yes.

14   *Q.*  And you had mentors there, as well?

15   *A.*  Yes.

16   *Q.*  Javier Rodriguez was one of them?

17   *A.*  Yes.

18   *Q.*  Mr. Thiry?

19   *A.*  Yes.

20   *Q.*  Joe Mello?

21   *A.*  Yes.

22   *Q.*  Many others?

23   *A.*  Yes.  There were a lot of talented people there.

24   *Q.*  And you maintained those friendships after you went to SCA;

25   is that so, sir?

425

Michael Rucker - Cross

1    A.   Yes.

2    Q.   And some to a greater extent than others.  That's natural

3    over time.  But you went to SCA; and during the whole time you

4    were at SCA, you had friends at DaVita.  Is that correct, sir?

5    A.   Yes.

6    Q.   And those friendships remained important to you, even

7    though you were now in a different business?

8    A.   Yes.

9    Q.   And we've been talking a lot about business here.  But it's

10   correct, sir, that you don't stop becoming a human being just

11   because you're an executive of a corporation; is that so?

12   A.   Yes.

13   Q.   And so your friendships remain important to you; is that

14   so?

15   A.   Yes.

16   Q.   Okay.  And when you're going about your business and trying

17   to do your job, it's just natural, isn't it, to have the fact

18   that you're dealing with friends when you are dealing with

19   friends impact the way you go about things.  Wouldn't that be

20   fair to say?

21   A.   I think that impacted the way that I went about things.

22   Q.   Sure.  It's not going to stop you from doing your job;

23   right?

24   A.   No, it would not stop me from doing my job.

25   Q.   You're going to keep doing when you're at SCA whatever is

426

Michael Rucker - Cross

1   best for SCA; isn't that fair to say, sir?

2   A.  Yes.

3   Q.  But if you're dealing with friends, you're going to at

4   least be cognizant of the fact that you're dealing with

5   friends.  And you're going to want to be able to do your job in

6   a way that in the end doesn't leave hard feelings, if you can

7   do that; right?

8   A.  Yes.  If you can do that.

9   Q.  If you can do that.  You're at least going to try your

10  best; is that fair?

11  A.  Yes.

12  Q.  Okay.  And when it came to the way in which you dealt with

13  DaVita when it came to trying to recruit and hire people, the

14  fact that you were recruiting and hiring from an organization

15  to which I take it you still had some loyalty -- you had sort

16  of graduated from there; is that fair to say?

17  A.  Yes.  I feel -- feel and have felt a sense of loyalty

18  towards DaVita over the years.

19  Q.  And to some extent, to this day; right?

20  A.  Yes.

21  Q.  And so is it fair to say that while it never stopped you

22  from doing whatever you felt was best for SCA, that sense of

23  loyalty very naturally impacted the way in which you went about

24  doing your job when it involved interacting with Kent Thiry and

25  DaVita; is that fair to say?

Michael Rucker - Cross

1    *A.*   Yes.

2    *Q.*   Now, am I correct, sir, that between the time when you

3    joined SCA in 2008, all the way up until 2012, DaVita and SCA

4    were recruiting and hiring from each other?

5    *A.*   Yes.  I think so.

6    *Q.*   And during that period of time, do you recall, sir, that

7    SCA hired around six or seven executives from DaVita to become

8    part of SCA's management team?

9    *A.*   I don't know about the six or seven executives that you're

10   talking about.  It's not out of the question, but there aren't

11   six or seven names that are top of mind for me.

12   *Q.*   Okay.  You don't specifically recall names, you don't

13   remember whether it happened, but you certainly can't say it

14   did not happen.  Is that fair to say?

15   *A.*   I think so.

16   *Q.*   Okay.  And -- well, let's back up now and talk a little bit

17   about the gentlemen's agreement that we've talked about

18   already.  You were not the one who made the agreement; correct,

19   sir?

20   *A.*   That's correct.

21   *Q.*   The agreement was struck between Mr. Hayek and Mr. Thiry;

22   correct?

23   *A.*   Correct.

24   *Q.*   And so you weren't part of those conversations, and you

25   don't know what was discussed between them?

428

Michael Rucker – Cross

1   A.   That's correct.

2   Q.   And you don't know why Andrew Hayek made the decision to

3   make that agreement?   It was his decision to make, and you

4   don't know why he made it.   Is that correct?

5   A.   That's correct.

6   Q.   And so if we wanted to know why Andrew Hayek decided to

7   enter into this gentlemen's agreement, we need to talk to

8   Andrew Hayek; correct?

9   A.   Sounds like a good idea.

10  Q.   Okay.   And consistent with the experience with Jung Lee,

11  the notice provision, the tell-your-boss provision of the

12  agreement, your understanding was that the purpose of that

13  provision was to allow whichever company was being recruited

14  from to try to compete to keep the employee; correct?

15  A.   Correct.

16  Q.   And despite the existence of the gentlemen's agreement,

17  there was recruiting and hiring back and forth between SCA and

18  DaVita after 2012; is that fair to say, sir?

19  A.   Yes.

20  Q.   And you were involved in some of those recruiting efforts

21  or discussions, weren't you, sir?

22  A.   Yes.   In one way, shape, or form.

23  Q.   Okay.   For example, do you know a man named Matthew

24  Weissert?

25  A.   Yes.

Michael Rucker - Cross

1    *Q.* Matthew Weissert was a DaVita executive during the time

2    that you were at SCA?

3    *A.* Yes.

4    *Q.* And he was a friend of yours; right?

5    *A.* Yes.  I hired him at DaVita.

6    *Q.* Okay.  And there was a point in time, wasn't there, sir,

7    that you spoke to him about coming over to SCA?

8    *A.* I talked to Matt about a lot of things over the years.  I

9    don't want to rule out that that was one of the things that I

10   talked to him about, but I don't have a specific recollection

11   of that.

12   *Q.* Okay.  Let me see if I can show you a document that might

13   help, sir.

14   *A.* Okay.

15       *MR. DODDS:* Can we pull up B515 just to Mr. Rucker's

16   screen just for a moment.

17   *BY MR. DODDS:*

18   *Q.* You have on the screen in front of you an email that is

19   Defense Exhibit 515.  Do you see that, sir?

20   *A.* Yes, I do.

21   *Q.* All right.  Have you had an opportunity to just look

22   through it quickly?

23   *A.* Yes.

24       *MR. DODDS:* Okay.  So if we can scroll down to the

25   very bottom.

Michael Rucker - Cross

1           And, Your Honor, at this time I'd like to move for the

2    admission of B515.

3           MR. VIGEN:  No objection.

4           THE COURT:  It's admitted.

5           MR. DODDS:  Thank you.

6           (Exhibit B515 admitted.)

7    BY MR. DODDS:

8    Q.  If you scroll down to the very bottom, you'll see there is

9    an email from you to Mr. Weissert, October 24, 2013, at

10   2:16 p.m.  Do you see that?

11   A.  Yes.

12   Q.  It looks like you're sending him a link to the retail road

13   show.  Do you see that?

14   A.  Yes.

15   Q.  Do you know what that was?

16   A.  No, I don't.

17   Q.  Okay.  If you go to the email that is above that, the

18   email from Mr. Weissert back to you, October 28, 4:10 p.m. --

19   A.  Yes.

20   Q.  You'll see that the subject line of that email is "SCA

21   road show."

22   A.  Yeah.

23   Q.  Does that refresh your recollection about what that was?

24   A.  Honestly, it does not.  I'm just not familiar -- the notion

25   of a road show, I don't know.  It looks like it's some sort of

Michael Rucker - Cross

1    recruiting event, perhaps; but I don't -- I can't tell you.

2    Q.  Fair enough.  And you'll see that Mr. Weissert wrote to

3    you, "Michael, looks like we are set for sometime on the 11th.

4    Do you have anything on the position that I can look at/prepare

5    for our discussion?  Anything you would like me to focus on or

6    prepare for with you or Andrew?"  Do you see that language?

7    A.  Yes, I do.

8    Q.  So it looks like he's asking -- he's asking you for

9    information to tee up a discussion with you and Mr. Hayek about

10   a position.  Does that sound fair?

11   A.  Yes.

12   Q.  And if you go to the email that's above that, you

13   actually send him on October 29 an attachment that says,

14   "SVP" -- presumably, senior vice president -- and you say,

15   "Hoping you have a terrific day.  See the attached job

16   description."  Do you see that?

17   A.  Yes.

18   Q.  So you send him a description of a position open at SCA;

19   does that sound right?

20   A.  Yes.

21            MR. DODDS:  So if we can now go to Exhibit B516.

22            And I think we have a stipulation on this one, Your

23   Honor.

24            THE COURT:  It's admitted.

25            (Exhibit B516 admitted.)

432

Michael Rucker - Cross

1    *BY MR. DODDS:*

2    *Q.*  So B516 it looks like, sir, is the job description that you

3    sent to Mr. Weissert that day.  Does that look correct to you?

4    *A.*  Yes.

5    *Q.*  And it's a description for a position of senior vice

6    president at SCA?

7    *A.*  Yes.

8    *Q.*  And this is during the period of time of the gentlemen's

9    agreement; correct?

10   *A.*  Yes.  I believe so.

11   *Q.*  And do you recall having discussions with Mr. Weissert

12   about this position after you sent him this information?

13   *A.*  I don't specifically recall the conversations.  Just in all

14   honesty, I don't specifically recall this set of conversations.

15   *Q.*  I'm asking you a question about something that happened

16   nine years ago, so I understand --

17   *A.*  Yeah.  So --

18   *Q.*  Okay.  But Matthew Weissert did not end up coming to SCA;

19   correct?

20   *A.*  No, he did not.

21   *Q.*  In fact, he ended going to become an executive at a company

22   called Hazel Health that is run by a man named Josh Golomb;

23   does that sound right?

24   *A.*  Yes.

25   *Q.*  Do you recall a woman by the name of Michelle Trent?

Michael Rucker - Cross

1   A.  No, I do not.

2          MR. DODDS:  Okay.  Let's see if we can help you out

3   here.

4          If you could pull up Government Exhibit 356, please.

5   BY MR. DODDS:

6   Q.  Just give me -- let me give you a second to look at this

7   email, Mr. Rucker; and then I'll ask you a couple questions

8   about it.

9   A.  Okay.

10  Q.  Okay.  Do you see that this is an email from a Winborne

11  Macphail to you dated January 25, 2016?  Do you see that, sir?

12  A.  Yes, I do.

13         MR. DODDS:  Your Honor, at this point in time I would

14  move for the admission of Government Exhibit 356.

15         MR. VIGEN:  No objection.

16         THE COURT:  Admitted.

17         (Exhibit 356 admitted.)

18  BY MR. DODDS:

19  Q.  First, who is Winborne Macphail?

20  A.  Winborne Macphail is an executive at Surgical Care

21  Affiliates that I hired.  And she was operating in the capacity

22  of running our sales team.

23  Q.  Okay.  And she's writing to you in this email about a

24  situation -- if you look at the first sentence -- "a situation

25  that has been brewing in Vanguard with Michelle Trent."  Do you

Michael Rucker - Cross

1   see that?

2   A.   Yes.

3   Q.   "Who we hired from DaVita in November," presumably,

4   November of 2015.  Do you see that?

5   A.   Yes.

6   Q.   And the email goes on to describe how the employment of

7   Ms. Trent with SCA is just not working out.  Do you see that?

8   A.   Yes, I do.

9   Q.   But she was hired to SCA during the period of the

10  gentlemen's agreement; is that correct?

11  A.   I believe so.  Yes.

12  Q.   And when she was hired to SCA -- if you go to the second

13  paragraph, there is a sentence from Ms. Macphail that says, "I

14  take full responsibility."  Do you see that?

15  A.   Yes, I do.

16  Q.   "We agree that this senior director position is now a

17  critical role for Vanguard's success."  Do you see that?

18  A.   Yes, I do.

19  Q.   So it looks like Ms. Trent was hired into a senior director

20  position of some importance for a particular business unit

21  within SCA; is that fair to say?

22  A.   Yes.

23  Q.   I'd like to show you one more exhibit, Mr. Rucker.

24           This is A079, please.

25           And you can just take a second to look at it, and then

Michael Rucker - Cross

1   we'll scroll down to the bottom and talk about it.

2   A.  Okay.

3   Q.  All set?

4   A.  Yes.

5   Q.  So this is a series of emails, Mr. Rucker, that you're

6   involved in that again involve Winborne Macphail and some other

7   folks in June of 2016; is that correct?

8   A.  Yes.

9         MR. DODDS:  And at this point in time, Your Honor, I'd

10  like to move for the admission of A079, please.

11        MR. VIGEN:  No objection.

12        THE COURT:  It's admitted.

13        (Exhibit A079 admitted.)

14  BY MR. DODDS:

15  Q.  So you'll see that the first email at the bottom is an

16  email from Ms. Macphail to you and a man whose name I will

17  probably butcher.  It looks like Ajay Chokshi?

18  A.  Ajay Chokshi.

19  Q.  Thank you.  This refers to a person named Vanessa Pfeiffer.

20  Do you see that?

21  A.  Yes.

22  Q.  Ms. Macphail is saying that she wants to make you aware of

23  Vanessa, who is at DaVita.  And it says, "Or I would say we go

24  after her hard for GVP role."  Do you see that?

25  A.  Yes.

Michael Rucker - Cross

1    *Q.*  GVP is group vice president?

2    *A.*  Yes, I believe so.

3    *Q.*  That was an executive position?

4    *A.*  Yes.

5    *Q.*  And then the next sentence says, "However, could come in

6    handy in some way in conjunction as our relationship continues

7    with HCP."  Do you see that?

8    *A.*  Yes.

9    *Q.*  HCP stands for HealthCare Partners?

10   *A.*  Yes.

11   *Q.*  Which was part of DaVita; correct?

12   *A.*  Yes.

13   *Q.*  At this point in time, am I correct SCA and DaVita HCP were

14   in discussion about different business collaborations at

15   different times?

16   *A.*  Yes.  I can't tell you there was at this time, but it

17   sounds like it was.  I don't recall when those discussions were

18   taking place, but it sounds like that's the case.  Yes.

19   *Q.*  But in any event, you know they did take place?

20   *A.*  They did take place.  Yes.

21       *MR. DODDS:*  And if you scroll up to the next email,

22   which I believe is your response.

23   *BY MR. DODDS:*

24   *Q.*  You respond saying, "Goes without saying that I know you'll

25   be super sensitive to appearance of us recruiting her, given

Michael Rucker - Cross

1    all that we are doing with HCP."  Do you see that?

