1        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLORADO

2

Civil Action No. 21-cr-00229-RBJ

3

UNITED STATES OF AMERICA,

4

    Plaintiff,

5

vs.

6

1. DAVITA INC., and

7  2. KENT THIRY,

8    Defendants.

9  _____

10              **REPORTER'S TRANSCRIPT**
            TRIAL TO JURY – DAY FOUR

11  _____

12       Proceedings before the HONORABLE R. BROOKE JACKSON,

13  Senior Judge, United States District Court for the District of

14  Colorado, continuing at 8:59 a.m., on the 7th day of April,

15  2022, in Courtroom A902, United States Courthouse, Denver,

16  Colorado.

17

18

19

20

21

22

23        THERESE LINDBLOM, Official Reporter
       901 19th Street, Denver, Colorado 80294

24   Proceedings Reported by Mechanical Stenography
      Transcription Produced via Computer

25

1                    **A P P E A R A N C E S**

2            MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE
    CLINGAN and ANTHONY WILLIAM MARIANO, Attorneys at Law, U.S.
3    Department of Justice, Antitrust Division, Washington Criminal
    II Section, 450 5th Street N.W., Washington, DC, 20530,
4    appearing for the Government.

5            JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius
    LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103,
6    appearing for Defendant DaVita.

7            JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP,
    1225 17th Street, Suite 2600, Denver, Colorado, 80220,
8    appearing for Defendant DaVita.

9            THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn
    LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201,
10    appearing for Defendant Thiry.

11            JUANITA ROSE BROOKS, Attorney at Law, Fish &
    Richardson, 12860 El Camino Real, Suite 400, San Diego,
12    California, 92130, appearing for Defendant Thiry.

13                        *   *   *   *   *

14                    **P R O C E E D I N G S**

15            (In open court at 8:59 a.m.)

16            THE COURT:  Good morning.  We have a juror that is

17    running late.  Do you have anything to discuss before we bring

18    the jurors in?

19            MS. LEWIS:  We have two pretrial matters, Your Honor.

20            THE COURT:  I thought you probably would.  Okay.

21            MS. LEWIS:  Thank you, Your Honor.  So the first one,

22    we just wanted to place on the record that we don't intend to

23    have any witness do an in-court identification of Mr. Thiry in

24    front of the jurors, because the parties have agreed that

25    identity is not an issue in this case.  So we just wanted to

1     place that on the record.

2              THE COURT:  Looks like him, but you never know.  All

3     right.

4              MS. LEWIS:  The second matter, Your Honor, is just a

5     scheduling issue.  So, basically, the United States has made

6     some decisions to streamline our case.  I think, as we shared

7     with defense counsel, we think it's likely we may rest on

8     Friday, potentially with time left in the day.  We wanted to

9     alert the Court to that schedule.

10             THE COURT:  You're running on each witness ahead of

11    schedule.

12             MS. LEWIS:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MR. MELSHEIMER:  That seems like unmitigated good

15    news, Your Honor.

16             THE COURT:  And is it your desire if we stop early to

17    recess for the week?

18             MR. MELSHEIMER:  Well, Your Honor, just for the

19    record, we're not going -- we weren't planning on putting on a

20    witness on Friday.  And our witness that we were planning on

21    putting on is not coming in until Saturday.  So who knows when

22    we will exactly finish on Friday; but if there is some time

23    left, we don't want to yield our ability to put on a defense.

24             THE COURT:  Okay.  Fine.

25             MS. LEWIS:  Your Honor, we have a pending motion for a

1    *Daubert* hearing, which if Your Honor was inclined to grant

2    that, we thought that that might be a way to make use of the

3    time on Friday, to give Your Honor time to consider the

4    evidence over the weekend.

5         THE COURT:  Well, but maybe they don't have their

6    *Daubert* witness.

7         MR. MELSHEIMER:  Two things.  The Masters, of course,

8    is going on Friday.  We don't want to miss any of that.  Our

9    witness is not available to testify on Friday.  Of course, you

10   could have the hearing without the witness.

11        This is kind of an unusual *Daubert*.  It's really a

12   relevance issue, and I don't think it really relates to his

13   qualifications or his methodology.  I think you could decide it

14   on the papers; I think you could decide it with just an oral

15   argument; but if you wanted to have a hearing on it with the

16   witness present, we'd have to do that Monday, with the Court's

17   indulgence.

18        MS. LEWIS:  I don't think that is correct.  I do think

19   we want the witness to be available for questioning.  But we

20   would be prepared to do that remote if their witness is not

21   able to travel physically to Denver.

22        THE COURT:  I don't know if their witness is available

23   Friday even remotely.

24        MR. MELSHEIMER:  Your Honor, no one has asked him,

25   frankly, about Friday.  I'm not fussing at them.  This just

 1   came up last night.  We can inquire about that.  I think it's

 2   probably --

 3           THE COURT:  I would prefer to do it Monday morning.

 4           MR. MELSHEIMER:  I would too, Your Honor.  And I

 5   think, again, the good news -- I think this case, you know, is

 6   going to finish early, middle of next week, which would be

 7   great news for all.

 8           THE COURT:  That's fine.  All right.  Well, we can

 9   have the jury come in late on Monday, maybe at 10 o'clock, and

10   hold a *Daubert* hearing Monday at 8:30, or something like that.

11           MR. MELSHEIMER:  Absolutely.

12           THE COURT:  I rarely exclude witnesses under *Daubert*.

13   *Daubert* is not intended to exclude; it's intended to expand the

14   expert witness testimony that's available to be heard.  I've

15   written that several times.  You've read my orders, so you know

16   that I feel that way about it.  And especially in a criminal

17   case, where the defense is defending against possible

18   incarceration and fines, you're going to have to be pretty

19   persuasive to keep their witness off the stand.  And if you do,

20   you're risking your verdict, just so you know.

21           All right.  I don't know if we have the juror yet.

22           COURTROOM DEPUTY:  I will go check, Your Honor.

23           (Jury in at 9:08 a.m.)

24           THE COURT:  Have a seat.  Good morning, ladies and

25   gentlemen.  How is everybody this morning?

1          Just so that you know, the case is going quite a bit

2   more quickly than the lawyers anticipated.  I think probably

3   you're going to get some time off tomorrow afternoon.  I don't

4   know how much.  And they're thinking we might even be finished

5   by midweek next week.  That's no promise, no guarantee, but

6   good news is always good news.

7          Okay.  Let's go.

8          MR. MELSHEIMER:  I'm ready, Your Honor.

9          THE COURT:  Good morning, Mr. Hayek.

10          THE WITNESS:  Good morning.

11          THE COURT:  You're still under oath from yesterday.

12          MR. MELSHEIMER:  May it please the Court?

13          THE COURT:   Yes.

14       (**ANDREW HAYEK, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**)

15                  **CROSS–EXAMINATION CONTINUED**

16   BY MR. MELSHEIMER:

17   Q.  Good morning again, Mr. Hayek.

18   A.  Good morning.

19   Q.  We ended yesterday talking about that it's important to

20   keep your employees happy.  Do you remember that?

21   A.  Yes.

22   Q.  Part of that can involve their compensation; true?

23   A.  True.

24   Q.  But it can be more than that; right?

25   A.  Yes.

1   Q.  It can involve positions, titles, responsibilities, things

2   like that; correct?

3   A.  Yes.  Those things and more.

4   Q.  Different things are important to different employees to

5   keep them happy and motivate them to do their best in the job;

6   is that a fair statement?

7   A.  I think that's true.  It depends on the individual.  It can

8   be their role, their boss, their opportunities for growth and

9   learning.  It's, especially for senior executives, very much up

10  to the individual.

11  Q.  Some folks want to be very involved in managing other

12  people; fair?

13  A.  Pardon me?  Managing other people?

14  Q.  Managing other people.

15  A.  Yes.  I think for executives, often the scope of the

16  responsibility, taking on more, developing teams, that sort of

17  thing.  Yeah.

18  Q.  Other senior executives, though, may like some other aspect

19  of their work that doesn't involve managing people.  You've

20  seen that; right?

21  A.  Yes.  For some people it's learning a new skill or taking

22  on a new product launch.  So it is very individual.

23  Q.  So different things drive different people's happiness at

24  work; fair statement?

25  A.  Yes.  There are a number of commonalities, and then there

Andrew Hayek - Cross

1    are a number of things that are unique.

2    Q.  You yourself worked at DaVita for a little over a year; is

3    that right?

4    A.  Yes.  About 15 months.

5    Q.  You learned something about being a CEO from Mr. Kent

6    Thiry; didn't you, sir?

7    A.  Yes.  I learned a number of things from Mr. Thiry and from

8    DaVita broadly.

9    Q.  You have your own style; correct?

10   A.  Yes.  We all have our own styles.  I'm, you know, from a

11   town in Iowa and was raised a certain way.  And, you know, that

12   affects who you are and how you communicate.  We all have our

13   styles.

14   Q.  You learned certain things from Mr. Thiry that you adopted,

15   and then you had your own ideas about the kind of CEO you

16   wanted to be.  Do I have that about right?

17   A.  Yes, that's right.  And I think I've learned from each

18   person I've worked for and people you work with.  You learn --

19   you learn from people you work with.

20   Q.  A CEO, it's important that they have their own identity,

21   their own style that they're comfortable with; is that fair?

22   A.  I do.  I think if you're not authentic to who you are, it's

23   not effective.

24   Q.  You left DaVita in 2008 to be your own kind of CEO; is that

25   right?

Andrew Hayek - Cross

1    A.  Yes.  I aspired to be a CEO and lead a team, and we very

2    much try to do it our way, which was partly my way, but also

3    the rest of the team's style.

4    Q.  Shortly after you left DaVita to go to work for SCA, you

5    recruited Mr. Michael Rucker from DaVita to come work with you

6    at SCA; true?

7    A.  True.

8    Q.  Mr. Rucker was a divisional vice president at DaVita, and

9    then he left to become I believe the chief operating officer at

10   SCA.  Do I have that right?

11   A.  We initially hired Michael to be a senior vice president of

12   operations, but Michael and I both knew that he would have a

13   really good shot at becoming chief operating officer.  And that

14   happened about a year later.

15   Q.  You testified yesterday, sir, that when you hired --

16   recruited and hired Mr. Rucker from DaVita, Mr. Thiry was

17   unhappy with that; fair?

18   A.  Yes, he was unhappy.

19   Q.  And he actually asked you, Andrew, can you stop hiring

20   people?  It's bothering me.

21   A.  Yes.  He was upset and didn't like it at all.

22   Q.  But you didn't stop hiring people; right?

23   A.  That's correct.  We hired a number of more -- of other

24   senior executives.

25   Q.  You didn't make any kind of agreement with Mr. Thiry in

Andrew Hayek – Cross

1   2008 to stop hiring people; right?

2   A.  No.  I would explain with the hiring of Mr. Rucker and

3   others that I wasn't bad-mouthing DaVita, I wasn't trying to do

4   anything untoward.  So I would explain it, but didn't develop

5   an agreement.

6   Q.  On your direct examination yesterday, you talked about one

7   of the challenges that a company faces when they're losing

8   people is this reputational challenge, that people might say,

9   oh, people are leaving there, must be a bad place to work.  Is

10  that what you were talking about?

11  A.  Yes.  When someone leaves, it raises questions, especially

12  of very senior executives.  Why are they leaving?  Is there

13  something wrong here?  You know, is there something I should be

14  thinking about?

15  Q.  So you may not have agreed with it exactly, but you

16  understood where Mr. Thiry was coming from; right?

17  A.  In terms of the damage or harm from losing someone, sir?

18  Q.  Yes, sir.

19  A.  Yes.  I think it's true in a company; it's true on a sports

20  team; it's -- when you lose someone from your team, it creates

21  difficulties.

22  Q.  You don't like losing your best players to another team;

23  right?

24  A.  I think that's true.

25  Q.  So SCA actually continued to hire, by my count, eight

Andrew Hayek - Cross

1    different DaVita employees, most of whom were senior level, in

2    2008, in 2009, in 2010, and 2011; do I have that about right?

3    A.   I don't know the number, but it's -- it sounds

4    directionally correct.  I would say several.

5    Q.   You knew each time you hired someone that it was at least

6    possible that Mr. Thiry might be frustrated with you; right?

7    A.   I expected it.  Yes.

8    Q.   And as I said, you told the ladies and gentlemen of the

9    jury, you to some extent understood that; right?

10   A.   Yes.  I could relate.  I don't think it's unusual.

11   Q.   From working a year or so in a very senior position at

12   DaVita, you had insights, I think you told us, into the people

13   at DaVita, their skills, that someone outside of DaVita might

14   not have; right?

15   A.   Yes.  I -- I knew the team at DaVita -- not all of the

16   team, but I knew a number of members of the team -- they knew

17   me.  So I knew a lot about DaVita, and I had relationships and

18   some level of trust.

19   Q.   My additional point, though, is sir, that was information

20   that other people outside of DaVita might not know; true?

21   A.   Yes, that is true.  That came from having worked there.

22   Q.   You didn't just know who the really good people were.  Fair

23   to say, you also knew maybe who to stay away from; right?

24   A.   Yes.  I had my own view of who was really, really good and

25   would be a good fit for SCA and people who might still be good

Andrew Hayek - Cross

1   but not the right fit for SCA.

2   Q.  And when you say someone is not the right fit for SCA,

3   that's not any kind of a criticism of them personally.  That's

4   just, they might be right for one job at one company, but might

5   not be right for SCA; fair?

6   A.  I think that is fair.  SCA is a surgery center company, and

7   we had a slightly different way of operating.  And so a person

8   could be very good at DaVita but not the type of person that

9   would be the best fit at SCA.

10  Q.  I want to talk a little bit about the people you did hire

11  from DaVita, sir.  I show that in 2009, SCA hired someone named

12  Kelli Ruiz, who was a director at DaVita that SCA hired to

13  become vice president of operations.  Does that ring a bell?

14  A.  It does.  I remember Kelli.

15  Q.  In 2009, SCA hired a gentleman named Richard Rice.  He was

16  a regional operations director at DaVita who became an

17  administrator at SCA.  Does that sound right?

18  A.  I remember the name.  I didn't know Rich -- Mr. Rice

19  personally.

20  Q.  In 2010, SCA hired a woman named Helen Como, who was

21  regional operations director at DaVita and hired to be SCA's

22  vice president of group operations.  Does that sound about

23  right?

24  A.  Yes.  I remember Ms. Como.

25  Q.  In 2010, SCA also hired Tom Gill, a vice president at

533

Andrew Hayek - Cross

1    DaVita, who SCA hired to also be a vice president.  Does that

2    sound right?

3    A.  It does.  I remember him.

4    Q.  In 2010, again, SCA hired Ajay Chokshi, a senior director

5    of strategy and special projects at DaVita, who SCA hired to be

6    a group president.  Does that sound right?

7    A.  It does.  Mr. Chokshi joined, I believe, in a strategy

8    role.  And he ultimately became a senior vice president --

9    group president, running one of our regions.

10   Q.  In 2011 is it your recollection that SCA hired a man named

11   Ben Jacobs, who was director of mergers and acquisitions, who

12   left DaVita to become vice president of development at SCA?

13   Does that sound right?

14   A.  Yes.  I remember Mr. Jacobs.  He became one of our listing

15   of people on our development and acquisitions team.

16   Q.  And, in fact -- I don't want to bring up a bad memory,

17   sir -- but, in fact, that hiring of Mr. Jacobs so upset an

18   executive at DaVita, a man named Tom Usilton, that he actually

19   declined a dinner invitation from you at around that time;

20   right?

21   A.  Yes.  I recall -- Mr. Usilton ran all of development at

22   DaVita, so that's an important relationship for us to do

23   business with DaVita.  And I believe I reached out about having

24   a meal or reconnecting, and Mr. Usilton declined to talk to me.

25   Q.  He was polite about it; right?

Andrew Hayek – Cross

1    A.   He was pretty direct about it.

2    Q.   He was direct about it, but you understood in a sense where

3    he was coming from; right?

4    A.   My personal style is not to be quite that direct.  But in

5    terms of, you know, feeling hurt when you lose somebody on your

6    team, I think that's something that everybody who leads a team

7    identifies with.

8    Q.   Mr. Usilton didn't have that Midwestern equanimity that

9    you're showing us; right, sir?

10   A.   He had a different style, and he was upset.

11   Q.   After Mr. Jacobs was hired, SCA hired a person named Terry

12   Forsyth.  Do you remember that?

13   A.   Yes.  I remember Mr. Forsyth.

14   Q.   Is that -- is that Mr. Forsyth or Ms. Forsyth?

15   A.   Mister.

16   Q.   So Mr. Forsyth was a regional operations director at

17   DaVita, who in 2011 became VP of operations at SCA.  Does that

18   sound right?

19   A.   Yes, sir.

20   Q.   Also in 2011, SCA hired Ms. Surber, Kris Gorman Surber, a

21   group healthcare administrator, who was hired by SCA to become

22   CEO of one of its Connecticut clinics.  Does that ring a bell?

23   A.   I remember her as Ms. Gorman.  And, yes, she ran one of our

24   surgery centers.  So we'd call that role an administrator, or

25   we would sometimes call that the CEO of the surgery center.

Andrew Hayek - Cross

1   Q.  You had hired so many people between 2008 and 2012 that in

2   one email, Mr. Thiry sent you in January of 2012 -- I think

3   the ladies and gentlemen of the jury have seen -- he said, "The

4   lore within the village is that you are quite the aggressor."

5   Right?

6   A.  That's correct.

7   Q.  And it's in 2012, around February, that you described

8   entering into this understanding or agreement with Mr. Thiry

9   about how solicitations would be conducted; right?

10  A.  Yes.  The agreement was approximately around January of

11  2012.

12  Q.  Now, I just want to take you back to 2012 and try to get

13  your mindset.  Is it fair to say, sir, that by 2012, you had

14  hired about all of the DaVita people that you wanted to hire at

15  that point; true?

16  A.  At the time, and -- I remember discussing with Mr. Rucker

17  and others that, you know, we had hired more people from DaVita

18  than anywhere else and that there was a risk that SCA would

19  just become known as DaVita part two.  And it was important to

20  us to have our own culture and our own identity and do things

21  our own way.  And so that was something that we thought about

22  and we talked about, is the risks of having more senior

23  executives from DaVita.

24  Q.  That was the independent thought that you had on your own

25  about what was the best decision for SCA going forward; true?

Andrew Hayek - Cross

1   *A.*   Independent meaning something I thought and Mr. Rucker

2   thought or --

3   *Q.*   Yes, sir.   Independent, it was within SCA, in your

4   decision, in your evaluation, not anyone else's?

5   *A.*   Yes, that was our own thoughts.   My own thoughts, and

6   thoughts expressed by some members of my team.

7   *Q.*   That made sense to you; right?

8   *A.*   It did.   Because having so many people from one place just

9   raises questions.   And is it a carbon copy?   Are you just

10  copying somebody else?

11  *Q.*   Well, so let's talk about that for a second.   So fair to

12  say, there were some good things about DaVita that you wanted

13  to have at SCA; right?

14  *A.*   There were a number of things that were very good, that I

15  learned from DaVita and that we used.   And then there was some

16  things we did our own way.   Yes.

17  *Q.*   I think what you just said, and I want to make sure I

18  understand it, you didn't want to be just a little DaVita or

19  carbon copy of DaVita.   You wanted to be your own independent

20  identity, where you and the others there could frame, build,

21  and develop the culture of SCA the way you wanted; does that

22  sound right?

23  *A.*   It does.   We borrowed some things from DaVita's culture

24  that we thought were really good, and we deliberately decided

25  to do things differently in other areas, and it was ours.   We

Andrew Hayek – Cross

1    created our own values and mission and vision; and we selected

2    our values democratically, all 6,000 of our teammates or

3    employees voting on it.  It was very important that SCA's

4    culture was ours and was unique.

5    *Q.*  Well, you used the word "teammates"; right?

6    *A.*  Yes, sir.

7    *Q.*  That was a thing that they used at DaVita too.  They called

8    everybody teammates; right?

9    *A.*  That is an example of something that I liked and we did

10    that was similar, among, you know, a number of other things.

11    *Q.*  It turns out, did it not, sir, that over time, you realized

12    that not everyone from DaVita worked out at the SCA culture;

13    true?

14    *A.*  That's correct.  Some did work out very well –– Mr. Rucker,

15    for nine years –– others did not.  Others, there were things we

16    knew that were not as portable about their skills and what they

17    had learned.

18    *Q.*  Well, don't be modest.  You worked out pretty well, too,

19    didn't you?

20    *A.*  It worked out pretty well.

21    *Q.*  So I want to take a look at Government Exhibit 91.  This is

22    a little bit later in time.

23          This is in evidence, Your Honor.

24          But this was talked about yesterday, and I want to ––

25    I think this is making the point that you just made, sir.

Andrew Hayek - Cross

1              If we go to the bottom, be this is an email from

2     Mr. Buono, and he's talking to Brian Mathis.  Do you know

3     Mr. Buono and Mr. Mathis?

4     A.   Yes.  Mr. Buono was a senior development executive, and

5     Mr. Mathis ran strategy and led all of the development team at

6     that time.

7     Q.   He says, "I recall that SCA had a mutual nonsolicit of

8     employees, whether contractual or verbal with DaVita."  That's

9     what he wrote; right?

10    A.   Yes.

11    Q.   This was a pretty well-known thing at the company; true?

12    A.   Yes.  We shared it.  We were open about it.  Yes.

13    Q.   And --

14    A.   It didn't come up every day; but, yes, we were open about

15    it.

16    Q.   You didn't keep it secret and weren't embarrassed about it?

17    A.   No, nothing I felt at the time to keep secret about it.

18    Q.   Mr. Mathis responds, "Tim, I think we're in the clear in

19    the circumstances you are describing.  And looping in Andrew."

20    That's you; right?

21    A.   Yes.

22    Q.   Let's go to the second paragraph, though.  "If we do

23    proceed with a candidate, we should push hard on their ability

24    to be thoughtful about market strategy and complex sales."

25    Then he says, "We had a few DVPs" -- that's division vice

539

Andrew Hayek – Cross

1    presidents?

2    *A.*   Either that or development vice presidents.

3    *Q.*   -- "from DaVita in the past, and they were not successful

4    in our environment."

5    *A.*   Yes, that's correct.

6    *Q.*   And then when you go up to your response -- and I'm not

7    sure I understood your testimony yesterday about this, so I

8    want to make sure we understand it.  When you respond to this,

9    you say at the end, "I would reiterate the cautionary note from

10   Brian about our historical experience with DaVita candidates."

11   Did I read that right?

12   *A.*   You did read it right.

13   *Q.*   What you're talking about there is not any kind of

14   agreement with DaVita; you're talking about what Mr. Mathis

15   just said about the DVPs from DaVita that were not successful

16   in your environment.  Isn't that right?

17   *A.*   That's correct.  We had hired at least a couple that I can

18   think of that were very good people, they're very smart, they'd

19   be successful in other environments, and they were not

20   successful in the SCA environment.  Because, you know,

21   essentially, our model is partnering with hospital systems and

22   health insurance companies and medical groups; and our vice

23   presidents needed to basically develop a unique strategy for

24   each market, you know, city or state.  It was a little less

25   routinized than dialysis clinics, so that was one difference

1    that we noted.

2    Q.  So if there was any suggestion that that email -- that line

3    in that email about historical experience -- if there is any

4    suggestion that that was somehow referring to your agreement

5    with Mr. Thiry, that's inaccurate; right?

6    A.  The phrase about the cautionary note from Mr. Mathis, yeah,

7    that's separate.  That's more of a -- you know, a view around

8    the track record of who has worked out and who hasn't worked

9    out.

10   Q.  Mr. Hayek, let's talk about the opposite direction; that is

11   to say, people leaving SCA to go to DaVita.  Are you with me?

12   A.  Yes.

13   Q.  You didn't see it as a material risk that SCA would lose

14   employees to DaVita; true?

15   A.  I think it's a risk.  I don't recall thinking it was one of

16   the main risks to the company, you know, in terms of financial

17   performance or otherwise.  It was a risk.

18   Q.  The SCA opportunity was something different than the DaVita

19   opportunity; is that right?

20   A.  How do you mean that, sir?

21   Q.  Well, here is what I mean by that:  DaVita was an

22   established company with a long track record of success; true?

23   A.  Yes.  By 2008 or '9 or '10, they would have been going for

24   many years.  They had their own turnaround and came from a

25   difficult spot; but by that point, they were large and quite

Andrew Hayek - Cross

1   successful.

2   Q.  That was the turnaround led by Mr. Kent Thiry.  No question

3   about that; true?

4   A.  Yes.  I wasn't there at the time.  That predated me.  But

5   there was a company called Total Renal Care that was in

6   financial trouble and lawsuits and it was, from my

7   understanding, in a very difficult spot.  And Mr. Thiry and his

8   team turned that company around and grew it for many years and,

9   you know, created a very successful company.

10  Q.  The spot that SCA was in in 2008 was different from the

11  spot that DaVita was in in 2008; fair?

12  A.  Yes.  We were in our difficult spot in 2008; whereas, they

13  had recovered from theirs many years prior.

14  Q.  So -- and I'm not saying this would apply to everyone,

15  Mr. Hayek -- but there may be people that would be interested

16  in the challenge of what you were doing at SCA, that would seek

17  that out, that wouldn't necessarily be interested in not having

18  that kind of challenge at DaVita; fair?

19  A.  I think that's possible.  Personally, for me, I sought it

20  out.  I wanted to be kind of the captain of my own ship, and it

21  didn't bother me that it was a ship with a bunch of holes in it

22  and taking on water.  That's not for everyone.

23  Q.  You had plenty of buckets though?

24  A.  Not at first.  I remember walking around in the evenings,

25  pacing and thinking, how are we going to get through the week

542

Andrew Hayek - Cross

1   or the month?  How are we going to survive?

2   Q.  One of the ways you did that was to hire folks from DaVita

3   between 2008 to 2012; correct?

4   A.  Yes, that is one way.  And people like Mr. Rucker and

5   Ms. Lansing and others were critical parts of the team.

6   Q.  Getting back to this people leaving SCA to go to DaVita,

7   just like the agreement that you had with Mr. Thiry didn't

8   prohibit SCA from hiring people from DaVita, the agreement did

9   not prohibit DaVita from hiring SCA people; correct?

10  A.  Correct, in that there were other circumstances that you

11  could proceed and hire, you know, if you followed the

12  parameters that we had discussed in the agreement.

13  Q.  I want to talk a little bit about competition.  Are you

14  with me?

15  A.  Yes.

16  Q.  Got to give you a little bit more information, though;

17  right?

18  A.  Please.

19  Q.  Okay.  So competition can take many different forms; true?

20  A.  Yes -- yes.  And I'm happy to expand.

21  Q.  I'm going to give you some examples, and then I'm going to

22  ask you to expand.  So, for example, SCA was a business that

23  was in some sense competing for patients; true?

24  A.  Yes.

25  Q.  SCA derived its revenue from surgeries or procedures

Andrew Hayek – Cross

1   performed in outpatient medical centers; right?

2   *A.*   Correct.  We needed to attract more patients to our surgery

3   centers; we needed to attract more surgeons to want to use our

4   surgery centers.  And there are a lot of different things they

5   care about, and you have to be really good at all of them.

6   *Q.*   And the competition for that is substantial?

7   *A.*   Yes, it's very competitive.  We competed with other surgery

8   center companies; we competed with hospital systems that have

9   their own surgery departments and sometimes their own surgery

10  centers; and some types of cases can be done in physician

11  offices sometimes, like GI procedures.  So there are lots of

12  sources of competition.

13  *Q.*   Back in 2008, DaVita was not competing with SCA for these

14  outpatient surgeries; true?

15  *A.*   True.  You know, DaVita does renal dialysis.  So when your

16  kidneys fail, you have to help the patient clean their blood.

17  So you take the blood out, you clean it, and, essentially, put

18  the blood back in.  SCA is about surgeries.  So you break your

19  arm, you need a cataract removed, ear, nose, throat procedures.

20  So surgeries.  The closest overlap would be the vascular access

21  procedures that we wanted to partner on, but that's really the

22  only place.

23  *Q.*   We're going to get to that, sir, in a bit.  Let's talk a

24  little bit about the competition for the senior executives.

25  Okay?

544

Andrew Hayek - Cross

1          While you were at SCA, you talked about one of your

2    roles was hiring the best people to fill senior-level positions

3    at the company; right?

4    A.   Yes.

5    Q.   You were not just in competition with other outpatient

6    surgery center companies for those kinds of employees; right?

7    A.   Correct.  We hired more broadly than just from the surgery

8    center space.  We hired a lot of people from the surgery center

9    space, but much more broadly across healthcare.

10   Q.   You were asked this question on your direct examination,

11   and I want to make sure I got it right.  "During your tenure at

12   SCA, how competitive was the job market for senior-level

13   employees?"  The job market for senior-level employees was the

14   question.  And you described it as being competitive and you

15   really had to work hard.

16   A.   Yes.  And I can't recall a time as a leader of a company

17   where it's not competitive to hire great people and recruit

18   them, and you work hard on a number of levels to do that well.

19   Q.   You looked for employees at all types of companies; right?

20   Not just healthcare companies?

21   A.   Correct.  We hired some people from consulting firms or

22   financial firms.  So, you know, across healthcare, and even in

23   some other areas.

24   Q.   That was the job market that the Division lawyer asked you

25   about in your direct examination?

Andrew Hayek – Cross

1          *MS. LEWIS:*  Objection, Your Honor.

2          *THE COURT:*  Rephrase that one, please.

3     *BY MR. MELSHEIMER:*

4     *Q.*  Was that the job market you were asked about in your direct

5     examination, as being competitive, the one you just described?

6     *A.*  I believe so.

7          *MS. LEWIS:*  Objection, Your Honor.

8          *THE COURT:*  The same question, Mr. Melsheimer.

9     Sustained.

10    *BY MR. MELSHEIMER:*

11    *Q.*  The market was competitive?

12    *A.*  Yes.

13    *Q.*  It would not be accurate to say that you recruited from

14    just one or two or three or four different companies; right?

15         *MS. LEWIS:*  Objection to this line, Your Honor.

16         *THE COURT:*  Overruled.

17         *THE WITNESS:*  Correct.  We recruited from a large

18    number of companies.  And, you know, I think later we codified

19    that in a list that was, you know, hundreds of companies.  And

20    when we created that list, that was really summing up things

21    that we had, you know, done and known, just hadn't bothered to

22    put on paper like that.  But it was -- but we tried to be

23    creative and expansive.

24    *BY MR. MELSHEIMER:*

25    *Q.*  I want to take a moment to talk about the task of filling

Andrew Hayek - Cross

1    one of these positions.  Filling a senior-level position at SCA

2    is different from filling a position at one of SCA's 250 or so

3    surgical centers; right?

4    A.   Yes.  If you're referring to a senior executive's role

5    being different than hiring the typical team that works within

6    one of the surgery centers, that's correct.

7    Q.   The senior-level positions I believe you testified

8    yesterday were located at one of five different offices for

9    SCA, Illinois, Connecticut, Alabama, California, and Texas?

10   A.   I gave those as examples, because that's where we opened

11   offices.  We also had senior executives who worked from home in

12   other states, as well.

13   Q.   Probably a lot more these days, huh?

14   A.   Yes.  We were relatively remote even before the last couple

15   of years.

16   Q.   On your direct examination you talked about Government

17   Exhibit 64-1.

18           If we could pull that up.

19           This was an email that Dr. Fanning sent you in August

20   of 2015, with a consolidated list of companies that SCA should

21   be thinking of hiring from for senior-level positions.  And

22   your input and that of the Cabin Team was sought; right?

23   A.   Yes.  Correct.  We were trying to codify a list of the

24   places that we could recruit senior executives from.  And

25   Dr. Fanning came from outside of the healthcare space; and so,

Andrew Hayek – Cross

 1    you know, she was seeking our input of, you know, from a

 2    healthcare perspective, where are all the places you can

 3    recruit from.

 4    Q.  You responded to Dr. Fanning's email with Defense

 5    Exhibit B470.

 6            Your Honor, which we offer.

 7            *MS. LEWIS:*  No objection.

 8            *THE COURT:*  Admitted.

 9            (Exhibit B470 admitted.)

10    *BY MR. MELSHEIMER:*

11    Q.  You provided some feedback.  This is at pages –– I think

12    it's the bottom there and the top.  So –– it gives your

13    feedback on the target list of companies.  Do you see that,

14    Mr. Hayek?

15    A.  Yes.

16    Q.  That rolls over to the next page.  You give some pretty

17    detailed commentary about the different companies where you saw

18    there being opportunities to hire senior-level executives.  Do

19    you see that?

20    A.  Yes, I do.  And I'm describing categories and giving

21    examples, but there would be a lot more companies under each of

22    these kind of categories.

23    Q.  Thank you for pointing that out.  These are not necessarily

24    the names of companies, although you do have some names in

25    there.  True?

Andrew Hayek - Cross

1   A.   Correct.

2   Q.   These are also categories, like surgical service companies,

3   for-profit hospitals, large not-for-profit health systems,

4   large physician groups.  Skipping one, health plans.  Going to

5   the bottom, healthcare technology firms.  These are all the

6   different categories that you were providing Dr. Fanning with

7   some of your comments about how some of those companies might

8   provide opportunities for SCA to hire senior executives?

9   A.   That's correct.

10  Q.   After your -- let me start over.  After you reviewed the

11  draft list that Dr. Fanning sent you, she sent another list.

12  And then you commented on that list in Government Exhibit 67-3.

13  I just want to talk to you about a couple of things about this

14  email, because we've seen it more than once.

15           You say, "The list looks great.  I have some minor

16  edits to the attached version."  Are you with me?

17  A.   Yes.

18  Q.   First you said you were putting a line through "current

19  partners and customers that we should not recruit from"; right?

20  A.   Correct.

21  Q.   You specifically struck, I'll represent to you, six

22  companies from the list.

23  A.   I don't know the number, but I know there were a handful.

24  Q.   In other words, you were noting that for those companies,

25  there should be no recruitment whatsoever; right?

549

Andrew Hayek - Cross

1    *A.*   Correct.  That we should not be recruiting from them.

2    *Q.*   I think this is obvious, but just to make it perfectly

3    clear, that's a pretty common thing; right?  To say, people

4    that we're serving, that are our customers or clients, we have

5    access to their people, it's just not right to then recruit

6    those people, because it may hurt that customer relationship we

7    have with them; right?

8    *A.*   I think that's my mindset and my understanding of my team's

9    mindset at that time.  And I think you asked a normal -- it

10   struck me as normal.  These are entities that we are doing

11   business with, and we didn't want to anger them and tick them

12   off.

13   *Q.*   That's in some sense just common sense; right?

14   *A.*   It struck me that way.

15   *Q.*   Now, you next commented that you were putting two companies

16   in italics, USPI and DaVita.  And in that situation, you could

17   recruit from those companies under the circumstances laid out

18   in the email; correct?

19   *A.*   Correct.  Under the circumstances I laid out.

20   *Q.*   This notion that the executives would have, quote, if they

21   had told their boss already they want to leave or are looking,

22   that did not mean to you that the person had to resign from

23   DaVita; right?

24   *A.*   Correct.

