1    IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 21-cr-00229-RBJ
3
     UNITED STATES OF AMERICA,
4
         Plaintiff,
5
     vs.
6
     1. DAVITA INC., and
7    2. KENT THIRY,
8        Defendants.
     _____
9
10                    **REPORTER'S TRANSCRIPT**
                    TRIAL TO JURY - DAY EIGHT
11
     _____
12
13           Proceedings before the HONORABLE R. BROOKE JACKSON,
14   Senior Judge, United States District Court for the District of
15   Colorado, continuing at 9:00 a.m., on the 13th day of April,
16   2022, in Courtroom A902, United States Courthouse, Denver,
17   Colorado.
18
19
20
21
22
23           THERESE LINDBLOM, Official Reporter
           901 19th Street, Denver, Colorado 80294
24       Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer
25

1          **A P P E A R A N C E S**

2          MEGAN S. LEWIS, WILLIAM JEFFERSON VIGEN, SARA MICHELLE
  CLINGAN, ANTHONY WILLIAM MARIANO, and TERENCE ANDREW PARKER,
3  Attorneys at Law, U.S. Department of Justice, Antitrust
  Division, Washington Criminal II Section, 450 5th Street N.W.,
4  Washington, DC, 20530, appearing for the Government.

5          JOHN C. DODDS, Attorney at Law, Morgan Lewis & Bockius
  LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103,
6  appearing for Defendant DaVita.

7          JOHN F. WALSH, III, Attorney at Law, WilmerHale LLP,
  1225 17th Street, Suite 2600, Denver, Colorado, 80220,
8  appearing for Defendant DaVita.

9          THOMAS MELSHEIMER, Attorney at Law, Winston & Strawn
  LLP, 2121 North Pearl Street, 9th Floor, Dallas, Texas, 75201,
10  appearing for Defendant Thiry.

11          JUANITA ROSE BROOKS, Attorney at Law, Fish &
  Richardson, 12860 El Camino Real, Suite 400, San Diego,
12  California, 92130, appearing for Defendant Thiry.

13                    *   *   *   *   *

14          **P R O C E E D I N G S**

15          (In open court at 9:00 a.m.)

16          THE COURT:  We have not received any briefing as you

17  said we were going to on the motion.

18          MR. WALSH:  Yes, Your Honor.  We are going to file

19  that submission at the close of all evidence when we renew a

20  motion for -- under Rule 29(a) and would ask you reserve your

21  ruling on both until that time.

22          THE COURT:  Okay.  But I'm not going to have time to

23  be reading a brief.  We've got a jury trial going on here,

24  Mr. Walsh.

25          MR. WALSH:  Yes.

1            THE COURT:  I did read the 10:56 p.m. last night

2       filing on instructions, but -- the time to be filing briefs is

3       past.

4            MR. WALSH:  We understand that, Your Honor.  We

5       also -- I will say about the brief we are going to file, it

6       follows the structure of the oral argument I made yesterday and

7       also wraps in Mr. Stone's argument.

8            THE COURT:  All right.  Now, with respect to the

9       instructions, I did receive from Ms. Lewis a clean set, except

10      that it says the caption of the case on the top.  I don't know

11      why you printed it that way.

12           MS. LEWIS:  Your Honor, we can reprint it without.  My

13      apologies.

14           THE COURT:  But I also received this almost midnight

15      filing from the defendants on jury instructions.  I sent the

16      proposed jury instructions to you, both sides, previously.  I

17      don't know when it was -- over the weekend to avoid just this

18      problem.  And that is, in the middle of a trial, we've got all

19      of our instructions set, and I'm getting a new proposal at

20      11 o'clock at night with a change that makes some sense to me.

21      Your proposal with respect to Instruction 16 just basically

22      asks me to -- I guess that's for the record.

23           MR. WALSH:  That's exactly right.  We were tendering

24      it as the Court suggested in the jury instruction conference

25      yesterday.

1    THE COURT: Right. But that we're past that, in terms

2    of what I've ruled.

3         With respect to Instruction 17, the second element of

4    the offense of conspiracy, I'm not persuaded to put in the word

5    "primary" on page 4 -- page 4 of their submission -- but I am

6    inclined to add some of the language that they've proposed on

7    what they call numbered page 5. They've got this long addition

8    in yellow. Do you know what I'm talking about?

9         MS. LEWIS: I do, Your Honor. Yes.

10        THE COURT: All right. I don't -- I'm not inclined to

11   do all of it, but I'm inclined to do part of it. So let me

12   explain.

13        They say, "However, evidence of lack of harm or

14   pro-competitive benefits might be relevant to determining" --

15   and then you've got a redundancy in there, so strike out

16   "whether the defendants entered into an agreement to allocate

17   the market and did so with the intent to allocate the market as

18   charged in the Indictment, i.e." Then go right to,

19   "whether" -- instead of "they" -- "whether defendants entered

20   into an agreement with" -- it should say -- "the purpose of

21   allocating the market for senior executives, Count 1, and other

22   employees, Count 2 and 3, through and across the

23   United States" -- again, nice try.

24        So let me say that again. I would be willing to

25   consider -- I will listen to what the government might want to

1    argue, but I think it's consistent with the rulings I've made

2    throughout the case to add the language, "However, evidence of

3    lack of harm or pro-competitive benefits might be relevant to

4    determining whether defendants entered into an agreement with

5    the purpose of allocating the market for senior executives,

6    Count 1, and other employees, Counts 2 and 3," period.

7              Does the government object?

8         MS. LEWIS:  Your Honor, we hear you when you say you

9    want the instructions to be a correct reflection of law.

10   Obviously, we made our record on that point at the motions

11   hearing; and we understand what Your Honor ruled about this

12   evidence coming in as probative of intent.  So we agree with

13   you that that is what Your Honor held in this case.  We think,

14   though, however, to make a clear statement of the law in this

15   area, if Your Honor is inclined to add that language, we think

16   it would be appropriate to add additional language that the

17   defendants themselves proposed and which Your Honor included in

18   your order resolving the disputes on jury instructions that

19   pertain to the "no need for the anticompetitive intent," as

20   well as the "no need to conclude it was unreasonable,

21   unjustified, or harmful."

22             So I do have copies I could propose up to Your Honor,

23   if you were inclined to see where the language might fit in.

24        THE COURT:  Oh, so now you want a change too?

25        MS. LEWIS:  Your Honor, we just got it at 11:00 p.m.

 1     last night, as well.  We were working this morning to take a

 2     look at that.

 3             THE COURT:  Okay.  Let me see what you've got.

 4             Folks, there comes a time when it is past disputing

 5     and time to decide; and I'm at that point.  And now you're

 6     giving this to the defendants for the first time.  At least you

 7     got theirs last night.

 8             MS. LEWIS:  Your Honor, I would just note this is

 9     language that came from defendants' proposed instruction, so

10     this is not the first time that they are seeing the language.

11             THE COURT:  I need the full instruction.  Or is the

12     full instruction what is there without the blue or the yellow?

13             MS. LEWIS:  Yes, Your Honor.  That's correct, yes.

14             THE COURT:  All right.  In the case of *Bogan v.*

15     *Hodgkins*, one of the defendants' favorite cases, which the

16     Court has considered when it entered its motion -- its order on

17     the motion to dismiss, the Court considered it again when it

18     entered its instruction -- or its order on jury instructions,

19     and I've read it again because it was the centerpiece of

20     Mr. Walsh's motion yesterday.  And it emphasizes that to be a

21     *per se* violation and specifically a market allocation

22     agreement, it must have had predominantly anticompetitive

23     effects and must allocate the market to a meaningful extent.

24             Now, those are fact issues in this case; but they're

25     important issues.  How can you say you need not conclude that

1  the conspiracy to allocate the market for employees was

2  unreasonable, unjustified, or harmful when the law says it has

3  to have predominantly anticompetitive effects?  Explain that to

4  me, if you can.

5          MS. LEWIS:  Yes, Your Honor.  I think that is the

6  heart of the *per se* rule, that once the finding has been made

7  that the agreement is *per se* unlawful, the relevant intent --

8  as described by the Supreme Court and the Tenth Circuit, the

9  relevant intent is to enter the unlawful -- *the per se* unlawful

10 agreement.  There is no need to find that there are

11 anticompetitive intentions, anticompetitive effects.  That is

12 canon black letter law for *per se* offenses.

13         THE COURT:  But I haven't held that it's a *per se*

14 violation.

15         MS. LEWIS:  I believe you did.  That was --

16         THE COURT:  No, I didn't.  What I held was that an

17 anti-solicitation agreement can be a horizontal market

18 allocation agreement; and if so, it's a *per se* violation.  But

19 to establish that it was that, you have to prove that they

20 entered into such an agreement and did so with the intent to

21 allocate the market.  If they say no to either question, then

22 you lose.

23         MS. LEWIS:  So, Your Honor, we absolutely agree that

24 what needs -- what is charged in the Indictment, which is a

25 *per se* violation, needs to be found by the jury in order for

1    them to convict here.  No question about that.

2         THE COURT:  Okay.  Comments on their proposal?

3         MR. WALSH:  Obviously, Your Honor, we object and agree

4    with the Court's analysis.  And I also believe the last

5    paragraph of this instruction, to the extent any discussion is

6    appropriate, adequately covers the points that the government's

7    making.

8         THE COURT:  I think so too.

9         All right.  So I'm going to ask that you make the

10   adjustment that I said on page 5.  Do you need to see that?

11        MS. LEWIS:  I believe we have that, Your Honor.  And

12   we'll check the realtime transcript, as well, and we'll get it

13   reprinted.

14        THE COURT:  All right.  Okay.  You can renew your

15   motion to dismiss, of course, at the end of your evidence.  But

16   I'm not going to have time for reading another brief, so you'll

17   have to rely on the argument you made.

18        Okay.

19        MR. WALSH:  Thank you, Judge.

20        (Jury in at 9:13 a.m.)

21        THE COURT:  All right.  Have a seat.  Good morning,

22   ladies and gentlemen.

23        First of all, how is everybody feeling today?

24        Good.

25        Sir, four and one.  Basically, we're practically in

 1    the World Series now; right?

 2            Nice to see you all again this morning.  We're getting

 3    there.

 4        (**PIERRE CREMIEUX, DEFENDANTS' WITNESS, PREVIOUSLY SWORN**)

 5            *THE COURT:*  Good morning, Doctor.

 6            *THE WITNESS:*  Good morning, Your Honor.

 7            *THE COURT:*  Do you prefer Doctor or Professor?

 8            *THE WITNESS:*  Doctor.  I'm not a professor anymore.

 9            *THE COURT:*  Ah --

10            *THE WITNESS:*  That's not my main occupation.

11            *THE COURT:*  All right.  So we started with some

12    questions with the jury yesterday, and now we're going to

13    continue with that.

14            *THE WITNESS:*  That sounds great.

15            *THE COURT:*  Question:  You used Mr. Hayek's testimony

16    to support a pattern seen in an analysis.  Is using a person's

17    comments to describe analytical results common practice in your

18    field?

19            *THE WITNESS:*  I'm sorry.  Can you read the end of the

20    question?

21            *THE COURT:*  How about if I read the whole question

22    again?

23            *THE WITNESS:*  Okay.  Thank you.

24            *THE COURT:*  You used Mr. Hayek's testimony to support

25    a pattern seen in an analysis.  Is using a person's comments to

1  describe analytical results common practice in your field?

2      THE WITNESS:  So I would say in academic research, it

3  can be; but I wouldn't say it's typical.  Because usually we

4  don't have the benefit of having information from the actors

5  that are relevant to what is going on.  So, for example, if I

6  think back to this work I was doing on airline deregulation, I

7  certainly talked to the unions, I talked to some of the

8  management to try to understand what they were thinking when

9  deregulation was happening, and that was part of what I had in

10  my thesis and some of the references that I had.  But I

11  wouldn't say that it happens all the time, because you have to

12  have access to it.

13      That being said, adding context to what is going on

14  with your data to try to understand it is fairly common.  And

15  in this case, there is a pretty extensive record of discussions

16  and information that I looked at; but certainly the core of my

17  analysis is the data that I'm looking at.  But then I can't and

18  shouldn't ignore information that helps me shed light on why I

19  observed the patterns that I observed in the data that I have.

20      THE COURT:  Question:  Did you ever meet with

21  Mr. Thiry while working on the analysis for this trial?

22      THE WITNESS:  I don't think so.  I don't -- so --

23  Mr. Thiry was here -- was in Denver, and I arrived a few days

24  ago, so we did meet at that point in person.  When I do my

25  analysis, I'm meeting with my team.  I mean, I'm talking and

1    working with the people on my team.  I did have video

2    conferences with attorneys to keep them abreast of what was

3    going on.  I don't remember -- you know, these

4    videoconferences, you've got ten people in the room.  I don't

5    remember whether Mr. Thiry was in the room or not; but I don't

6    remember having any interactions with him until I showed up in

7    Denver, whatever -- three days ago.  That's when I met him.

8         THE COURT:  Question:  Why was reviewing documents to

9    determine that SCA and DaVita were strategic partners part of

10   your work for the defense in the case?

11        THE WITNESS:  Yes.  If I go back to the method that

12   I'm using, what I'm trying to do is I'm trying to find evidence

13   of allocation of labor.  And so as I do that, I go through the

14   process of, you know, doing the data analysis that I've done

15   and --

16        I'm sorry.  I want to make sure I'm answering exactly.

17   Can you repeat the question?

18        THE COURT:  Sure.  Why was reviewing documents to

19   determine that SCA and DaVita were strategic partners part of

20   your work?

21        THE WITNESS:  Yeah.  Sorry.  And so as I go through my

22   analysis, one of the things I'm doing is trying to figure out

23   whether there is a set of data-based evidence that separates

24   these companies -- and DaVita in particular -- from other

25   companies that are not -- that have not been subject of any

1    allegations.  So, you know, as I do that --

2         Sorry.  Just one second.

3         I'm going to ask you to repeat the question one more

4    time.  I apologize.

5         THE COURT:  That's all right.  That's not a problem.

6    Why was reviewing documents to determine that SCA and DaVita

7    were strategic partners part of your work?

8         THE WITNESS:  Yes.  So as I do that, I'm trying to

9    differentiate DaVita, SCA, RP, and Hazel from other companies

10   to see whether there is something there that indicates that

11   there is a concern that there may be an allocation of labor.

12   So that's why I compared them -- I compared their hiring

13   patterns to the median company.  And I also looked at what SCA

14   did with companies other than DaVita and what its behavior was

15   relative to its behavior with DaVita.  And this is why -- since

16   DaVita was a strategic partner, it was relevant to see what it

17   was doing with the other strategic partners.  Was it hiring

18   preferentially from them?  Was it trying to avoid hiring from

19   them?

20        And that's why the fact that there was evidence that

21   SCA was avoiding -- or, rather, was not hiring from a number of

22   its strategic partners meant that its behavior -- its behavior

23   with DaVita, another strategic partner, was very much in line

24   with what I was observing it to be doing with the other

25   strategic partners.

 1          So, it's, again, part of the effort that I'm making

 2    throughout to find indicia or, you know, telltale signs of a

 3    difference in the behavior of DaVita and SCA with each other

 4    relative to the behaviors with -- the behaviors with other

 5    companies.

 6          THE COURT:  Question:  Have you and/or Analysis Group

 7    ever been hired by the United States government?

 8          THE WITNESS:  Yes, we have.  One example that some of

 9    you may recall is there has been over the last number of years

10    a big dispute between tobacco companies and the government.

11    And Analysis Group was hired, and I was part of the team that

12    was very active on the part of the attorney generals of the

13    various states, acting against the tobacco companies.  But

14    that's just one example.

15          We work with the DOJ and the FTC regularly, along with

16    working opposite, as we are today, the government.  So, yes.

17          THE COURT:  What types of companies and individuals

18    typically hire Analysis Group?

19          THE WITNESS:  I mean, really, every company you can

20    think of -- I mean, many of the companies in the U.S. have

21    hired us at one point or another.  Most of the work we do is

22    civil work, so we don't do a lot of work for individuals.  We

23    mostly work with companies or with the government.  But it's

24    every sector of the economy from commercial entities, banks,

25    you know, DOJ, FTC.  Really, every sector.  Manufacturing.  I

1    mean, we've worked in every area of the economy.

2         THE COURT:  Is the project that DaVita and Kent Thiry

3    hired you to do a typical undertaking for your Analysis Group

4    and you personally?

5         THE WITNESS:  In terms of analysis, yes.  You know,

6    the methods I'm using here are pretty typical of the methods

7    that I use on the majority of the cases that I've been involved

8    in personally; and I think that holds for my colleagues as

9    well.  This is, you know, trying to, as I said, test

10   hypotheses, identify the data, come up with conclusions is a

11   pretty standard way of doing things for us.

12        For me, I don't think I have been involved in -- I

13   mean, I've done a number of jury trials, as I've been in front

14   of juries a few times.  I haven't done a lot of criminal work.

15   Most of my work is civil, so that's different.  But the

16   underlying work is really the same.  Doesn't really matter in

17   terms of what I do whether it's a criminal trial, a civil

18   trial.  I use the same methods, same approach, same idea.

19        THE COURT:  Question:  Was any data used in your study

20   obtained through hiring firms?

21        THE WITNESS:  So I assume the question is about

22   third-party data, where you purchase data from firms that sell

23   data?  If that's the question, the answer is no.  None of the

24   data I used is purchased.  It either came from DaVita, from the

25   government -- which is free and public -- or from -- the

 1  LinkedIn data we assembled ourselves, so we didn't pay anybody

 2  to have it.

 3       If the question is whether there are other companies

 4  involved in the analysis of the data, the answer is also no.

 5  All the analysis was done in-house at Analysis Group by me and

 6  my team, so we don't have any third-party involved in any part

 7  of this work.

 8       THE COURT:  Would your compensation and hiring study

 9  for DaVita take into account the large growth of DaVita as a

10  company, whereas, the mean average would include

11  poor-performing companies?  Would it be more fair to compare

12  DaVita compensation and hiring to equally performing companies?

13       THE WITNESS:  That's a very good question.  It goes

14  into the issue of what the benchmark should be.  So there would

15  be issues that you run into, is the cherrypicking issue, which

16  I think we talked about earlier yesterday.  So I'm really wary

17  of kind of trying to tailor the group of companies that I'm

18  using, because, obviously, you can tailor it any which way you

19  want; and how you tailor it risks being a driver of the results

20  that you get.

21       That being said, if -- you know, if there was another

22  kind of established benchmark that DaVita in particular had

23  been using for its compensation and -- for its compensation

24  analysis and that was available and robust and reliable, then

25  that would be another way to do it.

1    I do want to emphasize that the benchmark is used

2    to -- kind of as a check on the fact that I observe an increase

3    in turnover, as opposed to a decrease, and that I observe an

4    increase in compensation, as opposed to decrease.  Or, rather,

5    as I said more precisely, that I don't observe a decrease in

6    either one of them.  That is not a result that is going to be

7    particularly sensitive to the benchmark picked, because it just

8    happens that during the period we're looking at, there really

9    aren't things happening in the macroeconomy that are going to

10   make the results unstable.

11   And so I think that question is well posed, because

12   there are other benchmarks that could be picked; but I don't

13   believe those -- picking a different benchmark would make any

14   difference, because the results are pretty clear that the rest

15   of the economy was pretty stable, as well.

16   THE COURT:  Okay.  Question:  Did your study include

17   director-level employees or only senior -- I think it says only

18   senior vice presidents?

19   Did your study include director-level employees or

20   only senior-level vice presidents?

21   THE WITNESS:  It included directors, as well.  For the

22   senior employees are defined as director plus VPs.

23   THE COURT:  In the analysis where you had the

24   population of 460 companies that hired someone from DaVita, did

25   you do this same analysis where the population of companies is,

1    quote, companies founded by a former DaVita employee who hired

2    someone from DaVita, close quote?  And now it says,

3    "Hypothesis" --

4            THE WITNESS:  That's great.

5            THE COURT:  Companies founded by DaVita alum hire more

6    people from DaVita than those that are not?

7            THE WITNESS:  Yes.  It's a long question, and there is

8    a hypothesis, so would you read it again, Your Honor?

9            THE COURT:  I'll start with the hypothesis.

10           THE WITNESS:  Okay.

11           THE COURT:  Which is, companies founded by a DaVita

12   alum hire more people from DaVita than those that are not

13   DaVita alums.  Now, the question is:  In the analysis where you

14   had the population of 460 companies that hired someone from

15   DaVita, did you do this same analysis where the population of

16   companies is companies founded by a former DaVita employee who

17   hired someone from DaVita?

18           THE WITNESS:  So that's not a hypothesis that I have

19   tested, because I suspect that's the question you are

20   interested in asking.  I haven't tested that hypothesis.  I

21   don't know -- and I don't have information, nor do I know if

22   that information exists anywhere on the companies that have

23   been founded by former DaVita employees.  I don't know -- I

24   just don't have that information.  I'm not sure how I could

25   identify that, because it's not going to be in my LinkedIn

 1   data; and I'm not sure it would be any other data set.  So

 2   that's not a hypothesis that I could test.

 3        THE COURT:  Well, I suppose you could have asked

 4   somebody at DaVita.

 5        THE WITNESS:  Yeah.  I don't know that they would

 6   know; but you're right, I could have asked.  I did not ask that

 7   question.

 8        THE COURT:  Let's see, next.  When you did the SCA

 9   versus DaVita analysis, why do you look at the median instead

10   of the mean?  If you used mean, it may be larger than a value

11   of one.

12        THE WITNESS:  Yes.  That's correct.  I think I

13   answered in part that question already, when we had a long

14   discussion yesterday about why I used the median versus the

15   mean; so I'll give you the short answer now.

16        Two things.  First, the mean would be higher than 1.

17   In fact, I think it's 1.3 or 1.4, something like that.  It's

18   only slightly higher than 1 because of the 460 companies, 400

19   literally hired one person.  So if you add together 400 times

20   1, plus 60 times a number that is going to be between 1 and

21   maybe 10 or 9, then you're going to get an answer that is going

22   to be not far from 1.  So in this case, it just happens that

23   the mean and the median are very close.

24        So then the question is, why use the median?  And the

25   answer is because I'm interested in knowing what a company

 1   does, and so the mean doesn't provide you that information.  It

 2   provides you a sense of overall, what did all of the companies

 3   do?  But what I want to know is, if I look at each one of the

 4   companies, what did they do?  And how are they different from

 5   SCA?  And so for that, the median is much more useful, because

 6   it gives you information about what half of the companies did.

 7   And it says, well, half of the companies hired just one

 8   person -- in fact, it's well over half.  It's 400 out of 460.

 9   And when you're looking at what is typical of an entity,

10   looking at the median of what these entities are doing is a

11   better metric than looking at the mean.

12        And in this case, the number would have been very

13   similar, 1 versus 1.2 or 1 3.; but analytically, the right way

14   to answer the question that I'm posing is to use the median, as

15   opposed to the mean.

16        THE COURT:  Question:  For SCA's movement to DaVita,

17   how do you factor in that SCA was a new company?  Isn't it

18   common to have less attrition in the first few years of a new

19   start-up?

20        THE WITNESS:  So I don't believe SCA was a new

21   company.  SCA was a rather old company that had changes in its

22   ownership over time.  But it's a company that was at least a

23   few decades old by the time that -- by the time these issues

24   came up.

25        THE COURT:  Okay.  Why didn't you reduce the

1   population of relevant companies to be companies in similar

2   industries or the companies that have a historical track record

3   of hiring heavily from DaVita, like SCA did?

4           THE WITNESS:  So I don't know if the question --

5           THE COURT:  You might have answered that question

6   already.  I'm not sure.

7           THE WITNESS:  Yeah.  Well, I don't think I answered

8   that question exactly, but -- and I don't know if it applies to

9   the first part of my analysis or whether this is about

10  compensation and turnover.

11          THE COURT:  Well --

12          THE WITNESS:  So let me answer both, and then we'll

13  know.

14          THE COURT:  Go ahead.

15          THE WITNESS:  If it's for the first part of the

16  analysis, remember that out of the 460 companies that hired

17  from -- someone from DaVita, 400 hired one person.  So the

18  question could be, well, why didn't you focus on the few

19  companies that hired more people and look at how those

20  companies compared with SCA?

21          So the issue there is that if you looked at -- so if

22  you look at the other companies -- the companies that hired

23  more than one, you've already picked out of the sample a

24  group -- you've kind of cherrypicked out of the sample a group

25  of companies that kind of bias the comparison you're going to

1   make.  What I want to know is not how SCA looks compared to a

2   company that did the same thing as SCA, because that would be

3   answering the question by setting it up.  What I want to know

4   is, how did SCA compare to other companies that hired from

5   DaVita?

6           So then the question is, well, why not restrict it to

7   companies that do the same business as SCA?  And the reason is

8   because these senior executives, who were going to hundreds of

9   companies, obviously have a broad market.  So if you think

10  about allocation of labor, you have to think of that broad

11  group of companies that individuals -- that individual

12  executives can go to, because those are the outlets that are

13  available to them.  So restricting those outlets to five or six

14  companies that look like SCA or twenty companies that look like

15  SCA -- and I'm not sure how I would determine that they look

16  like SCA -- would be incorrect, in that it would not be

17  reflecting the potential alternatives that these senior

18  executives have, as demonstrated by the fact that they're going

19  to these hundreds of companies.

20          So that's the reason in the first part of the analysis

21  to not restrict the sample to companies that would be like SCA.

22          The reason in the second part of the analysis to not

23  restrict the benchmark to companies that would be like DaVita

24  is because what I'm interested there -- interested in there is

25  correcting for macroeconomic factors.  So a broader base is

1503

```
 1    going to be a better way to control for those macro factors.

 2         THE COURT:  Question:  In the turnover analysis, did

 3    you consider DaVita's performance during the years 2012 to

 4    2017?  For example, if the company's performance was strong in

 5    that time period and people's bonuses were lower than expected,

 6    that would cause natural higher turnover.

 7         Hold on a second.  It says, For the lawyers, my

 8    hypothesis is that the business performance in 2012 to 2017 may

 9    have been lower is [sic] from Mr. Thiry's salary numbers the

10    prosecution showed.

11         THE WITNESS:  So one of the things that I think I

12    mentioned early in the -- the early part of my testimony is

13    that because I'm looking at salaries, I also checked to see

14    what -- let me back up.

15         The reason I'm using salaries is because in the

16    benchmark, that's what I have.  So if I want to have a

17    benchmark, I need to look at salaries.  That being said, I

18    think the question is well posed, which is, well, what if what

19    has been going on is that the bonus has been being affected

20    during that period -- the bonus of individuals, and that would,

21    then, lead to a movement in turnover that would be related to

22    these bonus changes.

23         So what I did do is I checked within the DaVita data

24    whether the ratio of base to bonus had changed.  In other

25    words, if the hypothesis is correct, what would happen is I
```

1504

1   would observe that the salary of individuals within the

2   category at DaVita are representing a bigger percentage of

3   their total compensation, because their bonus is getting lower

4   relative to what it was before.  And so I did confirm that

5   the -- over those years, the ratio of bonus to base or bonus to

6   salary was between 1.3 and 1.4.  So it oscillates a little bit;

7   but there is no downward trend in bonus, which reassures me

8   that there is no change in the composition associated with any

9   change in the performance of the company.

10          So I would not expect -- in fact, I know that there is

11  no hidden and unmeasured bonus impact on compensation that

12  would then -- that could then translate into a turnover impact

13  that I would be failing to measure.

14          But that's a very good point.  I mean, that is a check

15  that needed to be done to make sure that by picking salaries

16  instead of total compensation to adjust to the fact that that's

17  what my benchmark is, I wasn't biasing my results.

18          THE COURT:  Question:  Regarding the SCA eight hires

19  in the pre-agreement period versus the one hire, you have

20  pointed to Hayek's testimony as an explanation for that

21  reduction.  Before he said that, what would your conclusion

22  have been?  i.e., what were you planning to present on this

23  topic before Hayek said that quote in court?

24          THE WITNESS:  Yes.  So I would have presented the same

25  data, obviously, because my data analysis was and is what it

1     is.

2          In terms of the testimony, the process I follow --

3     just to, again, state it, is, I'm trying to prove the

4     government's point.  I'm trying to find evidence of allocation

5     of labor.  So as I go through the process, I look at the

6     hiring.  And if you remember the pattern of hiring of DaVita

7     employees from SCA is you have no hiring occurring from 2000 to

8     2008, over an eight-year period, and then you have a four-year

9     period -- a five-year period from 2008 to 2012 -- yes --

10    which -- during which you see the eight, and then the period at

11    issue is one where you go back to having one hire, which is in

12    line with what other companies are doing.

13         And so without the testimony from Mr. Hayek, what that

14    indicates is that during the conspiracy period, which is when I

15    would expect to see the anticompetitive behavior, I'm observing

16    behavior that is similar to that of other companies.  So I

17    don't have evidence of anticompetitive impact resulting from

18    allocation of labor.

19         So then if I look at what happened before -- I look at

20    this period from 2000 to 2008 -- sorry -- 2000 to 2012, and

21    what I find during that period is that I have a long period of

22    zero, followed after Mr. Hayek's arrival by a period of higher

23    than -- you know, higher than expected hiring.  And so I still

24    don't have the -- kind of the telltale sign of conspiratorial

25    effects.  I don't have the behavior that is different from that

1506

1    of other companies, but the -- the testimony from Mr. Hayek

2    kind of tied it all together.  It's like, okay, now I really

3    have a complete understanding of why I'm observing prior to the

4    conspiracy a behavior that is during those four years unusual

5    relative to the behavior that I observed for other firms, even

6    though --

7              You know, as I mentioned, Fresenius hired nine people.

8    So it's unusual in that it's at the higher end of the hiring,

9    but it's not out of whack with what other companies are doing.

10   THE COURT:  Question:  Did you study the demographics

11   of people who did move freely between these companies versus

12   people who did not?  My hypothesis is that even though there is

13   some movement, the people who are not as empowered or confident

14   would be likely to stay due to the agreements.  Did you study

15   this?

16   THE WITNESS:  I did not, because I don't have any

17   information on the dimensions that I would need to do that.  I

18   would have to know kind of what is the character of people, and

19   there is just no data set that would allow me to do that.

20   THE COURT:  Well, for example, age?  I'm --

21   THE WITNESS:  Yeah.  So, I mean, it would be an

22   imperfect proxy; but I don't have -- so in the -- in the

23   LinkedIn data, I would have to impute some kind of age based

24   on, like, date of first employment.  That's not something I've

25   done.  So I don't know the answer -- I mean, I don't know

1    whether there would be a different pattern.

2         THE COURT:  Is there anything in the LinkedIn data

3    that would give you the ability to assess what type of person

4    it was, whether that person was in a minority group or whether

5    that person was empowered in some way?

6         THE WITNESS:  No.  I mean, these are -- you know, you

7    have to remember, these are all -- for the first count, these

8    are all senior executives.  And so I'm not sure that -- I'm not

9    sure what I would pick to try to find the -- kind of the shy

10   senior executives versus the not shy senior executives.  No,

11   there is nothing in -- there is nothing that I can think of in

12   the LinkedIn data that would allow me to do that.

13        THE COURT:  Question:  I understand the logic of

14   looking for reduced compensation; but practically speaking, to

15   reduce the median salary would be very unlikely.  People would

16   have to be taking pay cuts or those who leave replaced with

17   lower-paid people.  How would keeping people employed at a

18   company be expected to result in a decrease of the median?

19        THE WITNESS:  Yes.  So, actually, if there is turnover

20   at the company -- and there is here with -- you know, there was

21   at DaVita during the period -- you could actually observe a

22   decrease in overall compensation that would just be resulting

23   from exactly what is described here, which is that new people

24   would be hired at lower level of compensation or that people

25   who are there because they have been allocated aren't getting

1508

1    pay raises.

2         Right?  So you would have a combination of people not

3    getting pay raises.  The people who are leaving are being

4    replaced with people who are promoted into their positions but

5    with lower pay raises because they have fewer options available

6    because they've been allocated.  So while for an individual the

7    point is right, which is typically you don't get a pay cut,

8    because we're looking at the population, meaning the entirety

9    of the company, for the companies, you could certainly see

10   that.  And, in fact, during periods of recession, for example,

11   it's not unusual to see that the average compensation at a

12   company overall goes down because there is downward pressure on

13   the compensation, which typically expresses itself with lower

14   compensation at the entry level or reduced -- you know, slow

15   increases at the higher level, with people leaving and people

16   taking their place, but on average being compensated less than

17   the people that they replaced.

18        THE COURT:  I think maybe the question was getting at,

19   if those things are true, then how is the fact that there

20   wasn't a decrease evidence of whether there or wasn't an

21   allocation of the market?

22        THE WITNESS:  Right.  So I'm saying -- yes, I agree,

23   that's a question.  So if there is an allocation of market, and

24   you're in a situation where people can't move -- they're stuck

25   at the company they're at -- then you're going to see a few

1509

1  things.  You're going to see a decrease of the competition for

2  the people who are there, which means that their wages are

3  going to stagnate because they have nowhere to go, there has

4  been an allocation.  Just like the price of vacuum cleaners

5  goes up when there is allocation.  You're going to see the

6  competition stagnate or go down in real-term, in that the

7  people who are leaving the company -- because you've got this

8  turnover -- are being replaced in position by someone's whose

9  compensation has not increased.  And so overall, you're going

10 to see a decrease in the compensation of the company.