2    A.  Yes.

3    Q.  So you are encouraging your teammates on this email to

4    make sure that they were sensitive because of these business

5    dealings that were going on; correct?

6    A.  Yes.

7    Q.  And you say "goes without saying."  I take it from that

8    that this is -- that this sensitivity about hiring and --

9    recruiting and hiring from DaVita because of these business

10   relationships with HCP is something that you thought should

11   have been obvious to everyone?  Or that people would

12   understand?

13   A.  Yes.  That's right.

14   Q.  Okay.  And you say, "I know you'll be super sensitive."  So

15   you're just reminding them of something that you expect them to

16   understand anyway?

17   A.  Yes.

18   Q.  Based on what they know is going on with DaVita from a

19   business standpoint at this time?

20   A.  Yes.

21        MR. DODDS:  And then if you scroll up to the next

22   email.

23   BY MR. DODDS:

24   Q.  Mr. -- would you say his name again, sir?  I'm sorry.

25   A.  Ajay.

Michael Rucker - Redirect

1   *Q.*  Okay.  Ajay responds to you, "Of course."  Right?

2   Basically saying, yes, I know.  We all know.

3   *A.*  Yes.

4   *Q.*  Right?  Okay.

5        *MR. DODDS:*  I have no more questions for you,

6   Mr. Rucker.  Thank you.

7        *THE COURT:*  Redirect.

8                    **REDIRECT EXAMINATION**

9   *BY MR. VIGEN:*

10  *Q.*  Mr. Rucker, let's pick up on the business discussions.

11  Again, was the gentlemen's agreement formed before or after the

12  business discussions with DaVita?

13  *A.*  Before.

14  *Q.*  And from the time that you learned of the gentlemen's

15  agreement from Mr. Hayek, did it exist for the rest of the time

16  that you worked at SCA?

17  *A.*  Yes.

18  *Q.*  And, again, when did you leave SCA?

19  *A.*  When did I leave SCA?  2017, approximately.

20  *Q.*  Mr. Dodds asked you some questions about an individual

21  named Jung Lee.  We also talked about that on direct

22  examination.  Do you know how Jung Lee was treated at DaVita

23  after he told his boss?

24  *A.*  I do not.

25  *Q.*  And remind me, when you were leaving DaVita to go to SCA,

Michael Rucker - Redirect

1   did you want to tell your boss?

2          *THE COURT:*  No.  You've asked that too many times.

3          *MR. VIGEN:*  Okay.  Thank you, Your Honor.

4   *BY MR. VIGEN:*

5   Q.  I want to talk briefly about some of the individuals that

6   were mentioned by Mr. Dodds.  If we can start with your friend

7   Mr. Weissert.  Did Mr. Weissert ever receive an offer from SCA

8   for employment?

9   A.  I don't believe so.  No.

10  Q.  And Mr. Dodds also mentioned that you're aware that

11  Mr. Weissert ultimately ended up at Hazel Health?

12  A.  Yes.

13  Q.  Okay.  Do you know when Mr. Weissert left DaVita for Hazel

14  Health?

15  A.  I do not.

16  Q.  Did he leave -- do you know whether he left at least after

17  Mr. Thiry stepped down as CEO of DaVita?

18  A.  I do not.

19  Q.  Okay.  You can't rule out that possibility?

20  A.  I can't rule out the possibility.

21         *MR. VIGEN:*  Okay.  If we can show the witness, please,

22  A079.

23  *BY MR. VIGEN:*

24  Q.  This is the email that you were shown on cross about a

25  woman named Vanessa Pfeiffer from DaVita; is that right?

440

Michael Rucker - Redirect

1  A.  Yes.

2  Q.  Did SCA end up recruiting or going after Vanessa Pfeiffer?

3  A.  I don't think so, but I don't know for sure.

4  Q.  And do you know whether she was ever given an offer by SCA?

5  A.  I do not know that.  I do not think so.

6       MR. VIGEN:  And, finally, if we could go look at

7  Government Exhibit 356, which you were shown on

8  cross-examination.

9       Can we please blow up a portion of the email you

10 were not shown, Mr. Rucker, the bottom of the email from

11 Winborne Macphail.

12 BY MR. VIGEN:

13 Q.  What does this indicate in the first bullet with respect to

14 how the process of this hiring was handled?

15 A.  Can I take a minute and read it?

16 Q.  Of course.

17 A.  Okay.  I'm sorry.

18 Q.  What does this email indicate with respect to how the

19 process of hiring this individual from DaVita was handled?

20 A.  In the first bullet there is reference to Winborne

21 indicating to Corey that she's going to take responsibility for

22 rushing to hire -- you know, rushing to make this hire with

23 pressure to fill and have someone in a role in Detroit.

24      MR. VIGEN:  If we can go to the top email, please.

25

441

Michael Rucker - Redirect

1    *BY MR. VIGEN:*

2    *Q.*  Does anywhere in this email indicate whether Dr. Fanning

3    was involved in this hiring?

4    *A.*  "I will be engaging Bridie on the hire and all senior hires

5    going forward, as well."

6    *Q.*  Does that indicate to you whether Bridie was involved in

7    this hiring?

8    *A.*  When you say, "in this hire," in the hire that didn't work

9    out?

10   *Q.*  Right.  Michelle Trent.

11   *A.*  Yeah.  It would seem to me, if I'm understanding this --

12   again, I haven't studied this -- but that she was not, but she

13   will be in future hires.

14   *Q.*  And, Mr. Rucker, if I were to represent to you that

15   Michelle Trent was the only person hired by SCA from DaVita

16   between February 2012 and July 2017, would you have any reason

17   to believe that that was not true?

18   *A.*  No.

19              *MR. VIGEN:*  No further questions.

20              *MR. DODDS:*  Your Honor, may I ask just one or two

21   questions in follow-up?

22              *THE COURT:*  One question?

23              *MR. DODDS:*  Sure.

24              *THE COURT:*  Okay.  One question.

25              *MR. DODDS:*  Can we put Government Exhibit 356 back up

Michael Rucker - Recross

1    on the screen.

2              THE COURT:  There was your question.

3              MR. DODDS:  I'm sorry.  That question was directed at

4    my colleague back here.  I didn't think it counted.

5              I'm trying to figure out how to do this in exactly one

6    question.

7              THE COURT:  I'll give you two questions.

8              MR. DODDS:  Thank you.

9                        **RECROSS-EXAMINATION**

10   BY MR. DODDS:

11   Q.  Mr. Rucker, will you take a look at the bullet that

12   Mr. Vigen just showed you, please.

13   A.  Yes.

14             MR. DODDS:  And can we highlight that first bullet,

15   please, "I will take full responsibility."

16   BY MR. DODDS:

17   Q.  So it looks like from this bullet -- and this is my

18   question -- there was nothing about the gentlemen's agreement

19   that slowed the hiring of Michelle Trent down even a little bit

20   before Bridie Fanning arrived; is that so?

21   A.  I don't know if I would say -- the way that you're

22   connecting Bridie Fanning's arrival is --

23   Q.  Let me take that part of it off.  It looks from this bullet

24   like there was nothing about the gentlemen's agreement that

25   slowed down the hiring of Michelle Trent at all; is that

1   correct, sir?

2   *A.*  I'm going to read this a little bit more literally and

3   suggest that Winborne is thinking that she went too fast with

4   this hire, and as a result it didn't work out well.

5            *MR. DODDS:*  Okay.  I had one question, and I'm not

6   going to press my luck.  Thank you.

7            No further questions, Your Honor.

8            *THE COURT:*  All right.  Ladies and gentlemen, do you

9   have any further questions of this witness?

10           Okay.

11           (Hearing commenced at the bench.)

12           *MR. VIGEN:*  No objection.

13           *MR. DODDS:*  No objection, here.

14           *THE COURT:*  10.

15           *MR. VIGEN:*  No objection.

16           *MR. DODDS:*  I don't like the question, but I don't

17  think we can object to it.

18           *MR. VIGEN:*  I think they heard you.

19           *THE COURT:*  That's just Julie entertaining them over

20  there.

21           *MR. DODDS:*  I've only done -- there is another one on

22  the back here.

23           I don't think we object to that.

24           *THE COURT:*  Okay.  Thank you.

25           *MR. DODDS:*  Thank you.

444

1              (Hearing continued in open court.)

2              THE COURT:  Mr. Rucker, the jurors have a few

3         questions for you also.

4              Question:  Why did the government give you a

5         no-prosecution agreement?

6              THE WITNESS:  I assume because they don't think I did

7         anything wrong or that they don't intend to prosecute me for

8         anything about which we're talking today.

9              THE COURT:  Question:  Please describe Vanguard's

10        connection to SCA and/or DaVita.

11             THE WITNESS:  Vanguard was the name of one of the

12        operating groups.  So -- we broke the company into four or five

13        teams, and each of them adopted their own identity.

14             THE COURT:  Which company?

15             THE WITNESS:  At Surgical Care Affiliates.  So it was

16        the name of a division, an operating division within -- inside

17        of Surgical Care Affiliates.

18             THE COURT:  Question:  Is a senior director role at a

19        level under scrutiny of the gentlemen's agreement?

20             THE WITNESS:  Yes.

21             THE COURT:  Question:  When you told Javier Rodriguez

22        and Kent Thiry that you were leaving for SCA and they said it

23        was unfortunate that you would be caught up in litigation, did

24        you feel like this was to threaten or intimidate you?

25             THE WITNESS:  It's hard for me to say why it was said.

1    It was a little intimidating.

2         THE COURT:  Question:  In your experience, can people

3    be retained by their employer via raises and promotions if they

4    already have a competitor offer and did not proactively tell

5    their boss?

6         THE WITNESS:  Would you mind reading that one more

7    time?

8         THE COURT:  In your experience, can people be retained

9    by their employer via raises or promotions if they already have

10   a competitor offer and did not proactively tell their boss?

11        THE WITNESS:  It's my experience that -- and I think

12   Jung Lee sounds like it was an example of this -- that people

13   can be retained by their employers if they go to their

14   supervisor and talk about the fact that they were looking for

15   another job and/or have received another offer.

16        Is that responsive -- the last part of the question,

17   I'm not sure if I'm picking that up.

18        THE COURT:  Well, I think it responds.  But if not,

19   the juror can ask another question.

20        And before that, the juror did ask another question,

21   which is:  Did this happen at DaVita?  And how often?  In other

22   words I think the juror is asking, how often did it happen that

23   when somebody told their boss, they were actually given a raise

24   or something and retained?

25        THE WITNESS:  I'm not aware of any other instances

1   where that happened.

2          THE COURT:  All right.  Any other questions, folks?

3   And if I have misunderstood or if the witness has misunderstood

4   your question, feel free to ask another one.

5          No?

6          All right.  Mr. Vigen.

7          MR. VIGEN:  No further questions, Your Honor.

8          MR. DODDS:  Nothing, Your Honor.  Thank you.

9          THE COURT:  All right.  Mr. Rucker, thank you for your

10  testimony.

11         THE WITNESS:  Thank you.

12         THE COURT:  You're excused and free to go.

13         THE WITNESS:  Thank you very much.

14         THE COURT:  Next.

15         MS. LEWIS:  Your Honor, the United States calls Andrew

16  Hayek.

17         For planning purposes, just when would Your Honor like

18  to take the afternoon break?

19         THE COURT:  Well, I'm pretty flexible.  When do people

20  want it?  We've been only going about an hour and ten minutes.

21         MS. LEWIS:  I'm happy to proceed.

22         THE COURT:  I would think maybe at quarter to 3:00,

23  something like that, depending on a good place to break.

24         MS. LEWIS:  I would certainly rely on Your Honor to

25  let me know when the hour arrives --

Andrew Hayek – Direct

1              We do need a break?

2              THE COURT:  All right.  Then let's do it now.

3              (Jury out at 2:31 p.m.)

4              THE COURT:  Ten minutes or so.

5              (Recess at 2:31 p.m.)

6              (Jury in at 2:49 p.m.)

7              MS. LEWIS:  Megan Lewis for the United States.  We'd

8    call around.

9              THE COURT:  Mr. Hayek.

10             (**ANDREW HAYEK, GOVERNMENT'S WITNESS, SWORN**)

11                       **DIRECT EXAMINATION**

12   BY MS. LEWIS:

13   Q.  Good afternoon, Mr. Hayek.

14   A.  Hello.

15   Q.  Would you please state your name for the record, spelling

16   your last name, please.

17   A.  Andrew Hayek, H-A-Y-E-K.

18   Q.  And what is your current occupation?

19   A.  I'm a partner in a small firm that builds healthcare

20   companies.

21   Q.  Did you previously work for a company called Surgical Care

22   Affiliates?

23   A.  Yes, I did.

24   Q.  If I refer to that as SCA, will you know what I'm talking

25   about?

Andrew Hayek - Direct

1   *A.*  Yes, I will.

2   *Q.*  And what type of company is SCA?

3   *A.*  An outpatient surgery company.

4   *Q.*  Can you just give a little more detail what that means?

5   *A.*  Outpatient surgeries are surgeries you can do on the same

6   day, so you're in and out on the same day, orthopedics,

7   cataracts, GI procedures.

8   *Q.*  What was your role at SCA?

9   *A.*  I was the chief executive officer.

10  *Q.*  And that means you were the top officer at the company?

11  *A.*  Yes, it does.

12  *Q.*  And how long approximately did you hold that role?

13  *A.*  Approximately nine years.  A little bit more than nine

14  years.

15  *Q.*  And could you please give us the approximate dates that you

16  were in that role?

17  *A.*  Yes.  April 2008 through the end of 2017.  And I wore a

18  couple of different hats in the last several months.

19  *Q.*  And what organization did you go to immediately following

20  SCA?

21  *A.*  We sold SCA to United Health Group, so that became the next

22  organization I worked for.

23  *Q.*  And could you just briefly explain how you transitioned out

24  of your SCA role into that United Health Group role?

25  *A.*  Yes.  We sold SCA approximately April of 2017.  And then

Andrew Hayek - Direct

1    through the end of that year, I had a broader role within

2    United, as well as the SCA CEO hat until we named my successor

3    at the very beginning of 2018.

4    Q.   Even though you were still wearing two hats during the

5    latter part of 2017, were you still acting as the CEO of SCA?

6    A.   Yes.

7    Q.   And, Mr. Hayek, have you entered into a cooperation and

8    non-prosecution agreement with the United States?