25   *Q.*   If someone said that that was the equivalent of requiring

Andrew Hayek - Cross

1   someone to resign, that would not be accurate; right?

2   A.  Correct.  I don't recall thinking, saying, or others saying

3   that to me.

4   Q.  Mr. Hayek, you did not think that the agreement that you

5   reached with Mr. Thiry was going to lead to the cessation of

6   competition for employees between DaVita and SCA; true?

7   A.  True.  I didn't think it would cease, because a number of

8   our people we had hired from DaVita knew other people at DaVita

9   and were talking.  Sometimes a recruiter has a relationship

10  already with an executive and knows if they're looking already.

11  So it wouldn't cease, because there are other ways that people

12  can and are recruited.

13  Q.  Indeed, there was still competition for employees between

14  the two companies in the way the agreement laid out, as you've

15  described it; correct?

16  A.  Correct.  There would still be competition.  There may be

17  less, but it's not -- it doesn't cease, because there are other

18  ways to recruit, as I mentioned.  And in some cases, people are

19  comfortable telling their supervisor they're looking for

20  another job.  I've had that -- my own experience at some points

21  in my career, where that made sense, and I was open about it.

22  Q.  Compare that to the competition with your customers and

23  client relationships, when you said you were not recruiting

24  from clients and customers; do you remember that?

25  A.  Yes.  From the email?

Andrew Hayek - Cross

 1   *Q.*  Yes.

 2   *A.*  Yes, I do.

 3   *Q.*  The competition there did cease, didn't it?

 4   *A.*  Well, yes.  I did not think we should be proactively

 5   recruiting from those -- those customers, but there wasn't an

 6   agreement.  There was nothing both directions.  That was just

 7   our opinion about recruiting from those customers of ours.

 8   *Q.*  Well, you knew that your customers certainly wanted you

 9   to -- wanted you to avoid that, didn't you?

10        *MS. LEWIS:*  Objection, Your Honor.  Asked and

11   answered.

12        *THE COURT:*  Overruled.

13        *THE WITNESS:*  I don't recall ever talking about it

14   with those customers.  That was our view of just not disrupting

15   a critical customer relationship.

16   *BY MR. MELSHEIMER:*

17   *Q.*  That's that common sense point we were talking about

18   earlier?

19   *A.*  It struck me as just what made sense.

20   *Q.*  I want to move to a different topic, Mr. Hayek.  And that

21   is the business relationships and the considered and discussed

22   business relationships between SCA and DaVita.  Are you with

23   me?

24   *A.*  Yes.

25   *Q.*  Do you recall telling the government in one of your

Andrew Hayek - Cross

1    interviews with them that the benefit that SCA gained in the

2    agreement that you and Mr. Thiry reached was in part your

3    relationship with Mr. Thiry; do you recall that?

4    A.   Yes, I do.

5    Q.   There is nothing sinister about that; right?

6    A.   I don't believe so.

7    Q.   Building relationships between companies is one way -- one

8    way -- of creating potential business opportunities; true?

9    A.   In my experience, the relationships are critical.  That's

10   how you get in the door; that's how you pitch your product and

11   what you're trying to sell and partner.  You know, in SCA's

12   case, the business model was predicated on partnerships.  We're

13   not a website that just sells things or a store.  We have to

14   partner with people, and partnerships are based on

15   relationships and trust.

16   Q.   This notion of building relationships to create business

17   opportunities, that's a very common thing for a CEO to think

18   about; true?

19   A.   In my experience, it's one of the most important things

20   that a CEO does on behalf of his or her organization.

21   Q.   It's not specific to the healthcare industry or the surgery

22   center industry or any specific industry; true?

23   A.   I know healthcare best.  I know in my experience in

24   healthcare, it's very important.  I assume it is in other

25   industries; I just don't know them.

Andrew Hayek – Cross

1  Q.  Like any kind of relationship that might lead to business,

2  the prospects might be immediate or they might be longer term;

3  right?

4  A.  Correct.  And often relationships take time to build.

5  Q.  You have some things that might be right in front of you,

6  and you have some things that you might see off into the future

7  as being potentially really great things, but they may take a

8  while to develop.  Correct?

9  A.  Yes.  In some cases it's, you know, a multi-year process.

10  Q.  Sometimes what you think might be a good opportunity

11  doesn't pan out?

12  A.  Unfortunately, often it doesn't pan out.  You have to plant

13  a lot of seeds; and, you know, you harvest only a fraction of

14  them.  You try, but a lot of things don't work out.

15  Q.  And the fact that something doesn't work out, though,

16  that's not an indication when you're involved that somehow it

17  wasn't entered into in good faith and with the intent to

18  actually consummate a business deal; right?

19  A.  No.  I -- I don't think so.  Because, you know, the

20  partnerships that we created, there would be a far larger

21  number that we tried and for any number of reasons, they fell

22  over.  Sometimes, too, you have to make multiple attempts at

23  the same opportunity, so you have to be persistent.

24  Q.  The phrase kissing a lot of frogs comes to mind.  Is that

25  a --

Andrew Hayek - Cross

1   A.   Yes, I think that's true.

2   Q.   Okay.

3   A.   I can recall us creating a target partner list that was

4   long, and maybe we succeeded on 10 or 20 percent of it.   But

5   that still was essential to us.

6   Q.   A business relationship between SCA and another company

7   could be something formal, like a merger or a supply contract,

8   for example?

9   A.   Yes.

10  Q.   But it could also be something informal and still have

11  value to both companies; right?

12  A.   Yes, I believe so.

13  Q.   The term "strategic partnership" was a general term that

14  you and others at SCA used to describe a broad set of

15  relationships that might not be formally documented -- they

16  might be documented, but they might not be -- where both

17  companies were working together for their respective benefit;

18  does that sound right?

19  A.   Yes.   Sometimes you have a formal document at the

20  beginning.   Sometimes you work on something for a while without

21  one; and when you consummate the legal transaction, then you

22  have a lot more documentation.   So it can work both ways.

23  Q.   You certainly understood -- again, I'm asking about your

24  understanding -- but you understood that your partners shared

25  your common goal of building relationships and developing

Andrew Hayek - Cross

1    potential business; right?

2    A.   Yes.  I think that's a very common way to go about

3    business.  Yes.

4    Q.   If you grow your business, you may have more revenue;

5    right?

6    A.   Yes.

7    Q.   Might have more facilities; right?

8    A.   Yes.

9    Q.   Might hire more people; right?

10   A.   Yes.  As you grow your business, all of those things are

11   natural parts of it.

12   Q.   Might not, but you might hire people.  Right?

13   A.   Yes.

14   Q.   I want to talk to you about -- in more detail about some of

15   these partnerships, opportunities that you and DaVita discussed

16   from about 2011 to about 2017.  Are you with me?

17   A.   Yes.

18   Q.   There were discussions and interests from 2011 to 2017;

19   fair?

20   A.   Yes.  And, you know, I'd say that Mr. Rucker and I were

21   familiar with, you know, the business Lifeline, from having

22   worked at DaVita.  So, you know, the concept of working with

23   DaVita probably predated 2011; but at least in that period,

24   yes.

25   Q.   Even before 2011?

Andrew Hayek - Cross

1    *A.* I believe so.  I shared my office space with DaVita

2    Lifeline, so I was familiar with that business, from back in

3    2007, when I worked there.  So it wasn't new to me, and it

4    wasn't new to Mr. Rucker.

5    *Q.* I want to make sure we understand the business of these two

6    companies, because I think it's going to be important to

7    understanding my question.

8         So let's talk about DaVita.  We've talked about DaVita

9    as being a dialysis company in part; right?

10   *A.* Yes.  That's the majority of what they did, their main

11   focus.

12   *Q.* You've talked about this, and we're going to get into it,

13   but I want to make sure we're on the same page.  Sometimes

14   dialysis patients needed something called vascular surgery to

15   repair or improve the veins in which they got dialysis; right?

16   *A.* Correct.  For any patient that you perform dialysis on, you

17   need a way to get the blood out of the body to cleanse it and

18   put it back in.  The two major ways I was familiar with were

19   you either have a port, which is a direct line near the heart.

20   The issue with that is that can become infected, and so there

21   is a lot of concern about having a port.  And the preferred way

22   to do dialysis is to have a fistula, which is like an

23   artificial vein -- a big vein that is surgically implanted

24   under your forearm.  And that way when the needle goes in to do

25   dialysis -- you do dialysis.  When you pull the needle out, the

Andrew Hayek – Cross

1    skin heals; and so there is a very low infection risk.  It's

2    preferred.  It's safer.  And so not every single dialysis

3    patient needs a fistula; but it's preferred, in my experience

4    or my understanding, for most of them.  So it's a very

5    important procedure.

6    Q.  You learned all of that in part during your brief time at

7    DaVita; right?

8    A.  I did.  And, you know, part of my orientation was going

9    into dialysis clinics and trying to learn, you know, the

10   business from the ground up.  That was one of the parts of

11   orientation and training.

12   Q.  So it's fair to say that when you became the CEO of SCA in

13   2008, that you already had in mind at least the opportunity

14   that might exist between a company that was trying to get

15   patients for surgery centers and a company that had a lot of

16   patients that might need surgery; right?

17   A.  Yes.  I was familiar with Lifeline, which is the division

18   that does vascular access when I was at DaVita and as I

19   shared -- actually shared an office floor with Lifeline.  So my

20   office was down the hall from the Lifeline team, so I was very

21   familiar with them.

22   Q.  So the other part of DaVita's business that we haven't

23   talked as much about, but I think we're going to see some

24   things about, is something called the DaVita Medical Group or

25   DaVita HealthCare Partners.  Are you with me?

Andrew Hayek – Cross

1   A.   Yes.

2   Q.   That was a part of DaVita that arose as a result of an

3   acquisition that the company did in 2012; right?

4   A.   Correct.  It was a very large acquisition of kind of a

5   different line of business, not dialysis.  But HealthCare

6   Partners had a number of physician groups, primary care and

7   specialist groups, that basically took responsibility for the

8   total quality, the experience, and the total cost of healthcare

9   for their patients.  So they took responsibility for far more

10  than just primary care, but the overall health of their

11  patients they cared for.  So that was a big acquisition for

12  DaVita.

13  Q.   In contrast, this Lifeline vascular access issue was

14  something that you knew about when you became SCA's CEO in

15  2008 --

16          MS. LEWIS:  Objection, Your Honor.  Asked and

17  answered.

18          THE COURT:  Overruled.

19  BY MR. MELSHEIMER:

20  Q.   So I'm not finished with my question.  That's 2008.  2012,

21  you became aware of this additional opportunity that presented

22  itself after DaVita had acquired, in effect, thousands of

23  doctors who had access to thousands of patients who might end

24  up needing a surgery or two from SCA; fair?

25  A.   Correct.  When DaVita acquired HealthCare Partners, that

Andrew Hayek – Cross

1  was a very big deal, because that could be a very, very

2  important partner for SCA, HealthCare Partners alone.

3  Q.  After the acquisition of HealthCare Partners, there was so

4  much potential business opportunity between SCA and DaVita that

5  SCA actually considered selling itself to DaVita at one point;

6  right?

7  A.  That's correct.  You know, the -- of the ways to grow SCA

8  and make SCA successful, partnering with what is called

9  risk-bearing medical groups -- these physician groups that take

10  total responsibility for the quality of care and the cost of

11  healthcare -- became very important.  You know, surgery is

12  about 30 percent of all of healthcare spent, and so -- and

13  we're high quality, great patient experience.  And so it was a

14  perfect kind of partner for SCA.  And we contemplated selling

15  to DaVita.  And then we ultimately sold to the main competitor

16  to HCP, which is called Optum.  I say "we."  I no longer work

17  at SCA.  I haven't for years, so -- I still I guess am using

18  "we" in a historical sense here.

19  Q.  I want to talk about something on a personal level with

20  respect to the sale of SCA to Optum.  You had had some

21  extensive discussions with Mr. Thiry and DaVita about

22  potentially selling SCA to DaVita; right?

23  A.  Yes.  Mr. Thiry and I discussed over a number of months

24  DaVita acquiring SCA and kind of combining it or pairing it

25  with HealthCare Partners.

560

Andrew Hayek - Cross

1    Q.  I want to make sure we're not confused about the time frame

2    for this.  This is much later in your tenure at SCA.  Give us a

3    year when you think these discussions first started, even

4    preliminarily.

5    A.  I remember discussions about -- specifically about DaVita

6    acquiring SCA in 2015, bridging into 2016.  I'd have to think a

7    little harder whether the idea of that was discussed -- but I

8    remember, you know, very direct, you know, intensive

9    discussions in those time periods.

10   Q.  You didn't end up selling the company to DaVita; right?

11   A.  No, sir.  We sold it to Optum.

12   Q.  But that decision was hard for you on a personal level

13   because of your relationship with Mr. Thiry; right?

14   A.  Yes.  That was one part.  When we considered selling, there

15   were really two entities that we considered selling to.  And,

16   you know, DaVita was one, because of the HealthCare Partners

17   business and the fit.  The other was Optum, that had a similar

18   business to HealthCare Partners.  There was a lot of

19   physicians, and it makes a really good partner.  And, you know,

20   for a number of reasons, the Optum transaction made sense.

21        But I remember before we announced the Optum sale,

22   that I traveled around to meet with a few key people before we

23   announced it.  One of those stops was to see Mr. Thiry, to tell

24   him.  And I wasn't looking forward to that conversation because

25   I knew he would be disappointed.

Andrew Hayek - Cross

1    *Q.* You flew to meet him in his home, didn't you?

2    *A.* I did.

3    *Q.* You thought that was the right thing to do, given your

4    long-standing relationship and friendship; right?

5    *A.* I did. We were going to announce the deal on a Monday.

6    And the Saturday before we announced the deal, I made four

7    visits. Our medical mission partner -- we had a medical

8    mission partner in Honduras and the Dominican Republic, and I

9    went to see him first. And then two hospital system

10   partners -- our biggest hospital system partners. And then I

11   went to Mr. Thiry's house.

12   *Q.* He didn't make you do that, did he?

13   *A.* No. I think he was a bit curious as to why I asked for a

14   last-minute, sudden meeting. And I think when he opened the

15   door, he said, "I hope you're not selling to Optum."

16   *Q.* And it turns out you were?

17   *A.* Yes.

18   *Q.* Okay. But I guess the question in my mind, sir, is that

19   you -- you felt that was the right thing to do, given your

20   relationship with Mr. Thiry. That not just was related to the

21   Optum sale, but the entire scope of your relationship with him,

22   dating back to when you started as a relatively young executive

23   at SCA; fair?

24   *A.* Yes. I think it was part of being respectful in a

25   relationship and also to an important business partner. We

562

Andrew Hayek - Cross

1    still wanted to partner with HealthCare Partners and work with

2    them, and so it was both.

3    Q.   And, Mr. Hayek, we've seen some emails where Mr. Thiry

4    wasn't particularly nice to you and anger and frustration and

5    sadness that you said he was expressing.  But the fact of the

6    matter is, you viewed Mr. Thiry, in spite of the pros and cons

7    and his flaws and otherwise, as a mentor to you; true?

8    A.   Yes.  Mr. Thiry -- you know, he hired me as a young

9    executive.  And, you know, he took a chance and gave me, you

10   know, a responsibility and, you know, provided guidance and

11   mentorship at various points over a number of years.

12   Q.   He took a chance on you, didn't he?

13   A.   Yes, he did.

14   Q.   And it's paid off?

15   A.   I --

16   Q.   I just mean for you personally.  You've been a success in

17   your career; fair?

18   A.   I think -- I think I've been blessed.  You know, I was at

19   DaVita only for 15 months.  And when I got hired at SCA, it was

20   from somebody who knew me from my job before DaVita, so I'm not

21   sure that DaVita experience itself led to my SCA opportunity.

22   But I learned a number of things, a number of, you know, very

23   powerful, positive things.  And then I -- you know, I've

24   subsequently left SCA -- that's been a number of years -- and

25   I've started my own firm with a partner, so I'm in a different

Andrew Hayek - Cross

1   part of healthcare that doesn't really overlap at all with

2   DaVita or Mr. Thiry.  But, you know, it -- I'm grateful.  I

3   would put it that way.  I'm grateful.

4   Q.  And when I said it paid off, sir, just so we're

5   communicating, I didn't mean to suggest that the -- the time

6   you spent at DaVita was what paid off.  What I meant was, is

7   that time and the subsequent mentoring and relationship

8   building that he's done with you, you view that as a very

9   positive thing for your career; fair?

10  A.  Yes.  I've had a number of mentors, and I'm grateful, and

11  you learn from everybody you work with.

12  Q.  I want to go back in time to about 2011.  Are you with me?

13  A.  Yes.

14  Q.  And at -- you talked about this yesterday.  But in 2011,

15  you said that you, SCA, and DaVita were -- that was a period of

16  time you were hoping in your mind to be able to partner them in

17  connection with this Lifeline business, this vascular access

18  business; right?

19  A.  Can you remind me of the year again, sir?

20  Q.  Well, I'm focusing on 2011 because of the -- the whole

21  Mr. Luther situation I want to talk about.  But just to ground

22  you -- I'm sorry.  That was a terrible question.  Your thought

23  about partnering with DaVita and Lifeline predates 2011; right?

24  A.  Yes.

25  Q.  But I want to focus on 2011, with the hiring of Mr. Luther.

Andrew Hayek - Cross

 1    Mr. Luther had worked at DaVita, right, before he came to SCA?

 2    A.   Yes.  Mr. Luther had worked at DaVita earlier in his

 3    career, and I believe had done one or two things, and then SCA

 4    hired him.  So he had worked at DaVita but didn't go directly

 5    from DaVita to SCA.

 6    Q.   And then he worked at SCA for a while, and then he was

 7    recruited back to come to DaVita; true?

 8    A.   Correct.  Mr. Luther was a regional vice president, so led

 9    a handful of surgery centers.  And then he was recruited, I

10    believe, to Lifeline.

11    Q.   The concern you had with respect to Mr. Luther's hiring

12    into the Lifeline business was that that might make it --

13    possibly make it less likely that SCA and DaVita would partner

14    in that line of business; true?

15    A.   I think that was one possibility that it raised.

16    Mr. Luther had learned the surgery center business by working

17    at SCA.  And our hope was that DaVita would partner with SCA

18    for the surgical procedures dialysis patients needed.  One

19    possibility was, would Mr. Luther go over to DaVita and replace

20    the need to partner with SCA?  So, you know, reduce or

21    eliminate that opportunity to partner in a business -- business

22    terms.

23    Q.   So with respect to the Lifeline business opportunity or any

24    other business opportunity, you knew that any chance of a

25    successful business relationship between SCA and DaVita

Andrew Hayek – Cross

1  depended at least in part on maintaining good relations with

2  Mr. Thiry; true?

3  A.  That's true.  I think if I didn't have a good relationship,

4  it would be very hard to -- especially if a negative

5  relationship, it would be very hard to partner at a business

6  level.

7  Q.  To be clear, that's true about most companies and most

8  CEOs; right?

9  A.  I think it's generally true.  And each company and CEO has

10  different things that they care about.  But having a good

11  relationship is very important.

12  Q.  Because if the two people at the top don't have a good

13  relationship, it might mean that the business opportunities

14  between the two companies, possibly won't go anywhere?

15  A.  I think that's true, especially when you're partnering or

16  joint venturing or combining in some way to co-own a business.

17  Often it takes a relationship at the top, and the CEOs are kind

18  of the ambassadors with that relationship at the top.  And they

19  set the tone and kind of encourage the team to work together on

20  the business.  And especially partnerships that take a lot of

21  time to develop or have fits and starts, and they need a nudge

22  from the top, I think that's true.

23  Q.  With respect to these companies that might be strategic

24  business partners of SCA, you had a policy of not aggressively

25  recruiting within the ranks of those potential business

Andrew Hayek - Cross

1    partners; true?

2    A.   I don't think we had a policy in so many words; but, yeah,

3    that was something, though, that when it came up, you know, we

4    were cautious and super thoughtful about recruiting from a

5    large partner.

6    Q.   Let's take a look at some of the strategic partners that

7    the company has identified.

8             If we could pull up Defense Exhibit A172.

9             Your Honor, this is an SCA presentation deck, or

10   portion of it.  I offer it.

11            MS. LEWIS:  No objection.

12            THE COURT:  Admitted.

13            (Exhibit A172 admitted.)

14            MR. MELSHEIMER:  So if we could go to the title there

15   on page 4.

16   BY MR. MELSHEIMER:

17   Q.   It says, "SCA's leading the market in developing and

18   implementing value-centric surgery strategies" -- surgery

19   strategies -- say that three times -- "in partnership with

20   health plans and medical groups."  Do you see that?

21   A.   I do.

22   Q.   To be fair, this is a 2015 document; right?

23   A.   Correct.  I believe so.

24   Q.   But this represents the strategy of SCA long before 2015;

25   true?

Andrew Hayek – Cross

1   *A.*   Yes.  We started to partner with medical groups like Optum

2   or HealthCare Partners, health plans, meaning insurance

3   companies, and hospital systems; and that strategy predates

4   2015.

5   *Q.*   Predates 2012; doesn't it?

6   *A.*   Yes.  I believe we began, for example, with Optum in 2011

7   and may have pitched HealthCare Partners in that time frame, as

8   well.  2011.  So –– I'm not sure about the payor timing.  That

9   might be 2011, 2012.

10  *Q.*   We're going to get to this in a minute, but you mentioned

11  in 2011 you were discussing –– SCA was discussing partnering

12  with HealthCare Partners?

13  *A.*   You said in 2011?

14  *Q.*   I thought that's what you said.

15  *A.*   Yeah.

16  *Q.*   In 2011.

17  *A.*   I believe so.

18  *Q.*   And that was at the time when it was called HealthCare

19  Partners before DaVita purchased it in 2012; correct?

20  *A.*   Yes.  I believe so.  And I think the discussion was focused

21  on the Nevada market for HealthCare Partners.

22  *Q.*   You already had some connection with this HealthCare

23  Partners entity as a potential business opportunity before

24  DaVita bought the company in 2012; true?

25  *A.*   I believe so.

Andrew Hayek - Cross

1    Q.  Just so there is no confusion, then DaVita changed its name

2    for a while to DaVita HealthCare Partners; right?

3    A.  Correct.  It became known as DaVita HealthCare Partners I

4    think for -- I'm guessing, five or six years.

5    Q.  That's what we see on this chart here, don't we, sir, as

6    one of the strategic partners between -- strike that.  What we

7    see here is DaVita identified as one of the strategic partners

8    of Surgical Care Affiliates; true?

9    A.  Correct.

10   Q.  Alongside with companies like CIGNA, United, the Austin

11   Regional Clinic.  Is that in Austin, sir?

12   A.  It is in Austin.

13   Q.  I want to go back.  You mentioned this HealthCare Partners

14   opportunity in Nevada?

15   A.  Yes.

16           MR. MELSHEIMER:  Can we go to Defense Exhibit B441.

17           Your Honor, this is a SCA presentation.  I offer it.

18           MS. LEWIS:  No objection, Your Honor.

19           THE COURT:  Admitted.

20           (Exhibit B441 admitted.)

21   BY MR. MELSHEIMER:

22   Q.  To set the timing, sir, this is August 29, 2011?

23   A.  Yes.

24   Q.  Right?  There is a discussion between HealthCare Partners

25   and Surgical Care Affiliates about some opportunities in the

1   Nevada region or location of HealthCare Partners; right?

2   A.  Correct.

3   Q.  Very briefly, because we're going to go through a lot of

4   these things, can you very briefly tell me just generally what

5   this opportunity was, as best you can recall.

6   A.  As I shared earlier, HealthCare Partners owned physician

7   groups, primary care, other specialties.  And those physician

8   groups basically were like small insurance companies, where

9   they took the total responsibility for the quality of care, the

10  outcomes, the patient experience, the total cost of HealthCare

11  Partners for the patients that they served.

12          Real simply, traditionally, primary care, you know,

13  you come in, you have your visit, you're in and out, and that

14  primary care physician gets paid per visit.  At HealthCare

15  Partners' standpoint, they were responsible for your total

16  health.  So if you ended up in the emergency room or the

17  hospital, that's something they were responsible for.  And so

18  they would invest a lot in trying to keep you healthy and being

19  open and open all week and weekends.  They do a lot of things

20  to try to help their patients.  One thing they could do is, you

21  know, identify the patients who are eligible for a surgery

22  center procedure and refer them there.  And so that made a very

23  good partner to us.  That's the general nature, and that is

24  what is going on here in Nevada, is proposing that kind of

25  partnership.

1          MR. MELSHEIMER:  If we can go to page 51 of

2     Exhibit 442.

3          I'm sorry, Your Honor.  I thought I had offered 442.

4     442 is a presentation to the SCA board of directors in December

5     of 2011.

6          MS. LEWIS:  No objection.

7          THE COURT:  Admitted.

8          (Exhibit B442 admitted.)

9     BY MR. MELSHEIMER:

10    Q.  Do you recognize this, sir, as a board of directors meeting

11    agenda for December 2011 in Dallas?

12    A.  Yes.

13         MR. MELSHEIMER:  And if we could go to page 51 of that

14    exhibit, sir.

15    BY MR. MELSHEIMER:

16    Q.  This is a presentation that was given to the board about

17    business opportunities that were in the pipeline, so to speak;

18    right?

19    A.  Yes.  These are in particular health system opportunities,

20    hospital system opportunities.

21    Q.  Health systems currently on SCA's pipeline, anticipated to

22    produce revenue within twelve months.  One of them was a

23    HealthCare Partners operation in Torrance, California; true?

24    A.  Yes.

25    Q.  And about six months later, after this board of directors

Andrew Hayek - Cross

1   meeting, that's when DaVita acquired HealthCare Partners;

2   right?

3   A.  Yes.  I believe DaVita acquired HealthCare Partners in the

4   summer of 2012.  So I can't say exactly how many months, but

5   roughly, you know, six, seven, eight months later.

6   Q.  Now, the document that you pointed to, Mr. Hayek, for the

7   starting point for your agreement with Mr. Thiry around

8   recruiting is defense -- well, it's admitted, but -- as B464.

9   Correct?

10          THE COURT:  It's already admitted under a different

11   number?

12          MR. MELSHEIMER:  I think it is, Your Honor.  But if

13   it's not, I offer B464.

14          MS. LEWIS:  I believe it is.  No objection if he wants

15   to introduce it.

16          MR. MELSHEIMER:  May it please the Court.  Your Honor,

17   we'll straighten out any duplication of exhibits before the

18   exhibits go to the jury, with the Court's permission.

19          THE COURT:  For now, 464B is admitted.

20          (Exhibit B464 admitted.)

21   BY MR. MELSHEIMER:

22   Q.  So this is an email from Mr. Thiry to you at the end of

23   January 2012?

24   A.  Yes.  It begins at the end of January and extends into

25   February.

Andrew Hayek - Cross

1   Q.  And he says at the end, "I will book a call with you, but I
2   am glad we are launching a strategic conversation regarding our
3   vascular access centers."  Right?
4   A.  Yes.
5   Q.  Now, you respond, "Neither Michael nor I are aware of
6   discussions on vascular access.  However, we're open to
7   thinking through the options."  Is that right?
8   A.  Yes.
9   Q.  Now, you weren't personally involved in all of the
10  discussions that were going on between DaVita and SCA on this
11  issue; right?
12  A.  No.  There would be periods of time where our teams, you
13  know, and DaVita's teams, you know, not at the CEO level would
14  be in discussions.  There are also times where the discussions
15  kind of went dormant and needed to be reignited.  So both.
16  Q.  Just so we're clear, you're not questioning Mr. Thiry's
17  statement that discussions were being launched regarding a
18  strategic conversation regarding vascular access; right?
19          MS. LEWIS:  Objection, Your Honor.  Asked and
20  answered.
21          THE COURT:  Overruled.
22          THE WITNESS:  I don't question it.  I think I
23  acknowledge it.  I'm not aware of the -- you know, the --
24  whatever the current conversations were.  So, no, I don't --
25  you know, I don't argue with it.

Andrew Hayek - Cross

1    *BY MR. MELSHEIMER:*

2    Q.  You and Mr. Thiry discussed the significance --

3              If we can go to his top email.

4              -- the significance of how SCA and DaVita might work

5    together, given our related businesses; right?

6    A.  Yes.  I think the opportunity to partner vascular access

7    was not new to me.  I think, you know, he was kind of

8    reigniting it and, you know, kind of repushing it.  So I don't

9    disagree with it.

10   Q.  You say it was not new to you, because you were thinking

11   about the vascular access opportunity, really, as early as

12   2008; right?

13   A.  Yes.  As I shared, you know, when I was at DaVita, I was

14   familiar with Lifeline.  I worked down the hall from Lifeline.

15   I don't know if it's in, you know, 2008 or '9 or '10, but, you

16   know, early in my SCA tenure, you know, the opportunity to

17   partner on these vascular access procedures was, you know -- it

18   was apparent to me and something we thought about.  And I think

19   the same is true for Michael Rucker.

20   Q.  Mr. Hayek, you and -- we've gone over a few emails

21   between you and Mr. Thiry.  But during the time period between

22   2012 and 2017, there were hundreds if not thousands of

23   communications between the two companies related to business

24   opportunities; fair?

25   A.  I don't know the count, but it wouldn't surprise me that

Andrew Hayek - Cross

1   it's hundreds, easily.  Thousands, quite possibly.  Because,

2   you know, for a while, I mean, I had at least a standing

3   monthly call on various partnerships.  So it was one of the

4   more common standing interactions I had.

5   Q.  You thought -- you spent a lot more time thinking and

6   strategizing about these business opportunity issues than you

7   did with respect to any issue regarding recruiting between the

8   two companies; is that fair?

9   A.  Yes.  The -- the business opportunities would be -- could

10  be weekly, it could be multiple times in a week.  Intense

11  meetings and multiple geographies and cities and traveling and,

12  you know -- I recall the recruiting coming up maybe two or

13  three times a year, you know.  So the business was much more

14  intense and focused.

15          MR. MELSHEIMER:  Your Honor, I'm about to move into

16  some specific business discussions.  Is this a good time for a

17  break, or would the Court like me to proceed?

18          THE COURT:  We can do that.

19          How long would you like, ladies and gentlemen?  15?

20  Okay.  10:45.

21          (Recess at 10:29 a.m.)

22          (In open court at 10:47 a.m.)

23          MR. MELSHEIMER:  May it please the Court.

24  BY MR. MELSHEIMER:

25  Q.  Mr. Hayek, with respect to the Lifeline potential

Andrew Hayek - Cross

1   relationship between SCA and DaVita, does the fact that there

2   are no formal presentations or PowerPoints exchanged between

3   the companies prior to February of 2012 -- that doesn't mean

4   that it wasn't a real opportunity; right?

5   A.  Correct.  And I don't know -- I don't recall whether there

6   were PowerPoints or not.  But correct.

7   Q.  Because what we're really focused on here is what was in

8   your mind; right?

9   A.  Yes, I assume so.

10  Q.  And one of the things that was in your mind was this

11  Lifeline opportunity of partnering with DaVita; true?

12  A.  True.

13  Q.  One of many things.

14  A.  One of a number, yes.

15          MR. MELSHEIMER:  Okay.  Let's take a look at Defense

16  Exhibit A265.

17          Your Honor, this is an email from Mr. Thiry to

18  Mr. Hayek.  We offer it.

19          MS. LEWIS:  I cannot see it on our screen.

20          We would object as hearsay.

21          MR. MELSHEIMER:  Your Honor, I believe it's an

22  exchange between the two executives.  Qualifies as a business

23  record, in any event.  It's also offered of the fact of the

24  communication and the effect on the reader.

25          THE COURT:  Objection is overruled.  The document is

Andrew Hayek – Cross

1    admitted.

2              (Exhibit A265 admitted.)

3    *BY MR. MELSHEIMER:*

4    *Q.*  This is an email from you to Mr. Thiry in December of 2012,

5    sir?

6    *A.*  Yes.

7    *Q.*  What is the subject matter of the follow-up?

8    *A.*  Discussions with HealthCare Partners regarding partnering.

9    *Q.*  This is subsequent to DaVita having acquired HealthCare

10   Partners; right?

11   *A.*  Correct.

12   *Q.*  When we see HCP, those initials, in the email, we're

13   talking about HealthCare Partners, typically; correct?

14   *A.*  Correct.

15   *Q.*  You mentioned various opportunities, one in Long Beach.

16   You mentioned, "We are developing an ASC with MemorialCare.

17   HCP acquired a small ASC through its acquisition of Jones

18   Medical Group."  What's -- so ASC is ambulatory surgery center?

19   *A.*  Yes.  Just means a surgery center, SCA's core business.

20   *Q.*  Just very briefly, what is happening here?  Why is this an

21   opportunity for the two companies?

22   *A.*  We have a surgery center right in the backyard of one of

23   HealthCare Partners' physician groups.  There is a partnership

24   opportunity in that surgery center.

25   *Q.*  What does Mr. Thiry respond?

Andrew Hayek – Cross

1  A.  "Got it.  Understood.  Let me do a little bit of talking,"

2  meaning, let me discuss it more with my team.

3  Q.  Is it your understanding that by this time DaVita was

4  getting up and running with these various HealthCare Partners

5  assets and looking for ways to expand the business; true?

6  A.  Yes.  They had just acquired them and were looking at all

7  of the different avenues they had to grow.

8        MR. MELSHEIMER:  Let's take a look at exhibit --

9  Defense Exhibit A284.  This is an email exchange between

10  Mr. Thiry and Mr. Calhoun.  And then later --

11        MS. LEWIS:  We object, Your Honor.  Mr. Hayek does not

12  appear to be on this email.  Object as hearsay.

13        MR. MELSHEIMER:  I may have the wrong email, Your

14  Honor.  I believe -- I believe 284 is an email from

15  Mr. Hayek -- it's a string that includes Mr. Hayek.  So we

16  offer it, Your Honor.

17        THE COURT:  All right.  Well, give me a second to read

18  it.

19        Scroll for me, please.  I can't scroll it.

20        Objection sustained.

21  BY MR. MELSHEIMER:

22  Q.  Mr. Thiry -- Mr. Hayek, you became aware that Mr. Thiry

23  took your proposal to his team at HealthCare Partners; correct?

24  A.  I believe he did.  And we were having discussions with the

25  team and I with Mr. Thiry to kind of keep prompt and moving

1    them forward.

2    *Q.*   And you put Mr. Goran Dragolovic on point for SCA; right?

3    *A.*   Correct.  For this particular partnership, in this market.

4    *Q.*   This idea generally of partnering between SCA and these

5    individual medical practices that DaVita now owned throughout

6    the country was a great opportunity for SCA to grow its

7    revenue; true?

8    *A.*   True.

9    *Q.*   Just so we're clear, HealthCare Partners had doctors'

10   offices, in effect, practices all over the United States;

11   right?

12   *A.*   In a number of markets across the country.

13   *Q.*   And anywhere there was a HealthCare Partners group of

14   doctors, that presented an opportunity for SCA to become the

15   provider of choice for when those patients of those doctors

16   needed surgery; right?

17   *A.*   Correct.

18   *Q.*   You didn't do all kinds of surgeries at ambulatory surgery

19   centers; right?

20   *A.*   We didn't do every kind of surgery.  There are some that

21   you really need to be in a hospital for, but most can be done

22   very safely in a surgery center.