11       Let me give you an example.  Suppose that you have two

12 people in a company, one is junior -- one is younger, and the

13 other one is closer to retirement.  And the younger person is

14 making $10; the person who is closer to retirement is making

15 15, because they're in a more senior position.  So the average

16 compensation is going to be 12 1/2.  Right?  Now, suppose this

17 person leaves, and the person who was at $10 is now promoted

18 into their role.  But because they can't go anywhere, because

19 there is an allocation of labor and an anticompetitive effect,

20 their compensation stays the same.  And then someone comes in

21 and replaces them from the outside at $10.  Now what you have

22 is two people making $10, and now the average compensation is

23 $10, whereas before it was 12 1/2.

24       So when you have turnover, because you have people

25 moving positions, and if there is allocation of labor, you're

1     going to have less pressure on increased compensation, the

2     result is you're going to have the average compensation go

3     down, even though in that example, no one's wage went down.

4     It's just the composition changed.

5            Think about the example of Mr. Holder, who was going

6     to other companies, getting offers -- so he obviously was not

7     allocated.  He could go to other companies -- and the result is

8     he would come back, and he would get raises.  When in the "but

9     for" world, where that is not available to him because there is

10    an allocation of labor, it's going to happen, his compensation

11    is going to go down.  So you can have average compensation go

12    down at the company even though you're not going to find any

13    individual whose compensation has gone down.

14            THE COURT:  Question:  At what point -- at one point

15    you said global benchmark.  Is the benchmark wage inflation --

16    is the benchmark wage inflation data U.S. only?

17            THE WITNESS:  Yes, it is.  It's U.S. only.

18            THE COURT:  Question -- it says, These questions

19    relate to the data points around movement from DaVita where SCA

20    and 400 other companies had one move and 20 companies had more

21    than one.

22            Question No. 1:  Did you look at the categories,

23    markets, that the companies fell into in each set, the 400 and

24    the 20?  And I think maybe the question means the 400 and the

25    60.

1           *THE WITNESS:*  Yes.  The answer is no, I have not

2    looked at the various sectors that the companies are in.

3           *THE COURT:*  Next question:  Were the companies in the

4    set of 20 -- or I think it's 60 -- with more movement more in

5    the healthcare field or business aligned with DaVita?

6           *THE WITNESS:*  So -- I'm sorry.  Does the question

7    say --

8           *THE COURT:*  Were the companies that hired more than

9    one DaVita person in the healthcare field or other business

10   aligned with DaVita?

11          *THE WITNESS:*  I don't remember.  The only one I

12   remember is Fresenius, which is a direct competitor of DaVita.

13   So they are literally in the dialysis businesses; they are

14   DaVita's direct competitor.  I don't remember where the others

15   were, but they were not all healthcare sectors.  They were from

16   different areas of the economy.

17          *THE COURT:*  And then:  Were the companies in the set

18   of 400, where only one was hired, healthcare companies, if you

19   know?

20          *THE WITNESS:*  So there definitely were healthcare

21   companies in the group of 400 -- of 400 companies that hired

22   only one.  Yes.

23          *THE COURT:*  There were some, but not all?

24          *THE WITNESS:*  No, not all.  Because the -- the hiring

25   of DaVita executives is from -- is done by companies that are

1    all over the country in various sectors, not just in -- not

2    just in the healthcare sector.

3         THE COURT:  Okay.  Question:  SCA had a large list of

4    companies to potentially hire from.  But within that smaller

5    list of target or close-fit companies, there was -- there was

6    testimony that put DaVita in the top three target companies.

7    With that, would you expect for the movement between DaVita and

8    SCA to be in the group with higher movement -- that is, the

9    group of 20 -- or the group with only one move -- the group of

10   400?

11        THE WITNESS:  I'm not sure what -- I'm sorry.  I don't

12   remember what -- I'm not sure what that refers to.

13        THE COURT:  Okay.  I think it gets back to the 460

14   companies.

15        THE WITNESS:  Yes.

16        THE COURT:  And my understanding is that there were

17   400 with one hire out of DaVita.

18        THE WITNESS:  Yes.

19        THE COURT:  And then 60 that had more than one.

20        THE WITNESS:  Yeah.

21        THE COURT:  And I think the question is using 420, but

22   I think that's what the question is referring to.  So the

23   questioner points out that there was testimony that put DaVita

24   in the top three target companies -- in other words, the

25   question is, there is a smaller list of target companies within

1513

 1    the 460 --

 2              THE WITNESS:  Uh-huh.

 3              THE COURT:  -- and DaVita was in that smaller list.

 4    Would you expect the movement between DaVita and SCA to be in

 5    the group of the 60, given that it's a target, as opposed to

 6    the group of 400?

 7              THE WITNESS:  So I think there are multiple dimensions

 8    here so -- there are multiple things pulling in different

 9    directions.  Right?  So you have SCA being a strategic partner,

10    and -- sorry -- DaVita being a strategic partner of SCA; and,

11    therefore, SCA having a preference for not hiring from its

12    strategic partners.  So that's going to push it towards the

13    other end of the distribution.

14              And then you have the comments on the three targets,

15    which is going to push it in the other direction.  So you

16    really have two kind of opposing forces that will lead to some

17    kind of behavior on the part of SCA.  But I would not assume

18    that that would lead SCA to be closer to one end of the

19    distribution versus the other end of the distribution,

20    particularly given the statements by Mr. Hayek that as of 2012

21    it's not interested in hiring more DaVita people.  It's

22    disappointed with the performance of the people that were hired

23    from DaVita.

24              So I think there are multiple forces in different

25    directions.  And it's important not to just isolate one, but to

1    look at the entire picture of the relationship between SCA and

2    DaVita.

3         THE COURT:  Question:  For compensation analysis, your

4    data looked at DaVita averages.  If employees stay at DaVita,

5    would a decrease in salaries only be seen if there were pay

6    cuts?  You looked for a decrease in compensation to assess

7    evidence of market allocation.  Help me understand how this

8    would be possible unless either there was a lot of movement and

9    new hires to fill gaps came in at a lower salary or DaVita

10   employees received salary cuts.  What other factors would lead

11   to a lower average in DaVita senior executive salaries?

12        You talked about some of this already.

13        THE WITNESS:  Yes, I think it's another version of the

14   question I answered earlier.  And so the answer is the same,

15   which is, because of the composition effect associated with

16   companies that have, you know, turnovers like DaVita, you can

17   have and you will observe decreases in compensation if there is

18   downward pressure on salaries as a result of -- as a result of

19   just the natural movement of employees through the company.

20   And the example I gave you with the -- you know, the two

21   individuals illustrates the fact that you don't have to have

22   anybody's compensation go down for the average at the company

23   to go down, simply because you have the natural movement of the

24   employees for the company.

25        THE COURT:  Question:  The data we've been reviewing

1515

1    with you is based on actual movement of employees.  During this

2    case, we've been discussing scenarios where the move didn't

3    occur.  How do you reconcile those scenarios of no movement

4    against the data of actual movement?

5              THE WITNESS:  Yes.  That's a very good question, which

6    is, how do you identify something that doesn't happen?  It's

7    really hard, because if it didn't happen, you don't see it.

8              But I think, here, what is important is that if in

9    fact -- and this is why there are two parts to my analysis.  If

10   in fact there had been an absence of movement resulting from an

11   allocation of labor, that would be reflected in the turnover,

12   and it would be reflected in the compensation.  Because the --

13   these unobservable individuals who are stuck, who can't move

14   are also the ones that are going to be subjected to downward

15   pressure on their compensation.  Which means, in the -- the

16   illustration I gave earlier, no raise even though you're

17   getting a -- you know, your position is changing.

18             And so while you can't observe those people who are

19   stuck and not moving and kind of quietly sitting where they are

20   in the data, you can certainly see whether an allocation of

21   labor occurred, because the purpose of an allocation of labor

22   is to decrease.  But the reason for doing it to decrease

23   compensation, to slow down compensation, and to -- of

24   individuals and, therefore, a decrease overall and to decrease

25   turnover.  Otherwise, what is the point?  So even though you

1    can't observe those people who are not moving, you can infer

2    whether or not people are getting stuck by looking at the

3    company and whether at the aggregate level the picture is

4    changing in a way that is unexpected.  Decrease in compensation

5    overall; decrease in turnover overall.  So you have to infer it

6    because they're not moving.

7              THE COURT:  That was the last question, unless you

8    have some more -- which you do.

9              THE WITNESS:  I would say in my experience, usually

10   I'm the one giving the tests.  And I feel that now I'm the

11   recipient of the tests, so it's only fair.

12             (Hearing commenced at the bench.)

13             THE COURT:  56.

14             MS. CLINGAN:  Yes.

15             MR. MELSHEIMER:  Your Honor, I have an objection to

16   this one.

17             THE COURT:  Wait a minute.  I'm on 56.

18             MR. MELSHEIMER:  Okay.  We have no objection on 56.

19   I'm sorry.

20             Your Honor, you see this question here?

21             THE COURT:  Which one?

22             MR. MELSHEIMER:  Thousands of hours --

23             THE COURT:  Let me read it.

24             MR. MELSHEIMER:  My objection, Your Honor, there were

25   things that were excluded by the Court.  It's not his fault,

```
 1    and I think it would be -- it would give a misleading
 2    impression if he said there is things I didn't present because
 3    he wasn't allowed to present it.  I think that's why I think
 4    it's and improper question and could lead to a misleading
 5    answer.
 6         MR. VIGEN:  We could reform it to "not included in
 7    your expert report."
 8         MR. MELSHEIMER:  I don't -- Your Honor, again, it
 9    raises an issue that the Court is well aware of about what is
10    allowed and what is not allowed.  And I just don't think it's
11    appropriate.  We object.
12         THE COURT:  I didn't hear you objecting when he was
13    talking about the opportunities for employment all over the
14    place.
15         MR. MELSHEIMER:  Well --
16         THE COURT:  You were happy to hear that come out.
17         MR. MELSHEIMER:  Well, Your Honor, is that an
18    accusation or -- Your Honor, my point is, we didn't object.
19    Neither did they.  And so I -- my point is, it's a little
20    tricky, I think.
21         THE COURT:  Overruled.
22         But if he's -- what he answers is that the Court --
23    there was a part that he opined on that he didn't say because
24    the Court said he couldn't, I'll explain that --
25         MS. LEWIS:  Sure.
```

| | |
|---|---|
| 1 | THE COURT:  -- in a way that doesn't make it look |
| 2 | like -- |
| 3 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 4 | THE COURT:  I'll do it in a neutral way. |
| 5 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 6 | THE COURT:  Here is 58. |
| 7 | MR. MELSHEIMER:  We have no objection. |
| 8 | No objection. |
| 9 | MS. LEWIS:  Is this -- that's new. |
| 10 | THE COURT:  59, any objections to 59? |
| 11 | MS. LEWIS:  Have you looked at the back? |
| 12 | MR. MELSHEIMER:  Yeah, we looked at those.  No |
| 13 | objection, Your Honor, to 59. |
| 14 | THE COURT:  Same with you? |
| 15 | MS. LEWIS:  No objection. |
| 16 | MR. MELSHEIMER:  No objection to 60 either, Your |
| 17 | Honor.  Very agreeable this morning. |
| 18 | THE COURT:  Okay.  That's good to hear. |
| 19 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 20 | MS. LEWIS:  Thank you, Your Honor. |
| 21 | (Hearing continued in open court.) |
| 22 | THE COURT:  So, Dr. Cremieux, you said you feel like |
| 23 | you're the one that is being tested; right? |
| 24 | THE WITNESS:  Yes. |
| 25 | THE COURT:  I put the question to you this way:  If |

1    these were students in your economics class, what would you

2    think of their questions?

3            THE WITNESS:  I'd be very are impressed.  Those are

4    probably the most -- I mean, these are really -- and they just

5    run the gamut.  I mean, I've not had a lot of students ask me

6    about P values just kind of casually, just wondering --

7    median -- we're really covering a wide, broad set of issues.

8    So it's kind of nice, you know.

9            THE COURT:  Well, I'm very proud of my jurors.

10           All right.  Here is some more questions from them for

11   you.

12           Question:  In a case like DaVita, where 400 companies

13   only hired one DaVita executive, is there any way possible to

14   prove a market allocation?

15           THE WITNESS:  Yes, I think that -- because it's a

16   world in which there is so much competition, the fundamental

17   idea that you could allocate the market is a really difficult

18   one to prove, because there is movement by these employees in a

19   wide variety of companies, and that means that there is no

20   suppression of competition from an economic standpoint.  Right?

21   Because if you're an employee at DaVita, you've got many

22   options available to you.  Then within the companies that are

23   the companies at issue -- the three, RP, SCA, and Hazel -- what

24   you see is you see a level of movement that is consistent with

25   the movements you see with others, which, of course, isn't very

1    high, because there are so many alternatives available.

2         Now, imagine a world where fewer alternatives are

3    available.  So, you know, the symmetric example to the vacuum

4    cleaner, where you have a two-company town, and only those two

5    companies hire employees.  Well, now it's a completely

6    different world, because in that world an allocation of labor

7    will be one in which you're stuck in your company.  And you're

8    going to see that, whereas, before the allocation, lots of

9    movement was happening; now very little movement is happening.

10   Here, we're in a world that is very different.  It's a world

11   that is highly competitive with a lot of movement.  And the

12   extent of the movement to each company is relatively small as a

13   result of the market being so competitive.

14        And so the companies that are at issue are behaving

15   either like the other companies or in the -- it's important to

16   remember, in the case of Hazel and Radiology Partners, they're

17   actually hiring many more people from DaVita than the median

18   company.  So what you're observing here is the opposite of what

19   you would expect to see if there was an allocation of market.

20   But you're working with small numbers, and the reason is

21   because of these other 464 companies that employees can go to.

22        THE COURT:  Next question:  Companies that hire one

23   are in line with typical behavior, companies that hire zero are

24   very close to typical behavior, so that median of one makes it

25   impossible.  Right?

 1    *A.*  No, I don't think it makes it impossible because remember

 2    that the sample that I'm working from is the sample of

 3    companies that have hired at least one.  So my comparison group

 4    is not all companies, which, of course, would include a large

 5    number of companies that never even heard of DaVita employees.

 6    Instead, because of that very problem, I limit my analysis and

 7    my comparison group to the companies that hired one or more

 8    employees.  Because, otherwise, you're completely right, that I

 9    wouldn't be able to see anything, because I would have the sea

10    of companies aren't hiring anybody from DaVita.  And I would

11    say, well, zero looks fine.  That's not what I'm doing.  I'm

12    starting from the premise that I'm only looking at companies

13    that are hiring from DaVita.

14         *THE COURT:*  Next question:  With the thousands of

15    hours of analysis on this, was all the analysis under the three

16    areas presented here, or was other data collected and analyzed

17    without presenting it here?  Do you think there was any

18    cherrypicking of data to select what to present, even by the

19    team under you?

20         *THE WITNESS:*  So, no.  Affirmatively not.  Meaning

21    that, A, this is a team I work with a lot, and so we trust each

22    other.  And I know them well; they know me well.  We don't hide

23    anything from each other.  We -- so there is no -- I have no

24    question that my team is presenting me with all the relevant

25    information that I need to be fully informed about everything

1    that is going on in the analysis I'm doing.  So that's in terms

2    of my team.

3            Then on the question of cherrypicking data.  We

4    started with the compensation, termination, benchmark data --

5    and we -- it actually took us a little bit of time to figure

6    out that LinkedIn data would be a really nice and -- I mean,

7    early on we thought that LinkedIn data would be useful.  It

8    took us a while to figure out that we could in fact use it and

9    that it was possible to go and -- we weren't allowed to scrape

10   the data because you are not allowed to do that with LinkedIn,

11   but you can go manually collect it.  And so that's what we did.

12   But there was no other inquiry of other data sets that we just

13   thought, oh, we don't like those results so we're going to

14   ignore them.  No such thing.

15           I should also add that a few months, maybe, before

16   today, everything we did, everything analysis, every chart,

17   every data set that was on our systems was sent to the

18   government; so they have the entirety of what our record was.

19   So if there had been anything done that wasn't shared, they

20   would have had an expert, you know, discussing that with you.

21   So, no, you can be assured that the analysis I'm showing you is

22   complete, it's 100 percent of what I've known and done, and

23   there is nothing that is kind of in the back of my head or in

24   the back of the head of my team that you wouldn't have -- that

25   I'm not sharing with you.

1        THE COURT:  Question:  You explained the difference in

2   hiring at SCA over two periods, eight hires versus one hire, by

3   referencing Hayek's testimony about already having a lot of

4   DaVita employees.  Do you think this is the only explanation,

5   or could there be others?  Specifically, could the gentlemen's

6   agreement and the tell-your-boss policy also be part of

7   explaining the difference in movement?

8        THE WITNESS:  Uh-huh.  So I think that goes -- that's

9   a very interesting and important question.  I think it goes

10  back to two things.  One is the scientific method, and the

11  second is the burden of proof, meaning -- in terms of the

12  scientific method, what I'm doing is I'm trying to find proof

13  that the reason I'm observing the numbers I'm observing is

14  because there is an allocation of labor.  So it's not a kind

15  of, could it be this?  Could it be that?  No.  It's, can I

16  demonstrate that without an allocation of labor, what I'm

17  observing here could not exist?  That's the question.

18       So -- and the reason why I set things up that way is

19  because that's what the burden of proof is.  If I was -- I

20  would do the same thing if I was working for the government.  I

21  would figure out, what can I do with the data to prove -- you

22  know, from a legal standpoint, beyond a reasonable doubt.  From

23  an economist standpoint, as clearly as I can -- to prove that

24  an allocation of labor is the reason I observe what I observe?

25  That's the standard.

1        And so there are many worlds that you could build,

2   saying, well, could it be this?  Could it be that?  But what

3   I'm observing is two things.  One is from the data alone, I

4   cannot conclude that there is an allocation of labor.  The

5   reason is because the behavior of SCA is similar to the

6   behavior of other companies for which there is no allegation.

7   And, second, there is this additional documentary evidence --

8   so, actually, second, there is also the behavior of SCA from

9   2000 to 2008, where they're not hiring from DaVita either.

10  And -- not hiring at all.  They hired one later.  And then,

11  finally, there is this additional information coming out of the

12  record.

13       And so that kind of leaves me stuck in that the data

14  doesn't demonstrate -- doesn't require an allocation of labor

15  if it doesn't show that there is an allocation of labor

16  necessary to explain what I see.  The behavior before, the, you

17  know, zero for some period of time, then a spike -- which, by

18  the way, you see for other companies that have a spike in

19  hiring from a particular target at one point or another -- also

20  doesn't require allocation of labor to explain.

21       And then, finally, you have these documents that kind

22  of, you know, explain, oh, well, this now all kind of holds

23  together.  I see my data; I can't see any evidence of

24  allocation of labor; and then I have this testimony from the

25  CEO of the company at issue that is saying, hey, this is how we

 1    were thinking about hiring.

 2          So I don't need that, because even absent that, I

 3    still don't have evidence that would allow me to conclude that

 4    there is an allocation of labor; but it certainly is an

 5    additional piece that provides a context for what was going on.

 6          THE COURT:  Question; do you believe that you or

 7    anyone from Analysis Group, Inc., would have testified if you

 8    had found evidence supporting the government's allegations?

 9          THE WITNESS:  Yeah.  So that's another really good

10    question, which is, I'm not the one who decides whether I

11    testify or not.  Meaning, I'm hired to do work; and then,

12    ultimately, the -- you know, the clients decide whether they're

13    going to put me up as an expert.  And there certainly are --

14    have been cases in the past where as a result of the work that

15    I've done, the clients decided that they would not have me

16    testify because the stuff that I would testify to is not

17    something they were interested in me testifying on.

18          So I'm not the one who decides whether I testify, but

19    I'm the one who decides what work I do and what I'm willing to

20    testify to.

21          THE COURT:  Question:  Do you consider the labor

22    market of healthcare restricted only to DaVita and companies

23    that work with DaVita?  That's the question.

24          THE WITNESS:  Yeah.  So in some ways, the question --

25    the best way to answer the question is to think about the

1    employees at DaVita.  Right?  The issue here is an issue of

2    anticompetitive conduct, and anticompetitive conduct is

3    something that is a concern to economists because it leads to

4    harm to employees.  And so on the question of whether I

5    consider the options that senior executives have at DaVita to

6    be limited to those companies, the answer is in the data, which

7    is, it's not limited, meaning that they -- as you can see from

8    the departures from DaVita, they have many options available to

9    them.

10        So if you put yourselves in the shoes of the employees

11   at DaVita, and you ask them, well, what are your options?  The

12   options are broad, as they would know from having seen their

13   colleagues going to various companies.

14        THE COURT:  Question:  Why didn't you frame your

15   analysis of Question No. 1, end of meaningful competition, to

16   include the rate of hiring or median number of hires of all

17   relevant healthcare companies even if they didn't work with

18   DaVita?  You could still compare hiring and movement data of

19   all healthcare companies to DaVita and SCA, DaVita and Hazel,

20   and DaVita and RAD Partners; correct?

21        THE WITNESS:  So -- I mean, I could.  Meaning, it's an

22   analysis that is possible.  It would be an enormous amount of

23   work, because you would have to basically use the entirety of

24   all records available on LinkedIn, as opposed to the 11,233

25   that we used, because you would have to have the universe of

1   all companies in the country.

2            But also I don't think that would be the right thing

3   to do, because the vast majority of the companies aren't hiring

4   DaVita employees, they're not hiring SCA employees.  So doing a

5   turnover analysis with a benchmark kind of gets at that

6   question but in a different way at the level of the company.

7   But including all of these other companies that don't have any

8   experience with hiring from DaVita would just add hundreds of

9   thousands of zeros to my analysis, which wouldn't be

10  informative.

11           What I want to know is, conditional on hiring one

12  employee, is what I'm observing -- that for SCA there was one

13  employee hired, something that is unusual.  To do that, I

14  shouldn't be looking at the universe of companies, because

15  otherwise I'm going to say, well, the other companies are

16  hiring zero.  But that's not right, because we know that there

17  is one hire that occurs here.  So the question is, conditional

18  on hiring, is it -- is that high or low?  So, in other words,

19  what I'm doing is, instead of doing -- kind of in technical

20  terms, instead of doing the raw probability, I'm doing the

21  conditional probability.  But conditional on, how many do you

22  hire?

23           THE COURT:  Question:  Do people using LinkedIn use --

24  do people using LinkedIn use profile pictures?  Can you

25  determine gender and race with these pictures?

1          *THE WITNESS:*  I never thought of that.  That's a good

2     question.  The answer is, some do; some don't, at least from

3     the data we looked at.  So it would be incomplete.

4          *THE COURT:*  I think this gets back to the question

5     about, would there be empowered groups or other groups -- would

6     there be a variation according to age or gender or race that

7     could impact the data?  I think that's what this is about.

8          *THE WITNESS:*  Yeah, it is.  Yes.

9          So, I mean, two things.  One is, just the idea that I

10    would be looking at profile pictures and trying to figure out

11    the race of the individual and whether they're male or female

12    is not something I would want to do, because that seems like a

13    highly subjective exercise.

14          The other thing is, I understand the concern, which

15    is, the vulnerable people.  Right?  Is this something that

16    disproportionately -- you know, do the allegations have the

17    potential of disproportionately affecting -- or even only

18    affecting vulnerable people?  These are senior executives.

19    Right?  At least for Count 1.  So it's -- I think it's

20    important to remember that, that these are not people who

21    are -- that we could systematically assume are going to behave

22    differently on the basis of race or gender -- not that I think

23    we could ever assume that's true.  And particularly for senior

24    executives, I would expect that their role, their experience at

25    the company, the education that they have which would be a much

1    more important determinate of how I would expect them to

2    respond than, frankly, their race or gender.  I would certainly

3    say in my experience, that's very much the case.

4            People individually behave in a way that is a function

5    of, you know, whatever their -- you know, their history is.

6    And it's really hard and I think dangerous to try to pigeonhole

7    people based on very broad categorization like this, which I

8    just worry would not be -- would not be right.

9            THE COURT:  Could you have allocation of labor without

10   a compensation decrease?

11           THE WITNESS:  So I think that goes back to the issue

12   of meaningful.  Meaning, if the allocation of labor has an

13   anticompetitive effect, I would expect one of the telltale

14   signs that I'm using to indicate that something is going

15   wrong -- I would at least expect either my compensation growth

16   to be smaller than it is in my benchmark, I would expect my

17   turnover to be lower than it is in my benchmark.  The problem

18   is, again, in this exercise in which I'm required to find proof

19   to demonstrate that there is an allocation of labor, I have to

20   try to find that indicia.  And, you know, that's the standard

21   I'm trying to apply here, because that's the standard I've been

22   asked to apply.  And it makes sense.

23           So, yeah, I think I would expect if there is a

24   meaningful restriction on competition to see one of those

25   indicia demonstrated, that's true, and offer proof.

1        *THE COURT:*  In a scenario with hourly workers, this

2   hypothesis makes sense.  But with senior executives, the

3   motives seem different and also the potential impact on

4   salaries.  Can you speak to this difference?  In other words,

5   it goes back to the question, could you have an allocation of

6   labor without a compensation decrease?  And then it goes on to

7   say, can you explain your answer by looking at senior

8   executives in a category and others in a different category?  I

9   think that's what it is asking.

10       *THE WITNESS:*  Yes.  So my worry is that I feel like

11  I've already answered that question.  And since these questions

12  have come after my prior answers, that suggests that I'm not --

13  that I'm wrong.  But I'll still remind you of the composition

14  effect, which means that I would expect a decrease in

15  compensation because of the composition effect if there is an

16  allocation of labor that meaningfully restricts competition.

17       In terms of the idea of comparing senior executives

18  with others at the company, I don't have data on the others at

19  the company, so I haven't done that exercise.  I'm not sure --

20  I haven't thought through how one would do that, but I've not

21  done it.

22       *THE COURT:*  Okay.

23       Any other questions?

24       (No response.)

25       Follow-up questions from the defense?

Pierre Cremieux – Examination

1    *MR. MELSHEIMER:*  Your Honor, we don't have any

2    additional questions of Dr. Cremieux.

3    *THE COURT:*  Okay.  From the government?

4    *MR. VIGEN:*  Just one topic.

5    **EXAMINATION**

6    *BY MR. VIGEN:*

7    Q.  Dr. Cremieux, you told the jury this morning that you

8    didn't test the hypothesis about companies run by former DaVita

9    employees; right?

10   A.  Correct.

11   Q.  And that's because you said you didn't know because it

12   wasn't in your data; right?

13   A.  Correct.

14   Q.  You actually told defense counsel last year that DaVita is

15   a source of senior talent for other companies run by former

16   DaVita senior-level employees.  Do you remember saying that to

17   defense counsel?

18   A.  No.

19   Q.  Do you remember listing Sound Physicians, National

20   Veterinary Associates, and American Dental Partners as

21   companies run by former DaVita employees?

22   A.  No, I don't.

23   Q.  Okay.  And you saw in the trial, the testimony and the

24   exhibits, about IntegraMed and William Hughson and Scott Drake

25   and Spectranetics and Steve Priest and Spero Health?

1    *A.*  Yes, I did hear that.

2    *Q.*  And you didn't separately analyze that question, did you?

3    *A.*  No, I did not.

4           *MR. VIGEN:*  Thank you.

5           *THE COURT:*  Okay.

6           *MR. MELSHEIMER:*  Is Dr. Cremieux free to go?

7           *THE COURT:*  Yes.  Thank you, sir.

8           *THE WITNESS:*  Thank you very much.

9           Thank you.

10          *THE COURT:*  Are there any other witnesses from either

11   of the defendants?

12          *MR. MELSHEIMER:*  Your Honor, there is no -- there are

13   no other witnesses we're offering on behalf of Mr. Thiry.

14          *MR. WALSH:*  And not from DaVita either, Your Honor.

15          *THE COURT:*  All right.  The defense rests.

16          Is there any rebuttal evidence?

17          *MS. CLINGAN:*  No, Your Honor.

18          *THE COURT:*  The evidence is closed.

19          All right.  Let's take our morning break here,

20   15 minutes.

21          (Jury out at 10:30 a.m.)

22          *THE COURT:*  The jury has been excused.  The defense

23   wants to make another motion at this time.

24          Mr. Walsh, you may do so.

25                        **RULE 29 ARGUMENT**

1          *MR. WALSH:*  Thank you, Your Honor.

2          Your Honor, I will be very brief.  The defense renews

3     it's Rule 29(a) motion at the close of all of the evidence.

4     And I offer just a couple of points.

5          The only additional evidence that came in, of course,

6     after the close of the government's case was Dr. Cremieux's

7     testimony.  And at this point, his unrebutted testimony shows

8     that hiring between the co-conspirators did not meaningfully

9     cease during the conspiracy period.  Moreover, that there were

10    hundreds of companies competing for the employees and that

11    there was no suppression of movement or wages in the overall

12    employment of DaVita employees.

13         In other words, Your Honor, it is -- it strongly

14    reinforces our point that, as the *Bogan* court held, there was

15    no meaningful impact on the movement of DaVita or SCA employees

16    during this period.  And as a result, the rule of reason should

17    apply to this case rather than the *per se* rule.  And because

18    the government indicted on a *per se* theory, given that this

19    should not be a *per se* case, the Indictment -- there should be

20    an entry of a judgment of acquittal.

21         That's all I have, Your Honor.

22         *THE COURT:*  Thank you.  Any response?

23         *MS. LEWIS:*  Your Honor, Mr. Parker will address this.

24         *MR. PARKER:*  Your Honor, Terence Parker on behalf of

25    the United States.

 1          We would just stand by our yesterday and note our

 2     agreement with Your Honor's point on the intent element.

 3          THE COURT:  Okay.

 4          MR. PARKER:  Thank you.

 5          THE COURT:  All right.  So as I said earlier today,

 6     and particularly when I didn't get the brief from the

 7     defendant -- but I would have done it anyway -- I went back and

 8     reread *Bogan*, and I asked my law clerks to do the same.

 9          THE WITNESS:  *Bogan v. Hodgkins* is a decision of the

10     Second Circuit back in 1999, reported at 166 F.3d 509.  It was

11     cited and relied upon by the defense in their motion to dismiss

12     earlier in the case.  And we considered the impact of *Bogan* at

13     that time.  Also, it was cited again in our order on jury

14     instruction issues.

15          It's a case from a Circuit Court of Appeals that is

16     expert, let's say, on financial matters, considered to be a

17     very worthy source, and one that I respect highly; but it

18     doesn't convince me that the analysis that we have applied to

19     this case is wrong.

20          *Bogan* involved a somewhat complex agreement among

21     general insurance agents for a life insurance company, who each

22     were allocated a geographical area.  Each of the general agents

23     in turn hired district agents.  And they in turn hired sales

24     agents, who sold the policies, and the commissions were split

25     in sort of a pyramid fashion.  And so as the Court explained,

1    it had elements of horizontal and vertical market allocation

2    agreements.  But that distinction was somewhat neutralized by

3    the Court saying, no matter how you view it, we don't consider

4    it to be a *per se* violation.

5         Another distinction is that that was decided on a

6    motion for summary judgment.  But, again, that doesn't really

7    distinguish it on the legal issue.

8         What I take from *Bogan* that really relates to our case

9    are several points.  One is that division of markets is a *per*

10   *se* violation, which has been our premise from the beginning.

11   The *Bogan* court said that their insurance industry agreement

12   that they were considering didn't fit into any of the

13   established *per se* categories.  Our conclusion was that this

14   agreement might fit into an established *per se* category -- that

15   is, a horizontal market allocation agreement.  And, indeed, on

16   different facts, to be sure, in the theater case out of Ohio, a

17   nonsolicitation type agreement was considered as a horizontal

18   market allocation agreement.

19        What we decided was not that it was or wasn't a

20   horizontal market allocation agreement but, rather, that if the

21   government could prove beyond a reasonable doubt two facts,

22   then it fit into the *per se* category.  Number one, that it was

23   in fact a market allocation agreement -- indeed, a horizontal

24   market allocation agreement.  And, two, that the defendant

25   entered into that agreement with the intent to allocate the

1    market.

2         In the *Bogan* case, the Court said, one has to define

3    the market or submarket.  We've done that.  There has been

4    unending disagreement between the two sides as to what the

5    market is or submarket is.  The Court decided that for better

6    or for worse, so we've done that.

7         The *Bogan* case says that the allocation of that market

8    must predominantly have -- must have predominantly

9    anticompetitive effects.  That is a fact issue.  The *Bogan*

10   court said the allocation agreement, if it is one, must

11   allocate the market to a meaningful extent.  That is a fact

12   issue and one that is built into our instructions.  In fact, we

13   are the ones here that added the second element, which is the

14   intent to allocate.  So I'm confident in our analysis.  It may

15   be that our Circuit will disagree with it, but it is what it

16   is.

17        It has been pointed out that there has been lots of

18   movement back and forth between and among the four companies

19   involved in this case.  That is a fact issue.  Has it -- has

20   there been a diminution in meaningful competition for senior or

21   non-senior employees among these companies within this market?

22   The jury will tell us the answer.

23        There was the argument that Mr. Walsh added that the

24   tell-your-boss rule in the evidence has shown to stimulate

25   competition.  Yes, there is evidence to that effect; and there

1537

1    is evidence such as the Eric Holder testimony to the contrary.

2    And, again, it's a fact issue that has to be decided by the

3    jury.

4         Overall, with respect to count by count, in Count 1,

5    there is evidence of the nonsolicitation agreement, there is

6    evidence of the tell-your-boss rule, there is evidence such as

7    through Bridie Fanning and all of her testimony about keeping

8    your hands off each other's employees from which the jury could

9    find a meaningful impact on competition.

10        Count No. 2, yes, Mr. Walsh, there was no percipient

11   witness; but there is evidence in the form of text messages

12   and emails that the CEO of Hazel Health, Mr. Golomb, agreed

13   to keep his hands off DaVita employees.