9    A.   Yes, I have.

10   Q.   Was that done all at once, or did you sign a couple of

11   different documents?

12   A.   Two documents.

13   Q.   And did the end result of those documents mean that you

14   won't be prosecuted for agreements to suppress competition for

15   employees?

16   A.   Yes.

17   Q.   And your agreement with the government requires you to

18   provide testimony today; is that right?

19   A.   Yes, it does.

20   Q.   Could you briefly describe the conduct for which you

21   received this immunity?

22   A.   Agreement not to solicit senior executives.

23   Q.   And was that with one company or more than one company?

24   A.   More than one.

25   Q.   What were the companies?

Andrew Hayek - Direct

1    *A.*  The companies were DaVita and United Surgical Partners, or

2    USPI.

3    *Q.*  And with regard to DaVita, who did you enter that agreement

4    not to solicit with?

5    *A.*  Mr. Thiry.

6    *Q.*  And what role did Mr. Thiry have at DaVita?

7    *A.*  He was the chief executive officer.

8    *Q.*  And turning to SCA, can you tell us approximately how many

9    employees SCA had while you were its CEO?

10   *A.*  Approximately 6,000, maybe 7,000.

11   *Q.*  And did SCA employ senior-level employees?

12   *A.*  Yes, we did.

13   *Q.*  And geographically, where were those senior-level employees

14   located?

15   *A.*  Multiple states.  We had a headquarters in Alabama, we had

16   opened an office in Chicago, we had an office ultimately in

17   Dallas, California, Connecticut.

18   *Q.*  Did SCA pay salaries of senior-level employees across state

19   lines?

20   *A.*  Yes, I believe we did.

21   *Q.*  Could you give some examples of the types of titles that

22   senior-level employees at SCA held?

23   *A.*  Chief operating officer, chief development officer, chief

24   financial officer, general counsel, chief of strategy, senior

25   vice president of operations, regional vice president of

451

Andrew Hayek – Direct

1  operations, director of operations, to name several.

2  Q.  Sure.  What about regular vice presidents?

3  A.  Yes.

4  Q.  Okay.  And can you just give a ballpark sense of the salary

5  level of a director-level position at SCA?

6  A.  There was a range.  If I were to guess a midpoint, maybe

7  $130,000 base salary and a bonus of 20 or 25 percent of that

8  base salary paid annually, and then a stock option grant,

9  typically.

10  Q.  So, roughly, 150ish, is that -- if I'm doing the math

11  right?

12  A.  In cash, and then the stock options would be additional

13  earnings.

14  Q.  Okay.

15  A.  They work a little different than cash, but they should be

16  valuable.

17  Q.  And as CEO of SCA, what was your involvement in recruiting

18  and hiring for SCA?

19  A.  I engaged in the overall talent strategy and recruiting

20  strategy, and then I'd be directly involved in the most

21  senior-level recruiting processes.

22  Q.  And did SCA conduct its own recruiting, or did it hire

23  recruiters?

24  A.  For more junior-level roles, we might do our own

25  recruiting.  For senior-level executives, we would typically

Andrew Hayek - Direct

1   use a firm -- an outside firm that specializes in recruiting.

2   Q.  And did you have authority over hiring and firing decisions

3   at the company?

4   A.  Yes.  I had the ultimate authority, like most other areas

5   of the company.

6   Q.  And how important was it to you as CEO to hire good

7   employees?

8   A.  Very important.  We're a services company.  We don't have

9   any technology or a patent, and so our people really make the

10  difference in being successful.

11  Q.  And were senior-level employees significant to the company?

12  A.  Yes.  Senior executives would help us set the strategy in

13  the market, help us partner with hospitals or physicians.  They

14  would hire a team and help set the tone and the culture, so

15  they had a large impact.

16  Q.  And what impact, if any, does losing a senior-level

17  employee have on a company?

18  A.  Well, first, you're without that executive; and you lose

19  their knowledge and history and all of their relationships that

20  they have built up over time.  If you go for a period of time

21  without someone in that role, you'd likely hire an external

22  firm that has an expense to recruit someone.  And that can

23  raise reputational questions, both externally and internally.

24  Why did this person leave?  Is there something wrong with SCA?

25  Q.  While you were CEO, did SCA experience that type of impact

Andrew Hayek - Direct

1   from losing senior-level employees?

2   A.   Yes, we did from time to time.

3   Q.   And how do you know Mr. Thiry?

4   A.   I worked for Mr. Thiry for just over a year, and I had met

5   him in the year prior to joining.

6   Q.   And when you say you worked for him, what company were you

7   working for?

8   A.   I worked for DaVita.

9   Q.   What was your title or your role at DaVita?

10  A.   The title was president of Village Health, which is a

11  subsidiary of DaVita, with a particular kind of clinical care

12  model.

13  Q.   Did you report directly to Mr. Thiry in that role?

14  A.   Yes, I did.

15  Q.   Approximately what's the time period that you were at

16  DaVita?

17  A.   From the beginning of 2007 until March or April of 2008.

18  About 15 months.

19  Q.   And over the years, has DaVita gone by any other names?

20  A.   Yes.  For a number of years, went by DaVita HealthCare

21  Partners, and then is as often referred to as The village.

22  Q.   And with regard to DaVita HealthCare Partners, is that the

23  same entity as DaVita, Inc.?

24  A.   Yes.  It -- it was renamed when they made an acquisition,

25  and then I think the name reverted back, so it's the same

Andrew Hayek - Direct

1    thing.

2    *Q.* And approximately how big of a company is DaVita, in terms

3    of employees?

4    *A.* My recollection is, 30,000 or more employees.

5    *Q.* Is that substantially larger than SCA?

6    *A.* Yes, materially larger.

7    *Q.* And did DaVita operate nationwide?

8    *A.* Yes. Across the country, in many, many states.

9    *Q.* And did they employ senior-level employees nationwide, as

10    well?

11    *A.* Yes. My recollection is there were senior executives

12    across the country.

13    *Q.* From your experience working at DaVita, what was the

14    business culture like?

15    *A.* The business culture was centered around caring for very

16    sick patients and a sense of mission and purpose of caring for

17    those patients. At a senior-executive level, it was very

18    performance orientated -- high-performance oriented and getting

19    great people and driving performance.

20    *Q.* Who was the primary person driving this high-performance

21    culture at DaVita?

22    *A.* I think it starts with Mr. Thiry and then his executive

23    team.

24    *Q.* Did you ever discuss the concept of loyalty with Mr. Thiry?

25    *A.* Yes. I think it came up a number of times.

Andrew Hayek – Direct

1   Q.  And what did Mr. Thiry express about loyalty?

2   A.  That loyalty was important, loyalty to DaVita and, you

3   know, the organization while you're there and an expectation

4   after you left.

5   Q.  And you indicated that the expectation of loyalty did not

6   end when you left DaVita.  Could you just explain what you mean

7   by that.

8   A.  Well, in my situation, I continued to help the team that I

9   had led when I was at DaVita after I left.  There were certain

10  projects and things, and I tried to continue to be helpful.

11  And I think that was, you know, expected and considered normal.

12  And then it also played into recruiting.

13  Q.  And how did it play into recruiting?

14  A.  I think a sense that for someone like me, who had built

15  relationships and knowledge and had gotten to know people and

16  earned their trust within DaVita, that it was not loyal and not

17  right to go back and use those relationships and knowledge to

18  recruit, at least in my case, senior executives.

19  Q.  And at some point did you leave your job at DaVita?

20  A.  Yes, I did.

21  Q.  And approximately what year was that?

22  A.  Early 2008.

23  Q.  And did you go from DaVita to SCA?

24  A.  Yes, I did.

25  Q.  And how did that opportunity come up for you to go to SCA?

Andrew Hayek – Direct

1   *A.*  I received a call from a board member at SCA.

2   *Q.*  And did you consider that a solicitation?

3   *A.*  Yes, I would.

4   *Q.*  So I want to walk through what happened in a moment.  But

5   what was the end result of that solicitation?

6   *A.*  The end result was that I joined SCA in the role of CEO.

7   *Q.*  And did that solicitation change your life?

8   *A.*  It was positive.  It was something I had wanted to do, that

9   kind of role; and I enjoyed my tenure very much at SCA.

10  *Q.*  And so how meaningful was receiving that solicitation to

11  you personally?

12  *A.*  In terms of my career, I thought it was very positive.  It

13  was very meaningful.

14  *Q.*  So after you got that solicitation call, did you express

15  interest in the position?  And could you just explain maybe how

16  you progressed through the recruitment?

17  *A.*  Yes.  I expressed interest.  I then met with a number of

18  the members of the board, including the chairman of the board.

19  I met with a recruiter -- recruiting executive that they had

20  hired for this search, so I had a number of meetings and then

21  engaged in the negotiation process.

22  *Q.*  And while you were going through that negotiation, did you

23  inform DaVita?

24  *A.*  No, I did not.

25  *Q.*  At some point did you decide to tell DaVita?

Andrew Hayek - Direct

1  *A.*  Yes.

2  *Q.*  And who did you tell?

3  *A.*  I told Mr. Thiry.

4  *Q.*  Now, before I ask you about the substance of that

5  conversation, did you tell Mr. Thiry before you had an offer or

6  after you had an offer?

7  *A.*  I told him after I had an offer.

8  *Q.*  I'll come back to that.  But turning to the day that you

9  decided to tell Mr. Thiry that you were leaving, did that

10  discussion take place in person or over the phone?

11  *A.*  It took place in person.

12  *Q.*  Okay.  Were there other people around or just the two of

13  you?

14  *A.*  Just the two of us.

15  *Q.*  Where were you?

16  *A.*  We were on a flight.

17  *Q.*  And can you briefly describe what Mr. Thiry's reaction was

18  when you started to have that conversation?

19  *A.*  When I shared that I was leaving, he was upset, he was sad,

20  frustrated.  So there was a range of emotions.

21  *Q.*  Was he angry?

22  *A.*  There was probably some anger.  I think mostly sad and

23  upset.

24  *Q.*  And in that conversation, did the two of you discuss

25  anything particularly about recruiting?

Andrew Hayek - Direct

1   *A.*  No.  I don't recall discussing recruiting, but I did

2   receive an offer of a promotion before I had shared my intent

3   to leave.

4   *Q.*  Did it seem like he had some sort of heads-up on that?

5           *MR. MELSHEIMER:*  Objection, Your Honor.  Leading.

6           *THE COURT:*  I actually didn't hear your question.  I

7   was listening, too; I just didn't hear it.

8           *MS. LEWIS:*  Certainly.  I asked if it seemed like

9   Mr. Thiry had a heads-up.

10          *MR. MELSHEIMER:*  Your Honor, objection.  Leading.

11          *THE COURT:*  Overruled.

12          *THE WITNESS:*  It didn't occur to me at that time.  I

13  found it strange.

14          *MS. LEWIS:*  All right.  And, Julie, if you may

15  activate our screen for the paralegals.

16  *BY MS. LEWIS:*

17  *Q.*  Mr. Hayek, I'm showing you what has been marked as

18  Government Exhibit 4.

19          And I would offer this as stipulated, Your Honor.

20          *THE COURT:*  Admitted.

21          (Exhibit 4 admitted.)

22  *BY MS. LEWIS:*

23  *Q.*  And so at some point subsequent to that conversation on the

24  airplane with Mr. Thiry, did he tell you anything about

25  competition if you took the job at SCA?

Andrew Hayek – Direct

1    *A.*   Yes.  I believe there were references to competition.

2    *Q.*   Do you recognize this email as an exchange between you

3    and Mr. Thiry?

4    *A.*   Yes, I do.

5    *Q.*   And is this before or after you told him about your offer

6    from SCA?

7    *A.*   After.

8    *Q.*   Okay.  So I'm directing you to the P.S. portion.  What

9    subject matter does this relate to?

10   *A.*   This relates to me leaving DaVita and joining SCA.

11   *Q.*   And could you please just read the P.S. out loud.

12   *A.*   "P.S., if you go with them, it does create some competitive

13   response issues for DaVita, because I would never" –– pardon

14   me –– "I would have never taken one of TPG's key people from a

15   major investment of theirs.  When companies do that to us, we

16   have a historical response strategy, which you and I should

17   discuss live."

18   *Q.*   And, first, who or what is TPG?

19   *A.*   TPG is an investment firm.  It was the majority shareholder

20   or owner of SCA.

21   *Q.*   And so when he says "if you go with them," is he referring

22   to SCA there?

23   *A.*   I believe so.

24   *Q.*   And is SCA a competitor to DaVita for senior-level

25   employees?

460

Andrew Hayek - Direct

1    A.   Yes.   In my case and subsequently so.

2    Q.   And what, if anything, is Mr. Thiry warning you about if

3    you go to SCA?

4    A.   That there would be a response -- you know, a negative

5    response.   You know, some form of, you know, retaliation or --

6    you know, a negative response.

7    Q.   And how personally or not did Mr. Thiry take it when

8    employees were recruited away from DaVita?

9    A.   In my experience, I think it was something that, you know,

10   he took personally and mattered a lot to him.   And on behalf of

11   DaVita, too.

12   Q.   And in your interactions with him over the years, did you

13   have a sense of what would irritate or provoke a response from

14   Mr. Thiry?

15   A.   In my experience, you know, recruiting a senior executive

16   would upset Mr. Thiry, and particularly so when someone like

17   me, who had built relationships and knowledge and trust within

18   DaVita, having had worked there.

19   Q.   And on the scale of things that irritated Mr. Thiry, where

20   did recruiting away an employee fall?

21   A.   Among the things that I did that irritated him, it would be

22   at the top.

23   Q.   So I believe you mentioned earlier that at the time you

24   joined SCA, SCA was a smaller company than DaVita; is that

25   right?

461

Andrew Hayek – Direct

1   A.  Yes, we were.

2   Q.  Okay.  And after you joined SCA, what growth goals did you

3   have for the company?

4   A.  Well, our immediate goal was to stabilize and save the

5   company.  SCA was small, struggling -- we were struggling

6   financially and in terms of all sorts of performance levels.

7   And so we needed to stabilize, and then we needed to generate

8   growth.

9   Q.  And how did you go about that with regard to employees?

10  A.  Regarding executives, in particular, two things.  There

11  were a number of senior executives at the time who weren't the

12  right fit, and so we needed to replace a number of senior

13  executives, and then we needed to add senior executives to

14  support that growth.

15  Q.  During your tenure at SCA, how competitive was the job

16  market for senior-level employees?