23            *MR. MELSHEIMER:*  Let's go to Defense Exhibit A282.

24   Your Honor, this is an email from Mr. Hayek to Mr. Thiry later

25   in 2013.  We offer it.

Andrew Hayek – Cross

1            MS. LEWIS:  We'd also object as hearsay.

2            THE COURT:  Objection is overruled.  It's admitted.

3            (Exhibit A282 admitted.)

4    BY MR. MELSHEIMER:

5    Q.  Mr. Hayek, this is an email from you to Mr. Thiry,

6    forwarding at Kent's request, Anthem.  Now, is this yet a

7    different potential business opportunity, between the two

8    companies?

9    A.  Could you scroll out again just so I see the full email?

10           It's a reference both to connecting Mr. Thiry to

11   someone at a big Blue Cross Blue Shield plan -- so health

12   insurance -- as well as a reference to HealthCare Partners.

13   Q.  How would that have benefited DaVita?

14   A.  The connection to the large Blue Cross Blue Shield plans?

15   Q.  Yes, sir.

16   A.  The individual I connected them to does strategic

17   partnerships on behalf of Blue Cross Blue Shield.  And I

18   thought there would be a number of ways that DaVita as well as

19   HealthCare Partners could collaborate with Blue Cross Blue

20   Shield.

21   Q.  How does it benefit SCA?

22   A.  It's part of building a relationship.

23   Q.  There is a reference in here to -- you say, "KT, great to

24   hear about the progress with Anthem.  I also heard today that

25   we are signing an NDA with HCP to get more serious at looking

580

Andrew Hayek - Cross

1   at optimizing surgery with them."  What is an NDA, sir?

2   A.  A nondisclosure agreement.

3   Q.  How does a nondisclosure agreement -- how is that part of

4   getting more serious at looking at optimizing surgery with HCP?

5   A.  It's a step in the process of partnering.  You know, you

6   discuss, you discuss.  When you get to an NDA, you're getting

7   more formal, you're sharing more information; so it's a step in

8   the partnering process.

9   Q.  That's a step that SCA took with DaVita so that the two

10  companies could share confidential information and potentially

11  make progress towards signing a formal deal; right?

12  A.  Correct.

13  Q.  Doesn't always happen that a deal gets signed; right?

14  A.  Correct.

15  Q.  But the NDA is a show of good faith and interest by both

16  sides; fair statement?

17  A.  Yes.

18  Q.  You don't go to the trouble of signing a nondisclosure

19  agreement and exchanging a bunch of information if it's just

20  for show; right?

21  A.  Not in my experience.

22  Q.  Are you familiar that -- are you aware that SCA started

23  signing these NDAs with various DaVita HealthCare Partners

24  groups throughout 2013?

25  A.  I'm generally aware that we were talking to HealthCare

581
Andrew Hayek - Cross

 1   Partners in a number of markets across the country.  Couldn't

 2   say exactly which ones had NDAs in 2000 -- in any given year.

 3          MR. MELSHEIMER:  Let's take a look at Defense Exhibit

 4   A272.

 5          Your Honor, this is an email from Mr. Hayek to

 6   Mr. Thiry on May 23, 2013, regarding an idea.

 7          MS. LEWIS:  Objection.  Cumulative.

 8          THE COURT:  Overruled.  It's admitted.

 9          (Exhibit A272 admitted.)

10          MR. MELSHEIMER:  Is it -- is it admitted, Your Honor?

11   I'm sorry.  I didn't hear the Court.

12          THE COURT:  Yes.

13          MR. MELSHEIMER:  Thank you, Your Honor.

14   BY MR. MELSHEIMER:

15   Q.  So this is an email from you to Mr. Thiry in May.  You say,

16   "KT, do you want to discuss when we meet on June 7 or set up a

17   call sooner to discuss vascular access ASCs?  I'm very open in

18   general to thinking about partnership models, opportunities.

19   As you would imagine, a lot depends on the details.  Let me

20   know how best to proceed."

21          What do you mean there?

22   A.  Well, in this email, Mr. Thiry is suggesting an

23   additional partnership model between Lifeline and SCA.  So it's

24   a -- it's an additional and new way to partner that would

25   involve converting Lifeline centers to surgery centers.  So

1    this is a discussion about very open to that.

2    Q.   You made plans to work with Mr. Thiry on two parallel

3    paths; is that correct?

4    A.   Correct.

5    Q.   Let's take a look at that.  This is an email from you to

6    Mr. Thiry in September of 2013, where you say, "Sorry for the

7    delay in responding.  The past few weeks have been particularly

8    hectic."  Do you see that?

9    A.   Yes.

10   Q.   It's correct, sir, that you had a lot going on as the CEO

11   of SCA; right?

12   A.   Yes.

13   Q.   Sometimes there would be large gaps of time between these

14   conversations about potential business opportunities; right?

15   A.   Correct.

16   Q.   That -- those gaps did not reflect a lack of interest by

17   you on behalf of SCA; right?

18   A.   No.  It would often be because of other things or the teams

19   making certain progress or you have to go through certain steps

20   on your side.

21   Q.   Certainly, you didn't interpret delays from DaVita as any

22   kind of sign of insincerity or lack of interest or anything

23   like that; right?

24   A.   No.  Generally not.

25   Q.   So you say, "I would suggest two steps."  And what are

Andrew Hayek - Cross

1   those two steps, sir?

2   *A.*   That we connect at the HealthCare Partners leadership

3   level, meaning, the leadership team for HealthCare Partners

4   that would report up through Mr. Thiry.  And then, similarly,

5   set up a call on vascular access or Lifeline.  So two steps.

6   *Q.*   So we've got two different sort of opportunities; right?

7   *A.*   Correct.

8   *Q.*   We've got the -- I'm going to use these words and you tell

9   me if this is right.  We've got the broader opportunity with

10  all of these physician groups that DaVita has now put under

11  their umbrella.  And that was a potentially great opportunity

12  for your surgery centers; right?

13  *A.*   Yes.

14  *Q.*   Then the second issue was, DaVita's sort of core business

15  of kidney care and this vascular access opportunity, where you

16  might be able to provide surgery centers to perform those

17  procedures for dialysis patients?

18  *A.*   Correct.

19  *Q.*   We see these conversations starting in 2013 on this --

20  strike that.  We see this email string starting in 2013.  And

21  it looks -- does it look like to you that things are really

22  starting to pick up steam?

23  *A.*   Yes.  I think -- that's generally true.

24  *Q.*   I want to switch to a different relationship, sir.  This is

25  the Arcadia partnership.  Are you familiar with Arcadia?

Andrew Hayek – Cross

1          MS. LEWIS:  Objection, Your Honor.  I don't know what

2   the relevance of agreements that are post-dating the agreement

3   that was entered in 2012.

4          MR. MELSHEIMER:  So, Your Honor, object to the

5   sidebar.  But I think it is relevant for the reasons the Court

6   has previously stated to the parties' intent --

7          THE COURT:  I don't know why it's relevant.  I have no

8   idea.  So if you want to argue that, come on up.

9          (Hearing commenced at the bench.)

10          THE COURT:  I don't know what this Arcadia is all

11   about.

12          MR. MELSHEIMER:  It's just another example of a

13   business relationship between the two companies that was being

14   discussed during the time period that the alleged conspiracy

15   was going on.

16          THE COURT:  She says it's after the time period.

17          MR. MELSHEIMER:  It's not.

18          MS. LEWIS:  It's absolutely after the time period of

19   when they entered the agreement.  They entered the agreement in

20   2012.  What was relative to their intent at the time they were

21   entering this agreement had nothing to do with Arcadia or any

22   of the joint ventures that happened in the years that followed.

23          And he testified further on direct that the no-poach

24   was not entered into as part of any of these business

25   transactions.

Andrew Hayek - Cross

1          MR. MELSHEIMER:  Your Honor, that's not our point.

2     We're not arguing the formal ancillary point.  We're arguing

3     that -- and I believe this witness has testified -- that there

4     were numerous business opportunities between the companies and

5     that part of the reason for not wanting to be aggressively

6     soliciting were these business opportunities and keeping

7     Mr. Thiry -- keeping a good relationship with Mr. Thiry.  This

8     is another example of that.  And I think it's 2013.

9          The conspiracy period is 2012 to 2017.  They say they

10    have -- they say they're doing that all throughout that time.

11    I think I'm entitled to bring up anything during that time

12    period.  The weight of it is up to the jury to decide.  They

13    can argue it's not relevant, but I think it's appropriate for

14    us to get into.

15         MS. LEWIS:  I think if Mr. Melsheimer intends to go

16    through every single email, every single business transaction,

17    we will not be closing by Friday.

18         THE COURT:  I think this is getting a little bit

19    tedious.

20         MR. MELSHEIMER:  Well, Your Honor, you don't think

21    it's tedious for me?  I mean, it is tedious.  But part of the

22    problem is they won't stipulate to these records coming in.

23    Now, what I've got -- I've got -- as you can see there, I've

24    got two binders of exhibits for which we have 901

25    certifications.  I would love to simply enter those into

Andrew Hayek - Cross

1    evidence, and we can cut this down to about 30 minutes.

2         *MS. LEWIS:*  Your Honor, Mr. Melsheimer --

3         *THE COURT:*  Thirty minutes?

4         *MR. MELSHEIMER:*  Of new topics, Your Honor.  I'm

5    saying that would conclude this topic, and I can move on to

6    finish --

7         *THE COURT:*  Well, they're not going to do that.

8    Objection is overruled.

9         Go ahead and be tedious.  You're losing your steam,

10   Mr. Melsheimer.

11        *MR. MELSHEIMER:*  You don't think I know that, Your

12   Honor?

13        *THE COURT:*  In case you didn't.

14        *MR. MELSHEIMER:*  Thank you, Your Honor.

15        (Hearing continued in open court.)

16        *THE COURT:*  All right.  That objection is overruled.

17        *MR. MELSHEIMER:*  I believe the objection was to a

18   question, not to an exhibit, Your Honor; so I'm going to

19   restate the question.

20   *BY MR. MELSHEIMER:*

21   Q.  In around the fall of 2013, did SCA and DaVita HealthCare

22   Partners begin discussing a partnership with something called

23   Arcadia?

24   A.  I believe in approximately that time frame.

25   Q.  Can you tell the jury briefly what Arcadia is.

Andrew Hayek - Cross

1    *A.*  Arcadia is a surgery center in the Los Angeles region.

2    *Q.*  And why was it an opportunity for the two companies to

3    partner?

4    *A.*  Similar to what we've been talking about here this morning,

5    it's a surgery center that is right in the backyard of a

6    HealthCare Partners physician group.

7    *Q.*  Did you also enter into a nondisclosure agreement with

8    respect to the Arcadia transaction?

9    *A.*  I believe we did.

10   *Q.*  Did the negotiations with respect to this Arcadia

11   partnership continue into 2014?

12   *A.*  Yes, I believe they did.

13   *Q.*  I'm going to --

14            I'd like to turn your attention, Mr. Hayek, to Defense

15   Exhibit 264, which is an email from Mr. Hayek to Mr. Thiry in

16   January of 2014.

17            I offer it, Your Honor.

18            *THE COURT:*  I assume you mean A264?

19            *MR. MELSHEIMER:*  A264.  Yes, Your Honor.

20            *MS. LEWIS:*  No objection.

21            *THE COURT:*  It's admitted.

22            (Exhibit A264 admitted.)

23   *BY MR. MELSHEIMER:*

24   *Q.*  So this is a "checking in," subject matter.  Do you see

25   that, sir?

Andrew Hayek - Cross

1    A.   Yes.

2    Q.   Was it common for you to check in with Mr. Thiry by email

3    on the various business opportunities between the two

4    companies?

5    A.   Yes.

6    Q.   Did you sometimes check in by telephone?

7    A.   Yes.

8    Q.   Were the telephone conversations memorialized in any way

9    other than your memory and Mr. Thiry's memory?

10   A.   Typically not.

11   Q.   You say to him, "KT, I hope all is well and your year is

12   off to a strong start.  I've asked my assistant to reach out to

13   your office to try to find a time."  And then you say, the

14   second paragraph, "I would like to check in with you regarding

15   an initial partnership opportunity for HCP and SCA."  And then

16   you talk about Arcadia.  What is going on here?

17   A.   It's a reference to what we talked a few minutes ago.

18   Arcadia is a surgery center we have in the Los Angeles area.

19   And there is a big HealthCare Partners physician group, and

20   we're hoping to partner.

21   Q.   Eventually, that Arcadia deal became a go; correct?

22   A.   Yes.

23   Q.   And that led to discussions of broader partnership

24   opportunities in Las Vegas, in Phoenix, and other locations

25   around these physician practices; right?

Andrew Hayek - Cross

1   *A.*  Yeah.  I believe we were talking about other markets at the

2   same time we were doing Arcadia, so they were happening in

3   parallel.

4           *MR. MELSHEIMER:*  Just one moment, Your Honor.

5   *BY MR. MELSHEIMER:*

6   *Q.*  I want to return to Defense Exhibit 005, which I think has

7   a corresponding government exhibit.  And this is this email

8   from Mr. Thiry to you --

9           It's admitted, Your Honor.

10          -- with respect to proactive -- "I do not do proactive

11  recruiting into your ranks," right?

12          *THE COURT:*  I don't think it's admitted, and I think

13  you're referring to A005.

14          *MR. MELSHEIMER:*  A005.

15          *THE COURT:*  It's not admitted in my book.

16          *MS. LEWIS:*  The duplicate from the government exhibit

17  is admitted, Your Honor.

18          *MR. MELSHEIMER:*  GX46, Your Honor, with an assist.

19          *THE COURT:*  Well, it would be wonderful if you would

20  just use one exhibit per exhibit.

21          *MR. MELSHEIMER:*  We're going to do that going forward,

22  Your Honor.

23          *THE COURT:*  But I'll give you A005, just to save time.

24          *MR. MELSHEIMER:*  Thank you, Your Honor.

25          (Exhibit A005 admitted.)

Andrew Hayek - Cross

1  *BY MR. MELSHEIMER:*

2  *Q.*  This is this, "I explained, I do not do proactive

3  recruiting into your ranks"?

4  *A.*  Yes.

5  *Q.*  Now, this is in October 2014.  But, of course, if we look

6  at an email from September 2014 from you to Mr. Thiry --

7          Which I'd like to pull up as Exhibit A280, Your Honor,

8  and offer it.

9          *THE COURT:*  A28?

10         *MR. MELSHEIMER:*  A280, Your Honor.  An  email string

11  between Mr. Hayek and Mr. Thiry.

12         *MS. LEWIS:*  No objection, Your Honor.

13         *THE COURT:*  All right.  Admitted.

14         (Exhibit A280 admitted.)

15  *BY MR. MELSHEIMER:*

16  *Q.*  So this is October 11, 2014.  And, Mr. Hayek, you say to

17  Mr. Thiry, as you called him, KT.  "All is well here.  Arcadia

18  either closed on Friday or should close early next week."  Is

19  that the Arcadia deal we've been talking about?

20  *A.*  Yes.

21  *Q.*  And you mentioned that you look forward to other

22  opportunities in Vegas and Phoenix; right?

23  *A.*  Correct.  We're working on those opportunities with members

24  of the team.

25  *Q.*  Mr. Thiry then responds to you --

Andrew Hayek - Cross

1           This is also 280 -- let me back up, Your Honor.  I'm

2    sorry.  I had my strings wrong here.

3           Let's go to the bottom of this email.  This is in

4    September of 2014.

5           He says to you, "Just learned that Sherif and Bob met

6    with you guys as part of wrapping up" -- and he said Acadia,

7    but it's Arcadia; right?

8    A.   Correct.  And it's Dr. Sherif Abdou.

9    Q.   And he says, "And you guys also talked about broader stuff.

10   Jim will be joining in and as our head of strategy is on point

11   for nailing down our overall analytical and strategic paradigm

12   for how to use ASCs now and in the future."  What did you

13   understand that to mean?

14   A.   Well, that Mr. Jim Rechtin, who is the chief of strategy

15   for DaVita at the time, would be on point in looking across

16   markets at various surgery center, HealthCare Partners

17   partnerships.

18           MR. MELSHEIMER:  Just trying to speed things up, Your

19   Honor.

20   BY MR. MELSHEIMER:

21   Q.   What was the -- can you give the jury a sense of the

22   financial size of the Arcadia deal and what it might have meant

23   to DaVita and what it might mean to SCA?

24   A.   I'm guessing, for a specific surgery center deal like

25   Arcadia, it would depend a lot about how many of the surgeries

Andrew Hayek – Cross

1    could shift to Arcadia.  But, you know, the benefit to DaVita

2    might be in the millions of dollars per year for that one

3    instance -- that one partnership.  And for SCA, could be a

4    million or more.

5    Q.  So by the end of 2015, sir, is it fair that these business

6    negotiations and discussions actually ended up including a

7    discussion between you and Mr. Thiry about you being recruited

8    back to DaVita?

9    A.  Yes.  There was a discussion of that in, I believe, late

10   2015.

11   Q.  And at the end of 2015, you addressed -- you wrote an email

12   to the SCA board of directors about Mr. Thiry recruiting you to

13   become the CEO of DaVita HealthCare Partners?

14   A.  Yes.  I tried to keep our board of directors updated on

15   everything, so I would shoot them a note.  I think the

16   conversation included recruiting me but also acquiring SCA.

17        MR. MELSHEIMER:  Your Honor, we offer Defense Exhibit

18   A104, which is Mr. Hayek's email to the board.

19        MS. LEWIS:  We would object as hearsay.

20        THE COURT:  Overruled.  Admitted.

21        (Exhibit A104 admitted.)

22   BY MR. MELSHEIMER:

23   Q.  Let's take a look at this.  On page 2, in the back here,

24   SCA board, December 22, 2015.  You say, "I spoke with Kent

25   Thiry, CEO of DaVita, yesterday, and the conversation focused

1    on the merits of me taking the HealthCare Partners CEO role and

2    moving to Denver."  Do you see that?

3    A.  Yes.

4    Q.  So you were actually notifying the board that you might --

5    someone was considering you for another job; right?

6    A.  Yes.  That's part of the email.

7    Q.  And, additionally, at this time, you were having the

8    discussions with United and their Optum subsidiary about

9    possibly selling the company to Optum; right?

10   A.  Correct.

11   Q.  And you say in this email that you're erring on the side

12   of overcommunicating with you the details of my interactions

13   with DaVita and United, given the significance of a potential

14   transaction; right?

15   A.  Correct.

16   Q.  And, in fact, that transaction ultimately happened.  And

17   that was the conversation you and I had about your having to

18   inform various folks, including Mr. Thiry; right?

19   A.  Correct.  We ultimately sold to United, which is also

20   called Optum, which is a subsidiary of United.

21   Q.  Okay.  I want to switch gears here to Mr. Kay.  Are you

22   with me?

23   A.  Yes.

24   Q.  Now, Mr. Kay reached out to Ms. -- excuse me -- Mr. Kay

25   reached out to Dr. Fanning about a position at SCA in April of

Andrew Hayek - Cross

1    2016; right?

2    A.  I believe around that time frame.

3    Q.  And when she raised this with you, did you tell her that

4    Mr. Kay could not be hired under any circumstances?

5    A.  No.  I think I recall sharing the -- you know, the

6    parameters of the agreement, which was, he needed to be looking

7    and have told his boss.

8    Q.  Did she tell you during that conversation about Mr. Kay

9    that these -- that this agreement that you had possibly could

10   make her job at recruiting a little harder?

11   A.  Yes.  I believe there -- she made a couple of references

12   to, hey, it added a couple of steps in the recruiting process

13   and made it a little more complicated.

14   Q.  Did she refer to it as sort of a speed bump?

15   A.  I don't know if she used that term, but that was the spirit

16   of it.

17   Q.  Let's take a look at Government Exhibit 81.  It's admitted.

18          This is the email from Mr. Kay to Ms. Fanning that

19   we've seen before about the position at SCA in April of 2016.

20   Do you see that, sir?

21   A.  Yes.

22   Q.  And she flips this to you; right?

23   A.  She forwards it to me.  Yes.

24   Q.  And then you respond to it -- well, let's look at what she

25   says first.  She says, "I think I know the answer, but I

1   thought I'd ask.  This possible candidate has reached out to me

2   and is a senior group director, officer at DaVita.  Is it a no

3   go?  I can, of course, diplomatically explain" -- you see what

4   she says about strategic partners; right?

5   *A.*  Yes.

6   *Q.*  Now, you responded simply by saying, "The same rules

7   apply."  And those are the terms that you've talked about

8   during your testimony; right?

9   *A.*  Correct.

10  *Q.*  You didn't tell her anything in this email or your phone

11  conference with her anything about needing permission -- that

12  Mr. Kay needed to get permission to interview?

13  *A.*  No, I don't recall ever saying that.

14  *Q.*  You also did not tell Dr. Fanning that SCA could not hire

15  Mr. Kay?

16  *A.*  Correct.

17  *Q.*  In fact, you told her that SCA would engage with Mr. Kay

18  regarding the recruitment if he had already shared with his

19  supervisor that he wants to explore outside opportunities and

20  speak to SCA; right?

21  *A.*  Correct.

22  *Q.*  That was the truth, wasn't it?

23  *A.*  Yes.

24  *Q.*  So you also told her at the end of the email that, "We're

25  in a very sensitive stage right now with DaVita."  Right?

Andrew Hayek - Cross

1    *A.*   Yes.

2    *Q.*   That was the truth, wasn't it?

3    *A.*   Yes.

4    *Q.*   We've seen a lot of back and forth in conversations and

5    emails about various transactions up to and including the

6    possibility of DaVita purchasing SCA; right?

7    *A.*   Correct.

8    *Q.*   Dr. Fanning was not part of any of those discussions that

9    we've talked about this morning, was she, sir?

10   *A.*   No, I don't recall she was.  She was focused on HR and not

11   on the strategy or the business.

12   *Q.*   So it's no surprise, really, and no criticism, really, that

13   she didn't know about those kind of discussions, because she

14   wasn't part of them; right?

15   *A.*   They might come up in a Cabin Team discussion.  But, yes,

16   she was very much focused on her role and leading HR.  And

17   others were more, you know, focused -- like myself -- on the,

18   you know, strategic partnerships.

19   *Q.*   Dr. Fanning then writes back to Mr. Kay on April 26 after

20   your conversation.  And she says, "Thanks for proactively

21   reaching out."  Do you see that?

22          I'm sorry, this is A002.  It's admitted.  It's her

23   response.  This is the, "Dear Andrew."

24          *MS. LEWIS:*  Again, Your Honor, this is a duplicate of

25   a government exhibit.

Andrew Hayek – Cross

1           MR. MELSHEIMER:  Again, Your Honor, at the break,

2    we'll cure that.  But it is in evidence.

3           THE COURT:  Yes, it's in evidence.  I wish you would,

4    as I said already, use the ones that are already admitted.

5           Actually, 002, as a favor to you, was admitted, even

6    though it was a duplicate.

7           MR. MELSHEIMER:  And I appreciate that, Your Honor.

8           (Exhibit A002 admitted.)

9    BY MR. MELSHEIMER:

10   Q.  First of all, she thanks Mr. Kay for proactively reaching

11   out.  Do you see that?

12   A.  Yes.

13   Q.  Now, that's kind of an overstatement; isn't it?

14   A.  He reached out.  I --

15   Q.  It --

16   A.  I don't know much more than that.

17   Q.  It wasn't part -- it wasn't part of the understanding you

18   had with Mr. Thiry, that you had to have people proactively

19   reach out; right?

20   A.  No.  I don't recall connecting proactive to the agreement.

21   We've talked about the terms of the agreement, so -- proactive

22   sounds like a different term.

23   Q.  She says, then, that DaVita are priority strategic partners

24   for us; right?

25   A.  Correct.

Andrew Hayek - Cross

1   Q.  Let's stop right there.  That's 100 percent true; isn't it?

2   A.  Yes.

3   Q.  We saw this email was preceded by all of these different

4   discussions, some with Mr. Thiry and you, some with others

5   within the company, about expanding the relationship between

6   the two companies; right?

7   A.  Correct.

8   Q.  Then she goes on to say, "We have a company policy that we

9   don't recruit from our clients and strategic partners unless

10  they have been given explicit permission by their employers."

11  Do you see that?

12  A.  Yes, I see that.

13  Q.  The permission requirement went too far; didn't it?

14  A.  It's not how I recall the discussions with Mr. Thiry or how

15  I shared and communicated the agreement.

16  Q.  As did her saying that Mr. Kay could not be considered.

17  That also went too far, didn't it?

18  A.  Well, if Mr. Kay had followed the parameters of the

19  agreement that we have talked about here this morning, then he

20  could be.

21  Q.  Do you know what happened with Mr. Andrew Kay at DaVita,

22  whether he told his boss?

23  A.  I don't know.

24  Q.  Let me ask you this:  If he had told his boss, under your

25  understanding of the agreement that you've described, he could

Andrew Hayek – Cross

1   have freely spoken to SCA; correct?

2   A.   If he had told his boss he was looking at opportunities,

3   yes.

4   Q.   And Dr. Fanning closed that door on him, didn't she, in

5   effect?

6   A.   Appears to have.

7   Q.   We discussed earlier a couple of emails --

8   recruiting-related emails between you and Mr. Thiry.  One was

9   the October 2014 email that we talked about regarding, "I

10  don't proactively reach into your ranks."  Do you remember

11  that?

12  A.   Yes.

13  Q.   And the second one was about a DaVita recruiter soliciting

14  someone named Christian Ellison; right?

15  A.   Correct.

16  Q.   Now, Mr. Ellison, I think, as we talked about earlier, was

17  a high-level employee at SCA in 2016; right?

18  A.   Yes.

19  Q.   He was the person you had asked to put together some of the

20  strategy presentations for expanding the strategic partnership

21  with DaVita Medical Group; right?

22  A.   Yes.  Mr. Ellison ran the Northeast region for SCA, so the

23  HCP partnership in Philadelphia, for example, fell under his

24  purview.

25            MR. MELSHEIMER:  May I just have a moment, Your Honor?

Andrew Hayek - Cross

1    *BY MR. MELSHEIMER:*

2    Q.  Mr. Hayek, I'm going to direct your attention to an

3    admitted exhibit -- stipulated to exhibit, Defense A009.  This

4    is the email string that you exchanged with Mr. Thiry about

5    the recruitment of --

6              MS. LEWIS:  No objection, Your Honor.  This is another

7    duplicate.

8              THE COURT:  Yes, it's a duplicate.  Admitted.

9              (Exhibit A009 admitted.)

10   *BY MR. MELSHEIMER:*

11   Q.  This is the LinkedIn outreach that he forwarded you from

12   Ms. Palmieri that went to Mr. Ellison; right?

13   A.  Correct.

14   Q.  And you sent this to Mr. Thiry on June 14, 2016?

15   A.  Correct.

16   Q.  He didn't respond to you for about a month; right?

17   A.  Correct.

18   Q.  And he says, "Just opened this.  Will check it out."

19   Right?

20   A.  Correct.

21   Q.  Now, you don't -- have you seen an email after this email

22   from Mr. Thiry where you and he ever talked about the topic of

23   recruiting after June of 2016?

24   A.  I don't recall so.

25   Q.  You didn't think you were at any serious risk of losing

1    Mr. Ellison to DaVita, did you?

2    A.   No, I did not.

3    Q.   So as best you can recall, nothing came of this?

4    A.   Correct.  Mr. Ellison forwarded it to me -- well, forwarded

5    it to Mr. Rucker, who forwarded it to me.

6    Q.   I want to just focus briefly on 2016, sir.  This was during

7    the time period that SCA was looking to be acquired; several

8    different suitors; one of them was United; one of them was

9    DaVita.  Right?

10   A.   Correct.  Two suitors.

11   Q.   Mr. Thiry [sic], I want to return to a topic the government

12   spent some time chatting with you about.  That is around the

13   emails surrounding you being hired as the CEO at SCA in 2008.

14   A.   Okay.

15   Q.   Since, that has happened, you have built a professional and

16   personal relationship with Mr. Thiry that continues to this

17   day?

18   A.   Well, we had -- our relationship the last, you know, few

19   years, Mr. Thiry has moved on from DaVita, I've moved on from

20   SCA.  We haven't really had as much of a basis to stay in

21   touch.  And, then, of course, with this case, we're really not

22   in touch.

23   Q.   Before all of this came about in terms of this case, you

24   had a pretty regular habit of getting together with him for

25   walks in the Chicago Botanical Gardens?

Andrew Hayek – Cross

1   A.  Yeah.  I believe we took, you know, a couple walks there.

2   Mr. Thiry kind of preferred to meet that way, to move around,

3   because he was traveling and sitting anyway.  But sometimes it

4   would be phone or otherwise.  But we met there a couple times.

5   Q.  What were the topics of those walks in the Botanical

6   Gardens?

7   A.  They ranged.  We typically talked about business or trying

8   to partner or whatever was going on at the time business-wise.

9   He'd give me advice.  Sometimes we'd talk about his aspiration,

10  and I shared one to do public service.  And I recall him

11  encouraging me to, you know, start early.  So it's a range of

12  business and then just kind of personal, professional advice,

13  and maybe catching up a bit personally, as well.  He'd check in

14  on my wife and kids and such like that.

15  Q.  I want to take you back to 2012.  In 2012, you had some

16  basic understandings of the antitrust laws; correct?

17  A.  Yes.

18          MS. LEWIS:  Objection, Your Honor, to this line.

19          THE COURT:  Well, we'll see where he tries to go.

20          MS. LEWIS:  Thank you, Your Honor.

21  BY MR. MELSHEIMER:

22  Q.  You knew, for example, that you could not allocate customer

23  markets with another company; right?

24          MS. LEWIS:  Objection, Your Honor.

25          THE COURT:  Sustained.

Andrew Hayek - Cross

1 | *BY MR. MELSHEIMER:*

2 | *Q.* If you had thought of your agreement with Mr. Thiry as one

3 | of allocating a market for employees, that would have raised

4 | red flags for you; correct?

5 |    *MS. LEWIS:* Objection, Your Honor.

6 |    *THE COURT:* Sustained. Don't go there,

7 | Mr. Melsheimer.

8 |    *MR. MELSHEIMER:* Thank you, Your Honor.

9 |    *THE COURT:* You know that.

10 |    *MR. MELSHEIMER:* Giving it -- I will not push the

11 | envelope, Your Honor. Thank you.

12 | *BY MR. MELSHEIMER:*

13 | *Q.* With respect to Dr. Fanning, did she ever tell you that she

14 | was embarrassed or ashamed by the agreement that you had

15 | reached with Mr. Thiry?

16 | *A.* No. I never recall embarrassed, ashamed, that it was

17 | wrong, anything of that nature from her or anyone else. I just

18 | recall it added a step or a complication -- it added work to

19 | the recruiting process, and brought that up a couple times.

20 | *Q.* Did anyone in the Cabin Team of your key advisers that

21 | you've talked about -- which included at times Dr. Fanning --

22 | did anyone in the Cabin Team express any similar sentiments

23 | like that?

24 | *A.* No. I don't recall any member of the Cabin Team or anyone

25 | else at SCA or externally ever raising, you know, wrong,

Andrew Hayek - Cross

1    immoral, not right, anything of that nature.

2    *Q.*  Thank you, Mr. Hayek.  So you come --

3           Your Honor, I'm wrapping up.

4           Mr. Hayek, you come as a witness today after a number

5    of meetings with the government and the FBI; right?

6    *A.*  Yes.

7    *Q.*  You had interviews dating back to July of 2019 and as

8    recently as two days ago?

9    *A.*  Yes.

10   *Q.*  Some of those meetings were in person; some of them were

11   over the telephone; some of them were videoconference?

12   *A.*  I believe the vast majority were in person.

13   *Q.*  You've also had a number of phone calls with Agent Hamel,

14   who is here at the government's table; right?

15   *A.*  Yes.  A handful.

16   *Q.*  So by my count, you've talked to the government -- again,

17   before coming in here, either in person or on the phone, eight

18   or more times; right?

19   *A.*  Yes.  I'd say more than eight times.

20   *Q.*  They asked you questions, and it appeared to you they were

21   taking notes; right?

22   *A.*  They asked questions.  I wasn't focused on the notetaking.

23   *Q.*  They showed you documents?

24   *A.*  Yes.

25   *Q.*  Is it fair to say, sir, that in these meetings, you covered

Andrew Hayek - Cross

1   a lot of the same material over and over?

2   A.   Yes.   Some topics stayed the same, and some topics changed.

3   Q.   The government asked you questions in your meetings that

4   they covered with you and you've answered in earlier meetings;

5   right?

6   A.   Yes.   Some of the questions were the same, and some

7   changed.

8   Q.   Now, you ended up testifying in a proceeding in Dallas;

9   right?

10   A.   No, sir.   I don't believe that's occurred yet.

11   Q.   Grand jury proceeding in Dallas?

12   A.   Pardon me.   Yes.

13   Q.   And before you did that testimony, you entered into two

14   different non-prosecution agreements with the government;

15   right?

16   A.   Correct.

17   Q.   The attorneys that helped you obtain those agreements are

18   actually in court here today; correct?

19   A.   I believe so.

20   Q.   And one of the -- the first of these agreements was entered

21   into in July of 2019.

22          And that is Government Exhibit 285.   Can we pull that

23   up?

24          This is an agreement addressed to you, care of your

25   lawyer; right?

1    *A.*  Correct.

2    *Q.*  And you say that you agree to cooperate fully and

3    truthfully with the United States in connection with its

4    investigation of possible violations of federal antitrust and

5    related criminal laws involving agreements between you and

6    DaVita.

7                *THE COURT:*  I don't have 285 in evidence.

8                *MR. MELSHEIMER:*  I'm sorry, Your Honor?

9                *THE COURT:*  It's not in evidence.

10               *MR. MELSHEIMER:*  Your Honor, I offer Government

11   Exhibit 285.

12               *MS. LEWIS:*  No objection, Your Honor.

13               *THE COURT:*  Admitted.

14               (Exhibit 285 admitted.)

15   *BY MR. MELSHEIMER:*

16   *Q.*  Did I read that correctly, sir?

17   *A.*  Yes.

18   *Q.*  This was specific to DaVita; right?

19   *A.*  This letter, yes.

20   *Q.*  Then a few months later, you entered into a second

21   non-prosecution agreement that was broader and covered more

22   than just the DaVita issue; true?

23   *A.*  Yes.  This letter relates to DaVita, and the second letter

24   related to a second matter.  So the second letter then included

25   both.

1          *MR. MELSHEIMER:*  Your Honor, I offer the second letter

2     as Defense Exhibit A001.

3          *MS. CLINGAN:*  No objection.

4          *THE COURT:*  It's admitted.

5          (Exhibit A001 admitted.)

6     BY MR. MELSHEIMER:

7     *Q.*  This is a few months later.  And it has different language;

8     right?  It says, "You agree to cooperate fully and truthfully

9     with the United States in connection with its investigation of

10    possible violations of federal antitrust and related criminal

11    laws involving agreements to suppress competition for employees

12    in the outpatient care center industry in the United States."

13    Right?

14    *A.*  Yes, I see those words.