14        Count 3, the Radiation -- Radiology Partners so-called

15   ground rules in the one email that was shown many, many times

16   during the case didn't specifically include a tell-your-boss

17   rule; but the evidence -- there was evidence that it was in

18   fact applied as if there was a tell-your-boss rule.  And Eric

19   Holder's testimony is an example of that evidence.

20        The Court is required to consider all evidence at this

21   stage as true to draw inferences in favor of the government,

22   not to put my own opinions forth but, rather, to simply

23   construe the evidence in the government's favor and decide

24   whether a rational jury could find beyond a reasonable doubt

25   that there was a market allocation agreement that was illegal.

1    And my answer is, they could.

2           With respect to the intent issue, I said before and I

3    say again, that is a paradigm example of an issue that is

4    factual in nature and has to be decided based on inferences

5    drawn from the direct evidence.  And that is a perfect example

6    of what juries do.

7           So the Court again denies the motion to dismiss made

8    at the conclusion of the government's evidence and now at the

9    conclusion of all evidence.

10          Do we have the instruction with the modification that

11   we made this morning done?

12          *MS. LEWIS:*  I believe we do, Your Honor.

13          *THE COURT:*  And do we have the new instruction ready

14   for the defendant to double-check to make sure that the

15   addition was made?

16          *MS. LEWIS:*  Yes.  I believe it was provided to

17   counsel.

18          *MR. EVERETT:*  Yes, Your Honor.  We acknowledge

19   receipt.

20          *THE COURT:*  Pardon me?

21          *MR. EVERETT:*  I'm sorry, Judge.  We acknowledge

22   receipt.  The correction was made.

23          *THE COURT:*  Okay.  Do you need our help in copying or

24   collating?

25          *MS. LEWIS:*  We do not, Your Honor.  We have the copies

1   here.

2            THE COURT:  With the new instruction in there?

3            MS. LEWIS:  Yes, Your Honor.  We have amazing

4   paralegals, for the record.

5            THE COURT:  Good for you.

6        How much time would you folks like before I instruct

7   the jury and then you start up your closings?

8            MS. LEWIS:  Ten to fifteen minutes, Your Honor.

9            THE COURT:  11 o'clock?

10           MR. DODDS:  Sounds fine, Your Honor.

11           THE COURT:  We're not going to get to all of the

12  closings before lunchtime.  You know that, so we're going to

13  have a break in there somewhere.  I won't break in the middle

14  of somebody's speech; but we're going to have a break,

15  probably.

16           MS. LEWIS:  Understood, Your Honor.

17           MR. DODDS:  11 o'clock, Your Honor?

18           THE COURT:  11 o'clock.

19           (Recess at 10:43 a.m.)

20           (In open court at 10:58 a.m.)

21           THE COURT:  So I had kind of forgotten that you wanted

22  the Indictment to go to the jury.  My staff has reminded me

23  that you did; and, in fact, somebody provided me with copies of

24  the Indictment.  So my question is, do you want me to read the

25  Indictment or just give them a copy?

1          *MS. LEWIS:*  Your Honor, we think just giving them a

2    copy is sufficient.

3          *THE COURT:*  What's the defendants' position?

4          *MR. WALSH:*  Your Honor, we don't think the Indictment

5    does need to go back to the jury.  The Court has, as the Court

6    has just this morning articulated, has given -- going to give

7    instructions as to the Court's view of the law, and we think

8    that would be clear.

9          *THE COURT:*  All right.  So I was told that there was

10   no dispute.  I was skeptical, and I was right.

11         *MS. LEWIS:*  Your Honor, they stood up yesterday and

12   agreed that the Indictment could and should go back to the

13   jury.  That's what we relied on.  The verdict form doesn't

14   identify even what the counts are.  We think it's critical that

15   the jury has the Indictment in the jury room.  I think it's

16   entirely appropriate that they have it.

17         *MR. WALSH:*  Your Honor, we understood the Court

18   addressed it in a different way yesterday.  That was in the

19   course of our colloquy back and forth.  We -- given where the

20   Court has come out and what we thought the back and forth was

21   yesterday, we don't think the Indictment should go back to the

22   jury.

23         *THE COURT:*  Why?

24         *MR. WALSH:*  Because the Court has very carefully

25   crafted its description of the elements of the offense and what

1541

1   has been alleged both by the government and the defense theory.

2   And to -- as the Court has said in it's motion to dismiss

3   order, that it is a little bit different than it may read in

4   the Indictment, to begin with.  And as a result, we think there

5   is a potential for jury confusion.

6        *THE COURT:*  You know, the interesting thing is that

7   when you were the U.S. -- the U.S. Attorney here in Colorado,

8   and during my entire time that I've been here in this court,

9   the standard practice of your office has been to build the

10  Indictment into the instructions.  So there would be a specific

11  instruction that causes me verbatim to read the Indictment.

12        And I remember one case -- you might even know which

13  case -- in which an inmate was accused of sending some very

14  sharply worded letters to various officials, and the issue was

15  whether they were true threats.  A case that went all the way

16  to the U.S. Supreme Court, in fact.  And because your office

17  wanted the Indictment to be part of the instructions, I had to

18  read, in effect, these letters verbatim with some of the most

19  unjudge-like language that I've ever been expected to read.

20        So it's a little unusual now that you're saying I

21  shouldn't let the Indictment go to the jury.  Is there law on

22  this?

23        *MS. LEWIS:*  Your Honor, I don't have any at my

24  fingertips.  But as Your Honor noted previously, the Indictment

25  charges what the Indictment charges.  It is what the grand jury

 1    has charged in this case.  I think it is too lengthy to read

 2    out loud in any meaningful way.  We would ask that it go back.

 3    We think Your Honor's instructions, complemented with the

 4    Indictment, make it perfectly clear to the jurors what they

 5    need to find.

 6          THE COURT:  I'll tell you what the problem is.  I told

 7    you before the case ever started that just because an exhibit

 8    is stipulated, I don't admit it unless somebody uses it --

 9    i.e., those two binders.  And the reason -- and those binders

10    weren't even stipulated.  But the reason is that anything that

11    goes into that jury room, I have to assume they're going to

12    read.  There is no reason to have it go in there otherwise.

13    And I don't want them reading an exhibit that nobody ever

14    talked about and finding some nugget in there that nobody

15    thought was relevant.  And we'll never know, because we don't

16    know what happens in the jury room.

17          So it seems to me that if they need to get the

18    Indictment, I probably need to read it, even though it's upside

19    down.  But to just put it in their package and let them do what

20    they want with it, I don't think so.  So do you need to have me

21    read the Indictment?

22          MS. LEWIS:  Your Honor, if the Indictment is not going

23    to go back, we would request that you read the Indictment.

24          MR. MELSHEIMER:  Your Honor, we'd object to that at

25    this stage of the proceeding.

1      THE COURT:  Do you have -- just give me a case, any

2   case, any authority that says I shouldn't send the Indictment

3   to the jury.

4      MR. MELSHEIMER:  The rule, Your Honor, where I come

5   from is that you don't give the Indictment to the jury, any

6   more than you give the complaint in a civil case to the jury.

7   It's just why we're here.  It doesn't go to the jury.  It just

8   initiates the proceeding.  We can find a case, and you don't --

9   we can find one over lunch.  But I think ultimately what often

10   happens is the Indictment is read at the beginning of the case,

11   and then we have all of the evidence.  So to read it now, it

12   seems peculiar to me.  And we would object to that.  And I

13   don't think it needs to be -- if they wanted it read -- which

14   is common, actually -- they could have asked you to read it.

15   Or sometimes the Court says -- you know, the prosecutor reads

16   the Indictment.  Or sometimes if it's a really long Indictment,

17   they do a summary of the Indictment, if there is, like, you

18   know 50 counts or something.

19      I don't think it goes back.  I think the cow's out of

20   the barn in reading it now.  And I would suggest that we not do

21   that, and we'll try to find a case to support what I'm saying.

22      THE COURT:  That's not going to be at all helpful,

23   because we're going to be instructing the jury now.

24      So we come down to this:  In this case that everybody

25   ballyhoos as a first of its kind, gets all of this media

 1   attacks, somebody possibly could go to prison, somebody could

 2   be fined millions, even hundreds of millions of dollars, in

 3   this case you're going to risk your verdict by whether or not I

 4   read the Indictment to this jury, with neither side having a

 5   case that says yes or no, and with instructions that already

 6   summarize what the Indictment indicted.  That's what you want

 7   to do with your case?  You have no authority, but that's what

 8   you want?

 9           MS. LEWIS:  Your Honor --

10           THE COURT:  And they have no authority either, and

11   that's what they don't want.

12           MS. LEWIS:  Your Honor, we don't have authority to

13   provide to you at our fingertips.  We would defer to Your

14   Honor.  If you think the summary is a sufficient description of

15   the charges, we would defer to Your Honor on this one.

16           THE COURT:  Then we'll pull the Indictment.  So their

17   package will be the instructions plus the verdict form, which

18   doesn't even have the caption of the case on it.  That's weird.

19           MS. LEWIS:  Your Honor, we would be happy to redo it.

20   My understanding is that you did not want a caption.

21           THE COURT:  No.  You had put the caption of the case

22   on every instruction.  I had never seen that before.  I didn't

23   care.  But the verdict form needs the caption.  So can you

24   print us one that has the caption?

25           MS. LEWIS:  We can, Your Honor.

1    THE COURT:  Can you do that, like, instantly?

2    MS. LEWIS:  We would probably need maybe 20 minutes to

3    run back to the rooms with the printers.

4    MR. WALSH:  Your Honor, we also have a printer that is

5    closer that we could get that quickly, if the government would

6    send us.

7    MS. LEWIS:  We can certainly do that also while Your

8    Honor is reading instructions.

9    THE COURT:  What it needs to say is the caption of the

10   case.  And then it shouldn't say "verdict form," it should say

11   "verdict."  And underneath it, it should say something like,

12   "We, the jury, unanimously answer the questions posed by the

13   Court as follows:"  And at the end, you need a signature.

14   There is no signature blank.  You need a place for the

15   foreperson to sign.

16   MS. LEWIS:  Certainly.

17   THE COURT:  This is what you guys stipulated to?  I

18   didn't look at it because you said, we have a joint stipulation

19   on the verdict form.

20   MS. LEWIS:  We'll fix it.

21   THE COURT:  Live and learn.  I shouldn't even believe

22   it.  I was so excited that you agreed on something, I -- I

23   didn't do my job.

24   COURTROOM DEPUTY:  If they want to email me the

25   verdict form, I can print it.  Just to Jackson Chambers'

1    email address.

2         THE COURT:  Can somebody give us one with a caption

3    that says, "We, the jury, unanimously the questions as

4    follows," and has the signature blank, and then underneath that

5    it says "foreperson."

6         MS. LEWIS:  We will have that to your office within

7    five minutes.

8         THE COURT:  Okay.  So pull those verdict forms out.

9         COURTROOM DEPUTY:  Yes, Your Honor.

10        THE COURT:  And give them just the instructions.  And

11   maybe by the time I finish reading instructions, I'll have the

12   verdict form.

13        COURTROOM DEPUTY:  Yes, Your Honor.

14        THE COURT:  Anything else?

15        MS. LEWIS:  Nothing, Your Honor.

16        MR. WALSH:  No, Your Honor.

17        THE COURT:  You'll waive reporting of the reading of

18   instructions, I assume?

19        Government?

20        MR. MARIANO:  Yes.

21        MS. LEWIS:  Yes, Your Honor.

22        MR. WALSH:  Yes.

23        (Jury in at 11:10 a.m.)

24        THE COURT:  All right.  Have a seat.  So, members of

25   the jury, I'm going to instruct you now on the law.  I've given

1       you earlier in the case a preliminary instruction that

2       discusses some of the points; but these instructions that

3       you've just been given in writing -- each of you -- are the

4       final and binding instructions that will on govern your

5       deliberations.  Okay?

6              I'll also be giving you a verdict form and will

7       discuss that with you.  But the draft version that we would

8       have normally included in your package had a typo, and so we're

9       having that fixed while I'm reading the instructions.

10             After I finish instructing you on the law, the

11      government, because it has the burden of proof, will have an

12      opportunity to make the first closing argument; and one of the

13      government lawyers will do that.  Then the defendants -- there

14      are two, as you know -- one of the lawyers for each of the

15      defendants will have an opportunity to make a closing argument

16      on behalf of his or her client.  And then the government will

17      have a final chance to make a rebuttal speech.  And after those

18      speeches are done, the case will be in your hands.

19             And, by the way, did you order lunch for these fine

20      jurors?

21             *COURTROOM DEPUTY:*  I did, Your Honor.  It's scheduled

22      for noon delivery.

23             *THE COURT:*  Okay.  We can't provide lunch every day,

24      but under the rules we can if you're deliberating, so you'll

25      get our lunches today.

1          Now, you can follow along on your own copy or just

2     listen, whatever makes sense to you.

3          And, of course, we'll start with Instruction No. 1.

4          (Instructions to the jury read but not reported.)

5          THE COURT:  It is 11:55.  Your lunches are arriving at

6     12:00.  My thought is that instead of starting the closings

7     right away, we take our lunch recess and then start afterwards.

8          How much time would you like for lunch before we get

9     into the closing arguments?

10         JUROR:  Forty-five minutes or an hour.

11         THE COURT:  How much would you folks -- you're going

12    to be the speechmakers, how much time would you like?

13         MS. LEWIS:  I think we'd defer, Your Honor.

14         MR. MELSHEIMER:  Forty-five, Your Honor, is fine with

15    us.  But, again, we'd defer to the Court and the jurors.

16         THE COURT:  Folks?

17         JUROR:  Forty-five, yeah.

18         THE COURT:  Quarter to 1:00?  Let's do it.

19         (Jury out at 11:56 a.m.)

20         THE COURT:  The jury has been excused.  Anything for

21    the record from the government?

22         MS. LEWIS:  Nothing for us, Your Honor.

23         THE COURT:  From the defendants?

24         MR. DODDS:  Nothing, Your Honor.  Thank you.

25         MR. MELSHEIMER:  No, Your Honor.

1    *THE COURT:*  All right.  See you at quarter to 1:00.

2        (Recess at 11:57 a.m.)

3        (In open court at 12:47 p.m.)

4        *THE COURT:*  Have a seat.

5        All right.  Closing argument for the government,

6    Mr. Mariano.

7        *MR. MARIANO:*  Thank you, Your Honor.  Anthony Mariano

8    for the United States.

9        May I proceed?

10       *THE COURT:*  Yes.

11                           **CLOSING ARGUMENT**

12       *MR. MARIANO:*  Free market competition.  You've heard

13   evidence throughout this trial that full and open competition

14   is how people in companies get the best results.  And that's

15   why we're here.  That's what this case is about.  Companies

16   that were competitors for employees, companies that should have

17   competed head to head for those employees, but they didn't,

18   because of Kent Thiry.  Because Kent Thiry and DaVita

19   orchestrated conspiracies that shut down that free market

20   competition.

21       The evidence is overwhelming that Kent Thiry and

22   DaVita entered agreements with their competitors, they made

23   plans to put DaVita employees off limits.

24       *THE COURT:*  All set?  Sorry.

25       *MR. MARIANO:*  So the evidence is clear that Kent Thiry

 1   and DaVita made plans with their competitors to put DaVita

 2   employees off limits to recruitment, to make it harder for

 3   DaVita employees to leave DaVita and more likely that they

 4   would stay.  And the purpose of those agreements is

 5   self-evident -- to keep those employees at DaVita -- or to

 6   allocate them to DaVita -- to make it harder for them to leave

 7   and go to any of these three competitors:  SCA, Hazel, and RAD

 8   Partners.  And that is the crime that they're charged with.

 9   That alone meets all of the elements of the charged offense.

10          But the questions and arguments from the defendants

11   have tried to make this case more complicated than it is.  But

12   it's very simple:  Competitors are not allowed to get together

13   and agree not to compete for their employees just because

14   they're friends, or they might one day want to engage in some

15   business deals, or because it might hurt someone's feelings.

16   Those are not excuses.  Those are just motives for committing

17   the crime.

18          And you saw the result of these schemes.  You saw the

19   result in the lost opportunities of these employees.  And let's

20   be clear, those opportunities weren't just lost; they were

21   stolen.  Stolen.  These were potentially life-changing

22   opportunities stolen by DaVita and Kent Thiry from their

23   employees.

24          Now, let me be clear, there is nothing wrong with a

25   CEO wanting to retain his employees; but there are legal ways

1    to do it and illegal ways to do it.  And the legal ways are

2    good for employees.  That means the CEO competes, fights hard

3    to retain the person, lets the employee choose to stay with

4    them.  And the CEO can do that by offering things like higher

5    salaries, better benefits, better working conditions.

6    Sometimes they'll win, sometimes they'll lose, but that's

7    business.  That's that classic head-to-head competition.

8    That's how the American economy works.

9         But there are illegal ways to do it, too.  CEOs can't

10   conspire together.  They can't enter a backroom deal to put

11   their employees off limits from solicitation.  That prevents

12   competition, and it hurts employees.  But you saw in this case

13   how Kent Thiry and DaVita conspired with their competitors to

14   cheat their employees out of job opportunities.  That's not

15   business as usual; that's the crime they're charged with.

16        Now, I can't go through all the evidence today, but I

17   want to highlight some of the key information for you.  You

18   know that Kent Thiry and DaVita entered into three agreements

19   with their competitors not to solicit employees, and you know

20   that they did it with the goal of keeping DaVita employees off

21   limits from these competitors -- SCA, Hazel, and RAD Partners.

22        And what you saw was that each of these conspiracies

23   followed the same pattern.  When a DaVita executive would leave

24   and become CEO of a smaller competing company, Kent Thiry would

25   use any influence he had over that person to get them to agree

1    not to solicit DaVita employees.  All of the agreements started

2    a same way.  A DaVita executive would leave, become CEO of

3    another company; and as soon as that CEO started competing with

4    DaVita for employees, doing what any CEO in their position

5    would do, Kent Thiry would shut it down.  He'd threaten to

6    withhold business deals, he'd leverage his personal

7    relationships, he'd threaten to retaliate, anything he could do

8    to make sure the former employee stayed loyal to DaVita and

9    loyal to him personally long after they left what Kent Thiry

10   called the village.

11        And that loyalty -- you saw that that loyalty came

12   with a cost, a cost to the employees who had their

13   opportunities stolen.

14        Now, all three agreements in this case were pretty

15   similar.  You have them on the screen in front of you.

16   Government Exhibit 67-3 for SCA, Government Exhibit 146 for

17   Hazel, and Government Exhibit 169-1 for RAD Partners.  We've

18   seen these documents a lot, so we don't need to read them now.

19   But you should write the exhibit numbers down and take a close

20   look at these documents back in the jury room.

21        But what you saw and heard is that each of these

22   conspiracies had two main rules.  The first was the

23   no-solicitation rule.  That's the broad rule that put these

24   employees off limits.  That said that DaVita employees could

25   not be solicited -- or in the case of Count 1, the senior-level

 1    employees.  And that means the employee never gets a recruiting

 2    call, they never get an email suggesting they apply for a job,

 3    they never get a LinkedIn message.  No matter how good the

 4    employee was, no matter how hard they worked, if they were

 5    waiting for a call from one of these companies, if they wanted

 6    that call, it was never going to come because of these

 7    conspiracies.

 8         But what if the employee wasn't waiting for a call?

 9    What if they were out there looking for jobs and wanted to

10    consider one of these other companies, SCA, Hazel, or RAD

11    Partners?  You saw that there was a rule for that, too.  Before

12    the employee could even be considered, they needed to go to

13    their current boss first and talk about it, tell them that they

14    were trying to leave DaVita.  That's the tell-your-boss rule.

15    They had to do that before they ever knew what their salary

16    would be, what the terms of their employment benefits would be,

17    before they even knew if they would get another offer, they had

18    to out themselves as looking for a job.  And the employee had

19    no choice about that, because the CEOs conspired to take away

20    that employee choice.

21         Now for Count 3, there was a little bit of a wrinkle

22    to the tell-your-boss rule, because there were two options:

23    Either you tell your boss that you're looking to leave, or you

24    have to be actively looking at other jobs at other companies,

25    so even beyond RAD Partners.  But if you weren't actively

1    looking for other jobs, if you weren't interviewing or already

2    had offers, you had to follow that tell-your-boss rule.  That's

3    what you saw with Elliot Holder.  Because the only job he was

4    considering at the time was RAD Partners, he needed to follow

5    that tell-your-boss rule.  And you saw the effect that that had

6    on him.

7                Now, both of these rules are important.  Let's start

8    with the no-solicitation rule.  You heard from the witnesses

9    how important solicitation is.  That's the beginning of the

10   process for these employees.  Bridie Fanning told you that in

11   her experience, 80 to 90 percent of executive placements are

12   made through active solicitation.  Jeff Lombardo basically told

13   you the same thing.  He said he always relies on active

14   solicitation.  That's how you get the best candidates.  So

15   active solicitation is very important, and this agreement shut

16   that avenue down.  Right there, that is stopping meaningful

17   competition between these companies.

18               And the don't-tell-your-boss rule [sic] was important,

19   too, because you saw how that intimidated employees and made it

20   less likely that they would leave DaVita, because the boss in

21   the tell-your-boss rule was often Kent Thiry.  And you saw how

22   he reacted when he learned that employees were trying to leave

23   the village without his permission.  You saw how he would use

24   it as an opportunity to retaliate.

25               We'll talk more about the rules in a minute.  Let's

1   talk about the elements of the offense.

2          Judge Jackson has already instructed you on the law.

3   You know that for each count, you need to find three elements

4   beyond a reasonable doubt.  First, that there was an agreement

5   to allocate the market for employees, as charged in the

6   Indictment; second, that the defendants knowingly entered the

7   conspiracy with the purpose of allocating the market; and,

8   third, that the agreement occurred in the flow of or

9   substantially affected interstate commerce.  Now, each of these

10  elements is pretty straightforward.  And I think the real

11  dispute and where I'll spend most of my time is on the question

12  of purpose.

13         Let's talk through each of the elements.

14         The first element is that there was an agreement to

15  allocate the market for employees.  That sort of has two parts.

16  The first question is, was there an agreement?  Absolutely.

17  That's not contested.  In each of the three counts, you saw

18  documents setting out the terms of those agreements; and you

19  heard witnesses tell you about those agreements.  And in their

20  opening statement, DaVita told you, they don't contest that

21  those agreements existed.

22         So the next question is whether these were agreements

23  to allocate the market for employees.  Now, that sounds sort of

24  complicated and technical; but, fortunately, you have

25  Judge Jackson's instructions.  They make it pretty clear.  He

1556

1   told you that for Count 1, the SCA count, the market is

2   senior-level employees at each other's companies.  So the

3   market is the job opportunities at these two companies, SCA and

4   DaVita.  So all this talk that you've heard about 400, 500

5   companies that might have hired some of these employees, that's

6   not what this is about.  The market is the two companies.

7           And Judge Jackson told you, there are other companies

8   in the healthcare industry and other industries that

9   potentially would hire these same senior-level employees; but

10  that is not the market that is the subject of this case.  And

11  it's the same principles for Counts 2 and 3, the Hazel and RAD

12  Partners counts.  The difference there is that those

13  conspiracies apply to all employees of DaVita, not just the

14  senior-level employees like in Count 1.

15          So the question is whether these were conspiracies to

16  allocate the market for employees, conspiracies between

17  competitors to stay away from employees, to say that DaVita

18  employees who weren't actively looking for jobs had to stay at

19  DaVita without competition from these three specific companies.

20  And it absolutely was.  Remember that first rule in every

21  agreement, no solicitation, none, zero.  That puts the

22  employees off limits.

23          These rules were designed so that DaVita employees

24  would stay at DaVita.  And these competitors could only compete

25  if they were already walking out the door, if they told their

 1   boss first, or they were already looking to go to other jobs.

 2   But if they weren't already heading out the door, these

 3   companies could not compete for them.  They were off limits.

 4        The defendants pointed out, as well, that

 5   co-conspirators in this case didn't call this market

 6   allocation.  They weren't calling each other on the phone and

 7   saying, Let's allocate the market.  Does that really surprise

 8   anyone?  That's not how people talk.  They also didn't say,

 9   Let's violate Section 1 of the Sherman Act.  But agreements to

10   allocate the market for employees is exactly what these were.

11   They called them guidelines or ground rules, hands off, off

12   limits, gentlemen's agreement; but they allocated the market.

13   When RAD Partners agrees that they won't solicit DaVita

14   employees, then those employees are allocated to DaVita.  It's

15   as simple as that.

16        Now, let me pause on Government Exhibit 146, because

17   we've talked less about Count 2 in this case than we've talked

18   about the other two counts.  We've heard the question, where is

19   Josh Golomb?  What would Josh Golomb have to say about this

20   conspiracy?  And Special Agent Matt Hamel told you why Josh

21   Golomb is not here.  But you don't have to wonder what Josh

22   Golomb would say about this conspiracy, because he said it.  He

23   wrote it down in Government Exhibit 146, that he would tell his

24   team to steer clear of candidates at DaVita, that he'd go back

25   to Kent Thiry and talk before they even considered someone

1    else.

2           So just like in Count 3, the agreement with Hazel, it

3    put DaVita employees off limits.  And just like in Count 3, it

4    didn't work the other way.  Only DaVita's employees were off

5    limits.  If DaVita wanted to recruit from Hazel or RAD

6    Partners, they could do that; but Hazel and RAD Partners

7    couldn't recruit from DaVita.

8           And you saw that Josh Golomb didn't want to agree to

9    this.  He did it because Kent Thiry bullied him into it.  He

10   writes, "My sense is that he goes full buckets with everyone

11   first time this happens so that we all accept a position none

12   of us would ever normally agree to."  And if there is any

13   suggestion that this was an independent decision by Josh Golomb

14   or Hazel, take a look back at this message, where he says he's

15   being forced to accept a position none of us would ever

16   normally agree to.

17          And you saw that Hazel followed the tell-your-boss

18   rule too.  This is Government Exhibit 136.  And in that second

19   callout, you see Josh Golomb tell Kent Thiry that he would only

20   discuss a DaVita candidate if she told her boss that she was

21   looking to leave first and that she was looking at Hazel.  And

22   in that first callout, you see that Josh Golomb had already

23   turned away four DaVita employees -- four stolen

24   opportunities -- as a result of this conspiracy.

25          And you saw for these agreements that there was no

1559

1    ending.  All of these agreements continued throughout the

2    tenures of the CEOs.  So for Count 1, that's through July of

3    2017, Andrew Hayek's time; and in Counts 2 and 3, that's

4    through June 2019 and Kent Thiry's tenure at DaVita.

5         And you see here the testimony of just some of the

6    witnesses telling you that these agreements had no ending.

7    They were tied to Kent Thiry and his tenure.

8         So let's turn to the second element.  The second

9    element requires that the defendants knowingly joined the

10   agreement with the purpose of allocating the market, and that

11   just means that they joined voluntarily and intentionally.  And

12   you saw that, too, in every charged conspiracy here.  Kent

13   Thiry didn't just join these conspiracies; he was the driving

14   force.  You saw that he was the one seeking out these

15   conspiracies whenever one of his former employees dared to

16   compete with him.

17        So there is no reasonable doubt that Kent Thiry joined

18   these conspiracies.  But it's not just Kent Thiry.  DaVita's

19   responsible too.  That's why you see DaVita indicted as a

20   defendant right alongside Kent Thiry.  Remember, Kent Thiry was

21   DaVita's CEO.  Everything he was doing to keep his employees at

22   DaVita was a part of his job, and he was doing it for the

23   benefit of DaVita.  And that's enough.  You can find DaVita

24   guilty based on Kent Thiry's conduct alone, but there was more.

25        You saw other DaVita executives in lockstep, marching

1   right behind the mayor of the village in reaching and enforcing

2   these agreements, as well.  You saw it with Javier Rodriguez,

3   Mike Staffieri, and Dennis Kogod.  So these were DaVita's

4   conspiracies, not just Kent Thiry's.

5            So what was Kent Thiry and DaVita's purpose?  The

6   defendants have told you, that's where the real dispute is in

7   this case.  So ask yourselves, why was Kent Thiry going from

8   company to company to company, insisting they not recruit his

9   employees and threatening retaliation when they did?  Because

10  he wants to keep DaVita employees at DaVita and make it harder

11  for them to leave and go to these companies.

12           You can use your common sense to come to that

13  conclusion, but you can also listen to the testimony of the

14  witnesses.  Dennis Kogod told you the purpose for all three

15  counts:  To ensure that these other companies were unable or

16  precluded or prevented from reaching out to, contacting,

17  presenting to any DaVita executive, to make it impossible to

18  hire a DaVita executive.

19           Bridie Fanning told you the purpose for Count 1:

20  Ensuring that SCA executives did not leave SCA for DaVita and

21  go to DaVita and that DaVita executives didn't leave DaVita and

22  go to SCA.  Michael Rucker told you the purpose was to limit

23  the number of employees or teammates that moved from DaVita to

24  SCA or from SCA to DaVita.  And Andrew Hayek told you the

25  purpose as well, for Kent Thiry to lose fewer valuable

1    executives.

2         And for Count 3 you heard from Anthony Gabriel and

3    Rich Whitney.  Dr. Gabriel told you the purpose was designed to

4    limit the number of people that RAD Partners employed from

5    DaVita.  And Rich Whitney told you the purpose was to address

6    Kent Thiry's concern that RAD Partners was targeting his

7    people, to make it harder for DaVita employees to leave.

8         Now, the defense has suggested that Kent Thiry just

9    wanted to compete; Kent Thiry just wanted the opportunity to

10   compete.  But you know that's not true.  You know that's not

11   true because every one of these conspiracies started because

12   one of his former employees was competing with him.  These

13   conspiracies were how he put a stop to it.  You know his

14   purpose was to shut down competition because you saw the first

15   rule in every one of these conspiracies was no solicitation at

16   all.  That's not allowing for competition; that is shutting it

17   down; that's DaVita blocking employee opportunities and taking

18   away employee choice.  And putting his employees off limits is

19   exactly what Kent Thiry wanted.

20        Let's look at Government Exhibit 336.  This deals with

21   another one of the nonsolicitation agreements you saw.  You saw

22   Kent Thiry reach this agreement with IntegraMed Fertility and

23   its CEO, Bill Hughson.  And one of DaVita's employees, Lisa

24   Dawe, received an offer from Bill Hughson to work at

25   IntegraMed.  And you saw Kent Thiry's reaction.  He was livid.

1    His words, "I am livid."  He wanted that employee's job offer

2    pulled.  He wanted her job opportunity taken away.

3         So we've told you time and again that Kent Thiry's

4    intent was to limit his employees' job opportunities, and you

5    see it right here in Government Exhibit 336.  Threatening

6    retaliation if another CEO didn't withdraw someone's job offer.

7         And look at the threat he makes.  "I'm going to tell

8    Hughson if he does not withdraw Dawe offer, major competitive

9    response."  Now, what does that tell you?  That tells you that

10   Kent Thiry knows how to compete.  But competing wasn't the

11   goal.  Competition was the backup plan; it was the last resort;

12   it's what Kent Thiry was working so hard to stop.

13        And if Kent Thiry just wanted to compete, like the

14   defense has suggested, he could have done it.  He could have

15   called up Lisa Dawe; he could have made her a counteroffer,

16   offered her more money or a better title; he could have tried

17   to negotiate with his employee; but you see what he does.  He

18   doesn't give the employee the choice.  He goes straight to his

19   CEO friend and tries to get her job offer pulled.

20        He did it again years later, when he tried to get Josh

21   Golomb to rescind Julio Quinones' offer.  Remember, Julio

22   Quinones was recruited to Hazel Health.  It was that experience

23   that set Kent Thiry off and was the triggering event that

24   caused the conspiracy in Count 2.

25        Now, this is a different part of Government

1    Exhibit 146 than we were looking at earlier.  Here is what is

2    happening:  Josh Golomb is explaining to Kent Thiry why he

3    refuses to rescind Julio Quinones' offer.  But that's clearly

4    what Kent Thiry was asking for.  So you see, once again, that

5    when his employees aren't looking, Kent Thiry tries to take

6    their opportunities away.  He goes behind their backs to cheat

7    them out of opportunities.

8         He did it with Andrew Hayek, as well.  You saw Kent

9    Thiry running the same play, undercutting his employees when

10   Andrew Hayek had the opportunity to be CEO.  This was before

11   any of the charged conspiracies, back when Andrew Hayek was

12   being recruited to SCA.  And you saw how Kent Thiry went behind

13   his back and tried to get that recruitment to stop.  He tried

14   to get that job offer pulled, as well.

15        So this is not the story of a CEO who wanted what was

16   best for his employees.  This is the story of a CEO who wanted

17   control, a CEO who was livid when he was forced to compete.

18   And if you're in the jury room, discussing the idea that what

19   these conspiracies were, were just a way for Kent Thiry to

20   compete, you should take another look at these documents.

21   Write these numbers down, Government Exhibit 336 and 146.  And

22   remember Andrew Hayek's testimony.  And try to explain how it

23   can be that Kent Thiry just wanted to compete with these

24   conspiracies when you see him running around behind the scenes

25   trying to get his employees' job offers pulled.

1        You also saw that Kent Thiry's practice was to insist

2   that these companies agree to the don't-tell-your-boss [sic]

3   rule, that any candidates would have to tell their boss first

4   before they could be recruited.  And this had nothing to do

5   with promoting competition either.