17  A.  I remember it being competitive.  We needed to work hard to

18  recruit people to SCA, tell our story, you know, compensate,

19  have a good place for culture, allow people to work from home,

20  things like that.

21  Q.  And in this time period immediately after you joined SCA,

22  did you recruit anyone from DaVita?

23  A.  Yes, we did.

24  Q.  Did you recruit anybody in the fall of 2008?

25  A.  Yes.  We recruited Mr. Rucker.  Mr. Michael Rucker.

462

Andrew Hayek – Direct

1   *Q.*  Did Mr. Rucker's recruitment provoke a response from

2   Mr. Thiry?

3   *A.*  Yes, it did.

4   *Q.*  What type of response did it provoke?

5   *A.*  There was a range of frustration, anger, disappointment.

6   There was a range of responses.

7   *Q.*  And did you receive those responses directly from

8   Mr. Thiry?

9   *A.*  Yes.  Through email and phone, a combination of the two.

10  *Q.*  And what did Mr. Thiry tell you in those conversations?

11  *A.*  Well, there is a range of things.  It was wrong to do what

12  I was doing, again, using those kind of relationships, that it

13  might create kind of a lose-lose scenario, that there might be

14  some responses or, you know, retaliation for it.  So there was

15  a range.

16  *Q.*  And just to clarify, when you say "it was wrong," do you

17  mean, that's what Mr. Thiry was conveying to you?

18  *A.*  Yes.  That someone like me, who had worked within DaVita,

19  built relationships, trust, knew DaVita, that that was unfair

20  and, you know, perhaps stabbing in the back to DaVita.

21  *Q.*  Did Mr. Thiry make any threats to you in those

22  conversations?

23  *A.*  I believe there were, you know, a number of things, you

24  know, ranging from reputational harm to potentially being sued

25  for it.  You know, various forms of retaliation.

463

Andrew Hayek – Direct

1    *Q.*  And did you perceive those as threats?

2    *A.*  Yes, I did.

3    *Q.*  And did you -- when you worked at DaVita, did you have a

4    nonsolicitation provision in your employment agreement with

5    DaVita?

6    *A.*  Yes, I did.

7    *Q.*  And can you just explain just a little bit about maybe the

8    scope or the time period or what it covered?

9    *A.*  My recollection was that the time period covered two years.

10   And I think the scope would be soliciting anyone into a

11   business that competed on a business level with DaVita.

12   *Q.*  And to clarify, did SCA compete in the underlying business

13   with DaVita?

14   *A.*  No.  You know, the core business of DaVita is kidney care,

15   dialysis; the core of SCA is outpatient surgery.  So I didn't

16   perceive that the two businesses competed in terms of the, you

17   know, product or service they offered.

18   *Q.*  And so was your understanding -- what was your

19   understanding about whether or not your contractual nonsolicit

20   prohibited you from recruiting senior-level employees from

21   DaVita?

22   *A.*  My belief is that my nonsolicit didn't preclude me from

23   recruiting Mr. Rucker, similar senior executives.

24   *Q.*  All right.  So you indicated that Mr. Thiry expressed his

25   views to you in an email; is that right?

464

Andrew Hayek – Direct

1   *A.*  Yes.  I think more than one email, as well as phone

2   conversations.

3          *MS. LEWIS:*  Showing you at this time Government

4   Exhibit 8, which I would move to admit pursuant to stipulation.

5          *THE COURT:*  It's admitted.

6          (Exhibit 8 admitted.)

7   *BY MS. LEWIS:*

8   *Q.*  Do you recognize this as an email chain between you and

9   Kent Thiry in July of 2008?

10  *A.*  Yes, I do.

11         *MS. LEWIS:*  Ms. Baskin, if we could pull up the last

12  page.

13  *BY MS. LEWIS:*

14  *Q.*  Directing you to the bottom here, I want to ask you a

15  clarifying question.  This is 2008 -- July of 2008.  Are you

16  employed by SCA or DaVita at this point in time?

17  *A.*  SCA.

18  *Q.*  And so the DaVita, Inc., that's appearing at the bottom of

19  this email chain, is that affiliated with you or not?

20  *A.*  Not with me.  I think it's something that gets copied to

21  the bottom of emails sometimes.

22  *Q.*  Okay.  So in this bottom email, what are you trying to do

23  here?

24  *A.*  I'm asking to set up a time to speak with Mr. Thiry.

25         *MS. LEWIS:*  And, Ms. Baskin, if we could pull up the

Andrew Hayek - Direct

1    text on page 3.

2    *BY MS. LEWIS:*

3    *Q.*  So looking at the text on this page, whose words are we

4    seeing here on this page?

5    *A.*  Mr. Thiry's.

6    *Q.*  And, generally, just at a high level, what topic does

7    Mr. Thiry indicate that he's going to raise with you on this

8    call?

9    *A.*  I think this relates to the recruitment of Mr. Rucker.

10   *Q.*  And based on what he expressed to you in this email, what

11   did his mood appear to be?

12   *A.*  Frustrated, angry, disappointed.  There was a range.

13   *Q.*  And we'll come back to this email in more detail; but

14   right now, I want to direct you to paragraph 4.

15            If we could blow that up, please.

16            What topic is Mr. Thiry sharing his views on here?

17   *A.*  My recruitment of Mr. Rucker and kind of that sort of

18   dynamic, broadly.

19   *Q.*  And could you just read aloud the sentence starting with,

20   "It is not amoral," and then read through the A, B, and C.

21   *A.*  "It is not immoral to do it in a business sense, not at

22   all.  But good friends don't do it to one another on a stealth

23   basis, A, because it is hurtful, and, B, it often has a

24   negative net present value in business and career terms.  Why

25   would you ever help someone after they take an exec in this

466

Andrew Hayek – Direct

1   way?  How would it make sense to do that?  And, C, it can

2   create a string of negative stuff, lousy, uncontrollable,

3   negative stuff."

4   Q.  And so what did you understand him to be expressing about

5   recruiting there?

6   A.  That it is hurtful, that it frustrates, angers him, and

7   that it can lead to a string of consequences -- negative

8   consequences.

9   Q.  And how did you understand his statement, "Why would you

10  ever help someone?"

11  A.  I think that the notion that it would damage --

12  significantly damage the relationship -- the business

13  relationship, and why would you ever seek to help another

14  person or their company if they behaved this way.

15  Q.  And so did you understand him to be suggesting that he was

16  not willing to help you in the future?

17  A.  I believe that's the implication.

18  Q.  And then directing you to the next sentence in the email,

19  where he says, "We will have to tell our board and the rest of

20  the senior team exactly what happened, and many of them will

21  take away negative conclusions about you."  How did you

22  interpret that statement?

23  A.  I think that falls under the description of reputational

24  damage, that what I did would be shared with the board of

25  directors and senior executives at DaVita, and that it was not

Andrew Hayek - Direct

1   right, that it was wrong what I was doing.

2   Q.  And so did you take that as a threat to your reputation?

3   A.  Yes.

4   Q.  And then directing you to the sentence that begins, "There

5   are contracts and free markets."  Could you read from there to

6   the end of the paragraph.

7   A.  "There are contracts and free markets, and there are

8   relationships.  Some execs live business primarily according to

9   contracts and free markets, others balance that with a heavy

10  emphasis on relationships and caring about one another over the

11  long-term."

12  Q.  Did you understand him to be talking about competition

13  here?

14  A.  I believe that's a reference in here.  Yes.

15  Q.  And what did you understand him to mean about free markets

16  versus relationships?

17  A.  I think the implication is that you can behave in a

18  short-term manner, and that's technically okay, but you're

19  impairing the long-term relationship, business-wise,

20  personally, et cetera.

21  Q.  Is he asking you not to compete for employees?

22  A.  I think that's an implication, is that that is part of the

23  short-term thinking.

24  Q.  And directing you to page 1 of the email.  Now, is this a

25  continuation still of the same email conversation with

Andrew Hayek - Direct

1   Mr. Thiry?

2   A.  Can you scroll down?

3         MS. LEWIS:  Ms. Baskin, if you want to maybe put two

4   pages up.

5         THE WITNESS:  Yes, I believe it is.

6   BY MS. LEWIS:

7   Q.  So I'm going to direct you to the paragraph near the bottom

8   of this first page of the email, which starts, "It is a

9   potentially nasty thing to start."  Could you just read the

10  first two sentences there.

11  A.  "It is a potentially nasty thing to start if you do

12  otherwise, because where does it stop?  The best people have

13  the best people, so we are all going to make each other's lives

14  more difficult than they are."

15  Q.  And what did you understand him to be referring to there?

16  A.  I think a downward spiral or cycle of, you know,

17  retaliatory acting and then more retaliation, and creates a

18  spiral.

19  Q.  And is that retaliation in the context of recruiting each

20  other's executives?

21  A.  Yes, I believe that's the reference here.

22  Q.  And jumping to the sentence that starts, "And do you think

23  friendships are easy?"  Could you read from there to the end of

24  the paragraph.

25  A.  "And do you think friendships are easy to maintain and

469

Andrew Hayek - Direct

1   develop over the years when you do that?  What world are you

2   living in?  I have competitors where we have basically stopped

3   going after each other's people because it is a lose-lose, and

4   those do not even have friendships at risk."

5   Q.  And when Mr. Thiry said, "when you do that," what is the

6   "that" that he's referring to?

7   A.  I believe it's a reference to recruiting senior executives.

8   Q.  And so how did you interpret these statements?

9   A.  I think as we discussed before, it was -- that there was a

10  series of risks or threats if I was to proceed with recruiting

11  Mr. Rucker and similar activity.

12  Q.  And what is he suggesting about your relationship with him

13  if you don't stop recruiting his people?

14  A.  That it would be very significantly damaged.

15  Q.  And what did it mean to you to be on the good side versus

16  the bad side of Kent Thiry?

17  A.  I think for me it meant preserving the business

18  relationship, business opportunities, the personal

19  relationship.  It meant a number of things.

20  Q.  And you mentioned preserving the business relationship.

21  Was there a current business deal on the table with DaVita?

22  A.  I don't believe so at this time.

23  Q.  So you're just thinking prospectively, that you'd someday

24  like to do business?

25  A.  Yes.  DaVita is a large company.  There are parts of DaVita

Andrew Hayek - Direct

1   that could partner very well with SCA.  I don't recall at this

2   moment in 2008 how much I thought about that business

3   partnership, but did over the, you know, following couple of

4   years.

5   Q.  So at this point in 2008, is it fair to say your thinking

6   is driven by the relationship aspect?

7   A.  Yes.  I think that's fair.

8   Q.  Now, in the next couple of years after 2008, did you

9   recruit DaVita employees to come and work for SCA?

10  A.  Yes, I did.

11  Q.  So in that time period, was SCA competing with DaVita for

12  senior-level employees?

13  A.  Yes, we were.

14  Q.  And did SCA recruit senior-level employees across state

15  lines?

16  A.  Yes.  I believe in some instances we did.  For example,

17  Mr. Rucker moved from the Washington, D.C. area to Chicago.

18  Q.  And throughout the time period that you were CEO of SCA,

19  did you also employ recruiting firms that recruited across

20  state lines?

21  A.  Yes, we did.

22  Q.  And how did Mr. Thiry respond to those recruitments in

23  those early years after 2008?

24  A.  When there was a response -- which it wasn't every time --

25  but when there was, it would have a similar nature to the

Andrew Hayek – Direct

1    response to Mr. Rucker.  Perhaps less intense sometimes, but

2    kind of similar themes.

3    Q.  And how do you know that was Mr. Thiry's response?

4    A.  Because it was communicated with me.

5    Q.  And when you received a response from Mr. Thiry, how did

6    you respond?

7    A.  I would seek to mollify.  You kind of get through the

8    moment and would often explain this person, like Mr. Rucker,

9    was leaving anyway.  If they hadn't come here, they would have

10   gone somewhere else.  I didn't bad-mouth or speak negatively

11   about DaVita.  There was nothing untoward or unfair.  So I

12   would seek to mollify.

13   Q.  Were you aware of actions taken by others at DaVita other

14   than Mr. Thiry in response to SCA's recruiting?

15   A.  Yes.  I think there were a number of instances of other

16   senior executives communicating their displeasure.

17   Q.  And did you at some point receive a call from an individual

18   named Joe Mello?

19   A.  Yes, I did.

20   Q.  And what did he convey to you?

21   A.  I believe it was around the time of recruiting Mr. Rucker,

22   and Mr. Mello communicated that one thing DaVita might do is

23   kind of systematically call our executives, irrespective of

24   whether there was a job or, you know, an intent to recruit

25   them.  But, you know, to call our folks and be disruptive.

Andrew Hayek - Direct

1   *Q.*  And did you perceive that as a threat, as well?

2   *A.*  Yes, I did.

3   *Q.*  And did DaVita and Mr. Thiry have the resources to come

4   after SCA's executives in that way?

5   *A.*  Yes, I believe they had the resources to do so.

6   *Q.*  And is soliciting -- even if there isn't hiring at the end

7   of the day, is soliciting disruptive to a business?

8   *A.*  Yes, I think it often is.  Not always, but it often is.  It

9   depends on the individual and the circumstance, but it

10  certainly can be.

11  *Q.*  And did DaVita, in fact, solicit and hire anyone away from

12  SCA in that time period?

13  *A.*  Yes, I believe they did.

14  *Q.*  Who was that?

15  *A.*  One example would be in 2011, they recruited Mr. Aaron

16  Luther, I believe.

17  *Q.*  And how did you perceive Mr. Luther's hiring?

18  *A.*  It raised questions.  Mr. Luther was I believe a regional

19  vice president on our team, and he was hired into the part of

20  DaVita that we were hoping to partner with in terms of

21  business.  And I can provide more detail about how that

22  partnership would work.  But it raised a question of whether

23  DaVita was moving away from the notion of that partnership.

24  And he was also an executive who had worked at DaVita

25  previously years before, you know, and why were they suddenly

Andrew Hayek – Direct

1    interested in him now?  So it raised some questions.

2    Q.  Did you have concerns that DaVita was maybe gearing up to

3    compete in that line of business?

4    A.  That was a possibility.

5    Q.  Focusing now on the 2011 to 2012 period.  Did you have

6    conversations with Mr. Thiry about competing for senior-level

7    employees?

8    A.  Yes, we did.

9    Q.  Was it just one conversation or more than one?

10   A.  It was more than one conversation.

11   Q.  And were those in person or over the phone?

12   A.  I believe they were over the phone; and then there were

13   some emails, as well.