15    *Q.*  And your understanding of both of these agreements is that

16    if you cooperate and the government thinks you've complied with

17    your obligations, you won't be prosecuted for anything that

18    you've talked about; right?

19    *A.*  Correct.

20    *Q.*  And to be fair, it's the government that gets to decide

21    whether you've complied with your obligations; right?

22    *A.*  Yes.  That's my understanding.

23    *Q.*  That's not something I get to decide or anyone else; right?

24    *A.*  That's correct.  And, you know, what I've been told is tell

25    the truth; and that's what I'm here to do.

Andrew Hayek - Cross

1   *Q.*   Indeed.  You have been told to tell the truth with the

2   government; right?

3   *A.*   Yes.

4   *Q.*   Now, the -- this 2000 -- November 2019 agreement actually

5   covers, in your understanding, another agreement that you had

6   with a company called USPI; right?

7   *A.*   Correct.

8   *Q.*   That was an agreement that you entered into before your

9   conversations with Mr. Thiry that we've talked about in this

10  trial; right?

11  *A.*   I recall them in, you know, roughly similar time frame.  I

12  couldn't exactly tell you.

13  *Q.*   And that involved a company called USPI based in

14  Birmingham, Alabama?

15  *A.*   No.  That's where SCA was based.  USPI was based in Dallas.

16  *Q.*   Dallas, Texas.  How did I get that wrong?  USPI based in

17  Dallas.  SCA based in Birmingham.  And that was an agreement

18  that you reached with a man named Bill Wilcox, right?

19  *A.*   Yes.

20  *Q.*   Bill Wilcox to your knowledge also has immunity or

21  non-prosecution type agreement --

22          *MS. LEWIS:*  Objection, Your Honor.

23          *MR. MELSHEIMER:*  -- related to USPI.

24          *MS. LEWIS:*  Relevance of Mr. Wilcox to this trial.

25          *THE COURT:*  Overruled.

1         *THE WITNESS:*  I'm sorry.  Could you restate?

2    *BY MR. MELSHEIMER:*

3    Q.  I apologize.  Mr. Wilcox has his own kind of immunity

4    agreement with respect to whatever happened between SCA and the

5    USPI company; right?

6    A.  I've been told that.

7    Q.  Same thing, he's not going to be prosecuted for anything

8    that he did with respect to you related to the agreement you

9    had with him; right?

10   A.  That's my understanding.

11        *MS. LEWIS:*  Objection.

12        *THE COURT:*  Sustained.

13   *BY MR. MELSHEIMER:*

14   Q.  USPI was a direct competitor of SCA; right?

15        *MS. LEWIS:*  Objection, Your Honor.  Relevance.

16        *THE COURT:*  Overruled.

17        *THE WITNESS:*  Yes.  USPI was in the surgery center

18   business.

19   *BY MR. MELSHEIMER:*

20   Q.  And you were competing with USPI with respect to hiring

21   doctors and executives and other types of things.  Y'all were

22   in the same business?

23   A.  We're in the same business, competing to partner with

24   physicians.

25        *MR. MELSHEIMER:*  So, Your Honor, I have two binders

Andrew Hayek - Cross

1   for this witness with certifications under Rule 902(11), one

2   from the SCA records custodian and one from a DaVita custodian,

3   related to the various business transactions and conversations

4   and potential arrangements that I've discussed, admittedly, at

5   some length, with Mr. Hayek.  And I would offer these exhibits

6   at this time.  And I can provide -- they're lengthy numbers,

7   but I can read these numbers into the record, or we can deal

8   with it at a break.  But I offer these as business records

9   between the two companies that reflect the volume of

10  communications that we've been discussing.

11          MS. LEWIS:  Your Honor, we object, and we'd ask to

12  approach.

13          THE COURT:  Okay.

14          (Hearing commenced at the bench.)

15          MS. LEWIS:  Your Honor, he's intending to offer some

16  285 exhibits, the majority of which we object to.  We've not

17  seen any of these certifications that he purports to have

18  gotten on these documents.  We believe many of them are

19  hearsay.  Many of them maybe do not even involve any of the

20  witnesses in this case.  So to the extent that there is -- I

21  will not be able to cross-examine or, you know, redirect

22  Mr. Hayek on 285 plus documents in these binders, it's going to

23  be cumulative and confusing for the jurors to have these

24  binders.

25          I understand the point that Mr. Melsheimer is trying

Andrew Hayek - Cross

1    to make.  I think he's made that point in his

2    cross-examination.  It's duplicative.  I'd ask for it to be

3    excluded under 403.

4           *MR. MELSHEIMER:*  May I be heard briefly, Your Honor?

5           *THE COURT:*  Well, that's what you're here for.

6           *MR. MELSHEIMER:*  Is it?  Sometimes I wonder, Your

7    Honor.

8           So, a couple of things, Your Honor.  We have provided

9    the certifications --

10          *MS. LEWIS:*  When?

11          *MR. MELSHEIMER:*  Well, of course, I didn't.  But I'll

12   check on that.  I thought they were provided.  I certainly

13   directed they be provided, so I'll check on that.

14          So I think that the business records exception is

15   satisfied, number one.

16          Number two, Your Honor, I think this is also relevant

17   just as things that happened and occurred.  In other words, if

18   there is a non-hearsay purpose for this, that just shows the

19   relationship between the companies, what was actually

20   happening, whether or not each individual email is literally

21   true, I don't think that's relevant to the point we're trying

22   to make.

23          I think first and foremost, they're business records.

24   And what I would suggest, Judge, is that we flag this.  They

25   can consider this at a break.  I'll make sure they have the

Andrew Hayek – Redirect

1    certifications –- well, maybe a longer break –- that they can

2    consider it.  We'll get them the certifications.  But I think

3    I'm entitled to get these into the record, Your Honor.

4            MS. CLINGAN:  Your Honor, if I could briefly respond.

5            THE COURT:  No.  Objection sustained.  It's cumulative

6    and unfair.

7            MS. LEWIS:  Thank you, Your Honor.

8            (Hearing continued in open court.)

9            THE COURT:  The objection to the two binders was

10   sustained by the Court.

11           Are you finished, Mr. Melsheimer?

12           MR. MELSHEIMER:  May I briefly consult with my

13   colleagues?

14           THE COURT:  Of course.

15           MR. MELSHEIMER:  Your Honor, I appreciate the Court's

16   indulgence.

17           Thank you, Mr. Hayek.

18           THE COURT:  All right.  Redirect.

19                       **REDIRECT EXAMINATION**

20   BY MS. LEWIS:

21   Q.  Good morning, Mr. Hayek.

22   A.  Good morning.

23   Q.  Now, Mr. Hayek, we've seen now hundreds of business

24   emails, communications, between SCA and DaVita.  Was the

25   no-poach agreement that you entered with Mr. Thiry part of any

1   of those transactions?

2   A.   The nonsolicit was not directly tied or subsidiary to them.

3   No.

4   Q.   And was the no-poach agreement necessary to effectuate any

5   of those business transactions?

6   A.   From our perspective, no.  We could and did with other

7   parties engage in strategic discussions with a more narrowly

8   defined or directly tied nonsolicit provision.

9   Q.   And so if we looked at your emails, we might see hundreds

10  of business emails and communications with business strategic

11  partners other than DaVita; right?

12  A.   Correct.  With some of them, there wouldn't be a lot of

13  emails.

14  Q.   And were you able to do the strategic partnership

15  discussions with other companies other than DaVita without

16  having a no-poach agreement with their CEOs?

17  A.   I think with the exception of the two companies you

18  referenced here, no, was not part of them or related.

19  Q.   So you were able to have strategic business partnerships

20  with other companies without a no-poach agreement; is that

21  right?

22  A.   Correct.

23  Q.   And did Mr. Thiry ever identify to you any confidential

24  transactional information that this nonsolicitation agreement

25  that you had with him was supposed to protect?

Andrew Hayek - Redirect

1   *A.*   No.  There was not a direct tie.

2   *Q.*   Did he ever identify any confidential information in a

3   transaction that was supposed to protect?

4   *A.*   There was not a direct tie from the nonsolicit to

5   confidential information.

6   *Q.*   So is that a no?

7   *A.*   I'm sorry.  Could you restate the question?

8   *Q.*   Did Mr. Thiry ever identify to you any confidential

9   transactional information that your nonsolicit agreement was

10  designed to protect?

11  *A.*   No.

12  *Q.*   And was your nonsolicitation agreement with Mr. Thiry --

13  was it limited to specific individuals involved in any of those

14  transactions?

15  *A.*   No.

16  *Q.*   Was it limited to any specific geography of any of those

17  transactions?

18  *A.*   No.

19  *Q.*   And did your nonsolicitation agreement with Mr. Thiry --

20  did that have any time limitation?

21  *A.*   No.

22  *Q.*   Now, you were asked about some 2011 communications or

23  presentations, PowerPoints, involving HealthCare Partners; is

24  that right?

25  *A.*   Yes.

615

Andrew Hayek – Redirect

1   *Q.*  Now, in 2011, was HealthCare Partners part of DaVita?

2   *A.*  No.

3   *Q.*  And in January or February of 2012, when you reached your

4   agreement with Kent Thiry, did DaVita even own HealthCare

5   Partners?

6   *A.*  No.

7   *Q.*  And now, Mr. Hayek, you are a fairly experienced business

8   person; is that fair?

9   *A.*  Reasonably so.  Yes.

10  *Q.*  And you have to compete; right?  Competition is part of

11  business?

12  *A.*  Yes.

13  *Q.*  And do your competitors sometimes get upset when you

14  compete vigorously with them?

15  *A.*  Yes.

16  *Q.*  And do you stop competing with them just because they get

17  upset?

18  *A.*  No.

19  *Q.*  Except in the instance of Mr. Thiry and employees; is that

20  correct?

21  *A.*  Except for the two matters we talked about here.

22  *Q.*  Now, DaVita was a large, successful company, was it not?

23  *A.*  Yes.  DaVita was larger and quite successful.

24  *Q.*  Did DaVita need to do those business transactions with SCA

25  to maintain its success?

Andrew Hayek - Redirect

1    A.  I think they would have been helpful.  I'm not sure they

2    would have failed absent them, no.

3    Q.  Well, let me ask about the Arcadia venture.  Right?  You

4    spoke about that with Mr. Melsheimer; is that correct?

5    A.  Yes.

6    Q.  And what year did Arcadia take place?

7    A.  Well, the discussions took place over a number of years.  I

8    think it got formalized in 2012, '13, '14-ish.  The NDA and

9    then, ultimately, the partnership document.

10   Q.  I think we looked at an email where the discussions were in

11   2013; is that right?

12   A.  Yes.

13   Q.  So were the discussions in 2013 part of your agreement you

14   reached in 2012?

15   A.  No.

16   Q.  And Arcadia -- where is that geographically located?

17   A.  In the Los Angeles area.

18   Q.  Is it just one center?

19   A.  Yes.  It's a reference to an area, but it's in this context

20   referencing a surgery center.

21   Q.  And so was it necessary to put senior-level employees off

22   limits nationwide in order to have a deal on one center in

23   California?

24   A.  As we talked about, from my perspective or our perspective,

25   no.  We entered into partnerships with other parties with a

1    more narrowly defined agreement.

2    Q.   And I think you spoke about with Mr. Melsheimer that there

3    was roughly a million dollars, maybe a couple of million

4    dollars, of benefit to DaVita from that transaction.  Did I get

5    that right?

6    A.   Yeah, a few million from that individual transaction.

7    That's a guess.

8    Q.   Is a few million dollars significant to a corporation the

9    size of DaVita?

10   A.   That individual transaction, no.  The opportunity, though,

11   could be much larger.  Meaning --

12   Q.   A hypothetical opportunity, right, at that point?

13          MR. MELSHEIMER:  Objection, Your Honor.  Leading.

14          THE COURT:  Sustained.

15   BY MS. LEWIS:

16   Q.   Was that -- was that opportunity any larger at that moment

17   in time than Arcadia?

18   A.   For Arcadia specifically?

19   Q.   Correct.

20   A.   No.  I tried to characterize the direct opportunity of that

21   individual partnership.

22   Q.   Okay.  And so from your conversations and your

23   understandings with Mr. Thiry, what was more important to him,

24   doing deals or keeping SCA away from DaVita's people?

25   A.   I think what upset him most of what I did was the

Andrew Hayek - Redirect

1   recruiting.  And particularly so given that I had worked there

2   and had relationships.

3   Q.  Now, you testified that you were recruited by Kent Thiry at

4   one point; is that right?

5   A.  Yes.  It was part of a discussion that also included buying

6   SCA.

7   Q.  And did you consider yourself covered by this

8   nonsolicitation agreement you had reached with Mr. Thiry?

9   A.  No, it didn't occur to me that way.

10   Q.  So it covered all of the executives except the CEOs; is

11   that right?

12   A.  Well, it didn't occur to me that way.  And I shared it with

13   my board, which is effectively my boss.

14   Q.  And Mr. Melsheimer asked you about a few people from DaVita

15   who didn't -- didn't work out at SCA; is that right?

16   A.  Correct.

17   Q.  And you mentioned that there were DaVita employees, DaVita

18   alumni, who did work out at SCA; is that right?

19   A.  Correct.

20   Q.  Who are a few of those individuals?

21   A.  Mr. Michael Rucker, Ms. Linda Lansing, Mr. Chokshi, to name

22   a few.

23   Q.  And roughly how many people did DaVita have at a director

24   level and above at their company?

25   A.  I don't know.  I know the SCA number.  I'd be hazarding a

Andrew Hayek - Redirect

1   guess for DaVita.

2   Q.   Larger than the SCA number; is that fair?

3   A.   Presumably so.

4   Q.   And did other people at SCA want to recruit from DaVita?

5   A.   Yes, I think some from time to time.

6   Q.   And if you had a promising candidate that was put in front

7   of you from DaVita, would you have excluded them just because

8   they were at DaVita, setting aside your agreement with

9   Mr. Thiry?

10  A.   Oh, setting aside the agreement?  I think the merits of the

11  individual would be what is most important.

12  Q.   And you testified about Mr. Kay; right?  We looked back at

13  Government Exhibit 81 regarding Mr. Kay; correct?

14  A.   Correct.

15  Q.   And now, Dr. Fanning, was she doing this on her own; or was

16  she following your instructions with regard to DaVita?

17  A.   My assumption is, she was trying to follow the -- what I

18  had shared with her about the agreement.

19  Q.   And that stopped the process for Mr. Kay; right?

20          MR. MELSHEIMER:  Objection.  Leading, Your Honor.

21          MS. LEWIS:  I'll rephrase, Your Honor.

22  BY MS. LEWIS:

23  Q.   What did that do for the process for Mr. Kay?

24  A.   I don't personally know how it transpired with Mr. Kay.

25  I -- I shared what I shared with Dr. Fanning; and then, you

Andrew Hayek – Redirect

1  know, we looked at an email here.  I just don't directly know.

2  Q.  Did you ever interact with Mr. Kay about a job possibility

3  at SCA?

4  A.  No, I don't recall so.

5  Q.  So it was more of -- more than just a speed bump for

6  Mr. Kay, wasn't it?

7       MR. MELSHEIMER:  Objection, Your Honor.  Leading.

8       THE COURT:  Sustained.

9  BY MS. LEWIS:

10  Q.  And then, again, in that same email we looked at, there

11  was language about a sensitive stage with DaVita.  Do you

12  recall that, Mr. Hayek?

13  A.  Yes, I do.

14  Q.  And, again, was this no-poach agreement, this

15  nonsolicitation, no-poach agreement that you reached with

16  Mr. Thiry, was that part of any business transaction that you

17  were conducting at that moment in time?

18       MR. MELSHEIMER:  Objection, Your Honor.  Asked and

19  answered.

20       THE COURT:  Overruled.

21       THE WITNESS:  No, it was not directly tied.  It wasn't

22  part of a business transaction.

23  BY MS. LEWIS:

24  Q.  Who were you worried about upsetting if you recruited?

25  A.  Recruiting from DaVita?

Andrew Hayek - Redirect

1  *Q.*  Correct.

2  *A.*  Mr. Thiry.  And to a lesser degree, some of his other team

3  members; but primarily Mr. Thiry.

4  *Q.*  So was that necessary not to annoy Mr. Thiry by that

5  recruiting?

6  *A.*  Meaning, did the -- was the business at risk because of the

7  reaction to the recruiting?

8  *Q.*  Correct.

9  *A.*  Yes.  I think annoying the executive team generally would

10  put the business at risk.

11  *Q.*  And Mr. Melsheimer asked you about complete cessation of

12  competition.  Do you recall him asking you about that?

13  *A.*  Yes, I do.

14  *Q.*  What was your agreement with Kent Thiry intended to achieve

15  with regard to competition for senior-level employees between

16  DaVita and SCA?

17      *MR. MELSHEIMER:*  Objection, Your Honor.  Asked and

18  answered.

19      *THE COURT:*  Overruled.

20      *THE WITNESS:*  The specific, you know, nonsolicit

21  itself, to reduce the number of senior execs coming to SCA and

22  vice versa.

23  *BY MS. LEWIS:*

24  *Q.*  And was that promoting competition or reducing competition?

25  *A.*  Between those two choices, you know, reducing.

 1           *MS. LEWIS:*  Thank you, Mr. Hayek.  Nothing further.

 2           *THE COURT:*  Members of the jury, any questions for

 3   this witness?

 4           Yes.

 5           (Hearing commenced at the bench.)

 6           *THE COURT:*  Question 11.

 7           You can start looking at 12 while they're looking at

 8   11.

 9           *MS. LEWIS:*  We would object -- we would object to

10   question 1.  And then on this one, we would ask to strike the

11   part about the legal agreement.  But the remainder of the

12   question we would not object to.  The third one, we would not

13   object to.

14           I'm told there are more on the back.

15           *MR. MELSHEIMER:*  I didn't see this.

16           *MS. LEWIS:*  No objection to that one.  I think we're

17   all agreed.

18           *THE COURT:*  All right.  So we're still on 11, though.

19   No objection on 12, you're saying.  But what about 11?

20           *MR. DODDS:*  What did you say on this one?  I'm sorry?

21           *MS. LEWIS:*  We object to No. 1.  This one, we would

22   ask to strike the legal agreement part.  But I think it's fine

23   to ask if it was written down.  And then no objection to this

24   one.

25           *MR. DODDS:*  I mean, from my point, if we're going to

1    ask the question, I think we should ask the question.

2            THE COURT:  You're not objecting?

3            MR. DODDS:  No.

4            THE COURT:  She's partially objecting.

5            MR. MELSHEIMER:  And to make sure you understand there

6    is some on the back, Judge.

7            THE COURT:  Right.  I understand that.

8            MS. CLINGAN:  That's fine.

9            MS. LEWIS:  No objection to the ones on the back.

10           MR. DODDS:  No objection.

11           MR. MELSHEIMER:  It's just --

12           THE COURT:  Okay.  I get it.

13           What's your objection to No. 1?

14           MS. LEWIS:  Relevance.

15           MS. CLINGAN:  Here is the challenge:  It relates to

16   another case.  So SCA has been charged separately in Dallas.

17           THE COURT:  I know that.

18           MS. CLINGAN:  I think there is no way for us to

19   explain the USPI conduct, why that's coming up here, without

20   necessarily getting into the charged conduct.

21           THE COURT:  Objection is overruled.

22           No. 2, what they're really asking is, did you ever put

23   the gentlemen's agreement in writing?

24           MS. LEWIS:  We don't object to that.  I think it

25   was -- getting into issues of legality, we would object.

1          *THE COURT:*  Is that okay with you?

2          *MR. MELSHEIMER:*  Well, we'd like it to be asked as

3    written, Your Honor.

4          *THE COURT:*  Okay.  Your objection is granted.  And,

5    therefore, your request that the whole thing be read is denied.

6          *MS. LEWIS:*  Thank you, Your Honor.

7          *THE COURT:*  For the same reasons that we have

8    consistently kept out the legal stuff, although that's really

9    not what she's asking.  And the rest of it, no one objects to.

10          *MS. LEWIS:*  Correct.

11          *MR. DODDS:*  Correct, Your Honor.

12          *THE COURT:*  All right.  13.

13          *MR. DODDS:*  Once they get rolling.  There are nine

14    questions here, Your Honor.

15          *THE COURT:*  Just read them.

16          *MS. LEWIS:*  Should we, perhaps, read that one while

17    they're reading that, then we can switch.

18          *THE COURT:*  I had a case where each individual

19    question, it was over a thousand.  This is Little League,

20    comparatively.

21          *MS. LEWIS:*  No objection from us on that one.

22          *MR. MELSHEIMER:*  I think those are okay.

23          *THE COURT:*  They are okay with 14.

24          *MS. LEWIS:*  No objection, Your Honor.

25          *MR. MELSHEIMER:*  Without taxing the Court's patience,

1    may I ask a question?

2            THE COURT:  Of course.

3            MR. MELSHEIMER:  I think there could be a lot of

4    follow-up questions based on these questions for examination.

5    I just wonder -- I don't -- if we're going to keep the jury

6    over from lunch, and if it's wise we send them to lunch, come

7    back.

8            THE COURT:  Are you going to have a lot of follow-up

9    questions?

10           MR. MELSHEIMER:  I don't know what his answers are,

11   Your Honor.

12           THE COURT:  Let me ask the questions and get his

13   answers, as a courtesy to him.  But then if you folks tell me

14   that you've got quite a bit of follow-up, we'll come back for

15   that.

16           MR. MELSHEIMER:  Thank you, Your Honor.

17           (Hearing continued in open court.)

18           THE COURT:  All right.  We have a few questions for

19   you, Mr. Hayek, from the jurors.

20           Question:  Why did SCA have the same type of unusual

21   no-poach agreement with USPI as it did with DaVita?

22           THE WITNESS:  In both cases we were asked by the -- or

23   suggested by the CEOs of the other companies.  And USPI was

24   another company that we did a lot of, you know -- it was a

25   different kind of business relationship.  We worked together in

1    Washington, D.C. on a lot of policy and quality reporting and

2    advocating for the industry.  So it was another entity that we

3    had a lot of interaction with and we worked a lot with.  And

4    the CEO there, you know, in a different style and in a

5    different manner made it clear that it was important to him.

6           And so, again, it was -- USPI was in our industry.

7    But what we did together was go to Washington, D.C., report

8    quality information and advocate on behalf of the industry and

9    a bunch of work that was really important to both SCA and to

10   USPI and the industry in general.  So it was a different kind

11   of collaboration, but there was a lot of collaboration with

12   USPI and their CEO, you know, in a different style.  But made

13   it clear that it was important to him.

14          THE COURT:  All right.  Next question:  Was the

15   agreement between you and Mr. Thiry ever reduced to a final

16   contract that was signed and dated, that type of contract?

17          THE WITNESS:  No, sir.  It was not.  It was discussed

18   and, you know, emailed, again, maybe two or three times a

19   year.  So it was written in the emails, but there was no

20   letter or contract or that sort of thing.  It didn't occur to

21   us that, you know, we'd do that.

22          THE COURT:  No formal document, as such?

23          THE WITNESS:  No, sir.  No, Your Honor.  Just the

24   email exchanges, phone conversations.  And then we'd email

25   about it internally, externally with job candidates,

1    recruiters.  You know, we communicated it; we just never had it

2    in a contract, *you know, per se.*

3           THE COURT:  All right.  Question:  In the email

4    exchanges with Mr. Thiry about this agreement, were you trying

5    to intentionally use vague terminology, as if speaking in a

6    code?

7           THE WITNESS:  No, Your Honor.  No, sir, not ever.  I

8    mean, it -- it's -- if it's vague or it's expressed different

9    ways, it's because it comes up very infrequently.  So, you

10   know, people interpret words a little differently or you

11   paraphrase something differently.  We never ever tried to hide

12   this or, you know, let's speak in code.  Nothing of that sort.

13   We didn't hide it internally; we didn't hide it externally; we

14   talked about it with recruiters and, you know, other people we

15   worked with and candidates that we -- we communicated openly

16   about it.

17          Frankly, if you wanted to hide something, you wouldn't

18   put it in email all the time.  So, no, we never tried to hide

19   it or put it in code.

20          THE COURT:  Question:  Did you have a no-hire or

21   no-poach agreement with Optum?

22          THE WITNESS:  No, sir.  No, Your Honor.

23          THE COURT:  Is it common to have a no-hire or no-poach

24   from any company that may potentially acquire your company?

25          THE WITNESS:  I have limited experience to generalize.

1    My only experience with these kinds of nonsolicit agreements

2    are with DaVita and USPI.  That's the extent of my, you know,

3    experience; so I can't generalize more broadly, sir.

4         THE COURT:  What is the litmus test of defining -- or

5    defining factor when you and CEOs decide if a company should be

6    a no-hire or a no-poach?

7         THE WITNESS:  Well, Your Honor, I can only speak to my

8    experience.  You know, in both the instances we talked about

9    today, these are companies that we had a lot going on with, you

10   know, relationships that were important for different reasons.

11   You know, we were, you know, asked -- it was, you know, made

12   clear that it was important to the others -- you know, these

13   two CEOs and their organizations.  I can't say there was much

14   more of a litmus test than it seemed like the right thing to do

15   on behalf of SCA and kind of the collective success.  And

16   that's how we thought about it, as we're trying to save and

17   then grow a company and, you know, survive, and then be

18   successful and -- for different reasons, we thought they were

19   important to doing so, to being successful.

20        THE COURT:  Okay.  Next question is:  Did the

21   agreement affect the hiring of junior executives or executives

22   below director between SCA and DaVita, that you are aware of?

23        THE WITNESS:  No, Your Honor.  I'm not aware of it

24   impacting below the director level.  And, you know, the

25   director level and above, the senior executives are about

1 percent of the total employees of SCA.  So to my knowledge,

it didn't affect the 99 percent that were outside the scope.

THE COURT:  Question:  In your view, was the agreement

to tell your boss essentially the same as getting permission,

or do you see it differently?

THE WITNESS:  Your Honor, I never thought of it as

getting permission.  I thought of it as a -- you know, an audit

mechanism or a way to confirm and validate that the person was

looking anyway.  My recollection is that, for example,

Mr. Thiry suggested, hey, it's real easy to make that up at the

end of a long recruitment process, and you're talking to the

candidate, and all of those things and then say at the end, oh,

I was looking anyway.  That the tell-your-boss was, you know,

no, authentically that person was looking.  That's how you

prove it.  That's how you validate it.

THE COURT:  I think you might have partially answered

or wholly answered the next question, but I'll read it.  If not

permission, how would you describe it?  Giving approval, a

required step in the process, or something else?

THE WITNESS:  Your Honor, I would think of it as a

required step in the process.  That the candidate is looking,

and they've told their boss that they are looking.  Some people

do that.  I've done that from time to time.  So a required step

in the process, sir.

THE COURT:  All right.  Question:  Did your --

630

1    SCA's -- agreement with USPI include a tell-your-boss

2    requirement?

3              THE WITNESS:  Yes, Your Honor.  To the degree of,

4    you've got to tell your boss or make your boss aware that

5    you're looking for a job -- looking at other opportunities.

6    That's my understanding.

7              THE COURT:  Who wanted the tell-your-boss requirement

8    in place between SCA and DaVita, you, Mr. Thiry, or both?

9              THE WITNESS:  My recollection, Your Honor, is it came

10   up from Mr. Thiry as, again, a way to validate that that --

11   prove that that person was looking anyway.  I believe, you

12   know, from time to time he'd say, look, it's really easy to

13   make that up or wink, wink, nod, nod, nudge, nudge, and kind of

14   say at the end of a recruitment or solicitation process, hey,

15   the person was looking anyway.  It's hard to know that -- or

16   impossible for DaVita to know that or believe that unless that

17   person had let someone know.  And the easiest way to think

18   about that is let your boss know.

19             THE COURT:  Question:  Who wanted the tell-your-boss

20   requirement in place for the USPI and SCA agreement?

21             THE WITNESS:  My recollection is that we kind of took

22   that provision, you know, or that aspect, you know, kind of

23   applied it to the USPI relationship.  That this sort of thing

24   didn't come up very often anyway, and so it's pretty hard to

25   have two different thoughts in your mind for something that

1   comes up pretty infrequently.  So my recollection is, we kind

2   of took it from the DaVita relationship and more or less

3   applied it, sir, to the relationship we had with USPI.

4          THE COURT:  Did SCA publicly post job ads for

5   executive director positions?

6          THE WITNESS:  Your Honor, in my experience, a lot

7   of -- some executive roles would have been posted or been

8   public in some manner.  Often you hire a recruiter, and they

9   drive the process.  You know, possibly they post it on

10  something like LinkedIn.  They're doing a lot of direct

11  outreach.  I'm not sure.  I think it's situational, especially

12  at the senior-most levels, where the candidate pool is, you

13  know, pretty -- you know the level of person you're looking

14  for, and it's the recruiter's job to go find them.  I'd say

15  it's a combination of sometime a recruiter would post them or

16  SCA might post them, but not always.  It's situational.

17         THE COURT:  The next one you've already answered, I

18  believe.  I'll read it, but I think you've answered that.  Did

19  you record your agreement with Mr. Thiry related to no poaching

20  and tell-your-boss in a signed formal document?  If not, why

21  not?

22         THE WITNESS:  So, Your Honor, same answer as before.

23  It never occurred to us that way.  It was something we

24  emailed, you know, we communicated about.  The parameters were

25  pretty short.  You know, there is the -- the level, meaning,

1    initially VP and then ultimately adding the director level, and

2    then there is the needs to be looking, you know, they need to

3    have let someone know, i.e., their boss, that they are

4    looking.  It never struck me -- I don't recall anyone inside

5    SCA saying, hey, let's put this into a formal letter or

6    contract.  Perhaps it's because it came up relatively, as I

7    said, infrequently.  And it wasn't, you know, a lengthy set of

8    parameters or details that would go into a long document.  It

9    was, as we described it.  It was, you know, pretty brief in its

10   parameters.

11        THE COURT:  Question:  Did your no -- did your

12   no-solicit lasting two years with DaVita specify a specific

13   division or employees that you couldn't solicit?

14        THE WITNESS:  Your Honor, my nonsolicit, I believe --

15   I don't recall a limitation on the division of DaVita or the

16   level or, you know, specifics on the employees of DaVita that

17   couldn't be solicited.

18        What I do recall is that it was focused, though, on

19   cannot solicit them to a business that competes on business

20   terms.  So if I went to another dialysis company, then my

21   nonsolicit would say I can't solicit to another dialysis

22   company.  But because I went to a surgery center company, I

23   didn't view that as, you know, limiting.  So that's my

24   recollection.

25        THE COURT:  And maybe you've just answered the next

1    question.  Did anyone you solicited at SCA fall under your

2    nonsolicit agreement?

3         THE WITNESS:  Your Honor, because I went to a

4    different type of business, a surgery business, leaving a

5    dialysis business, I didn't view my own nonsolicit as impacting

6    people I would recruit from DaVita.  That said, other

7    executives we recruited from DaVita, you know, may have had

8    their own nonsolicits that were outside of mine.  And I just

9    don't know.

10        THE COURT:  Question:  Was the tell-your-boss

11   requirement in the SCA and DaVita and SCA and USPI agreements

12   to ensure that employees were serious about leaving?

13        THE WITNESS:  Your Honor, my recollection, again, is,

14   you know, it was a way to prove or demonstrate or validate that

15   that person was looking anyway.  That's, you know, the spirit

16   and kind of the context with which I remember, you know,

17   Mr. Thiry referring to that need to let someone know.

18             Am I answering your question, sir?

19        THE COURT:  It's not my question; it's theirs.  But --

20   I think you did.  It's -- the question was:  Was the

21   tell-your-boss requirement in those two -- with those two

22   companies, DaVita and USPI, intended to ensure that employees

23   were serious about leaving?

24        THE WITNESS:  Yes.  So I do think I answered it.  I

25   recall thinking about it in the terms I just described, which

1    is a way to demonstrate that the person was looking anyway.  I

2    didn't think about it in the terms of, was serious at the time.

3         THE COURT:  In your experience, do executive directors

4    respond to solicitations or reach out to prospective employers

5    if they are not serious about changing jobs?

6         THE WITNESS:  Your Honor, I'd say it's very much up to

7    the individual.  Some people send out a lot of, you know,

8    outreaches or LinkedIn, and they like to be in a lot of

9    conversations.  And other senior executives are happily in

10   their job for a long, long time and don't take calls or make

11   calls.  So I think it's the individual.  Very individual.

12        THE COURT:  Question:  Did SCA and other companies

13   that they did business with have written formal no-solicit

14   agreements?

15        THE WITNESS:  The only two nonsolicit agreements of

16   this nature that I'm aware of are DaVita and USPI.  You know,

17   in my experience, those are the only two that have come up.

18   And as I described, they were the two companies we did a lot of

19   work with.  Different kinds of work, but had a lot of

20   interaction with.

21        THE COURT:  Question:  If Bridie Fanning had expressed

22   concern over agreements that you had with other partners or

23   companies, would you have considered her thoughts and been open

24   to changing agreements or policies?

25        THE WITNESS:  Yes, sir.  First, I'd start with, we had

1     a collaborative, open culture.  We encouraged feedback.  We

2     encouraged people to push back, and they did.  I mean, I

3     received feedback from everything to how I dressed to how I

4     talked to -- I mean, we wanted feedback.  And I'd say

5     especially so for a senior executive like Dr. Fanning.  She is

6     an extraordinarily accomplished human resources leader.  She

7     works with CEOs.  I mean, we would have -- not only I, we would

8     have taken that feedback, thought about it, acted on it, if

9     there was anything about morality or improperness or unfairness

10    or -- I mean, believe me, our culture was based on doing what

11    is right.

12            And I'd say, that's true for all the normal reasons.

13    It's especially true for SCA because the company that -- the

14    predecessor company at SCA that we were trying to save had had

15    its own legal problems.  So we were driven and motivated to do

16    everything right and to be, you know, by the book and proper,

17    for all the normal reasons you would in life, and even more,

18    because of the history of SCA before we stepped in.

19            All the way to the extent of, we had, you know,

20    anonymous lines -- you could call an anonymous line and share

21    anything that was of concern to you.  And our teammates, our

22    employees, did.  We got submissions about, I don't like my

23    boss, to, you know, I want a different kind of soda in the

24    refrigerator.  We reviewed all of them.  They got rolled up and

25    summarized to the board of directors regularly.  So there are

1    all sorts of avenues to share feedback, and I would have taken

2    Dr. Fanning's very seriously.

3              THE COURT:  Follow-up by the government.

4              MS. LEWIS:  Your Honor, we do have follow-up.  Did you

5    want to break?

6              THE COURT:  Depends on how much -- if you can finish

7    relatively quickly, we can let the witness go.  If you think

8    you're going to be lengthy, we'll take our lunch now.

9              MS. LEWIS:  I think it may be prudent to take lunch.

10             THE COURT:  All right.  How much time would you like

11   for the lunch break today, folks?

12             JUROR:  Hour and ten minutes.

13             THE COURT:  An hour and ten minutes.  That would put

14   us to 1:35.  Okay.  Done.

15             (Recess at 12:25 p.m.)

16             (In open court at 1:50 p.m.)

17             COURTROOM DEPUTY:  They have more questions.

18             (Hearing commenced at the bench.)