6        Andrew Hayek told you that what this was, was a way to

7   enforce the agreement, to make sure both parties were holding

8   up their end of the conspiracy.  But this requirement that Kent

9   Thiry demanded is just one more way you know his purpose was to

10  suppress competition.  Because ask yourselves, how many

11  employees are really going to go to their boss and tell them

12  they have one foot out the door before they even know where

13  they're going to go?  Bridie Fanning told you almost no

14  employee would be willing to do that, because you'd be risking

15  your job.  Elliot Holder told you the same thing.  He thought

16  telling his boss before he had a job offer would put two jobs

17  at risk -- the job he wanted and the job he already had.  And

18  Dennis Kogod told you the same thing.  He told you that saying

19  you were even thinking of leaving the village could destroy

20  your career, so most employees will never take that risk.

21       So you know, this is a requirement designed to

22  intimidate employees and make it less likely that they would

23  leave; and that was the point.  But even if you don't believe

24  Bridie Fanning, even if you don't believe Elliot Holder, even

25  if you don't believe Dennis Kogod, you just need to believe

1    Kent Thiry.  You just need to look at his own words.  Kent

2    Thiry knew this was the purpose and effect of that requirement.

3            Government Exhibit 8, Kent Thiry admits that this

4    requirement makes it less likely an employee will leave DaVita.

5    "Most of the time the candidate refuses to do it."  He knew the

6    effect of this requirement was to stop employees from leaving

7    DaVita, and that's why he insisted on it.

8            And he didn't just say it once.  Government

9    Exhibit 338, you see Josh Golomb back in 2015.  This is when he

10   was still a DaVita employee, and he was proposing a process to

11   allow employees to move within DaVita, from one part of DaVita

12   to another.  Now, that's employment movement that Kent Thiry

13   wanted to allow, because that was all under the DaVita

14   umbrella.  But when he wanted to allow the employee movement,

15   he knew this system won't work.  He says, "I fear we are doomed

16   if we continue with current process.  It will not work to tell

17   people to talk to their bosses.  Too many won't."

18           That was the point.  Kent Thiry knew what he was

19   getting away with.  So this wasn't a courtesy notice; this

20   wasn't a heads-up; this was a shutdown.  This was a roadblock

21   for employees who were trying to leave DaVita, and it was a

22   roadblock that Kent Thiry knew most employees would never

23   overcome.

24           And if DaVita really wanted to compete, what was

25   stopping them?  DaVita can always compete to retain an employee

1    after they have an offer.  The witnesses told you, that's

2    possible.  It happens all the time.  That happened with Elliot

3    Holder.  When he had an offer from SCAN Health Plan, DaVita was

4    able to make him a counteroffer and retain him.  So it works

5    that way, and DaVita could have competed.  But competition

6    wasn't the goal.  Stopping competition was the goal.

7           And by the way, you saw what Kent Thiry did when he

8    found out his employees were looking for other jobs.  You saw

9    how he would go behind their backs and try to get their job

10   offers pulled.

11          This is Andrew Hayek in Government Exhibit 8.  And he

12   tells Kent Thiry that Kent Thiry finding out he was looking for

13   another job put that job opportunity at risk.  It resulted in

14   Andrew Hayek making less money.  So this wasn't even a

15   roadblock; this was an opportunity for Kent Thiry to retaliate

16   when someone was leaving.

17          This is not normal.  This is not business as usual.

18   Even Andrew Hayek, one of the co-conspirators in Count 1, knew

19   it.  He told Kent Thiry, "A candidate has a right to explore

20   career options that may be best for them in privacy."  That is

21   how a job search should work, but not in the village.  In the

22   village, it was up to the mayor whether you got recruited by

23   one of these companies.  And if you did get recruited, and if

24   you were fortunate enough to receive a job offer, he might just

25   go behind your back and try to get that job offer pulled,

1    because Kent Thiry wanted control.  He didn't want one of his

2    former employees to go off and compete with him.  And he

3    couldn't stand the idea that some of his employees might prefer

4    to work for someone else, so he shut that competition down.

5    That was his purpose.

6         Let's talk about a very important issue in this case:

7    Kent Thiry's feelings.  Because from the arguments you've heard

8    and the questions you've heard on cross-examination, that's

9    what this case is about.  That conspiring with employees was

10   necessary.  That if these CEOs wanted to be able to keep

11   strolling the botanical gardens together, they needed to

12   conspire to cheat their employees first.

13        Defense counsel said multiple times in their opening

14   statement that these conspiracies were all about finding a way

15   to compete without hard feelings.  They actually said that more

16   than once, that they had to enter these conspiracies because

17   otherwise Kent Thiry would have hard feelings.  Who cares?  Who

18   cares?  This case is not about a powerful CEO and his feelings.

19   This is about the employees, their jobs, their careers, their

20   livelihoods.  And just because a CEO is powerful, it doesn't

21   entitle them to put their feelings above their employees'

22   careers.  There is no exception to the Sherman Act for hard

23   feelings.

24        But what their question suggests is that they couldn't

25   have intended to allocate the market for employees because they

1568

1   were all motivated by preserving their friendships with Kent

2   Thiry.  But that's not a justification; that's a motive.  It's

3   a motive.  That was the leverage that Kent Thiry had over his

4   co-conspirators.  It's how he got them to agree.  But you're

5   not allowed to commit a crime just because you have a really

6   strong motive.  So we don't disagree that the friendships were

7   a big part of this.  They were huge.  But you have to ask, what

8   was endangering the friendships?  It was Kent Thiry.  He was

9   the one that was holding these friendships hostage until his

10  CEO friends agreed not to compete, until they agreed to let

11  Kent Thiry keep his employees without having to compete for

12  them.  That was the purpose, and the friendships were just the

13  leverage he used to get there.

14          But let's be clear, this case is not about the CEOs

15  and whether they got to stay friends.  Defense counsel pointed

16  out on cross-examination that Rich Whitney, despite all of

17  this, still likes Kent Thiry.  Is anyone surprised by that?

18  Rich Whitney wasn't cheated out of a job.  People like Elliot

19  Holder were.  Rich Whitney has 17 million reasons to still be

20  friends with Kent Thiry.  So there is no doubt, this conspiracy

21  worked out pretty well for Rich Whitney; but it didn't work out

22  well for the employees.

23          And by the way, there are a lot of ways to preserve

24  friendships.  Most people do it by going to baseball games or

25  movies or dinners; they don't do it by entering conspiracies,

1   because there is no criminal law that you're allowed to violate

2   just because you do it with your friends.  There is no crime

3   you're allowed to commit just because it will make one of your

4   friends really, really happy.  And even if you believe that

5   maintaining the friendships was one of the purposes -- and it

6   wasn't.  It was a motive -- but even if you think it was a

7   purpose, the question is if there was one purpose even among

8   many to allocate employees.  That's the instruction you

9   received from the Court.

10          Let's talk about the other motive you heard about from

11  defendants.  The defendants have suggested over and over that

12  these agreements were good for DaVita because DaVita was able

13  to keep its employees, that it was good for business to enter

14  these conspiracies.  Of course it was.  They're absolutely

15  right about that.  When CEOs get together and cheat their

16  employees, that's good for the bottom line.  It would also be

17  good for the bottom line for them to cheat on their taxes, but

18  you're not allowed to commit a crime just because it's good for

19  the bottom line.  Large corporations aren't able to do whatever

20  they want.  We have laws that say, large corporations and the

21  CEOs aren't the only ones that matter, laws like the Sherman

22  Act, that say the customers and employees matter too.

23  Companies can't conspire.  They can't get together and decide

24  to cheat their employees out of job opportunities just because

25  it's good for the bottom line, because those job opportunities

1    matter.  They mattered for the DaVita employees.

2         These DaVita employees were just like anyone else.

3    Some of them had families, some of them had children, lots of

4    them wanted higher salaries or better titles, lots of them

5    wanted to advance their careers.  The difference is they had a

6    boss who cheated them, who went behind their back to block

7    their job opportunities.  And they've admitted it.  Defendants

8    told you in their opening statement -- Defendant DaVita told

9    you that if there was an employee who didn't want to give

10   notice, they don't dispute that that employee's opportunity to

11   go to one of these three companies would be affected.  So their

12   defense boils down to two words:  So what?  Because the logical

13   extension of that argument is that this is okay, this is

14   acceptable business, and there is absolutely nothing wrong with

15   that.  And they're just wrong, because DaVita's employees

16   didn't belong to Kent Thiry.  They weren't his to control, they

17   had rights too.

18        And Bill Hughson told Kent Thiry that.  He told Kent

19   Thiry that what he was doing to DaVita employees was wrong.

20   Remember, IntegraMed is one of those other agreements you heard

21   about that Bill Hughson entered with Kent Thiry.  And you see

22   Bill Hughson agree to that here.  And he explains to Kent Thiry

23   that what he is doing is bad for employees.  This is Government

24   Exhibit 256.  He says, "You're always free to recruit people

25   who work at my company, whether they're looking or not, because

1    they aren't mine.  They just happen to be working with me right

2    now."  And he says, "I'd never want to inhibit that opportunity

3    for them.  I want them to freely choose to work with me each

4    day with full knowledge of the alternatives."  That's not what

5    Kent Thiry believed.

6          Kent Thiry believed that his employees belonged to

7    him.  He believed that he could get together with his CEO

8    friends and move them around like pieces on a chessboard.  He

9    could have competed for them.  Kent Thiry's track record shows

10   he's a good businessman, he knows how to compete, he knows how

11   to go head to head and win in that classic free market

12   competition but he didn't do that here.  Instead, he cheated.

13         So let's talk about what happened with the employees,

14   because you saw how these conspiracies resulted in stolen

15   opportunities for the employees.  And that shows you the

16   purpose, too.  Now, let's be clear, in order to find the

17   defendants guilty, you don't need to find that the conspiracies

18   worked perfectly or that they were always successful.

19   Judge Jackson told you that if you find the defendants sought

20   to end meaningful competition for the affected employees, then

21   it doesn't matter if you find that switching employers was

22   possible.  And it actually happened in some cases.  And you've

23   seen evidence throughout this trial, from the United States and

24   from the defendants, that there were employees who jumped over

25   these hurdles and who were able to move from one company to

1    another.

2           But you also saw the employees that didn't make it

3    over those hurdles.  You saw the DaVita employees who were

4    cheated out of jobs because the mayor of the village decided

5    they couldn't leave.  And that's a big deal, because we're

6    talking about people's livelihoods, real people who had

7    opportunities stolen because Kent Thiry didn't want to compete.

8           So let's talk about the stolen opportunities you heard

9    about in this case.  The very last witness you heard from in

10   the United States' case was Elliot Holder, and he told you

11   about how the scheme in Count 3 affected him.  He was a young

12   employee at DaVita.  He was rising up the ranks, and he wanted

13   to be considered for a job at RAD Partners.  He told you that

14   going to RAD Partners would have been a great opportunity to

15   advance his career, so he applied.  You heard he had a great

16   interview.  And you saw documents that behind the scenes, RAD

17   Partners was ready to make him a job offer.  But you know that

18   he never got that job offer because before they could offer him

19   the job, RAD Partners tried to force Elliot Holder to go to his

20   supervisor, go to his current boss at DaVita, and tell him that

21   even though he didn't have a job offer to rely on, he was

22   trying to leave DaVita.  That's Government Exhibit 224.  And

23   you know that the reason they did that was because of the rule

24   and the conspiracy in Count 3, the tell-your-boss rule.

25           And Elliot Holder said no.  He told you he's never

1    been asked to do something like that in any job search before

2    or since.  He told you he panicked; he was intimidated.  As

3    soon as he got this email, he forwarded it to his brother and

4    said the obvious thing, This is shady.  But that requirement,

5    the tell-your-boss rule, was exactly what Kent Thiry demanded.

6    And the purpose of that requirement was to keep DaVita

7    employees at DaVita and make it harder for them to leave.  And

8    that's exactly how it worked out for Elliot Holder.

9             Government Exhibit 226, you saw how he made the only

10   decision he felt he could, and he withdrew from consideration

11   from a job they wanted to offer him, but it never got that far.

12   And isn't that the conspiracy working exactly as Kent Thiry and

13   DaVita intended?  They blocked an opportunity for Elliot

14   Holder, and they got to keep him at DaVita without having to

15   compete for him, without having to respond to any competing

16   offer, and without giving Elliot Holder the choice to decide

17   for himself.

18            Make no mistake, this wasn't just Elliot Holder.  You

19   saw more stories of stolen opportunities throughout this trial.

20   You saw opportunities taken away from Craig McKessar and Jordan

21   Thau.  This was in Count 1, the SCA count.  These were DaVita

22   employees who were being recruited for SCA positions by Russell

23   Reynolds, one of the recruiting companies you heard about.  But

24   you saw what happened as soon as SCA learned that these were

25   DaVita employees.  Bridie Fanning writes, "This is a no-go.  We

1574

 1   must not under any circumstances be contacting people at

 2   DaVita."  Government Exhibit 100.  And you see Russell Reynolds

 3   following those instructions, turning off Craig McKessar and

 4   Jordan Thau from DaVita.  Those opportunities were taken away

 5   from them; and for Kent Thiry, that's mission accomplished.

 6        And take a look at Government Exhibit 278.  Even after

 7   being turned down, Craig McKessar made another pitch for

 8   himself.  He wanted the job, and he wanted to reopen the

 9   opportunities.  And look at what Bridie Fanning says, "If he

10   can get his leader's permission to pursue SCA, then fine.

11   Otherwise, no.  DaVita is a no-go for us."  That door stayed

12   closed.

13        You saw another stolen opportunity with Andrew Kay,

14   Government Exhibit 83.  He was a DaVita employee interested in

15   a job at SCA.  He even reached out to an SCA employee to offer

16   to share his resumé and to try to learn more.  Now, the

17   defendants asked some questions and suggested that Andrew Kay

18   didn't really want to move jobs.

19        Take a look at this email, because it's pretty

20   clear.  He writes, "I would like to explore opportunities."

21   And that was his right.  And if DaVita and Kent Thiry followed

22   the law, if there was no conspiracy, he would have been allowed

23   to explore those opportunities.  But as soon as SCA saw that he

24   worked at DaVita, that was it.  The process stopped, and Andrew

25   Kay was told he could not be considered.  He couldn't explore

1   those opportunities.

2           And Bridie Fanning told you why.  Andrew Kay couldn't

3   be considered because Kent Thiry and Andrew Hayek had a

4   CEO-to-CEO deal not to recruit each other's senior executives.

5   You see Dr. Fanning's response to Andrew Kay, SCA would not

6   recruit from DaVita.  And she talked to you about this email.

7   She told you that she chose her words carefully here.  She

8   writes, "We have a company policy that we don't recruit from

9   our clients and strategic partners."  And she told you why she

10  said that, because she didn't want to tell Andrew Kay the full

11  story, that Kent Thiry and Andrew Hayek had a hands-off

12  agreement.  She told you she tried to dress it up, she tried to

13  put it in business terms, because she knew it would be obvious

14  how wrong it was if she told Andrew Kay the full truth, that

15  SCA and DaVita had a backroom deal not to solicit each other's

16  employees.

17          And part of what makes these conspiracies so

18  underhanded is that the employee often never knows that they're

19  blocked from receiving a job opportunity.  Think about how

20  these conspiracies worked.  They stopped recruiting calls and

21  emails.  So the employees didn't get solicited, they didn't

22  get calls saying, We want to hire you, We want to interview

23  you, We think you'd be a great candidate.  Those calls were

24  never made.  And make no mistake, those calls can be life

25  changing.

1          Andrew Hayek told you in this case about his own

2    experience of a recruiting call that changed his life, that

3    gave him the opportunity to be a CEO.  But once he had his

4    opportunity, you saw how he turned around and conspired with

5    Kent Thiry to block opportunities from their employees.  So you

6    see one set of rules for the CEOs of these companies and

7    another set of rules for everyone else.

8          Remember how Elliot Holder told you, he had no idea

9    why RAD Partners was insisting he tell his boss first.  That's

10   exactly the point.  That's why these conspiracies were so

11   nefarious, because when an employee would start at DaVita, no

12   one told them about these conspiracies.  No one told them their

13   job opportunities would be limited.  Kent Thiry didn't tell his

14   employees that when one of them would receive a job offer, he'd

15   just call up one of his CEO buddies and try to make a backroom

16   deal.  And because he didn't tell his employees about it, the

17   employees never know when they're cheated out of a job

18   opportunity.

19         Remember the testimony of Bridie Fanning.  She told

20   you that when she worked at SCA, DaVita would have been one of

21   the top three companies she would have targeted to recruit

22   from.  But because of the conspiracy, she wasn't allowed to, so

23   she didn't.  Kent Thiry and DaVita stopped those calls from

24   being made.

25         And you heard similar testimony from Jeff Lombardo.

1577

He was a recruiter for RAD Partners.  He told you he would have

recruited more employees from DaVita to RAD Partners, but he

was told not to, and he didn't.  Kent Thiry and DaVita stopped

those calls from being made, too.

You saw how Kent Thiry cheated employees in Count 2,

as well.  This is Government Exhibit 136.  This is

February 2018.  And Josh Golomb writes to Kent Thiry, "I took

our conversations last year to heart.  Although there have been

four people that have reached out over the past year to probe

about opportunities, I have not pursued those conversations."

And there you see Josh Golomb underlining the stolen

opportunities that are at the heart of these conspiracies.  And

Kent Thiry got exactly what he wanted, DaVita employees to stay

at DaVita without competition from Hazel.

You saw more instances of employees being blocked from

job opportunities before the process even started.  You saw

text message after text message from Josh Golomb showing more

stolen opportunities.  Government Exhibit 130, Josh Golomb

writes, "Do you know any former RFPs not at Rx today?"  And you

heard that Rx was a reference to DaVita.  Government

Exhibit 134, Josh Golomb again, "Please let me know if you

think of any great folks, nobody currently at DaVita."  And

Government Exhibit 132.  Josh Golomb's trying to recruit

customer service employees, and he says, "Nobody at Rx today,

promised Kent."

1          That's the conspiracy in action.  Those are examples

2     of employees being cheated out of job opportunities, because

3     Josh Golomb and Kent Thiry conspired to block those

4     opportunities.

5          Now let's talk about this text message for another

6     reason, because the defendants have suggested that even in

7     Counts 2 and 3, this was all about the senior executives.  But

8     you see here, Josh Golomb is writing about customer service

9     employees, not senior executives.  So it's true for Count 1,

10    Count 1 was an agreement about senior-level employees; but

11    Counts 2 and 3 refer to all employees at DaVita.  All of them

12    were off limits.

13         Same thing with Elliot Holder for Count 3.  He was a

14    mid-level analyst at DaVita.  He told you he was making $70,000

15    a year, and you heard that this conspiracy blocked his job

16    opportunity.

17         And then there is Government Exhibit 216.  This is in

18    Count 3.  This is January 2015.  Kent Thiry emails Rich

19    Whitney and asks about Belinda Reynaga.  "Did the process of

20    recruiting this person fit our guidelines?"  And Rich Whitney

21    assures Kent Thiry that he looked into it, and they followed

22    the ground rules.  She was never solicited.  And Kent Thiry

23    accepts that because she was never solicited, this is in line

24    with their agreement.

25         But this email is telling for two reasons:  First, the

1    defense tried to argue that this was all about the senior-level

2    employees.  That for Count 3, it was really about the people

3    that Anthony Gabriel and Rich Whitney knew personally from

4    their time at DaVita.  But here you see Kent Thiry enforcing

5    the agreement, making sure that a low-level recruiter wasn't

6    being recruited to RAD Partners.

7           And I mentioned a moment ago, and you heard from Rich

8    Whitney and Anthony Gabriel that this email was about Belinda

9    Reynaga.  But take a look at the subject line, "Belinda

10   someone."  Kent Thiry doesn't even know this employee's last

11   name.  So when we tell you this case is about conspiracies

12   driven by Kent Thiry's need to control his employees, this is

13   what we mean.  Even for employees whose names he didn't know,

14   Kent Thiry demanded control.  Because the simple truth is that

15   Kent Thiry didn't care about the employee's name.  He didn't

16   care about the employee; what he cared about was control.

17          So when the defense tells you that Kent Thiry was a

18   good boss, that he cared about his employees and their careers,

19   take a look back at Government Exhibit 216.  Take a close look

20   and ask yourselves whether it really seems like Kent Thiry

21   cares about the career of the person he calls "Belinda

22   someone."

23          So in count after count you saw Kent Thiry's intent.

24   His intent was to try to put up a wall around the village and

25   allocate the DaVita employees to DaVita without competition

1       from these other companies.  But you don't need to rely just on

2       the evidence from these three counts.  You know this was his

3       intent because you saw he was reaching the same agreements with

4       other companies, too.

5            You saw it with IntegraMed Fertility in Government

6       Exhibit 258, and you saw it with Spectranetics, in Government

7       Exhibit 255.  These were two more agreements along the same

8       terms that Kent Thiry sought out and entered with his

9       competitors.  And just like in the three charged conspiracies,

10      these agreements involved former DaVita executives who became

11      CEOs of smaller competing companies.  You know Kent Thiry's

12      intent because you saw how again and again, whenever he had

13      influence, he used that influence to get his competitors to

14      agree to hands-off agreement for his employees.  These

15      agreements were all the same because they were all coming from

16      the same place and from the same person, DaVita and Kent Thiry.

17           Dennis Kogod told you about Kent Thiry's purpose, too.

18      Now, the defendants tried to say that Dennis Kogod felt like

19      the odd man out at DaVita because he didn't have an Ivy League

20      education.  But you saw that for years, he was Kent Thiry's

21      right-hand man.  And Dennis Kogod took you inside the walls of

22      the village.  He told you about each of the conspiracies in

23      this case, and he told you about Kent Thiry's purpose.

24           And there were some broken promises from the

25      defendants about Dennis Kogod.  Now, they have no burden in

1   this case and they didn't need to make an opening statement;

2   but DaVita in their opening statement told you that you'd see

3   that Dennis Kogod lied under oath.  You didn't see that.  They

4   told you that you'd see that Dennis Kogod had a personal

5   vendetta again Kent Thiry, and you didn't see that either.  But

6   this testimony was crystal clear.  He told you that these

7   conspiracies were all driven by Kent Thiry's need for control,

8   his need to control his employees and whether, when, and how

9   they left the village.

10          And he told you what the tell-your-boss rule did in

11   practice.  He told you it had a chilling effect.  It shut

12   people out of the process.  And he told you that these

13   agreements had nothing to do with business deals, not in the

14   case of SCA, and not in the case of Hazel or RAD Partners

15   either.

16          So let's take a moment on the business deals.  Does

17   anyone really believe this cover story that it was all about

18   business deals?  You saw evidence of three charged

19   conspiracies, and you saw other agreements, all along the same

20   lines, all organized by the architect, the mayor of the village

21   himself, Kent Thiry.  And for a grand total of one of those

22   companies were there ever any real business deals.  That was

23   SCA.  And that relationship only materialized years after they

24   made the gentlemen's agreement.

25          And the witnesses told you -- you see the testimony

1    here -- for count after count, these agreements were not part

2    of any business deals, and they were not necessary for any

3    business deals.

4            So you need to ask yourselves, why did Kent Thiry do

5    this with so many companies, almost all of which he had no

6    business deals with?  And why would a CEO like Kent Thiry, who

7    knows how to write a contract, why wouldn't he write this down

8    in a real contract?  If this was all above board and

9    legitimate, wouldn't he want the certainty of a written

10   enforceable contract?  He didn't put these in contracts because

11   he knew what these were.  These were backroom deals.  Don't

12   take my people, and I'll introduce you to some senators, some

13   CEOs, some other people that can help you.

14           Let's talk about what the defense brought before you

15   in this case.  The defense has asked you to set aside the

16   testimony of the people who entered these conspiracies --

17   Andrew Hayek and Rich Whitney.  They've asked you to set aside

18   the testimony of these people who learned about these

19   conspiracies and enforced them -- Dennis Kogod, Michael Rucker,

20   Bridie Fanning, Anthony Gabriel.  And they want you to set

21   aside all the documents, the documents that spelled out what

22   these conspiracies were and the documents that showed you these

23   conspiracies in action.  They want you to ignore all of that

24   evidence and buy their million dollar story, the story of their

25   hired expert witness, the hired witness who with a 25-person

```
 1   team and over 5,000 hours and a million dollars spent was able
 2   to find a grand total of one employee who left DaVita for SCA
 3   during the conspiracy and exactly zero who went from SCA to
 4   DaVita.
 5            So during this trial, you were treated to the
 6   testimony of a witness who made $1 million for every employee
 7   they saw move in Count 1.  And let's be clear about the
 8   analysis that this witness did.  This was a classic "heads I
 9   win, tails you lose" test.  He sat in that chair for $1,000 an
10   hour and told you that when you see eight employees moving
11   between the companies before the agreement and only one moving
12   during the agreement, that doesn't mean you saw any evidence of
13   suppression of competition.  And you have to ask, if one
14   employee moving wasn't enough to show suppression of
15   competition, what would zero employees be?  What would that
16   show?  That clearly wasn't enough for the hired witness either,
17   because that's how many employees he found went from SCA to
18   DaVita; and he still concluded there was no evidence of
19   suppression of competition.
20            And did he give you a straight answer on any of the
21   questions you asked him when you had the opportunity?  Of all
22   the questions he asked -- you asked, did he give a single
23   yes-or-no answer?  One question was about, what articles or
24   text books he relied on.  He couldn't answer that.  He just
25   talked around it for ten minutes.  You also asked him whether
```

1584

1    it was possible that one explanation for the change in the data

2    was that there was a gentlemen's agreement.  A simple yes-or-no

3    question.  Is this one opportunity?  Is this one possible

4    explanation?  He couldn't answer that for you either.  For

5    $1,000, he couldn't give you a simple yes or no to that

6    question.

7            But it doesn't matter, because you don't need a Ph.D.

8    economist to tell you whether there was a conspiracy in this

9    case.  You just need to look at the documents.  You don't need

10   50 slides on the scientific method, because they wrote it down.

11   You saw it spelled out in the emails; you heard it from the

12   witnesses in the room who entered these agreements.  And you

13   can rely on those emails; you can rely on that testimony.

14   Because this case isn't about data; it isn't about some charts

15   and graphs made by the million-dollar man; it's about people,

16   workers.  Real people like Elliot Holder, Craig McKessar, and

17   Jordan Thau who had their job opportunities taken away.

18           And the hired economist didn't measure that.  He

19   didn't even try.  You asked questions about how the effect of

20   the agreement on employees impacted his analysis.  He basically

21   told you that it didn't.  He didn't think about it.  And if an

22   employee doesn't get recruited, that doesn't show up in the

23   hired witness's charts and graphs; but it affects people's

24   lives.

25           The third and final element requires that the

1    conspiracy occurred in the flow of or substantially affected

2    interstate trade or commerce.  That's an easy one.  The

3    companies are in interstate commerce, operating across the

4    United States, with employees all over the country.  DaVita

5    itself is in 45 or 46 states.  You heard that DaVita is based

6    right here in Denver, Colorado; SCA was based in Birmingham,

7    Alabama and Deerfield, Illinois; Hazel Health was based in

8    San Francisco, California; and RAD Partners was based in

9    El Segundo, California.

10        There is no reasonable doubt that these conspiracies

11   involved interstate commerce, the movement of people or funds

12   across state lines.  They prevented employees from moving from

13   one job to another at a number of national companies with

14   offices across the United States.  And DaVita and the other

15   companies had to pay these employees, so those are funds in

16   interstate commerce.

17        In a few minutes I'll sit down, and you might hear

18   some arguments from the defendants, and then from my colleague

19   Ms. Clingan with some final remarks.

20        I want to discuss one more document before I wrap up,

21   Government Exhibit 8.  This is an email from Kent Thiry to

22   Andrew Hayek.  It's from 2008.  That's before any of the

23   charged conspiracies, but it's important.  It's important

24   because it's Kent Thiry in his own words.  So you should read

25   it carefully.  You should take a close look at this document

1    back in the jury room, because Kent Thiry tells you his purpose

2    very clearly.  He's talking about competing for employees, and

3    he writes, "Where does it stop?  The best people have the best

4    people, so are we all going to make each other's lives more

5    difficult than they are?"  And he writes later in the

6    paragraph, "I have competitors where we have basically stopped

7    going after each other's people because it is a lose-lose."

8           And what he's saying is that competition for employees

9    is bad for the CEOs, so let's put a stop to it.  Why bother

10   competing when we can just cheat?  Because employees having a

11   choice to change jobs of their own free will was a lose-lose

12   for the CEOs.  But competition is not a lose-lose for the

13   employees.  Competition is good for employees.  It gives them

14   choice; it gives them opportunities.  But employees having

15   those opportunities was bad for Kent Thiry and his CEO friends,

16   so they put a stop to it.

17          This is the origin story for these crimes.  This is

18   the philosophy that underlies every agreement you saw Kent

19   Thiry reach in this case.  He saw competition as a lose-lose,

20   so he stopped it.  And he knew exactly what he was doing.

21          This is that same email chain, Government Exhibit 8.

22   Again, it's Kent Thiry to Andrew Hayek.  And he writes, "There

23   are contracts and free markets, and there are relationships."

24   The free market or relationships.  That's how Kent Thiry would

25   coerce his competitors into reaching these agreements, because

1587

1   a relationship with Kent Thiry opened doors for these men.  It

2   opened doors to investments, to recommendations, to senators,

3   even.

4         Kent Thiry was at the top of the healthcare industry,

5   and this is how he wielded his power, to force his competitors

6   to choose between a relationship with him and all of the

7   benefits that brought over free market competition.  This was

8   about suppressing that competition.  That was the purpose.

9         Members of the jury, the United States has proven

10  every element beyond a reasonable doubt.  This has been a long

11  trial; but at the end of the day, this is not a very

12  complicated case.  It's a case that may be about things that

13  sound complicated -- employee allocation, nonsolicitation,

14  interstate commerce -- but at its core, this case is about

15  companies that were competitors for employees who conspired not

16  to compete.  It's about the CEO, Kent Thiry, who so badly

17  wanted to control his employees that he orchestrated conspiracy

18  after conspiracy to prevent those employees from being

19  recruited; and it's about the loss of competition and the

20  stolen opportunities that resulted from those conspiracies.

21  And those stolen opportunities matter.  Because, ask

22  yourselves, what gives these powerful CEOs the right to decide

23  whether their employees even get those job opportunities?  What

24  gives them the right to take away their employees' choice and

25  privacy in their job search?

1        They don't have that right, but they did it anyway.

2   And that's why we're here, because it is a crime for

3   competitors to get together and choose not to compete for each

4   other's employees, to come to that agreement.  We know that

5   you'll follow the judge's instructions and apply the law to the

6   facts that have been proven throughout this trial.  And when

7   you do that, you'll find that there is only one outcome in this

8   case:  That the defendants are guilty on all counts beyond a

9   reasonable doubt.

10        Thank you.

11        THE COURT:  All right.  Thank you.

12        How about you folks, would any of you like a break

13  before we continue?  No?

14        JUROR:  Let's roll.

15        THE COURT:  Mr. Dodds.

16        MR. DODDS:  Your Honor, may I just try to turn this

17  just slightly so I can face the jury a little better?

18        THE COURT:  You bet.

19        MR. DODDS:  Thank you.

20        THE COURT:  You don't have to stand behind it if you

21  don't want to.

22        MR. DODDS:  I'm sure I'll start roaming around a

23  little bit, Your Honor.

24        THE COURT:  If you do, just keep your voice up.

25                        **CLOSING ARGUMENT**

1          *MR. DODDS:*  Yes, sir.

2          May it please the Court, counsel for the Division,

3    members of the jury.

4          You may recall what when I stood before you a little

5    over a week ago, I started by telling you the things that we

6    did not dispute:  That Kent Thiry behaved badly.  That he

7    reacted badly when people that he promoted, mentored, helped to

8    get a job in other companies used DaVita as a source for

9    executive talent for those companies.  He reacted to that

10   badly.  And they had to react to his reaction and find a way to

11   placate him, a way to mollify him; and they did try to do that.

12   And you heard an awful lot during this trial about that being

13   what they were trying to do.  You heard words like that,

14   placate, mollify, things like that, calm him down.  Okay.  We

15   disputed none of that, and we dispute none of that now.

16         And as Mr. Mariano said, I stood up and I said, what

17   they were trying to do was find a way to continue to compete,

18   to continue to do their jobs running their companies without

19   hard feelings, without having to deal with his anger.  I did

20   say it.  I said it repeatedly, and I stand by it, because that

21   is what they were trying to do.

22         Now, I admitted all of that for two reasons.  One,

23   because I did not want to waste your time, and I did want to

24   insult your intelligence.  Two, because I wanted to get to the

25   heart of this case, to the pivotal question -- the pivotal

 1    factual and legal question on which your verdict in this case

 2    is going to rest.

 3         And that question is not whether Kent Thiry behaved

 4    badly.  He did.  It's not whether employees should have been

 5    made to feel like they had to get an okay from their boss or

 6    tell their boss they were in the job market.  They should not

 7    have had to do that.  It's not even whether individual people

 8    in individual circumstances, depending on the choice they made

 9    under this circumstance in which they should not have been put,

10    we admit, may have been affected by it.  Some were.  Others, as

11    you've heard, and as we'll talk about, were affected

12    positively.  We dispute none of that, and it's not about any of

13    that.

14         And it is certainly not about whether any of this

15    looks or feels good, because it sure doesn't.  It looks and

16    feels bad.  Anybody looking at this set of facts would have

17    that reaction, and that's what -- mostly what Mr. Mariano just

18    talked about.  His closing argument was long on rhetoric, long

19    on outrage, short on evidence.  Well, in a little while, we're

20    going to turn to the evidence, and I'm going to walk you

21    through the evidence very carefully against the essential

22    elements on which you're going to have to decide very

23    carefully, because that's what you're here to do.