14   Q.  And what did you discuss, if anything, with regard to

15   solicitation and recruiting?

16   A.  We agreed not to solicit each other's senior executives.

17   Q.  And was there a further aspect to that agreement, as well?

18   A.  Yes.  If the senior executives was already looking at

19   outside jobs and had told their supervisor, then we could

20   solicit.

21   Q.  And so I'd like to put that aspect aside and just focusing

22   on the aspect related to solicitation.  When you use the term

23   "solicit" with regard to job opportunities, what does that term

24   mean to you?

25   A.  To call to describe a job opportunity.

Andrew Hayek – Direct

1   Q.  And so under the agreement that you reached with Mr. Thiry,

2   could SCA or its recruiters solicit a senior DaVita employee

3   for a position at SCA?

4   A.  No.

5   Q.  And initially, what level of employees were off limits

6   under your agreement?

7   A.  Vice presidents and above.

8   Q.  And did you interact with Mr. Thiry about this agreement

9   over the course of the subsequent years?

10  A.  Yes, we did.

11  Q.  And did your understanding of the scope of the agreement

12  get refined through those course of dealings with Mr. Thiry?

13  A.  Yes, it did.

14  Q.  So focusing on the level of employee, did that get refined?

15  A.  Yes.  We ultimately expanded to include the director level,

16  which is a role that became a bit more common in SCA, as we

17  grew over the years.

18  Q.  And so once you landed on the level with Mr. Thiry, did the

19  core terms of your agreement with him ever change?

20  A.  No.

21  Q.  And did this agreement come up every single day in your

22  life at SCA?

23  A.  No.  It might have come up a couple times a year.

24  Q.  So what was the geographical scope of your agreement with

25  Mr. Thiry?

475

Andrew Hayek - Direct

1    A.   It was nationwide, wherever these senior executives were

2    based.

3    Q.   And did your interactions with Mr. Thiry over the years

4    about the agreement not to solicit take place across state

5    lines?

6    A.   Yes.  I believe many or most of them did.

7    Q.   So did individual employees sometimes reach out to SCA on

8    their own?

9    A.   Yes.  Sometimes they did.

10   Q.   And did you consider that to be a solicitation?

11   A.   Not -- not that outreach to us, but we would share with

12   that person the nature of the agreement.

13   Q.   Okay.  And so for these candidates who weren't solicited,

14   what restriction, if any, did your agreement with Mr. Thiry

15   require?

16   A.   That if they weren't already looking at other opportunities

17   and had not told their boss or supervisor, that we couldn't

18   advance them in the process.

19   Q.   And who proposed that part about requiring a supervisor

20   notification?

21   A.   Mr. Thiry.

22   Q.   And did he ever explain to you why he proposed that?

23   A.   Yes.  The notion was that unless somebody told their boss,

24   it's very easy to kind of make up on the back end, at the very

25   end of a process, that a person was looking anyway.  So it was

476
Andrew Hayek - Direct

1    a way to audit or ensure that the person actually was looking.

2    Q.   To ensure you weren't cheating on the agreement; is that

3    fair?

4    A.   Yes.

5         MR. MELSHEIMER:   Objection, Your Honor.   Leading.

6         MS. LEWIS:   I would --

7         THE COURT:   Sustained.

8    BY MS. LEWIS:

9    Q.   At what point in the recruitment process was the candidate

10   supposed to tell their boss?

11   A.   I think the spirit was earlier in the process.

12   Q.   And did the candidate have an offer at the time that they

13   were supposed to notify their boss?

14   A.   No.   I don't think that's the spirit of it.

15   Q.   And what was the purpose of that provision?

16   A.   The notification?

17   Q.   Yes.

18   A.   As we talked about, the -- to prevent kind of cheating or

19   making up that reason at the very end of the process.

20   Q.   And did it have any other purpose?

21   A.   I think there were -- Mr. Thiry shared some thoughts via

22   email that often a person wasn't actually looking anyway, or

23   they weren't serious about looking, and so for that kind of

24   person, it would deter them from advancing in the process.

25   Q.   And so did that provision have a purpose of encouraging or

Andrew Hayek - Direct

1   discouraging candidates from switching between the companies?

2   A.  I think between those two, it served to discourage.

3   Q.  And if an employee was not willing to tell their boss,

4   could you pursue them, or were they off limits?

5   A.  They would be off limits.

6   Q.  And what did that do to the recruitment and hiring process

7   for that person?

8   A.  It would stop it.

9   Q.  And based on your experience as an executive, did you have

10  an understanding about whether employees would or would not

11  want to tell their boss that they're trying to leave?

12  A.  I think it's very individual.  It depends on the individual

13  and their relationship with their boss.  So sometimes people

14  would not want to do that; sometimes they were comfortable.

15  Q.  Did you personally experience not wanting to notify your

16  boss before you had an offer?

17  A.  Yes, I did, in my experience of leaving DaVita and going to

18  SCA.

19  Q.  And who was your boss at that time?

20  A.  Mr. Thiry.

21  Q.  Why did you not want to tell Mr. Thiry before you had an

22  offer that you were thinking about leaving?

23  A.  In my case, I was oriented around moving on from DaVita.  I

24  wasn't personally interested in a broader role or something

25  that DaVita would offer; and there was some question in my mind

Andrew Hayek – Direct

1    of how Mr. Thiry would respond.

2    Q.   Was there a risk in not keeping your job discussions

3    private?

4    A.   Yes, there is a risk.

5    Q.   What was that risk?

6    A.   That there would be a negative response, that I'd be

7    thought of or looked at differently.  I don't know, but there

8    are risks, you know; and you don't know what the response will

9    be.

10   Q.   And did there come a point in time when you learned that

11   Mr. Thiry had in fact spoken with the individuals who were

12   recruiting you over to SCA?

13   A.   Yes.  I came to learn that a number of days after my

14   conversation where I shared I was leaving.

15   Q.   And that's your conversation with Mr. Thiry where you

16   shared you were leaving; is that right?

17   A.   Correct.

18   Q.   Okay.  And did Mr. Thiry speaking to the competing company

19   that you were trying to get a job with occur with your

20   knowledge or without your knowledge?

21   A.   The conversation was with a partner at the firm that owned

22   the majority of SCA, and that conversation occurred without me

23   knowing it.

24   Q.   And did you learn of anything that Kent Thiry had done with

25   regard to your offer at SCA?

479

Andrew Hayek - Direct

1   A.   Mr. Thiry had requested that the offer be either pulled or

2   frozen, meaning, in the negotiation of the job, to not -- kind

3   of not move further.

4   Q.   How did you feel about that conduct by Mr. Thiry?

5   A.   I didn't like that it occurred behind my back without me

6   knowing, so it was disappointing and frustrating.

7   Q.   And did you ever confront Mr. Thiry about that conduct?

8   A.   I believe I addressed it in one or more email exchanges,

9   and I think that was the extent of it.

10  Q.   Directing you back to Government Exhibit 8 --

11          If we could pull up the second page, Ms. Baskin.

12          Directing you to -- well, let me first ask you, whose

13  words are we seeing here on this page?

14  A.   Those are mine.

15  Q.   And directing you to paragraph No. 3, what did you express

16  with regard to Mr. Thiry talking about your new employer?

17  Directing you to the first part of this paragraph.

18  A.   That I was deeply disappointed that the shareholder had

19  told you, meaning Mr. Thiry, about, you know, my recruitment to

20  SCA, for a number of reasons.

21  Q.   And could you just read what those reasons are.

22  A.   "First, I believe that a candidate, me, has the right to

23  explore career options that may be best for them in privacy.

24  Second, I never wanted to leverage SCA and DaVita against each

25  other into a," quote, "bidding war.  And, third, the net effect

Andrew Hayek – Direct

1    of the heads-up discussion that occurred prior to me discussing

2    my decision to leave with you was to put my offer at risk," for

3    example, you know, "the request for TPG to withdraw it and to

4    lower my ultimate economics," for example, "to freeze my offer

5    and leave the 10 percent wiggle room regarding base and bonus

6    untapped.  None of this felt good or right."

7    Q.  And so even this effect of a heads-up discussion, did that

8    have a positive or negative impact on your offer?

9    A.  The ask was for it to have a negative effect.  I don't know

10   whether it did.  I ultimately pursued and took the job.

11   Q.  And then directing you to Mr. Thiry's response to this on

12   page 1, beginning with the paragraph that says, "Not that it is

13   relevant."

14            If Ms. Baskin will blow that up.

15            Mr. Thiry says, "Not that it is relevant, but you had

16   downside with the disclosure of your search."  What did you

17   understand Mr. Thiry to mean by downside to disclosure?

18   A.  I think it's a reference to risk if I disclosed my job

19   search or discussions with SCA.

20   Q.  And so Mr. Thiry is aware that there was a downside to

21   disclosing your offer?

22   A.  I believe it's a reference, yes, to me having a downside.

23   Q.  And so for you, was there a positive or negative impact to

24   your offer from your boss, Mr. Thiry, finding out about it?

25   A.  The request or the ask of TPG, and by extension SCA, was to

Andrew Hayek - Direct

1   negatively impact it.

2   *Q.*  And so directing you now to the third page of Government's

3   Exhibit 8, paragraph 1.  And, again are we now looking again at

4   Mr. Thiry's own words?

5   *A.*  Yes, we are.

6   *Q.*  And to just provide the context for this paragraph, are you

7   and Mr. Thiry CEOs of competing employers at this point in

8   time?

9   *A.*  Yes.  In terms of competing for me, as an example, and

10  Michael.

11  *Q.*  Okay.  And just to clarify the timing of this, you are now

12  at SCA; is that right?

13  *A.*  That's correct.

14  *Q.*  And the Michael that is referenced in here, is that a

15  reference to Michael Rucker?

16  *A.*  Yes, it is.

17  *Q.*  And what is Mr. Thiry -- I'm sorry -- and you're -- in

18  these emails, you're referencing the fact that you are

19  competing for Michael Rucker; is that right?

20  *A.*  Yes, we are.

21  *Q.*  And what is Mr. Thiry suggesting that you should have done

22  with regard to Michael Rucker?

23  *A.*  There was a suggestion that I should have asked Michael to

24  let DaVita know that he was considering this opportunity before

25  I extended an offer.

482

Andrew Hayek – Direct

 1   Q.  And what does Mr. Thiry express at the end of that

 2   paragraph with regard to whether candidates typically want to

 3   disclose?

 4   A.  That most of the time, the candidate chooses not to do it.

 5   Q.  And you testified earlier that you discussed this same type

 6   of supervisor notification provision with Mr. Thiry in the

 7   context of your agreement not to solicit senior employees; is

 8   that right?

 9   A.  Yes.  A few years later.

10   Q.  And so what effect was this supervisor notification

11   provision intended to have on the movement of employees?

12   A.  To reduce.

13   Q.  And did Mr. Thiry express to you his purpose for this

14   provision?

15   A.  I think what he expressed was to prevent cheating, as we

16   talked about earlier, as well as express that oftentimes the

17   candidate doesn't do it.

18   Q.  And did he express whether he wanted to deter movement or

19   encourage movement of employees between DaVita and SCA?

20   A.  I think across the various communications, between those

21   two, would be to deter or reduce.

22   Q.  So I want to talk now a little bit about the motivation for

23   entering the agreement with Mr. Thiry.  Did you have one

24   motivation or more than one motivation?

25   A.  More than one motivation.

483

Andrew Hayek - Direct

1   *Q.*   What were some of your motivations?

2   *A.*   Well, at the time of entering into the agreement, there is

3   the business relationship, there was business opportunity, and

4   then there was the avoidance of a number of risks -- being

5   sued, reputational harm, and then retaliatory targeting or

6   raiding of our executives.

7   *Q.*   And in the course of your conversations with Mr. Thiry and

8   your emails with him, what, if anything, did Mr. Thiry tell

9   you about his objective of the agreement?

10  *A.*   I think what upset him was losing senior executives.  And

11  then especially so when someone like me did it, who had worked

12  there and had knowledge and relationships and kind of an unfair

13  advantage, it felt like stabbing him in the back.

14  *Q.*   What, if anything, did he express to you in regard to

15  staying away from his people?

16  *A.*   Asked me to do so.

17  *Q.*   And did Mr. Thiry ever express that the reason he was doing

18  this was for a purpose of job creation?

19  *A.*   No, I don't recall those words.

20  *Q.*   And did you enter this with the express purpose of trying

21  to create jobs?

22  *A.*   Not explicitly so, no.  One motivation was preserving,

23  strengthening the business.  So jobs might be an effect of

24  that, but I don't recall thinking job creation as a primary.

25  *Q.*   So considering all aspects of your agreement with

Andrew Hayek – Direct

1   Mr. Thiry, did it have a purpose to encourage or discourage the

2   movement of senior-level employees between SCA and DaVita?

3   A.  I think to discourage.

4   Q.  Did you think this agreement with Kent Thiry would benefit

5   SCA?

6   A.  Yes, I did.

7   Q.  How so?

8   A.  I think there is the growth opportunity that partnering

9   with DaVita provided to SCA, when we needed growth; there is

10  the business relationship; and then there is avoiding risk, the

11  risk that I described before, being sued, the reputational

12  harm, and then being targeted or raided in some manner.

13  Q.  And did some of the employees at SCA who were affected by

14  the agreement, did some of them know about it?

15  A.  Yes.  A number of them knew.  Yes.

16  Q.  And did all of the directors, VPs, and up know about the

17  agreement?

18  A.  No, I don't believe all of them knew.

19  Q.  And did any of them get compensated specifically for this

20  restriction being placed on them?

21  A.  No, there wasn't a specific compensation.  They had stock

22  options and ownership, so they benefited when the company did

23  well, but not a specific compensation for this.

24  Q.  And did Mr. Thiry ever express whether he disclosed the

25  agreement that he had with you to all DaVita employees who were

Andrew Hayek - Direct

1    affected by it?

2    A.  No, I don't recall him doing so.

3    Q.  And are you aware of the DaVita employees affected by this

4    agreement being compensated specifically for the restriction

5    that you agreed to with Mr. Thiry?

6    A.  I'm not aware of a specific compensation for it.

7    Q.  So you testified earlier that you hoped to do more business

8    with DaVita if you agreed not to solicit Kent Thiry's senior

9    employees; is that correct?

10   A.  Correct.

11   Q.  Was the prospect of doing business with DaVita attractive

12   to SCA?