19             THE COURT:  I just handed you Question 15.

20             MR. MELSHEIMER:  No objection.

21             MS. LEWIS:  May we see that one?  Counsel did not have

22   an opportunity --

23             THE COURT:  I thought you already saw it.

24             MS. CLINGAN:  That one is fine with me.

25             MS. LEWIS:  No objection.

1              THE COURT:  Okay.  16.

2              MR. DODDS:  We'll pass this back to you in a second.

3              THE COURT:  Objection to 16?

4              MR. MELSHEIMER:  No.

5              MS. LEWIS:  No objection.

6              MR. MELSHEIMER:  No objection.

7              (Hearing continued in open court.)

8              (Jury in at 1:52 p.m.)

9              THE COURT:  All right.  Have a seat.

10             As evidence of the jury's dedication to the task,

11    while I was checking the leaderboard at Augusta, they were

12    asking more questions, which I will now ask Mr. Hayek.

13             Question:  You mentioned, quote, other ways, close

14    quote, to recruit even with the agreement in place.  Can you

15    explain those other ways?

16             THE WITNESS:  Yes, sir.  One way is because we already

17    employed a number of SCA executives -- pardon me -- DaVita

18    executives at SCA, they knew people, and they were catching up

19    with friends and, you know, talking to colleagues at DaVita.

20    And they could learn that somebody was looking.  And if they

21    were looking and they had told their, you know, supervisor,

22    then that someone who -- you know, our executive who came from

23    DaVita would know, okay, we can recruit or solicit that person.

24    So that's one way.

25             Another way is that search executives, recruiters,

1   these executives who -- search firms who recruit senior

2   executives, they often have a network of relationships, or

3   they're recruiting for multiple positions at a time.  And so

4   they're in contact with people, not around just one

5   opportunity, but multiple, or just catching up.  You know,

6   they've known that executive, and they check in once or twice a

7   year.  And if they learn that that DaVita executive was looking

8   and was, you know -- had let their supervisor or, you know --

9   know, then that could be a solicitation, as well.  So those are

10  two ways that it could occur.

11          THE COURT:  And the next question is:  This would

12  still have to involve the employees telling their boss;

13  correct?

14          THE WITNESS:  Yes, sir.  You still would need to be

15  looking and have told your boss that you're considering other

16  job opportunities.

17          THE COURT:  And this next question, perhaps you've

18  already answered.  Were there any other ways to open the door?

19          THE WITNESS:  Yes, sir.  You could reach out, as

20  Mr. Kay did.  Then we'd respond the way that, you know, you

21  need to be looking and have told your supervisor, so somebody

22  could reach in.  I suppose somebody could see a posting, and

23  then we'd respond the same way.  To advance in the process, you

24  know, you need to be looking and have told your supervisor.  So

25  I think those are maybe four ways that come to mind.

1      THE COURT:  Question:  Before the agreement, many

2  executive positions had been filled.  How many do you estimate

3  were open when the agreement started in 2012?

4      THE WITNESS:  My guess is that -- so if you step back,

5  and you think about at the -- you know, back in 2012, at the

6  vice president level and above, maybe there are 50 people out

7  of the 5 or 6,000 that worked at SCA.  So out of those 50

8  people, maybe a few are leaving each year, and then you're

9  maybe adding a few roles a year at that level.  Maybe that's

10  half a dozen, perhaps slightly more that you're recruiting in a

11  given year.  So at a point in time, it probably would be less

12  than, you know, five or six senior executives roles back in

13  2012.  So my guess would be, less than a half a dozen roles.

14      THE COURT:  Next question is:  How many executive

15  positions do you estimate were filled during Bridie's tenure?

16      THE WITNESS:  So, Your Honor, Bridie -- Dr. Fanning

17  was with us for two years.  I would guess maybe 20 -- 15 or

18  20 -- I'll go with 20.  We had grown.  And if you add the

19  director role, that expands the pool a bit more from the vice

20  president role.  So 20 over the course of two years, sir.

21      THE COURT:  I probably should have read the next

22  sentence as part of the question.  The next question is:  She

23  indicated that that was one of her focus areas.

24      THE WITNESS:  Yes, sir.  Recruiting and -- recruiting

25  senior executives, as well as broad recruiting, was a big part

1    of Dr. Fanning's job.  She was our senior-most human resources

2    leader, and she brought a background in talent and talent

3    management, recruiting or those sorts of things.  I think

4    that's accurate.  She had other responsibilities but that is a

5    major one.

6          THE COURT:  The next question:  You spoke about how

7    the tell-your-boss rule serves to validate the intent of the

8    employee.  With three parties involved -- one, the current

9    employer; two, the potential employer; and, three, the current

10   employee -- how would you say that each are impacted either

11   positively or negatively from this validation of intent?

12         THE WITNESS:  Well, let me think for a moment.  From

13   the --

14         THE COURT:  Maybe I should read the -- there is

15   something on the back here.  I'll read this too.  Okay?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  It is easy to see the positive impact for

18   both the current and potential employers, but do you see any

19   positive impact for the current employee?

20         THE WITNESS:  Yes, sir.  So I'll answer that last part

21   first.  I think for senior executives, we're all co-owners of

22   the business.  Senior executives are paid based on the growth

23   and success of the business.  You know, so the growth and

24   success of SCA in total, you know, ties to how well the senior

25   executives, the 1 percent of the senior-most managers of the

1    company, are paid in terms of their bonus and the value they

2    get out of their ownership stake, their stock options, so there

3    is a collective benefit.  And to some degree, you know, it

4    reflects well on their career to be part of a successful

5    company that went from in a very troubled spot to successful

6    and growing.  So, you know, those can be -- those can be

7    positives.

8         You know, a potential positive is if their current

9    employer seeks to retain them and make a counteroffer and, you

10   know, compete for them.

11        A negative is if they're uncomfortable telling their

12   supervisor that they're considering other job opportunities,

13   and that causes them to be hesitant, and they don't move

14   forward in a solicitation process.  And I've had that

15   experience in my career, at some points being -- not wanting to

16   share.  I've had other points in my career where I've been open

17   and shared it.  And that, Your Honor, is very individual.  Very

18   individual part.

19        Would you like me to answer about the two company part

20   or was the focus, sir, on the individual, the employee?

21        THE COURT:  I think the focus was on the pluses and

22   minuses for the employees.

23        THE WITNESS:  Yes, sir.  I think I've summarized for

24   the executives the ones that come to mind.  Let me pause one

25   more second.

1      THE COURT:  It's okay.  We're going to get some

2  questions from the lawyers, so you can think some more if you

3  need to.

4      THE WITNESS:  Okay.  Thank you.

5      THE COURT:  Any other questions before we turn it back

6  to the lawyers?

7      (No response.)

8      Ms. Lewis, do you have follow-up?

9      MS. LEWIS:  I do, Your Honor.

10                          **EXAMINATION**

11  BY MS. LEWIS:

12  Q.  So, Mr. Hayek, just picking up right where we left off

13  there.  So did you ramp up recruiting after 2012?

14  A.  Pardon me?

15  Q.  Did you ramp up recruiting at some point after 2012?

16  A.  I think there was a lot of recruiting pre-2012, in the

17  turnaround phase.  And then after that, we recruited as we

18  grew.  And so I'm sure it did increase as the company increased

19  in size; but the intense turnaround period was up front.

20  Q.  Then when Dr. Fanning came on board, did you ramp up

21  recruiting again in that time period?

22  A.  I think we systematized and organized the recruiting

23  better.  I wouldn't say her joining caused us to recruit more

24  people, but we were more organized about it.  She added a lot

25  of process and structure.

643

Andrew Hayek – Examination

1   Q.  And you had a number of positions to fill at that point in

2   time; is that fair?

3   A.  Yes.

4   Q.  And how many people, if you know, may get solicited for any

5   one open position?

6   A.  At the senior-executive level?

7   Q.  Yes.

8   A.  Many.  Often you're soliciting interest from, I'm going to

9   guess, 20, 30 people; and then you ultimately choose one.

10  Q.  And did your agreement with Mr. Thiry allow solicitation

11  for job opportunities to happen with DaVita employees?

12  A.  No, not unless they followed the parameters.

13  Q.  And what impact did the agreement that you had with

14  Mr. Thiry have on employees' ability to be solicited by either

15  DaVita or SCA?

16  A.  Reduced.

17  Q.  And in the ordinary course, does an employee always have

18  their own choice and their option to raise a potential offer to

19  their own employer?

20  A.  Yes.

21  Q.  And did the agreement that you had with Mr. Thiry allow

22  that choice, or did it take it away?

23  A.  It took that choice away.

24  Q.  And do you recall that we looked at yesterday an email from

25  Mr. Thiry, where he referred to candidates telling their

Andrew Hayek - Examination

1    boss -- this tell-your-boss provision, and they wanted to --

2    I'm sorry -- telling their boss they wanted to leave, and he

3    stated that most of the time the candidate refused to do it.

4    Do you recall looking at that email?

5    A.  I do recall looking at that email.

6    Q.  What is your view about whether Mr. Thiry's belief was one

7    of the factors that motivated him to ask you for the

8    tell-your-boss rule?

9         MR. MELSHEIMER:  Your Honor, I'm going to object to

10   the question as calling for speculation.

11        THE COURT:  Sustained.

12   BY MS. LEWIS:

13   Q.  Mr. Hayek, did you have personal interactions and

14   conversations with Mr. Thiry about the tell-your-boss rule?

15   A.  Yes.

16   Q.  And based on your personal interactions and your experience

17   and your discussions with Mr. Thiry, what was -- what did

18   Mr. Thiry express about whether that was one of the factors

19   that motivated him?

20   A.  My recollection is mostly around audit, making sure people

21   weren't cheating on it.  And I do recall that email, that

22   most of the time they don't -- they're not serious about

23   looking or they're not serious about leaving.

24   Q.  And was the fact that most of the time the candidate

25   refuses to do it part of what Mr. Thiry's expressed to you

Andrew Hayek - Examination

1  about this provision?

2          *MR. MELSHEIMER:*  Objection, Your Honor.  Leading.

3          *THE COURT:*  Sustained.

4  *BY MS. LEWIS:*

5  *Q.*  What, if anything, did Mr. Thiry express to you about

6  whether candidates want to tell their bosses that they're

7  leaving?

8  *A.*  In that 2008 email, that most of the time they don't.

9  That -- something to the extent, they're not serious about it

10  or -- serious enough to tell their boss.

11  *Q.*  And did that sentiment have anything to do with the reason

12  that Mr. Thiry asked you for that requirement?

13  *A.*  It may have.

14  *Q.*  And you testified that whether a person is comfortable

15  telling their boss depends on the boss in question and the

16  relationship; is that right?

17  *A.*  Yes, in part.  There are other factors, but that's a part.

18  *Q.*  And has it been your experience that the personality of the

19  boss matters to the employee in that decision?

20  *A.*  Yes.  That's a factor.

21  *Q.*  I want to ask you:  You testified about your agreement with

22  Mr. Wilcox; do you recall that?

23  *A.*  Yes.

24  *Q.*  And when you formed the agreement with Mr. Wilcox, were you

25  relatively new in the ASC industry?

646

Andrew Hayek - Examination

1   A.   Yes.

2   Q.   What was Mr. Wilcox's stature in the industry?

3   A.   Mr. Wilcox, who was the CEO of USPI, was a senior statesman

4   of the industry.  He led a very successful company and knew a

5   lot about the industry.  He was very, very well thought of.

6   Q.   Did you look up to him?

7   A.   Yes, I did.

8   Q.   And when you referred to advocacy efforts in Washington,

9   D.C., in layman's terms, what is that type of advocacy called?

10  A.   Many people would call it lobbying or -- let me just -- in

11  plain terms, it was telling the story of why surgery centers

12  are good for America and good for the healthcare system and

13  explaining that to that various people in Washington, D.C., who

14  make decisions.

15  Q.   Members of Congress, for example?

16  A.   Yes.  Members of Congress, Medicare, Medicaid, other

17  agencies.  Yes.

18  Q.   And who asked for or initiated the agreement between you

19  and Mr. Wilcox?

20  A.   Mr. Wilcox did, in his own style.

21  Q.   And you also testified that you did not use code words or

22  try to hide this agreement at SCA or with its retained

23  recruiters; did you testify to that?

24  A.   Correct.

25  Q.   Okay.

Andrew Hayek - Examination

1   A.  I didn't think there was anything wrong in --

2   Q.  Mr. -- let me ask the question.  When you were referring to

3   "we" in your answer there -- do you remember that, you used the

4   word "we" in your answer?

5   A.  Regarding communicating?

6   Q.  Yes.  Were you referring to you and your colleagues at SCA?

7   A.  Yes, I believe I was.

8   Q.  And are you able to say whether Mr. Thiry used code words

9   when he spoke about this agreement internally at DaVita?

10  A.  No.  I'm not able to speak to the communications I wasn't

11  on.

12  Q.  And at the time that you entered the agreement with

13  Mr. Thiry, how would you compare Mr. Thiry's level of business

14  experience with your own?

15  A.  Well, more senior, more experienced.

16          MS. LEWIS:  Thank you.  No further questions.

17          MR. MELSHEIMER:  May it please the Court, Your Honor?

18                          **EXAMINATION**

19  BY MR. MELSHEIMER:

20  Q.  Mr. Hayek, with respect to code words, it's not your

21  testimony that Mr. Thiry used any code words with you; right?

22  A.  No.  I'm not aware of any.

23  Q.  Do you know of anybody using code words in this whole

24  arrangement?

25  A.  No.

Andrew Hayek - Examination

1   *Q.* You were asked some questions about USPI.

2   *A.* Yes.

3   *Q.* Do you recall, sir, that that agreement was originally

4   entered into by you and Mr. Wilcox in 2010 or 2011?

5   *A.* Yes.

6   *Q.* Finally, you were asked a question from a member of the

7   jury about a no-hire agreement.

8   *A.* Yes.

9   *Q.* Just to be clear, the agreement that you reached with

10  Mr. Thiry was not a no-hire agreement; true?

11  *A.* Correct.  It placed parameters or limitations on

12  solicitation.

13  *Q.* There are no-hire agreements sometimes in your business;

14  right?

15  *A.* Yes.  In some cases, with a particular transaction, you

16  could have one.

17  *Q.* Well, you might have such an agreement with a recruiting

18  firm, for example, if they -- if they place a recruit in your

19  company, then they might promise forever, never to hire that --

20  try to recruit that person to go somewhere else; right?

21  *A.* Yes.  I think it's often for a time period; but, yes,

22  directionally.

23  *Q.* It could be for a time period.  It could be forever; right?

24          *MS. LEWIS:* Objection.  Speculative.

25          *THE COURT:* Overruled.

Anthony Gabriel – Direct

1          *THE WITNESS:*  I'm not sure.  It could be either way.

2          *MR. MELSHEIMER:*  Your Honor, may I have just one

3     moment?

4          *THE COURT:*  Yes.

5          *MR. MELSHEIMER:*  Mr. Hayek, thank you, sir.

6          *THE COURT:*  Thank you, sir.  You're excused.  Free to

7     go.

8          *THE WITNESS:*  Thank you.

9          *THE COURT:*  Or stay and watch if you want.

10         Next witness.

11         *MR. MARIANO:*  United States calls Dr. Anthony Gabriel.

12         Your Honor, I have a binder of documents for the

13    witness.  I have one for the bench, as well, if that's helpful.

14         *THE COURT:*  I don't need it.  I don't know if the

15    witness needs it.

16         *THE WITNESS:*  Hello, sir.

17         *THE COURT:*  Hello.

18         (**ANTHONY GABRIEL, GOVERNMENT'S WITNESS, SWORN**)

19                        **DIRECT EXAMINATION**

20    BY MR. MARIANO:

21    *Q.*  Good afternoon.

22    *A.*  Hello.

23    *Q.*  Could you please state and spell your name for the record.

24    *A.*  My name is Anthony Gabriel.  First name, A-N-T-H-O-N-Y.

25    Last name is G-A-B-R-I-E-L.

650

Anthony Gabriel – Direct

1    Q.   Where do you work?

2    A.   I currently work at Radiology Partners.

3    Q.   What is Radiology Partners?

4    A.   Radiology Partners is a large radiology practice.  We have

5    about 3,000 radiologists and operate around 100 imaging centers

6    across the United States.

7    Q.   Is Radiology Partners sometimes called RAD Partners?

8    A.   Yes, RAD Partners, or sometimes we refer it to as RP.

9    Q.   What is your position within RAD Partners?

10   A.   I'm the chief operating officer.

11   Q.   Has RAD Partners applied for leniency in connection with

12   this case?

13   A.   Yes.

14   Q.   And is leniency an arrangement in which people who report

15   potential antitrust violations receive a promise not to be

16   prosecuted?

17   A.   Yes, that is my understanding.

18   Q.   Are you hoping as part of that leniency agreement that you

19   personally won't be prosecuted?

20   A.   Yes.

21   Q.   Can you describe the underlying conduct for which RAD

22   Partners will receive leniency?

23   A.   It's related to an understanding that Radiology Partners

24   had with DaVita with relation to hiring DaVita employees.

25   Q.   And who are the parties to this agreement, in terms of

Anthony Gabriel - Direct

1  individuals?

2  *A.*  The two individuals were Kent Thiry and Rich Whitney.

3  *Q.*  Do you know who first proposed this restriction on

4  recruiting?

5  *A.*  The proposal was initially sent out by Rich, following a

6  conversation that he had had with Kent.

7  *Q.*  And your leniency agreement with the United States requires

8  you to cooperate and provide testimony if called; is that

9  right?

10  *A.*  Yes.  That's correct.

11  *Q.*  So you mentioned you work at RAD Partners currently.  Can

12  you provide the jury with a brief overview of your professional

13  background?

14  *A.*  Yes.  I started -- I finished my residency and practiced

15  medicine in Southern California.  I was a hospitalist there

16  full time for about three years, part time for almost seven

17  years.  That part time was while I was also working at DaVita.

18  I continued to practice a little bit, then.  I worked at DaVita

19  for about 15 years in the areas of information technology,

20  revenue management, and operations.  And left there, and we got

21  Radiology Partners started right around the end of 2012,

22  beginning of 2013.

23  *Q.*  And you mentioned you're a hospitalist.  What's a

24  hospitalist.

25  *A.*  So a hospitalist is a physician that takes care of patients

Anthony Gabriel – Direct

1   that are in the hospital.  Very commonly, primary care doctors,

2   like internists and family practitioners, they don't have the

3   skills or the time anymore to take care of a small number of

4   patients that are admitted to the hospital, so they transfer

5   their care to somebody like me.  It's actually -- when I

6   started it was very uncommon.  Now it's become very common.

7   Almost every hospital has them.

8   Q.  Dr. Gabriel, I want to make sure the jurors are getting all

9   the information you have, so it's important to just speak a

10  little slower.  Is that okay?

11  A.  I can do that.

12  Q.  You mentioned you currently work at RAD Partners.  And did

13  you mention where you worked immediately prior to RAD Partners?

14  A.  Yes.  DaVita, is where I worked for about 15 years.

15  Q.  So when were you first hired at DaVita?

16  A.  That would have been in 1998.  And at that time, it was

17  actually called Total Renal Care.  It wasn't called DaVita

18  until a couple of years later.

19  Q.  What kind of business is DaVita?

20  A.  It's a kidney care business.  Primarily operates dialysis

21  centers around the U.S. and other parts of the world.

22  Q.  And when you worked at DaVita, where did DaVita operate?

23  A.  When I first started there, it was in the United States;

24  and then later on, the company had expanded internationally.

25  Q.  And did DaVita have employees in one state or multiple

653

Anthony Gabriel – Direct

1   states while you worked there?

2   A.  Multiple states.

3   Q.  You said you started at DaVita around 1998.  Do you recall

4   what your first position was there?

5   A.  I believe the title was director of process management.  I

6   kind of was an interface between the different operating units

7   and out in the -- the Midwest, primarily, and the corporate

8   office from an operational perspective when I first started.

9   Q.  Do you recall what your last formal position was at DaVita

10  before you left?

11  A.  My last formal -- I was the CIO, was my last formal

12  position before I left.

13  Q.  And in case the jury is not familiar, what is CIO?

14  A.  The chief information officer.  I was responsible for the

15  technology and information systems at the company.

16  Q.  And approximately when were you in that position?

17  A.  That would have been approximately 2008 to 2012, roughly,

18  about that time period, maybe 2009.  I don't remember exactly

19  the year.

20  Q.  And can you give us a sense within DaVita of how high up in

21  the org chart CIO would be.

22  A.  It's a senior position.  I reported to Kent for part of my

23  time as the CIO officer.

24  Q.  Approximately how many people at DaVita reported to you in

25  that role?

654

Anthony Gabriel – Direct

1  *A.*  Well, if you count the entire kind of span of control, not

2  directly reporting to me, it was between 800 and a 1,000, plus

3  some contracts we had used overseas.

4  *Q.*  What were your general responsibilities as CIO?

5  *A.*  I was responsible for the computer technology, software,

6  laptops, servers, networking systems, things like that.

7  *Q.*  Did you have any responsibilities with respect to

8  recruiting or hiring?

9  *A.*  Within my -- within the information technology area, yes.

10  We were recruiting for people that directly reported to me; and

11  also I oversaw positions within the department, of course, as

12  well.

13  *Q.*  And in your experience at DaVita, did DaVita recruit

14  employees from one state or from multiple states?

15  *A.*  We would recruit from multiple states.

16  *Q.*  And were there cases where an employee would move from one

17  state to another for a job at DaVita?

18  *A.*  Occasionally, yes.

19  *Q.*  You might have mentioned this earlier, but who did you

20  report to when you were CIO?

21  *A.*  I reported to Kent for part of my time, and I reported to

22  Javier Rodriguez for part of the time.

23  *Q.*  Who is Mr. Rodriguez?

24  *A.*  He is currently the CEO at DaVita.

25  *Q.*  So you mentioned you reported to Mr. Thiry for at least

Anthony Gabriel – Direct

1   some of that time.  What kind of working relationship did you

2   have with Mr. Thiry?

3   A.  I would say, generally, very good.  I -- we interacted

4   regularly, would have live meetings every four to eight weeks,

5   I would say, plus interactions via email, voicemail,

6   telephone on a much more frequent basis.

7   Q.  And was that sort of frequent communication only in your

8   position as CIO or in other positions, as well?

9   A.  I'm sorry.  Can you maybe rephrase the question a little

10   bit?  I'm not sure I totally understand.

11   Q.  Sure.  I think you were describing how closely you worked

12   with Mr. Thiry.  I'm asking if that was only in your role as

13   CIO or if you had that relationship for other positions, as

14   well?

15   A.  It was primarily at that last role when I was the CIO; but

16   I also had a close relationship -- working relationship with

17   him previous to that role, as well.

18   Q.  You also have a personal relationship with Mr. Thiry?

19   A.  I would describe us as very close work colleagues.  I

20   didn't see him socially outside of work events, typically.

21   Q.  So you mentioned you had some responsibility for recruiting

22   and hiring at DaVita.  Was retention of employee talent

23   important at DaVita?

24   A.  Yes.  Very important.

25   Q.  How do you know that?

Anthony Gabriel – Direct

1    A.  I participated in meetings with Kent.  We would do a review

2    of top talent periodically, make sure that we were doing

3    everything possible to retain those people.  We wanted to make

4    sure they had good assignments, they were being paid

5    appropriately.  Top talent was very important to the

6    organization.

7    Q.  And in your experience, was Mr. Thiry personally focused on

8    retaining employee talent?

9    A.  Yes.

10   Q.  So based on your experience, how could losing employee

11   talent affect a businesslike DaVita?

12   A.  Top talent is what makes the organization perform well.  So

13   losing top talent could impact it from a financial perspective,

14   from an operating perspective, for a healthcare company like

15   DaVita, from a clinical and patient-care perspective.  So it

16   was important to keep top people.

17   Q.  One of the items you mentioned was an impact from a

18   financial perspective.  So how could losing employee talent

19   affect DaVita financially?

20   A.  It -- you know, if operating performance in the business

21   wasn't strong, costs went up, revenue went down, profits

22   wouldn't be as good, and so that could impact the business from

23   a financial perspective.

24   Q.  DaVita is a publicly traded company; is that right?

25   A.  That's right.

Anthony Gabriel - Direct

1   Q.  So what, if any, impact could losing employee talent have

2   on DaVita's stock price?

3   A.  Well, if you lose a lot of top people, the stock price

4   could be negatively impacted.

5   Q.  And at the end of your time with DaVita, you and Mr. Thiry

6   were both C-level executives; is that right?

7   A.  Yes.

8   Q.  So do you have an understanding of the ways in which

9   C-level executives were compensated at DaVita?

10  A.  Yeah.  So C -- senior executives at DaVita were compensated

11  with a mix of salary -- at least at the time I was there --

12  salary, a performance bonus, and usually some sort of stock

13  award, as well.

14  Q.  So based on your experience, did the ability to retain

15  employee talent affect any of those areas of compensation?

16  A.  Yeah.  The -- it certainly could, if one was to not retain

17  top talent within their area, it could negatively -- if you

18  lost all of your top talent, you probably wouldn't get a very

19  good performance bonus, your salary might not go up, things of

20  that nature.

21  Q.  What about the equity award?

22  A.  If it was severe enough to negatively impact the stock

23  price, I suppose that part would not be as high, as well.

24  Q.  So all three components of an executive's total

25  compensation could be affected by losing employee talent;

Anthony Gabriel – Direct

1   right?

2   A.   That's correct.

3   Q.   When you worked at DaVita, did you ever see executives

4   leave DaVita and go to other companies?

5   A.   Yes.

6   Q.   And did you ever observe those executives recruit employees

7   from DaVita to their new companies?

8   A.   Yes.

9   Q.   Did you ever observe how Mr. Thiry would respond to that?

10   A.   Not directly.  But I know that Kent would be upset if you

11   had people that left and recruited people away to go work at a

12   new company -- people they had known while they were working at

13   DaVita.

14   Q.   Had you heard that Mr. Thiry was upset about any particular

15   instances of that?

16   A.   I know when -- when Bill left, he was -- Bill Hughson left,

17   he was upset that Bill had recruited some people away.  But,

18   otherwise, I just have some more general knowledge of that.

19   Q.   Sure.  Let's take a look at a document on that.

20          This is Government Exhibit 152, which has been

21   previously admitted.

22          Is this an email thread ending November 9, 2010,

23   between Bill Hughson and Kent Thiry, copying you?

24   A.   Yes.

25   Q.   Who is Bill Hughson?

Anthony Gabriel - Direct

1   *A.*  Bill was an executive at DaVita.

2   *Q.*  Do you know where he worked at the time of this email?

3   *A.*  He was working at DeVry.

4   *Q.*  Do you know where Hughson worked after DeVry?

5   *A.*  I know subsequent to DeVry, Bill was the CEO of a company

6   called IntegraMed.  After that, I don't remember if it was

7   directly after he left DeVry or if there was something else in

8   between.

9   *Q.*  So let me direct you to the email at 11:02 p.m.  Can you

10  read the text of that email, starting with the subject?

11  *A.*  "Subject:  Kathy, please set up an 30-minute call with Bill

12  and I."  The body says, "Subject is his recruiting of DaVita

13  teammates.  No rush.  Sometime before Christmas, please."

14  *Q.*  And who sent that message?

15  *A.*  Kent.

16  *Q.*  And who did he send that to?

17  *A.*  He sent it to Bill Hughson.

18  *Q.*  So there are some other individuals copied here, and I'd

19  like to ask you about a few of them.

20        You mentioned Javier Rodriguez previously.  Was he a

21  senior executive at DaVita at the time?

22  *A.*  He was.

23  *Q.*  Another executive here is Dennis Kogod.  Who is Dennis

24  Kogod?

25  *A.*  I believe Dennis was the -- he was a senior executive.  I

Anthony Gabriel - Direct

1    believe he was the chief operating officer at that time.

2    Q.  Laura Mildenberger is also copied.  Who was that?

3    A.  Laura was the chief people officer, or the head of human

4    resources.

5    Q.  And Rich Whitney is also copied?

6    A.  Yes.

7    Q.  Who is Mr. Whitney?

8    A.  Rich is currently the CEO at Radiology Partners --

9    Q.  Do you know --

10   A.  He was a senior executive at DaVita at that time, I don't

11   recall his exact title at that time.

12   Q.  Generally, what did you understand from receiving this

13   email?

14   A.  My general understanding was that Kent was upset that Bill

15   was recruiting people from DaVita.

16   Q.  And what did Mr. Thiry do in response to being upset?

17   A.  He was reaching out to talk with Bill about it.

18          MR. MARIANO:  Let's go to Government Exhibit 153, and

19   just show this to the witness.

20   BY MR. MARIANO:

21   Q.  Dr. Gabriel, is this an email thread ending June 14, 2011,

22   between Dennis Kogod and Kent Thiry, copying you?

23   A.  Yes, it is.

24          MR. MARIANO:  Your Honor, could we move for admission

25   of this document?

1        MR. DODDS:  I'm having trouble seeing.  Just give me

2    one second please.

3            No objection.

4        THE COURT:  Admitted.

5        (Exhibit 153 admitted.)

6    BY MR. MARIANO:

7    Q.  And, Dr. Gabriel, can you read the text of the first

8    email here, again, starting with the subject line.

9    A.  The subject is, "Hughson continues to recruit our people.

10   Private.  Do not forward."  And then the body says, "Make sure

11   our searches include recruiting his."

12   Q.  And who sent that message?

13   A.  That was from Kent Thiry.

14   Q.  And what did you understand Mr. Thiry's order, "Make sure

15   our searches include recruiting his" to mean?

16   A.  That when DaVita was recruiting for talent, that we would

17   recruit at Bill's company, which at that time was DeVry.

18   Q.  Did you understand why Mr. Thiry wanted to recruit from

19   DeVry in this case?

20   A.  My understanding was because Bill was recruiting from

21   DaVita.

22   Q.  Was this a form of retaliation?

23   A.  I mean, I suppose you could say that.

24   Q.  Can you read Mr. Kogod's response in the next email?

25   A.  Yes.  It says, "Laura, can you get us a list of his folks

Anthony Gabriel – Direct

 1   with contact numbers somehow."

 2   *Q.*   And who was Laura, in this context?

 3   *A.*   Laura is Laura Mildenberger, the chief people officer.

 4   *Q.*   What did you understand this request to be?

 5   *A.*   Dennis was asking if Laura could get contact information so

 6   that if anybody was recruiting, we could recruit one of those

 7   people.

 8            *MR. MARIANO:*   Great.   We can set that document aside.

 9   *BY MR. MARIANO:*

10   *Q.*   Let me turn to your experience at RAD Partners.   When did

11   you start working at RAD Partners?

12   *A.*   We got the business started towards the end of 2012 and

13   really started in earnest in '13 -- 2013.

14   *Q.*   Why did you start working there?

15   *A.*   Why did I start working there?

16   *Q.*   I should say, you co-founded RAD Partners; right?

17   *A.*   I did.   Co-founded it with Rich Whitney and one other

18   gentleman, Scott Castle.

19   *Q.*   What was the idea behind co-founding RAD Partners?

20   *A.*   The idea was that a large-scale radiology practice could

21   significantly outperform and do a better job taking care of

22   patients than an average-sized practice.   We saw a really big

23   opportunity there to improve clinical results and build a big

24   business.   So that's why we did it.

25   *Q.*   You mentioned Mr. Whitney was also one of the co-founders;

Anthony Gabriel – Direct

1   right?

2   A.   Yes, he was.

3   Q.   Did you know Mr. Whitney from your time at DaVita?

4   A.   Yes, I did.

5   Q.   And what position did he have at RAD Partners?

6   A.   Rich was the CEO at RAD Partners from the time we started.

7   Q.   Did Mr. Thiry have any relationship with RAD Partners?

8   A.   He did.  Later on, Kent did make an investment in Radiology

9   Partners.

10  Q.   Between its founding in approximately 2012, 2013, and 2019,

11  where did RAD Partners operate?

12  A.   When we first started, we were only in Southern California.

13  But the first radiology practice that joined us was based in

14  Texas and Oklahoma; and over the course of the years, going

15  forward to 2019, we expanded and started operating in many

16  other states.  Today we're in about 29 states on site.  And all

17  states, we serve remotely.  In 2019 it was probably between 20

18  and 25 states that we were serving at that time.

19  Q.   And did RAD Partners also have employees in multiple

20  states?

21  A.   Yes, we did.

22  Q.   And in your experience, would RAD Partners recruit from one

23  state or from multiple states?

24  A.   We recruited from multiple states.

25  Q.   And in your experience, would employees, just like at

Anthony Gabriel - Direct

1   DaVita, sometimes move from one state to another for a job at

2   RAD Partners?

3   A.  Occasionally, yes.

4   Q.  Let me take a step back.  When you started and co-founded

5   RAD Partners, did you need to hire additional employees?

6   A.  Yes, we did.

7   Q.  And can you generally describe for the jury what you are

8   looking for in new employees.

9   A.  Well, at the very beginning in 2013, we were very small.

10  There was less than ten people there -- only three when we

11  first started.  We were looking for people that were smart, had

12  knowledge of the healthcare space, were versatile, could do

13  lots of different things, would be a good fit for the culture.

14  We wanted people that very kind of patient-oriented,

15  patient-centric, were committed to improving care, because

16  that's what was really important to us.  Those were the things

17  that we were after.

18  Q.  Were there particular companies that were attractive for

19  RAD Partners to recruit from?

20  A.  Many healthcare companies that had a lot -- yeah, had a lot

21  of attractive talent we were recruiting from, some consulting

22  firms, as well.  We would attract people that were consultants

23  that worked on lots of different healthcare projects.  So a

24  number of firms.

25  Q.  What did DaVita, was DaVita an attractive source of talent

Anthony Gabriel – Direct

1    for RAD Partners?

2    A.   Yeah.   DaVita was certainly an attractive source of talent.

3    It's a healthcare firm.   Top people that worked there, did a

4    good job of mentoring, training, developing their people,

5    certainly.

6    Q.   When you first started RAD Partners, did you in fact hire

7    some employees from DaVita?

8    A.   We did.

9    Q.   So let me ask you about a very different topic.   When you

10   left DaVita, did you have any nonsolicitation terms in any

11   employment contracts from your time there?

12   A.   Yes.

13   Q.   And, generally, what were those terms?

14   A.   That I was not to solicit employees from DaVita for a

15   period of one year after I left.

16   Q.   And who were those agreements between?

17   A.   The agreement was between me and DaVita.

18   Q.   Were those agreements written down in contracts?

19   A.   Yes.   It was part of an -- a contract.

20   Q.   And were those nonsolicitation clauses negotiable in the

21   sense that you could always refuse to sign a contract?

22   A.   You could refuse.

23   Q.   Were you receiving compensation in exchange for entering

24   those agreements?

25   A.   Yes.

Anthony Gabriel – Direct

1  Q.  I think you said the agreement lasted one year after you

2  left DaVita; is that right?

3  A.  The term of the nonsolicitation was one year after I left I

4  was not to solicit DaVita employees.

5  Q.  And that would be until approximately when?

6  A.  I believe February of '14.

7  Q.  And did those contractual agreements, the agreements that

8  you signed, restrict what anyone else at RAD Partners could do?