24         You are not here to decide whether this should have

25    happened or shouldn't have happened, whether it was fair or

1591

1       unfair, whether active solicitation is the best way to recruit,

2       and if you cut that off, there is no other way.  We've heard

3       there are lots of ways to recruit.  You're not here to

4       determine any of that.  But that's the way the government

5       presented its case, and that's the way Mr. Mariano just argued

6       the case, as if those are the questions that you've taken the

7       oath to decide.  As if their belief that Kent Thiry is a bad

8       guy who hurt people justifies indicting him and the company he

9       used to run, as if it justifies you convicting him or

10      convicting DaVita, and as if it justifies how they have gone

11      about trying to get you to do that very thing.

12              One of the things that you've seen, if you've seen

13      nothing else during the course of this trial, is the power that

14      sits on this side of the room.  Sure, we have lots of lawyers,

15      and we have high-paid experts, and all of that stuff; but no

16      one has the unilateral power that sits on this side of the

17      room.  The power to decide when nonsolicit, noncompete

18      agreements -- which you have heard again and again, including

19      from their star witness, Bridie Fanning -- Dr. Fanning -- are

20      commonplace.  The power to decide which of those get indicted

21      and which of those do not.  The power to collect, preserve, and

22      present evidence, to decide who they're going to talk to and

23      who they're not going to talk to, to decide who they're going

24      to listen to and who they're not going to listen to, to decide

25      whose interviews they're going to record and whose interviews

1592

1   they're not going to record, to decide who to accept as telling

2   the truth and who to just decide is not telling the truth, to

3   decide what evidence to present and, as I think you saw and we

4   will talk about, the other day when Agent Hamel testified, what

5   evidence to simply choose not to show you.  The power to do all

6   of that.

7          The power to decide who gets prosecuted and who

8   doesn't, who gets immunity and leniency and who doesn't, who

9   ends up sitting here instead of sitting there, and then hearing

10  like His Honor, Judge Jackson said to witness repeatedly during

11  this trial, "You're free to go."  The power to try to do that

12  by simply having someone come in and read documents written by

13  and about people they don't even have the decency to bring in

14  here and talk to you, to read these documents to tell you what

15  they suggest they mean without calling the witnesses to talk

16  about it themselves.  And to put some of those documents on the

17  screen here today, like the document that they showed you

18  involving Bill Hughson.  And we know from Agent Hamel's

19  testimony the other day and Juanita Brooks' cross-examination

20  of him, that they interviewed Bill Hughson, and he said that he

21  could recruit anybody he wanted from DaVita.  That they

22  interviewed Steve Priest, and told them that that email was

23  all about not running into trouble under his own legal

24  contractual nonsolicit agreement.

25          They have the unilateral power to make those

 1   decisions, to slice and dice the truth in an effort to do what

 2   Mr. Mariano just tried to get you to do:  Make you angry and

 3   hope that your outrage at the behavior you saw here would be

 4   enough to distract you from your duty.

 5        Well, we know, ladies and gentlemen, that you're not

 6   going to do that, because we've seen how carefully you've paid

 7   attention.  And we have certainly seen from your questions how

 8   careful and analytical you have been.  And the duty that you're

 9   going to embark on when you deliberate is going to call on that

10   very skill, that very interest, that very diligence, to be

11   analytical, to look at the evidence -- not the rhetoric, not

12   the anger -- the evidence against the elements and the law as

13   Judge Jackson has told you.  Because when you do that -- when

14   you apply the evidence to the law dispassionately, that is how

15   justice is done.  Not by sending signals, not by giving

16   messages, not by punishing someone that they think is a bad

17   guy, but by following the evidence and the law.  In this

18   courtroom, that's how justice is done.

19        Now, that brings us to the heart of this case, the

20   pivotal question on which your verdict here will rest.  This

21   question:  Whether all of this drama, all of this

22   unpleasantness, all of this bad behavior amounted to evidence

23   that the government has proved beyond a reasonable doubt what

24   they have to prove.  That all of this, all of this mess, were

25   market allocation conspiracies in violation of the Sherman Act.

1   And that is a very specific, particular statute that has very

2   specific, particular elements.  We embrace them, and we want

3   you to look at them very, very carefully.  So let me start by

4   walking through some of them.

5           And you've already seen these.  They're in your

6   instructions.  I'm going to at least try not to dwell on them

7   for too long, but just to sort of set the discussion of the

8   evidence we're going to have in a few minutes.

9           This is Instruction No. 13, the government has to

10   prove beyond a reasonable doubt that these conspiracies that

11   they have charged existed on or around the dates that are

12   charged and that you'll see in the instructions.  And that

13   those were conspiracies, in Count 1, to allocate the market for

14   senior executives of DaVita and SCA; and in Counts 2 and 3, to

15   allocate the market for employees of DaVita.  And then, second,

16   that the defendants did so knowingly -- that they knowingly

17   entered the conspiracy with the purpose of allocating the

18   market with respect to that conspiracy.

19           And when you sit down and go through this, you can

20   chunk it out and follow it through, because there are

21   additional instructions that explain what those mean.  A

22   conspiracy to allocate the market requires that the government

23   prove beyond a reasonable doubt that whatever agreements or

24   understandings were entered into were entered into with the

25   purpose of unlawfully allocating the market -- and this is

 1   important, because it's where the rubber meets the road -- by

 2   ending meaningful competition.  Ending meaningful competition.

 3   Not slowing it down, not making it harder, not making it more

 4   complicated; ending meaningful competition.

 5          And you have been instructed and you'll see in the

 6   instructions that you may not find that a conspiracy to

 7   allocate the market existed unless you find that the alleged

 8   agreements or understandings sought to end meaningful

 9   competition for the services of these employees.  To end

10   meaningful competition.

11          And then you'll be instructed on what "knowingly"

12   means, because they have to prove beyond a reasonable doubt

13   that the defendants entered into these agreements knowingly --

14   and that is, with the purpose of allocating the market,

15   applicable to that conspiracy.  And "knowingly" means

16   voluntarily and intentionally, not because of mistake or

17   accident.  The question here is, not how can what they did then

18   be characterized now?  The question is, what did they

19   understand they were doing then?  Because unless all of the

20   alleged conspirators -- Kent Thiry and Andrew Hayek, Kent Thiry

21   and Josh Golomb, Kent Thiry and Rich Whitney -- understood and

22   the evidence proved beyond a reasonable doubt that they

23   understood at the time that what they were trying to do was end

24   meaningful competition, your verdict must be not guilty.

25   That's the heart of this case.  That's the pivotal question

1    that you have to answer in order to render your verdict here.

2         One of the things that you have heard about during the

3    course of this trial is how all of this actually worked in

4    realtime, in the marketplace.  And there are arguments on both

5    sides about the effects and the impacts that these discussions

6    had.  But this instruction is also critical:  Evidence of lack

7    of harm or of pro-competitive benefits may be relevant to

8    determining the very thing that you have to decide, whether the

9    defendants entered into an agreement with the purpose of

10   allocating the market.  Senior executive in Count 1 and other

11   employees in Counts 2 and 3.

12        In other words, you have to know you're doing it at

13   the time you do it.  You can't do something thinking you're

14   doing something else, that you're trying to accomplish some

15   other goal, you have some other purpose or intent, and then

16   come in later and have the government say, aha, you actually

17   allocated the market.  This is not how this works.  It can't be

18   how this works.  That's the pivotal question here; that's what

19   you have to decide.

20        Now, before we start turning to the evidence, let me

21   talk a little bit about my client, DaVita.  And I don't think I

22   have to say this to you good folks; but in good conscience, I

23   have to say it.  There is a natural tendency for many people --

24   sometimes even me -- to think, well, it's a corporation; it's

25   not a person.  What does it care?  It's huge.  It's got lots of

1    money.  This doesn't really matter.

2            Well, ladies and gentlemen, I know you know better.

3    But you've heard about this company throughout this trial, and

4    you have certainly heard about some bad and undesirable

5    behavior by its former CEO.  But from every witness who has

6    testified, each of the government's witnesses who worked at

7    DaVita or work at DaVita, they talked about the village, which

8    the government likes -- is a term the government likes to mock.

9    It is a little strange.  It's not common.  Most businesses

10   don't call themselves things like that, but this business does

11   and has for a long time.

12           And it is a village that is made up of good women and

13   men like yourselves who go to work every day, wanting to do the

14   right thing just as much as you do.  It is a village made up of

15   people -- and you've heard this in the evidence -- who are

16   mission focused -- who are focused on the core value of the

17   DaVita village -- patient first, community first, living those

18   core values, and that their mission is caring for some of the

19   most vulnerable, sickest patients and neighbors we have.  And

20   it matters to them a great deal.  Your decision here matters to

21   them a great deal, and it has real consequences.

22           And I know you know that; but in good conscience to

23   the company for which I speak, I had to say it.  But I know you

24   know.

25           Now, let's start talking about the evidence itself.

1598

 1    There are two sources of evidence that you've heard here,

 2    documents and testimony.  Now, you can take all of these

 3    documents, including the ones that Mr. Mariano showed you, and

 4    you can search them until your eyes get bloodshot, and you will

 5    not see anything in them that suggests that any of the authors

 6    of the documents or the recipients of them remotely thought

 7    back then that what they were doing was trying to allocate

 8    employees, trying to allocate a market, trying to end

 9    competition.  You'll see a lot of bad language, but you will

10    not see that testimony.  I'm going to focus mostly today on the

11    testimony that you have heard.

12         Now, in the prosecution's opening, they said that you

13    wouldn't hear any of their witnesses come in and say -- use the

14    word "allocation," because nobody talks like that.  Fair

15    enough.  Fair enough.  But if you indict and place the futures

16    of a man and a company in the balance, don't you have the duty

17    to ask the very simple question, if it's true, and that is:

18    Was it your purpose and intent to end meaningful competition?

19    Was it your purpose and intent to end meaningful competition?

20    That's the question you are going to be charged with answering.

21    Wouldn't it just make sense to ask the people who they brought

22    here, who they alleged were trying to do that if, in fact, that

23    is what they were trying to do?  A yes-or-no question.

24         But when you remember the testimony -- and we'll talk

25    about it -- with every one of the supposed co-conspirators --

1599

1     Mr. Hayek, Mr. Whitney -- you didn't get to talk to Mr. Golomb,

2     and we'll come back to that -- they asked questions all around

3     the pivotal question that you're going to be asked to decide,

4     but they never asked the actual question.

5           On cross-examination, the government's own witnesses

6     said what their purpose was.  And not one of them said that

7     their purpose was to end meaningful competition or anything

8     like that.  In fact, they said exactly the opposite.  And,

9     ladies and gentlemen, there is reasonable doubt on that basis

10    alone.

11          I want to talk a little bit about what I mean when I

12    say "reasonable doubt."  You have this instruction, you've

13    heard it from Judge Jackson, but that's the government's

14    burden:  Proving the defendants guilty beyond a reasonable

15    doubt.  And if it fails to do so, you must -- even if you're

16    angry and hate doing it -- and especially if you feel that way,

17    because that's when focusing on your duty is most important --

18    you must find them not guilty.

19          And he explained, and you have in your instructions

20    what reasonable doubt means.  But what it means at bottom is,

21    what is in the underlying sentence in this instruction.  If you

22    think there is a real possibility that the defendant is not

23    guilty, you must give him the benefit of the doubt and find him

24    not guilty.

25          Now, let's talk about Mr. Lombardo, because before I

1  get to the evidence, I want to talk about two things -- and

2  just try to get them off the table so we can get to the

3  evidence.

4          Mr. Lombardo came in, and Mr. Lombardo is an

5  experienced recruiter.  Human resources is his business.  And

6  you'll remember that on cross-examination, he was asked how he

7  reacted when he got the subpoena from the government or an

8  email from the government and he wondered what all of this was

9  all about.  And he was asked this question:  "When you were" --

10  and remember that the government asked him about an email

11  that he got from Radiology Partners saying, basically, to take

12  DaVita off of his recruiting list.  That's what they asked him

13  about.

14          And he was asked, Well, how did you react back then

15  when you saw that email?  And he said, "Well, I wasn't

16  familiar with the rules that I have come to learn in the last

17  couple of weeks or months."

18          And then he was asked again, So you did not think it

19  was improper?  And his answer was, "I made the assumption that

20  he was asked to take DaVita off of his recruiting list out of

21  respect, because leadership from DaVita had moved to Radiology

22  Partners.  That was my assumption."

23          The question was asked again, Did you think it was

24  improper?  "I didn't think about it one way or the other."

25          And that brings us back to what this case is all

1   about.  What did they understand then?  The man who makes his

2   living in HR back then gets an email that says, take DaVita off

3   your recruiting list and thinks -- in fact, doesn't think about

4   it at all.  Only now that this case has been brought is he

5   starting to wonder whether there is some rules that he

6   violated.

7           So what does he do?  You heard this testimony.  He

8   asked the lawyers from the antitrust division to help him

9   understand this, the lawyers who have charged us with crimes

10  for this very thing.  And he's asked this question:  "You asked

11  the FBI agent and the attorneys for the antitrust division just

12  a month ago or so for advice on how to handle clients who asked

13  you to put certain companies off limits for recruiting."

14          And he gives an answer.  And he says again, "As I

15  previously said, was it improper that they -- Radiology

16  Partners -- asked that.  I didn't give it any thought.  I would

17  want to know what's improper and not improper in the future, I

18  liked to be educated."

19          And Mr. Melsheimer asked, "Well, you're learning that

20  from the government; is that fair?"  The government who tells

21  you that this was illegal.

22          What did they say to him?  "They were very clear that

23  they can't give me any sort of counsel or advice.  They were

24  very direct and clear that they're not meant to be sources of

25  information or to provide anything and that if I needed to

1  learn more, I could just go learn more."

2          If that's the state of play now, what was in the minds

3  of the people back then?  And when you look at the evidence,

4  you will see that whatever was in their mind, none of it had to

5  do with allocating the market, none of it had to do with ending

6  competition.

7          Now, let's talk about this tell-your-boss rule.  Now,

8  that's not in the evidence anywhere.  Right?  There is nothing

9  that says there is the tell-your-boss rule.  That's a label

10  that they put on this, and I understand why, because it feels

11  bad.  Right?  It feels like something you shouldn't have to do,

12  tell your boss.  That's why they call it the tell-your-boss

13  rule.  But, again, let's talk about what the evidence shows

14  about that tell-your-boss rule.

15          This is the testimony -- or piece of the testimony

16  from Andrew Hayek.  And he was asked:  "Is it correct, sir,

17  that Mr. Thiry communicated to you that his purpose in pursuing

18  the agreement was to lose fewer valuable people?"

19          And he says, "For him to lose fewer valuable senior

20  executives?  Yes."

21          And then he's asked, "And to try to compete.  To allow

22  DaVita to compete to retain those people; true?"

23          Answer:  "I believe some of the references included

24  the notion that they would want to engage with that executive

25  around staying.  So, yes, to compete."

1        Mr. Hayek was asked this question by one of you -- and

2   we're going to go through a bunch more questions that you asked

3   and answers that you got, because there is all of this legal

4   talent here, and you asked some of the best questions in this

5   case, and this was one of them.

6        "In your view, was the agreement to tell your boss

7   essentially the same as getting permission, or do you see it

8   differently?"

9        And his answer to a question from one of you:  "I

10  never thought of it as getting permission.  I thought of it as

11  an audit mechanism or a way to confirm and validate that the

12  person was looking anyway."

13       And then a follow-up question was, "Well, if it wasn't

14  permission, how would you describe it?  Giving approval, a

15  required step in the process, or something else?"

16       "Your Honor, I would think of it as a required step in

17  the process."

18       Part of the process.  It didn't end competition,

19  allowed it to continue, but with another step in the process.

20       This is Michael Rucker on cross-examination.  And I

21  asked him the question -- because, remember, we were talking a

22  bit about Jung Lee and how about this notice provision or what

23  they called the tell-your-boss rule applied to Jung Lee.  And I

24  asked whether the purpose of that provision as he understood it

25  was to allow whichever company was being recruited from to try

1   to compete to try to keep the company employee.  He said that

2   was correct.

3          Richard Whitney.  Now, remember, Mr. Whitney was the

4   one who put the word "or" in the provision.  Right?  Let your

5   boss know, or just represent to us that you're thinking about

6   leaving, that you're looking for another job.  Why did you put

7   that in there?  "Because I wanted it to be clear that what I

8   was suggesting was either/or."

9          So not that they had to do both, but that the employee

10  has to be actively pursuing other opportunities, and they have

11  to tell their boss, or the other thing; is that fair?

12         Yes.

13         Certainly, as to Radiology Partners, there was no

14  tell-the-boss rule in the ground rules that they say were the

15  conspiratorial agreement.

16         This is another question from you -- one of you -- to

17  Mr. Whitney:  "If a DaVita employee reached out to Radiology

18  Partners about a job opportunity, did Radiology Partners ask

19  the DaVita employee to tell their boss or if they were looking

20  at other companies?"

21         The answer was, "No, because if the person reached out

22  to us, that was clearly evidence that they were considering

23  opportunities outside of DaVita."

24         Which as you heard from the testimony again and again

25  was the whole point, to make sure that you were talking to

1    people who were otherwise inclined to leave.

2            Anthony Gabriel, another question from one of you.

3    "How would one show that they were interviewing?  How would

4    someone you were talking to show that they were interviewing

5    somewhere else?"

6            Answer:  "Just ask them."

7            And yet another question from one of you:  "What was

8    the purpose of the tell-your-boss requirement," to Anthony

9    Gabriel.

10            "To give an opportunity to DaVita to be able to

11    rectify any problem that might exist with that person's role --

12    that employee's role.  If they were unhappy about their pay,

13    something about the type of work they were doing, that their

14    boss would have an opportunity to address that."  To compete.

15            Now, Mr. Mariano may not see it that way; but this is

16    the evidence.  And the witnesses at that time did see it that

17    way.  And what someone thinks now, Mr. Mariano or anybody else,

18    doesn't matter.  It's what they thought then.

19            And even Agent Hamel when he was cross-examined about

20    whether transparency in your -- with respect to your career

21    plans and your job satisfaction was part of the DaVita culture.

22    Are you aware that DaVita has that same policy of encouraging

23    their employees to be open in discussing their future at the

24    company; right?

25            Well, he said, I don't know if it's a policy.  But,

 1    generally speaking, yes, I understand that was encouraged.

 2          And he is asked the question, whether this gives

 3    DaVita an opportunity to compete in a meaningful and fair way

 4    to try to keep their employee?

 5          What he said was, Well, yes, but they could also do

 6    that if they waited till they got an offer.  "I think DaVita's

 7    ability to present other opportunities to that employee are

 8    there whether or not that conversation happens early or it

 9    happens late."

10          Well, ladies and gentlemen, if that's what this case

11    comes down to, that's reasonable doubt.  Because the Sherman

12    Act does not say, Thou shalt wait to compete until Special

13    Agent Hamel or anybody else thinks is the right time.  It is

14    clear from the testimony of the people at that time that this

15    was about competition.  It was about giving DaVita the ability

16    to compete.  It may have been the wrong way to do it; it may

17    have been a messy way to do it; but the question is, what was

18    the purpose of it?  And that's what the purpose of it was.

19          Now, I want to, if we can, deviate a little bit to

20    touch on a couple documents that Mr. Mariano talked about that,

21    frankly, I didn't think he would.  And I'll explain why in a

22    second.

23          Government Exhibit 338, please.

24          This is the internal email that Mr. Mariano focused

25    on and that the government focused on in the testimony, where

1607

```
 1   Mr. Thiry says --

 2            And if you want to highlight in that middle paragraph

 3   that begins, "I don't think this is the right system."  Just

 4   highlight the whole paragraph for me, please.

 5            Okay.  They focused on the language, "It will not work

 6   to tell people to talk to their bosses.  Too many won't."  And

 7   said aha, that tells you that that was his purpose in this

 8   tell-your-boss rule.  Well, when you go back and deliberate,

 9   I'm going to ask you to take this document and look at

10   carefully, GX338.  Read the whole document, and you'll see

11   exactly what it's about.  In fact, you can see it from the "re"

12   line.

13            Can you highlight that, please.

14            "Please let me know if you are talking to anyone about

15   joining Paladina or Rx from any other part of the company."

16   And this email involved Josh Golomb, who at the time was the

17   president of the two DaVita business units that are being

18   talked about here, Paladina and DaVita Rx.

19            And this document is all about a very simple, very

20   common sense internal management issue, whether employees were

21   going to be wanting to move from the parts of DaVita they were

22   in -- DaVita Kidney Care, for example -- to one of these other

23   divisions.  And if so, how should we handle that so we're not

24   disorganized, so that we're not cannibalizing ourselves, and so

25   that we can run our business in the right way?  That's what
```

this email is about. It has nothing to do with what they've called the tell-your-boss rule in this case and everything to do with how to sensibly run a business.

And if you look at the language that comes after that, "It will not work to tell people to talk to their bosses. Too many won't," what does he say next? "But it is our job to be proactive, and we should think about what is best for people, who is likely to be getting stale, et cetera." Who is going to want to move? Why are they going to want to move, and how do we manage that? And he says, "We need a people services organization to help with this."

So they took this document, which is about nothing that is at issue in this case, picked out that sentence, and said, Aha. Guilty. The purpose of the tell-your-boss rule was to stop people from competing.

Let's pull up Government Exhibit 8 if we can. Let me see if I can find the language that they focused on before.

I would have planned for this if I thought they were going to --

Keep scrolling down on this. Do you want to point it out to me? Go back up, please.

You know what? I can't find it here, because, again, I can't believe that they did it. Take a look at this document when you go back in the jury room. Government Exhibit 8. They pointed to that language, most people won't tell their boss or

1    whatever that language was.  The very next sentence is, because

2    they're not really not thinking about leaving anyway.  That's

3    what it says.  It doesn't say they won't tell their boss

4    because they're going to be intimidated to do it; it's because

5    they're not thinking about leaving anyway.

6         Take the document, read it for yourselves, and decide

7    what they're trying to do here.

8         Okay.  Can we get back to the slide deck, please.

9    There we go.  All right.

10        So let's talk about the counts in turn.  Let's start

11   with Count 1.  This is the count related to SCA.  And we've

12   talked about all of the background.  You already have heard all

13   of this, about how Andrew Hayek became the CEO to take over a

14   company that was struggling, about how while it was struggling,

15   he was hiring executives from DaVita, about eight or so that

16   you heard about during the course of the testimony, including

17   from Dr. Cremieux.  And you heard about Kent Thiry's reaction

18   to that, which, again, has been vilified; but you also have

19   Andrew Hayek's reaction to that reaction as a CEO himself.

20        And he was asked on cross-examination by

21   Mr. Melsheimer, "You knew each time you hired someone that it

22   was at least possible that Mr. Thiry might be frustrated with

23   you; right?"

24        And he said, "I expected it.  Yes."

25        And then he asks him, and says, "You told the ladies

1  and gentlemen of the jury that to some extent you understood;

2  right?"

3            And he said, "I could relate.  I don't think that's

4  unusual."

5            He also said, "I knew that the team at DaVita -- not

6  all of the team, but I knew a number of the members of the

7  team.  They knew me.  So I knew a lot about DaVita, and I had

8  relationships and some level of trust."

9            And then was asked the question whether other people

10  outside of DaVita might not have that relationship, that level

11  of trust.

12            And his answer was, "That's true.  That came from

13  having worked there."

14            And at the end he is asked, "Fair to say you also knew

15  maybe who should be the people you should go after and who

16  should be the people you should stay away from?"

17            He said, "Yes.  I had my own view of who was really,

18  really good and would be a good fit and people who might still

19  be good but not be the right fit for SCA."

20            And he was also asked whether Mr. Thiry told him about

21  the objective of the agreement.  "I think what upset him was

22  losing senior executives.  And then especially so when someone

23  like me did it, who had worked there and had knowledge and

24  relationships and kind of an unfair advantage.  It felt like

25  stabbing him in the back."

1          Now, the pivot point in Count 1 is 2012.  That's when

2    the government alleges that the conspiracy started.  And the

3    focus for your analysis of the facts here is why?  What

4    changed?  Remember, that's what we talked about when I stood

5    before you then.  Something changed in 2012.  What was it?

6          Well, they can talk about what it was, but Andrew

7    Hayek told you what it was.  This is his testimony on

8    cross-examination.

9          "Is it fair to say, sir, that by 2012, you had hired

10   about all of the DaVita people that you wanted to hire at that

11   point; true?"

12         And he says, yes, that was what they were talking

13   about at the time.  "We had hired more people from DaVita than

14   anywhere else, and that there was a risk that SCA could just

15   become known as DaVita part two.  And it was important to us to

16   have our own culture and our own identity and to do things our

17   own way."

18         This case puts in -- before you the question of, why

19   did Andrew Hayek do what he did?  And as I told you in the

20   opening, there were several reasons.  This was one of them.

21   Not ending competition; not allocating anyone or anything.

22         He also told you -- and they can call it a ruse all

23   they want; but if they want to call it a ruse, they have to

24   tell you not to believe the witnesses they gave immunity to and

25   brought in to swear to tell the truth and then presented to you

1     as someone who is telling the truth.  I guess except not about

2     this.  Because if he is telling the truth about this, your

3     verdict is not guilty.

4         Here is what he said.  All the way back in 2008, here

5     is the question:  "You're just thinking prospectively that

6     you'd like someday to do business with DaVita?"

7         And he says, "Yes.  DaVita is a large company.  There

8     are parts of DaVita that could partner very well with SCA.  I

9     don't recall at this moment in 2008 how much I thought about

10    that business partnership; but I did over the, you know,

11    following couple of years."  Before that alleged conspiracy

12    even starts, this is something he wants.

13        "So at this point in 2008, is it fair to say that your

14    thinking is driven by the relationship aspect?"

15        Answer:  "Yes, I think that is fair."

16        Your thinking is driven by that.  And what was driving

17    his thinking is what this case and this count is all about.

18        He's asked the question, "Did you think that the

19    agreement with Kent Thiry would benefit SCA?"

20        The answer was, Yes.  "I think that there is a growth

21    opportunity that partnering with DaVita provided to SCA when we

22    needed growth.  There was a business relationship."

23        And that was his focus at the time that this supposed

24    conspiracy was hatched.  And, in fact, that was his business as

25    a CEO.  He told you that.  Their witness told you that.

 1   Relationships are critical.  In SCA's case -- and remember I

 2   told you this in opening, and their witness confirmed it -- the

 3   business model -- SCA's business model, the whole way he built

 4   his company -- was predicated on partnerships.  "We have to

 5   partner with people, and partnerships are based on

 6   relationships and trust."

 7        Question:  "The notion of building relationships to

 8   create business opportunities, that's a very common thing for

 9   CEOs to do; right?"

10        Answer:  "In my experience, it's one of the most

11   important things that CEOs do."

12        That was what Andrew Hayek was thinking in 2008, '9,

13   '10, '11, '12, and all the way through that alleged conspiracy.

14        And remember also -- and I want to say this because

15   the government has spent so much time trying to convince you

16   that there are victims, that with all of their resources and

17   the entire FBI and subpoena power and everything else, they

18   couldn't actually present to you except for Mr. Holder.  And

19   we'll talk about him.

20        Count 1 is all about senior executives.  All about

21   senior executives.  And Andrew Hayek told you that the

22   agreement he reached with Kent Thiry -- and you'll see the

23   testimony on the screen -- impacted senior executives, the

24   1 percent of the total employees of SCA.  And that's important

25   here.  That's important here, because the way they're paid and

1    their incentives are different.

2           So with that backdrop, here are the pivotal questions

3    for you on Count 1:  Was the purpose and intent of the

4    agreement to end meaningful competition for senior executives,

5    or was the purpose and intent to manage the way in which they

6    would compete for those senior executives in order to further

7    the shared the goal of business collaboration?

8           And you saw from all of the evidence that SCA's

9    purpose and intent was driven by business collaboration, not by

10   allocation.  SCA's entire business model was built on

11   partnering, including with DaVita.  They want to tell you that

12   this is a sham of some sort; but it's in the documents from the

13   witness that they brought here to try to prove their case.

14          And, again, there were two opportunities he was

15   focused on.  One was the opportunity involving Lifeline,

16   DaVita's vascular access center.  And he was asked this

17   question on cross-examination:  "Is it fair to say that when

18   you became the CEO of SCA in 2008" -- four years before the

19   alleged conspiracy -- "you already had in mind at least the

20   opportunity that might exist?"

21          And he said, "Yes.  I knew all about Lifeline.  I

22   shared office space with Lifeline.  My office was down the

23   hall, and I was very familiar with them."

24          And, again, testified again and again that he was

25   thinking about this opportunity with Lifeline as early as 2008.

1615

1   "Early in my SCA tenure, the opportunity to partner on these

2   vascular procedures was -- it was apparent to me and something

3   that we thought about."

4          And then you had HealthCare Partners, which DaVita

5   bought sometime in 2012, admittedly, after the government

6   alleges the conspiracy started.  But what is important here,

7   and Mr. Hayek testified to it, and the evidence in this case

8   shows it, is that SCA and Mr. Hayek were focused on and

9   interested in and wanted the opportunity to partner with

10  HealthCare Partners before DaVita even bought it.

11         This is a presentation from SCA's documents in August

12  of 2011, when they were already focused on the opportunity with

13  HealthCare Partners.  And Andrew Hayek said that when DaVita

14  bought HealthCare Partners, that was a very big deal, because

15  that could be a very, very important partner for SCA.

16  HealthCare Partners alone.

17         And he was asked this question:  "There was so much

18  potential business opportunity between SCA and DaVita that SCA

19  actually considered selling itself to DaVita at one point; is

20  that correct?"

21         "That's correct."  Because DaVita was a perfect kind

22  of partner for SCA.

23         They're saying this is a sham.  Their witness told you

24  that this was so important and so valuable that SCA thought

25  about selling itself to DaVita so that SCA and HealthCare

1    Partners could be one.

2         And we talked when I stood here before about the

3    balance between the communications between Mr. Hayek and

4    Mr. Whitney about recruiting during the alleged conspiracy and

5    the communications about these business collaborations.  And

6    they showed you -- and we'll talk about them in a few

7    minutes -- two communications between Mr. Thiry and Mr. Hayek

8    that had anything to do with recruiting during the course of

9    this alleged conspiracy.  And Mr. Hayek told you that there

10   were hundreds if not thousands of communications between the

11   two companies related to business opportunities.  That was the

12   question he was asked.

13        And the answer was, "It wouldn't surprise me that it's

14   hundreds, easily.  Thousands, quite possibly.  It was one of

15   the more common standing interactions he had."

16        And he was asked about how much time he spent thinking

17   about these recruiting issues versus how much time he spent

18   thinking about these business collaborations.  And their

19   witness gave this answer:

20        Question:  "You spent a lot more time thinking and

21   strategizing about these business opportunity issues than you

22   did with respect to any issue regarding the recruiting between

23   the two companies; is that fair?"

24        Answer:  "Yes.  Intense meetings and multiple

25   geographies and cities and traveling, and I recall the

1    recruiting coming up maybe two or three times a year.  So the

2    business was much more intense and focused."

3         And, again, back to a question from one of you, which

4    was, "What was the litmus test for defining when you and CEOs

5    decided a company should be a no-hire or a no-poach?"  Very

6    insightful question, because the why is what you're focused on

7    in your deliberations about this case, including about this

8    count.

9         And what did he say?  "There are companies that we had

10   a lot going on with, relationships that were important for

11   different reasons.  I can't say there was much more of a litmus

12   test than it seemed like the right thing to do on behalf of SCA

13   and kind of collective success.  That's how we thought about

14   it" -- that's how we thought about it -- "as we're trying to

15   save and then grow a company and, you know, survive and then be

16   successful -- for different reasons, we thought they were

17   important for doing so, to being successful."  Not, we thought

18   we could end meaningful competition.  We thought we could

19   allocate someone or something.  "We thought it was good for the

20   business and would grow the business."

21        And this comes back to the point I was setting up when

22   I reminded you that this count relates to senior executives,

23   because he was asked, again, by one of you:  "It's easy to see

24   the positive impact for both the current and potential

25   employers, but do you see any positive impact for the current

1    employee?"

2           And he says, "For senior executives, we're all

3    co-owners of the business."  We're all co-owners of the

4    business.  "Senior executives are paid based on the growth and

5    success of the business.  And when the business grows and

6    succeeds, it reflects well on their career to be part of the

7    successful company, that went from one in a very troubled spot

8    to one that was successful and growing."

9           So for the senior executives, who are the subject of

10    this count and supposedly the victims, their witness, Andrew

11    Hayek, told you that they're the beneficiaries of the decision

12    that he made.

13           Now, let's talk about the two communications between

14    Mr. Hayek and Mr. Thiry about recruiting during this alleged

15    conspiracy period.  This is the first one, which is October of

16    2014.  This is one where Mr. Thiry tells Mr. Golomb, "I do not

17    proactively recruit into your ranks."  The government says,

18    Aha, there is the conspiracy.  What they didn't show you is

19    what was happening then, because, as we said before and you all

20    know, context matters.

21           That email is on October 20 of 2014.  It is nine

22    days earlier than that they closed this deal that you heard

23    about.  The Arcadia deal.  That's what was happening at the

24    time that Mr. Thiry sent this email.  And Mr. Hayek says to

25    Mr. Thiry in this email nine days earlier, "Arcadia either

1   closed on Friday or should close early next week.  I had a good

2   call with Jim Rechtin" -- another DaVita employee -- "a week

3   ago and will be talking about the process for LA and will be

4   talking about opportunities in Vegas and Phoenix."  That's what

5   was happening.  That's the context that explains Mr. Thiry's

6   email.

7          Let's go to the other communication.  This is the one

8   from June of 2016, where Andrew Hayek forwards a LinkedIn

9   outreach to one of his SCA executives, Mr. Ellison.  And he

10  forwards it to Mr. Thiry.  And Mr. Thiry says, "Just saw this.