13   A.  Yes, quite.  DaVita -- DaVita's patients, dialysis

14   patients, often need a minor surgical procedure that we can

15   describe; and those surgical procedures can be done very

16   safely, cost effectively at SCA surgery centers.

17   Q.  What is that surgical procedure?

18   A.  The surgical procedure is called vascular access, or

19   placing what is called a fistula.  It basically makes doing

20   dialysis safer and easier.  It's like creating a large vein in

21   your forearm.

22   Q.  And did Mr. Thiry refer to these business prospects when he

23   talked to you about recruiting?

24   A.  I believe sometimes they occurred in the same conversation.

25   Mostly we were talking about business.  And when recruiting

Andrew Hayek - Direct

1   came up, sometimes it would be in the same conversation or

2   email exchange.

3   Q.  And was that generally forward looking about prospective

4   business opportunities?

5   A.  Yes, often.

6   Q.  And based on your conversations with Mr. Thiry, did you

7   think Mr. Thiry would do business with SCA if you did not agree

8   to stop soliciting his employees?

9   A.  I thought it would be very unlikely that we would do

10  business together if I was on the wrong side of DaVita.

11  Q.  And so at some point after you reached your agreement with

12  Mr. Thiry, did SCA engage in joint ventures with DaVita?

13  A.  Yes, we did.

14  Q.  Was there any specific business transaction that this

15  agreement that you reached with Mr. Thiry was a part of?

16  A.  No.  It was not part of those specific joint ventures.

17  Q.  Was it ever necessary to any business transaction?

18  A.  Not from our perspective.  We were able to explore these

19  kind of partnerships and do partnerships with other parties

20  with a more specific or narrower nonsolicit or sometimes none

21  at all, so we were able to do that with other parties.

22  Q.  And so why did you have to do it with Mr. Thiry?

23  A.  This topic was very important to Mr. Thiry and DaVita.  As

24  I mentioned, of the things that I did that upset him and his

25  team, by extension, this was at the top of the list.

Andrew Hayek – Direct

1    *Q.* And were you worried about what might happen to your

2    business opportunities?

3    *A.* Yes, I was.

4    *Q.* Were you worried they might go away?

5    *A.* Yes, I was.

6    *Q.* And did any CEO other than Mr. Thiry ever threaten to

7    retaliate against you for soliciting their employees?

8    *A.* No, I don't believe so.

9    *Q.* So after you agreed not to solicit DaVita's senior-level

10   employees, did you try to live up to that agreement?

11   *A.* Yes.

12   *Q.* Did you have a senior leadership team at SCA?

13   *A.* Yes, I did.

14   *Q.* Was that called the Cabin Team?

15   *A.* It was named the Cabin Team.  It was named after the first

16   place that we had an off-site meeting together.

17   *Q.* And did you tell the Cabin Team about the agreement you

18   reached with Mr. Thiry?

19   *A.* Yes.  We discussed it a number of times over a number of

20   years.

21   *Q.* And what dynamic had other members of your Cabin Team

22   experienced with regard to DaVita?

23   *A.* Well, in the case of Mr. Rucker, he had worked there, and

24   he had personally been through that experience.  There is a

25   Ms. Linda Lansing who also worked at DaVita, and she was on

488

Andrew Hayek - Direct

1   that Cabin Team, and so she had some knowledge and experience.

2   Others hadn't worked there.  And so it varied by person.

3   Q.  And had they experienced anything if they attempted to

4   reach out to DaVita executives?

5   A.  I believe some had.  For example, Mr. Rucker, I believe he

6   had some interactions and experience with that.

7   Q.  And what was the experience that they had with that?

8   A.  I'm less familiar, but I think of a similar tone -- nature

9   as my own.

10  Q.  And when you say similar to your own, what was that?

11  A.  That it was -- it caused anger and frustration and was

12  upsetting, et cetera.

13  Q.  So other people had attempted to recruit from DaVita and

14  gotten this kind of reaction; is that fair?

15  A.  Well, again, I'm less familiar; but, yes, a lot of our

16  senior executives reported to Mr. Rucker in his role as chief

17  operating officer.  A lot of people we're talking about

18  reported up through him.  And he had Ms. Lansing and some

19  others who had come from DaVita, and so he would have been

20  involved in a lot of this recruiting.

21  Q.  And so was it generally known what DaVita's reaction was to

22  an attempt to recruit?

23  A.  I think Mr. Rucker, yes.  And as we talked about it as a

24  team, the whole team was.

25  Q.  And who is Bridie Fanning?

489

Andrew Hayek - Direct

1  *A.*  Bridie Fanning is a senior HR -- human resources leader

2  that worked with SCA from late 2014 to late 2016, so two years.

3  *Q.*  And was she part of your Cabin Team during that time?

4  *A.*  Yes, she was.

5  *Q.*  And did you tell her about your agreement with Kent Thiry

6  and DaVita about not soliciting?

7  *A.*  Yes, I did.

8  *Q.*  And who at SCA was the primary point of contact for

9  recruiting firms?

10  *A.*  During Dr. Fanning's tenure, she was.  She added a lot of

11  structure and process.  Prior to her, it wasn't as clear; but

12  with her, she became a primary contact for most of our

13  recruiting firms.

14  *Q.*  And were you involved in setting parameters for some of the

15  recruiter searches?

16  *A.*  Yes, I was.

17  *Q.*  What, if anything, did you convey about DaVita?

18  *A.*  I conveyed the agreement with Mr. Thiry and DaVita, and

19  then some feedback on specific candidates or roles from time to

20  time.

21  *Q.*  And did you expect Dr. Fanning to convey your instructions

22  to the recruiting firms?

23  *A.*  Yes.  I think with anything we discussed as a team and

24  agreed to, we each expected each other to follow through.

25  *Q.*  Now, did some employees at DaVita get solicited even with

490

Andrew Hayek - Direct

1    the agreement in place?

2    A.   Yes.  I believe that happened from time to time.

3    Q.   And SCA was a relatively big organization; right?

4    A.   Yes.  I think by most standards, we're a large

5    organization.  There are certainly organizations that are much

6    larger.  But, yes.

7    Q.   And I think you testified earlier, this agreement wasn't

8    something in your daily existence.  It would just come up from

9    time to time; did I hear that correctly?

10   A.   Correct.  Maybe a couple times a year, a few times a year.

11   Q.   And why would that agreement tend to come up?

12   A.   It would often come up over the years because of something

13   that Mr. Thiry shared with me or perhaps a different senior

14   executives at DaVita or a teammate -- a member of our team

15   would share of something that occurred that was not consistent

16   with the agreement.

17   Q.   And when you learned of those instances where something was

18   not consistent with the agreement, what would you do?

19   A.   I would perhaps gather some of the facts about the

20   situation and then forward it along to Mr. Thiry.

21   Q.   And so what was your intention in those followups?

22   A.   To share what had happened and, you know, ask Mr. Thiry to

23   follow up with his own team or recruiters.

24   Q.   So was your intention to comply or avoid the agreement?

25   A.   Comply.

Andrew Hayek - Direct

1   *Q.* And so approximately how often did the agreement come up

2   between you and Mr. Thiry?

3   *A.* Again, perhaps, two times a year, three times a year.

4   *Q.* And at any point did Mr. Thiry ask, What agreement are you

5   talking about?

6   *A.* No, I don't recall so.

7   *Q.* Did you ever have to explain what agreement you were

8   talking about?

9   *A.* No, I did not.

10  *Q.* Did you ever tell Mr. Thiry that you were ending your

11  agreement not to solicit each other's senior-level employees?

12  *A.* No, I did not.

13  *Q.* And did Mr. Thiry ever tell you that he was ending your

14  agreement?

15  *A.* No, he did not.

16  *Q.* Did anyone at DaVita ever tell you that?

17  *A.* No.

18  *Q.* So from the time period that you were CEO of SCA, were you

19  aware of anyone at SCA telling anyone at DaVita that the

20  agreement was no longer in effect?

21  *A.* No, I'm not aware of such.

22  *Q.* And so was the agreement in place from the time that you

23  formed it in 2012 through the time that you left SCA?

24  *A.* Yes.  And during 2017, there is that transition period

25  where I wore a couple of hats.  Yes.

492

Andrew Hayek – Direct

1    *Q.* So I'd like to go back in time a little bit and show you

2    some documents, starting in 2012.

3            I'm showing you what has been marked as Government

4    Exhibit 27, which I offer as stipulated.

5            *THE COURT:* 27 is admitted.

6            (Exhibit 27 admitted.)

7    *BY MS. LEWIS:*

8    *Q.* So do you recognize this as an email chain between you and

9    Mr. Thiry starting in January of 2012?

10   *A.* Yes, I do.

11   *Q.* And directing you to the bottom email in this chain.

12           Ms. Baskin, if you could blow that up.

13           What was the context of this email?

14   *A.* I'm reaching out to Mr. Thiry to set up a time to speak and

15   referenced recruitment philosophies specifically.

16   *Q.* What was Mr. Thiry's response to that?

17   *A.* That it would be great to catch up and happy to discuss the

18   item I mentioned.

19   *Q.* And then what does he say about that?

20   *A.* "The lore within the village is you are quite the

21   aggressor."

22   *Q.* And what did you understand him to mean by that?

23   *A.* I think it's a reference to me recruiting and hiring senior

24   executives from DaVita.

25   *Q.* And did you speak with Mr. Thiry about recruiting around

Andrew Hayek – Direct

1    the time of this email?

2    A.   Yes.  I believe a couple times in the following weeks.

3    Q.   Showing you what has been marked as Government Exhibit 33.

4         I would move to admit this as stipulated, as well.

5         THE COURT:  All right.  Admitted.

6         (Exhibit 33 admitted.)

7    BY MS. LEWIS:

8    Q.   Mr. Hayek, do you recognize this email chain as one between

9    you and Mr. Thiry?

10   A.   Yes, I do.

11   Q.   And it starts at the end of January 2012 and continues into

12   February; is that right?

13   A.   Yes, it is.

14   Q.   So directing you to Mr. Thiry's first sentence in the

15   bottom email.  Could you just read that out loud.

16   A.   "Sorry it took some iterating on this end, but we are on

17   board."

18   Q.   And what was your understanding of his reference to "we are

19   on board"?

20   A.   I believe it's a reference to the agreement we're talking

21   about.

22   Q.   The agreement not to solicit senior-level employees?

23   A.   Correct.

24   Q.   And how did you respond?

25   A.   Acknowledging it, "Understood."

494

Andrew Hayek - Direct

1   Q.  Mr. Thiry's email also mentions vascular access.  He

2   says, "I'm glad we're launching strategic conversations

3   regarding our vascular access centers."  What did you convey

4   back to Mr. Thiry about vascular access discussions?

5   A.  That at that time neither Michael Rucker or I were aware of

6   the discussions that he had referenced, but very open to

7   thinking through the options.

8   Q.  And so at this point in time, was there any imminent

9   vascular access deal that was on your radar?

10  A.  No.  We had tried, and I think there was a lull in the

11  conversation, meaning, it was dormant at that moment.

12  Q.  So the agreement that you reached with Mr. Thiry, did that

13  have a specific connection to any vascular access deal?

14  A.  No.  It was not specifically tied to a vascular access deal

15  or specifically connected.

16  Q.  And directing you to the second sentence in the top

17  email, could you read that out loud?

18  A.  "And I think the ball is in your court on the other

19  boundary issue.  You were going to talk to Michael."  It's a

20  reference to Michael Rucker.

21  Q.  And what did you understand that to be a reference to?

22  A.  I believe it's either a reference to the level, as in vice

23  president, or the need to notify one's boss.

24  Q.  And even though you continued to refine these details, did

25  you have an agreement with Mr. Thiry at this point in time?

495

Andrew Hayek – Direct

1    *A.*   Yes.

2           *MS. LEWIS:*   Showing you what has been marked as

3    Government Exhibit 46, which I would also offer as stipulated.

4           *THE COURT:*   All right.   Exhibit 46 is admitted.

5           (Exhibit 46 admitted.)

6    *BY MS. LEWIS:*

7    *Q.*   Do you recognize this email?

8    *A.*   Yes.

9    *Q.*   Is that also an email between you and Mr. Thiry?

10   *A.*   Yes.

11   *Q.*   And are these Mr. Thiry's words that we're seeing on the

12   page?

13   *A.*   Yes.

14   *Q.*   Okay.   Could you read the first two sentences out loud.

15   *A.*   "Someone called me to suggest that they reach out to your

16   senior biz dev" -- business development -- "Guy for our

17   corresponding spot.   I explained I do not do proactive

18   recruiting into your ranks."

19   *Q.*   What did you understand Mr. Thiry to be referring to in

20   this email?

21   *A.*   It's a reference to the agreement we've been discussing.

22   *Q.*   And what was your understanding of why he's telling you

23   this?

24   *A.*   A reminder.   An example of complying with the agreement.

25   *Q.*   So he's letting you know that he's complying on his end?

Andrew Hayek - Direct

1  *A.*  Yes.

2  *Q.*  And showing you what has been I believe previously admitted

3  as Government Exhibit 51 and its attachment, Government

4  Exhibit 52.

5        Do you recognize these documents, Mr. Hayek?

6  *A.*  Yes.

7  *Q.*  What are these documents?

8  *A.*  These -- there is an email exchange between a few

9  executives at Spencer Stuart, which is a recruiting firm, and

10  Dr. Fanning, and then an email from Dr. Fanning to myself, and

11  an attachment that is a presentation from that recruiting firm.

12  *Q.*  And is that recruiting firm seeking to do business, or what

13  are they trying to do with this presentation?

14  *A.*  I believe this presentation is either the pitch to propose

15  they do the recruiting or a kickoff meeting to launch the

16  search after they had been retained.

17  *Q.*  So directing your attention to page 7 of the attachment on

18  government 52.  Could you read out loud just the title of that

19  slide.

20  *A.*  "target candidate pools."

21  *Q.*  And what's your understanding of a target candidate pool?

22  *A.*  That these are examples of companies that Spencer Stuart

23  would include.

24  *Q.*  And is DaVita included on that list?

25  *A.*  Yes, it is.

Andrew Hayek – Direct

1    Q.  And then showing you now what has been previously admitted

2    as Government Exhibit 53-1.  What are you providing feedback

3    on?

4    A.  I believe this is feedback on the attachment we just -- the

5    document we just saw a page from.

6    Q.  And who are you providing this feedback to?

7    A.  To Dr. Fanning.

8    Q.  Directing your attention to your response regarding page 7.

9    Could you read aloud the second bullet under the sub-bullet

10   there.