9  A.  No.

10  Q.  You mentioned earlier that RAD Partners did, in fact, hire

11  some employees from DaVita early on.  After doing that, did any

12  executives from DaVita contact you or the other senior execs at

13  RAD Partners?

14  A.  Yes.  I was contacted once by Alan Cullop after an IT

15  executive came and joined us.  And I was also -- I was not

16  contacted, but RP was contacted by Kent once after we had

17  recruited somebody.

18  Q.  And who did Mr. Thiry contact?

19  A.  He reached out to Rich -- Rich Whitney.

20  Q.  Do you know what was communicated in that conversation?

21  A.  Not exactly, no.  Other than I know that Kent expressed his

22  displeasure that we were recruiting DaVita people -- that some

23  of the people from DaVita had joined.

24      MR. MARIANO:  Let's take a look at Government

25  Exhibit 156, which we'll move for admission for based on

667

Anthony Gabriel – Direct

1   stipulation.

2          THE COURT:  It's admitted.

3          (Exhibit 156 admitted.)

4   BY MR. MARIANO:

5   Q.  Is this an email thread ending October 22, 2013, between

6   you and Rich Whitney?

7   A.  Yes.

8   Q.  So directing your attention to the first email in the

9   chain, who is Julie Allen?

10  A.  I believe that Julie was Kent's assistant at this time.

11  Q.  And can you generally describe the substance of this first

12  email.

13  A.  Yeah.  The first message is from Julie to Rich, asking to

14  set up a 15-minute call with Rich.

15  Q.  So let me direct your attention to your response at

16  6:31 p.m.  Can you read that?

17  A.  Yes.  It says, "Call with Kent" is the subject.  And my

18  body is, "Wow, this happened with Jeff Long, who we got because

19  he reached out to Scott.  Strap in, boys."

20  Q.  When you say, "This happened with Jeff Long," what are you

21  referring to?

22  A.  We had recently hired Jeff, who was -- Jeff Long -- who at

23  the time was an analyst or manager in the finance group at

24  DaVita.  He had reached out to some type of online posting to

25  Scott and ended up interviewing and joining RP.

Anthony Gabriel – Direct

1   Q.   And you write, "Strap in, boys."  Why did you say that?

2   A.   Because I anticipated that Kent was going to be upset with

3   us about hiring somebody from DaVita.

4   Q.   So you were strapping in for Mr. Thiry's reaction?

5   A.   Yeah.

6            MR. MARIANO:  You can set that document aside.

7            Let's look at Government Exhibit 287.  We'll also move

8   for admission of this document pursuant to stipulation.

9            THE COURT:  Admitted.

10           (Exhibit 287 admitted.)

11  BY MR. MARIANO:

12  Q.   Is this an email thread ending October 23, 2013, between

13  you and Rich Whitney?

14  A.   Yes.

15  Q.   And can you read the text of the first email at the

16  bottom of the screen, starting with the subject line.

17  A.   Yeah.  It appears there is only a subject line.  And the

18  subject is, "Targeting our teammates.  I would like to discuss.

19  Okay," question mark.

20  Q.   And who wrote that?

21  A.   Kent Thiry.

22  Q.   And who did he send that message to?

23  A.   Rich Whitney.

24  Q.   Can you read Mr. Whitney's response.

25  A.   Rich's response is, "Hadn't seen this email, as it went

Anthony Gabriel – Direct

1   to a different account.  So I guess it's pretty clear what he

2   wants to talk about.  Hoping that it relates to Elements, not

3   RP."

4   *Q.*  Do you know what Elements refers to?

5   *A.*  Yeah.  Elements is a healthcare company that Rich was on

6   the board of at that time.

7   *Q.*  So what was your reaction to receiving this email?

8   *A.*  My thought was that this kind of confirms what I

9   anticipated before, that Kent was upset about us hiring people

10  from DaVita.

11  *Q.*  Were you surprised to see this reaction from Mr. Thiry?

12  *A.*  No.

13  *Q.*  And did you and the other folks on this email,

14  Mr. Whitney and Mr. Usilton, take any steps in response to

15  seeing this email?

16  *A.*  I believe we set up some time to discuss how we should

17  handle this.

18  *Q.*  Sir, I'd like to look at that in a moment.  But first let

19  me ask, who is Tom Usilton?

20  *A.*  Tom Usilton was the chief development officer at Radiology

21  Partners.  He previously was the chief development officer at

22  DaVita.  He had left and wasn't working and then came out of

23  retirement for a few years to help us.

24  *Q.*  Did you know Mr. Usilton from your time at DaVita?

25  *A.*  Yes, I did.

Anthony Gabriel – Direct

1      *MR. MARIANO:*  Let's take a look at Government

2   Exhibit 167.  Also move for admission pursuant to stipulation.

3      *THE COURT:*  Admitted.

4      (Exhibit 167 admitted.)

5   *BY MR. MARIANO:*

6   *Q.*  And is this a calendar appointment from Mr. Usilton to you

7   and Mr. Whitney for a November 5, 2013, 10:00 a.m. meeting

8   between the three of you?

9   *A.*  Yes, it is.

10  *Q.*  And what was the purpose of this meeting?

11  *A.*  It was to have a discussion about two things.  One was

12  GHRA, which was a radiology business that we had been talking

13  to in Texas, and hiring of DaVita employees.

14  *Q.*  And did you in fact have a conversation with Mr. Usilton

15  and Mr. Whitney about these topics?

16  *A.*  I did.  I don't know if it happened at exactly this time,

17  but we did discuss it.

18  *Q.*  And what was the goal of that discussion?

19  *A.*  We wanted to come up with some way to handle the -- we

20  didn't want Kent to be upset with us.  We wanted to figure out

21  some way to be able to accommodate that and handle that.

22  *Q.*  Did you ultimately come to a decision about how to try to

23  handle that?

24  *A.*  We came with some general ideas of -- from that meeting, we

25  came up with some general ideas, some principles that we

671

Anthony Gabriel – Direct

1    thought we could live with, that we could do, that would work.

2    Q.  So let me ask you to just summarize what those ideas were.

3    A.  We had talked about not initiating contact with DaVita

4    employees for purposes of employing them, and we had talked

5    about having some certain rules around how we would handle any

6    DaVita employees who contacted us with regards to employment.

7    Q.  And did you ultimately reach a mutual understanding with

8    Kent Thiry and DaVita along those terms?

9    A.  Yes.  I recall an understanding, yeah, that we did.

10   Q.  Do you recall how that was communicated to DaVita?

11   A.  Rich had sent an email to Kent, proposing some ground rules

12   about how we would handle hiring DaVita employees.

13   Q.  So this calendar appointment is for November 5, 2013, at

14   10:00 a.m.  I'd like to take a look at what happened a few

15   hours later.

16        That's Government Exhibit 170.  We'll also move for

17   admission pursuant to stipulation.

18        THE COURT:  Admitted.

19        (Exhibit 170 admitted.)

20   BY MR. MARIANO:

21   Q.  And is this an email forwarded from Rich Whitney to you on

22   November 5, 2013?

23   A.  Yes, it is.

24   Q.  So let me direct your attention to the first email in

25   this chain.  Who is this email from?

Anthony Gabriel – Direct

1   *A.*   The first email is from Rich Whitney to Kent Thiry,

2   copying Tom Usilton.

3   *Q.*   What was the purpose of this email?

4   *A.*   It was to propose some ground rules around how we would

5   hire DaVita employees who --

6   *Q.*   And did those ground rules generally match what you had

7   discussed with Mr. Whitney and Mr. Usilton previously?

8   *A.*   Generally, yes.

9   *Q.*   So let's take a look at this first paragraph in

10   Mr. Whitney's email.

11          Mr. Whitney writes, "I've had a chance to think about

12   our conversation and discuss it with key people at RP."  Do you

13   see that?

14   *A.*   Yes.

15   *Q.*   Do you know who he's referring to by the "key people at

16   RP"?

17   *A.*   The key people would have been Tom Usilton and myself.

18   *Q.*   Can you read the two -- the last two sentences in this

19   paragraph, starting with "The following"?

20   *A.*   "The following is a bullet-point list of ground rules that

21   we would be comfortable with as being fair to both RP and

22   DaVita.  This is not meant to create any kind of legal

23   agreement but, instead, serve to create clarity around what we

24   hopefully can both agree is a fair way to treat each other out

25   of respect for our long-term relationships while maintaining

Anthony Gabriel – Direct

1   our ability to meet our responsibilities to our shareholders

2   and other company constituents."

3   Q.   What did you understand Mr. Whitney to mean when he says

4   that this was not meant to create any kind of legal agreement?

5   A.   That he wasn't planning on getting lawyers involved, he

6   wasn't going to draft a formal contract, we weren't going to

7   set up specific terms or times that the agreement would

8   necessarily go away or stay in force, things like that.  There

9   was nothing ever signed, that I know of.

10  Q.   Any -- in your career, have you signed or reviewed

11  contracts between companies that included nonsolicitation

12  clauses?

13  A.   Yes.

14  Q.   And those are typically associated with formal business

15  deals; right?

16  A.   Yeah.  Business deals, sometimes between a vendor and a

17  customer or sometimes as part of an employment agreement.

18  Q.   And --

19  A.   There is multiple ways you might find yourself doing some

20  sort of nonsolicitation.

21  Q.   And are those nonsolicitation clauses written down as part

22  of negotiated, signed contracts?

23  A.   Commonly, yes.

24  Q.   So why not do the same thing here?

25  A.   I'm not sure.

674
Anthony Gabriel – Direct

1   Q.  Well, let me ask it a different way.  Did DaVita and RAD

2   Partners at this time have any formal business deals?

3   A.  No, we did not.

4   Q.  Were any business deals between RAD Partners and DaVita

5   being negotiated at this time?

6   A.  No.

7   Q.  Okay.  So I'd like to walk through the numbered items in

8   this document.  Generally, what did you understand these

9   numbered items to reflect?

10  A.  The numbered items were rules, proposed guidelines, around

11  how we would -- the process or -- that we would use when it

12  came to hiring DaVita employees.

13  Q.  And why was RAD Partners proposing these ground rules?

14  A.  It was -- we wanted to maintain our relationship with Kent

15  and DaVita, and so that's why we were proposing these.

16  Q.  Would RAD Partners have proposed these ground rules if Kent

17  Thiry had not complained about recruiting?

18  A.  No, we would not.

19  Q.  Did RAD Partners create similar ground rules with any other

20  companies?

21  A.  Not to my knowledge, no.

22  Q.  Why not?

23  A.  Because we didn't have -- like, nobody had reached -- we

24  didn't have to.  Nobody had reached out to us about setting up

25  anything like this.

675
Anthony Gabriel - Direct

1   Q.  Let's take a look at Ground Rule No. 1.  Can you read that?

2   A.  Yeah.  No. 1 is, "We nor our recruiters will initiate

3   contact with DaVita teammates about positions at RP."

4   Q.  Why did RAD Partners agree to this?

5   A.  We did this because we were trying to, again, maintain

6   that -- we wanted to be able to maintain our relationship there

7   with Kent and DaVita.

8   Q.  And did RAD Partners try to abide by this agreement going

9   forward?

10  A.  We did.

11  Q.  Which DaVita employees did this ground rule apply to?

12  A.  It -- all DaVita employees.

13  Q.  Did this apply to DaVita employees in one state or all

14  states?

15  A.  All states.

16  Q.  And in your experience, did Mr. Thiry expect that RAD

17  Partners would follow this ground rule?

18          MR. DODDS:  Objection, Your Honor.  Calls for

19  speculation.

20          THE COURT:  Overruled.

21  BY MR. MARIANO:

22  Q.  So let me ask the question again.  In your experience, did

23  Mr. Thiry expect that RAD Partners would follow this ground

24  rule?

25  A.  Yes.

Anthony Gabriel – Direct

1    *Q.*   And who did this ground rule benefit?

2    *A.*   I think it benefited DaVita.

3    *Q.*   Are you familiar with the term "solicit" as it's used in

4    recruiting?

5    *A.*   Yes.

6    *Q.*   What does that mean?

7    *A.*   Solicit is reaching out, contacting an individual for the

8    purposes of employing them -- offering them a job.

9    *Q.*   So this ground rule uses the language of "initiate

10   contact," but is that a reference to solicitation?

11   *A.*   Yes.

12   *Q.*   What, if any, impact did this commitment have on employee

13   mobility?

14   *A.*   Well, I suppose for -- if there is a person who didn't know

15   about a position that was available at RP, and one of our

16   recruiters would have reached out to them except for this, they

17   wouldn't have found out about it.  Could have been limiting.

18   *Q.*   Did you have an understanding of whether this ground rule

19   was designed to impact employee mobility?

20   *A.*   It was designed to limit, like, the number of people that

21   we employed from DaVita, so -- if that's what you're intending,

22   yes.

23   *Q.*   Who benefited from that?

24   *A.*   I would say DaVita.

25   *Q.*   Let's turn to the second ground rule.  That has two

Anthony Gabriel – Direct

1    components; right?

2    A.   Yes, it does.

3    Q.   Can you read ground rule 2A.

4    A.   2A, "Before exploring possible opportunities at RP, we will

5    encourage them to consider all of their potential opportunities

6    within DaVita/HCP, we will encourage them to fully discuss

7    those potential opportunities with their boss."

8    Q.   And why did RAD Partners make this commitment?

9    A.   We primarily did it because we thought this would be

10   showing our commitment to partnering, like to being -- not just

11   stealing people from DaVita.  We wanted to maintain that

12   relationship, and we thought this was a good thing to do to

13   help maintain that.

14   Q.   When you say "partnering," you're referring to the personal

15   relationship?

16   A.   Personal relationship, yes.  Not any kind of business

17   relationship.

18   Q.   Can you read the second part of the ground rule 2, 2B?

19   A.   2B, "We will not pursue possible employment opportunities

20   for them with RP unless they either represent to us that they

21   are actively pursuing other opportunities outside of DaVita --

22   e.g., they are interviewing or have offers, et cetera -- or

23   that they have had a specific conversation with their boss,

24   telling him/her that they are interested in pursuing

25   opportunities outside of DaVita."

Anthony Gabriel – Direct

1   *Q.*  And just like 2A, this ground rule was for the DaVita

2   employees who contacted RAD Partners first; right?

3   *A.*  That's right.

4   *Q.*  So the employees that weren't even solicited?

5   *A.*  That's right.

6   *Q.*  So why did RAD Partners make this commitment?

7   *A.*  Similar to the previous one, we were trying to maintain

8   that relationship.  Thought this was a -- something that would

9   be good at being able to maintain that.

10  *Q.*  And did RAD Partners try to follow ground rule 2B going

11  forward?

12  *A.*  Yeah, we did.

13  *Q.*  And, likewise, did this apply to all DaVita employees?

14  *A.*  All DaVita employees who contacted us.  Yes.

15  *Q.*  And who did this component of the agreement benefit?

16  *A.*  I think it benefited DaVita, at times it benefited the

17  employee as well, so both.

18  *Q.*  Let me ask what, if any, impact this component of the

19  agreement, 2B, had on employee mobility?

20  *A.*  You know, it could slow things down a little bit in the

21  recruiting process, could limit it.

22  *Q.*  So I want to go back to your prior answer.  I think you

23  said ground rule 2B could benefit the employee; did you say

24  that?

25  *A.*  At times, yeah, it could.

Anthony Gabriel - Direct

1    Q.  And what did you mean by that?

2    A.  Because at times they would go back and talk to their boss,

3    and it might mean they could get -- if the boss thought they

4    were really good, the boss may say, oh, wow, you're thinking

5    about leaving.  I'm going to give you a bigger job, a bigger

6    pay package, bigger something.  Something beneficial to the

7    employee.

8    Q.  Let me put the question this way:  Does anything prevent an

9    employee from having that conversation with their current boss

10   after they receive an offer?

11           MR. DODDS:  Object to the leading, Your Honor.

12           THE COURT:  Overruled.

13           THE WITNESS:  Could you repeat?

14   BY MR. MARIANO:

15   Q.  Sure.  Does anything prevent an employee who gets an offer

16   from another company from going to their current employer and

17   trying to negotiate for a higher salary?

18   A.  No.  Nothing.

19   Q.  And focused again on 2B, did Mr. Thiry want RAD Partners to

20   go even further than this?

21   A.  He had originally suggested that it was -- that the

22   employee had to talk to their boss first.

23   Q.  So let me ask about that.  How would a requirement that a

24   candidate have a specific conversation with their boss, telling

25   him or her that they're interested in pursuing opportunities

Anthony Gabriel – Direct

1   outside of DaVita, how would that impact employee mobility?

2   A.   That could limit it.

3   Q.   So let's move on to the next couple of ground rules.  Can

4   you read the first sentence of the fourth ground rule.

5   A.   The first sentence of No. 4?

6   Q.   Correct.

7   A.   No. 4, "Hopefully, in turn, if you have any talented

8   teammates for whom you do not have appropriate opportunities or

9   if for whatever reason you want/need to transition them out of

10  DaVita, you will tell them they should talk to us."

11  Q.   Why was this ground rule included?

12  A.   It was to show that we were trying to be -- maintain a

13  relationship with them; this was a two-way thing.  Certainly,

14  if there were other people that they didn't have a need for,

15  you know, we were trying to help here with regards to how we

16  were hiring, that they would do something for us too if it was

17  okay -- convenient for them.

18  Q.   Let's take a look at the next paragraph, after the numbered

19  items.  So this moves on from one page to the next.  In that

20  paragraph, can you read the sentence at the end of the first

21  page, beginning, "Further."

22  A.   "Further, we are committing that we will encourage the full

23  exploration of their opportunities within DaVita, and we will

24  offer transition support, two things that other companies, of

25  course, will not have any interest in doing."

1   *Q.*  Did you agree with Mr. Whitney that these were two things

2   other companies would have no interest in doing?

3   *A.*  Most often, no.

4   *Q.*  Let's go on to the next paragraph.  Can you read the

5   sentence beginning "And importantly."

6   *A.*  "And importantly, if you ever have the impression that we

7   are not living up to our commitment, we would expect that we

8   would communicate about it so that there is clarity around the

9   facts and so that we can course correct together as

10  appropriate."

11  *Q.*  And why was that included?

12  *A.*  We wanted to make sure that if there was any perception

13  that we weren't abiding by what we proposed here, that somebody

14  would reach out to us first, rather than just assuming that we

15  were not living up to our commitment -- what we had said we

16  would do.

17          *MR. MARIANO:*  Great.  You can set that document aside.

18          Let me ask the Court if this is a good time for a

19  break.  I'm happy to keep going, of course.

20          *THE COURT:*  Yeah, we could do that.

21          How much time?

22          *JUROR:*  Ten minutes.

23          *THE COURT:*  Okay.

24          (Recess at 2:53 p.m.)

25          (In open court at 3:04 p.m.)

682

Anthony Gabriel – Direct

1      *COURTROOM DEPUTY:* A juror asked me to ask you to

2  please slow down, because she can't keep up.  I don't think

3  it's the speed.  I think it's how quick you're going to the

4  next question, is what she told me.

5      *MR. MARIANO:* Got it.  Okay.

6      (Jury in at 3:06 p.m.)

7  *BY MR. MARIANO:*

8  *Q.* Dr. Gabriel, during the break, I also received a note to

9  slow down.  I think we'll both have to be cautious about that

10  to make sure the jurors get everything.

11  *A.* Okay.

12  *Q.* So right before the break we were talking about the ground

13  rules that you had agreed to with DaVita; is that right?

14  *A.* That's right.

15  *Q.* And you said that RAD Partners tried to follow those ground

16  rules.

17  *A.* That is right.

18  *Q.* You also said that those ground rules applied to all DaVita

19  employees; right?

20  *A.* Yes.

21  *Q.* In practice, was RAD Partners more attentive to following

22  the ground rules with certain DaVita employees?

23      *MR. MELSHEIMER:* Your Honor, objection.  Leading.

24      *THE COURT:* Sustained.

25

Anthony Gabriel – Direct

1    *BY MR. MARIANO:*

2    *Q.*  What factors played into RAD Partners -- the degree to

3    which RAD Partners would focus on the ground rules?

4    *A.*  We would focus on the ground rules for pretty much

5    everybody.  Certainly, for people that -- I think we were more

6    careful about it for people that we knew and had a relationship

7    with prior to leaving or people that Kent knew directly.  There

8    was probably a little bit more intensity there.

9    *Q.*  Why was RAD Partners more attentive to the employees that

10   Mr. Thiry knew personally?

11   *A.*  Because we were doing this to try to maintain a

12   relationship with Kent and DaVita, and those would be more

13   likely to be visible, and we didn't want to upset anyone there.

14         *MR. MARIANO:*  So let's take a look at another

15   document, Government Exhibit 172.  We'll also move for

16   admission pursuant to stipulation.

17         *THE COURT:*  All right.  Admitted.

18         (Exhibit 172 admitted.)

19   *BY MR. MARIANO:*

20   *Q.*  Is this an email thread from November 5, 2013, between you

21   and Mr. Whitney?

22   *A.*  Yes.

23   *Q.*  And what is the first email in this chain?

24   *A.*  The first email is the one we were talking about a moment

25   ago that proposed the ground rules.

Anthony Gabriel – Direct

1   Q.   So let's take a look at the email next up in the chain.

2   Can you read that response.

3   A.   The response is, "Am not comfortable with this, as it is

4   fundamentally asymmetrical to our disadvantage.  How might you

5   propose to deal with this?"

6   Q.   Who sent that?

7   A.   Kent Thiry.

8   Q.   And how did Mr. Whitney respond?

9   A.   Mr. Whitney responds, "I don't understand what you mean by

10   'asymmetrical.'"

11   Q.   And Mr. Whitney forwards that email to you; right?

12   A.   Yes.

13   Q.   And then you ultimately respond; right?

14   A.   Yes, I do.

15   Q.   So let's take a look at your response.  Would you mind

16   reading that?

17   A.   Yes.  My response is, "Okay.  If he agrees to make sure he

18   doesn't solicit our people.  However, if one of them calls

19   DaVita, the DaVita person should encourage them to look at all

20   other opportunities at RP, then make sure that they interview

21   for other positions at other companies before they can take the

22   DaVita job.  I'll do it.  That should make it symmetrical."

23   Q.   What did you mean by that response?

24   A.   It was a sarcastic response, really.  Trying to just mirror

25   the same proposal that we had made but in reverse.

Anthony Gabriel - Direct

1   *Q.* Did you in fact believe that the agreement was

2   fundamentally asymmetrical?

3   *A.* Yes.

4   *Q.* To whose benefit?

5   *A.* DaVita.

6   *Q.* So why were you willing to agree to these ground rules if

7   you thought they were fundamentally asymmetrical against RAD

8   Partners?

9   *A.* Because we were trying to maintain a relationship with Kent

10  and DaVita.

11  *Q.* What do you think would have happened if RAD Partners did

12  not agree to these ground rules?

13  *A.* I'm really not sure.

14  *Q.* So Mr. Whitney -- excuse me -- Mr. Thiry earlier in that

15  email we looked at earlier said he was not comfortable with

16  this.  In practice, did RAD Partners still follow those ground

17  rules?

18  *A.* Yes.

19  *Q.* And did Mr. Thiry ever seek to ensure that RAD Partners

20  followed those ground rules?

21  *A.* On one occasion, I remember that he did.

22          *MR. MARIANO:* So let's take a look at Government

23  Exhibit 216.  We'll also move for admission pursuant to

24  stipulation.

25          *THE COURT:* Admitted.

Anthony Gabriel – Direct

1          (Exhibit 216 admitted.)

2     *BY MR. MARIANO:*

3     *Q.*  Can you read the first email in this chain, starting with

4     the subject line.

5     *A.*  "Subject:  Belinda someone."  And then the body said, "Did

6     the process of recruiting this person fit our guidelines?  Hope

7     all is well."

8     *Q.*  And who is that message from?

9     *A.*  Kent Thiry.

10    *Q.*  And who did he send that to?

11    *A.*  To Rich Whitney.

12    *Q.*  What did you understand this reference to "our guidelines"

13    to be.

14    *A.*  It was referring back to the email that we discussed a

15    moment ago from Rich to Kent and that numbered list.

16    *Q.*  The subject line here is "Belinda someone."  Do you see

17    that?

18    *A.*  Yes.

19    *Q.*  Based on this email, did Kent Thiry even know this

20    employee's name?

21          *MR. MELSHEIMER:*  Objection, Your Honor.  Leading and

22    calls for speculation.

23          *THE COURT:*  Okay.  Sustained.

24    *BY MR. MARIANO:*

25    *Q.*  Dr. Gabriel, do you know who this employee is?

Anthony Gabriel – Direct

1   A.   Yes.

2   Q.   Who is it?

3   A.   Belinda Reynaga.

4   Q.   So let's look at the next email in the chain from

5   Mr. Whitney.

6   A.   Uh-huh.

7   Q.   Can you read the first paragraph of his response.

8   A.   Yes.  It says, "I looked into it.  And, yes, it looks like

9   it fit our guidelines.  She is a low-level recruiter.  We had

10  the position posted on job boards, and she applied.  So we

11  didn't contact her.  She contacted us for a specific job

12  posting.  We have already 250 people in our practice now.  I am

13  not involved in most people that we hire now.  We'll definitely

14  make sure we are staying in touch on higher level people, and

15  we absolutely won't target anyone at DaVita.  But for lower

16  level people that respond to our job listings," dot, dot, dot.

17  Q.   I want to ask about the sentence, "We had the position

18  posted on job boards and she applied, so we didn't contact

19  her."  Was that in your understanding consistent with the

20  ground rules?

21  A.   Yes.  Consistent with No. 1.

22  Q.   What was No. 1?

23  A.   That RP would not initiate contact with DaVita employees.

24  Q.   So let's take a look at the next email up in the thread.

25  How does Mr. Thiry respond to Mr. Whitney's explanation?

Anthony Gabriel – Direct

1   *A.*  Would you like me to read it?

2   *Q.*  Sure.

3   *A.*  It says, "Belinda thing sounds fine to me, as does your

4   logic.  I was in" -- then it talks about the Super Bowl.  "Hope

5   all is well.  Good growth."

6   *Q.*  What did you understand that statement about Ms. Reynaga to

7   mean?

8   *A.*  That Kent was agreeing with Rich's explanation that it was

9   consistent with the ground rules.

10  *Q.*  So this email is February 2015; is that right?

11  *A.*  That's right.

12  *Q.*  At that point were you under any nonsolicitation clauses

13  from any of those previous employment contracts with DaVita?

14  *A.*  No.

15          MR. MARIANO:  Let's take a look at Government

16  Exhibit 177.  We'll also move for admission pursuant to

17  stipulation.

18          *THE COURT:*  Okay.  It's admitted.

19          (Exhibit 177 admitted.)

20  *BY MR. MARIANO:*

21  *Q.*  Is this an email forwarded from Rich Whitney to you dated

22  November 19, 2013?

23  *A.*  Yes.

24  *Q.*  So this is just a couple of weeks after the ground rules

25  email; right?

Anthony Gabriel – Direct

1   *A.*   Approximately, yes.

2   *Q.*   Can you describe the general subject matter of this

3   email.

4   *A.*   Generally, the initial email is from Kent to Tom and

5   Rich; and it is recapping conversations that it appears he had

6   with them in the days prior.

7   *Q.*   I'd like to ask you about a few of the items Mr. Thiry

8   writes about.  Let's start with Item No. 6.  Can you read what

9   Mr. Thiry wrote.

10  *A.*   Yes.  It says, "Chet, for example, is quite angry with you,

11  Rich, that after 16 years of a friendship you would take one of

12  his folks like that without calling him.  And, of course, we

13  all know that he and Gustafson, for whom Jeff worked, are two

14  of the nicest guys around, not the 'retaliation if you tell me

15  you are looking elsewhere' kind of guys.  I did not provoke any

16  of the Chet anger.  He brought it up himself when I just asked

17  what happened."

18  *Q.*   What did you understand Mr. Thiry to be referring to by the

19  "retaliation if you tell me you are looking elsewhere kind of

20  guys"?

21  *A.*   That Chet and Jim, those two people, are not the types of

22  executives that would retaliate against a person who came to

23  them saying, I'm looking elsewhere.

24  *Q.*   What did you understand the reference to "retaliation" to

25  be?

Anthony Gabriel – Direct

1    *A.*  I think it was referring to -- regarding, like, if you tell

2    your boss about something, that people would retaliate.

3    *Q.*  Let's take a look at Item No. 7.  Mr. Thiry writes, "So I'm

4    just asking you to step back and think about how humans

5    actually work.  Life is long, and healthcare is a small

6    community."  Do you see that?

7    *A.*  Yes.

8    *Q.*  How did you interpret this?

9    *A.*  I think Kent was just giving advice, that healthcare

10   leadership is a small group of people, and that if you hire

11   away from other people that you've worked with in the past,

12   they're not going to want to work with you in the future.

13   So --

14   *Q.*  Can you read the following sentence, beginning, "I am at

15   peace"?

16   *A.*  "I am at peace now after our conversations, and am content

17   to sit back and just see what you guys actually do and how you

18   explain it."

19   *Q.*  How did you interpret this?

20   *A.*  That Kent was willing to wait and see if we actually

21   followed -- did what we said we would do.

22   *Q.*  Let's take a look at item 8, which is on the next page.

23          Dr. Gabriel, can you read that?

24   *A.*  Yes.  "I close as I close our phone conversation yesterday,

25   Rich.  Let me know if I can do anything for you.  I hope I

Anthony Gabriel – Direct

1  always feel like ending a conversation that way, as I do with

2  many other CEOs, executives, business school professors, U.S.

3  senators, et cetera."

4  Q.  What was your reaction to this?

5  A.  That Kent was offering advice, any introductions he could

6  make, as he does with a number of other people in the

7  healthcare leadership community.

8  Q.  Has Mr. Thiry been helpful to you in your career?

9  A.  Yes.

10 Q.  How?

11 A.  Both while I was at DaVita, in terms of learning a great

12 deal as an executive there; and also subsequent to that, in

13 terms of giving advice on certain things.

14 Q.  Mr. Thiry mentions his relationships with other CEOs,

15 executives, business school professors, U.S. senators, et

16 cetera.  Do you see that?

17 A.  Yes.

18 Q.  Has Mr. Thiry put you or RAD Partners in touch with people

19 like that?

20 A.  Not with me directly.  I believe he has with RAD Partners

21 through Rich, but I don't recall any specifics.

22      MR. MARIANO:  Let's take a look at Government

23 Exhibit 234.  Again, we'll move for admission pursuant to

24 stipulation.

25      THE COURT:  234 is admitted.

Anthony Gabriel – Direct

1          (Exhibit 234 admitted.)

2     *BY MR. MARIANO:*

3     *Q.*  Is this an email thread ending November 6, 2017, between

4     you and Rich Whitney, among others?

5     *A.*  Yes.

6     *Q.*  And this is a few years after the ground rules email that

7     we were looking at earlier; right?

8     *A.*  Yes.

9     *Q.*  Can you summarize the initial email from Mr. Whitney.

10    *A.*  The initial email from Rich says that he had dinner with

11    Kent, told him about the progress we were making at Radiology

12    Partners, the good things that we were doing, and he had heard

13    that during a town hall meeting at DaVita, Kent had praised the

14    things that we were doing at RP.  Then talks about the fact

15    that -- kind of jokingly, I believe, says, "I think they must

16    be getting ready to lay off a lot of people."

17    *Q.*  Mr. Whitney also writes, "This is a far cry from the

18    circle-the-wagons approach to RP that was in force earlier."

19    *A.*  Yes.

20    *Q.*  What do you understand the circle-the-wagons approach to RP

21    to refer to?

22    *A.*  He was referring to the fact that they were upset that we

23    were hiring DaVita people and didn't want us to do that.

24          *MR. MARIANO:*  You can set that document aside.

25

1   *BY MR. MARIANO:*

2   *Q.*  Did you provide guidance or instructions to anyone else at

3   RAD Partners with respect to this restriction on recruitment of

4   DaVita candidates?

5   *A.*  Yes.  To Ari Fleischauer, who was and still is our head of

6   HR.

7   *Q.*  And what did you tell Ms. Fleischauer?

8   *A.*  I had told her that our recruiters should not initiate

9   contact with DaVita employees and that if anybody from DaVita

10  applied to a position at RP, that she should let either Rich or

11  myself know about it.

12  *Q.*  And why did you provide that guidance?

13  *A.*  Because we had committed to following the steps outlined in

14  the guidelines email that we were talking about a moment ago.

15  And Ari was and is responsible for recruiting, so I had to let

16  her know.

17  *Q.*  Ms. Fleischauer was an internal recruiter at RAD Partners;

18  right?

19  *A.*  Ms. Fleischauer was and is the head of HR.  And recruiting

20  is a function that reports up to her.

21  *Q.*  Did RAD Partners also use external recruiters for

22  assistance in recruiting?

23  *A.*  Yes.

24  *Q.*  And how would RAD Partners use external recruiters?

25  *A.*  We would use external recruiters to fill positions when we

Anthony Gabriel – Direct

1   didn't think our internal team was able to fill the position or

2   maybe because they were capacity constrained.  We would

3   sometimes use outside recruiters.

4   *Q.*  Were these external recruiters ever given guidance on the

5   restriction of recruiting DaVita candidates?

6   *A.*  Yes.

7   *Q.*  What were they told?

8   *A.*  They were not to initiate contact with DaVita employees.

9         *MR. MARIANO:*  Let's take a look at Government

10  Exhibit 166.  We'll move for admission pursuant to stipulation.

11        *THE COURT:*  Admitted.

12        (Exhibit 166 admitted.)

13  *BY MR. MARIANO:*

14  *Q.*  Is this an email thread from October 29, 2013, again,

15  between you and Rich Whitney?

16  *A.*  Yes.

17  *Q.*  There is a reference here to Eddie Robles.  Who is Eddie

18  Robles?

19  *A.*  Eddie Robles is an employee at Radiology Partners.  He's an

20  IT person.  He's director of networking for us.  He was also an

21  IT employee at DaVita; and he was at this time, October of

22  2013.

23  *Q.*  So let me direct your attention to that top email on the

24  page from Mr. Whitney.  Can you read the fourth paragraph of

25  that top email.

Anthony Gabriel – Direct

1    A.  The fourth paragraph starts, "Finally, are we 100 percent

2    whole on this one in terms of believing he is leaving DaVita in

3    any event and that we aren't encouraging him to leave?  I am

4    about to make that commitment to Kent, so we really need to be

5    sure that we are living up to it, or I shouldn't say it."

6    Q.  Did you understand why Mr. Whitney wanted to confirm that

7    Mr. Robles was leaving DaVita in any event and that RAD

8    Partners wasn't encouraging him to leave?

9    A.  Yes.  Because Rich was planning on suggesting the

10   guidelines out to Kent.  He already started thinking about them

11   and was about to make the commitment that we wouldn't hire

12   anybody that wasn't already looking outside.

13            MR. MARIANO:  Let's go to another document, Government

14   Exhibit 178.  Also move for admission pursuant to stipulation.

15            THE COURT:  Admitted.

16            (Exhibit 178 admitted.)

17   BY MR. MARIANO:

18   Q.  Is this an email thread ending November 20, 2013, between

19   Basak Ertan and Rich Whitney, copying you?

20   A.  Yes.

21   Q.  Who is Basak Ertan?

22   A.  Basak is our chief revenue officer.  She is also my wife.

23   Q.  Did you know her prior to starting at RAD Partners?

24   A.  Yes.

25   Q.  Did she also work at DaVita?

Anthony Gabriel – Direct

1    *A.*  Yes, she did.