11  I'll check it out."  Well, what was happening then?  This is

12  June and July of 2016.  2016 is the time when SCA was looking

13  to be acquired by several different suitors, and one of them

14  was DaVita.  The intensity of the business discussions was so

15  high at that time that they were talking about buying SCA and

16  SCA about selling itself to DaVita.  That's the context in

17  which this communication occurred.

18          Now, let's talk a little bit about Bridie, who

19  testified a lot -- hold on a second.

20          Would you like a break?

21          JUROR:  Yes.

22          THE COURT:  I'm sorry to interrupt.  I want them to be

23  able to concentrate on what you're saying.

24          MR. DODDS:  I don't want them to be uncomfortable.

25          (Jury out at 2:42 p.m.)

1    THE COURT:  I don't usually interrupt somebody's

2    closing.

3        MR. DODDS:  I was a little bit worried about that,

4    Your Honor, when I started.

5        THE COURT:  I kept my eye on her, and I wasn't sure

6    she was focused on you.

7        MR. DODDS:  Understood.  Thank you, Your Honor.  I

8    appreciate it.

9        (Recess at 2:42 p.m.)

10        (In open court at 3:00 p.m.)

11        MR. DODDS:  I should have said before I got started

12    that this was going to take a while.  But I want to tell you

13    why.

14        Mr. Mariano said that the defense wants you to set

15    aside the documents and the testimony.  Well, clearly, we don't

16    want you to do that.  In fact, I want you to lean into the

17    documents; and I especially want you to lean into the

18    testimony.  And I have an obligation, representing an

19    organization and its people who are under criminal indictment,

20    to do that with you very, very carefully, the way I know you

21    want me to.  And so that's why I'm taking the time that it's

22    taking.  But I should have warned you up front so perhaps we

23    could have taken a comfort break before we got started.

24        The other thing I want to touch on is something I need

25    to say now because I won't get to say it later.  Because as you

 1   heard from Judge Jackson, after we finish, the government gets

 2   the last word, and I won't get to talk again after that.

 3          And I expect that you may hear, What Dodds was talking

 4   about was motive.  It doesn't matter what motivated them to do

 5   this.  That's not what I'm talking about at all.  I'm not

 6   talking about what motivated them to make the agreement.  I'm

 7   talking about when they made the agreement, what were they

 8   trying to do?  Because for your verdict to be guilty, the

 9   government has to prove beyond a reasonable doubt that what

10   they were trying to do was to allocate the employee market, to

11   end meaningful competition.  And there is nothing in the

12   testimony or the documents that could support that conclusion.

13          So I'm not talking about why they did it -- well, I

14   am.  I am talking about it, but what I'm really focused on is

15   what they were trying to accomplish.  And I expect you are

16   going to hear about that later, and I wouldn't get a chance to

17   correct it, so I wanted to say it now.  So please remember that

18   when the government gets up and gets another chance to talk.

19          Okay.  So let's go back and talk about Bridie Fanning,

20   who they relied on a lot.  You heard Mr. Mariano talk more

21   about her than he talked about Andrew Hayek, who was the man

22   who, according to the government, hatched this conspiracy with

23   Mr. Thiry.  And he testified about what Bridie Fanning said

24   this was all about and what Bridie Fanning said this was all

25   trying to accomplish but forgot to remind you that Bridie

1    Fanning wasn't there when the agreement was made.  She arrived

2    two years later.  She was never part of the discussions.  And

3    you'll recall this, that when she communicated with people in

4    the outside world about the agreement, what she said to them

5    was different than what Andrew Hayek said to her.  She said,

6    "Off limits.  Off limits.  Off limits."  And that's not what

7    Andrew Hayek ever said to her.

8            She also told you that these kinds of agreements are

9    very common.  This is her testimony under cross-examination:

10   "CEOs often makes agreements with other CEOs.  I've come across

11   them multiple times."

12           "Again, you testified that these agreements are

13   actually not uncommon."

14           "That's correct.  They are more common."

15           "So when you got to SCA, the idea of a no-poach

16   agreement was not something new to you; correct?"

17           Answer:  "True."

18           But this was not a no-poach agreement.  The government

19   doesn't allege it was a no-poach agreement.  The government

20   alleges it was an agreement not to proactively solicit; that's

21   the allegation here.  And, in fact, Andrew Hayek, the man who

22   made the agreement, was asked:

23           "This was not an agreement that prohibited movement

24   between DaVita and SCA; true?

25           "Correct.

1          "In other words, this was not a no-hire agreement?  Do
2     I have that right?

3          "That's correct.  Under certain circumstances, one
4     could hire."

5          On its face, it was not an agreement the purpose of
6     which was to end meaningful competition.  Did it change it?
7     Yes.  Did it alter it?  Yes.  Did it end it?  No.  Was it
8     intended to end it?  No.

9          And, in fact, it didn't stop SCA from continuing to
10    try to recruit people from DaVita.  You heard me talk to
11    Mr. Rucker about his effort to recruit Matt Weissert from
12    SCA -- from DaVita, who was a DaVita executive.  Tried to
13    recruit him away to SCA in 2013 during the thick of this
14    supposed conspiracy for a senior vice president position.  And
15    he testified that that is exactly what he was trying to do
16    during the period of this so-called gentlemen's agreement,
17    trying to recruit Mr. Weissert.  Now, Mr. Weissert decided not
18    to go to SCA; and as you heard from the testimony, he ended up
19    with Josh Golomb at Hazel Health.  But recruiting continued.

20         And SCA hired Michelle Trent, an executive from DaVita
21    over to SCA during the course of this supposed conspiracy
22    period.  Now, she didn't work out and ended up leaving SCA.
23    And you heard Mr. Hayek testify that that was one of the
24    factors in why he was recruiting less from DaVita beginning in
25    2012.  He had already hired all the people he wanted to.  And

1    as he continued to, some of them just weren't working out.

2    They didn't fit in that culture.  That was their witness's

3    testimony.

4         But the way they recruited -- and Mr. Rucker talked to

5    you about this was informed by, altered by, the fact that they

6    were in these business relationships.  Remember, I asked him

7    about an outreach involving a woman at DaVita named Vanessa

8    Pfeiffer.  And Winborne Macphail, an SCA executive, found

9    Vanessa Pfeiffer's LinkedIn thing -- I'm not on LinkedIn, so I

10   don't really know what is on there -- but a LinkedIn thing and

11   passed it up the chain.  And what did Mr. Rucker say back?

12   "Goes without saying that I know you'll be super sensitive to

13   the appearance of us recruiting her, given all that we are

14   doing with HCP."  Not because we have a hands off; not because

15   she's allocated; not because we're trying to end competition.

16   "Given all we're doing with HCP."

17        And I asked him about that.  I asked him, "So you're

18   encouraging your teammates to make sure that they're sensitive

19   because of these business dealings?"

20        And he said, "Yes."

21        And he put -- and I noted that he put in his email

22   "it goes without saying."  And I asked him this question:  "I

23   take it from that, that this sensitivity about hiring and

24   recruiting from DaVita because of these business relationships

25   with HCP is something that everyone knew and understood."

1             And he said, "Yes.  That's right."

2             That's what was going on behind the scenes during the

3     emails, the one, two emails, the one, two lines from

4     emails that they pick out and they show you.

5             Now, let's talk about for a moment about

6     Dr. Cremieux's testimony, because Mr. Mariano made a big deal

7     about the fact that they only hired -- SCA only hired one

8     person from DaVita during the conspiracy period; but

9     Dr. Cremieux testified to you about that.  And what he told you

10    was what makes sense.  What's important is not the number --

11    the absolute number, but how does that compare to hiring from

12    DaVita by companies that are not alleged to be part of the

13    conspiracy?  That just makes sense.  You can't convict somebody

14    of a conspiracy because the number is one instead of two or

15    three or four or five or a hundred.  You can only convict

16    somebody of a conspiracy if the number means something, if the

17    number means that it's the result of a conspiracy; and

18    Dr. Cremieux told you it's not.  And how do you know it's not?

19    Because they didn't typically hire from a strategic partner;

20    and that number was no different than the controls he used,

21    companies that are not alleged to be part of any of this.

22            And, in fact, he showed you how consistent this is

23    with the fact that DaVita was a strategic partner.  This is a

24    list of some of the strategic partners that SCA had.  And these

25    were taken from that other exhibit that I showed you before,

1    that had all of the different names of the strategic partners

2    on it.  And what you'll see is the number of people that SCA

3    hired -- senior-level people -- from those companies during the

4    alleged conspiracy period.  From all of them except DaVita they

5    hired none; from DaVita they hired one.  So when you're

6    thinking about Mr. Mariano's talking about, well, it was only

7    one, and it was eight before, remember what Dr. Cremieux said

8    and look at this exhibit.  This is Defense Exhibit B588.

9         Now, Dr. Cremieux told you just this morning in

10   response to one of your questions, why the change to SCA

11   hiring, why did it lessen in 2012, was not -- in his obviously

12   expert opinion, not evidence of market allocation, for the

13   reasons I said.  SCA still hired DaVita employees in line with

14   other companies that hired DaVita employees.  And combined with

15   the testimony of Andrew Hayek about what he did intend -- to

16   foster business partnership -- and what he didn't intend -- to

17   end meaningful competition -- that alone, ladies and

18   gentlemen -- that testimony alone in response to one of your

19   questions raises a reasonable doubt about whether the purpose

20   and intent of this agreement was to allocate employees and end

21   meaningful competition.  That question and that answer alone.

22        Now, let's go back to what I said at the beginning,

23   when you know what the case is about, what it comes down to is

24   whether the purpose and intent at the time the agreement was

25   made was to end meaningful competition, whether you shouldn't

 1    just ask that question.  Because if that was the understood

 2    purpose and intent, Andrew Hayek would know.  And if it was

 3    true, he would say it.  But they never asked him that question.

 4    They asked questions like this.  "Did Mr. Thiry express whether

 5    he wanted to deter movement or encourage movement?"

 6          And you'll remember, somewhat like Mr. Whitney,

 7    Mr. Hayek sort of sat there and sort of choked out the answer

 8    that he thought the government wanted him to give.  And he

 9    said, I think across various communications between those two,

10    okay, it would be to deter or reduce.

11          And then he was asked, "Considering all the aspects of

12    the agreement, did it have a purpose to encourage or discourage

13    the movement of employees?"

14          And he said, "I think to discourage."

15          More testimony from Mr. Rucker on this point.  What

16    question did the government ask?  What was your agreement with

17    Kent Thiry intended to achieve?

18          Well, to reduce the number of senior executives coming

19    to SCA and vice versa.

20          And then this is the question:  And was that promoting

21    competition or reducing competition?

22          And once again, between those two -- okay.  Well,

23    between those two choices, okay, reducing.

24          Now, here is the instruction that is the pivotal

25    instruction in this case:  Whether the defendants entered into

1    agreements with the purpose of unlawfully allocating the market

2    by ending meaningful competition, you may not find that that

3    conspiracy that they've charged exists unless you find that

4    these agreements or understandings sought to end meaningful

5    competition for the services of these employees.  Not "deter,"

6    not "discourage," not "reduce," not "alter," not "change."  And

7    when you're -- you put a company on trial for its future and a

8    man on trial for his future, if that's what's at stake,

9    shouldn't you just ask the question?

10          And I suspect we know why they didn't ask the

11   question.  Because when Mr. Hayek was cross-examined, we asked

12   him the question:  "Mr. Hayek, you did not think that the

13   agreement that you reached with Mr. Thiry was going to lead to

14   the cessation of competition for employees between DaVita and

15   SCA; true?"

16          "True.  I didn't think it would cease."  It wouldn't

17   cease because there are other ways that people can and are

18   recruited.

19          There you have it.  There you have it, what he

20   thought, what he intended, what he understood at the time.

21   Reasonable doubt in that question and that answer alone.

22          But there is more.  "Indeed, there was still

23   competition for employees between the two companies in the way

24   the agreement laid out; correct?

25          "Correct, there would still be competition."  There

1    would still be competition.  "Maybe less, but it doesn't cease,

2    because there are other ways to recruit, as I mentioned."

3          The government didn't ask that question because they

4    knew that was going to be the answer.  And they hoped that your

5    outrage about the conduct here, that your concern for the

6    victims that they can't identify would be enough, that they

7    could get away with that, and that you would never know the

8    truth, which is in the question and answer I just showed you

9    and in this question and answer.

10         But there is more.  He wasn't asked this question on

11   direct; but on cross-examination, Mr. Melsheimer asked him:

12   "Back in 2012, you never thought of your agreement with

13   Mr. Thiry in terms of market allocation; true?"

14         Answer:  "Correct.  I don't recall thinking in those

15   terms or using those terms.  I don't recall thinking even in

16   those terms."

17         "You never used the phrase 'allocate the market' or

18   words to that effect; true?

19         "Correct.  I don't recall ever using those kinds of

20   words.

21         "And you didn't hear Mr. Thiry use those kind of words

22   or words to that effect in your discussions either; true?

23         "Correct.  I don't recall Mr. Thiry using those kinds

24   of words."

25         Now, let's talk about the victims.  The victims.  And

1    I don't put air quotes around them in a way to be demeaning or

2    to diminish anybody who is -- on whom any of this had an

3    impact.  But for the government to tell you that there are

4    victims is -- well, let me just say, it isn't right.  And here

5    is why:  Because they can't just tell you; they have to prove

6    it.  And what they did for the most part is just read the names

7    of people from emails, real people, living, breathing people,

8    who could have come in here and told you for themselves whether

9    they were victims, whether they were victimized in any way.

10   And they didn't.  In fact, most of them, they didn't even talk

11   to.

12            They talked a lot during the testimony about Jung Lee,

13   who did give notice that he was talking to SCA and, ultimately,

14   you heard from the testimony was promoted within DaVita and is

15   at HCP to this day.  He was presented to you as a victim but

16   never even interviewed.  This morning they talked about Craig

17   McKessar, and they kept bringing his name up because it

18   appeared in the emails.  They presented him as a victim, but

19   they never even bothered to interview him.  Jordan Thau, they

20   presented him as a victim; but they never bothered to interview

21   him.

22            And we may know why.  Because the one person that they

23   presented as a victim, Andy Kay -- remember, he's the one who

24   got the email from Bridie Fanning -- Andy Kay, when they

25   talked to him, we now know from the cross-examination of

1    Agent Hamel, that he said he was not a victim.  And he was

2    transparent within DaVita about the fact that he was looking,

3    and he got a promotion.

4         So this brings us to -- back to what I call the

5    pivotal question, and this is the question I would ask you to

6    consider when you deliberate:  How can the government prove

7    beyond a reasonable doubt that there was an agreement with the

8    purpose and intent to end meaningful competition for senior

9    executives when the government avoided asking Andrew Hayek that

10   very question?  When Hayek's answer on cross-examination was

11   no?  When Hayek testified that the purpose and intent of the

12   agreement was to serve the larger competitive business goals?

13   And when he testified that the agreement did not prohibit

14   recruiting?  It was not a no-hire, no-poach agreement.

15        So here are just a few things for you to think about.

16   Remember that I said, if there is a real possibility in your

17   mind that the government hasn't carried its burden on an

18   element, your verdict must be not guilty?  If there is a real

19   possibility that Andrew Hayek -- if you think there is a real

20   possibility that Andrew Hayek entered into this agreement not

21   for the purpose of ending meaningful competition or allocating

22   markets but for the purpose of fostering business collaboration

23   with DaVita, your verdict must be not guilty.

24        If you think there is a real possibility that Andrew

25   Hayek entered into this agreement not for the purpose of ending

1    meaningful competition but for the purpose of positioning SCA

2    as a potential acquisition target for DaVita, your verdict must

3    be not guilty.

4         If you think there is a real possibility that Andrew

5    Hayek had already hired all of the DaVita executives he really

6    wanted by 2012, and that's why he slowed down, your verdict

7    must be not guilty.  In fact, if you think any of these things,

8    your verdict on Count 1 must be not guilty.

9         Now let's go to Count 2.  We know that Count 2 was all

10   about emotion; it was all about the relationship between Kent

11   Thiry and Josh Golomb.  You'll recall from the evidence that a

12   month after Josh Golomb got his job as the CEO of Hazel Health

13   with Kent Thiry's recommendation, Kent Thiry was told by Julio

14   Quinones that Golomb was recruiting him, and Kent was angry.

15   And Golomb started texting him and talking to him about trying

16   to make him understand, he did not want him to be hurt, did not

17   want him to be angry.

18        And sent him this email:  "I did not sleep much last

19   night knowing how much everything hurt you.  I get that it felt

20   like a blindside and a betrayal, and I have thought through a

21   very specific set of ground rules based on your feedback to

22   commit to."

23        What does Kent Thiry say in response?  "Could you

24   write me a note and walk me through how you think about asking

25   someone for a reference and then recruiting away someone with

1    whom they are working regularly a few weeks later."  This was

2    very, very personal.

3          So we can get to the pivotal question on Count 2 much

4    faster than on Count 1, because there is no evidence -- no

5    evidence whatsoever -- none, zero, zip, zilch -- that the

6    purpose and intent of anything Golomb said or committed to Kent

7    Thiry was to end meaningful competition.  No testimony from

8    Josh Golomb, who wanted immunity but couldn't get it, even

9    though almost everybody else in the world who had anything to

10   do with this got it.  Josh Golomb somehow couldn't get it.  No

11   other witnesses from Hazel.  Not one.  And we now know, because

12   of the cross-examination of Special Agent Hamel the other day,

13   that there were Hazel witnesses that the government interviewed

14   but didn't call because they refute the government's

15   allegations here, squarely and directly.  Nick Woods, Kristian

16   Lau, Jeannie Chen, and Julio Quinones.

17         Remember Mr. Mariano showing you this document as the

18   evidence of the conspiracy, the document where he commits to

19   Kent that he's going to make sure everyone on his team knows to

20   steer clear of anyone at DaVita and then will come back to you

21   and talk before he ever gets anywhere near hiring someone else.

22   He is going to tell his team to steer clear.  Well, his team

23   were the four people that I just mentioned who the government

24   interviewed but didn't call.

25         And what did Mr. Woods tell the government?  According

1    to Agent Hamel's FBI 302, "Mr. Woods, the co-founder of Hazel,

2    could not recall any conversations for or against hiring from

3    DaVita with Mr. Golomb since Mr. Quinones had been hired; is

4    that right?"

5           Now, Agent Hamel recalled everything he wanted to say

6    about the government's case; but in response to this, "I don't

7    recall that."  But he acknowledged that that is what he put in

8    his report.

9           "You learned from Mr. Woods that Mr. Golomb never

10   expressed hesitation in hiring DaVita employees, at least as

11   far as he was aware?

12          "I don't recall that," but that's what is in my

13   report.  And if it's what is in my report, it's got to be true.

14          "And after Mr. Woods said that, the interview was

15   terminated and Mr. Woods was told to keep the nature of the

16   discussion confidential."

17          Jeannie Chen.  They interviewed Jeannie Chen, who was

18   the personnel person at Hazel.  And if Josh Golomb was really

19   going to tell anybody at Hazel that DaVita is off limits, it

20   would have been the head of personnel, Jeannie Chen.  So what

21   do we now know about what Jeannie Chen had to say?

22          The question was asked of Agent Hamel:  "Did you learn

23   during the course of your investigation that Ms. Chen did not

24   have any recollection of any company being identified as a

25   place to avoid with regard to recruitment?

1    "Yes, I do.

2    And, in fact, she was never under the impression that

3  a current DaVita employee could be solicited?

4    "Correct."

5    "Could not be solicited.

6    "Correct."

7    Thank you.

8    She was asked again, "She could not think of any

9  person that Mr. Golomb wanted to recruit but could not?"

10   "I see that's what it says here.  I don't recall her

11 saying that, but if it's here, it must be true."

12   Mr. Lau.  "Did you learn from your interview with

13 Mr. Lau that Mr. Golomb did not have to approve whatever

14 candidates he wanted to reach out to for recruiting?

15   "I don't remember him saying that, but I see that it's

16 here.  That's what is in my 302."  And he testified, "I

17 wouldn't put it in my 302 if that's not what the man said.

18   "Is it true you learned from Mr. Lau that he had

19 complete autonomy in reaching out to potential candidates?

20   "I don't remember him saying that, but that's what my

21 302 says."

22   So they tell you based on that email that

23 Agent Hamel read, that it means Josh Golomb really did reach

24 out to his team and tell them that DaVita was off limits.

25 Without bringing Josh Golomb in, because he wanted immunity,

1    which they could give to everyone else but not him, but not to

2    all of the witnesses that he was talking about.  Because the

3    witnesses that he was talking about would tell you that that

4    email Mr. Mariano showed you simply wasn't true.  And, in

5    fact -- and, in fact, competition did continue.  He did

6    continue recruiting.

7         He continued recruiting Julio Quinones.  And DaVita

8    competed to try to keep him.  Remember, we showed Agent Hamel

9    the offer letter from DaVita, the offer letter that was part of

10   their competition to try to convince him not to go to Hazel.

11   And what did he say?  I don't think I've ever seen this before.

12        He was the project manager of a massive investigation

13   that involved all of the resources of the federal government,

14   where they're coming in here and saying that Josh -- that Julio

15   Quinones is evidence that competition was ended, and they have

16   his offer letter from DaVita, and the case agent, the project

17   manager, tells you he's never even seen it.

18        Arlene Villa Howells.  They competed for her during

19   the time of this alleged agreement, and DaVita competed to try

20   to keep her.  You see this from her text message, and she

21   decided to go to Hazel.

22        Now, they showed you this email, where Golomb is

23   telling Kent Thiry that there is a person who has reached out

24   to him a couple of weeks ago.  She's a manager, and so on and

25   so forth, and that "I won't talk to her unless you give me the

1    go ahead."  That's in February of 2018.

2          Well, what we know from the text messages is that

3    Golomb had actually started talking to her over a year before

4    that about coming to Hazel.  Over a year before that.  But he

5    told Kent Thiry that it just happened a couple of weeks ago.

6    And he told Kent Thiry that she said she was already looking

7    for a position or he wouldn't have talked to her.  But we know

8    from her text that Josh Golomb had reached out to her before

9    she had made any decision to leave for DaVita a year before

10   that, but he told Kent Thiry something different.

11         Ladies and gentlemen, Josh Golomb isn't here.  I

12   submit the fair inference from this evidence is, Josh Golomb

13   isn't here because he was shining Kent Thiry on.  He was trying

14   to tell him whatever he needed to tell him to calm him down so

15   he could go on with his business.  And when you go back into

16   the jury room, think about this and look at these exhibits --

17   look at these exhibits -- and compare them to see what was

18   happening; and you'll see that that was the truth.  Josh Golomb

19   didn't come in here to tell you that, because that's what he

20   would have said.  And Count 2 is gone, as it should be, when

21   you deliberate.

22         So this leads us to the pivotal question on this

23   count:  How can the government prove beyond a reasonable doubt

24   that there was an agreement with the purpose and intent to end

25   meaningful competition when the government did not call a

1    single witness with knowledge to say it?  Not one.  Not one

2    witness.  They had the agent read some emails; they had

3    Dennis Kogod read some emails.  When the witnesses the

4    government interviewed but didn't recall refute it?  And when

5    competition continued?

6         So back to our reasonable doubt standard.  If you

7    think there is a real possibility that Josh Golomb was just

8    shining Kent Thiry on, your verdict must be not guilty.  If you

9    think there is a real possibility that Golomb never told his

10   team that DaVita was off limits -- and the only evidence you

11   have is that he never told his team that -- your verdict must

12   be not guilty.  If you think there is a real possibility that

13   Golomb never directed his team to stay away from DaVita -- and

14   the only evidence you have is that he never told his team to

15   stay away from DaVita -- your verdict must be not guilty.  If

16   you think it's important that when the government indicts a

17   human being and the organization he used to lead, that they

18   bring in a witness who actually was there, who actually was

19   involved to tell you what happened, if you think that is

20   important at all, your verdict on Count 2 must be not guilty.

21   If you think any of these things, your verdict on Count 2 must

22   be not guilty.

23        Okay.  Now, Count 3.  And, again, the context for

24   Count 3 is in this email.  This is an email in October of

25   2013 from Rich Whitney to a bunch of executives at Radiology

1    Partners, many of whom are former DaVita executives.  And this

2    is when they hired Basak Ertan away from DaVita.  And

3    Mr. Whitney says -- and they're very excited.  You can see from

4    the "re" line with all of the exclamation points.  "She'll

5    inform DaVita Friday, after which we will have more clarity on

6    transition.  We will be very flexible with them, since we have

7    taken a lot of top talent and since they are our friends."

8            Now, Mr. Mariano said in his opening that a crime

9    doesn't stop becoming a crime because you commit it with your

10   friends.  Of course not.  We're not saying anything like that.

11   We're not saying anything like that.  But the fact that they

12   were friends was part of the decision making here, and this is

13   all about why they made the decision they made and what they

14   were intending to do.  And if they were intending to preserve

15   their friendships or relationships for personal or business

16   reasons and not intending to allocate employees and end

17   meaningful competition, that's a not guilty.

18           Actually, I'm going to move you on a little bit, but I

19   know I've been going on for a long time, and I'm almost done.

20           But let's talk about the document that the government

21   says is their evidence of this conspiracy.  Remember, Rich

22   Whitney's ground rules email.

23           There are two ways in this case in which you can

24   answer the question you have to answer:  Was the purpose and

25   intent to allocate markets and end meaningful competition?

1640

1    There are two places that you can go for that.  The first is

2    the ground rules themselves.  The ground rules themselves.

3    Because he explains what his purpose is, right on the face of

4    the document.

5         The government wants to focus on 1, 2, 2A, 2B,

6    either/or, blah, blah, blah.  But the question is, what is he

7    trying to accomplish by the ground rules?  And he says it right

8    here.  "To find a fair way to treat each other out of respect

9    for long-term relationships, while maintaining" -- and this is

10   the key -- "while maintaining our ability to meet our

11   responsibilities to our shareholders and other company

12   constituents.  It's a way for us to continue to go about our

13   business with respect for our relationship."  To maintain our

14   responsibilities to our shareholders and our companies and to

15   go about our business.  And those responsibilities, they

16   testified, included being able to hire the best people they

17   could.  This was not about ending meaningful competition.  It

18   was about how to have meaningful competition while preserving

19   their relationship.

20        And if we're at the point where the Sherman Act says,

21   trying to continue to compete but to do it in a way that you

22   don't ruin your relationships -- thou shalt not compete in a

23   way that doesn't ruin your relationships -- if that's what the

24   Sherman Act says -- and that's really what the government is

25   trying to get you to believe -- then we're in a lot of trouble.

1    But that isn't what it says.

2            Now, in addition to the document answering the

3    question, Rich Whitney answered the question.  "Can you just

4    tell us how the agreement came into place?"

5            It was in a phone call.  And here is what he testified

6    telling Kent Thiry during the phone call, "I reassured Kent

7    that we were -- the people that we had hired were people that

8    we believed were already looking at other opportunities outside

9    of DaVita, and I committed that I would" -- look at this --

10   "continue doing recruiting from DaVita in that way."  And he

11   said that several times.  That he committed to continue to

12   recruiting the way he had been.  The way he had been.

13           He answered the question again, "What was your intent?

14           "My intent was to" -- this is what this is all

15   about -- "maintain the relationships that I had with Kent and

16   others at DaVita within the context of having hired a number of

17   executives and the belief that I was likely to hire a number of

18   additional executives going forward."

19           Those are the words that came out of the mouth of the

20   government's witness, that when he made the agreement, he

21   intended to continue to hire from DaVita.  And you know that he

22   did.

23           More testimony from Mr. Whitney.  "The agreement was

24   something that the three of you could work within and still be

25   able to hire the people that you needed?"

1       Answer:  "Yes."

2       How could we continue to hire?  There is nothing in

3  any of the documents and certainly nothing in the testimony of

4  the government's key witness on this count that says anything

5  other than -- other than he was going to continue to hire.

6       And we talked about the either/or paragraph --

7  either/or language.  And Mr. Whitney was asked what that was

8  all about on cross-examination.  And he said he put that in

9  there because he did not want to be at an unfair disadvantage

10 relative to other companies and competing for talent with

11 DaVita.  Everything he said is the opposite of what the

12 government has to prove beyond a reasonable doubt to get a

13 conviction on Count 3.  Everything is "keep competing," which

14 is as far away from "end meaningful competition" as you could

15 possibly get.  That's the testimony of their witness.

16      And this was, again, another question from one of you.

17 And the question was:  "What was his problem with the

18 speak-to-your-boss rule?"  Everybody was adopting that

19 phraseology at that point.

20      "I was willing to commit to recruit in a particular

21 way from DaVita.  I was not willing to commit to not recruit

22 from DaVita, and I was not willing to commit to things that I

23 thought would put me at a disadvantage versus other companies

24 in recruiting from DaVita."

25      That's the testimony of their witness.  That

1    testimony, like the testimony I showed you before, by itself

2    raises a reasonable doubt about whether the purpose and intent

3    of this agreement was to end competition.

4         But there is more.  He didn't even think he agreed to

5    all of the things in the ground rules.  He said, "There was

6    never an agreement in my mind, but this was a list of things

7    that might provide evidence to show that I was living up to the

8    spirit of what I committed to."

9         And he was asked whether he ever followed up with

10   Mr. Thiry -- again, by one of you -- about his initial

11   reaction.  He said something about what Mr. Whitney was

12   proposing was fundamentally asymmetrical, and one you asked him

13   whether he ever followed up.  And he said they had another

14   phone conversation where they just agreed to disagree.

15        Anthony Gabriel also told you what the intent of the

16   ground rules was.  "The intent was to come up with a solution

17   that would allow us to maintain our relationships -- to

18   maintain our relationship with Kent and DaVita while at the

19   same time allowing us to meet our requirements to be able to

20   hire people."  Not to stop hiring people, not to put DaVita

21   people off limits, but to keep hiring DaVita people.  The

22   government's witness.  That answer alone on Count 3 is

23   reasonable doubt.

24        And he testified that even with the ground rules, a

25   pretty fair number of people moved from DaVita to Radiology

1   Partners.  He said it was over 20, perhaps.  I think I said 30

2   in the opening.  We now know I think it was 27.  I was off by

3   three.  But 27 people came from DaVita to Radiology Partners

4   during a period of time where the government has to prove

5   beyond a reasonable doubt that they were trying to keep that

6   very thing from happening.  They were trying to end

7   competition.

8           And, again, for those reasons, the government didn't

9   ask the question.  It asked around the question.  Did you

10  agree -- "are you agreeing to compete with DaVita for employees

11  less forcefully?

12          "Yes.

13          "Did you ultimately compete for DaVita as hard as you

14  would have?

15          "No."

16          But, again, here is the instruction.  It is, were you

17  intending to end competition?  It doesn't say anything about

18  less forcefully, less vigorously, less hard; it says "end."

19  And the government didn't ask a very simple question, because

20  on cross-examination, you saw the answer.

21          Now, let's talk about Elliot Holder, the one person

22  that the government brought in to present to you as a victim.

23  And you have two sources of evidence about Mr. Holder -- one is

24  his testimony, and one is the testimony of Dr. Cremieux.  And

25  Mr. Holder was asked why it was preferred that DaVita employees

1    who left were solicited versus seeking out another job on their

2    own.  And his answer was, because they wanted to make sure that

3    everybody on the team was happy.  If anybody just left on their

4    own, it meant that they weren't doing their jobs.  An employee

5    wasn't happy, they weren't satisfied, they weren't committed,

6    and that was a problem.  And that's why they didn't like it.

7    Their witness told you that.

8           Now, remember, Mr. Holder came in -- and he was an

9    earnest young man and a sincere young man.  And when all of

10   these things happened, he was a younger man.  And he said that

11   he didn't want to share that he was looking for another job

12   because he was nervous at the time.  And that may well -- that

13   very well may have been.  But what did he also say?  He also

14   testified that recruiting, soliciting, people reaching out

15   happened all the time.  "Sometimes you would go to your

16   supervisor and say, Hey, I've got people reaching out to me

17   about jobs that may pay me more; right?"

18          And he says, "Yeah, that was pretty commonplace.  So

19   even my supervisors would mention how often they get

20   solicited," and so forth.

21          And he testified about why in this particular instance

22   he didn't want to tell DaVita that he was looking.  It's

23   because he had done that before, and he had done the

24   competitive thing in that instance.  He had used the fact that

25   he had another offer, that he had other interest, to leverage a

 1   raise.

 2          And here is what he said.  He was asked the

 3   question -- and this, again, was a question from one of you.

 4   "What do you think the reaction would have been from your

 5   supervisor if you had told him about the RAD Partners before

 6   having an offer?"

 7          And he says, "I don't know, to be honest."  And he

 8   says, it would have been a difficult situation on his end.  But

 9   then he said, "I think there would have been a little bit of

10   frustration that I was -- that I kind of presented another --

11   that I was looking again after a year and a half, after the

12   first opportunity at SCAN, that I was looking to leave again,

13   that I was looking outside."  But he said, "I think they would

14   have potentially tried to match it, because I was working hard

15   at the time.  They would have tried to retain me."

16          Now, should Mr. Holder have been put in the position

17   of feeling like he had to do this?  I told you up front, no.

18   But is Mr. Holder a victim?  No.  No.  This opportunity didn't

19   work out.  But he told you what he's done since then, and he's

20   done pretty well.  May he have had the opportunity to do

21   equally well at Radiology Partners?  Perhaps.  But the one

22   person they could find to actually bring in here to present as

23   a victim is not a victim at all.