11   A.  "DaVita is off the table, given our relationship."

12   Q.  And what were you referring to by "our relationship"?

13   A.  The agreement not to solicit senior executives.

14   Q.  And what did you expect Dr. Fanning to do in response to

15   your comment that DaVita is off the table?

16   A.  To follow through or adhere to that.

17   Q.  Did you expect her to convey that back to the recruiting

18   firms, as well?

19   A.  Yes, that would be part of the expectation.

20        MS. LEWIS:  Your Honor, to be mindful of time, I

21   wanted to pause and see -- I do have some additional, but

22   wanted to just be mindful if you wanted to break.

23        THE COURT:  It's not even 4 o'clock yet.

24        MS. LEWIS:  Certainly, Your Honor.  I'm happy to keep

25   going.  I just wanted to check if you were intending to break

Andrew Hayek – Direct

 1    at 4:00 today.

 2              *THE COURT:*  Keep going, please.

 3              *MS. LEWIS:*  Certainly.

 4              *THE COURT:*  I'm sure the jury would like to go home

 5    and have the afternoon off.  But we want to get this case

 6    tried, so keep going.

 7              *MS. LEWIS:*  Understood, Your Honor.

 8    *BY MS. LEWIS:*

 9    *Q.*  Mr. Hayek, I'm showing you what has been previously

10    admitted as Government Exhibit 67-3 and its attachment,

11    Government Exhibit 70-1.  Do you recognize these documents?

12    *A.*  Yes, I do.

13    *Q.*  Could you just briefly explain what is happening in this

14    email and its attachment?

15    *A.*  When Dr. Fanning worked with us as part of the team, she

16    brought a lot of structure and systematizing the recruitment

17    process.  And one part of that was generating this list of

18    companies that we would recruit senior executives from.  And

19    I'm providing feedback to a draft of that list.

20    *Q.*  And is this list intended to apply for one position or many

21    positions at SCA?

22    *A.*  Many.  It's a base list, and you could certainly add to it

23    for specific types of jobs.  If there was a tax job, you'd add

24    a bunch of tax firms.  But it's a base list.

25    *Q.*  And directing you to your email.  Did you give her edits

Andrew Hayek - Direct

1   on this list?

2   *A.*  Yes, I did.

3   *Q.*  Could you please read your first bullet there in the

4   email.

5   *A.*  "Putting a line through and making the text red for current

6   partners/customers that we should not recruit from."

7   *Q.*  And then could you read the second bullet there, as well?

8   *A.*  "Putting two companies in italics, USPI and DaVita.  We can

9   recruit junior people below director, but our agreement is that

10   we would only speak with senior executives if they have told

11   their boss already that they want to leave and are looking."

12   *Q.*  And what does this second bullet reflect?

13   *A.*  It's a reference to the agreement we were discussing this

14   afternoon.

15   *Q.*  Your agreement with Mr. Thiry?

16   *A.*  Yes.

17   *Q.*  And what are you intending to distinguish between the

18   strike-through companies and the italics companies?

19   *A.*  That the strike-through companies we should not recruit

20   from.  The italics companies, tried to describe the agreement

21   specifically.

22   *Q.*  And for the line-through companies, you refer to them as

23   current partners and customers; is that right?

24   *A.*  Correct.

25   *Q.*  And directing you to the attachment -- page 4 of the

Andrew Hayek - Direct

1   attachment.  I believe you testified earlier that DaVita

2   HealthCare Partners is just another name for DaVita; is that

3   right?

4   A.  Correct.

5   Q.  And is that in italics or strike-through?

6   A.  In italics.

7   Q.  And did you eliminate DaVita because it was a customer or

8   partner or for a different reason?

9   A.  I believe it's -- it's related.  They were in kind of a

10   different category, though, in terms of the nature of the

11   agreement.

12   Q.  So what was your reason why you placed DaVita on italics in

13   this list?

14   A.  Because we had the agreement going back a number of years

15   before and through that time.

16   Q.  And did you write this email long before this government

17   investigation began?

18   A.  Yes, I believe so.

19   Q.  So, Mr. Hayek, I'm showing you what has been previously

20   admitted as Government Exhibit 81.  Do you recognize this

21   email?

22   A.  Yes, I do.

23   Q.  And directing you to the bottom email.  Who is Andrew

24   Kay?

25   A.  Andrew Kay was a group director at DaVita at the time.

Andrew Hayek - Direct

1   Q.  And directing you to Dr. Fanning's email where she

2   forwards Andrew Kay's inquiry to you.  What does she ask you?

3   A.  "Andrew, I think I probably know the answer, but I thought

4   I'd ask.  This possible candidate has reached out to me and is

5   a senior group director of ops within DaVita.  Is it a no go?

6   I can, of course, diplomatically explain that DaVita is a

7   partner, and we don't recruit from partners without explicit

8   permission.  But I thought I'd at least ask because he's not at

9   the VP level."

10  Q.  And how did you respond?

11  A.  My response was, "I think the same rules would apply, that

12  we would give him the message that we would only engage if he

13  had already shared with his supervisor that he wants to explore

14  outside opportunities and speak with SCA.  We're in a very

15  sensitive stage right now with DaVita."

16  Q.  So when you're referring to rules, what rules are you

17  referring to?

18  A.  The agreement not to solicit senior executives that we've

19  been discussing.

20  Q.  And remind us, what year did you reach that agreement?

21  A.  2012.

22  Q.  And at the time of this email, did you take the time to

23  find out anything about Andrew Kay other than the fact that he

24  worked for DaVita?

25  A.  I don't recall following up beyond this email exchange.

Andrew Hayek - Direct

1   Q.  And was he automatically off limits unless he told his

2   boss?

3   A.  Yes.  He would have needed to be looking and told his boss.

4   Q.  And what did you mean by "sensitive stage with DaVita"?

5   A.  At this point in time, in addition to the vascular access

6   opportunity, we were trying to partner with HealthCare

7   Partners, which is a subsidiary of DaVita.  And there had been

8   conversations in the prior months about DaVita acquiring SCA,

9   so there was a few different things going on at that point in

10  time.

11  Q.  And what came first your discussions or the agreement with

12  Mr. Thiry?

13  A.  With the exception of the vascular access, the agreement.

14  Q.  You testified earlier the vascular access was not related

15  to the agreement; is that right?

16          MR. MELSHEIMER:  Objection, Your Honor.  Leading and

17  asked and answered.

18          THE COURT:  Sustained on both counts.

19          MS. LEWIS:  Certainly.  I'll move on, Your Honor.

20  BY MS. LEWIS:

21  Q.  Was the agreement that you reached with Mr. Thiry part of

22  any business transaction that you were exploring with DaVita at

23  this point in time?

24          MR. MELSHEIMER:  Your Honor, again, asked and

25  answered.

Andrew Hayek – Direct

1        *THE COURT:*  Sustained.  Let's just not repeat the same

2    things over and over and over.  They get it.  They get it.

3        *MS. LEWIS:*  Sure, Your Honor.

4        *THE COURT:*  Let's go to something new.

5    *BY MS. LEWIS:*

6    *Q.*  To your knowledge, did Andrew Kay ever proceed any further

7    in the recruitment process at SCA?

8    *A.*  Not to my knowledge.

9    *Q.*  Showing you what has been previously admitted as Government

10   Exhibit 84.  Do you recognize this document?

11   *A.*  Yes, I do.

12   *Q.*  And directing you to the bottom email in the thread.  Who

13   is Christian Ellison?

14   *A.*  Christian Ellison is a senior vice president of operations,

15   so a direct report to Mr. Michael Rucker, at SCA.

16   *Q.*  And what did you understand to be happening in this

17   email?

18   *A.*  In this email, a corporate recruiter that worked for

19   DaVita reached out to Mr. Ellison.

20   *Q.*  And was this recruitment of Mr. Ellison a violation of your

21   agreement with Kent Thiry?

22   *A.*  Yes.

23   *Q.*  How does Mr. Ellison respond?

24   *A.*  "I thought there was a gentlemen's agreement between us and

25   DaVita regarding poaching talent."  And he sent that to

504

Andrew Hayek - Direct

1   Mr. Rucker.

2   *Q.*  How did Mr. Rucker respond?

3   *A.*  "There is.  Do you mind if I share with Andrew, who has

4   most recently addressed this with Kent?"

5   *Q.*  And did you, in fact, alert Mr. Thiry to this outreach?

6   *A.*  Yes, I believe I did.  By email.

7         *MS. LEWIS:*  Showing you now what is marked as

8   Government Exhibit 86-2.

9         I would move to admit as stipulated?

10        *THE COURT:*  It's admitted.

11        (Exhibit 86-2 admitted.)

12   *BY MS. LEWIS:*

13   *Q.*  Do you recognize this email?

14   *A.*  Yes.

15   *Q.*  How does this email relate to the prior email we just

16   looked at?

17   *A.*  This is me following up on what Michael -- pardon me --

18   Mr. Rucker and Mr. Ellison suggested.  And I forwarded the

19   original email outreach from the DaVita recruiter.

20   *Q.*  Why did you alert Mr. Thiry to this outreach?

21   *A.*  Because it was not consistent with the agreement, and I was

22   letting him know.

23   *Q.*  And you indicate, "Please see below.  LinkedIn outreach

24   from a DaVita corporate recruiter to one of our six group

25   leaders, senior VP level."

505

Andrew Hayek – Direct

1          Did you intend to remind him with respect to

2   Mr. Ellison's recruitment or more broadly than that?

3   A.  Specifically Mr. Ellison; but it's part of a broader

4   agreement.

5   Q.  And directing you to the top email in this chain.  How

6   does Mr. Thiry respond?

7   A.  "Just opened this.  Will check it out."

8   Q.  And how did you interpret his response?

9   A.  That he would follow up with his team.

10  Q.  And did you understand that response as an indication he

11  would seek to comply with the agreement?

12  A.  Yes.

13          MS. LEWIS:  So showing you what has been marked as

14  Government Exhibit 90, which I would move to admit as

15  stipulated.

16          THE COURT:  Admitted.

17          (Exhibit 90 admitted.)

18  BY MS. LEWIS:

19  Q.  Do you recognize this email chain?

20  A.  Yes, I do.

21  Q.  And is this an email chain between you and an individual

22  named Matt Brubaker in April of 2017?

23  A.  Yes, it is.

24  Q.  Who is Matt Brubaker?

25  A.  Dr. Brubaker is a human resources consultant, focusing on

506

Andrew Hayek - Direct

1    talent and culture and leadership coaching.

2    Q.  And directing you to the bottom email in this chain.

3          If, Ms. Baskin, on the second page, you could just

4    blow up the bottom email in the chain.

5          What did you understand Dr. Brubaker to be suggesting

6    to you in this email?

7    A.  He asked if I had ever met a gentleman named Cameron Faili.

8    Described him as very talented and asked if we would have any

9    interest in talking to him.  Asked me if I'd like an

10   introduction to Mr. Faili.

11   Q.  Is he suggesting that you solicit Mr. Faili, or is he

12   suggesting something else?

13   A.  I think he's suggesting an outreach around job

14   opportunities.

15   Q.  And what did you instruct Dr. Brubaker in response?

16   A.  Well, I let Dr. Brubaker know that in terms of the

17   agreement I had with Mr. Thiry and DaVita, that in order to

18   pursue Mr. Faili, he would -- would have needed to have

19   communicated that he's planning to leave DaVita, and that's the

20   relationship that we have with DaVita.

21   Q.  What were you referring to by "relationship"?

22   A.  It's a reference to the agreement not to solicit senior

23   executives.

24   Q.  And does the DaVita employee here, Mr. Faili, does he have

25   to disclose to his boss before you can even talk to him?

Andrew Hayek - Direct

1   *A.*   Yes.

2   *Q.*   And what happened to the recruitment process if he did not?

3   *A.*   That we wouldn't proceed.

4   *Q.*   And how did Dr. Brubaker respond?

5   *A.*   He said, "Great question.  And I'm glad you arrived at that

6   agreement with KT" -- or Mr. Thiry.  "I'm not sure, but Cameron

7   is on that track, having discussed his potential transition

8   with the new Rx" -- which is a reference to DaVita Rx --

9   "president.  But he's definitely on KT" -- Mr. Thiry's --

10   "radar screen and has been retained in the past.  I'll confirm

11   before introducing you."

12   *Q.*   And to your knowledge, did this DaVita employee advance any

13   further in the recruitment process with SCA?

14   *A.*   Not to my knowledge.

15          *MS. LEWIS:*  So showing you what has been marked as

16   Government Exhibit 91, which I would move to admit as

17   stipulated.

18          *THE COURT:*  Admitted.

19          (Exhibit 91 admitted.)

20   *BY MS. LEWIS:*

21   *Q.*   Do you recognize this email chain as one dated July of

22   2017?

23   *A.*   Yes, I do.

24   *Q.*   And what is the subject line of this email?

25   *A.*   "Regarding DaVita," quote, "no fly zone."

1   Q.  And could you just at a high level give us the context of

2   this email?

3   A.  The context is that a senior development executive within

4   DaVita is asking the chief strategy officer -- pardon me -- did

5   I say DaVita?

6   Q.  I think you did, but I think you meant SCA.

7   A.  Pardon me.  A senior development executive at SCA is

8   reaching out to his boss, who is the chief of strategy, asking

9   about the nonsolicit agreement with DaVita.

10  Q.  So just taking this piece by piece, who is Tim Buono?

11  A.  Yes.  Tim Buono is a senior executive -- I believe, at this

12  point a senior vice president of development -- on the SCA

13  team.

14  Q.  And he asks you, he says -- I'm sorry -- he asks someone

15  named Brian -- he says, "I recall that SCA had a mutual

16  nonsolicit of employees whether contractual or verbal with

17  DaVita.  Is that still the case?"

18        Now, what was your understanding of what this is

19  referring to?

20  A.  I believe it's a reference to the agreement not to solicit

21  senior executives that we have been talking about.

22  Q.  Who is Brian Mathis?

23  A.  Mr. Mathis was the chief strategy officer at SCA.  At this

24  point I think he had also begun taking on additional

25  responsibilities; but, essentially, led strategy and

Andrew Hayek - Direct

1   development.

2   Q.  Was he part of your Cabin Team meetings from time to time?

3   A.  Yes.  He was regularly part of them.

4   Q.  And was he aware of your agreement with Kent Thiry?

5   A.  Yes, he was.

6   Q.  And he indicates that he's looping in Andrew to specify how

7   he would like to handle both DaVita and USPI at this stage.