2    *Q.*  So looking at that first email from Ms. Ertan, she writes

3    to Mr. Whitney, "I have a short call with KT tomorrow.  Any

4    messages I can help reinforce with him or any topics to avoid

5    based on how your discussions with him are going?"  Do you see

6    that?

7    *A.*  Yes.

8    *Q.*  Do you know who KT refers to?

9    *A.*  Kent Thiry.

10   *Q.*  Can you read Mr. Whitney's response.

11   *A.*  "Just that we weren't the reason you were exploring other

12   opportunities.  You felt it was time."

13   *Q.*  And do you know why Mr. Whitney wanted Ms. Ertan to share

14   that message?

15   *A.*  Because it was consistent with the guidelines that we had

16   just sent out.

17           *MR. MARIANO:*  Let's go to Government Exhibit 231.

18   Move for admission pursuant to stipulation.

19           *THE COURT:*  It's admitted.

20           (Exhibit 231 admitted.)

21   *BY MR. MARIANO:*

22   *Q.*  Is this an email thread ending February 23, 2017, between

23   you and Phil Reger?

24   *A.*  Yes, it is.

25   *Q.*  Who is Phil Reger?

Anthony Gabriel – Direct

 1   *A.*  Phil Reger was the CIO -- chief information officer -- at

 2   Radiology Partners.  He previously was an IT executive at

 3   DaVita.

 4   *Q.*  And the subject line here says, "Talked to Lenin."  Who is

 5   Lenin?

 6   *A.*  Lenin Chaturvedi was an IT executive at DaVita.

 7   *Q.*  So looking at your email from 3:38 p.m., you write,

 8   "Let's not offer until we talk about the whole DaVita thing."

 9   Do you see that?

10   *A.*  Yes.

11   *Q.*  What did you mean when you wrote "the whole DaVita thing"?

12   *A.*  I was referring to the guidelines.

13   *Q.*  And what did you want to discuss with Mr. Reger prior to

14   making an offer?

15   *A.*  That we were following the guidelines that we had sent out

16   to DaVita earlier.

17   *Q.*  So this is February 2017, and I -- I think you said

18   earlier, you weren't under any nonsolicitation obligations from

19   your time at DaVita; right?

20   *A.*  That's correct.

21         *MR. MARIANO:*  Let's go to Government Exhibit 232.  And

22   we'll move for admission pursuant to stipulation.

23         *THE COURT:*  It's admitted.

24         (Exhibit 232 admitted.)

25

698

Anthony Gabriel – Direct

1   *BY MR. MARIANO:*

2   *Q.* Is this an email thread ending June 22, 2017, between you

3   and Rich Whitney?

4   *A.* Yes, it is --

5   *Q.* And in the subject line there is a reference to Bowie

6   Remaley.  Who is Bowie Remaley?

7   *A.* Bowie Remaley is a vice president at Radiology Partners

8   today.  She previously was an executive at DaVita.

9   *Q.* So let me direct you to the second page, your email.  And

10  the paragraph on the second page, you write, "her DaVita

11  contract has a three-month notice in it.  She's already told

12  them she needs to leave Asia and has looked for a role

13  stateside, but nothing has come up, so I think we are okay

14  there."  Do you see that?

15  *A.* Yes.

16  *Q.* What are you referring to when you say, "we are okay

17  there"?

18  *A.* I'm referring to, we were following the guidelines that we

19  were proposing.

20  *Q.* And why were you okay there in this case?

21  *A.* Because she knew she had the -- she was working in DaVita's

22  Singapore office.  For personal reasons, she had to move back

23  to the U.S.  And she had explored within DaVita looking for

24  other opportunities there, and there was no other opportunities

25  at DaVita for her in the United States.

Anthony Gabriel – Direct

1          MR. MARIANO:  Okay.  We can pull this document down.

2     BY MR. MARIANO:

3     Q.  Let me ask you about another individual.  Are you familiar

4     with Cameron Cleeton?

5     A.  Yes.

6     Q.  Who is Cameron Cleeton?

7     A.  Cameron is currently the chief development officer at

8     Radiology Partners.  He previously was an executive at DaVita.

9          MR. MARIANO:  Let's take a look at Government

10    Exhibit 194.  We'll move for admission pursuant to stipulation.

11         THE COURT:  Admitted.

12         (Exhibit 194 admitted.)

13    BY MR. MARIANO:

14    Q.  This is an email thread ending January 27, 2014, between

15    you and Mr. Whitney; right?

16    A.  Yes.  Myself, Mr. Whitney, and Mohamed Makhzoumi.

17    Q.  What, if any, conversations to this point had you had with

18    Mr. Cleeton about Radiology Partners?

19    A.  Cameron had reached out to me shortly after I left DaVita

20    and we had gotten Radiology Partners started.  Cameron and I,

21    in addition to working together, had become close friends

22    personally, as well.  And just wanted to learn more about what

23    we were doing, why we had decided to start this business, and I

24    had told him quite a bit about it.  And at some point he had

25    said, well, maybe there might be a role for me some day; and I

Anthony Gabriel - Direct

1   said maybe.  And we had talked about a potential role over a

2   very extended period of time, so --

3   Q.  So at this point, Mr. Cleeton was still at DaVita; right?

4   A.  Yes.

5   Q.  And were you interested in recruiting him for a role at RAD

6   Partners?

7   A.  Yes.

8   Q.  So looking at the top email on the page, can you read the

9   second paragraph that you wrote.

10  A.  The second paragraph is, "Cameron is now at a point where

11  he is pretty sure he is ready to leave DaVita.  I'm sure this

12  is what he wants to talk to you about.  He is still very

13  interested in us, as we are in him.  We cooled our process with

14  him primarily due to the fact that a number of people have come

15  to RP from DaVita recently.  With the new information that he's

16  going to leave anyways, I think it may put us in a position

17  where we could start to look at him again."

18  Q.  So you write, "We cooled our process with him primarily due

19  to the fact that a number of people have come to RP from DaVita

20  recently."  Was that a true statement?

21  A.  Yes.

22  Q.  And "cooled our process" means you slowed down the

23  recruitment of Mr. Cleeton; right?

24  A.  Yes.

25  Q.  So as of January 2014, you had already slowed down the

Anthony Gabriel – Direct

1   recruitment of Mr. Cleeton?

2   A.   Yes.

3   Q.   And how had you done that?

4   A.   I just didn't talk to him as much, maybe didn't bring the

5   idea up as much with him when we did talk.   Cameron and I did

6   still speak occasionally.   As I said, we were friends.   And

7   they weren't always -- our conversations were not always about

8   work.   But just -- didn't bring it up as much.

9          MR. MARIANO:   Let's go to Government Exhibit 204.

10   Again, we'll move for admission pursuant to stipulation.

11          THE COURT:   All right.   Admitted.

12          (Exhibit 204 admitted.)

13   BY MR. MARIANO:

14   Q.   This is an email thread ending June 4, 2014, between you

15   and Mr. Whitney; is that right?

16   A.   Yes, that's right.

17   Q.   So let's take a look at that first email.   What's the

18   subject of this email?

19   A.   The first -- the subject is, "CC communications outline."

20   And "CC referred" to Cameron Cleeton.

21   Q.   In terms of timeline, how does this email relate to the

22   document that we were just looking at, where you said that you

23   cooled your process with Mr. Cleeton?

24   A.   I don't remember exactly, but it looks like five-ish months

25   or so.

Anthony Gabriel – Direct

1  *Q.*  So Mr. Cleeton had not been hired by RAD Partners, yet;

2  right?

3  *A.*  Not at this time.  No.

4  *Q.*  And what are the bullet points in this email?  Can you

5  just summarize.

6  *A.*  Yeah.  The summary here is, I was just outlining for Tom

7  and Rich the timeline, what the events that had occurred since

8  Cameron and I had very first started talking about the

9  possibility of him working at RP.

10 *Q.*  And were the ground rules relevant to these talking points?

11 *A.*  Yes.

12 *Q.*  How so?

13 *A.*  Well, we wanted to ensure we were following the steps in

14 No. 2, that he was exploring other opportunities at DaVita and

15 exploring other opportunities outside.

16 *Q.*  Let's take a look at that first bullet.  Can you read the

17 first bullet?

18 *A.*  The first bullet says, "CC" -- Cameron Cleeton -- "has

19 decided that the opportunities currently available for him at

20 DaVita don't meet his career objectives."

21 *Q.*  And why did you write that?

22 *A.*  Because Cameron had told me that.

23 *Q.*  Was that relevant to the ground rules?

24 *A.*  Yes.  They -- Cameron had explored other opportunities

25 there and didn't feel that those were the best fit for him.

1   *Q.*  Can you read the next bullet.

2   *A.*  Yeah.  The next one is, "CC" -- Cameron Cleeton -- "has

3   begun an active search.  He currently has an" -- it says

4   "over," but I think I meant offer -- "has an offer at one

5   organization and is advancing in the process at a second."

6   *Q.*  And why did you write that?

7   *A.*  Because one of the ground rules was that people -- we would

8   encourage people to look elsewhere.  Cameron was looking

9   elsewhere.

10  *Q.*  Can you read the next bullet.

11  *A.*  The next one says, "CC" -- Cameron Cleeton -- "has

12  contacted Anthony to see if there are any opportunities

13  available for him here," meaning RP.

14  *Q.*  Why did you write that?

15  *A.*  That Cameron initiated, like -- we didn't reach out to

16  Cameron to hire him, to give him an offer.

17  *Q.*  And Anthony here is you; correct?

18  *A.*  Yes.  This Anthony is me.

19  *Q.*  Can you read the second to last bullet, starting with, "We

20  are not."

21  *A.*  "We are not recruiting.  Cameron Cleeton has decided to

22  leave and thinks this may be a good opportunity."

23  *Q.*  And why did you write that?

24  *A.*  Because we had not actively reached out to him for the

25  purposes to employ him, consistent with No. 1.

704

Anthony Gabriel – Direct

1   *Q.*  Why --

2   *A.*  Camera was going to leave.  He was ready to move on to do

3   something else and thought this was a really good fit for him,

4   this being Radiology Partners.

5   *Q.*  You said consistent with No. 1.  Consistent with ground

6   rule No. 1?

7   *A.*  Yeah.  Consistent with ground rule No. 1.

8   *Q.*  Let's look at the next email up in the thread, the top of

9   the page.  So you write to Mr. Whitney, "We are unanimous in

10  thinking that you should reach out to Kent."  Who is the "we"

11  in that sentence?

12  *A.*  That was Tom Usilton and myself.

13  *Q.*  And why did you and Mr. Usilton think that Mr. Whitney

14  should reach out to Mr. Thiry?

15  *A.*  We thought that because Rich was the CEO, it was

16  appropriate that he reach out and talk to Kent about the fact

17  that Cameron was interested in joining RP.  This was supposed

18  to happen after Cameron talked to his supervisor at DaVita

19  about it, not before.

20  *Q.*  Did you have an expectation of what would happen if

21  Mr. Whitney did not reach out to Mr. Thiry and Cameron Cleeton

22  had just been hired?

23  *A.*  Can you ask that one more time?

24  *Q.*  Sure.  Did you have an expectation that you would receive

25  any reaction if Cameron Cleeton was hired without this notice?

1        MR. MELSHEIMER:  Object, Your Honor.  He's rephrased

2   the question in a way that's leading.  Objection.

3        THE COURT:  Sorry.  I couldn't hear you.

4        MR. MELSHEIMER:  Objection.  Leading, Your Honor.

5        THE COURT:  Sustained.

6   BY MR. MARIANO:

7   Q.  Did you have an expectation of what would happen if this

8   communication didn't occur but Mr. Cleeton was hired?

9   A.  I think that DaVita was going to be upset whether we

10  reached out or not.  Cameron was certainly a very talented

11  individual, so they were going to be upset.

12  Q.  Do you know if Mr. Whitney in fact reached out to Mr. Thiry

13  about this?

14  A.  I believe he did.

15        MR. MARIANO:  Let's look at Government Exhibit 208.

16  We'll move for admission pursuant to stipulation.

17        THE COURT:  It's admitted.

18        (Exhibit 208 admitted.)

19  BY MR. MARIANO:

20  Q.  Is this an email thread ending June 10, 2014, between you

21  and Mr. Whitney?

22  A.  Yes.

23  Q.  So let me direct your attention to the first email in

24  that chain on the second page.  That's from Mr. Thiry; right?

25  A.  Yes, it is.

1  Q.  Mr. Thiry writes, "I am probably the right person to talk

2  to Cameron.  I will be in the same city as him next week on

3  Wednesday, the 18th.  So if you could please wait until next

4  week, the week of the 23rd, would be much appreciated."  Do you

5  see that?

6  A.  Yes.

7  Q.  And what is Mr. Whitney's response?

8  A.  Mr. Whitney's response is, "Yup, no problem."

9  Q.  So why would RAD Partners agree to let DaVita be the only

10 company talking to Mr. Cleeton at this time?

11 A.  He was saying that because we wanted to be -- we wanted to

12 maintain that relationship with DaVita at the time.

13 Q.  And did this delay the process of considering Mr. Cleeton

14 at RAD Partners?

15 A.  I suppose maybe a little.

16 Q.  And could Mr. Thiry have competed to retain Mr. Cleeton

17 even after Mr. Cleeton received a job offer from RAD Partners?

18 A.  Yes.

19      MR. MARIANO:  Let's go to Government Exhibit 211.

20 We'll move for admission pursuant to stipulation.

21      THE COURT:  It's admitted.

22      (Exhibit 211 admitted.)

23 BY MR. MARIANO:

24 Q.  Is this an email thread ending October 6, 2014, between you

25 and Mr. Whitney?

Anthony Gabriel – Direct

1    *A.*   Yes.

2    *Q.*   So let me direct you to Mr. Whitney's email from

3    2:45 p.m.  Can you read that?

4    *A.*   Yes.  It says, "If I do see him, you will have to remind me

5    of the steps we took regarding Cam" -- meaning Cameron Cleeton.

6    "It's been a while, but didn't we tell Kent he wanted to talk

7    with us and then gave him a couple of weeks to talk to Cam

8    first?  I am perhaps getting confused with Guy.  But we will

9    want to have exact facts because he will likely forget."

10   *Q.*   When Mr. Whitney writes, "If I do see him," do you know who

11   the "him" refers to?

12   *A.*   Yeah.  He's referring to Kent.

13   *Q.*   What did you understand "the steps we took" to refer to?

14   *A.*   The steps, the outline of the history of the interaction

15   between Cameron and myself and the rest of Radiology Partners,

16   similar to the outline that we had just spoken about a moment

17   ago.

18   *Q.*   Did you understand why Mr. Whitney wanted to be reminded of

19   those facts?

20   *A.*   Rich wanted to be reminded because he thought if he ran

21   into Kent, that they might talk about that; and he wanted to

22   make sure he had the facts straight, that he remembered them

23   correctly.

24   *Q.*   So let's look further up at your response from 4:57 p.m.

25   Can you read your response?

708

Anthony Gabriel - Direct

1   *A.*   Yeah.  It says, "Yes.  He reached out to us.  He's been in

2   touch with me regularly, since we are close.  Told me he was

3   looking for other opportunities outside of DaVita and asked if

4   we had anything.  He also was looking at other places and got a

5   job offer from somewhere else with a higher base than what

6   we're paying.  He's definitely leaving."

7   *Q.*   Why did you outline these specific steps?

8   *A.*   Because it demonstrated our -- that we were following the

9   guidelines.

10  *Q.*   So earlier we looked at a January 2014 email in which you

11  said you had cooled your process with Mr. Cleeton.  Do you

12  remember that?

13  *A.*   Yes.

14  *Q.*   So at what point did Mr. Cleeton ultimately receive an

15  offer from RAD Partners?

16  *A.*   I don't recall exactly, but it was around this time of

17  October 2014.

18  *Q.*   Looking back at that email we read a moment ago from

19  Mr. Whitney, he says, "I am perhaps getting confused with Guy."

20  Do you know what that referred to?

21  *A.*   He's -- that he was perhaps getting confused with the

22  recruiting process that we had with Guy Seay, another person at

23  DaVita.

24  *Q.*   So let's turn to that story.

25          You can pull this document down.

1          Who is Guy Seay?

2   *A.*  Guy Seay was a finance executive at DaVita.

3   *Q.*  And did you consider Mr. Seay for a job at RAD Partners?

4   *A.*  We did.

5          *MR. MARIANO:*  Let's take a look at Government

6   Exhibit 188.  We'll move for admission pursuant to stipulation.

7          *THE COURT:*  Admitted.

8          (Exhibit 188 admitted.)

9   *BY MR. MARIANO:*

10  *Q.*  Is this an email thread ending January 2, 2014, between you

11  and Mr. Whitney?

12  *A.*  Yes.  It ends that way.

13  *Q.*  So looking at this first email in the thread from

14  Mr. Whitney to Mr. Thiry, did you have any role in reviewing or

15  drafting this email?

16  *A.*  Yes.  I believe I reviewed it prior to Rich sending it to

17  Kent.

18  *Q.*  What was the general purpose of this email?

19  *A.*  It was to suggest an idea that we had, that Guy might be a

20  good chief financial officer for Radiology Partners.

21  *Q.*  Let's look at the paragraph starting, "Here is my idea."

22  Mr. Whitney writes, "I think that Guy Seay would be the exact

23  right fit for the role."  Do you see this?

24  *A.*  Yes.

25  *Q.*  At the time, did you agree that Mr. Seay would be a great

Anthony Gabriel – Direct

1    fit for the role?

2    *A.*  Yes.  A great fit.

3    *Q.*  Let's turn to the next few paragraphs.

4         So in that next paragraph, Mr. Whitney writes, "Let me

5    immediately say that neither I nor anyone on my team has talked

6    to Guy about this nor will we without your buy-in.  Further, we

7    have not in any way hinted to him or otherwise indicated there

8    might be an opportunity.  Zero.  Nothing."  Do you see that?

9    *A.*  Yes.

10   *Q.*  Was that a true statement?

11   *A.*  Yes.

12   *Q.*  Do you understand why Mr. Whitney wrote this to Mr. Thiry?

13   *A.*  He was expressing that we were following the guidelines,

14   that we had not initiated contact.

15   *Q.*  And in the absence of the ground rules, the guidelines,

16   would you have raised this job opportunity with Mr. Seay

17   directly first?

18   *A.*  Most likely, yes.

19   *Q.*  In that next paragraph Mr. Whitney writes, "Even though I,

20   as well as TU and AG" -- let me pause there.  TU is Tom

21   Usilton?

22   *A.*  That is correct.

23   *Q.*  And AG is you, Anthony Gabriel; right?

24   *A.*  Yes, that's correct.

25   *Q.*  Okay.  Mr. Whitney writes, "Even though I, as well as TU

1  and AG, view him as a very strong fit for the role, I

2  considered him off limits, particularly in light of our recent

3  good, healthy conversations on this topic."  Do you see that?

4  A.  Yes.

5  Q.  What did you understand "off limits" to mean in this

6  context?

7  A.  That we wouldn't reach out to him for this position.

8  Q.  And do you understand why Mr. Whitney wrote this to

9  Mr. Thiry?

10  A.  Yes.  He wanted to demonstrate that we were following -- we

11  were doing what we proposed.  We were doing what we said we

12  would.

13  Q.  In the absence of the ground rules, would RAD Partners have

14  considered Mr. Seay off limits?

15  A.  No.

16  Q.  So let's go back to the prior paragraph.  Mr. Whitney

17  writes, "You may hate this idea, and if that is the case, we

18  will never bring it up with him and we will move on and do a

19  normal search."  Do you see that?

20  A.  Yes.

21  Q.  And do you understand why Mr. Whitney wrote this to

22  Mr. Thiry?

23  A.  To demonstrate that we were following the guidelines,

24  No. 1, in the guidelines.

25  Q.  And in the absence of the guidelines, would RAD Partners

Anthony Gabriel – Direct

1    commit to never bringing this job up with Mr. Seay?

2           *MR. MELSHEIMER:*  Your Honor, objection.  It's asked

3    and answered.

4           *THE COURT:*  Sustained.

5    *BY MR. MARIANO:*

6    *Q.*  Dr. Gabriel, let me ask, if Mr. Thiry had asked RAD

7    Partners not to communicate with Mr. Seay, how would RAD

8    Partners have responded?

9    *A.*  I don't think we would have talked to him, although I'm not

10   sure.

11   *Q.*  Let's go all the way to page 4 of this document and take a

12   look at the paragraph beginning, "Perhaps."

13          Mr. Whitney writes, "In any event, the three of us

14   felt we had to bring this up with you before we moved in a

15   different direction and filled the position."  Do you see that?

16   *A.*  Yes.

17   *Q.*  And what did you understand this to mean?

18   *A.*  That we wanted to ask Kent if he thought this was a

19   reasonable idea before we were to go try to fill the position

20   elsewhere.

21   *Q.*  Let's go further up in the document, take a look at

22   Mr. Thiry's response.

23          Mr. Thiry writes, "I will talk to JR and think.  Your

24   note is most thoughtful."  Do you see that?

25   *A.*  Yes.

Anthony Gabriel – Direct

1  *Q.*  Who is JR?

2  *A.*  JR is Javier Rodriguez.

3  *Q.*  What position was RAD Partners discussing in this email

4  that Mr. Seay was being considered for?

5  *A.*  Mr. Seay was being considered for the CFO position for us.

6  And in the second paragraph here, where it says, "he will not

7  become the CFO of DaVita" -- the CFO of DaVita position.

8  *Q.*  But RAD Partners wanted to consider Mr. Seay for the CFO

9  position at RAD Partners?

10  *A.*  Correct.

11  *Q.*  Was that CFO job posted publicly?

12  *A.*  No.

13  *Q.*  Was it even public information that RAD Partners had a CFO

14  opening?

15  *A.*  No.

16  *Q.*  So without reaching out, could Guy Seay have just called up

17  HR at RAD Partners to apply for the job?

18        *MR. MELSHEIMER:*  Objection, Your Honor.  Calls for

19  speculation.

20        *THE COURT:*  Sustained.

21  BY MR. MARIANO:

22  *Q.*  Was HR at that point taking applications for the CFO

23  position?

24  *A.*  No.

25  *Q.*  At the time was there any way for candidates to express an

Anthony Gabriel – Direct

1    interest in the CFO position if they weren't proactively

2    recruited?

3           MR. MELSHEIMER:  Objection, Your Honor.  Calls for

4    speculation.

5           THE COURT:  Overruled.

6    BY MR. MARIANO:

7    Q.  I'll ask again, was there any way for a candidate to be

8    considered if they weren't proactively recruited?

9    A.  Not at that time.

10   Q.  More broadly, for positions like CFO, would RAD Partners

11   typically rely on proactive solicitation to find candidates?

12   A.  For a senior position like that, yes.

13          MR. MARIANO:  Let's take a look at Government

14   Exhibit 193.  And we'll move for admission pursuant to

15   stipulation.

16          THE COURT:  It's admitted.

17          (Exhibit 193 admitted.)

18   BY MR. MARIANO:

19   Q.  Is this an email thread ending January 13, 2014, between

20   you and Mr. Whitney?

21   A.  Yes.

22   Q.  Let me direct your attention to the email from Mr. Thiry.

23   In that last paragraph, Mr. Thiry writes, "I would prefer that

24   there be no reach-out to him for a couple of weeks as we nail

25   down what his DaVita/HCP options are.  Once again, he is free

1    to call you at any time.  I did not ask for any restraint on

2    that front."  Do you see that?

3    A.  Yes.

4    Q.  So what did you understand Mr. Thiry to be asking?

5    A.  He was asking that we not call Guy for a couple of weeks.

6    Q.  Let's take a look at Mr. Whitney's response.  Did RAD

7    Partners agree to this?

8    A.  It says, "Yes."  It says, "I did commit to us not calling

9    for a couple of weeks."

10   Q.  And why did RAD Partners agree?

11   A.  Because Kent had requested we not.

12   Q.  And who did this advantage?

13   A.  I believe it advantaged DaVita.

14         MR. MARIANO:  Let's take a look at Government

15   Exhibit 197.  We'll move for admission pursuant to stipulation.

16         THE COURT:  Admitted.

17         (Exhibit 197 admitted.)

18   BY MR. MARIANO:

19   Q.  Is this an email thread ending March 2, 2014, between you

20   and Mr. Whitney?

21   A.  Yes.

22   Q.  So let's take a look at the email from Mr. Thiry at

23   4:36 p.m.  Mr. Thiry writes, "It is feeling to me that you guys

24   should stop talking to Guy.  Agree?"  Do you see that?

25   A.  Yes.

Anthony Gabriel – Direct

1   Q.  And then looking up at Mr. Whitney's response -- can you

2   read the second paragraph of Mr. Whitney's response?

3   A.  "As for stopping talking with him, if that is what you

4   want, that is what we will do.  As you know, we only talked

5   with him with your permission because we felt that this was the

6   perfect fit for him and the type of opportunity that likely

7   won't present to him very often.  If there is a better

8   opportunity within DaVita or you just don't want him

9   considering this because it would put you in a bind, we'll move

10  on."

11  Q.  Did RAD Partners in fact ultimately stop talking to

12  Mr. Seay about this CFO job opportunity?

13  A.  Yes.

14  Q.  So Mr. Seay never became CFO at RAD Partners; right?

15  A.  No.

16  Q.  Did Mr. Seay ever become CFO at DaVita?

17  A.  No.

18       MR. MARIANO:  You can pull this document down.

19  BY MR. MARIANO:

20  Q.  Did you and Mr. Thiry ever discuss that the ground rules

21  between DaVita and RAD Partners were no longer necessary to

22  follow?

23  A.  No.

24       MR. MARIANO:  Thank you, Dr. Gabriel.  No further

25  questions.

1          *THE COURT:*  Cross-examination.

2          *MR. DODDS:*  Thank you, Your Honor.

3                              **CROSS-EXAMINATION**

4     *BY MR. DODDS:*

5     *Q.*  Dr. Gabriel, good afternoon.

6     *A.*  Hello.

7     *Q.*  My name is Jack Dodds, and I represent DaVita.

8          Let's start, sir, where we ended up with Guy Seay.

9     You testified in response to Mr. Mariano's questions that this

10    CFO job that was available to Guy Seay was not available to

11    anybody else; correct?

12    *A.*  Not at that initial time, no.

13    *Q.*  Correct.  So if not for the fact that you worked through

14    Kent Thiry to make him aware of the job, he would have never

15    known about it at all; correct?

16    *A.*  That's correct.

17    *Q.*  And he would have never had the opportunity to be

18    considered; correct?

19    *A.*  That is correct.

20    *Q.*  And he was considered, was he not?

21    *A.*  Yes, he was.

22    *Q.*  And he did consider taking the job; correct?

23    *A.*  Yes, he did.

24    *Q.*  And you had several conversations with him about that very

25    thing; did you not?

Anthony Gabriel – Cross

1    A.   Yes, I did.

2    Q.   Trying to convince him to come to Radiology Partners; yes?

3    A.   Yes.

4    Q.   And others at Radiology Partners tried to convince him to

5    come to Radiology Partners too; correct?

6    A.   Yes.

7    Q.   And he considered all of that and ultimately decided to

8    stay at DaVita; isn't that right?

9    A.   That's right.

10   Q.   So he knew, despite all of this drama about how long it

11   took and who had to ask who and all that, he was considered for

12   a job that he otherwise would never have known about, he

13   evaluated whether to take that job, and decided not to.

14   Correct?

15   A.   That's correct.

16   Q.   So it was his choice?

17   A.   Yes.  It was his choice.

18   Q.   And you have no doubt about that; correct?

19   A.   I'm pretty confident it was his choice.  There could have

20   been somebody else talking to him, but I think it was his

21   choice.

22   Q.   And Guy Seay, you know him fairly well; right?

23   A.   Yes.

24   Q.   He's a pretty deliberate, careful guy?

25   A.   Very deliberate and careful.

Anthony Gabriel - Cross

1   Q.  And takes his time to figure things out?

2   A.  Yes.  Very much so.

3   Q.  That is what he did here; correct?

4   A.  That is correct.

5   Q.  And, ultimately, at the end of the day, he was more

6   comfortable staying with the security of the bigger company,

7   DaVita, that go to Radiology Partners; is that fair to say, as

8   far as you know?

9   A.  Yes.

10  Q.  Okay.  And Guy Seay did not -- just so we're crystal clear,

11  Guy Seay did not become the CFO of Radiology Partners because

12  he didn't want to; correct?

13  A.  That's correct.

14  Q.  So let's go to Cameron Cleeton.  You know Cameron Cleeton

15  well, too; correct?

16  A.  Yes.

17  Q.  And Mr. Mariano took you through a bunch of questions about

18  there being a delay in Cameron Cleeton being considered; do you

19  recall that?

20  A.  Yes.

21  Q.  Cameron Cleeton was considered; correct?

22  A.  He was.

23  Q.  And, in fact, you had many conversations with him about the

24  possibility of him joining Radiology Partners; is that correct?

25  A.  Yes.

Anthony Gabriel – Cross

1    *Q.* And DaVita knew that he was being considered for a position

2    at Radiology Partners; correct?

3    *A.* At some point. Yes.

4    *Q.* And DaVita competed to try to convince him to stay at

5    DaVita; correct?

6    *A.* Yes.

7    *Q.* And he had other opportunities, as well -- Mr. Cleeton --

8    did he not?

9    *A.* He did. I don't recall the specifics, but I know he had at

10   least one other offer and was interviewing at another company

11   in Phoenix.

12   *Q.* So he had an offer in hand from some company?

13   *A.* Uh-huh.

14   *Q.* And was interviewing at another company in Phoenix?

15   *A.* Uh-huh.

16   *Q.* And had Radiology Partners trying to get him; correct?

17   *A.* Uh-huh. That's all correct.

18   *Q.* And DaVita trying to get him?

19   *A.* Yes.

20   *Q.* All at the same time?

21   *A.* Yes.

22   *Q.* A lot of competition for Mr. Cleeton; right?

23   *A.* Yes.

24   *Q.* And, ultimately, whatever drama was involved in whatever

25   people thought they had to tell Kent so that he wouldn't be

Anthony Gabriel - Cross

1    angry, the process worked the way it should work in the

2    abstract.  He had the opportunity -- he considered four

3    opportunities, in fact -- considered which one he wanted, and

4    ultimately came to Radiology Partners.  Correct?

5    A.   That's correct.

6    Q.   And that's the long and the short of the Cameron Cleeton

7    story; right?

8    A.   Yes.

9    Q.   We also talked about a Bowie Remaley; do you recall that?

10   A.   Bowie Remaley.

11   Q.   Thank you.  And Mr. Mariano showed you some documents or --

12   I'm getting confused.  We've seen so many documents, and I'm

13   trying to keep us away from documents at least for a little

14   while.  But she was -- Bowie is a she?

15   A.   Bowie is a she.  Yes.

16   Q.   She was at DaVita in an executive position; is that

17   correct?

18   A.   Yes.

19   Q.   And she was hired to come to Radiology Partners in an

20   executive position; correct?

21   A.   Correct.

22   Q.   And she's at Radiology Partners today?

23   A.   That's correct.

24   Q.   So she had -- and as far as you knew, DaVita tried to

25   compete to keep her as well; correct?

Anthony Gabriel - Cross

1  A.  I don't think so --

2  Q.  Okay.

3  A.  -- actually in that case.  She explored other opportunities

4  in the U.S.  She had to leave Singapore, and there wasn't

5  anything that was a good fit.  I think it was sort of mutual.

6  Q.  Fair enough.

7  A.  So she was looking for other companies to move to.

8  Q.  But she had the opportunity to look for other -- the chance

9  to look for other opportunities within DaVita and with other

10  companies?

11  A.  That's correct.

12  Q.  And ultimately did that to her satisfaction, presumably;

13  right?

14  A.  Presumably.  I believe so.

15  Q.  And ultimately was hired at Radiology Partners?

16  A.  Yes, she was.

17  Q.  Correct?

18  A.  Yes, she was.

19  Q.  So that's the long and the short of the Bowie Remaley

20  story; right?

21  A.  Yes.

22  Q.  So now we have two people hired from DaVita to Radiology

23  Partners during the period where these ground rules were in

24  effect; correct?

25  A.  Correct.

723

Anthony Gabriel – Cross

1   *Q.* So the ground rules didn't get in the way of those two

2   people moving from DaVita to Radiology Partners one lick, did

3   they?

4   *A.* No. They ended up working there.

5   *Q.* Now, you talked about the Basak Ertan, who is your wife;

6   correct?

7   *A.* Yes.

8   *Q.* She was an executive at DaVita?

9   *A.* Yes.

10  *Q.* And is an executive at Radiology Partners now; correct?

11  *A.* Correct.

12  *Q.* And nothing about the ground rules got in the way of her

13  moving to Radiology Partners, did they?

14  *A.* She ended up there, so I guess no.

15  *Q.* That's the long and the short of that story; correct?

16  *A.* Yes.

17         *MR. DODDS:* Bear with me one moment, Your Honor,

18  please.

19  *BY MR. DODDS:*

20  *Q.* We also talked about a man named Eddie Robles. Do you

21  recall that?

22  *A.* Uh-huh. Yes.

23  *Q.* And Eddie -- I believe Mr. Mariano showed you an email or

24  emails that related to Mr. Robles that were around in the late

25  2013 time frame; do you recall that?

Anthony Gabriel - Cross

1    *A.*  Yes.

2         *MR. DODDS:*  Now, in fact, if we could, can we pull up

3    Government Exhibit 166.

4         I'm sorry.  I was trying to stay away from documents,

5    but this won't take long.

6    *BY MR. DODDS:*

7    *Q.*  Okay.  So this is the email that Mr. Mariano showed you

8    about Eddie Robles; correct?

9    *A.*  Yes.

10   *Q.*  Okay.  And if you go to the top, you'll see that the date

11   of this email is October 29, 2013.  Do you see that?

12   *A.*  Yes.

13   *Q.*  So that is before the ground rules email that Mr. Whitney

14   sent November 5 of 2013; correct?

15   *A.*  Correct.

16   *Q.*  So it is before Radiology Partners proposed these ground

17   rules to Mr. Thiry; correct?

18   *A.*  Correct.

19        *MR. DODDS:*  And at that point in time, if you can go

20   down to the fourth paragraph, please.  The one beginning

21   "final."

22   *BY MR. DODDS:*

23   *Q.*  Okay.  This -- this is the one that Mr. Mariano showed you.

24   "Are we 100 percent whole on this one in terms of believing he

25   is leaving DaVita in any event and that we aren't encouraging

Anthony Gabriel - Cross

1   him to leave.  I am about to make that commitment to Kent, so

2   we really need to be sure that we are living up to it, or I

3   shouldn't say it."  Right?

4   A.  Right.

5   Q.  Okay.  Now, this is a commitment that Mr. Whitney and you

6   and others at Radiology Partners were prepared to make

7   respecting Eddie Robles before the ground rules even existed;

8   is that correct?

9   A.  That's correct.

10  Q.  And Eddie Robles had at least one other opportunity as well

11  besides DaVita and Radiology Partners; is that correct?