24          And let's talk about the other victims that they tried

25   to present to you during -- for this count.  Remember, we went

 1    back and forth about the long and short of it, when I asked all

 2    of those questions.  They talked about Guy Seay and how Kent

 3    Thiry was the one who told him about his offer instead of

 4    Radiology Partners telling him about his offer.  But, again, he

 5    didn't come to Radiology Partners because he didn't want to.

 6          Cameron Cleeton, who they tried to present during the

 7    case as a victim.  Cameron Cleeton had offers, three or four in

 8    hand; and he used them to try to leverage a better deal.  And

 9    he ended up with DaVita competing to try to keep him, and he

10    went to Radiology Partners.

11          Bowie Remaley, same thing.  Basak Ertan, same thing.

12    Eddie Robles, same thing.  All people who during the course of

13    this trial are names the government threw at you in an effort

14    to make you think that they were victims here because the

15    process was somehow impacted.  And every one of them was

16    competed over, and every one of them made their own decision,

17    and none of them are victims.

18          So now the pivotal question on Count 3:  How can the

19    government prove beyond a reasonable doubt that there was an

20    agreement with the purpose and intent to end meaningful

21    competition when the government avoided asking their witness

22    Rich Whitney that very question?  When his answer to that

23    question on cross-examination was a flat-out no?  When the

24    ground rules didn't prohibit recruiting and when competition

25    for DaVita employees continued?

1    So back to the standard, reasonable doubt.  If you
2  think there is a real possibility that Whitney followed the
3  ground rules, not because he was trying to end competition, not
4  because he was trying to allocate, but for the purpose of
5  maintaining an important relationship, your verdict must be not
6  guilty.  If you think there is a real possibility that Whitney
7  followed the ground rules for the purposes of being respectful
8  to an investor and a business partner and not to allocate the
9  market or end competition, your verdict must be not guilty.  If
10  you think there is a real possibility that the ground rules
11  simply articulated that what Whitney was already doing was what
12  he was willing to do on his own, your verdict must be not
13  guilty.  In fact, if you think any of those things, your
14  verdict must be not guilty.

15    Ladies and gentlemen, I'm about done.  There was a lot
16  of drama in all of these facts here.  You heard an awful lot
17  about it.  It was pushy conduct, obnoxious conduct, flat-out
18  bad conduct.  What there wasn't was any evidence of the only
19  thing that could make all of that a crime, agreements with the
20  purpose and intent, again, of allocating markets and ending
21  meaningful competition.  And for that reason, you have the
22  power to say to DaVita and to Kent Thiry, you're free to go.
23  And that's what we're going to ask you to do.

24    Thank you.

25    *THE COURT:*  Thank you.

1        Closing argument for Mr. Thiry.

2        *MS. BROOKS:*  Your Honor, could we approach for one

3   moment just to talk about timing?

4        *THE COURT:*  Timing?

5        *MS. BROOKS:*  Yes.  I have approximately 45 to

6   50 minutes, and then there is going to be rebuttal.  I don't

7   want to tax the jurors' patience any more than I have.  This is

8   no repetition of what Mr. Dodds said.

9        *MS. CLINGAN:*  Your Honor, my rebuttal is 15 minutes;

10  and I see no reason why it shouldn't go to the jury today.

11       *THE COURT:*  No, let's go.  Let's get it done.

12       *MS. BROOKS:*  Okay.

13       *THE COURT:*  Try to keep it as brief as possible.

14                    **CLOSING ARGUMENT**

15       *MS. BROOKS:*  I will, Your Honor.

16       Good afternoon, ladies and gentlemen of the jury.

17  Thank you for your indulgence.  I have the great task of being

18  the late afternoon speaker here.

19       I'm going to try not to repeat anything that Mr. Dodds

20  said, but I'd like to start with something I talked with you

21  about at the very beginning of this case.  You may remember, I

22  wasn't talking at you; I actually got to talk with you.  And I

23  talked with you about the burden of proof.  And, remember, we

24  talked about why the burden of proof was on the government?

25  Because it was impossible -- remember, we had the discussion

1    with the one lady who was a cashier and who couldn't figure out

2    a way to prove that she didn't take the $100, let alone that

3    she didn't have the intent, if she opened her drawer, of taking

4    the $100?  And what we're talking about here is an intent

5    crime.  And everybody understood and agreed that it's

6    impossible to prove a negative, and that's why the burden of

7    proof remains on the government at all times.

8            And then we talked about how high that burden is,

9    beyond a reasonable doubt.  This is not a civil case.  This is

10   not where an employee feels like they've been deprived of a

11   business opportunity; and so they sue the person that they feel

12   deprived them of the opportunity for, you know, some kind of

13   monetary restitution.  That's not this case.  This is a

14   criminal case, a felony criminal case, with serious

15   ramifications; and so that's why the burden is so high.  It's

16   not more likely than not; it's not even highly probable; it's

17   beyond a reasonable doubt.

18           And when you fill out your verdict form, you're going

19   to fill it out in pen; not in pencil, where there is an eraser,

20   and in case you make a mistake, you can erase it.  It's in pen,

21   because that's how sure you have to be about your verdict.

22           So with all of that in mind, let's look at what the

23   people with the burden brought to us.  And, again, I'm not

24   going to repeat what Mr. Dodds has already gone over.  But it's

25   interesting how this case was put together, and you revealed it

1651

1    in your questions.  And what is so interesting is, it was very

2    reminiscent of the Salem witch trials.  Now, I know my partner,

3    Mr. Melsheimer, is over there thinking, well, that's because

4    she was at the Salem witch trials.  That's how she knows all

5    about them.  I was not; but I have certainly studied them quite

6    a bit, because it's interesting what they did there.

7            There was a tribunal with too much time on their

8    hands.  And they decided there were witches in the

9    neighborhood, and so they would bring someone before the

10   tribunal and say, You are a witch.  Admit you're a witch, and

11   name other witches.  And if not, you will suffer trial by

12   ordeal.

13           So trial by ordeal was, they would throw you in the

14   lake.  If you were possessed, you would float, which means you

15   were a witch.  So they'd pull you out of the lake, and you'd be

16   stoned to death.  If you sunk, well, then, you weren't

17   possessed.  Of course, you will have drowned.  And that was

18   trial by ordeal, and that is what has happened here.

19           One person after another -- and we're going to see how

20   it began, thanks to your questions -- one person after another

21   was brought before the tribunal, Admit that you engaged in

22   antitrust violations and name others that did, until they get

23   to one person who says, No, I will suffer trial by ordeal.

24   Fortunately, we don't have that anymore.  This isn't Salem,

25   Massachusetts; this is Denver, Colorado.  This isn't 1692; this

 1    is 2022.  And we don't have trial by ordeal; we have trial by

 2    jury.  And that is why we're here.

 3              So how did we come to be here?  How did the witch hunt

 4    begin?  Your question revealed it.  One of you asked

 5    Agent Hamel, What was the genesis of your investigation?  Do

 6    you remember that?  And he said, "I've answered it specifically

 7    to DaVita and Mr. Thiry.  The overall case under which I was

 8    working was opened in the fall of 2018; and that was related to

 9    a company that you've heard about, USPI."  So it's the

10    beginning of the witch hunt.  "And that agreement" --

11              MS. CLINGAN:  Objection, Your Honor.  This is really

12    crossing the line of prejudicial.  A witch hunt?

13              THE COURT:  Ms. Brooks --

14              MS. BROOKS:  It --

15              THE COURT:  -- you told your story.

16              MS. BROOKS:  Okay.  Your Honor.

17              THE COURT:  It was kind of clever.  Let's not call it

18    a witch hunt anymore.

19              MS. BROOKS:  No more, that's it.

20              Okay.  So it begins.  The investigation begins.

21    "You've heard about a company" -- this is Agent Hamel

22    speaking -- "about USPI and that agreement that USPI had, one

23    of those is Surgical Care Affiliates, that you've heard about."

24    So we've got USPI; now we have Surgical Care Affiliates.

25              Then what happened?  There was another question asked

1    by you.  "Next question" -- this is His Honor speaking -- "what

2    triggered the FBI and the Division's investigation of DaVita

3    and Kent Thiry?"

4         Answer:  "Specific to DaVita and Mr. Thiry, it came as

5    a result of information I discovered during an interview.  It

6    was not at the same time that the whole case was opened -- the

7    case was opened before that, but we learned in the summer --

8    yeah -- summer of 2019 specific to Mr. Thiry and DaVita."

9         And then the Court asked, "And that gave you cause to

10   start looking at DaVita?"

11        And Agent Hamel said, "Yes, sir."

12        Remember that, summer of 2019.

13        Now, let's look at when Andrew Hayek was interviewed.

14   Andrew Hayek was interviewed in July of 2019.  The summer of

15   2019.  So we have USPI going to SCA, going to Andrew Hayek.

16   And Mr. Hayek told us when Mr. Melsheimer was questioning him

17   about USPI -- and Mr. Melsheimer got it wrong.  He said USPI

18   was based in Birmingham, but that was actually SCA.  USPI is

19   based in Dallas.  You've got USPI in Dallas; SCA based in

20   Birmingham.  "And that was an agreement that you reached with a

21   man named Bill Wilcox; right?"

22        Answer:  "Yes."

23        "Mr. Wilcox has his own kind of immunity agreement

24   with respect to whatever happened between SCA and the USPI

25   company; right?

1           "I've been told that."

2           And then his agreement, Mr. Hayek's agreement, we have

3      where he --

4           MS. CLINGAN:  Your Honor, I'm going to ask this slide

5      be taken down.

6           MS. BROOKS:  I'm sorry, Your Honor.  If we could

7      remove all the titles.  Thank you.

8           Okay.  So he's briefly describing the conduct for

9      which he received immunity, and he says, "The companies

10     were" -- first he names USPI, but then he names DaVita.

11          So sticking with USPI, he's asked, "Do you recall,

12     sir, that agreement was originally" -- this is the USPI one,

13     now -- "was originally entered into by you and Mr. Wilcox in

14     2010 or 2011?"

15          Now, remember how the prosecutor said that Kent Thiry

16     drove all of this?  2010, 2011, according to Andrew Hayek, was

17     the agreement between Andrew Hayek and Bill Wilcox, USPI and

18     SCA.  And what do we have in evidence that shows what happened

19     next?  It is GX -- Government Exhibit 027.  The date is

20     January 5, 2012, one to two years after Bill Wilcox and Andrew

21     Hayek enter into this nonsolicitation agreement.

22          Now, I know that Andrew Hayek tried to make it sound

23     like it was Mr. Thiry's idea; but what does the document show?

24     Andrew Hayek reached out to Kent Thiry on January 5, 2012, and

25     says, "I'd like to catch up in general and discuss recruitment

 1    philosophy specifically."  So now we figured out how it is that

 2    we came to be here.

 3           Of course, then who comes along, but Dennis Kogod.

 4           Now, the prosecution said that Mr. Dodds had said in

 5    opening how Dennis Kogod lied in a court and how that was a

 6    promise and it didn't happen.  It did, right here in this

 7    courtroom, in front of you.  And I'm going to prove to you that

 8    he did.  And I'm sorry to have to say this about him -- he's

 9    the only one that I'm going to say it about -- but it is

10    exactly what happened.

11           His direct examination began with the prosecution

12    asking him, "Do you have any personal animosity toward

13    Mr. Thiry?"

14           Mr. Kogod, "No, quite the contrary.  I have tremendous

15    regard for Mr. Thiry personally, professionally for many years.

16    I'm grateful for the opportunities.  I don't have any bad

17    feelings toward Mr. Thiry.  I regret the relationship ended

18    where it did, but I don't have any regret or any animosity

19    toward him."

20           Why did they have him say that in the beginning of his

21    direct?  Because if he said, Oh, this guy cost me my job, he

22    cost me my career, you would all think, wow, he has

23    potentially, then, a motive to lie about Mr. Thiry.  And so

24    they wanted to try to neutralize that by saying, no, no, no,

25    that is -- absolutely no hard feelings.

1    And so I asked him, "Whether it was Mr. Thiry telling

2  you that it was time to go or you finally deciding it was time

3  to go, you went; correct?

4    "I went.

5    "And the job that you considered the job of a lifetime

6  came to an end; did it not?"

7    Answer:  "A wonderful time at DaVita, it came to an

8  end.  Yes."

9    And then remember Mr. Kogod had described to us that

10 Mr. Thiry had two right-hand people, Javier Rodriguez and

11 Dennis Kogod.  And now Mr. Kogod is here in court.  Mr. Javier

12 Rodriguez is the CEO of DaVita now, Mr. Thiry having retired;

13 and Mr. Kogod is finding himself unemployed.  But he tells you

14 that he is just fine with that.

15    One of the instructions you're going to be given is

16 that you can use your common sense.  Is that believable, that

17 he is just fine with that, where he was at the height of his

18 business, making almost $10 million a year?  That he is just

19 fine, finding himself unemployed now?

20    And then I asked him -- Mr. Kogod, not only did he

21 leave DaVita, but since then, he's been having a difficult time

22 finding employment.  And I said, "Do you agree or disagree,

23 sir, that you've had a difficult time finding employment in the

24 same industry after leaving DaVita and you attribute that

25 difficulty to Mr. Thiry?"

1        And he said, "I don't agree with that.  No."

2        So then I questioned Agent Hamel.  And it turned out,

3   I was reading verbatim what Dennis Kogod had represented to

4   Agent Hamel --

5        MS. CLINGAN:  Objection, Your Honor.  She continues to

6   say that those 302s represent what the individuals said

7   verbatim, and we all know that's not true.

8        THE COURT:  That's correct.

9        MS. BROOKS:  Your Honor, I said I was reading verbatim

10  the 302.  Let me rephrase it.

11       I said to Agent Hamel -- so Agent Butcher did the

12  interview, and then I showed it to Agent Hamel, and we talked

13  about how he would review the 302s -- as the case agent, he

14  would review the 302s of the other agents, including

15  Agent Butcher.  And he hoped he would be as accurate as

16  Agent Hamel was in preparing his 302s.

17       So now I am showing him the 302.  And I said, "In the

18  302, it says Kogod described his time at DaVita as a good run,

19  and that is in quotes; right?"

20       Answer:  "Yes, it is."

21       Then I went on, "Kogod liked the people he worked

22  with, and then he represented" -- this is me asking

23  Agent Hamel -- "and then he represented to Agent Butcher --

24  "Kogod had a difficult time finding employment in the same

25  industry after leaving DaVita, which he, Mr. Kogod, attributed

 1    to Mr. Thiry; is that right?"

 2            And Agent Hamel responded, "That's what is written

 3    here."  And then says, "Of course, I wasn't there for the

 4    interview."  But we had already established that he certainly

 5    hoped that Agent Butcher had followed the rules and done it

 6    accurately.

 7            But then Agent Hamel went on and said, but, you know,

 8    that -- this phrase here, I'm not sure if he's attributing his

 9    leaving DaVita to Mr. Thiry or having trouble finding

10    employment in the industry, attributing that to Mr. Thiry.

11            So I said to Agent Hamel, "Okay.  So it could be --

12    "it could be that he was blaming Mr. Thiry for he --

13    Mr. Kogod's departure from DaVita; correct?"

14            And Agent Hamel rightfully corrected me.  He said,

15    "Attributing.  I don't know if blame" --

16            I said, "You're right.  Attributing his departure from

17    DaVita to Mr. Thiry, that's one way to interpret that term;

18    right?

19            "Yes, ma'am.

20            "Another way to interpret it is he was attributing his

21    difficulty in finding employment in the same industry --

22    attributing it to Mr. Thiry?  That's another way to interpret

23    it?"

24            Answer:  "Yes, ma'am.

25            "Or could be both.  He was attributing his leaving

 1    DaVita to Mr. Thiry and attributing his difficulty in finding a

 2    new job in the same industry to Mr. Thiry?"

 3          Answer:  "That's possible."

 4          And so then we find out that not only is Dennis Kogod

 5    at least what he said to the agents, that they recorded in the

 6    302, attributing bad -- things -- bad things what happened to

 7    him, attributing them to Mr. Thiry, not only that, but when

 8    Agent Hamel reached out -- do you remember that testimony?  He

 9    reached out to Mr. Kogod.  And he couldn't remember exactly how

10    he did it, if he left a business card or if he left a

11    voicemail.

12          But then later there was a conversation with

13    Agent Hamel where he talked about -- with Guy Seay, how he

14    called Guy Seay, but he never returned the call.  And then I

15    think he was asked, you know, does that happen often?  Oh, a

16    lot worse than that.  You should hear some of the things people

17    say to me, and then they hang up on me.  Well, what reaction

18    did Agent Hamel get from Mr. Kogod's attorney?  His attorney

19    represented to Agent Hamel that Mr. Kogod -- I'm showing

20    Agent Hamel to refresh his recollection what was represented to

21    him.

22          Agent Hamel says, "I can see that his attorney wrote

23    the word 'eager.'  I know that Mr. Kogod, generally speaking,

24    was willing to cooperate with the government.  Yes."  Without

25    knowing what the investigation was, he was chomping at the bit

1    to come in and work with the government.

2          And why was that so important to the Division?

3    Because Dennis Kogod was the only person to say the magic words

4    that the Division needs to get a conviction in this case.

5    Dennis Kogod was the only person who said, "What was the

6    purpose of those agreements?"

7          Answer:  "To ensure that these other companies were

8    unable or precluded or prevented from reaching out to,

9    contacting, presenting to any DaVita executive, to make it

10   impossible to hire a DaVita executive."

11         Now, that's market allocation.  Right there is market

12   allocation.  Now, we know that's not true.  We saw all the

13   movement; we saw all the recruiting.  We know that is a lie

14   that he told in this courtroom.  Whatever his motivation was,

15   we know it's not true because it's in direct contradiction to

16   the documents and the testimony of the other witnesses.  And we

17   know that because -- and I'm not going to go back over these

18   now, because Mr. Dodds did do it -- go through all of these.

19   Jeannie Chen from Hazel told us, she could hire anyone she

20   wanted.  Same thing, she understood as the head of operations,

21   there weren't any restrictions on who she wanted to hire,

22   including from DaVita.  But, of course, we never saw Jeannie

23   Chen.  This is my cross-examination of Agent Hamel.

24         We did hear from Rich Whitney.  Rich Whitney said,

25   "Were you in any way hindered in pursuing the employees that

1    were" -- I said -- let me back up.  "And this commitment that

2    you made, was the purpose of the commitment, while it would

3    inhibit you from actively soliciting employees who were not

4    looking to leave, it in no way hindered you in pursuing

5    employees that were looking to leave?"

6           Answer:  "I think that's right.

7           "Again, is it true, sir, that you never felt that

8    there were people at DaVita that you wanted to hire but could

9    not because of the agreement?"

10          Answer:  "I can't think of any examples where that

11   would have been the case."

12          Direct contradiction to what Dennis Kogod said, and

13   it's Rich Whitney who can tell you what was in his mind.

14          And we even spoke, Mr. Whitney and I, about a

15   gentleman named Cameron Cleeton.  And Mr. Dodds covered it, but

16   there is another part to the Cameron Cleeton story.  That once

17   he got to Radiology Partners, he recruited Bowie Remaley, Paul

18   Catlett, and Carrie Copeland, all from DaVita.  According to

19   Mr. Kogod, that can't have happened.  They were completely off

20   limits.  It was impossible for them to get out of the village.

21   As soon as Mr. Cleeton came to DaVita from Radiology

22   Partners -- and this was during the period where Mr. Whitney

23   had made a commitment to Mr. Thiry -- as soon as he came, he

24   recruited some of his friends from DaVita.

25          And we heard from Andrew Hayek that his arrangement

 1    with Mr. Thiry did not prohibit SCA from hiring people from

 2    DaVita.  The agreement did not prohibit DaVita from hiring SCA

 3    people.  Completely opposite of what Dennis Kogod told us.

 4         So what else did he tell us?  He told us about Julio

 5    Quinones.  And he made it sound like Mr. Quinones was so

 6    trapped in the village, he never even got to go to Hazel.  Now,

 7    we know that's not true.  And, again, Mr. Dodds covered it; so

 8    I will go through very quickly today.

 9         We established that Agent Hamel actually interviewed

10    Mr. Quinones.  Mr. Quinones said that while he told Mr. Thiry

11    it was not a requirement implemented by Mr. Thiry, that he did

12    it because he felt it was professional courtesy.  The right

13    thing to do.  And we have the actual document -- this is

14    Exhibit A015 -- where Mr. Quinones is writing to Mr. Thiry to

15    let him know that he wants to leave.  Again, the complete

16    opposite of what Dennis Kogod said.

17         And Mr. Dodds already showed you that as a result of

18    Mr. Quinones saying he wanted to leave, DaVita competed for him

19    and made an offer to him.  He chose to go, instead, to Hazel.

20    That was his choice.  And what we saw here was meaningful

21    competition between DaVita and Hazel.

22         And, again, we have Mr. Kogod telling us how poor

23    Mr. Lee, how he was a victim of character assassination, that

24    as soon as -- according to, under oath, Mr. Kogod, that he

25    believed that when Jung made it clear that he wanted to leave,

1       there was an effort to assassinate his character.

2               And I asked Mr. Kogod, Were you aware that well before

3       he said he wanted to leave, there had been an anonymous -- you

4       know, companies have these hotlines, where if something happens

5       and people don't like it, they can report anonymously and say,

6       unfortunately, Jung had a few too many drinks at the firm

7       function or the company function the other night.

8               And so April 21 -- and you're going to see a document

9       in a minute to show -- this is a month before he ever says he's

10      thinking about leaving, there had been an anonymous complaint

11      that Mr. Lee had overindulged in the recent surf and sun

12      division meeting.  That's what happens when you get too much

13      sun.

14              So Mr. Kogod didn't even know -- he gets up here and

15      tells you that there was this character assassination; and he

16      didn't even know that a month before Mr. Lee told anybody he

17      was thinking of leaving, there had been an anonymous complaint.

18      And, obviously, it must have been investigated, because,

19      according to Mr. Kogod, "As soon as Mr. Lee" -- this is Kogod's

20      words -- "as soon as Mr. Lee said that he wanted to leave, he

21      was, quote, toast, unquote.  Does that sound like something

22      you'd say?"

23              Answer:  "That's reasonable."

24              Now let's look at what really happened.  Here is the

25      document.  This one is Exhibit A779.  Scott Doniger on June 2,

1  two months after the anonymous complaint, to Dennis Rechtin.

2  "Dennis, I spoke -- I'm sorry -- to Dennis Kogod, and a cc to

3  Jim Rechtin.  "Dennis, I spoke with Jung today regarding the

4  Inland Empire.  I think he left pretty excited" -- I won't read

5  the whole thing, but the bottom line, you may remember, is that

6  Mr. Lee said he was thinking of leaving, and DaVita started

7  this, how about this?  How about this job?  How about this job?

8  What about Las Vegas?  Would you be interested in the Inland

9  Empire?  They competed hard to keep Mr. Lee there.  He was the

10  opposite of having become toast.

11        And Mr. Lee was really appreciative of it.  This is

12  Mr. Lee in his own words to Mr. Kogod, of all people.

13  Apparently Mr. Kogod forgot this.  He said to Mr. Kogod, "I

14  wanted to thank you for the open, direct dialogue.  It is

15  greatly appreciated.  I had a discussion with the family,

16  Tanya, Lucas, Sasha, last night about LV" -- Las Vegas.  "I was

17  proud to be able to start by letting them know that the company

18  I work for wants to make sure my kids don't miss their Daddy."

19        Does that sound like somebody who is toast as far as

20  DaVita is concerned?  It's just the opposite.  And he went on

21  to describe to Mr. Kogod how excited he was of the opportunity

22  that DaVita was offering him.

23        And, in fact, I said to Mr. Kogod, "Isn't it true,

24  sir, that Mr. Lee ended up staying at DaVita and became senior

25  vice president of HealthCare Partners in Southern California?"

 1              Dennis Kogod tried to portray Mr. Lee as a victim,

 2     when he was the exact opposite.  This was meaningful

 3     competition, which is exactly how it's supposed to be.

 4              So you would think that the Division, knowing that the

 5     documents don't support what Dennis Kogod said, knowing that

 6     the testimony doesn't support what Dennis Kogod said, that the

 7     interviews don't support what Dennis Kogod said might walk away

 8     from him.  But, instead, they doubled down.

 9              Agent Hamel was asked, "Did you find Mr. Kogod

10     credible when you interviewed him?

11              "I did.

12              "Why did you find him credible?

13              "Well, because what he said matched up not only with

14     documents" -- we just saw it did not -- "and matched other

15     witness statements."  We just saw, it did not.

16              Why did the Division have to double down on Dennis

17     Kogod?  Because he's the only person that came in this

18     courtroom and said the magic words that would equal market

19     allocation.  Because nobody else would say it, because it

20     didn't happen.

21              And it's even worse than that.  The Division knew that

22     Dennis Kogod had a reputation for not being truthful.

23              Here is my cross-examination of Agent Hamel:  "You

24     learned during the course of your investigation that -- at

25     least according to Mr. Hughson, that based on a number of

1   interactions he had with Dennis Kogod, he did not have a high

2   opinion of him; correct?

3            "Generally speaking, yes.  I think that's true."

4            He -- meaning Mr. Kogod -- Mr. Hughson saying that

5   Mr. Kogod was a person of low integrity.

6            "Yes, that's what is written.

7            "That, in fact, if we go to page 5" -- I'm showing the

8   302 -- "that" -- according to Mr. Hughson -- "Mr. Kogod had

9   lied to people at DaVita.

10           "Well, Mr. Hughson thought Mr. Kogod had lied.

11           "Yes.  This is all according to Mr. Hughson,

12   obviously.  Mr. Hughson thought that Mr. Kogod had lied to

13   people at DaVita; correct?"

14           Answer:  "Yes."

15           "Mr. Kogod, according to Mr. Hughson, misrepresented

16   in a number of cases to paint himself in a positive light;

17   right?

18           "Yes.

19           "And, in fact, he" -- meaning Mr. Hughson -- "relayed

20   to you that Mr. Kogod had lied to Mr. Thiry about he and

21   Mr. Hughson; correct?

22           "Correct.

23           "And as a result of what Mr. Mr. Kogod said to

24   Mr. Thiry, didn't, according to Mr. Hughson, he would lose his

25   entire bonus for the year?"

 1          That is the kind of man that the Division puts up for

 2    you to base a verdict of beyond a reasonable doubt.  That in

 3    and of itself is a reasonable doubt that runs throughout the

 4    entire proof.

 5          And what did the Division do?  Did they go to

 6    Mr. Kogod and say, you know, we've heard some really disturbing

 7    things about you and your reputation for truthfulness?  Did

 8    they confront him?  Did they do a background check?  Did they

 9    try to figure out who they're dealing with here?  Should he be

10    trusted?  Should he be put up there, take an oath, and look at

11    you ladies and gentlemen in the eye?  No, they didn't.  They

12    just decided to take him at his word because they liked his

13    word.

14          Now, how else was this investigation conducted?

15    Remember the whole thing about the recording or lack thereof of

16    the interviews?  So I asked Agent Hamel whether or not

17    interviews are recorded in this case, and the answer was no.

18    And then I said, well, some of them, because of COVID were on

19    WebEx.  And he said, Well, I don't know that I've ever recorded

20    in WebEx or any other videoconference.  I'm not sure how much

21    trouble that would be.  I don't know.

22          And I said, you don't know whether there is a little

23    button that says "record" and a light blinks and says "this is

24    being recorded"?  I don't know that.  So apparently that's

25    missing at Quantico, and hopefully they will have a class on

1     that.

2          So I asked what the reason might be, Why would you not

3     record?  Because if it was recorded, then we would know not

4     only what the witness said -- right?  Now, we know supposedly

5     what the witness said because of the 302.  What is missing is

6     what the questioner said.  What they asked, how they asked it,

7     and the tone that they asked it.  Was it a question that

8     suggested the answer?  Was it a question that suggested they

9     didn't like the answer?  Was it a question that let the witness

10    know what the Division wanted to hear?  If we had a recording,

11    we could play it, and we could all hear it.  But it never

12    happened.

13         But what is strange is, one of you asked -- it was --

14    there was already a question about recording.  And then His

15    Honor is asking Agent Hamel a related question, "How often does

16    the FBI record interviews?"

17         And Agent Hamel said, "Well, it's hard for me to say

18    kind of blanket how much.  I've done it in maybe five or

19    ten percent."

20         So we do know that Agent Hamel knows how to record,

21    just not in this case.  And he was asked, Well, then -- His

22    Honor asked, "Well, if you do it once in a while, how do you

23    decide whether or not to record?"

24         And the answer is right at the bottom, "If I think a

25    witness might lie to me, I might consider recording them."

1           Well, how do you know if somebody is going to lie

2    until you start talking to them?  And if you're talking to

3    them, you think they're lying, you say, Oh, wait a second.

4    That's a whopper.  I want to start recording.  Not terribly

5    credible.

6           Now, we continue with -- actually, Mr. Dodds has

7    already done this.  We know Julio Quinones was interviewed.

8    Julio Quinones did not say what the Division wanted to have him

9    say.  He was never brought to Court.

10          We know that the founder -- the co-founder of Hazel

11   was interviewed and said, as far as he knew, there was no

12   agreement about not hiring from DaVita or any conditions about

13   not hiring from DaVita.  And, again, he was not brought to

14   court.

15          This one actually kind of turned out to be

16   interesting, going back to the recording.  So I asked

17   Agent Hamel, "So after Mr. Woods made that representation to

18   you, is it correct that the interview was terminated and he" --

19   Mr. Woods -- "was told to keep the nature of the interview

20   confidential?"

21          And Agent Hamel said, "Well, the reason I'm hesitating

22   is because these 302s aren't always sort of laid out in order.

23   So, generally speaking, yes; but I don't know the exact order

24   of how that played out."

25          And I said, "Well, but if we had a recording, we'd

```
 1   know exactly; is that right?"

 2             And his answer was, "I suppose that's true.  Yes."

 3             Another reason why it's so important to record.  Can

 4   you imagine if the co-founder of Hazel is telling the case

 5   agent that there is no agreement between Hazel and DaVita --

 6   Count 2 -- and all of a sudden we hear on the recording, well,

 7   that's enough.  Thank you very much.  Have a nice day.  And by

 8   the way, don't tell anyone about this interview --

 9             MS. CLINGAN:  Objection, Your Honor.

10             MS. BROOKS:  Wouldn't we like to hear that?

11             THE COURT:  What's your objection?

12             MS. CLINGAN:  First, this has been going on for quite

13   a while.  But, second, to suggest that there is something

14   improper about the lack of recording has been going on for many

15   minutes now.

16             THE COURT:  Okay.  It's a closing argument.  But it

17   has been going on for quite a while.

18             MS. BROOKS:  I'm doing my best, Your Honor.  I'm

19   almost there.

20             All right.  You know, with that kind of sloppy

21   investigation, no one was safe.

22             Do you remember Mr. Lombardo?  He came in here.  He

23   had no immunity agreement.  All he wanted to know is what he as

24   a recruiter should or should not be doing.  And so he -- for

25   some reason -- there we go.  And so he asked the Division, the
```

1    antitrust division, what should I be doing?  What is right and

2    what is wrong?  What is okay and what is not okay?  And they

3    wouldn't tell him.

4         Now, just a couple of other quick things before we get

5    to the end.

6         One of the other instructions you're going to be told

7    about is the lawyers' statements and arguments are not evidence

8    and that their questions are not evidence.  So let's look at

9    what happened with Rich Whitney.

10        Mr. Whitney kept saying he had made a commitment to

11   Mr. Thiry -- not an agreement, but a commitment.  And the

12   questioner kept turning it into the words "gentlemen's

13   agreements."  He said "commitment."

14        Question:  "Was it important to you to demonstrate

15   your commitment to the gentlemen's agreement to Mr. Thiry?"

16        Mr. Whitney, "It was important to me to live up to the

17   commitment."

18        Question:  "Is this email consistent or inconsistent

19   with the gentlemen's agreement?"

20        Answer:  "I think it's consistent with the commitment

21   I made."

22        Try as they might -- and I think they brought out how

23   painful it was for Mr. Whitney to testify against his former

24   colleague and friend, Mr. Thiry.  It was painful because he was

25   having words shoved down his throat.  He didn't say

1   "gentlemen's agreement."  The questioner said "gentlemen's

2   agreement," and he kept saying "commitment."

3          Now, let me go to another subject.  There is a jury

4   instruction that says, "you should consider the testimony given

5   under a grant of immunity with greater care and caution than

6   the testimony of an ordinary witness."

7          Now, why is that?  Well, use your common sense,

8   because that's another jury instruction.  You know, there are

9   some things in this life that can be bought and some things

10  that can't.  For example, one could acquire a house; but you're

11  not buying a home.  You might acquire an escort, but you can't

12  buy love.  And you might acquire testimony, but you can't buy

13  the truth.

14         And how many of the witnesses that the Division

15  brought to us were brought to us under conditions of immunity?

16  Dennis Kogod, Michael Rucker, Dr. Bridget Fanning, Dr. Anthony

17  Gabriel, Andrew Hayek, Rich Whitney.  And what sword was

18  hanging over their head?

19         This is the Radiology Partners' conditional leniency

20  agreement.  It says that in the event that a covered employee

21  fails to comply fully with their obligations, then the

22  agreement is void.  Who decides that?  The antitrust division.

23  If I think they're not telling the truth, I can't revoke their

24  agreement.  If you think they're not telling the truth, you

25  can't revoke their agreement.  The only people that can decide

1    if they like the truth is the antitrust division.  And if they

2    do revoke it, there shall be no judicial review of any

3    antitrust decision to revoke any conditional non-prosecution

4    protection.

5              That was the sword hanging over the head of

6    Mr. Whitney when he testified.

7              Andrew Hayek's agreement required him to do more than

8    just testify.  This is right out of Mr. Hayek's

9    nonprosecution -- agreement not to prosecute, GX285.  In

10   addition to having to testify, Mr. Hayek had to agree to

11   affirmatively investigate, including recording conversations.