8   A.  Yes.

9   Q.  What was your understanding of why he was looping you in?

10  A.  SCA was in transition.  We had been acquired by United

11  Health Group a few months earlier.

12  Q.  And how did you respond to Mr. Mathis looping you in?

13  A.  "This is a bit tricky with DaVita, given that we are in a

14  broader dialogue with them currently.  I would say that if the

15  candidate was found through a search firm/external process and

16  if the candidate is looking to leave -- in other words also

17  evaluating other opportunities -- then we're okay.  I would

18  reiterate the cautionary note from Brian about our historical

19  experience with DaVita candidates."

20  Q.  And what are you generally referring to here in your

21  response?

22  A.  This is a general reference to the agreement regarding

23  soliciting senior executives.

24  Q.  And how precisely are you describing this agreement in

25  this email?

Andrew Hayek - Direct

1    *A.*  Less precisely.

2    *Q.*  And what did you intend to convey with regard to complying

3    or not complying with the agreement in this email?

4    *A.*  General compliance.

5    *Q.*  So was your agreement with Kent Thiry still in place at

6    least up until this time in July of 2017?

7    *A.*  Yes.

8           *MS. LEWIS:*  You can take down the document, Ms.

9    Baskin.

10   *BY MS. LEWIS:*

11   *Q.*  And what was your agreement with Kent Thiry intended to

12   achieve with respect to competition for employees?

13          *MR. MELSHEIMER:*  Your Honor, again, asked and

14   answered.

15          *THE COURT:*  Sustained.

16   *BY MS. LEWIS:*

17   *Q.*  Based on your numerous interactions with Mr. Thiry and your

18   own experience, what was your intention with regard to the

19   specific senior-level employees?

20          *MR. MELSHEIMER:*  I understand the question, Your

21   Honor.  I also -- asked and answered.

22          *THE COURT:*  Yes.  Sustained.

23   *BY MS. LEWIS:*

24   *Q.*  Mr. Hayek, were you -- were you able to have strategic

25   relationships and partnerships with companies other than

Andrew Hayek - Cross

1    DaVita?

2    *A.*  Yes.

3    *Q.*  And did you have to include a no-poach agreement in order

4    to have those strategic partnerships with those companies?

5    *A.*  Outside of the two examples we've talked about today, no,

6    we did not have to have an agreement of this nature.

7              *MS. LEWIS:*  Thank you, Mr. Hayek.

8              *THE COURT:*  Cross-examination.

9              *MR. MELSHEIMER:*  Yes, Your Honor.

10                       **CROSS-EXAMINATION**

11   *BY MR. MELSHEIMER:*

12   *Q.*  May it please the Court.

13             Mr. Hayek, my name is Tom Melsheimer, and I represent

14   Mr. Thiry.  All right?

15   *A.*  Yes.

16   *Q.*  You and I have never met before; right?

17   *A.*  Correct.

18   *Q.*  We've never spoken on the phone or anything like that;

19   right?

20   *A.*  Correct.

21   *Q.*  Okay.  So I want to start, sir, with talking with you

22   about --

23             Do you need to get something?

24             *MS. LEWIS:*  My apologies, Mr. Melsheimer.

25             *MR. MELSHEIMER:*  That's okay.

Andrew Hayek - Cross

1    *BY MR. MELSHEIMER:*

2    Q.  I want to start talking with you about what this agreement

     was not.  Are you with me?

4    A.  Yes.

5    Q.  So this was not an agreement that prohibited movement

6    between DaVita and SCA; true?

7    A.  Correct.

8    Q.  In other words, this was not a no-hire agreement; do I have

9    that right?

10   A.  That's correct.  Under certain circumstances, one could

11   hire.

12   Q.  This agreement had nothing to do with fixing wages or

13   benefits or anything like that; right?

14   A.  No, I don't believe it was about those things.

15   Q.  It didn't affect any terms of someone's employment with

16   either company; true?  The terms of their employment?

17   A.  Meaning their salary, bonus --

18   Q.  Yeah.

19   A.  -- et cetera?  No, it did not.

20   Q.  Stock options, anything like that?

21   A.  No, I don't believe so.

22   Q.  Whatever your agreement was with Mr. Thiry, you've

23   described it, it did not apply to all employees; fair?

24   A.  Correct.  It applied to senior executives.

25   Q.  And even with respect to senior executives, it didn't

513

Andrew Hayek - Cross

1    prevent a senior-level executive from moving from one company

2    to another under certain circumstances; right?

3    A.   Correct.  Under certain circumstances, they could move.

4    Q.   In fact, some employees did move from either DaVita to SCA

5    or SCA to DaVita during the -- after you reached this agreement

6    with Mr. Thiry; true?

7    A.   Yes.  I believe there were instances of that.

8    Q.   Do you recall that in the fall of 2015, SCA hired a woman

9    by the name of Michelle Trent, a senior director of business

10   development, from DaVita?

11   A.   I recall the name Michelle Trent.  I don't recall the

12   particulars of it.

13   Q.   And I believe you've previously told the Division that the

14   spirit of your agreement with Mr. Thiry was that employees

15   could leave and look for employment elsewhere if they wanted

16   to; right?

17   A.   Well, subject to the terms that we've talked about this

18   afternoon.  Yes.

19   Q.   And people were free to look at jobs at either SCA or

20   DaVita at some level; true?

21   A.   Again, subject to the parameters that we've talked about,

22   you know, if they were looking, if they had told their boss,

23   then, yes.

24   Q.   That was the senior-level employees.  But as to the junior

25   level, people could move freely and do whatever they wanted;

514

Andrew Hayek - Cross

1    fair statement?

2    *A.*   Correct.

3    *Q.*   If one of the senior employees did inform their

4    supervisor -- their direct supervisor -- it was then set up for

5    both companies, SCA and DaVita, to potentially compete for the

6    services of that employee; true?

7    *A.*   Yes, I believe that's an outcome that could and

8    sometimes -- well, could occur.

9    *Q.*   Is it correct, sir, that Mr. Thiry communicated to you that

10   his purpose in pursuing the agreement was to lose fewer

11   valuable people; right?

12   *A.*   For him to lose fewer valuable senior executives.

13   *Q.*   From DaVita; true?

14   *A.*   Yes.

15   *Q.*   And to try to compete -- allow DaVita to compete to retain

16   those people; true?

17   *A.*   I believe some of the references were -- included the

18   notion that, you know, they would want to engage with that

19   executive around staying.  So, yes.

20   *Q.*   If it was someone that DaVita wanted to keep, someone who

21   was a valuable employee, that they could then engage with a

22   counteroffer or counterproposal, to keep that employee; true?

23   *A.*   That's one thing they could do.  Yes.

24   *Q.*   They didn't have to, of course.  They could -- under this

25   agreement, someone could leave, and DaVita wouldn't have to

Andrew Hayek - Cross

1    give a counteroffer or try to compete to retain them; true?

2    A.  Yes.  If I understand the question, it was DaVita's choice

3    whether to counter or not.  I think that is true.

4    Q.  Mr. Hayek, ten years ago, during the period of time that

5    you told the jury -- the jury and the Division that you reached

6    this agreement with Mr. Thiry regarding recruiting, isn't it

7    true, sir, that you thought you were acting in the best

8    interests of SCA?

9    A.  Yes.  I thought I was acting in the best interests of SCA.

10   Q.  You did not think back then that you were doing anything to

11   harm SCA or its employees; true?

12   A.  No, I did not think I was doing harm.

13   Q.  I gather from the questions you've been asked, sir, that

14   you spent much more time thinking about this agreement since

15   the government investigation started than you did while it was

16   going on; true?

17   A.  There has been a lot more time during this process thinking

18   about the specific emails and conversations, yes.

19   Q.  But you understand that what we're here to talk about today

20   is not a reflection of what you think about the agreement now,

21   but what your intent was back then, in 2012; true?

22   A.  Correct.  I think I've done my best to recall what I was

23   thinking at the time.

24   Q.  Isn't it true, sir, that you thought at this time, back in

25   2012, that -- you were under the impression that this type of

Andrew Hayek - Cross

1    relationship between companies with regard to recruiting was

2    normal; true?

3    A.  Yes.  At the time it didn't strike me as abnormal.  You

4    know, it was earlier in my career and didn't have as many data

5    points.  I don't recall thinking of it as normal, but I don't

6    recall thinking of it as abnormal.

7    Q.  You never thought -- back in that 2012 time period, you

8    never thought of your agreement with Mr. Thiry in terms of a

9    market allocation; true?

10   A.  Correct.  I don't recall thinking in those terms or using

11   those terms.

12   Q.  You never used the phrase "allocate a market," or words to

13   that effect; true?

14   A.  Correct.  I don't recall ever using those kinds of words.

15   Q.  And you didn't hear Mr. Thiry use those kind of words or

16   words to that effect in your discussions either; true?

17   A.  Correct.  I don't recall Mr. Thiry using those kinds of

18   words.

19   Q.  You don't see any words like that or words to that effect

20   in any of the emails either, do you, sir?

21   A.  Correct.  In the emails that I recall and I reviewed, I

22   don't recall seeing those kind of words.

23   Q.  Your goal back then, as the CEO of SCA, was to make the

24   company as successful as possible; fair statement?

25   A.  Yes.  As I've shared, we were in a tough spot, and we were,

1   you know, battling for survival, and then to grow.  So it

2   was -- it was difficult.

3   *Q.*  You sort of took over SCA at -- as I think as you put it,

4   at a tough spot; right?

5   *A.*  Yes.  It was in a very tough spot.

6   *Q.*  It had had years of problems and declining revenue and

7   things of that nature, so you were brought in, in some sense,

8   to try to help rebuild the company; is that a fair statement?

9   *A.*  Yes.  SCA had had a number of years of declining

10   profitability.  It was what is called negative cash flow,

11   meaning it was losing money every year.  We had pretty poor

12   results on a number of levels.

13   *Q.*  Part of making a company successful is keeping your

14   employees happy; right?

15   *A.*  Yes.  And I think particularly so in a service business, as

16   I shared.

17   *Q.*  And that can be much more --

18         Your Honor, do you want me to keep going?

19         *THE COURT:*  How much more do you have?

20         *MR. MELSHEIMER:*  I have more than five minutes, Your

21   Honor.

22         *THE COURT:*  Okay.  Well, I could have guessed that.

23   How much more?  Five minutes more or --

24         *MR. MELSHEIMER:*  Yes, Your Honor.  I'll keep going.

25         *THE COURT:*  No.  I mean, do you have another half an

 1    hour worth?

 2          *MR. MELSHEIMER:*  No, sir.  I have more than a half an

 3    hour worth.

 4          *THE COURT:*  Let's stop here.

 5          Ladies and gentlemen, have a nice evening.  See you in

 6    the morning.  Take care.

 7          (Jury out at 4:26 p.m.)

 8          *THE COURT:*  All right.  The jury has been excused.

 9    And, of course, in a moment --

10          Well, you can leave at any time.

11          *THE WITNESS:*  I'm sorry?

12          *THE COURT:*  You can go, if you wish.

13          *THE WITNESS:*  Yes, sir.

14          *THE COURT:*  I always ask at the end of the day when

15    they've been excused, does the government have anything further

16    to put on the record at this time?

17          *MS. LEWIS:*  Nothing further, Your Honor.

18          *THE COURT:*  How about the defendants?

19          *MR. WALSH:*  Not from DaVita, Your Honor.

20          *MS. BROOKS:*  I have a question, Your Honor about the

21    rule, but it's another rule.

22          With Mr. Hayek on cross-examination, is the

23    prosecution allowed to talk to him over the evening, or is he

24    off limits?

25          *THE COURT:*  They can talk to him.

1              Are you planning to?

2              *MS. LEWIS:*  Your Honor, I don't believe we are.

3              *MS. BROOKS:*  Thank you, Your Honor.  Some courts have

4    rules that you can't talk to a witness if they're already on

5    cross-examination; some courts have rules that you're perfectly

6    free to -- about the substance of their testimony.

7              *THE COURT:*  Yeah.  I don't care, but I don't think

8    they're going to do that.  But I do appreciate the fact that

9    there apparently is more than one "the rule."

10             *MS. BROOKS:*  There is, apparently, Your Honor.

11             *THE COURT:*  Have a nice evening, folks.

12             *MR. MELSHEIMER:*  Thank you, Your Honor.

13             *MS. LEWIS:*  Thank you, Your Honor.

14             (Recess at 4:28 p.m.)

15                          **I N D E X**

16   **Item**                                                    **Page**

17

        BRIDGET FANNING
18           Cross-Examination Continued By Mr. Melsheimer    303
             Redirect Examination By Ms. Lewis                371
19           Examination By Ms. Lewis                         385
        MICHAEL RUCKER
20           Direct Examination By Mr. Vigen                  388
             Cross-examination By Mr. Dodds                   418
21           Redirect Examination By Mr. Vigen                439
             Recross-examination By Mr. Dodds                 443
22      ANDREW HAYEK
             Direct Examination By Ms. Lewis                  448
23           Cross-examination By Mr. Melsheimer              512

24

25

1                         DEFENDANTS' EXHIBITS

2  | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |

3  | A002 | | 355 | | | |
   | A079 | | 436 | | | |
4  | B474 | | 387 | | | |
   | B515 | | 431 | | | |
5  | B516 | | 432 | | | |

6                        GOVERNMENT'S EXHIBITS

7  | Exhibit | Offered | Received | Refused | Reserved | Withdrawn |

8  | 4 | | 459 | | | |
   | 8 | | 465 | | | |
9  | 26 | | 397 | | | |
   | 27 | | 493 | | | |
10 | 33 | | 494 | | | |
   | 46 | | 496 | | | |
11 | 50 | | 414 | | | |
   | 57 | | 314 | | | |
12 | 59-1 | | 313 | | | |
   | 63-1 | | 320 | | | |
13 | 64-1 | | 320 | | | |
   | 66-2 | | 329 | | | |
14 | 84 | | 416 | | | |
   | 86-2 | | 505 | | | |
15 | 90 | | 506 | | | |
   | 91 | | 508 | | | |
16 | 356 | | 434 | | | |

17                       REPORTER'S CERTIFICATE

18          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
19
            Dated at Denver, Colorado, this 25th day of April,
20  2022.

21

22                              _Therese Lindblom_

23                              _____
                                Therese Lindblom,CSR,RMR,CRR

24

25