12  A.  Yeah.  It was at a networking company.  I don't remember

13  the name, but he did have another offer.

14  Q.  So there was competition for his services?

15  A.  Yes.

16  Q.  And he evaluated those opportunities?

17  A.  Yes.

18  Q.  And decided to come to Radiology Partners?

19  A.  Yes.

20  Q.  So the long and short of it is, regardless of whatever

21  drama there was about what needed to be said to Mr. Thiry,

22  Eddie Robles went from DaVita to Radiology Partners; right?

23  A.  Yes.

24  Q.  And nothing about any commitments or ground rules stood in

25  the way of that one lick, did they?

726

Anthony Gabriel – Cross

1    *A.*  He did come to Radiology Partners.

2    *Q.*  And that's the long and short of that story; correct?

3    *A.*  Yes.

4    *Q.*  There was also some discussion about a man named Jeff Long;

5    do you recall that?

6    *A.*  Yes.

7    *Q.*  And like the other people we've talked about, except for

8    the one person who just made the choice not to go to Radiology

9    Partners, Guy Seay, Jeff Long also ended up at Radiology

10   Partners?

11   *A.*  Yes.

12   *Q.*  So nothing about these ground rules that we've been talking

13   about affected his ability to come to Radiology Partners one

14   lick, did it?

15   *A.*  He -- he came to Radiology Partners.

16   *Q.*  And, in fact, even after the ground rules were articulated,

17   a pretty fair number of people moved from DaVita to Radiology

18   Partners; isn't that correct?

19   *A.*  Yes.  It was certainly over ten.

20   *Q.*  Certainly over ten?

21   *A.*  Over 20, perhaps, I think.

22   *Q.*  I'm sorry?

23   *A.*  Over 20.

24   *Q.*  Over 20 people --

25   *A.*  Yeah.

Anthony Gabriel - Cross

1    Q.  -- moved from DaVita to Radiology Partners despite the

2    ground rules; correct?

3    A.  Yes.

4    Q.  And while the ground rules were in effect?

5    A.  Yes.

6    Q.  Okay.  And those people included people in the executive

7    position; right?

8    A.  Yes.

9    Q.  And people who were not executives; correct?

10   A.  Yes.

11   Q.  And as you sit here today, sir, you have no reason to

12   believe that the number would have been 40, 50, or 60 if the

13   ground rules weren't in effect; right?

14   A.  I don't know.  I have no reason to say that.  I don't know.

15   Q.  But you'll agree with me that that's a pretty significant

16   number of people moving from one company to another in that

17   period of time; correct?

18   A.  Yes.

19   Q.  Okay.  Now, sir, let's go back to what led to the ground

20   rules coming into effect in the first place.  Okay?  I think

21   you testified earlier that Mr. Thiry complained when Radiology

22   Partners was hiring people that -- from DaVita, and

23   particularly people that the people at Radiology Partners knew;

24   correct?

25   A.  Yes.

728

Anthony Gabriel - Cross

1    Q.  And so that was a particular point of sensitivity for him,

2    right?  It wasn't just sort of hiring anybody; it was

3    particularly related to people you guys knew?

4    A.  That was the most sensitive spot.  Yes.

5    Q.  Okay.  And the people you guys knew that were -- that were

6    sensitive for him were senior-level people -- executive-level-

7    people for the most part; is that correct?

8    A.  Yes, mostly.

9    Q.  Okay.  And his complaint, as you understood it, was that

10   it -- doing that, former DaVitans hiring people that they know,

11   in his view sort of took unfair advantage of the fact that you

12   had sort of inside baseball and inside connections at DaVita.

13   That is what was really bugging him, as he articulated it;

14   correct?

15   A.  That was my understanding.

16   Q.  Okay.  Now, putting aside what happened after that and how

17   he expressed it, on a human level, that's kind of

18   understandable; right?

19   A.  Seems understandable.

20   Q.  And you might feel the same way yourself; right?

21   A.  I might.

22   Q.  Now, let's go back and talk about something I think that

23   you touched on, which related to DaVita's approach to nurturing

24   and keeping talent.  Are you with me?

25   A.  I'm with you.

729

Anthony Gabriel - Cross

1   Q.   Okay.  Now, let me just find my -- let me just find my

2   note -- the place in my notes where I think you talked about

3   that to make sure I try to get this right.  Bear with me one

4   second please.

5        All right.  You testified in response to Mr. Mariano's

6   questions that retention of talent was really important at

7   Radiology Partners; right -- I'm sorry -- at DaVita.

8   A.   Yes.  It's important at Radiology Partners, too.

9   Q.   I'm sure it is.  I'm sure it is.  And that the way in which

10  DaVita went about trying to retain talent -- and we're talking

11  for the most part here in all of these discussions about

12  executive talent; aren't we?

13  A.   For most of these discussions, yes, we're talking about

14  executive talent.

15  Q.   Okay.

16  A.   Kind of director level and above.

17  Q.   That's what was really the flash point for all of this;

18  right?

19  A.   Yes.

20  Q.   Okay.  And, in fact, the ground rules that we looked at

21  before, even though they don't specify director level and above

22  on their face, they're not limited in any way, the real focus

23  of this was on director level employees and above; right?

24  A.   Those were the most sensitive employee.  Yes.

25  Q.   And so the higher in the food chain of DaVita the potential

Anthony Gabriel – Cross

1    hire was, the more sensitive Radiology Partners felt it needed

2    to be about how it handled that recruiting process; fair?

3    A.  Fair.  Yes.

4    Q.  Okay.  So let's go back to DaVita's approach to retaining

5    talent.  You said that DaVita tried to do that by making sure

6    they had good assignments; right?

7    A.  Yes.

8    Q.  That they were compensated appropriately?

9    A.  Yes.

10   Q.  And their compensation, generally speaking, is a factor of

11   their value in the open market; right?

12   A.  I believe so.  Yes.

13   Q.  What they could get if they went somewhere else?

14   A.  Yes.

15   Q.  Okay.  For a similar type of position?

16   A.  Certainly, we did not want them receiving higher offers and

17   leaving.

18   Q.  Okay.  And is it correct to say, sir, that when you were at

19   DaVita, DaVita worked very hard to make sure that the people

20   we're talking about, senior level and above, were very well

21   paid?

22   A.  Yes.  Especially if they were talented.  Yes.

23   Q.  And that makes sense; right?  The better you are at your

24   job at the executive level, the more you're going to get paid;

25   right?

Anthony Gabriel – Cross

1   A.  Makes sense to me.  Yes.

2   Q.  Okay.  Now, in addition to making sure they had good

3   assignments and that they were paid appropriately, there was

4   also a focus, was there not, on making sure -- not just that

5   they had good assignments, but that they felt like they were

6   growing; right?

7   A.  Yes.

8   Q.  And that they felt like they had a path for advancing if

9   they wanted to do that?

10  A.  Yes.

11  Q.  Now, in order to make sure that you're investing in your

12  talent in the way that we're describing here, you have to talk

13  with them about those things; right?

14  A.  Yes.

15  Q.  And so am I correct, sir, that one of the sort of

16  approaches at DaVita that DaVita executives were expected to

17  have with the executives they supervised was to have a line of

18  communication with them, a relationship with them where they

19  could understand that person's needs, desires, level of

20  happiness, and so forth.  Otherwise you can't address these

21  things; right?

22  A.  Yeah.  That's correct.

23  Q.  And that was the way it was done at DaVita; right?

24  A.  Most commonly, when done well.  Yes.

25  Q.  Yeah.  And that's the way you did it; right?

Anthony Gabriel - Cross

1   A.   I'd like to think so.  Yes.

2   Q.   And sometimes you're more successful at that than others.

3   Sometimes you're better at developing a relationship with your

4   subordinate executive than at other times; right?

5   A.   True.

6   Q.   But you're trying to develop an atmosphere where they can

7   feel free to talk with you about their dissatisfactions, about

8   their goals, including about the fact that they might be

9   looking for something elsewhere; right?  That if they don't get

10  what they want here, they might be willing to go somewhere

11  else; right?

12  A.   I -- yes.

13  Q.   And that's all very healthy; right?

14  A.   Healthy and normal.

15  Q.   Healthy and normal.  And was normal at DaVita; correct?

16  A.   It was most commonly, when done well.

17  Q.   When done well.  The aspiration is that it be done well.

18  But certainly coming down from Mr. Thiry to the executives that

19  reported up to him, that's what they were expected to do;

20  right?

21  A.   Yes.

22  Q.   And the executives that those executives supervised were at

23  least encouraged to be open about these things, for all the

24  reasons we've been talking about; right?

25  A.   Yes.

Anthony Gabriel - Cross

1   *Q.*  Okay.  And I'm going to take it as a given that you and

2   Mr. Whitney and the other executives at Radiology Partners took

3   that approach to Radiology Partners and applied it there, too;

4   right?

5   *A.*  We have.

6   *Q.*  Okay.  One of the things that you told the ladies and

7   gentlemen of the jury in response to Mr. Mariano's questions

8   was that Kent Thiry was an investor in Radiology Partners;

9   right?

10  *A.*  Yes.

11  *Q.*  And, in fact, he was not the only DaVita executive who

12  invested in Radiology Partners; correct?

13  *A.*  Correct.

14  *Q.*  And these are folks that invested their own money in the

15  company that you and Rich Whitney, their former colleagues at

16  DaVita, went to found; right?

17  *A.*  That's right.

18  *Q.*  And, in fact, that investment group was called the friends

19  and family investment group, or something like that; correct?

20  *A.*  I don't know that it was a formal name, but that is what

21  they were commonly referred to.  Kind of friends and family

22  investors.  Yes.

23  *Q.*  And that included Mr. Thiry?

24  *A.*  Yes, it did.

25  *Q.*  Okay.  Mr. Mariano asked you some questions about something

Anthony Gabriel - Cross

1    that is not at issue in this case, which is a contractual

2    nonsolicitation provision in employment agreements.  Do you

3    remember those questions?

4    A.  I do.

5    Q.  And he asked you -- and that's something that you sign in

6    an employment agreement when you're starting the job; right?

7    A.  It was -- for me it was not part of an employment

8    agreement.  It was part of an equity agreement.  But, yes.

9    Q.  All right.  Fine.  And just to make sure that everybody is

10   clear about that.  There can be an employment contract; right?

11   A.  Correct.

12   Q.  But for executives, executives typically have different

13   components to their compensation; right?

14   A.  Correct.

15   Q.  They'll have salary?

16   A.  Yes.

17   Q.  They'll have bonus, typically?

18   A.  Yes.

19   Q.  And then they'll have what you called the equity component;

20   right?

21   A.  Correct.

22   Q.  And the equity component is stock in the company; right?

23   A.  Stock or stock options.  Yes.

24   Q.  Or stock options.  And that stock or those stock options

25   can be worth a significant amount of money; right?

Anthony Gabriel – Cross

1    A.   Yes.

2    Q.   So your noncompete was in the equity portion of your

3    employment deal when you started at DaVita; right?

4    A.   Noncompete.  Yes.

5    Q.   Yeah.  So -- but the fact is that if you don't sign the

6    noncompete when you start, you don't get the job; right?

7    A.   Yeah.  You don't get the job, or you may not get the

8    equity, which is a significant amount of money.

9    Q.   Okay.

10   A.   So you usually sign it.

11   Q.   Okay.  So going back to the sort of buildup to the ground

12   rules that we talked about, I think you testified that -- yeah,

13   here it is.  You testified that after Mr. Thiry reacted

14   negatively to Radiology Partners hiring other DaVita executives

15   that they knew, you and Mr. Whitney and Mr. Usilton got

16   together and tried to come up with something that you could

17   live with; right?

18   A.   Yes.

19   Q.   Okay.  And so when -- let's sort of unpack that a little

20   bit.  So you're sitting there -- you or all executives at

21   Radiology Partners; right?

22   A.   Yes.

23   Q.   And you have a fiduciary obligation to Radiology Partners

24   and its shareholders and its personnel; right?

25   A.   Correct.

736

Anthony Gabriel - Cross

1   *Q.* And so you're trying to think of a way to take his

2   temperature down that is consistent with those obligations to

3   the shareholders and the company and the employees; right?

4   *A.* Yes.

5   *Q.* And you're not going to do anything that doesn't meet that

6   standard; right?

7   *A.* That's right.

8   *Q.* Okay. And you didn't here, did you?

9   *A.* No.

10  *Q.* Okay. And so one of the things that you have an obligation

11  to the shareholders and everybody else to do is to continue to

12  try to recruit the best talent you can; right?

13  *A.* Yes.

14  *Q.* And so when you sat down to do this, it was not your

15  intention to compromise your ability to do that; was it?

16  *A.* No.

17  *Q.* In fact, you were trying to find a way to satisfy

18  Mr. Thiry, while continuing to be able to hire the best talent

19  you could from where -- whatever source, including DaVita;

20  correct?

21  *A.* That is correct.

22  *Q.* And you -- you guys came up with a way that you thought you

23  could do that; right?

24  *A.* Yes.

25  *Q.* That's why you put it out there to him; right?

Anthony Gabriel – Cross

1   A.   Yes.

2   Q.   Because you thought that you could put it out there to him,

3   satisfy him, and continue to hire everybody that you needed or

4   wanted to hire from DaVita, albeit maybe with some steps

5   involved; right?

6   A.   Yes.   The people we wanted, we felt that we would still be

7   able to hire.

8   Q.   And, in fact, the people that you wanted, you still did

9   hire; didn't you?

10   A.   Perhaps with the exception of Guy.

11   Q.   But that was because Guy decided he didn't want you?

12   A.   That's correct.

13   Q.   Okay.   And one of the reasons why, sir, you felt like you

14   could do that was because you had relationships at DaVita;

15   right?

16   A.   I did.

17   Q.   You had -- you and Mr. Usilton, Mr. Whitney, the other

18   former DaVita executives had relationships at DaVita?

19   A.   Yes, we did.

20   Q.   Sort of a network; right?

21   A.   Yes, we -- I worked there for 15 years almost.

22   Q.   And you were in communication with that network pretty

23   regularly; right?

24   A.   Yes.

25   Q.   And so if you had a position that you wanted to fill, one

738

Anthony Gabriel - Cross

1   way that you could fill it was just to sort of put word out

2   into your network that there was this job at Radiology Partners

3   available, is anybody interested; right?

4   A.   That was one way we could fill it.   Yes.

5   Q.   And because people at Radiology Partners knew you and you

6   knew them and there was this network, if there were people at

7   DaVita who were interested, you'd find that out?

8   A.   Yeah, sometimes.   Oftentimes.

9   Q.   And so that -- you thought -- you certainly still had that

10   available to you; correct?

11   A.   Yes.

12   Q.   But, in any event, whatever other ways you had available,

13   when you presented these ground rules to Mr. Thiry, you

14   presented them because they were consistent with your

15   obligations to Radiology Partners; right?

16   A.   Yes.

17   Q.   And they would not inhibit your ability to get talent from

18   DaVita to the extent you wanted to; right?

19   A.   Not -- for people who contacted us, no.

20   Q.   Okay.   But for even people who didn't contact you, you had

21   a way to make it known within DaVita that positions were

22   available; correct?

23   A.   Perhaps.   Like, we had a way to put things out to the

24   network.   How far it went, I can't say.   But we did --

25   certainly, we could make things known to the network.

Anthony Gabriel - Cross

1   *Q.*   Okay.

2   *A.*   So --

3   *Q.*   And, sir --

4          I'm sorry, Your Honor.  Bear with me for one second,

5   Your Honor.

6          Now, is it fair to say, Dr. Gabriel, that if you were

7   recruiting somebody that you knew at DaVita -- let me back up.

8          You're recruiting somebody at DaVita that you had a

9   relationship with from your time there; right?  Let's assume

10  that.  Assume this is a person who worked for you.

11  *A.*   A person who worked for me?

12  *Q.*   Yes.

13  *A.*   Directly?

14  *Q.*   Yes.

15  *A.*   Okay.

16  *Q.*   If you're recruiting that person, isn't it true, sir, that

17  you would have encouraged them to think about what

18  opportunities there might be for them at DaVita even if these

19  ground rules never existed?  That you would do that as a matter

20  of your relationship with them?

21  *A.*   For somebody that I had a close relationship with, yes.

22  *Q.*   Uh-huh.  You wouldn't consider there to be anything unusual

23  or abnormal or certainly wrong about that; right?

24  *A.*   No.

25  *Q.*   Okay.  Now, let's just talk about the ground rules

Anthony Gabriel - Cross

1    themselves for a few minutes.  Mr. Whitney and -- was the one

2    who had the conversations with Mr. Thiry that led to these

3    ground rules; correct?  You were not involved in those

4    conversations; right?

5    A.  I was not in those conversations.

6    Q.  And you weren't involved in any conversations with

7    Mr. Thiry about the issues that led to the putting out of the

8    ground rules; correct?

9    A.  No.

10        MR. DODDS:  Okay.  Now, can we put up on the screen

11   Government Exhibit 170, please.

12   BY MR. DODDS:

13   Q.  Okay.  Do you see that, Dr. Gabriel?

14   A.  It's on the screen.  Yes.

15   Q.  Okay.  So just so we're clear, Mr. Mariano asked you a

16   bunch of questions about what different provisions -- different

17   language in these ground rules meant.  But the email from

18   Mr. Whitney to Mr. Thiry that states the ground rules, you are

19   not on that email; correct?

20   A.  I'm not on the email.

21   Q.  Okay.  So in terms of what Mr. Whitney meant by what

22   Mr. Whitney said, the best person for us to talk to is

23   Mr. Whitney; right?

24   A.  Yes.  Makes sense to me.

25        MR. DODDS:  So I'd like to go down to paragraph 2B.

Anthony Gabriel – Cross

1    And if you could just highlight paragraph 2B, please --

2    actually, no.  Start with 2A, please.  Okay.

3    *BY MR. DODDS:*

4    *Q.*  So this 2A and 2B is the sort of notice provision, so to

5    speak; correct?

6    *A.*  Yes.

7    *Q.*  All right.  So let's talk about what that actually is.

8    First, it says, "Before exploring possible opportunities at RP,

9    we will encourage them to consider all of their potential

10   opportunities with DaVita/HCP" -- which is HealthCare Partners;

11   right?

12   *A.*  Yes.

13   *Q.*  "We will encourage them to fully discuss those potential

14   opportunities with their boss."  Correct?

15   *A.*  Correct.

16   *Q.*  Anything wrong with encouraging them to consider their

17   options at DaVita?

18   *A.*  Nothing wrong with it.

19   *Q.*  Then we go to 2B.  It says, "We will not pursue possible

20   employment opportunities for them with RP unless they

21   either" -- either -- "represent to us that they are actively

22   pursuing other opportunities outside of DaVita" -- then there

23   is a parenthetical -- "or that they have had a specific

24   conversation with their boss telling him or her that they are

25   interested in pursuing opportunities outside of DaVita."

Anthony Gabriel - Cross

1    Right?

2    A.  Right.

3    Q.  So two ways to go there.

4    A.  Yes, two ways.

5    Q.  The first way -- and you can do it either way.

6    A.  Yes.  There is an "or."

7    Q.  Right.  The first way, all that requires is for the DaVita

8    person to say to you, I'm looking outside of DaVita.  Right?

9    A.  Yes.  It says, "either represents to us that they are

10   actively pursuing other opportunities."  Yes.

11   Q.  Okay.  If they do that, according to the ground rules that

12   Mr. Whitney proposed, full speed ahead; right?

13   A.  Yes.

14   Q.  And in that instance, DaVita doesn't know, because the

15   person's come and said, I'm looking for jobs outside of DaVita.

16   And under these ground rules, you could keep talking to them

17   without DaVita ever knowing; correct?

18   A.  Yes, I suppose so.

19        MR. DODDS:  I'm sure everybody is happy to see me

20   looking at papers and putting them aside.

21        THE COURT:  We're hoping.

22        MR. DODDS:  I'm doing my best.

23        Can I just have one moment, Your Honor?

24        THE COURT:  Sure.

25        MR. DODDS:  Nothing else, Your Honor.  Thank you.

Anthony Gabriel – Redirect

1          *THE COURT:*  All right.  Redirect.

2                        **REDIRECT EXAMINATION**

3    *BY MR. MARIANO:*

4    *Q.*  Dr. Gabriel, I'd like to clarify a few things.  I think

5    cross-examination started with a question regarding Guy Seay.

6    And I wrote the language down.  If not for the fact that you

7    worked through Kent Thiry to make him aware of the job, he

8    would have never known about it at all.  Do you remember that

9    question?

10   *A.*  Yes, I do.

11   *Q.*  What if you called him directly?

12   *A.*  I could have called him directly.  I -- that would have

13   been a way to do it.

14   *Q.*  Mr. Dodds also went through a number of employees that were

15   hired by RAD Partners.  Were any one of those employees

16   solicited?

17   *A.*  No.  I don't think any of those were solicited.  Not to my

18   knowledge.

19   *Q.*  And a number of those employees were hired before the

20   ground rules existed; right?

21   *A.*  Some of them were, yeah.

22   *Q.*  For example, Mr. Dodds brought up Jeff Long; right?

23   *A.*  Yes.

24   *Q.*  And Jeff Long was what you thought had triggered Mr. Thiry

25   to complain?

1   A.  Yes, I did think that.

2           MR. MELSHEIMER:  Objection, Your Honor.  Leading.

3           I'm sorry, Doctor.

4           THE COURT:  All right.  That was leading.  Sustained.

5   BY MR. MARIANO:

6   Q.  And I think a few times your friendship with Kent Thiry has

7   come up; right?

8   A.  Yeah.

9   Q.  Did you have friendships with CEOs of other companies that

10  competed with RAD Partners for employees?

11  A.  Yes, I do.

12  Q.  Did you have close relationships with senior executives at

13  other companies that competed with RAD Partners for employees?

14  A.  Yes, I do.

15  Q.  And have any of those other CEOs or senior executives other

16  than at DaVita ever reached out and asked you not to recruit

17  their employees?

18  A.  No.

19  Q.  And you also said on cross-examination that you hired

20  people that you personally knew you wanted to hire from DaVita;

21  is that right?

22  A.  Can you repeat that one more time?  I'm sorry.

23  Q.  Mr. Dodds asked if you were able to hire the people that

24  you personally knew and wanted to hire from DaVita.

25  A.  Yes.

1   *Q.* And Mr. Dodds asked if this agreement was really about the

2   employees that you and Mr. Whitney personally knew at DaVita;

3   is that right?

4   *A.* Yes.

5   *Q.* When you worked at DaVita, did you know an employee named

6   Elliot Holder?

7           Did you know an employee named Elliot Holder from your

8   time at DaVita?

9   *A.* I don't recall that name.

10          *MR. MARIANO:* Thank you, Dr. Gabriel. No further

11  questions.

12          *THE COURT:* Questions from the jury?

13          *MR. DODDS:* I have nothing.

14          *THE COURT:* Well, that's a pretty broad statement.

15          *MR. DODDS:* I have no further questions, Your Honor.

16          (Hearing commenced at the bench.)

17          *THE COURT:* Question 18.

18          *MR. MARIANO:* That's fine with me.

19          *MR. WALSH:* No objection from --

20          *THE COURT:* Here is No. 19.

21          *MR. MARIANO:* That's fine.

22          *MS. CLINGAN:* I'm the least literal of the bunch.

23          *MR. MARIANO:* No objection.

24          *MR. DODDS:* No objection, Your Honor.

25          *THE COURT:* All right. There is 20.

1          MR. DODDS:  Did you guys look at this one?

2          MR. MARIANO:  Yes.

3          MR. DODDS:  That's the part -- I don't know that this

4    is a basis for an objection, Your Honor; but I'm concerned

5    about sort of the e.g. part of the question.  It's --

6          THE COURT:  Well, yeah.  So, first of all, is somebody

7    objecting to this?

8          MR. DODDS:  I think we are.  I think we're taking us

9    in a direction -- we already have enough disagreements about

10   the issues in the case.

11         MS. CLINGAN:  Sorry.  Can we see this again?

12         I see.  You want to just not ask the e.g. part?

13         MR. DODDS:  Yes.

14         MS. CLINGAN:  We don't have any objection.

15         MS. LEWIS:  I don't have any objection.

16         MR. DODDS:  To taking it out or keeping it in?

17         MS. CLINGAN:  To keeping it.

18         THE COURT:  Doesn't matter.  You're both objecting to

19   keeping it?

20         MS. LEWIS:  We do not object to keeping it in.

21         MR. DODDS:  And we do.

22         THE COURT:  There we go.

23         All right.  The objection is sustained as to the part

24   that I have now bracketed.

25         MR. DODDS:  Thank you, Your Honor.

 1              THE COURT:  Otherwise, it's no objection.

 2              MR. DODDS:  No objection otherwise.  Yes, sir.

 3              THE COURT:  And then 21.

 4              MR. DODDS:  No objection.

 5              MR. MARIANO:  No objection.

 6              THE COURT:  Okay.

 7              (Hearing continued in open court.)

 8              THE COURT:  All right.  Questions from the jury for

 9    you, sir.

10              Question:  Referring to the bullet points you proposed

11    to Mr. Thiry, were you forced or induced to make the offer?

12              THE WITNESS:  You mean -- we're referring to the

13    numbered list that Rich sent to Kent, is that --

14              THE COURT:  I think so, yes.

15              THE WITNESS:  Yeah.  We were not forced to do it.  We

16    were trying to come up with a solution that would allow us to

17    maintain our relationship with Kent and DaVita while at the

18    same time allowing us to meet our requirements to be able to

19    hire people.

20              THE COURT:  Were you induced into making that offer?

21              THE WITNESS:  In terms of --

22              THE COURT:  Or was it at your discretion, is what the

23    person is saying?

24              THE WITNESS:  I mean, I guess we were induced in so

25    much as we were contacted with a complaint, basically.  So if

1     that counts as an inducement.  But we didn't receive any sort

2     of financial inducement or anything that could be translated in

3     any kind of monetary value, if that is what the question is

4     more referring to.

5             THE COURT:  All right.  Next question:  In the RAD

6     Partners and DaVita agreement, what was the purpose of the

7     tell-your-boss requirement?

8             THE WITNESS:  That -- so that -- I believe -- I can

9     only speculate, really, as to what the idea was there.  But I

10    believe, due to looking at the -- to give an opportunity for

11    DaVita to be able to rectify any problem that might exist with

12    that person's role -- that employee's role.  If they were

13    unhappy about their pay, something about the type of work they

14    were doing, that their boss would have an opportunity to

15    address that.

16            THE COURT:  What was the purpose of the requirement

17    that the DaVita -- that DaVita employees needed to be looking

18    at other companies other than RAD Partners?

19            THE WITNESS:  That was really mostly to demonstrate

20    that somebody was going to leave anyways.  We had all worked

21    together, we had relationships.  The logic behind it was

22    really, look, if somebody is going to leave DaVita anyways, you

23    might as well have them come work with us, some people you know

24    and respect.  We were trying to do good things in healthcare.

25    You would rather have them come to us than go someplace else if

1       they're going to leave anyways.  So that was what that was

2       there for.

3              THE COURT:  And then it says -- goes on to say, to

4       ensure something to DaVita or RAD Partners like the serious

5       intent of the employer or -- of the employee, question mark?

6              THE WITNESS:  I'm sorry.  Can you repeat that one more

7       time?

8              THE COURT:  Yeah.  It goes back to the question that

9       you just answered.  You answered the question, What was the

10      purpose of the requirement that DaVita employees needed to be

11      looking at other companies other than RAD Partners?  And

12      question mark there.  And then it says, to ensure something to

13      DaVita or RAD Partners like the serious intent of the employee,

14      question mark.

15             THE WITNESS:  I'm not -- gosh, I really -- I'm not

16      sure -- I answered the first part.  And it sounds like the

17      second part --

18             THE COURT:  Another purpose might have been to assure

19      DaVita or your company that these people had a serious intent

20      of leaving.

21             THE WITNESS:  Yeah.  It was definitely the former.  If

22      they were going to be leaving DaVita, to ensure they had a

23      serious intent of leaving DaVita.  And, again, at that point,

24      if they did have a serious intent of leaving DaVita, well,

25      wouldn't it be -- wouldn't it be good, wouldn't it be okay if

1    they went to RAD Partners versus someplace else.

2        THE COURT:  Okay.  Next question:  How did you expect

3    to enforce that all DaVita employees engaging in RAD Partners

4    job opportunities followed the guidelines?  And did it include

5    telling anyone who was involved in any hiring at RAD Partners

6    about the agreement?

7        THE WITNESS:  So for people at RAD Partners involved

8    in hiring -- it was mostly the recruiting team -- and they were

9    informed not to contact DaVita employees to -- with the purpose

10   to solicit them.  So the recruiting team was told that.

11       Other DaVita executives -- former DaVita executives

12   that were at RAD Partners were told, don't reach out to DaVita

13   executives for the purposes of employment.  I don't believe

14   that the rest of the agreement was not made broadly known, the

15   understanding that we had, that email.

16       THE COURT:  Question:  In one of the November 5,

17   2013, emails about guidelines, Rich said, quote, Fair way to

18   treat each other, close quote.  Does "each other" include the

19   employees of the companies?

20       THE WITNESS:  I could only speculate what Rich's

21   intent was there.  I think it was mostly directed at the people

22   that were on that email chain.  So --

23       THE COURT:  All right.  Question:  We have heard that

24   it is technically possible for someone to move to RP from

25   DaVita even respecting the ground rules.  In your opinion, do

1    the ground rules put any groups of people or types of

2    personalities at a disadvantage to successfully having that

3    opportunity?

4         THE WITNESS:  Hmmm.  I mean, the only -- as far as

5    part 2, no.  I can't really think of anything like that.  You

6    know, the only kind of person is just about somebody who maybe

7    didn't become aware that there was a posting, and because of

8    the fact that they didn't get reached out to, they might not

9    find out about it.  But that -- I don't know what personality

10   type or group of people that would encompass.

11        THE COURT:  Right.

12        Let's see.  If part 2A, the first half, said that if

13   employees are actively looking, then full steam ahead.  Then

14   why was it so hard and involved to hire Cameron?

15        THE WITNESS:  Cameron wasn't sure he wanted to leave.

16   He was trying to decide what was right for him over the course

17   of that time period.  He was evaluating his options at DaVita,

18   and he was evaluating outside options.  He's a very

19   intentional, deliberate thinker about that -- about his career.

20   I know him very well, and that's why it took so long.

21        THE COURT:  All right.  Any other questions, folks?

22        (No response.)

23        Follow-up questions?

24        MR. MARIANO:  Very briefly.

25

Anthony Gabriel – Examination

1          **EXAMINATION**

2   *BY MR. MARIANO:*

3   *Q.*  Dr. Gabriel, you were asked a question about whether these

4   ground rules put any particular types of employees at a

5   disadvantage; do you remember that?

6   *A.*  Uh-huh.

7   *Q.*  How would this -- these ground rules have impacted

8   employees who were nervous or unwilling to talk to their boss

9   before leaving DaVita?

10  *A.*  Yeah.  It -- for those employees, like, that didn't want to

11  talk to their boss about leaving, it would be a problem.  But

12  they have to either work criteria inside the ground rules, or

13  there is two options that they could follow.  So --

14  *Q.*  And if those employees weren't already actively looking for

15  other jobs, the ground rules required them to talk to their

16  boss first; is that right?

17              *MR. MELSHEIMER:*  Objection, Your Honor.  Leading.

18              *MR. MARIANO:*  I can --

19              *THE COURT:*  Overruled.

20              *THE WITNESS:*  Could I -- would I be allowed to look at

21  the text of the document --

22  *BY MR. MARIANO:*

23  *Q.*  Sure.

24  *A.*  -- to answer this question?

25              *MR. MARIANO:*  Could you pull up Government

Anthony Gabriel – Examination

1    Exhibit 170.

2            If we could highlight ground rule 2B.

3            *THE WITNESS:*  Sorry.  I just want to make sure I

4    answer it correctly.

5    *BY MR. MARIANO:*

6    *Q.*  Absolutely.  So let me repeat what I think the question

7    was.  For DaVita employees who have reached out to RAD Partners

8    and who were not otherwise already looking for other jobs, did

9    they have a choice about talking to their boss, or was that a

10   requirement?

11   *A.*  No.  If they were unwilling to look for other jobs, then

12   they needed to talk to their boss.

13           *MR. MARIANO:*  Thank you, Dr. Gabriel.  Nothing

14   further.

15           *MR. DODDS:*  Your Honor, just one question.

16           Can you pull that document back up?

17           *THE COURT:*  That's your question?

18                          **EXAMINATION**

19   *BY MR. DODDS:*

20   *Q.*  Just to be clear, Dr. Gabriel, this language says they

21   represent to you that they're looking for other jobs; right?

22   *A.*  Yes.

23           *MR. DODDS:*  That's all, Your Honor.  Thank you.

24           *THE COURT:*  All right.  Thank you.

25           Thank you, sir.

754

1          THE WITNESS:  Thank you.

2          THE COURT:  You're excused and free to go.

3          We'll stop here for the day at 4:41.  Thank you,

4   ladies and gentlemen.  We're getting there.  9 o'clock.

5          (Jury out at 4:41 p.m.)

6          THE COURT:  The jury has been excused.  Anything to

7   put on the record tonight, government?

8          MS. LEWIS:  Nothing from us, Your Honor.

9          THE COURT:  Defendants?

10          MR. DODDS:  No, Your Honor.

11          MR. MELSHEIMER:  No, Your Honor.

12          THE COURT:  Have a nice evening.

13          MR. MELSHEIMER:  You too.

14          (Recess at 4:42 p.m.)

15                        **I N D E X**

16   **Item**                                            **Page**

17

    ANDREW HAYEK
18          Cross-Examination Continued By Mr. Melsheimer    528
            Redirect Examination By Ms. Lewis               614
19          Examination By Ms. Lewis                        644
            Examination By Mr. Melsheimer                   649
20      ANTHONY GABRIEL
            Direct Examination By Mr. Mariano               651
21          Cross-examination By Mr. Dodds                  718
            Redirect Examination By Mr. Mariano             744
22          Examination By Mr. Mariano                      753
            Examination By Mr. Dodds                        755

23

24

25

```
 1                    GOVERNMENT'S EXHIBITS

 2   Exhibit     Offered   Received   Refused   Reserved   Withdrawn

 3   153                     663
     156                     669
 4   166                     696
     167                     672
 5   170                     673
     172                     685
 6   177                     690
     178                     697
 7   188                     711
     193                     716
 8   194                     701
     197                     717
 9   204                     703
     208                     707
10   211                     708
     216                     687
11   231                     698
     232                     699
12   234                     693
     285                     608
13   287                     670

14                    DEFENDANTS' EXHIBITS

15   Exhibit     Offered   Received   Refused   Reserved   Withdrawn

16   A001                    609
     A002                    599
17   A005                    591
     A009                    602
18   A104                    594
     A172                    568
19   A264                    589
     A265                    578
20   A272                    583
     A280                    592
21   A282                    581
     B441                    570
22   B442                    572
     B464                    573
23   B470                    549

24

25
```

1                        REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.

3

            Dated at Denver, Colorado, this 25th day of April,
4    2022.

5

6                                    _Therese Lindblom_

7                              _____
                              Therese Lindblom,CSR,RMR,CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25