12   So apparently Mr. Hayek was going to learn how to record

13   conversations if, in fact, the Division ordered him to.  And so

14   hopefully they would show the little red button.

15             Now, there was more -- you know, I'm going to skip

16   over all of this.  This is the Cameron Cleeton, making it sound

17   like he was a victim.  He wasn't.

18             Actually, this one is worth just spending one moment

19   on.  So Mr. Kogod is shown an email.  And in that email he is

20   shown a bullet point where it talks about risks and a perceived

21   disloyalty.  It says -- this is the question from the Division.

22   "And the third bullet point, Mr." -- this should say Hughson --

23   "writes, 'As someone myself believes I've suffered retribution

24   because of perceived disloyalty, I understand the risk that I'd

25   be asking people to accept.' Can you explain what he means by

1   the risks?"

2          And Mr. Kogod talks about the risks based on telling

3   your supervisor.  That wasn't -- so Mr. Kogod is asked what

4   Mr. Hughson is thinking when he wrote that third bullet point.

5   Well, it turns out the Division -- and this is the email

6   right here, GX279 -- it turns out the Division knew exactly

7   what Mr. Hughson was thinking in that bullet point because they

8   asked him.  And what Mr. Hughson said was -- I'm sorry -- what

9   the Division learned in their interview of Mr. Hughson was

10  that, according to Mr. Hughson, the retribution he had suffered

11  at DaVita related specifically to Kogod, as did the perceived

12  disloyalty and risks referenced in the email.

13         Then I have a whole module on Dr. Fanning.  I'm going

14  to skip it.  But it is where Andrew Hayek says to her, nobody

15  is off limits.  They just need to tell their supervisor.  And

16  it makes her job more difficult; and so she tells Andrew Kay,

17  you're off limits.  Do you remember that?  It wasn't Andrew

18  Hayek that told her that.  Bridie Fanning decided to say it was

19  a no-go.

20         Let me see if I can skip to -- let's skip, if we can,

21  to slide 90.

22         Actually, mine is probably at a different numbering,

23  FBI and Division --

24         So this is about Andrew Kay.  Do you remember?  It

25  really sounded like he was a victim.  It was really sad.

1   Ms. Fanning said, you know, I told him no.  "Did you ever hear

2   from him again?"

3         "No.  I never even got his resumé."

4         Well, the Division knew the truth, because, once

5   again, Mr. Kay had been interviewed.  And the Division learned

6   from Mr. Kay that he had been transparent with his supervisor

7   about his desire to advance -- I think "degree" should be

8   "career" -- with or without DaVita.  And he didn't feel obliged

9   that he had to tell his supervisor.  He felt inclined to tell

10  his supervisor.

11        And what happened after he told his supervisor was, he

12  got a promotion.  And specifically -- and, again, the 302

13  doesn't show the question.  But someone must have asked him,

14  Oh, but don't you think you were a victim?  And he specifically

15  said he did not consider himself a victim, because the way the

16  events unfolded, they unfolded well for him by staying at

17  DaVita.  That's what he told the Division.

18        Okay.  If I can just have one moment, Your Honor.  I'm

19  trying to get through this as fast as I can.  Let me see where

20  I can skip to now.

21        So this is another instruction.  "To prove that a

22  conspiracy existed, the evidence must show that the alleged

23  members of the conspiracy in some way came to an agreement or

24  mutual understanding to accomplish some unlawful purpose."

25        And, actually, Mr. Dodds already showed you this.

1    I'll only take a second.  We actually had Rich Whitney tell us

2    just the opposite, that, in fact, they didn't come to an

3    agreement.  They agreed to disagree, and that there was no

4    meeting of the minds.

5            But there is another important point here.  The

6    count -- and the government has to prove every element.

7    Count 3 is not just senior executives, the way Count 1 is; it's

8    all employees.

9            So did Rich Whitney have in his mind when he made this

10   commitment to Kent Thiry that it would apply to all employees?

11   Here is what I asked Mr. Whitney:  "And as far as the

12   commitment that you were making to Mr. Thiry, in your mind" --

13   remember, this is intent now -- "did this commitment focus on

14   senior-level employees at DaVita?

15           "In my mind, it did."

16           This alone is a failure of proof as to Count 3, that

17   results in a not guilty.  Just that in and of itself.

18           Very quickly, as far as -- because you've seen this

19   before, about the allocating the market, that it has to seek to

20   end meaningful competition.

21           So now we come to the testimony of Dr. Cremieux.  And,

22   as he said, those were amazing questions that you had.  But one

23   thing I want to point out.  When evaluating his testimony, we

24   have no burden of proof at all.  We didn't need to call him.

25   And based on how long it took, we probably shouldn't have

1   called him, and we could have all been gone yesterday.  But we

2   did call him so you could hear the data, because we promised

3   you that you would hear some data.

4          And what is interesting is, Dr. Cremieux said he gave

5   the Division all of his data a year ago.  They had all of this

6   time to come up with a rebuttal expert to Dr. Cremieux, the

7   party who has the burden of proof.  Nobody.  Nobody.  They

8   could have had someone come up and say, oh, no, no.  He missed

9   this.  He cherrypicked.  He used the wrong methodology.  Look

10  here.  Look there.  Nobody.  We had no burden, and yet we put

11  on Dr. Cremieux so you could hear all of the evidence.

12         Now let's go if we could very quickly --

13         This is the very last module, Your Honor.

14         I want to talk quickly about intent and purpose and

15  what the evidence showed as to Mr. Thiry.

16         Now, I know counsel for DaVita has called Mr. Thiry a

17  few unpleasant things; and, certainly, some of those emails

18  show that he can be a bit of a hot head.  Maybe he should think

19  a little bit more before writing.  That's not a crime;

20  otherwise, half the men I know would be in prison.  However,

21  the question is intent.

22         Let's look at the whole Kent Thiry that we learned

23  about in court.  Rich Whitney -- let's go back a little and see

24  how that relationship developed.

25         "Am I right that you joined in 1995" -- that's Renal

1    Care.

2              "Yes.

3              "And at that point in time, what was the name of

4    DaVita?

5              "Total Renal Care.

6              "And Mr. Thiry joined in 1999."  And I said, "What was

7    the economic shape of Total Renal Care at that point in time?"

8              Answer:  "It was in significant distress."

9              Question:  "Did Mr. Thiry, if you know, make any

10   contribution toward turning that around?"

11             Answer:  "Yes, of course."

12             And then I asked him to tell you about it.  And

13   Mr. Whitney said, "Kent over the course of many years

14   transformed that business from one that was failing

15   financially, was devoid of significant positive culture, and

16   was very financially oriented, as opposed to patient oriented,

17   and he turned that company into one of the premier healthcare

18   services businesses in the U.S., that is both successful

19   financially and contributing substantially to taking care of

20   various sick patients."

21             And we saw people writing, like Mr. Whitney, in

22   realtime to Mr. Thiry back in January of 2014, thanking him for

23   all of his mentorship, helping Rich Whitney to go on and make

24   the healthcare world a better place.

25             And I asked Mr. Whitney, "Did you mean that when you

1    said it?"

2            He said, "Absolutely.

3            "Do you still feel that same way today?

4            "Yes."

5            So the Division would have you believe that somehow

6    Mr. Thiry bullied people into doing things that they didn't

7    want to do.  Rich Whitney would not have those feelings about

8    Kent Thiry if that were true.

9            We also had Andrew Hayek tell us that he learned

10   something about being a CEO from Mr. Thiry.  And what did he

11   learn?  This is Mr. Whitney, because he listed for us the

12   village values.

13           So you've heard about the village.  It's where

14   everybody -- no one is outside.  Everybody is part of the

15   village.  Everybody counts.  It's kind of like, interestingly,

16   when you go in the jury room, you each are going to speak with

17   an equal voice.  No matter what your position, no matter what

18   your gender, no matter what your age, you all speak with an

19   equal voice.  And that's how the village values were.  That's

20   why they called themselves the village, because everybody was

21   part of the village.

22           And here were the values:  Teamwork, continuous

23   improvement, accountability, fulfillment.  And, I know, a lot

24   of companies have these mission statements; and they sound like

25   a bunch of hot air.  But Mr. Whitney told us, no, they really

1    lived by it.  He lived by it, and Kent Thiry lived by it.

2              THE COURT:  I need to ask you to give Ms. Clingan a

3    chance to make a rebuttal.

4              MS. BROOKS:  I will, Your Honor.  I'm going to wrap up

5    right now, then.  But, Your Honor, this is very important.

6    This is Mr. Thiry's, so if Your Honor would indulge me for five

7    more minutes, please, on behalf of Mr. Thiry.  None of this has

8    been said on his behalf.

9              May I continue, Your Honor?

10             THE COURT:  Yes.  But you've already gone over the

11   amount of time you said you were going to take.  So make your

12   very important point, but then it's also important to hear from

13   Ms. Clingan and for me to give the last instruction to the jury

14   and so forth.

15             MS. BROOKS:  Understood, Your Honor.

16             Mr. Rucker also had amazing things to say about

17   Mr. Thiry, but here is the most important parts.

18             Mr. Thiry believed -- and this is contemporary

19   emails now, not done for this trial -- about planting seeds,

20   meaning, executives going out, not being behind the walls of

21   the village -- executives going out and planting seeds in other

22   companies and making it a better overall -- healthcare better

23   overall, and sending ripples.

24             And Mr. Whitney told us what "sending ripples" meant.

25   And what it meant was that, "DaVita had become quite a unique

1    developer of talent, quite a unique mission-driven,

2    patient-oriented culture and was therefore developing lots of

3    capable leaders that had the potential to impact other parts of

4    the healthcare field for the benefit of the patients.  And when

5    an executive left DaVita and went on to do that, the idea was

6    that sent ripples from DaVita throughout the rest of the

7    healthcare community, and that was a good thing."

8            That, ladies and gentlemen, is the opposite of market

9    allocation.  The literal opposite.  And that -- all Mr. Thiry

10   ever asked was for an opportunity to compete fairly, to keep

11   his talent; and if not, then they would become part of the

12   ripples.  They would become part of the seeds.

13           And how do we know that?  Basak Ertan, when she

14   left -- and they really tried to keep her -- she met with

15   Mr. Thiry.  She said he was sentimental, remembering the old

16   days, but he focused on wishing her well, he emphasized the

17   importance of keeping in touch, including that maybe if he was

18   looking to hire a female executive, he could send her to

19   Ms. Ertan for a reference.

20           And so this is the final instruction that you will be

21   given.  As I mentioned, you each speak with an equal voice.  I

22   have to sit down now.  I don't want to.  I feel like I've held

23   Mr. Thiry's future in my hands.  I'm turning it over to you.  I

24   thank you so much for all the time and attention that you have

25   given this case.

1          Thank you.

2          *THE COURT:* All right.  Thank you.

3          Ms. Clingan.

4          *MS. CLINGAN:* Your Honor, I would endeavor to be as

5 brief as possible in responding to three hours of argument.

6 Could I ask --

7          *THE COURT:* Well, a good way to start that is by

8 starting it.

9                      **REBUTTAL ARGUMENT**

10          *MS. CLINGAN:* Well, then, let's do it.

11          Ladies and gentlemen of the jury, how do you allocate

12 a market?  If a CEO wants to stake his claim to his employees,

13 how would he do that?  You might not have known the answer to

14 that question when you got up and came to jury selection last

15 Monday, but you've had a master class in how it's done since

16 then.

17          You find a company that is attractive to your

18 employees, and you reach explicit rules with the CEO of that

19 company to dictate the exact circumstances under which that

20 company can talk to your people, and you make sure the first

21 rule is no recruitment.  Now, you've seen the rules that the

22 defendants and their co-conspirators put in place in this case.

23 Those rules are explicit, and those rules are clear.  There is

24 a word for that conduct.  It's called conspiracy.  And it's the

25 crime the defendants are charged with.

1683

1          Now, for all the argument you've seen over the last

2    week and a half, this is actually a pretty straightforward

3    case.  Defendants and their co-conspirators in their

4    underhanded pursuit of control over their employees generated

5    mounds of evidence detailing the purpose of the conspiracies

6    they are charged with entering.

7          You saw how they described those agreements in

8    realtime, turning candidates away, denying employees

9    opportunities that would otherwise be available to them, or

10   making those employees jump through hoops, just to be

11   considered for opportunities for which they were well

12   qualified.

13         Now, to Kent Thiry and the CEOs he conspired with,

14   that might not be a big deal.  You basically heard that from

15   them this afternoon.  After all, they've already had all the

16   opportunity in the world.  But for the employees who worked

17   hard to gain experience, to gain opportunities, who wanted to

18   be in the best job that they were qualified to be in, these

19   conspiracies had a real impact.

20         Like I said, this is actually a pretty straightforward

21   case.  Defendants certainly can't deny that the agreements

22   existed.  And so, instead, they've tried to muddy the waters,

23   tried to pull your attention to things that just don't matter.

24         Let's talk about why defendants' arguments just don't

25   matter.  And let's start with the witnesses that you heard from

 1    and the witnesses that you didn't.

 2           Now, it's true, the United States did not call as a

 3    witness to testify every single person who might have had some

 4    information about this case.  This case has to close sometime.

 5           Now, Mr. Dodds suggested that there might be something

 6    weird about that.  Now, the United States alone has the burden

 7    to prove this case; and the defense has no such burden.  But

 8    neither party owns any witness.  Defendants also have the

 9    ability to subpoena witnesses to come testify.  Keep that in

10    mind.

11           Let's talk about the recordings.  Now, Mr. Walsh

12    acknowledged in questioning Agent Hamel, there is an FBI policy

13    that governs recording.  And defendants in closing suggested

14    that there might be something improper about that.  Ladies and

15    gentlemen, if you're upset that you didn't get to listen to

16    recordings, let me suggest that you got something a whole lot

17    better -- live testimony, in person, from witnesses who you

18    also got to question.

19           Defendants next tried to argue that the conspiracy

20    didn't end all competition for employees.  And let me just

21    point your attention to the jury instructions.  Now, first,

22    you'll see in Jury Instruction No. 15 that defendants didn't

23    intend -- have to intend to end all competition for employees;

24    they just had to intend to end meaningful competition.

25           And I'd like you to also pay very close attention to

1    Jury Instruction No. 14.  That's the jury instruction that the

2    defendants did not show you.  To find the defendants guilty in

3    this case, you don't have to find that the defendants ended all

4    competition for employees, you don't have to find that the

5    defendants' conspiracies worked perfectly, you don't have to

6    find that the conspiracies worked at all.  You just have to

7    find that the defendants entered into the conspiracies and that

8    in doing so, the defendants sought to end a meaningful

9    competition between themselves and SCA and Hazel and RAD

10   Partners.

11         And in this case, you have heard so much more than

12   that.  You've heard that more than just intending to stifle

13   competition, the conspiracies actually did stifle competition.

14   Remember Jordan Thau, Craig McKessar, Elliot Holder?

15         Now, I wasn't surprised to hear from defense counsel

16   this afternoon that defendants don't see these men as victims.

17   Defendants have never cared about how their conspiracies

18   affected the employees.  You don't have to find that these men

19   were victims either.  You just have to find that competition

20   for these employees were stifled.  And in doing so, consider

21   every other DaVita employee who didn't want to raise their hand

22   and make it known, stick their neck out, let people know that

23   they were actively looking to leave.

24         It is telling that of the 30,000 some odd employees

25   who were at DaVita during the conspiracy period, their million

1    dollar expert found barely 30 who were able to make the leap

2    from SCA -- to SCA or Hazel or RAD Partners during the

3    conspiracy period.  In five years, just one.  One lucky soul

4    was able to make the jump to SCA, a company who Bridie Fanning

5    told you would have loved to be recruiting from DaVita because

6    it was a great talent pool.  You don't need an expert to tell

7    you, that's astounding.  These were attractive companies for

8    DaVita employees, companies where DaVita employees had

9    relationships.

10           Now, through cherrypicked data, Dr. Cremieux tried to

11   make that look normal.  But do you remember Dr. Cremieux's

12   answer when he was asked, how do you know if your data is

13   cherrypicked?  His answer was, because the people who are

14   helping me with this are my friends.

15           And that brings me to defendants' next argument.

16   Defendants next tried to argue that their agreements were

17   somehow legitimate because the defendants and their

18   co-conspirators were friends, that some co-conspirators were

19   motivated by friendship.  And that's certainly true.  We know

20   Mr. Thiry leveraged his friendships and all of the access and

21   the financial benefits that his friendship conferred to coerce

22   these agreements into existence.  There is not a bro code

23   exception to the Sherman Act.  Just like Anthony told you, you

24   don't get to violate federal law with your friends any more

25   than you get to violate federal law with your priority

1687

1    strategic partner.

2           Also let me just tell you, people don't enter into

3    criminal conspiracies with their enemies or their casual

4    acquaintances.  They do it with people they know and trust,

5    their friends.

6           Next, you heard defendants try to justify the

7    opportunities they stole by arguing that the agreements were

8    influenced by the possibility of potential future business

9    transactions.  But the only company that defendants had any

10   business transactions with was SCA.  That's the company that is

11   charged in Count 1.

12          So if the no-poach conspiracies were really about

13   keeping business opportunities on the table, then why did the

14   defendants also have agreements with Hazel or RAD Partners or

15   IntegraMed or Spectranetics or Kindred?  The answer to that

16   question is obvious, because you heard it from the mouths of

17   the witnesses who were intimately familiar with the agreements

18   and with DaVita's business.

19          Dennis Kogod and Rich Whitney testified that the

20   agreements were totally unrelated to any business transaction

21   between DaVita and the other companies.  The only reason the

22   business transactions come up at all?  Mr. Thiry's practice of

23   smart communication.  Be careful how you put things in writing.

24   Mr. Thiry, trying to dress up his illegitimate agreements by

25   cloaking them in language to suggest that they were related to

1    some future business transaction.  And the people who were

2    tasked with carrying these conspiracies out followed his lead.

3            Bridie Fanning told you she was embarrassed to have to

4    implement these agreements, and so she used the same false

5    dress-up language that Mr. Thiry used.  But to really get to

6    the point of why the business transactions don't matter,

7    because you don't get to collude just because it might be good

8    for your business, just like agreeing with a competitor to

9    raise the prices that you charge to customers might be good for

10   business, the Sherman Act says, executives don't get to do

11   that.

12           But if you're still on the fence about whether or not

13   the defendants were motivated by friendship or feelings or

14   business, just take a look at Jury Instruction No. 16.

15   Allocating a market does not have to be the only purpose for

16   the conspiracies.  It can be true that some of these

17   co-conspirators were motivated by their genuine friendship with

18   Mr. Thiry or were motivated by potential future business

19   transactions.  All that matters is that you find that a purpose

20   of the conspiracy was to allocate the market, and you have

21   heard so much evidence that that is true.

22           Also what matters here is the defendants' intention.

23   So keep that in mind when you reflect on Mr. Hayek's testimony

24   or Mr. Whitney's testimony.  What matters here is that one of

25   the defendants' purposes was to allocate the market.

1        Now, defendants next tried to argue that the no-poach

2   conspiracies actually might have helped competition, actually

3   might have helped them compete for employees or helped keep

4   them from losing their best players to people like Andrew

5   Hayek, who knew who the best players were.  And, of course,

6   companies want to keep their talent.  That's a given.  What

7   makes defendants' conduct a problem is the way they went about

8   it, by reaching illegal agreements with their competitors.

9   That's why they were charged.

10        While we're on the subject, you got to hear from Rich

11   Whitney, somebody who knows a thing or two about building a

12   business.  Mr. Whitney has created a $2 billion business with

13   9,000 employees, all without a single no-poach agreement that

14   applies to his employees.  Ladies and gentlemen of the jury,

15   you don't need a no-poach agreement with your competitors to

16   keep top talent.

17        Next, defendants tried to argue that the heads-up

18   provision might have helped employees to negotiate better jobs

19   or also might have helped defendants to better compete to keep

20   their people; but you know, that's not what this was about.  It

21   forced these employees to stick their neck out, to let their

22   boss know that they were looking for another job before they

23   even had a firm offer in hand.

24        You heard how Elliot Holder reacted to that.  He

25   panicked.  He told you he thought doing that, that complying

1  with the notify-your-boss provision, would jeopardize both

2  jobs.

3          And remember Dennis Kogod?  He told you what happened

4  to DaVita employees who make it known in DaVita that they want

5  to leave?  They were retaliated against.  He told you the

6  specific story about how all sorts of allegations against Jung

7  Lee became public only after Mr. Lee made it known for the

8  first time that he was considering options outside the village,

9  and that Mr. Lee was ultimately able to stay at DaVita because

10  it was Mr. Kogod himself who was so concerned about the

11  repercussions that Mr. Lee was going to suffer, that Mr. Kogod

12  offered him a job in his own division.

13          You saw examples of Mr. Thiry squirreling around

14  behind the scenes trying to get his competitors to pull his

15  employees' offers.  What you saw was not about defendants

16  caring about their employees; what you saw was about control.

17  The notify-your-boss provision wasn't to help employees.  It

18  wasn't a good thing.  It was a mechanism for policing the

19  agreement and scaring employees out of pursuing a job

20  opportunity.

21          And that's exactly what happened with Elliot Holder.

22  Now, had Elliot Holder actually been able to get a firm offer

23  from RAD Partners, defendants are absolutely correct, he might

24  have been able to leverage that offer to get better work out of

25  DaVita.  But Mr. Holder never got that chance.  And the reason

1   he never got that chance is because the conspiracies worked.

2   They scared him out of trying to pursue that opportunity.

3          I want to take just a second to talk about Count 2,

4   and that's the agreement with Hazel.  The documents on Count 2

5   are crystal clear.  They unequivocally reflect, in realtime,

6   Josh Golomb committing not to compete for DaVita employees.

7   That Julio Quinones was able to get an offer out of Hazel

8   before the conspiracy in Count 2, before the agreement between

9   Josh Golomb and Mr. Thiry is in effect, tells you nothing about

10  whether or not that agreement existed.  It doesn't call that

11  agreement into effect.  That defendants' own expert only found

12  two people who were actually able to make the leap from DaVita

13  to Hazel during the conspiracy period also doesn't call the

14  agreement into effect.  It proves the agreement worked.

15         And ask yourself, if Josh Golomb was really trying to

16  pull a fast one on Kent Thiry, then why did he tell people

17  other than Kent Thiry that he had this agreement?  Why did he

18  say "nobody at Rx today," he promised Kent?  Why in other

19  conversations was he living up to his end of the bargain.

20         Defendants next tried to argue that the agreements

21  weren't intended to allocate the market.  And, again, the

22  question here is not if the agreements intended to end all

23  competition.  The question is if the agreements intended to end

24  meaningful competition.  And the agreements did try to allocate

25  the market and did seek to end meaningful competition in three

1692

1     ways.  First, the no-active-solicitation provision.  Now, think

2     about what that means.

3          Now, defense counsel tried to argue that there were

4     lots of different ways that an individual could be recruited

5     besides active solicitation.  But what you heard was that for a

6     lot of these jobs, active solicitation was during the

7     conspiracy period the primary way that the job search was done.

8     Now for jobs that aren't publicly posted, active participation

9     is the only way a DaVita employee could find out about a

10    potential job opportunity.  Ending active solicitation took a

11    whole lot of opportunities off the table for DaVita employees.

12         Second, for DaVita employees who weren't actively

13    looking, the agreements rendered them completely off limits.

14    And, third, for DaVita employees who were actively looking but

15    weren't yet ready to make that fact known, they were off limits

16    too.  Each one of these provisions intended to stifle

17    meaningful competition between the companies, and defendants

18    did it threefold.

19         Now, defendants argue that no witness testified that

20    they intended to end meaningful competition.  And not in that

21    legalese, no, they didn't.  But you saw and heard so much

22    evidence in the way people really talk that the agreements

23    intended to allocate employees to their current employer, that

24    steps were put in place to make it harder for employees to

25    move.

1    Dennis Kogod, Mr. Thiry's right-hand man, the person

2    who was in the room for a lot of these conspiracies, told you,

3    the purpose of all of these conspiracies was to keep employees

4    at their respective employer.  Once you cross that bridge into

5    the village, there was no turning back.

6    Now, defendants tried to sully up Mr. Kogod.

7    Mr. Kogod, the man who after he stepped down as a formal

8    executive at DaVita, defendants themselves hired to stay on as

9    a consultant.  The guy who continued to get drinks with

10   Mr. Thiry well after he had left his executive role.  The guy

11   whose testimony you observed in person, and you observed how it

12   aligned with the documents that were formed about the

13   conspiracy in realtime.

14   Now that Mr. Kogod wasn't buddies with Bill Hughson, a

15   guy whose own credibility is highly questionable, tells you

16   nothing about whether or not the charged conspiracies existed.

17   Bridie Fanning told you, even if she really wanted to

18   consider a DaVita candidate, she couldn't.  Bridie Fanning

19   wasn't there when the agreements were formed; that's true.  But

20   Bridie Fanning was one of the key individuals who was tasked

21   with implementing the conspiracy.

22   Even Mr. Thiry's inner circle conceded that while they

23   may have been motivated to enter the agreement to keep

24   Mr. Thiry happy, the purpose of the agreements was to keep

25   employees at their respective employers.  That's from

1    Mr. Whitney.  That's from Mr. Thiry's friend.  That's a

2    conspiracy to allocate a market.

3         You also saw piles of documents created during the

4    conspiracy period.  Candidate after candidate, will not pursue.

5    Withdraw him.  Candidate turned off.  Candidate off limits.

6    Candidates caught in the hands-off.  And on and on and on.

7         Ladies and gentlemen of the jury, let's take this out

8    of lawyers' terms.  You see this, and what do you think

9    defendants were trying to do?  Dennis Kogod, Bridie Fanning,

10   Andrew Hayek and Rich Whitney, they all knew what defendants

11   were trying to do.  Nobody was confused about this.  Now

12   whether or not they or Jeff Lombardo or anybody else thought it

13   was wrong or improper then or now doesn't matter.

14        Let me just suggest, people who enter these types of

15   agreements are not and should not be the arbiters of right and

16   wrong.  And even if they were -- you saw the elements of the

17   crime.  That's in Jury Instruction No. 13.  And nowhere in

18   there do you see wrongfulness; in other words, we don't have to

19   prove that anyone then or now thought that this was wrong.

20        But let me just pose the question:  If Mr. Thiry

21   didn't think this was wrong, then why the need for smart

22   communication?

23        Ladies and gentlemen, maybe you don't think this

24   conduct is wrong, maybe you don't think it's a huge deal for

25   CEOs to conspire to keep employees where they're at.  But

 1   that's not how our economy is supposed to work.  People should

 2   have the personal liberty to make those decisions for

 3   themselves, not to have those choices dictated to them from on

 4   high.

 5            This case isn't about enforcing piddly little

 6   regulations meant to make business people's lives harder.  This

 7   job is about enforcing a federal law that has protected free

 8   market competition for over 100 years.  So when you receive

 9   Judge Jackson's jury instruction on your obligation to follow

10   the law and to apply the jury instructions that you receive in

11   this case, I ask that you take that obligation seriously.

12            *THE COURT:*  Ms. Clingan, would you try to wrap it up,

13   please.

14            *MS. CLINGAN:*  I am.

15            Ladies and gentlemen of the jury, you know what these

16   conspiracies were about.  The defendants reached these

17   agreements to make it harder for people to leave their village.

18   CEOs don't get to do this.

19            For the employees who were victimized by the

20   defendants' conspiracies, they never had a choice; but you do.

21   You can choose to hold the defendants accountable and find them

22   guilty on all three counts.

23            Thank you.

24            *THE COURT:*  Thank you.

25            All right.  It's hard when you have a cough, and here

1    you are in a roomful of people.  And I appreciate your hanging

2    in there.

3              So Instruction No. 21, folks.

4              In a moment, the bailiff will escort you to the jury

5    room.  All exhibits admitted into evidence will also be placed

6    in the jury room for your review.  When you go to the jury

7    room, you should select -- first select a foreperson, who will

8    help to guide your deliberations and will speak for you here in

9    the courtroom.  Next you might benefit from reviewing the

10   instructions.  Remember, although you are the judges of the

11   facts, you are bound by your oath to follow the law as stated

12   in the instructions.

13             To reach a verdict, whether it is guilty or not

14   guilty, all of you must agree.  Your verdict must be unanimous

15   on each count of the Indictment.  You will never have to

16   explain your verdict to anyone.  You must consult with one

17   another and deliberate in an effort to reach agreement if you

18   can do so.  Each of you must decide the case for yourself, but

19   only after an impartial consideration of the evidence with your

20   fellow jurors.

21             During your deliberations, do not hesitate to

22   reexamine your own opinions and change your mind if convinced

23   that you were wrong.  But do not give up your honest beliefs

24   solely because of the opinion of your fellow jurors or for the

25   mere purpose of returning a verdict.

1    Now, it's obviously late in the day.  I don't have

2 much more to say to you, except that you're on your own now.

3 And that means you can take breaks whenever you want; you don't

4 have to ask.  And that I would suggest might be a good time now

5 to take a break and come back fresh in the morning, but that's

6 up to you.  The only thing I will ask is that if you're not in

7 the deliberation room behind closed doors as a group of twelve,

8 don't talk about it.  That's got to be secret.  It's got to be

9 with all of you together.  Take your breaks, do whatever you

10 need, but that's an important thing.

11    As the instruction said, we'll get the exhibits put

12 together for you so that if you want to look at any exhibit or

13 all of them, for that matter, you'll have them.  Now, I can't

14 give you any more evidence.  The evidence is closed.  You have

15 a lot of evidence, but it's closed.  If you have a question and

16 ask for more evidence, I'm going to have to disappoint you and

17 say, can't do that.  But if you have a question about anything

18 else, maybe about an instruction or some issue you've got, just

19 write out your question -- the foreperson will write out the

20 question, contact Julie, she'll let me know, I'll discuss it

21 with the lawyers here, and I'll try to get you an answer if I

22 can.  Sometimes it takes a little while because I have to get

23 the lawyers on the phone or in the courtroom and make the

24 record that way; but we'll do the best we can to answer any

25 questions that you have.

1          Once you do have a verdict, what you need to do is to

2   notify Julie that you have a verdict.  Please don't tell her

3   what the verdict is.  She shouldn't know that.  Just tell her

4   you've got a verdict, and then we'll assemble people, and we'll

5   take your verdict.  Whomever the foreperson turns out to be

6   will not have to stand up and read the verdict.  Okay.  That

7   makes good theater on TV.  It sure does.  We've all seen it.

8   It also puts more pressure on the foreperson than is necessary.

9   Julie will take the verdict from the foreperson and bring it

10  over here, and I'll read the verdict.

11          Any questions?

12          *JUROR:*  Closing arguments -- you said that the closing

13  arguments are not part of evidence, but will we get to see the

14  content -- the transcripts?

15          *THE COURT:*  Probably not.  Probably you're going to

16  have to rely on your own memory, which makes it tougher.  But

17  that's generally how it works.  In fact, I don't think we'll

18  even have a transcript probably prepared by the morning of the

19  closing arguments.  The closing arguments lasted -- I counted

20  it, actually -- about three hours and forty-five minutes,

21  between the various speakers.  So -- but the evidence itself,

22  yes, you'll have that.  The slides, all of that stuff.

23          Now, I'm going to give an oath to the bailiff.

24          (Bailiff sworn.)

25          I'm going to give the bailiff my copy -- it's the same

 1    as yours.  We produced them off the same copy machine.  We'll

 2    consider that one to be the original, and hopefully you will

 3    fill that one out.  Use your copies for whatever you wish,

 4    scribble on them or whatever you want.  Same with your copies

 5    of the instructions; those are yours.  You can mark them up any

 6    way you want.

 7            With that and, again, with our great thanks for a hard

 8    job and a long job you've done not just today but for a week

 9    and a half, we thank you for that.

10            We'll be in recess at 5:09 for the jury to begin the

11    process of deliberations.  Let Julie know if you decide to go

12    home so we can all leave.

13            (Jury out at 5:09 p.m.)

14            *THE COURT:*  All right.  The jurors have been excused.

15    Does the government have anything further to put on the record?

16            *MS. CLINGAN:*  Nothing from the United States, Your

17    Honor.

18            *THE COURT:*  Do the defendants have anything further to

19    put on the record?

20            *MR. MELSHEIMER:*  We don't, Your Honor.

21            *MR. WALSH:*  We don't.

22            *THE COURT:*  All right.  So if you want to stick around

23    for a few minutes, I'm pretty sure they'll just go home.  I

24    hope so, but we'll let you know.  And we'll let you know when

25    they plan to come back and all of that.

1    You folks don't have to come back and sit around for

2    the length of the deliberation.  That's up to you.  What we do

3    need is to make sure we know how to contact you and get you

4    over here when needed.

5         With that, I wish you good luck and a good evening.

6    At least you can relax now.

7         (Recess at 5:10 p.m.)

8                        **I N D E X**

9    **Item**                                                **Page**

10   Rule 29 Argument                                       1534
     Closing Argument By Mr. Mariano                        1550
11   Closing Argument By Mr. Dodds                          1590
     Closing Argument By Ms. Brooks                         1650
12   Rebuttal Argument By Ms. Clingan                       1683

13   **Witness**                                             **Page**

14       PIERRE CREMIEUX
             Examination By The Court                  1491
15           Examination By Mr. Vigen                      1532

16

17                   REPORTER'S CERTIFICATE

18        I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
19

20        Dated at Denver, Colorado, this 12th day of May, 2022.

21                        _Therese Lindblom_

22                        _____
                          Therese Lindblom,CSR,RMR,CRR

23

24

25